# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FEDERAL HOME LOAN BANK OF
BOSTON,

                              Plaintiff,

    v.

ALLY FINANCIAL, INC. F/K/A GMAC
LLC; BANC OF AMERICA FUNDING
CORPORATION; BANK OF AMERICA
CORPORATION; BANK OF AMERICA,
NATIONAL ASSOCIATION; BARCLAYS
CAPITAL INC.; BCAP LLC; BEAR
STEARNS ASSET BACKED SECURITIES
I LLC; CAPITAL ONE FINANCIAL
CORPORATION; CAPITAL ONE,
NATIONAL ASSOCIATION; CHEVY
CHASE FUNDING LLC; CITICORP
MORTGAGE SECURITIES, INC.;
CITIGROUP FINANCIAL PRODUCTS,
INC.; CITIGROUP GLOBAL MARKETS
INC.; CITIGROUP GLOBAL MARKETS
REALTY CORP.; CITIGROUP INC.;
CITIGROUP MORTGAGE LOAN TRUST
INC.; CITIMORTGAGE, INC.;
COUNTRYWIDE FINANCIAL
CORPORATION; COUNTRYWIDE HOME
LOANS, INC.; COUNTRYWIDE
SECURITIES CORP.; CREDIT SUISSE
(USA), INC.; CREDIT SUISSE FIRST
BOSTON MORTGAGE SECURITIES
CORP.; CREDIT SUISSE HOLDINGS
(USA), INC.; CREDIT SUISSE
SECURITIES (USA) LLC; CWALT, INC.;
CWMBS, INC.; DB STRUCTURED
PRODUCTS, INC.; DB U.S. FINANCIAL
MARKET HOLDING CORPORATION;
DEUTSCHE ALT-A SECURITIES, INC.;
DEUTSCHE BANK SECURITIES INC.;
DLJ MORTGAGE CAPITAL, INC.; EMC
MORTGAGE CORPORATION; FITCH,
INC.; GMAC MORTGAGE GROUP LLC

Case No. 1:11-cv-10952-GAO

**AMENDED COMPLAINT FOR
RESCISSION AND DAMAGES AND
DEMAND FOR JURY TRIAL**

F/K/A GMAC MORTGAGE GROUP, INC.;
GOLDMAN, SACHS & CO.; IMH ASSETS
CORP.; IMPAC FUNDING
CORPORATION; IMPAC MORTGAGE
HOLDINGS, INC; IMPAC SECURED
ASSETS CORP.; J.P. MORGAN
ACCEPTANCE CORPORATION I; J.P.
MORGAN MORTGAGE ACQUISITION
CORP.; J.P. MORGAN SECURITIES LLC
F/K/A BEAR, STEARNS & CO. INC . AND
J.P. MORGAN SECURITIES INC.;
JPMORGAN CHASE & CO.; JPMORGAN
CHASE BANK, NATIONAL
ASSOCIATION; JPMORGAN
SECURITIES HOLDINGS LLC; MERRILL
LYNCH & CO., INC.; MERRILL LYNCH
MORTGAGE INVESTORS, INC.;
MERRILL LYNCH MORTGAGE
LENDING, INC.; MERRILL LYNCH,
PIERCE, FENNER & SMITH
INCORPORATED; MIT HOLDINGS INC.;
MOODY'S CORPORATION; MOODY'S
INVESTORS SERVICE, INC.; MORGAN
STANLEY; MORGAN STANLEY & CO.
INC.; MORGAN STANLEY CAPITAL I
INC.; MORGAN STANLEY MORTGAGE
CAPITAL HOLDINGS LLC; MORTGAGE
ASSET SECURITIZATION
TRANSACTIONS, INC.; MORTGAGEIT
SECURITIES CORP.; MORTGAGEIT,
INC.; NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA CREDIT &
CAPITAL, INC.; NOMURA HOLDING
AMERICA, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS
ACCEPTANCE INC. F/K/A GREENWICH
CAPITAL ACCEPTANCE, INC.; RBS
FINANCIAL PRODUCTS INC. F/K/A
GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC.; RBS HOLDINGS USA
INC. F/K/A GREENWICH CAPITAL
HOLDINGS, INC.; RBS SECURITIES INC.
F/K/A GREENWICH CAPITAL
MARKETS, INC.; RESIDENTIAL
ACCREDIT LOANS, INC.; RESIDENTIAL
FUNDING COMPANY, LLC F/K/A

RESIDENTIAL FUNDING
CORPORATION; STANDARD & POOR'S
FINANCIAL SERVICES LLC;
STRUCTURED ASSET MORTGAGE
INVESTMENTS II INC.; THE BEAR
STEARNS COMPANIES LLC F/K/A THE
BEAR STEARNS COMPANIES INC.; THE
MCGRAW-HILL COMPANIES, INC.; UBS
AMERICAS INC.; UBS REAL ESTATE
SECURITIES INC.; UBS SECURITIES
LLC; WAMU CAPITAL CORP.; WELLS
FARGO & COMPANY; WELLS FARGO
ASSET SECURITIES CORPORATION;
WELLS FARGO BANK, NATIONAL
ASSOCIATION; and DEFENDANTS JOHN
DOE 1-50,

                                   Defendants.

## AMENDED COMPLAINT FOR RESCISSION AND DAMAGES
## AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ............................................................................. 1

II.  EXECUTIVE SUMMARY ............................................................................. 3

    A.   PLMBS Defined............................................................................................. 3

    B.   The Bank Purchased Only the Highest Rated (Triple-A-Rated) PLMBS. ...................................................................................................... 4

    C.   The Mortgage Originators Who Issued Loans Backing the Certificates Abandoned Underwriting Guidelines and Issued Loans Without Ensuring the Borrowers' Ability to Pay and Without Sufficient Collateral. ..................................................................................... 4

    D.   The Defendants Provided Misleading Information About the Certificates in the Offering Documents They Prepared and Provided to the Bank. ...................................................................................... 5

    E.   The Bank Is Entitled to Rescission and Damages. .............................. 9

III.  JURISDICTION AND VENUE ...................................................................... 9

IV.  THE PARTIES................................................................................................ 11

    A.   Plaintiff ........................................................................................................ 11

    B.   Defendants ................................................................................................... 12

        1.   The Bank of America Entities.................................................. 12

        2.   The Barclays Entities ................................................................. 14

        3.   The Bear Stearns Entities.......................................................... 15

        4.   The Chevy Chase (Capital One) Entities ............................... 19

        5.   The Citigroup Entities ............................................................... 20

        6.   The Countrywide Entities ......................................................... 23

        7.   The Credit Suisse Entities......................................................... 26

        8.   The Deutsche and MortgageIT Entities ................................. 29

        9.   Goldman, Sachs & Co................................................................ 32

        10.  The Greenwich Entities............................................................. 33

11.    The Impac Entities ................................................................ 35

12.    The J.P. Morgan Entities ........................................................ 36

13.    The Merrill Lynch Entities ...................................................... 39

14.    The Morgan Stanley Entities ................................................... 40

15.    The Nomura Entities .............................................................. 43

16.    The Residential Funding (GMAC) Entities ............................. 44

17.    The UBS Entities ................................................................... 47

18.    WaMu Capital Corp. .............................................................. 49

19.    The Wells Fargo Defendants ................................................... 49

20.    The Securities Defendants ...................................................... 50

21.    The Rating Agency Defendants ............................................... 50

C.    Successor Liability Allegations against Certain Defendants ............................ 52

1.    Successor Defendant Bank of America Corporation
      (Countrywide) ....................................................................... 52

      a.    Bank of America's merger with Countrywide ............................ 52

      b.    Touting the benefits of the merger, Bank of
            America rebrands Countrywide as Bank of America
            and Countrywide ceases operations ........................................... 53

      c.    Bank of America has assumed Countrywide
            liabilities ............................................................................. 60

2.    Successor Defendant Capital One Financial Corporation
      and Capital One, National Association (Chevy Chase) ........................ 68

3.    Successor Defendants DB Structured Products, Inc. and
      MIT Holdings, Inc. (MortgageIT) ........................................... 74

4.    Successor Defendant JPMorgan Chase Bank, N.A. (EMC
      Mortgage Corporation). ........................................................... 77

5.    Successor Defendant Merrill Lynch, Pierce, Fenner &
      Smith Incorporated (Banc of America Securities LLC). ........................ 79

6.      Successor Defendant Morgan Stanley Mortgage Capital
        Holdings LLC (Morgan Stanley Mortgage Capital Inc.)....................... 79

D.      The John Doe Defendants .................................................................. 80

E.      Summary Charts of Defendants and Certificates ............................................ 80

V.      FACTUAL BACKGROUND ........................................................................ 80

A.      The Creation of Mortgage-Backed Securities.................................................... 80

        1.      The Securitization Process .................................................................... 80

        2.      Defendants' Access to Loan Files and Due Diligence
                Obligations............................................................................................ 84

        3.      The Rating Process for PLMBS.......................................................... 86

B.      The Mortgage Originators Abandoned Underwriting and Appraisal
        Standards and Engaged in Predatory Lending. ................................................. 88

        1.      The Shift from "Originate to Hold" to "Originate to
                Distribute" Securitization Encouraged Mortgage
                Originators to Disregard Loan Quality. ................................................. 88

        2.      Mortgage Originators Abandoned Underwriting Guidelines
                to Create Loans for Securitization. ........................................................ 94

        3.      Mortgage Originators Manipulated Appraisals of
                Collateralized Real Estate to Create Loans for
                Securitization. ...................................................................................... 96

        4.      Mortgage Originators Engaged in Predatory Lending to
                Initiate Loans for Securitization.......................................................... 101

        5.      Widespread Defaults and Delinquencies Are the Inevitable
                Consequence of Loans Issued Without Meaningful
                Underwriting....................................................................................... 105

        6.      Loan Files Recently Provided by Certain Trustees Confirm
                the Underwriting Guidelines Were Abandoned.................................. 106

C.      Federal and State Investigations, Press Reports, Publicly Available
        Documents Produced in Other Civil Lawsuits, and Analysis of the
        Loan Pools Underlying the Certificates Identify Systematic
        Violation of Underwriting Guidelines, Appraisal Guidelines, and
        Predatory Lending by the Originators Whose Loans Back the
        PLMBS in this Case.......................................................................................... 108

1.      Countrywide Home Loans, Inc. ............................................................ 109

        a.      Government actions against Countrywide and
                documents produced therein demonstrate
                Countrywide's abandonment of its stated
                underwriting guidelines. ........................................... 110

        b.      Press reports and private actions against
                Countrywide demonstrate Countrywide's
                abandonment of its stated underwriting guidelines. ................ 121

        c.      Confidential sources provide further evidence of
                Countrywide's abandonment of its stated
                underwriting guidelines. ........................................... 129

        d.      The mortgages originated by Countrywide and
                securitized in the PLMBS purchased by the Bank
                provide further evidence of Countrywide's
                abandonment of its stated underwriting guidelines. ................ 133

        e.      Press reports, government investigations, and
                related litigation demonstrate that Countrywide
                engaged in predatory lending.................................... 134

        f.      Confidential sources provide further evidence of
                Countrywide's predatory lending practices. ............................ 136

2.      Bear Stearns Residential Mortgage Corporation and EMC
        Mortgage Corporation........................................................ 137

        a.      Press reports, private actions, and confidential
                sources demonstrate that Bear Stearns Residential
                Mortgage Corporation and EMC Mortgage
                Corporation abandoned their stated underwriting
                guidelines. ...................................................... 138

        b.      Evidence from the Bank's review of loan files
                further indicates that EMC Mortgage Corporation
                and Bear Stearns Residential Mortgage abandoned
                their stated underwriting guidelines......................... 145

        c.      Bear Stearns Residential Mortgage Corporation and
                EMC Mortgage Corporation manipulated the
                appraisal process .................................................. 149

        d.      The mortgages originated by Bear Stearns
                Residential Mortgage Corporation and EMC
                Mortgage Corporation and securitized in the

PLMBS purchased by the Bank provide further evidence of these originators' abandonment of their stated underwriting guidelines. ................................................. 152

3. IndyMac Bank, F.S.B. .......................................................................... 153

 a. Government actions and related lawsuits and investigations demonstrate IndyMac's abandonment of its stated underwriting guidelines and its predatory lending. .................................................... 153

  LOAN 1 ................................................................. 154

  LOAN 2 ................................................................. 155

  LOAN 3 ................................................................. 155

  LOAN 4 ................................................................. 156

 b. Private actions against IndyMac demonstrate IndyMac's abandonment of its stated underwriting guidelines. ................................................................. 157

 c. Confidential sources provide further evidence of IndyMac's abandonment of its stated underwriting guidelines. ................................................................. 160

 d. The mortgages originated by IndyMac and securitized in the PLMBS purchased by the Bank provide further evidence of IndyMac's abandonment of its stated underwriting guidelines. ................. 163

4. Washington Mutual Mortgage Securities Corp. .................................... 164

 a. Government actions and related lawsuits and investigations demonstrate WaMu's abandonment of its stated underwriting guidelines. ........................................ 164

 b. WaMu manipulated the appraisal process. .............................. 169

 c. WaMu engaged in predatory lending. ....................................... 176

 d. Confidential sources provide further evidence of WaMu's failures to adhere to its stated underwriting guidelines, predatory lending, and manipulation of the appraisal process. .............................................................. 180

e.      The mortgages originated by WaMu and securitized
        in the PLMBS purchased by the Bank provide
        further evidence of WaMu's abandonment of its
        stated underwriting guidelines. ................................................. 187

5.      Wells Fargo Bank, N.A. ..................................................................... 188

        a.      Investigations, lawsuits and confidential sources
                demonstrate that Wells Fargo abandoned
                underwriting guidelines. ........................................................ 189

        b.      The mortgages originated by Wells Fargo and
                securitized in the PLMBS purchased by the Bank
                provide further evidence of Wells Fargo's
                abandonment of its stated underwriting guidelines. ................. 195

        c.      Investigations, lawsuits and confidential sources
                demonstrate that Wells Fargo engaged in predatory
                lending. .................................................................................. 195

6.      Ameriquest Mortgage Company ......................................................... 200

        a.      Investigations and lawsuits demonstrate that
                Ameriquest abandoned underwriting guidelines and
                engaged in predatory lending. ................................................. 200

        b.      The mortgages originated by Ameriquest and
                securitized in the PLMBS purchased by the Bank
                provide further evidence of Ameriquest's
                abandonment of its stated underwriting guidelines. ................. 205

7.      Aurora Loan Services LLC and Lehman Brothers Bank,
        F.S.B. ................................................................................................ 206

        a.      Evidence produced in the Lehman Brothers
                bankruptcy case demonstrates that Aurora
                abandoned its stated underwriting guidelines. .......................... 206

        b.      Confidential sources provide additional evidence of
                Aurora's abandonment of its stated underwriting
                guidelines. .............................................................................. 210

        c.      The mortgages originated by Aurora and securitized
                in the PLMBS purchased by the Bank provide
                further evidence of Aurora's abandonment of its
                stated underwriting guidelines. ................................................ 212

8.      Chase Home Finance LLC and JPMorgan Chase Bank,
        N.A. ................................................................................................ 213

        a.      Investigations and confidential sources demonstrate
                that the Chase Originators abandoned their stated
                underwriting guidelines. ........................................................ 213

        b.      The mortgages originated by the Chase Originators
                and securitized in the PLMBS purchased by the
                Bank provide further evidence of abandonment of
                their stated underwriting guidelines. ..................................... 218

9.      American Home Mortgage and American Home Mortgage
        Investment Corporation ...................................................................... 219

        a.      Investigations, lawsuits and confidential sources
                demonstrate that AHM abandoned its stated
                underwriting guidelines. ........................................................ 219

        b.      Evidence from the Bank's review of loan files
                further indicates that AHM abandoned its stated
                underwriting guidelines. ........................................................ 223

        c.      AHM manipulated the appraisal process ................................. 224

        d.      The mortgages originated by AHM and securitized
                in the PLMBS purchased by the Bank provide
                further evidence of AHM's abandonment of its
                stated underwriting guidelines. .............................................. 226

10.     MortgageIT, Inc. ................................................................................. 227

        a.      The Bank's review of loan files demonstrates that
                MortgageIT abandoned its stated underwriting
                guidelines. ............................................................................. 228

        b.      MortgageIT Manipulated the Appraisal Process. ................... 232

        c.      Investigations and lawsuits demonstrate that
                MortgageIT engaged in predatory lending. ............................ 233

        d.      The mortgages originated by MortgageIT and
                securitized in the PLMBS purchased by the Bank
                provide further evidence that MortgageIT
                abandoned its stated underwriting guidelines. ....................... 234

11.     Silver State .......................................................................................... 235

a.    Evidence from the Bank's review of loan files and a journalistic investigation indicates that Silver State abandoned its stated underwriting guidelines. .......................... 235

b.    Silver State manipulated the appraisal process. ........................ 238

c.    The mortgages originated by Silver State and securitized in the PLMBS purchased by the Bank provide further evidence of Silver State's abandonment of its stated underwriting guidelines. ................ 239

12.    Alliance Bancorp ................................................................. 240

13.    Morgan Stanley Mortgage Capital Inc. ................................... 243

a.    The Bank's review of loan files demonstrates that MSMC abandoned its stated underwriting guidelines. ............................................................... 244

b.    An investigation by the Massachusetts Attorney General provides evidence that Morgan Stanley & Co. Inc. abandoned its stated underwriting guidelines. ............................................................... 247

c.    MSMC acquired mortgages based upon artificially inflated appraisals. ................................................... 251

d.    The mortgages originated by MSMC and securitized in the PLMBS purchased by the Bank provide further evidence that Morgan Stanley Mortgage abandoned its stated underwriting guidelines. ............................................................... 252

14.    Other Mortgage Originators Originating Loans Underlying the PLMBS Also Abandoned Their Stated Underwriting Guidelines and Engaged in Predatory Lending in Order to Issue Loans for Securitization ................................................ 253

D.    The Securitization Process Was Plagued by Conflicts of Interest and Misplaced Incentives ................................................................. 254

1.    The Vertical Integration of Many of the Firms Involved in the Issuance of the PLMBS Purchased by the Bank Provided the Securities Defendants with Access to Information Regarding the Abandonment of Underwriting Guidelines, the Manipulation of the Appraisal Process, and Predatory Lending Practices. .............................................. 254

2.      Financial Ties Between the Investment Banks and Non-
        Bank Lenders Provided the Securities Defendants with
        Access to Information Regarding the Mortgage
        Originators' Failure to Adhere to Underwriting Guidelines
        and Predatory Lending Practices. ........................................................260

3.      Conflicts of Interest Undermined Adequate Due Diligence
        and Disclosure to Investors. ..............................................................263

4.      The Sponsor Defendants, Underwriter Defendants, and
        Mortgage Originators Limited Third-Party Firms' Due
        Diligence and Misused the Results of That Due Diligence. ...............265

        a.      The Securities Defendants, Underwriter Defendants,
                and mortgage originators used third-party due
                diligence providers to review the mortgage loans
                securing the PLMBS. ..............................................................266

        b.      The Sponsor Defendants, Underwriter Defendants,
                and mortgage originators directed the due diligence
                process and were provided with detailed reports
                describing the results of the process, and thus
                should have known that loan pools included
                defective loans. ......................................................................267

        c.      The Sponsor Defendants and mortgage originators
                limited the due diligence performed on the loan
                pools. ......................................................................................270

        d.      The Sponsor Defendants and mortgage originators
                manipulated the due diligence results. .....................................271

        e.      The Sponsor Defendants and mortgage originators
                misused the results of the limited diligence that was
                performed ................................................................................274

        f.      The Offering Documents failed to disclose the
                manipulation of the due diligence process. ..............................274

5.      The Sponsor Defendants' Own Due Diligence Identified
        Defective Loans in the Mortgage Pools Backing PLMBS. ................275

E.      The Controlling Person Defendants Controlled the Management,
        Activities, and Policies of the Controlled Entities. ...........................277

1.      The Vertical Integration of Many of the Firms Involved in
        the Issuance of the PLMBS Enabled the Controlling Person
        Defendants to Control the Controlled Entities. ..................................278

2.      The Sponsor Defendants Controlled Their Affiliated
        Depositors. ......................................................................... 287

3.      Bear, Stearns & Co. Controlled Affiliate EMC Mortgage
        Corporation. ....................................................................... 288

F.   The Rating Agency Defendants Knew, and the Securities
     Defendants Should Have Known, That the Credit Ratings
     Materially Misstated the Credit Risk of the PLMBS. ...................................... 290

1.      The Rating Agency Defendants Knew That the Credit
        Ratings Were Inaccurate Because They Were Based on
        Underwriting Standards That the Rating Agency
        Defendants Knew Had Been Abandoned. ............................................. 292

2.      The Credit Ratings Were Compromised by Conflicts of
        Interest, Manipulation and Misinformation. ........................................ 294

        a.      Ratings Shopping ...................................................... 295

        b.      The Rating Agency Defendants Knew that Ratings
                Shopping Reduced the Quality of Their Ratings. ..................... 297

        c.      Management Pressure to Close Deals ...................................... 299

        d.      Manipulation of the Committee Process .................................. 304

        e.      Manipulation of Staffing and Resource Allocation ................. 305

        f.      The Rating Agency Defendants Further
                Manipulated Their Ratings By Using Inaccurate,
                Outdated Models. ...................................................... 307

3.      Subsequent Downgrades Confirm That the Investment-
        Grade Ratings Reported in the Offering Documents Were
        Unjustifiably High and Knowingly Misstated the True
        Credit Risk of the PLMBS Purchased by the Bank. ............................ 310

4.      Other Actions of the Rating Agency Defendants Further
        Demonstrate that They Knew Their Ratings Were
        Inaccurate. ........................................................................... 313

5.      The Rating Agency Defendants Knew That Their PLMBS
        Ratings Fundamentally Differed from Their Ratings of
        Corporate Bonds. .................................................................. 314

6.      The Bank Reasonably Relied on the Credit Ratings
        Reported in the Offering Documents. .................................................. 315

G.  The Proper Steps Were Not Taken To Ensure That the Mortgage Loans Underlying the Trusts Were Enforceable............................................318

    1.  Federal and State Investigations and Publicly Available Documents Produced in Other Civil Lawsuits Indicate that the Originators, Sponsors, Depositors, and Issuing Trusts Routinely Failed to Properly Assign Mortgages and Promissory Notes. .................................................................320

    2.  The Assignment Problems Were Systemic..........................................326

VI.  DEFENDANTS' MATERIAL UNTRUE STATEMENTS AND OMISSIONS IN CONNECTION WITH THE SALE OF PLMBS TO THE BANK ........................................................................................................329

A.  The Securities Defendants Misrepresented Underwriting Guidelines Utilized by Mortgage Lenders........................................330

    1.  The Materiality of Underwriting Guidelines .......................................330

    2.  Misstatements Regarding Underwriting Guidelines............................330

    3.  Evidence Demonstrating Misstatements in the Offering Documents Regarding the Originators' Underwriting Practices. ...........................................................................................334

        a.  Government investigations, actions and settlements, confidential sources, and evidence developed in other private lawsuits demonstrate systematic and pervasive abandonment of stated underwriting practices by the originators. .......................................334

        b.  Analysis of loans that backed the PLMBS purchased by the Bank demonstrates the abandonment of stated underwriting practices by the originators. .............................................................335

B.  The Securities Defendants Misrepresented the Appraisal Process and LTVs That Were Based Upon Those "Appraisals." ...................345

    1.  The Materiality of Representations Regarding Appraisals and LTVs .............................................................................................345

    2.  Misstatements Regarding Appraisals and LTVs..................................349

        a.  The Offering Documents falsely state that the LTVs were based upon appraisals.......................................................350

b.      Misstatements regarding the standards to which the purported "appraisals" conformed ........................................... 354

c.      Misstatements regarding aggregate LTVs ................................ 356

3.      Evidence Demonstrating Misstatements about Appraisals and LTVs in the Offering Documents ................................... 357

a.      Government investigations, press reports, and confidential sources demonstrate systemic and pervasive appraisal manipulation by the mortgage originators ............................................................................... 357

b.      Analysis of loans that backed the PLMBS purchased by the Bank demonstrate that appraisals were materially inflated and the LTVs were materially understated. ............................................................... 357

C.      The Offering Documents Were Materially Misleading Because They Failed to Inform Investors of the Presence of Compounded High-Risk Mortgages in the Loan Pools ........................................................... 372

D.      Defendants' Statements Regarding the Triple-A Rating of the PLMBS Were False and Misleading ................................................................. 376

1.      The Materiality of the Credit Rating Process and Ratings ................... 376

2.      False Representations That the Certificates the Bank Purchased Would Not Be Issued Unless They Earned Triple-A Ratings ................................................................. 376

3.      Misstatements about the Credit Rating Process and Ratings ............... 377

4.      Evidence Demonstrating Misstatements about the Ratings and Ratings Process .......................................................... 379

E.      The Securities Defendants Misrepresented the Mortgage Originators' Compliance with Predatory Lending Restrictions ...................... 383

1.      The Materiality of Predatory Lending Practices and the Issuance of Loans that Violate Other State and Federal Lending Statutes ................................................................... 383

2.      Misstatements about Predatory Lending Compliance ......................... 385

3.      Evidence Demonstrating Misstatements about Predatory Lending Practices of the Mortgage Originators ................................... 386

a.     Government investigations, actions and settlements, confidential sources and evidence developed in other private lawsuits demonstrate predatory lending by the mortgage originators. ...................................... 386

b.     Analysis of loans that backed the PLMBS purchased by the Bank demonstrate that loans in the mortgage pools were the result of predatory lending ............... 387

F.     The Securities Defendants Misrepresented the Due Diligence Performed on the Mortgage Pools That Backed the PLMBS Purchased by the Bank. .................................................................. 387

    1.     The Materiality of Due Diligence on the Mortgage Pools ................... 387

    2.     Misstatements about Due Diligence ..................................... 388

    3.     Evidence of Misstatements about Due Diligence ................................ 390

G.     The Securities Defendants Misrepresented That Mortgages and Mortgage Loans Were Validly Assigned and Transferred to the Issuing Trusts ......................................................................... 390

    1.     The Materiality of Valid Assignment and Transfer ............................ 390

    2.     Misstatements Regarding Valid Assignment and Transfer ................. 391

    3.     A Material Number of Mortgages and Mortgage Loans Were Not Validly Transferred or Assigned to the Issuing Trusts ....................................................................... 393

H.     The Bank's Claims Are Timely ..................................................... 393

VII.     COUNTS ............................................................................. 396

FIRST CAUSE OF ACTION ............................................................... 396

Primary Violations of the Massachusetts Uniform Securities Act .............................. 396

SECOND CAUSE OF ACTION ............................................................. 406

Joint and Several Liability under the Massachusetts Uniform Securities Act ................................................................................... 406

THIRD CAUSE OF ACTION ............................................................... 420

Negligent Misrepresentation by Certain Securities Defendants ................................... 420

FOURTH CAUSE OF ACTION ............................................................. 430

Violations of the Massachusetts General Law c. 93A by Certain Securities
Defendants ....................................................................... 430

FIFTH CAUSE OF ACTION ....................................................... 441

Fraud by Rating Agency Defendants ............................................ 441

SIXTH CAUSE OF ACTION ....................................................... 446

Violations of Massachusetts General Law c. 93A by the Rating Agency
Defendants ....................................................................... 446

SEVENTH CAUSE OF ACTION ................................................... 448

Negligent Misrepresentation by Moody's and S&P ......................... 448

VIII.   PRAYER FOR RELIEF ....................................................... 450

IX.   DEMAND FOR JURY TRIAL ................................................. 451

## APPENDICES

PLMBS CERTIFICATES PURCHASED BY FEDERAL HOME LOAN BANK
OF BOSTON ............................................................. APPX. I

CLAYTON TESTIMONY AND SUPPORTING DOCUMENTS REGARDING DUE
DILIGENCE REVIEWS
    A.   CLAYTON SERVICES, INC. REPORT ON DUE DILIGENCE REJECTION
         AND WAIVER TRENDS
    B.   TESTIMONY OF VICKI BEAL, SENIOR VICE PRESIDENT, CLAYTON
         HOLDINGS, BEFORE THE FINANCIAL CRISIS INQUIRY COMMISSION,
         SEPTEMBER 23, 2010
    C.   TESTIMONY OF KEITH JOHNSON, FORMER PRESIDENT,
         CLAYTON HOLDINGS, BEFORE THE FINANCIAL CRISIS
         INQUIRY COMMISSION, SEPTEMBER 23, 2010 ............... APPX. II

DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND
OMISSIONS REGARDING UNDERWRITING GUIDELINES ...................... APPX. III

DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND
OMISSIONS REGARDING THE CREDIT RATING PROCESS AND
THE AAA RATING OF THE PLMBS ....................................... APPX. IV

DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND
OMISSIONS REGARDING THE MORTGAGE ORIGINATORS'
COMPLIANCE WITH PREDATORY LENDING RESTRICTIONS ............... APPX. V

DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND
    OMISSIONS REGARDING DUE DILIGENCE PERFORMED ON THE
    MORTGAGE POOLS THAT BACKED THE PLMBS PURCHASED BY
    THE BANK ..................................................................................................... APPX. VI

LOAN-TO-VALUE RATIO DEFINITIONS AS REPRESENTED IN THE
    OFFERING DOCUMENTS ............................................................................. APPX. VII

ANALYSIS OF ADDITIONAL LOAN FILES ORIGINATED BY ALLIANCE
    BANCORP. AND MORTGAGEIT, INC. ......................................................... APPX. VIII

ADDITIONAL ORIGINATORS ..................................................................................... APPX. IX

DEFENDANTS WHO ARE OR WERE REGISTERED TO CONDUCT
    BUSINESS IN MASSACHUSETTS ................................................................. APPX. X

SPONSOR DEFENDANTS ............................................................................................. APPX. XI

DEPOSITOR/ISSUER DEFENDANTS ........................................................................ APPX. XII

UNDERWRITER AND / OR CORPORATE SELLER DEFENDANTS .................. APPX. XIII

CORPORATE CONTROLLING PERSON DEFENDANTS ..................................... APPX. XIV

SUCCESSOR DEFENDANTS ...................................................................................... APPX. XV

CREDIT RATING AGENCY DEFENDANTS ........................................................... APPX. XVI

Plaintiff, FEDERAL HOME LOAN BANK OF BOSTON (hereinafter the "Bank")

alleges the following based upon personal knowledge with regard to its own acts, and upon

public information as well as information and belief as to all other matters. The Bank's

information and belief is based on, among other things, the investigation by its counsel.  The

investigation included but was not limited to: (1) review and analysis of the Offering Documents

for the securities that are the subject of this action; (2) interviews with individuals with first-hand

knowledge of the events alleged herein; (3) examination of relevant filings with the Securities

and Exchange Commission ("SEC"), press releases and other public statements; (4) review and

analysis of pleadings in other private civil actions involving certain Defendants; (5) review and

analysis of investigations  and complaints filed by state and federal authorities against certain

Defendants; (6) published materials, media reports, congressional testimony and additional

related materials; (7) analysis of the performance and composition of the loan pools underlying

the securities; (8) review of origination files for loans underlying certain of the securities to

which the Bank recently has been provided access; and (9) review of appraisal reports for loans

underlying certain of the securities to which the Bank recently has been provided access.  Many

of the facts related to Plaintiff's allegations are known only by the Defendants, or are exclusively

within their custody or control, including, for example, the loan origination files to which the

Bank has not been provided full access.  Plaintiff believes that substantial additional evidentiary

support for the allegations set forth below will be developed after a reasonable opportunity for

discovery.

## I.    NATURE OF THE ACTION

1.     The action arises from the sale by certain Defendants to the Bank of over $5.7

billion in Private Label Mortgage-Backed Securities ("PLMBS" or "Certificates").  The

Certificates are "securities" within the meaning of the Massachusetts Uniform Securities Act,

M.G.L. c. 110A, § 401(k).[1]   The Defendants include the Depositors/Issuers, Underwriters, and

Sponsors who packaged, marketed, offered, and sold the Certificates to the Bank ("Securities

Defendants").

2.   The Certificates were sold to the Bank by means of registration statements, free

writing prospectuses, prospectuses, supplemental prospectuses, private placement memoranda

and other written offering materials (collectively, the "Offering Documents") that the Securities

Defendants wrote, signed, and/or circulated, and which contained untrue statements of material

facts and omitted to state material facts necessary in order to make the Offering Documents not

misleading.   The Bank received and reviewed these Offering Documents, received offers of sale

for the Certificates, and purchased the Certificates at its headquarters in Boston, Massachusetts.

3.   Accordingly, the Bank seeks rescission and damages under M.G.L. c. 110A,

§ 101 *et seq.* (the Massachusetts Uniform Securities Act), M.G.L. c. 93A, § 1 *et seq.*, and

applicable common law.

4.   The Bank purchased the Certificates in reliance on the ratings assigned to them by

Fitch Inc.; The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC;

and Moody's Investors Service, Inc. and Moody's Corporation ("Rating Agency Defendants").

The Rating Agency Defendants issued these ratings knowing that the ratings were inaccurate,

unreliable, and lacked a sufficient basis in fact, and they issued the ratings without due care.   The

Bank seeks appropriate relief against the Rating Agency Defendants under M.G.L. c. 93A, § 1 *et

seq.* and applicable common law.

---

[1] Attached as Appendix I is a list of the PLMBS purchased by the Bank that are the subject of this action.  One of the certificates, MARM 2007-R5 A1, is not directly backed by a mortgage pool, but rather constitutes an investment in a separate PLMBS, BALTA 2005-9 22A1, and is therefore backed indirectly by the pool of mortgages that back BALTA 2005-9 22A1.

## II.   EXECUTIVE SUMMARY

### A.   PLMBS Defined.

5.      PLMBS are mortgage pass-through Certificate securities entitling the holder to income payments from pools of mortgage loans.[2]  The securities are referred to as "private label" because they are issued by private entities instead of the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which are U.S. government-sponsored enterprises ("GSEs").  (Mortgage securities issued or guaranteed by Fannie Mae and Freddie Mac are referred to as "agency" mortgage securities.)

6.      The value of a mortgage pass-through Certificate depends on the ability and willingness of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral the borrowers provide.  In the event that borrowers fall behind or default, the investor is exposed to loss.  For this reason, statements regarding the nature and extent of the underwriting guidelines utilized by the mortgage originators who issued the loans backing the PLMBS and the collateral for the loans are critically important to investors such as the Bank.  If stated underwriting criteria are not followed, the collateral is not properly appraised, or the creditworthiness of the borrower is not accurately measured, the Certificates are riskier and more likely to result in losses than is apparent from the Offering Documents.  Similarly, if the loans supporting a Certificate bear characteristics that differ from those described in the Offering Documents, then the risk profile of the Certificate is different from that described in the Offering Documents.

---

[2]  The terms "PLMBS" and "Certificate(s)" are used interchangeably.  The Bank identifies the PLMBS using the ticker symbols for each certificate as created by Bloomberg.

**B.      The Bank Purchased Only the Highest Rated (Triple-A-Rated) PLMBS.**

7.      PLMBS are segmented into "tranches" with laddered payment priority and varying return potential for the holders of certificates representing various tranches.  The most senior tranches enjoy the highest payment priority and lowest risk of default. Thus, if mortgage payments are not made, the losses are allocated first to the most junior tranches and move toward the more senior tranches as losses cause the junior tranches to be exhausted.  The senior tranches often are protected as well by certain credit enhancements, a common form of which is known as "overcollateralization."  When a tranche is overcollateralized, the mortgages in that tranche have an aggregate principal balance that exceeds the aggregate principal balances of the Certificates secured thereby.  For these reasons, the tranches are given different credit ratings—the higher up the ladder, the higher the rating.

8.      Pursuant to both Bank policy and applicable regulatory requirements, and in order to minimize the risk of any loss on the PLMBS, the Bank intended to purchase only senior, triple-A-rated PLMBS tranches.  Thus, based on the Offering Documents, the Bank believed it was buying safe and secure Certificates with an extremely low risk of default—equivalent, from an investment quality standpoint, to other triple-A-rated investments.  Instead, the Bank purchased a toxic stew of PLMBS backed by doomed mortgage loans.

**C.      The Mortgage Originators Who Issued Loans Backing the Certificates Abandoned Underwriting Guidelines and Issued Loans Without Ensuring the Borrowers' Ability to Pay and Without Sufficient Collateral.**

9.      The Bank did not know when it purchased the Certificates that the mortgage originators who made the loans backing the PLMBS, many of whom were affiliates of the Securities Defendants, sought to issue as many loans as possible to feed these Defendants' securitization machines.  Whether borrowers could repay the loans and the quality of the collateral became secondary considerations to the originators' ability to sell the pooled interests

in the loans.  The mortgage loan originators' standard operating procedure was to approve any loan that could be sold into the secondary mortgage market.  As a result, unbeknownst to the Bank, exceptions to underwriting and appraisal standards became the norm.  Likewise, the originators knowingly obtained flawed appraisals of the collateral for the loans.  Rather than requiring appraisals conducted in accordance with governing federal appraisal regulations, the mortgage originators pressured and coerced appraisers to ensure that the appraisals came back "at value," *i.e.*, the level necessary to close the loan.  These practices violated applicable appraisal standards, including the Uniform Standards of Professional Appraisal Practice ("USPAP"), with which the Offering Documents represented the appraisals would comply.  The collateral for the loan pools backing the Certificates purchased by the Bank was vastly deficient.

10.     The Bank also did not know that the Securities Defendants failed to ensure that the loans they purchased and packaged into the Certificates complied with the mortgage originators' stated underwriting guidelines and appraisal standards.  As revealed in recent government investigations, this approach to securitization was labeled "IBGYBG"—"I'll be gone, you'll be gone" when these securitization practices harm upstream investors.  Lost in this process was any effort by the Securities Defendants to truthfully and accurately describe the loans in the Offering Documents so that investors such as the Bank could ascertain the true risk of the Certificates.  Making matters even more egregious, the Securities Defendants conducted a certain amount of due diligence on the loans, and were in a position to know that no real underwriting had been done.

**D.     The Defendants Provided Misleading Information About the Certificates in the Offering Documents They Prepared and Provided to the Bank.**

11.     In many arm's-length transactions, a buyer and a seller have limited disclosure obligations and the doctrine of buyer beware, or *caveat emptor*, may be appropriate.  This,

however, is not the case with the sale of securities.  Those who participate in the sale of

securities are required to provide detailed information regarding what is being sold.  Here, as

required by law, the Defendants prepared detailed Offering Documents in which they purported

to describe, among other things, the characteristics of the loans backing the Certificates.

However, unbeknownst to the Bank, and to its great detriment, the Offering Documents

contained material misstatements and omitted to disclose material information with respect to the

mortgage pools backing the Certificates.  As a result, despite their original triple-A ratings and

the abundant representations and warranties regarding the underlying mortgage pools, the

Certificates were far riskier than could be determined from the Offering Documents.

12.    Though the Certificates themselves are complex, the abuses by the Defendants

can be put in simple terms.  The Offering Documents did not provide truthful or accurate

information about the underwriting and appraisal standards used when the loans backing the

pools were issued, or about the due diligence conducted when the loans were securitized.

13.    Defendants' untrue statements and omissions of material fact went to the heart of

the risk of the mortgage pools underlying the PLMBS.  Specifically, Defendants failed to

accurately describe key characteristics of the mortgages and the securitization of the mortgages,

including, but not limited to:

**a.    The Mortgage Originators' Underwriting Guidelines.**  The Offering
Documents contained material misstatements and omitted material information regarding
the mortgage originators' abandonment of underwriting guidelines.  The Defendants
represented that the mortgage originators applied their stated underwriting guidelines
when issuing loans to borrowers.  However, the mortgage originators routinely
disregarded their own guidelines and granted exceptions without proper justification.

**b.    The Loan-to-Value Ratios of the Mortgage Loans and the Appraisal
Standards Used to Determine the Ratios.**  The Offering Documents contained material
misstatements and omitted material information regarding the loan-to-value ratios
("LTVs") of the loans in the mortgage pools and the appraisal standards that were
purportedly applied to determine the home values.  The LTVs were purportedly based on
valid appraisals performed in accordance with specific regulations and standards—but in

truth, they were not based on legitimate appraisals at all.  Rather, they were based on predetermined values that the appraisers knew were inaccurate and that were set to ensure that the loans would close.  Moreover, the Offering Documents falsely represented that the appraisals would comply with appraisal standards, including USPAP.  In reality, the mortgage originators manipulated the appraisal process and, as a result, appraisers routinely issued appraisals that violated these standards.

       **c.**     **The Ratings Process**.  The Offering Documents contained material misstatements and omitted material information regarding the basis for the Certificates' triple-A ratings and the ratings processes.  The Offering Documents represented that the Rating Agency Defendants conducted analysis that was designed to assess the likelihood of delinquency and defaults in the underlying mortgage pools.  However, the Rating Agency Defendants knew, and the Securities Defendants should have known, that the ratings were the result of flawed models, willful disregard for the abandonment of underwriting guidelines, Rating Agency capture, and the Rating Agency Defendants' obsession with market share.  All of these factors caused the ratings to vastly understate the true risk of the PLMBS and overstate their creditworthiness.

       **d.**     **Predatory Lending.**  The Offering Documents contained material misstatements and omitted material information regarding the mortgage originators' compliance with state and federal predatory lending prohibitions.  Pursuant to the Bank's regulatory requirements, it was not permitted to purchase any mortgage-backed securities that were secured by mortgage loans that violated these prohibitions.  The Defendants represented that the mortgage pools did not contain any mortgage loans that violated state and federal predatory lending prohibitions.  However, in truth, the mortgage originators engaged in rampant predatory lending, and, thus, the mortgage pools contained many loans that violated state and federal predatory lending restrictions.

       **e.**     **Due Diligence.**  Many of the Offering Documents contained material misstatements and omitted material information regarding the Sponsors' and mortgage originators' due diligence on the mortgage loans in the PLMBS mortgage pools.  The Offering Documents stated that the underlying mortgage loans were inspected for compliance with the mortgage originators' underwriting and appraisal guidelines and documentation requirements.  However, the Offering Documents omitted that the third-party due diligence firms retained to conduct the due diligence felt pressured to ignore deviations from the applicable underwriting criteria, and that even with regard to loan defects identified through the due diligence process, the Sponsors and mortgage originators nonetheless waived the defects as to a substantial percentage of these loans and, in many cases, used this information about defective loans to negotiate lower prices for the loan pools.  These lower prices were not reflected in the PLMBS prices paid by investors.

       **f.**     **Enforceability of Mortgages.**  Many of the Offering Documents contained material misstatements regarding the measures taken to ensure the enforceability of the mortgages and mortgage notes transferred to the trusts.  In order for a mortgage to be enforced, basic steps need to be taken to validly assign the mortgage and mortgage note to the trust and ensure that the trustee has the proper papers.  These

basic steps, and the representations made about these steps, were critical to investors (including the Bank), because if a mortgage cannot be enforced, then the mortgage note, and the Certificates dependent on these loans, are worthless.  The Offering Documents failed to disclose that in fact basic steps regarding the transfer of mortgages and mortgage notes were not followed—mortgages and mortgage notes were not validly assigned.

> **g.     The Offering Documents Did Not Disclose the Compounded High-Risk Mortgages that Infected the Mortgage Pools.**  The Offering Documents contained certain statistical measurements of the overall mortgage pools, including measurements of the pools' weighted average LTVs, credit scores, and debt-to-income ratios ("DTIs").  In addition to the material inaccuracy of much of this data, the Offering Documents did not disclose the compounding of risks in many mortgages in the pools.  The representations in the Offering Documents indicated that a high risk according to one measure (say, a bad credit score) would be offset by a low risk according to another measure (say, a good LTV).  If the Offering Documents were accurate, then, the mortgage pools would contain few if any mortgages with *compounded* high risks—with, for example, a bad credit score *and* a bad LTV.  But analysis of the loans in the mortgage pools shows otherwise.  Many of the mortgage loans in the pools in fact contained multiple risky factors.  The undisclosed presence of a significant volume of loans with these characteristics made the Certificates much more prone to default than the Offering Documents indicated.  The prevalence of these compounded high-risk loans tainted the loan pools and contributed substantially to the decline in performance and value of the Certificates.

14.     The untrue, incomplete and materially misleading statements summarized above and discussed in detail below were made with respect to each of the Certificates purchased by the Bank.  The Bank reasonably relied on these statements and was misled by the omissions when deciding to purchase the Certificates.

15.     As a result of these untrue statements in and omissions from the Offering Documents, the Bank purchased Certificates that were far riskier than represented by the Defendants, and that were not in truth "highest investment grade" as stated in the Offering Documents, but, instead, were low-quality, high-risk Certificates.  Each of the one hundred eleven Certificates has been downgraded to below investment-grade, *i.e.*, "junk," indicating a high probability of default.

**E.      The Bank Is Entitled to Rescission and Damages.**

16.     As indicated above, and described in detail below, it is not happenstance, or the result of later events, that the PLMBS failed to perform, plunged in value, and were ultimately severely downgraded.  To the contrary, the PLMBS purchased by the Bank collapsed because the underlying loans were not what the Offering Documents represented them to be at the time the Certificates were issued.  They were *not* backed by pools of loans issued to borrowers based on the application of stated underwriting standards.  Exceptions to underwriting guidelines were *not* justified by "compensating circumstances."  Valid appraisals of the collateral for the loans were *not* performed.  The Securities Defendants did *not* engage in appropriate and effective due diligence to ensure that the loans satisfied the originators' stated underwriting guidelines.

17.     Because the Offering Documents were marred by material misstatements and omissions that concealed the true risk of the Certificates, the Bank is entitled to rescission and such other make-whole relief afforded by applicable law.

18.     The fair value of these Certificates has also declined dramatically.  Moreover, as a result of the current and anticipated future poor performance of the mortgages underlying these Certificates, the Bank has incurred other-than-temporary impairment losses on these investments, resulting in hundreds of millions of dollars in losses.

19.     Accordingly, the Bank seeks relief from Defendants in the manner set forth herein.

### III.   JURISDICTION AND VENUE

20.     This Court determined that it has jurisdiction over the claims alleged in this action.

21.     This is an action for rescission and damages in an amount exceeding tens of millions of dollars.

22.     Massachusetts law applies to Plaintiff's state law claims that arise under the Massachusetts Uniform Securities Act and under the common law of Massachusetts, because the Bank's claims arise from its transaction of business with Defendants in Massachusetts.  The offer and sale to the Bank of the Certificates, including Defendants' making of materially false and misleading statements and omissions of material facts alleged herein, took place in Massachusetts—the Defendants directed the Offering Documents to the Bank at the Bank's headquarters in Boston, Massachusetts, and the Bank, from its headquarters in Boston, Massachusetts, received and accepted Defendants' offer to purchase these Certificates.

23.     The Defendants are subject to the personal jurisdiction of this district because the Bank's claims against Defendants arise from Defendants' transaction of business within Massachusetts and/or the Defendants are subject to general jurisdiction in this state.

24.     As set forth in Appendix X attached to this Complaint, numerous Defendants are or were at the relevant time registered to do business in Massachusetts and have thereby submitted to the jurisdiction of this Commonwealth.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).  The Bank resides and has its principal office in this district, and the transactions that are the subject of this action took place in this district, including Defendants' making of materially false and misleading statements and omission of material facts alleged herein.

26.     The Bank acknowledges the automatic stay, entered in *In re Residential Capital, LLC, et al.*, No. 12-12020 (Bankr. S.D.N.Y.) pursuant to 11 U.S.C. § 362 of the Bankruptcy Code, with respect to the following debtor Defendants: Residential Accredit Loans, Inc. and

Residential Funding Company, LLC.  *See* Notice of Bankruptcy and Effect of Automatic Stay,

Dkt. No. 176.[3]

## IV.   THE PARTIES

**A.   Plaintiff**

27.     The Bank was created by the Federal Home Loan Bank Act of 1932.  The Bank is

a cooperative bank created to promote housing finance opportunities for Americans of all income

levels.  For more than 75 years, the Bank has pursued that public policy mission by loaning

money at competitive rates to member financial institutions, which helps those members make

home loans available to prospective home buyers.

28.     The headquarters of the Bank are in Boston, Suffolk County, Massachusetts, and

the Bank serves approximately 240 member financial institutions in the Commonwealth of

Massachusetts.

29.     The Bank is capitalized solely by the capital-stock investments of its members

and by its retained earnings.

30.     The Bank's members are all private institutions eligible for membership,

including banks, savings banks, savings and loan associations, cooperative banks, credit unions,

and insurance companies.

31.     The Bank is not a federal agency.  The Bank is federally chartered, but privately

capitalized and independently managed.  The federal government is not involved in the day-to-

day management of the Bank's operations.  Management of the Bank is vested by law in the

Bank's board of directors, all members of which are either elected by the Bank's shareholder

members or, in the case of a vacancy, appointed by the board of directors.  No tax dollars are

---

[3] The Bank further notes that, pursuant to an agreement between the Bank and certain non-debtor
    affiliates of these debtor Defendants, the claims against non-debtor Defendants GMAC LLC
    and GMAC Mortgage Group, Inc. are temporarily stayed through October 31, 2012.

involved in the operation of the Bank, and the federal government does not own any of the Bank's stock.

32.     The Bank is supervised and examined by the Federal Housing Finance Agency, the successor to the Federal Housing Finance Board.

33.     In light of its public policy mission, the Bank has a very conservative investment philosophy.  The Bank bought the PLMBS on the basis of factual representations designed to convince the Bank that these securities were safe, prudent, and highly rated investments.  The Bank could not and would not have purchased the PLMBS if the Offering Documents had disclosed the truth about their quality.  The Bank could not have purchased the PLMBS if the Offering Documents had disclosed the truth that predatory loans backed the Certificates.

**B.     Defendants**

**1.     The Bank of America Entities**

34.     Depositor/Issuer Defendant Banc of America Funding Corporation is a Delaware corporation.  Banc of America Funding Corporation was the Depositor for Certificates BAFC 2006-D 1A1 and BAFC 2005-H 7A1.

35.     Non-Defendant Underwriter and Corporate Seller[4] Banc of America Securities LLC was a Delaware limited liability company that, during the relevant period, maintained a securities broker-dealer Financial Institutions Regulatory Authority ("FINRA") registration in Massachusetts and was registered to do business in Massachusetts.  Banc of America Securities LLC underwrote Certificates NAA 2007-3 A1, BAFC 2006-D 1A1 and BAFC 2005-H 7A1.  Banc of America Securities LLC also sold Certificate WFMBS 2006-AR12 1A1 to the Bank.

---

[4] As used in this Complaint, "Corporate Seller" refers to a corporate entity that sold a particular issuance of PLMBS directly to the Bank, but did not act as an Underwriter for that PLMBS. For example, Banc of America Securities LLC acted as a Corporate Seller—but not as an Underwriter—with respect to Certificate WFMBS 2006-AR12 1A1.

Effective November 1, 2010, Banc of America Securities LLC merged with and into Successor

Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation.  *See*

*infra* § IV.C.5.  All references herein to Banc of America Securities LLC are also to Merrill

Lynch, Pierce, Fenner & Smith Incorporated, which is liable as a matter of law as successor to

Banc of America Securities LLC by virtue of its status as the surviving entity in its merger with

Banc of America Securities LLC.

36.    Sponsor and Controlling Person Defendant Bank of America, National

Association is a nationally chartered bank that operates branches throughout Massachusetts and

is regulated by the Office of the Comptroller of the Currency (OCC).  Bank of America, National

Association was the Sponsor of the two offerings for which Banc of America Funding

Corporation was the Depositor and from which the bank purchased Certificates BAFC 2005-H

7A1 and BAFC 2006-D 1A1.  Bank of America, National Association was also the direct parent

of Defendant Banc of America Funding Corporation.  *See* BAFC 2006-D Pros. Supp. at S-29

("Bank of America, National Association, which is the Sponsor, . . . is the direct parent of the

Depositor.").  As its corporate parent and the Sponsor of its PLMBS offerings, Bank of America,

National Association possessed the practical ability to direct or cause the direction of the

management, policies, and actions of Banc of America Funding Corporation related to the

PLMBS offerings, and in fact exercised such direction and control over the activities of these

entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, Bank of

America, National Association was a controlling entity of Banc of America Funding

Corporation.

37.    Bank of America, National Association was also an originator of loans for the

offering in which the bank purchased Certificate BAFC 2006-D 1A1.

13

38.     Controlling Person Defendant Bank of America Corporation is a Delaware corporation.  Banc of America Funding Corporation, Banc of America Securities LLC, and Bank of America, N.A. are wholly-owned indirect subsidiaries of Bank of America Corporation. Corporate Disclosure Statement, Dkt. No. 59.  As a corporate parent of these entities, Defendant Bank of America Corporation possessed the practical ability to direct or cause the direction of the management, policies, and actions of Banc of America Funding Corporation, Banc of America Securities LLC, and Bank of America, N.A. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, Bank of America Corporation was a controlling entity of Banc of America Funding Corporation, Banc of America Securities LLC and Bank of America, National Association.

39.     Bank of America Corporation is also named as a Successor Defendant to CWALT, Inc., CWMBS, Inc., Countrywide Securities Corporation, Countrywide Home Loans, Inc. and Countrywide Financial Corporation.  *See infra* § IV.C.1.  As set forth below, on or about July 1, 2008, Successor Defendant Bank of America Corporation acquired Countrywide Financial Corporation and all of its subsidiaries, including CWALT, Inc., CWMBS, Inc., Countrywide Securities Corporation, and Countrywide Home Loans, Inc.

### 2.     The Barclays Entities

40.     Depositor/Issuer Defendant BCAP LLC is a Delaware corporation.  BCAP LLC was the Depositor for Certificate BCAP 2006-AA1 A1.

41.     Underwriter Defendant Barclays Capital Inc. is a Connecticut corporation which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts.  Barclays Capital Inc.

underwrote Certificates RALI 2007-QS6 A29, CCMFC 2006-2A A1, CCMFC 2007-1A A1, CCMFC 2007-2A A1, LUM 2006-7 2A1, LUM 2006-6 A1, and BCAP 2006-AA1 A1.

### 3.    The Bear Stearns Entities

42.    Depositor/Issuer Defendant Bear Stearns Asset Backed Securities I LLC is a Delaware limited liability company.  Bear Stearns Asset Backed Securities I LLC was the Depositor for Certificate BALTA 2006-1 11A1.

43.    Depositor/Issuer Defendant Structured Asset Mortgage Investments II Inc. is a Delaware corporation.  Structured Asset Mortgage Investments II Inc. was the Depositor for Certificates BSMF 2007-AR5 1A1A, BALTA 2007-3 1A1, BSMF 2007-AR4 1A1, BALTA 2007-2 1A1, BALTA 2007-1 1A1, BSMF 2007-AR1 1A1, BSMF 2006-AR5 1A1, BALTA 2006-7 1A1, BSMF 2006-AR3 1A1, BSMF 2006-AR2 1A1, BALTA 2006-6 1A1, SAMI 2006-AR7 A1A, BSMF 2006-AR1 1A1, BALTA 2006-5 1A1, SAMI 2006-AR4 4A1, SAMI 2006-AR6 1A1, BALTA 2006-4 11A1, BALTA 2006-4 13A1, LUM 2006-3 11A1, BALTA 2006-3 1A1, BALTA 2006-2 11A1, BALTA 2005-10 11A1, LUM 2005-1 A1, BALTA 2005-9 11A1, BALTA 2005-8 11A1, SAMI 2005-AR6 2A1, GPMF 2005-AR4 4A1A, SAMI 2005-AR3 1A1, GPMF 2005-AR2 A1, SAMI 2005-AR2 1A1, GPMF 2005-AR1 A2, and GPMF 2006-AR3 4A1.

44.    Sponsor and Controlling Person Defendant EMC Mortgage Corporation, now known as EMC Mortgage, LLC (hereafter "EMC Mortgage Corporation" or "EMC"), is a Delaware corporation that was and is registered to do business in Massachusetts.  EMC was the Sponsor for the offerings for which Bear Stearns Asset Backed Securities I LLC and Defendant Structured Asset Mortgage Investments II Inc. were Depositors and from which the Bank purchased the following Certificates: SAMI 2006-AR6 1A1, SAMI 2005-AR6 2A1, SAMI 2005-AR3 1A1, SAMI 2005-AR2 1A1, GPMF 2005-AR4 4A1A, BSMF 2007-AR5 1A1A, BALTA 2007-3 1A1, BSMF 2007-AR4 1A1, BALTA 2007-2 1A1, BALTA 2007-1 1A1, BSMF

2007-AR1 1A1, BSMF 2006-AR5 1A1, BALTA 2006-7 1A1, BSMF 2006-AR3 1A1, BSMF

2006-AR2 1A1, BALTA 2006-6 1A1, SAMI 2006-AR7 A1A, BSMF 2006-AR1 1A1, BALTA

2006-5 1A1, SAMI 2006-AR4 4A1, BALTA 2006-4 11A1, BALTA 2006-4 13A1, BALTA

2006-3 1A1, BALTA 2006-2 11A1, BALTA 2006-1 11A1, BALTA 2005-10 11A1, BALTA

2005-9 11A1, BALTA 2005-8 11A1, GPMF 2005-AR2 A1, GPMF 2005-AR1 A2, and GPMF

2006-AR3 4A1.  As the Sponsor of the PLMBS offerings for which these entities were

Depositors, EMC possessed the practical ability to direct or cause the direction of the

management, policies, and actions of Depositor/Issuer Defendants Bear Stearns Asset Backed

Securities I LLC and Structured Asset Mortgage Investments II Inc. related to the PLMBS

offerings, and in fact exercised such direction and control over the activities of these entities

related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, EMC was a

controlling entity of Bear Stearns Asset Backed Securities I LLC and Structured Asset Mortgage

Investments II Inc.

45.    EMC also was an originator of mortgage loans, and originated loans for the

offerings in which the bank purchased Certificates BALTA 2007-3 1A1, BALTA 2007-2 1A1,

BALTA 2007-1 1A1, BALTA 2006-7 1A1, BALTA 2006-5 1A1, BALTA 2006-3 1A1, BALTA

2006-2 11A1, BALTA 2006-1 11A1, BALTA 2006-4 13A1, BALTA 2006-4 11A1, BALTA

2005-9 11A1, BALTA 2006-6 1A1, BALTA 2005-10 11A1, BSMF 2006-AR5 1A1, BSMF

2006-AR2 1A1, BSMF 2006-AR3 1A1, BSMF 2007-AR1 1A1, LUM 2005-1 A1, BALTA

2005-8 11A1, BSMF 2006-AR1 1A1, BSMF 2007-AR4 1A1 and BSMF 2007-AR5 1A1A.

46.    On or about April 1, 2011, the vast majority of EMC's assets were transferred to

affiliate JPMorgan Chase Bank, N.A. ("JPMC Bank") by the entities' mutual parent company,

JPMorgan Chase & Co.  Subsequently, EMC has ceased independent business operations.  As a

result of this *de facto* merger, JPMC Bank is named as a Successor Defendant to EMC.  *See* §

IV.C.4.  All references herein to EMC are also to JPMC Bank, which is liable as a matter of law

as successor to EMC.

47.     Underwriter, Corporate Seller, and Controlling Person Defendant Bear, Stearns &

Co. Inc., now known as J.P. Morgan Securities, LLC (hereafter "Bear, Stearns & Co. Inc."),[5] is a

Delaware corporation which, at all relevant times, has maintained a securities broker-dealer

FINRA registration in Massachusetts and was and is registered to do business in Massachusetts.

Bear, Stearns & Co. Inc. maintains its Massachusetts principal office at One Federal Street,

Boston, MA 02110.  Bear, Stearns & Co. Inc. underwrote Certificates AHM 2005-2 1A1, MHL

2005-5 A1, LUM 2005-1 A1, NAA 2007-3 A1, NAA 2007-1 2A1, LUM 2006-7 2A1, IMM

2005-7 A1, LUM 2006-6 A1, BSMF 2007-AR5 1A1A, BALTA 2007-3 1A1, BSMF 2007-AR4

1A1, TMST 2007-1 A2A, BALTA 2007-2 1A1, BALTA 2007-1 1A1, BSMF 2007-AR1 1A1,

BSMF 2006-AR5 1A1, BALTA 2006-7 1A1, BSMF 2006-AR3 1A1, BSMF 2006-AR2 1A1,

BALTA 2006-6 1A1, SAMI 2006-AR7 A1A, BSMF 2006-AR1 1A1, BALTA 2006-5 1A1,

SAMI 2006-AR4 4A1, SAMI 2006-AR6 1A1, IMSA 2006-2 1A2A, BALTA 2006-4 11A1,

BALTA 2006-4 13A1, LUM 2006-3 11A1, BALTA 2006-3 1A1, BALTA 2006-2 11A1,

BALTA 2006-1 11A1, BALTA 2005-10 11A1, IMSA 2005-2 A1, BALTA 2005-9 11A1,

---

[5] During the fall of 2008, Underwriter Defendant J.P. Morgan Securities Inc. merged with and into Underwriter Defendant Bear Stearns & Co., Inc.  The surviving corporation changed its name from Bear Stearns & Co. Inc. to J.P. Morgan Securities Inc.  The company changed its name again on or about September 1, 2010, when it converted into J.P. Morgan Securities LLC. For the sake of clarity, Plaintiff refers to this Underwriter Defendant as Bear Stearns & Co., Inc. in connection with all pre-merger acts and omissions of Bear Stearns & Co., Inc. Similarly, Plaintiff refers to this Underwriter Defendant as J.P. Morgan Securities Inc. in connection with all pre-merger acts and omissions of J.P. Morgan Securities Inc. To the extent that Underwriter Defendant J.P. Morgan Securities Inc. has undergone a change in corporate structure and/or ownership through merger, J.P. Morgan Securities LLC remains liable as the initial entity's successor.

BALTA 2005-8 11A1, SAMI 2005-AR6 2A1, GPMF 2005-AR4 4A1A, SAMI 2005-AR3 1A1,

GPMF 2005-AR2 A1, SAMI 2005-AR2 1A1, GPMF 2005-AR1 A2, GPMF 2006-AR3 4A1 and

CWHL 2005-2 2A1.  Bear, Stearns & Co. Inc. also sold Certificate NAA 2006-AR4 A2 to the

Bank.

48.     Additionally, at all relevant times, Defendant Bear, Stearns & Co. Inc. was a

controlling entity of Sponsor and Controlling Person Defendant EMC.  Bear, Stearns & Co.

exercised complete domination and control over EMC, both generally and specifically with

respect to the PLMBS.  *See infra* § V.E.3.

49.     Controlling Person Defendant The Bear Stearns Companies Inc. is a Delaware

corporation.  At the time the Bank acquired the relevant Certificates, each of the following

Defendants were wholly-owned subsidiaries of The Bear Stearns Companies Inc.; Bear Stearns

Asset Backed Securities I LLC, Structured Asset Mortgage Investments II Inc.; Bear, Stearns &

Co. Inc.; and EMC.  *See, e.g.*, Form S-3, Asset Mortgage Investments II Inc., at 60 (Jan. 26,

2007); Form S-3, Bear Stearns Asset Backed Securities I LLC, at 91 (March 31, 2006).  As a

corporate parent of these entities, Defendant The Bear Stearns Companies Inc. possessed the

practical ability to direct or cause the direction of the management, policies, and actions of Bear

Stearns Asset Backed Securities I LLC; Structured Asset Mortgage Investments II Inc.; Bear,

Stearns & Co. Inc.; and EMC related to the PLMBS offerings, and in fact exercised such

direction and control over the activities of these entities related to the issuance and sale of the

Certificates.  *See infra* § V.E.  Therefore, The Bear Stearns Companies Inc. was a controlling

entity of Bear Stearns Asset Backed Securities I LLC; Structured Asset Mortgage Investments II

Inc.; Bear, Stearns & Co. Inc.; and EMC.

50.     At the time of the transactions, The Bear Stearns Companies, Inc. was also the parent company and a controlling entity of Bear Stearns Residential Mortgage Corporation which originated loans for the offerings in which the Bank purchased Certificates BALTA 2007-3 1A1, BALTA 2007-2 1A1, BSMF 2006-AR1 1A1, BSMF 2007-AR4 1A1, BSMF 2007-AR5 1A1A, BSMF 2007-AR1 1A1, BSMF 2006-AR3 1A1, BSMF 2006-AR2 1A1, and BSMF 2006-AR5 1A1.  On or about July 6, 2008, The Bear Stearns Companies, Inc. legally changed its name to The Bear Stearns Companies LLC.  All references herein to The Bear Stearns Companies, Inc. are also to The Bear Stearns Companies LLC.

### 4.     The Chevy Chase (Capital One) Entities

51.     Depositor/Issuer Defendant Chevy Chase Funding LLC is a Delaware limited liability company.  Chevy Chase Funding LLC was the Depositor for Certificates CCMFC 2006-2A A1, CCMFC 2007-1A A1, and CCMFC 2007-2A A1.

52.     Non-Defendant Sponsor and Controlling Person Chevy Chase Bank, F.S.B. was a federally chartered savings bank that was registered to do business in Massachusetts at the time of the transactions.  Chevy Chase Bank, F.S.B. was the Sponsor for the offerings for which Chevy Chase Funding LLC was a depositor and from which the Bank purchased Certificates CCMFC 2006-2A A1, CCMFC 2007-1A A1 and CCMFC 2007-2A A1.  Depositor/Issuer Chevy Chase Funding LLC was also a subsidiary of Chevy Chase Bank, F.S.B.  *See* Comptroller of the Currency, Conditional Approval of Applications to convert Chevy Chase Bank, F.S.B. to a national bank and to merge the converted bank into Capital One, National Association (July 14, 2009).  As its corporate parent and as the Sponsor of the PLMBS offerings for which it was a depositor, Chevy Chase Bank, F.S.B. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Chevy Chase Funding LLC related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these

entities related to the issuance and sale of the Certificates. *See infra* § V.E. Thus, Chevy Chase Bank, F.S.B. was a controlling entity of Chevy Chase Funding LLC.

53.     Chevy Chase Bank, F.S.B. was also the parent company and a controlling entity of Chevy Chase Funding LLC and originated loans for the offerings in which the Bank purchased Certificates CCMFC 2006-2A A1, CCMFC 2007-1A A1 and CCMFC 2007-2A A1. During December 2008, Chevy Chase Bank, F.S.B. was acquired by and merged with and into Successor Defendants Capital One Financial Corporation and Capital One, National Association. *See infra* § IV.C.2. All references herein to Chevy Chase Bank, F.S.B. are also to Capital One Financial Corporation and Capital One, National Association, which are liable as a matter of law as successor to Chevy Chase Bank, F.S.B. and its subsidiaries, including Chevy Chase Funding LLC, by virtue of their status as the surviving entities in the acquisition of and merger with Chevy Chase Bank, F.S.B.

### 5.     The Citigroup Entities

54.     Depositor/Issuer Defendant Citicorp Mortgage Securities, Inc. is a Delaware corporation. Citicorp Mortgage Securities, Inc. was the Depositor for Certificate CMALT 2007-A4 1A7.

55.     Depositor/Issuer Defendant Citigroup Mortgage Loan Trust Inc. is a Delaware corporation. Citigroup Mortgage Loan Trust Inc. was the Depositor for Certificate CMLTI 2005-9 1A1.

56.     Underwriter and Corporate Seller Defendant Citigroup Global Markets Inc. is a New York corporation which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts. Citigroup Global Markets Inc. underwrote Certificates LUM 2007-2 1A1, RALI 2006-QA2 1A1,

and CMLTI 2005-9 1A1.  Citigroup Global Markets Inc. also sold Certificates MARM 2005-7

2A1 and GPMF 2006-AR3 4A1 to the Bank.

57.     Sponsor and Controlling Person Defendant Citigroup Global Markets Realty

Corp. is a New York corporation that was and is registered to do business in Massachusetts.

Citigroup Global Markets Realty Corp. was the Sponsor for the offering for which Citigroup

Mortgage Loan Trust Inc. was Depositor and from which the Bank purchased Certificate CMLTI

2005-9 1A1.  As the Sponsor of the PLMBS offerings for which it was a Depositor, Defendant

Citigroup Global Markets Realty Corp. possessed the practical ability to direct or cause the

direction of the management, policies, and actions of Citigroup Mortgage Loan Trust Inc. related

to the PLMBS offerings, and in fact exercised such direction and control over its activities

related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, Citigroup Global

Markets Realty Corp. was a controlling entity of Citigroup Mortgage Loan Trust Inc.

58.     Sponsor and Controlling Person Defendant CitiMortgage, Inc. is a New York

corporation that was and is registered to do business in Massachusetts.  CitiMortgage, Inc. was

the Sponsor of, and originated loans for, the offering for which Citigroup Mortgage Securities,

Inc. was Depositor and from which the Bank purchased Certificate CMALT 2007-A4 1A7.

Citicorp Mortgage Securities, Inc. also is a wholly-owned subsidiary of CitiMortgage Inc.  *See,*

*e.g.*, CMALT 2007-A4 Pros. at 80; Corporate Disclosure Statement, Dkt. No. 51.  As its

corporate parent and as the Sponsor of the PLMBS offerings for which it was a depositor,

Defendant CitiMortgage, Inc. possessed the practical ability to direct or cause the direction of the

management, policies, and actions of Citigroup Mortgage Securities, Inc. related to the PLMBS

offerings, and in fact exercised such direction and control over its activities related to the

issuance and sale of the Certificates.  *See infra* § V.E.  Thus, CitiMortgage, Inc. was a

controlling entity of Citicorp Mortgage Securities, Inc.

59.     Controlling Person Defendant Citigroup Financial Products, Inc. is a Delaware

corporation.  Citigroup Mortgage Loan Trust Inc., Citigroup Global Markets Inc., and Citigroup

Global Markets Realty Corp. are wholly-owned subsidiaries of Citigroup Financial Products, Inc.

Corporate Disclosure Statement, Dkt. No. 51.  As a corporate parent of these entities, Defendant

Citigroup Financial Products, Inc. possessed the practical ability to direct or cause the direction

of the management, policies, and actions of Citigroup Mortgage Loan Trust Inc., Citigroup

Global Markets Inc., and Citigroup Global Markets Realty Corp. related to the PLMBS

offerings, and in fact exercised such direction and control over the activities of these entities

related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, Controlling Person

Defendant Citigroup Financial Products, Inc. was a controlling entity of Citigroup Mortgage

Loan Trust Inc., Citigroup Global Markets Inc. and Citigroup Global Markets Realty Corp.

60.     Controlling Person Defendant Citigroup Inc. is a Delaware corporation.  The

following Defendants are wholly-owned subsidiaries of Citigroup Inc.:  Citicorp Mortgage

Securities, Inc.; CitiMortgage, Inc., Citigroup Financial Products, Inc., Citigroup Mortgage Loan

Trust Inc., Citigroup Global Markets Inc., and Citigroup Global Markets Realty Corp.  Corporate

Disclosure Statement, Dkt. No. 51.  As a corporate parent of these entities, Defendant Citigroup

Inc. possessed the practical ability to direct or cause the direction of the management, policies,

and actions of Citicorp Mortgage Securities, Inc.; CitiMortgage, Inc., Citigroup Financial

Products, Inc., Citigroup Mortgage Loan Trust Inc., Citigroup Global Markets Inc., and

Citigroup Global Markets Realty Corp. related to the PLMBS offerings, and in fact exercised

such direction and control over the activities of these entities related to the issuance and sale of

the Certificates.  *See infra* § V.E.  Therefore, Citigroup Inc. was a controlling entity of Citicorp

Mortgage Securities, Inc., Citigroup Mortgage Loan Trust Inc., Citigroup Global Markets Inc.,

Citigroup Global Markets Realty Corp., CitiMortgage, Inc. and Citigroup Financial Products,

Inc.

### 6.      The Countrywide Entities

61.      Depositor/Issuer Defendant CWALT, Inc. is a Delaware corporation.  CWALT,

Inc. was the Depositor for Certificates CWALT 2007-OA9 A1, CWALT 2007-OA4 A1,

CWALT 2006-OA16 A2, CWALT 2006-OA8 1A1, CWALT 2005-86CB A10, and CWALT

2005-16 A4.

62.      Depositor/Issuer Defendant CWMBS, Inc. is a Delaware corporation.  CWMBS,

Inc. was the Depositor for Certificate CWHL 2005-2 2A1.

63.      Underwriter Defendant Countrywide Securities Corporation is a California

corporation.  Countrywide Securities Corporation underwrote Certificates IMM 2005-7 A1,

CWALT 2007-OA9 A1, AHMA 2007-5 A1, AHMA 2007-2 A1, AHMA 2006-6 A1A, CWALT

2006-OA16 A2, IMSA 2006-2 1A2A, CWALT 2005-86CB A10, and IMSA 2005-2 A1.

64.      Sponsor and Controlling Person Defendant Countrywide Home Loans, Inc. is a

New York corporation that was and is registered to do business in Massachusetts.  Countrywide

Home Loans, Inc. was the Sponsor for the offerings for which CWALT, Inc. and CWMBS, Inc.

were Depositors and from which the Bank purchased Certificates CWALT 2007-OA9 A1,

CWALT 2007-OA4 A1, CWALT 2006-OA16 A2, CWALT 2006-OA8 1A1, CWALT 2005-

86CB A10, CWALT 2005-16 A4, and CWHL 2005-2 2A1.  Countrywide Home Loans, Inc. also

originated loans for the offerings in which the Bank purchased Certificates BALTA 2007-1 1A1,

BALTA 2006-7 1A1, BALTA 2006-5 1A1, MARM 2005-7 2A1, CWALT 2007-OA9 A1,

CWALT 2007-OA4 A1, CWALT 2006-OA8 1A1, CWALT 2005-86CB A10, CWALT 2005-16

A4, CWHL 2005-2 2A1, DBALT 2006-AR4 A1, BALTA 2006-4 11A1, DBALT 2006-AR3 A2, JPALT 2006-A2 1A1, BAFC 2005-H 7A1, HVMLT 2007-1 2A1A, BCAP 2006-AA1 A1, SAMI 2006-AR7 A1A, SAMI 2006-AR6 1A1, HVMLT 2005-10 2A1A, BAFC 2006-D 1A1, SAMI 2005-AR2 1A1, SAMI 2006-AR4 4A1, CWALT 2006-OA16 A2, MARM 2005-8 1A1, ARMT 2006-3 4A2, ARMT 2007-2 2A21, BALTA 2005-9 11A1, LUM 2005-1 A1, ARMT 2006-1 6A1, BALTA 2006-6 1A1, and LUM 2006-6 A1.  As the Sponsor of the PLMBS offerings for which these entities were Depositors, Defendant Countrywide Home Loans, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of CWALT, Inc. and CWMBS, Inc. related to the PLMBS offerings, and in fact exercised such direction and control over their activities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, Countrywide Home Loans, Inc. was also a controlling entity of CWALT, Inc. and CWMBS, Inc.

65.    Controlling Person Defendant Countrywide Financial Corporation[6] is a Delaware corporation.  At the time the Bank acquired the relevant Certificates, Countrywide Financial Corporation was a holding company which, through its subsidiaries, was engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.  Countrywide Financial Corporation managed its business through five business segments:  Mortgage Banking; Banking; Capital Markets; Insurance; and Global Operations.  The Mortgage Banking segment

---

[6] By virtue of a merger that became effective on July 1, 2008, Countrywide Financial Corporation merged with and into a Bank of America Corporation subsidiary, which acquired substantially all Countrywide Financial Corporation assets and responsibility for all pre-merger liabilities and was re-named Countrywide Financial Corporation.  *See infra* § IV.C.1.a.  As such, as a matter of law, the surviving entity Countrywide Financial Corporation is liable as a successor to its predecessor Countrywide Financial Corporation.  All references herein to Countrywide Financial Corporation are to both the pre- and post-merger Countrywide Financial Corporation.

was Countrywide Financial Corporation's core business and generated 48% of the Countrywide Financial Corporation's pre-tax earnings in 2006.  The mortgage loan production of the Mortgage Banking segment "[h]istorically . . . has occurred in Countrywide Home Loans [Inc.]," a direct wholly-owned subsidiary of Countrywide Financial Corporation.  2007 Form 10-K, Countrywide Financial Corporation at 4, Schedule 3.13.  Additionally, "[t]he Capital Markets Segment includes the operations of Countrywide Securities Corporation," which is an indirect wholly-owned subsidiary of Countrywide Financial Corporation.  2007 Form 10-K, Countrywide Financial Corporation at F-90, Schedule 3.13.  Finally, CWALT, Inc. and CWMBS, Inc. are both limited purpose finance subsidiaries of Countrywide Financial Corporation.  *See* Form S-3, CWALT Inc. at S-1 (Feb. 7, 2006); Form S-3, CWALT Inc. at S-3 (Sep. 29, 2003).  As a corporate parent of these entities, Defendant Countrywide Financial Corporation possessed the practical ability to direct or cause the direction of the management, policies, and actions of CWALT, Inc., CWMBS, Inc., Countrywide Securities Corporation and Countrywide Home Loans, Inc. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.  *See infra* § V.E. Thus, Countrywide Financial Corporation was a controlling entity of CWALT, Inc., CWMBS, Inc., Countrywide Securities Corporation and Countrywide Home Loans, Inc.

66.    Bank of America Corporation is also named as a Successor Defendant to CWALT, Inc., CWMBS, Inc., Countrywide Securities Corporation, Sponsor Defendant Countrywide Home Loans, Inc., and Controlling Person Defendant Countrywide Financial Corporation.  *See infra* § IV.C.1.  As set forth below, on or about July 1, 2008, Successor Defendant Bank of America Corporation acquired Countrywide Financial Corporation and all of

its subsidiaries, including CWALT, Inc., CWMBS, Inc., Countrywide Securities Corporation, and Countrywide Home Loans, Inc.

### 7. The Credit Suisse Entities

67. Depositor/Issuer Defendant Credit Suisse First Boston Mortgage Securities Corp. is a Delaware corporation that was and is registered to do business in Massachusetts. Credit Suisse First Boston Mortgage Securities Corp. was the Depositor/Issuer for Certificates ARMT 2007-2 2A21, ARMT 2007-1 5A1, ARMT 2006-3 4A2, ARMT 2006-1 6A1, and ARMT 2006-2 6A1.

68. Underwriter, Sponsor, and Controlling Person Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts. Credit Suisse Securities (USA) LLC underwrote Certificates CCMFC 2006-2A A1, CCMFC 2007-1A A1, CCMFC 2007-2A A1, ARMT 2007-2 2A21, ARMT 2007-1 5A1, TMST 2007-1 A2A, ARMT 2006-3 4A2, ARMT 2006-2 6A1, ARMT 2006-1 6A1, WFMBS 2006-AR12 1A1, and MHL 2006-1 1A2. Credit Suisse Securities (USA) LLC was also the Sponsor for an offering for which Credit Suisse First Boston Mortgage Securities Corp. was Depositor and from which the Bank purchased Certificate ARMT 2006-2 6A1. As the Sponsor of this PLMBS offering for which Credit Suisse First Boston Mortgage Securities Corp. was Depositor, Defendant Credit Suisse Securities (USA) LLC possessed the practical ability to direct or cause the direction of the management, policies, and actions of Credit Suisse First Boston Mortgage Securities Corp. related to this PLMBS offering, and in fact exercised such direction and control over its activities related to the issuance and sale of this Certificate. *See infra* § V.E. Thus, Credit Suisse Securities (USA) LLC was also a controlling entity of Credit Suisse First Boston Mortgage Securities Corp. with respect to this Certificate.

69.     Sponsor and Controlling Person Defendant DLJ Mortgage Capital, Inc. is a Delaware corporation that was and is registered to do business in Massachusetts.  DLJ Mortgage Capital Inc. was the Sponsor for the other offerings for which Credit Suisse First Boston Mortgage Securities Corp. was Depositor and from which the Bank purchased Certificates ARMT 2007-2 2A21, ARMT 2007-1 5A1, ARMT 2006-3 4A2, and ARMT 2006-1 6A1.  As the Sponsor of these PLMBS offerings for which Credit Suisse First Boston Mortgage Securities Corp. was Depositor, Defendant DLJ Mortgage Capital, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Credit Suisse First Boston Mortgage Securities Corp. related to these PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of these Certificates.  *See infra* § V.E.  Thus, DLJ Mortgage Capital, Inc. was also a controlling entity of Credit Suisse First Boston Mortgage Securities Corp. with respect to these Certificates.  DLJ Mortgage Capital, Inc. also originated loans for the offering in which the Bank purchased Certificates ARMT 2007-2 2A21, ARMT 2006-2 6A1, ARMT 2006-3 4A2, and ARMT 2007-1 5A1.

70.     Controlling Person Defendant Credit Suisse (USA), Inc. is a Delaware corporation that was and is registered to do business in Massachusetts.  Credit Suisse Securities (USA) LLC and DLJ Mortgage Capital, Inc. are wholly-owned subsidiaries of Credit Suisse (USA), Inc.  *See* Corporate Disclosure Statement, Dkt. No. 18.  Additionally, Credit Suisse First Boston Mortgage Securities Corp. is an indirect wholly-owned subsidiary of Credit Suisse (USA), Inc.  *Id.*  As a corporate parent of these entities, Defendant Credit Suisse (USA), Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Credit Suisse First Boston Mortgage Securities Corporation, Credit Suisse Securities (USA) LLC, and DLJ Mortgage Capital Inc. related to the PLMBS offerings, and in fact

exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates. *See infra* § V.E. Thus, Credit Suisse (USA), Inc. was a controlling entity of Credit Suisse First Boston Mortgage Securities Corporation, Credit Suisse Securities (USA) LLC, and DLJ Mortgage Capital Inc.

71.     Controlling Person Defendant Credit Suisse Holdings (USA), Inc. is a Delaware corporation that was and is registered to do business in Massachusetts.  Credit Suisse (USA), Inc. is a wholly-owned subsidiary of Credit Suisse Holdings (USA), Inc. *See* Dkt. No. 18. Accordingly, Credit Suisse Securities (USA) LLC, DLJ Mortgage Capital, Inc., and Credit Suisse First Boston Mortgage Securities Corporation are indirect wholly-owned subsidiaries of Credit Suisse Holdings (USA), Inc. *See supra* ¶ 70.  As a corporate parent of these entities, Defendant Credit Suisse Holdings (USA), Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Credit Suisse (USA), Inc., Credit Suisse First Boston Mortgage Securities Corporation, Credit Suisse Securities (USA) LLC, and DLJ Mortgage Capital Inc. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates. *See infra* § V.E.  Therefore, Credit Suisse Holdings (USA), Inc. was a controlling entity of Credit Suisse First Boston Mortgage Securities Corp.; Credit Suisse Securities (USA) LLC; DLJ Mortgage Capital, Inc.; and Credit Suisse (USA) Inc.

72.     The Credit Suisse Entities identified in paragraphs 67 through 71 above are also affiliates, under common ownership, of Credit Suisse Financial Corporation, which originated loans for the offerings in which the Bank purchased Certificates ARMT 2006-1 6A1, ARMT 2006-2 6A1, ARMT 2006-3 4A2, ARMT 2007-1 5A1, and ARMT 2007-2 2A21.

8.       **The Deutsche and MortgageIT Entities**

73.       Depositor/Issuer Defendant MortgageIT Securities Corp. is a Delaware corporation.  MortgageIT Securities Corp. was the Depositor/Issuer for Certificate MHL 2005-5 A1.

74.       Sponsor and Controlling Person Defendant MortgageIT, Inc. is a New York corporation that was and is registered to do business in Massachusetts.  MortgageIT, Inc. was the Sponsor for the offering in which the Bank purchased Certificate MHL 2006-1 1A2.  Defendant Mortgage IT Securities Corp. was a wholly-owned subsidiary of MortgageIT, Inc.  Corporate Disclosure Statement, Dkt. No. 35.  As a corporate parent of Mortgage IT Securities Corp., MortgageIT, Inc. possessed the practical ability to direct or cause the direction of its management, policies, and actions related to the PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus MortgageIT, Inc. is a controlling entity of MortgageIT Securities Corp. MortgageIT, Inc. also originated loans for the transactions in which the Bank purchased Certificates CWALT 2006-OA16 A2, DBALT 2006-AR3 A2, DBALT 2006-AR4 A1, DBALT 2007-AR1 A1, LUM 2006-6 A1, MARM 2005-7 2A1, MHL 2005-5A1, MHL 2006-1 1A2, MSM 2006-16AX 2A1, RALI 2006-QA2 1A1, and RALI 2006-QA3 A1.

75.       Sponsor and Controlling Person Non-Defendant MortgageIT Holdings, Inc. was a Maryland corporation.  MortgageIT Holdings, Inc. was the Sponsor for the offering for which MortgageIT Securities Corp. was Depositor and from which the Bank purchased Certificate MHL 2005-5 A1.  Mortgage MortgageIT Securities Corp. was also a wholly-owned subsidiary of MortgageIT Holdings, Inc.  Corporate Disclosure Statement, Dkt. No. 35.  As its corporate parent and as the Sponsor of the PLMBS offering for which it was Depositor, MortgageIT Holdings, Inc. possessed the practical ability to direct or cause the direction of the management,

policies, and actions of MortgageIT Securities Corp. related to the PLMBS offering, and in fact exercised such direction and control over its activities related to the issuance and sale of the Certificate. *See infra* § V.E.  Additionally, Defendant MortgageIT, Inc. was a wholly-owned subsidiary of MortgageIT Holdings, Inc.  Corporate Disclosure Statement, Dkt. No. 35.  As a corporate parent of MortgageIT, Inc., MortgageIT Holdings, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of MortgageIT, Inc. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.  *See infra* § V.E. Thus, MortgageIT Holdings, Inc. was a controlling entity of MortgageIT Securities Corp. and MortgageIT, Inc.  On our about January 2, 2007 MortgageIT Holdings, Inc. was acquired by Successor Defendant DB Structured Products Inc. and was merged with and liquidated into Successor Defendant MIT Holdings Inc.  *See infra* ¶¶ 79-80.

76.     Depositor/Issuer Defendant Deutsche Alt-A Securities, Inc. is a Delaware corporation.  Deutsche Alt-A Securities, Inc. was the Depositor/Issuer for Certificates DBALT 2006-AR2 1A1, DBALT 2006-AR2 1A2, DBALT 2006-AR3 A2, DBALT 2006-AR4 A1, DBALT 2006-AR5 1A1, and DBALT 2007-AR1 A1.

77.     Underwriter and Corporate Seller Defendant Deutsche Bank Securities Inc. is a Delaware corporation which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts. Deutsche Bank Securities Inc. underwrote Certificates DBALT 2006-AR2 1A1, DBALT 2006-AR2 1A2, DBALT 2006-AR3 A2, DBALT 2006-AR4 A1, DBALT 2006-AR5 1A1, DBALT 2007-AR1 A1, and RALI 2006-QA3 A1.  Deutsche Bank Securities Inc. also sold Certificate JPMMT 2005-ALT1 2A1 to the Bank.

78.     Sponsor, Controlling Person, and Successor Defendant DB Structured Products, Inc. is a Delaware corporation that was and is registered to do business in Massachusetts.  DB Structured Products, Inc. was the Sponsor for the deals for which Deutsche Alt-A Securities, Inc. was Depositor and from which the Bank purchased Certificates DBALT 2006-AR2 1A1, DBALT 2006-AR2 1A2, DBALT 2006-AR3 A2, DBALT 2006-AR4 A1, DBALT 2006-AR5 1A1, and DBALT 2007-AR1 A1.  DB Structured Products, Inc. also held all shares of capital stock of Deutsche Alt-A Securities, Inc.  *See* Corporate Disclosure Statement, Dkt. No. 35.  As its corporate parent and as the Sponsor of the PLMBS offerings for which it was Depositor, Defendant DB Structured Products, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Deutsche Alt-A Securities, Inc. related to the PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, DB Structured Products, Inc. was a controlling entity of Deutsche Alt-A Securities, Inc.

79.     DB Structured Products, Inc. is also named as a Successor Defendant to Sponsor and Controlling Person Non-Defendant MortgageIT Holdings, Inc., and its subsidiaries MortgageIT Securities Corp. and MortgageIT, Inc.  On or about January 2, 2007, MortgageIT Holdings, Inc. was acquired by DB Structured Products, Inc.  Subsequently DB Structured Products, Inc. absorbed MortgageIT Holdings, Inc., MortgageIT, Inc., and MortgageIT Securities Corp. into its operations.  *See infra* § IV.C.3.  All references herein to MortgageIT Holdings, Inc., MortgageIT, Inc., and MortgageIT Securities Corp. are also to DB Structured Products, Inc., which is liable as a matter of law as a successor to MortgageIT Holdings, Inc, MortgageIT, Inc., and MortgageIT Securities Corp.

80.     Successor Defendant MIT Holdings, Inc. (f/k/a Titan Holdings Corp.) is a Maryland Corporation that is a successor through merger of Sponsor and Controlling Person Non-Defendant MortgageIT Holdings, Inc.  As set forth below, DB Structured Products, Inc.'s acquisition of MortgageIT Holdings, Inc. was effectuated through a series of transactions by which MortgageIT Holdings, Inc. was merged with and liquidated into DB Structured Products Inc.'s subsidiary, MIT Holdings, Inc.  *See infra* § IV.C.3.  All references herein to MortgageIT Holdings, Inc. are also to MIT Holdings, Inc., which is liable as a matter of law as a successor to MortgageIT Holdings, Inc.

81.     Controlling Person Defendant DB U.S. Financial Market Holding Corporation is a Delaware corporation.  DB Structured Products, Inc. and Deutsche Bank Securities, Inc. are wholly-owned by DB U.S. Financial Markets Holding Corporation.  Corporate Disclosure Statement, Dkt. No. 35.  As a corporate parent of these entities, Defendant DB U.S. Financial Market Holding Corporation possessed the practical ability to direct or cause the direction of the management, policies, and actions of Deutsche Alt-A Securities, Inc., Deutsche Bank Securities Inc., and DB Structured Products, Inc. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Therefore, DB U.S. Financial Market Holding Corporation was a controlling entity of Deutsche Alt-A Securities, Inc.; Deutsche Bank Securities Inc.; and DB Structured Products, Inc.

## 9.     Goldman, Sachs & Co.

82.     Underwriter Defendant Goldman, Sachs & Co. is a New York corporation which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts.  Goldman, Sachs & Co underwrote Certificates AHM 2005-2 1A1, CWALT 2007-OA4 A1 and RALI 2006-QO10 A1.

### 10.    The Greenwich Entities

83.    Depositor/Issuer Defendant Greenwich Capital Acceptance, Inc. is a Delaware corporation.  Greenwich Capital Acceptance, Inc. was the Depositor for Certificates DSLA 2005-AR1 2A1A, DSLA 2005-AR2 2A1A, HVMLT 2007-1 2A1A, HVMLT 2006-8 2A1A, HVMLT 2006-7 2A1A, MHL 2006-1 1A2, and HVMLT 2005-10 2A1A.  Pursuant to its Restated Certificate of Incorporation, dated July 8, 2009, Greenwich Capital Acceptance, Inc. legally changed its name to RBS Acceptance Inc.  All references herein to Greenwich Capital Acceptance, Inc. are also to RBS Acceptance Inc.

84.    Underwriter Defendant Greenwich Capital Markets, Inc. is a Delaware corporation which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts. Greenwich Capital Markets, Inc. underwrote Certificates AHM 2005-2 1A1, DSLA 2005-AR1 2A1A, DSLA 2005-AR2 2A1A, NAA 2006-AR4 A2, NAA 2007-1 2A1, LUM 2007-2 1A1, CMALT 2007-A4 1A7, TMST 2007-1 A2A, HVMLT 2007-1 2A1A, HVMLT 2006-8 2A1A, HVMLT 2006-7 2A1A, MHL 2006-1 1A2, HVMLT 2005-10 2A1A, INDX 2005-AR8 2A1A, INDX 2005-AR4 2A1A, and INDX 2005-AR12 2A1A.  Pursuant to its Restated Certificate of Incorporation, dated April 1, 2009, Greenwich Capital Markets, Inc. legally changed its name to RBS Securities Inc.  All references herein to Greenwich Capital Markets, Inc. are also to RBS Securities Inc.

85.    Sponsor and Controlling Person Defendant Greenwich Capital Financial Products, Inc. is a Delaware corporation that was and is registered to do business in Massachusetts. Greenwich Capital Financial Products, Inc. was the Sponsor for most of the offerings for which Greenwich Capital Acceptance, Inc. was Depositor, including the offerings from which the Bank purchased Certificates DSLA 2005-AR1 2A1A, DSLA 2005-AR2 2A1A, HVMLT 2007-1

2A1A, HVMLT 2006-8 2A1A, HVMLT 2006-7 2A1A, and HVMLT 2005-10 2A1A.  As the

Sponsor of these PLMBS offerings for which Greenwich Capital Acceptance, Inc. was

Depositor, Defendant Greenwich Capital Financial Products, Inc. possessed the practical ability

to direct or cause the direction of the management, policies, and actions of Greenwich Capital

Acceptance, Inc. related to these PLMBS offerings, and in fact exercised such direction and

control over its activities related to the issuance and sale of these Certificates.  *See infra* § V.E.

Thus, Greenwich Capital Financial Products, Inc. was also a controlling entity of Greenwich

Capital Acceptance, Inc. with respect to these Certificates.  Pursuant to its Restated Certificate of

Incorporation, dated April 1, 2009, Greenwich Capital Financial Products, Inc. legally changed

its name to RBS Financial Products Inc.  All references herein to Greenwich Capital Financial

Products, Inc. are also to RBS Financial Products Inc.

86.     Controlling Person Defendant Greenwich Capital Holdings, Inc. is a Delaware

corporation.  Greenwich Capital Acceptance was a limited purpose finance subsidiary of

Greenwich Capital Holdings, Inc.  Form S-3, Financial Asset Securities Corp. at S-17 (Oct. 28,

2004).  Greenwich Capital Markets, Inc. and Greenwich Capital Financial Products, Inc. are

wholly-owned, direct subsidiaries of Greenwich Capital Holdings, Inc.  HVMLT 2007-1 Pros

Sup. at S-28.  As a corporate parent of these entities, Defendant Greenwich Capital Holdings,

Inc. possessed the practical ability to direct or cause the direction of the management, policies,

and actions of Greenwich Capital Acceptance, Inc., Greenwich Capital Markets, Inc. and

Greenwich Capital Financial Products, Inc. related to the PLMBS offerings, and in fact exercised

such direction and control over the activities of these entities related to the issuance and sale of

the Certificates.  *See infra* § V.E.  Accordingly, Greenwich Capital Holdings, Inc. was a

controlling entity of Greenwich Capital Acceptance, Inc., Greenwich Capital Markets, Inc. and

Greenwich Capital Financial Products, Inc.  Greenwich Capital Holdings, Inc. legally changed its name to RBS Holdings USA Inc.  All references herein to Greenwich Capital Holdings, Inc. are also to RBS Holdings USA Inc.

### 11. The Impac Entities

87.     Depositor/Issuer Defendant IMH Assets Corp. is a California corporation.  IMH Assets Corp. was the Depositor for Certificate IMM 2005-7 A1.

88.     Depositor/Issuer Defendant Impac Secured Assets Corp. is a California corporation.  Impac Secured Assets Corp. was the Depositor for Certificates IMSA 2005-2 A1 and IMSA 2006-2 1A2A.

89.     Sponsor and Controlling Person Defendant Impac Funding Corporation is a California corporation that was and is registered to do business in Massachusetts.  Impac Funding Corporation was the Sponsor for the offerings for which Impac Secured Assets Corp. was Depositor and from which the Bank purchased Certificates IMSA 2006-2 1A2A and IMSA 2005-2 A1.  Defendant Impac Secured Assets Corp. is a wholly-owned subsidiary of Impac Funding Corporation.  2005 Form 10-K, Impac Mortgage Holdings, Inc. at 1.  As its corporate parent and as the Sponsor of the PLMBS offerings for which it was Depositor, Defendant Impac Funding Corporation possessed the practical ability to direct or cause the direction of the management, policies, and actions of Impac Secured Assets Corp. related to the PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, Impac Funding Corporation was a controlling entity of Impac Secured Assets Corp.

90.     Sponsor and Controlling Person Defendant Impac Mortgage Holdings, Inc. is a Maryland corporation.  Impac Mortgage Holdings, Inc. was the Sponsor for the offering for which IMH Assets Corp. was Depositor and from which the Bank purchased Certificate IMM

2005-7 A1.  IMH Assets Corp. was a wholly-owned subsidiary of Impac Mortgage Holdings, Inc.  Form 10-K, Impac Mortgage Holdings, Inc. at 1 (Mar. 15, 2006).  As its corporate parent and as the Sponsor of the PLMBS offering for which it was Depositor, Defendant Impac Mortgage Holdings, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of IMH Assets Corp. related to the PLMBS offering, and in fact exercised such direction and control over its activities related to the issuance and sale of the Certificate.  *See infra* § V.E.  Additionally, the Defendants Impac Funding Corporation and Impac Secured Assets Corp. are wholly-owned subsidiaries of Impac Mortgage Holdings, Inc. *See* Form 10-K, Impac Mortgage Holdings, Inc. at 1 (Mar. 15, 2006).  As a corporate parent of these entities, Defendant Impac Mortgage Holdings, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of, Impac Secured Assets Corp. and Impac Funding Corporation related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, Impac Mortgage Holdings, Inc. was a controlling entity of IMH Assets Corp., Impac Secured Assets Corp. and Impac Funding Corporation.

### 12.    The J.P. Morgan Entities

91.    Depositor/Issuer Defendant J.P. Morgan Acceptance Corporation I is a Delaware corporation.  J.P. Morgan Acceptance Corporation I was the Depositor for Certificates JPALT 2007-A2 12A1, JPALT 2006-A3 1A1, JPALT 2006-A2 1A1, JPALT 2006-A1 1A1, and JPMMT 2005-ALT1 2A1.

92.    Underwriter Defendant J.P. Morgan Securities Inc., a Delaware corporation, changed its name and organization to J.P. Morgan Securities LLC, a Delaware limited liability company, on or about September 1, 2010.  This entity will simply be referred to as "J.P. Morgan

Securities Inc."[7]  It has, at all relevant times, maintained a securities broker-dealer FINRA

registration in Massachusetts and was and is registered to do business in Massachusetts.  J.P.

Morgan Securities Inc. underwrote Certificates JPALT 2007-A2 12A1, JPALT 2006-A3 1A1,

JPALT 2006-A2 1A1, and JPALT 2006-A1 1A1.

93.     Sponsor and Controlling Person Defendant J.P. Morgan Mortgage Acquisition

Corp. is a Delaware corporation.  J.P. Morgan Mortgage Acquisition Corp. was the Sponsor for

the offerings for which J.P. Morgan Acceptance Corporation I was Depositor and from which the

Bank purchased Certificates JPALT 2006-A2 1A1, JPALT 2006-A1 1A1, JPALT 2007-A2

12A1, JPALT 2006-A3 1A1, and JPMMT 2005-ALT1 2A1.  As the Sponsor of the PLMBS

offerings for which J.P. Morgan Acceptance Corporation I was Depositor, Defendant J.P.

Morgan Mortgage Acquisition Corp. possessed the practical ability to direct or cause the

direction of the management, policies, and actions of J.P. Morgan Acceptance Corporation I

related to these PLMBS offerings, and in fact exercised such direction and control over its

activities related to the issuance and sale of these Certificates.  *See infra* § V.E.  Thus, J.P.

Morgan Mortgage Acquisition Corp. was also a controlling entity of J.P. Morgan Acceptance

Corporation I with respect to these Certificates.

94.     Controlling Person Defendant JPMorgan Securities Holdings LLC is a Delaware

limited liability company.  Defendant J.P. Morgan Acceptance Corporation I is a direct, wholly-

owned subsidiary of JPMorgan Securities Holdings LLC.  Form S-3/A, J.P. Morgan Acceptance

Corp. I, at *87 (Apr. 3, 2006).  Additionally, JPMorgan Securities Holdings LLC held 100

percent of the voting securities of subsidiary J.P. Morgan Securities Inc.  *See, e.g.*, Form 10-K,

J.P. Morgan Chase & Co. at Exhibit 21.1 (Mar. 1, 2007).  As a corporate parent of these entities,

---

[7] *See* footnote 5, *supra*.

Defendant JPMorgan Securities Holdings LLC possessed the practical ability to direct or cause the direction of the management, policies, and actions of J.P. Morgan Acceptance Corporation I and J.P. Morgan Securities Inc. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates. *See infra* § V.E.  Therefore, JPMorgan Securities Holdings LLC was a controlling entity of J.P. Morgan Acceptance Corporation I and J.P. Morgan Securities Inc.

95.     Successor Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") is a national banking association.  JPMC Bank is a successor to Sponsor and Controlling Person Defendant EMC Mortgage Corporation ("EMC").  On or about April 1, 2011, JPMC Bank acquired all or substantially all of EMC's assets and succeeded to EMC's business. *See infra* § IV.C.4.  All references herein to EMC are also to JPMC Bank, which is liable as a matter of law as successor to EMC.  JPMC Bank is a wholly owned subsidiary of JPMorgan Chase & Co.

96.     Controlling Person Defendant JPMorgan Chase & Co., a Delaware corporation, owned 100 percent of the voting securities of subsidiaries J.P. Morgan Mortgage Acquisition Corp. and JPMorgan Securities Holdings LLC, *see, e.g.*, Form 10-K, J.P. Morgan Chase & Co. at Exhibit 21.1 (Mar. 1, 2007), which in turn was the parent company of J.P. Morgan Acceptance Corporation I and J.P. Morgan Securities Inc. *See supra* ¶ 94.  As a corporate parent of these entities, Defendant JPMorgan Chase & Co. possessed the practical ability to direct or cause the direction of the management, policies, and actions of JPMorgan Securities Holdings LLC, J.P. Morgan Acceptance Corporation I, J.P. Morgan Securities Inc. and J.P. Morgan Mortgage Acquisition Corp. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates. *See infra* § V.E.  Therefore, JPMorgan Chase & Co. is a controlling entity of JPMorgan Securities

Holdings LLC, J.P. Morgan Acceptance Corporation I, J.P. Morgan Securities Inc. and J.P.

Morgan Mortgage Acquisition Corp.  JP Morgan Chase & Co. was also a parent company of

both Chase Home Finance LLC and JPMorgan Chase Bank, N.A. which originated loans for the

offerings in which the Bank purchased Certificates JPALT 2007-A2 12A1, JPALT 2006-A2

1A1, JPALT 2006-A3 1A1, and JPALT 2006-A1 1A1.

### 13.    The Merrill Lynch Entities

97.    Depositor/Issuer Defendant Merrill Lynch Mortgage Investors, Inc. is a Delaware

corporation.  Merrill Lynch Mortgage Investors, Inc. was the Depositor for Certificate MANA

2007-A3 A2A.

98.    Underwriter and Successor Defendant Merrill Lynch, Pierce, Fenner & Smith

Incorporated is a Delaware corporation which, at all relevant times, has maintained a securities

broker-dealer FINRA registration in Massachusetts and was and is registered to do business in

Massachusetts.  Merrill Lynch, Pierce, Fenner & Smith Incorporated underwrote Certificates

IMSA 2006-2 1A2A, INDX 2006-AR19 1A1, MANA 2007-A3 A2A, MHL 2005-5 A1, and

NAA 2006-AF2 5A1.  Effective November 1, 2010, Banc of America Securities LLC merged

with and into Successor Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, a

Delaware corporation.  All references herein to Banc of America Securities LLC are also to

Merrill Lynch, Pierce, Fenner & Smith Incorporated, which is liable as a matter of law as

successor to Banc of America Securities LLC by virtue of its status as the surviving entity in its

merger with Banc of America Securities LLC.

99.    Sponsor and Controlling Person Defendant Merrill Lynch Mortgage Lending, Inc.

is a Delaware corporation that was and is registered to do business in Massachusetts.  Merrill

Lynch Mortgage Lending, Inc. was the Sponsor for the offering for which Merrill Lynch

Mortgage Investors, Inc. was Depositor and from which the Bank purchased Certificate MANA

2007-A3 A2A.  As the Sponsor of the PLMBS offering for which Merrill Lynch Mortgage

Investors, Inc. was Depositor, Defendant Merrill Lynch Mortgage Lending, Inc. possessed the

practical ability to direct or cause the direction of the management, policies, and actions of

Merrill Lynch Mortgage Investors, Inc. related to this PLMBS offering, and in fact exercised

such direction and control over its activities related to the issuance and sale of this Certificate.

*See infra* § V.E.  Thus, Merrill Lynch Mortgage Lending, Inc. was a controlling entity of Merrill

Lynch Mortgage Investors, Inc. with respect to this Certificate.

100.     Controlling Person Defendant Merrill Lynch & Co., Inc. is a Delaware

corporation.  At the time of the relevant transactions, Merrill Lynch & Co. owned, directly or

indirectly, at least 99% of the voting securities of each of the following subsidiary Defendants:

Merrill Lynch Mortgage Investors, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated;

and Merrill Lynch Mortgage Lending, Inc.  *See, e.g.*,  Form 10-K, Merrill Lynch & Co. , Inc.,

Ex-21 (Feb. 25, 2008); *see also* Dkt. No. 59.  As a corporate parent of these entities, Merrill

Lynch & Co., Inc. possessed the practical ability to direct or cause the direction of the

management, policies, and actions of Merrill Lynch Mortgage Investors, Inc., Merrill Lynch,

Pierce, Fenner & Smith Incorporated, and Merrill Lynch Mortgage Lending, Inc. related to the

PLMBS offerings, and in fact exercised such direction and control over the activities of these

entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  As such, Merrill

Lynch & Co., Inc. was a controlling entity of Merrill Lynch Mortgage Investors, Inc.; Merrill

Lynch, Pierce, Fenner & Smith Incorporated; and Merrill Lynch Mortgage Lending, Inc.

### 14.     The Morgan Stanley Entities

101.     Depositor/Issuer Defendant Morgan Stanley Capital I Inc. is a Delaware

corporation.  Morgan Stanley Capital I Inc. was the Depositor for Certificates MSM 2006-13AX

A1, MSM 2006-16AX 2A1, MSM 2006-8AR 1A2, MSM 2006-9AR A3, MSM 2007-2AX 2A2, MSM 2007-5AX 2A2, and MSM 2007-7AX 2A1.

102.    Underwriter Defendant Morgan Stanley & Co. Incorporated is a Delaware corporation which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts.  Morgan Stanley & Co. Incorporated underwrote Certificates CMALT 2007-A4 1A7, CWALT 2005-86CB A10, LUM 2005-1 A1, MSM 2006-13AX A1, MSM 2006-16AX 2A1, MSM 2006-8AR 1A2, MSM 2006-9AR A3, MSM 2007-2AX 2A2, MSM 2007-5AX 2A2, and MSM 2007-7AX 2A1.

103.    Sponsor and Controlling Person Non-Defendant Morgan Stanley Mortgage Capital Inc. was a New York corporation that was registered to do business in Massachusetts. Morgan Stanley Mortgage Capital Inc. was the Sponsor for the offerings for which Morgan Stanley Capital I Inc. was Depositor and from which the Bank purchased Certificates MSM 2006-13AX A1, MSM 2006-16AX 2A1, MSM 2006-8AR 1A2, MSM 2006-9AR A3, MSM 2007-2AX 2A2, MSM 2007-5AX 2A2, and MSM 2007-7AX 2A1.  As the Sponsor of the PLMBS offerings for which Morgan Stanley Capital I Inc. was Depositor, Morgan Stanley Mortgage Capital Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Morgan Stanley Capital I Inc. related to these PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of these Certificates.  *See infra* § V.E.  Thus, Morgan Stanley Mortgage Capital Inc. was a controlling entity of Morgan Stanley Capital I Inc. with respect to these Certificates. Morgan Stanley Mortgage Capital Inc. also originated loans for the offerings in which the Bank purchased Certificates MSM 2006-13AX A1, MSM 2006-16AX 2A1, MSM 2006-8AR 1A2,

MSM 2006-9AR A3, MSM 2007-2AX 2A2, MSM 2007-5AX 2A2, and MSM 2007-7AX 2A1.

Effective June 17, 2007, Morgan Stanley Mortgage Capital Inc. merged with and into Successor

Defendant Morgan Stanley Mortgage Capital Holdings LLC, a New York limited liability

company that is registered to do business in Massachusetts. *See infra* § IV.C.6.  Since the

merger, Morgan Stanley Mortgage Capital Holdings LLC has continued the business of Morgan

Stanley Mortgage Capital Inc.  All references to Morgan Stanley Mortgage Capital Inc. are also

to Morgan Stanley Mortgage Capital Holdings LLC, which is liable as a matter of law as

successor to Morgan Stanley Mortgage Capital Inc. by virtue of its status as the surviving entity

in its merger with Morgan Stanley Mortgage Capital Inc.

104.    Controlling Person Defendant Morgan Stanley is a financial holding company

organized under the laws of Delaware.  The following Defendants are wholly-owned subsidiaries

of Morgan Stanley: Morgan Stanley & Co. Incorporated, Morgan Stanley Capital I Inc., and

Morgan Stanley Mortgage Capital Holdings LLC.  Corporate Disclosure Statement, Dkt. No. 14.

Moreover, Morgan Stanley Mortgage Capital Inc. was also a wholly-owned subsidiary of

Morgan Stanley prior to its merger with Morgan Stanley Mortgage Capital Holdings LLC.  *See*,

From 10-K, Morgan Stanley at Exhibit 21 (Feb. 13, 2007).  As a corporate parent of these

entities, Morgan Stanley possessed the practical ability to direct or cause the direction of the

management, policies, and actions of Morgan Stanley & Co. Incorporated, Morgan Stanley

Capital I Inc., Morgan Stanley Mortgage Capital Inc., and Morgan Stanley Mortgage Capital

Holdings LLC related to the PLMBS offerings, and in fact exercised such direction and control

over the activities of these entities related to the issuance and sale of the Certificates.  *See infra*

§ V.E.  Thus, Morgan Stanley was a controlling entity of Morgan Stanley Capital I Inc., Morgan

Stanley & Co. Incorporated, Morgan Stanley Mortgage Capital Inc., and Morgan Stanley Mortgage Capital Holdings LLC.

### 15. The Nomura Entities

105. Depositor/Issuer Defendant Nomura Asset Acceptance Corporation is a Delaware corporation. Nomura Asset Acceptance Corporation was the Depositor for Certificates NAA 2006-AF2 5A1, NAA 2006-AR4 A2, NAA 2007-1 2A1, and NAA 2007-3 A1.

106. Underwriter Defendant Nomura Securities International, Inc. is a Delaware corporation which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts. Nomura Securities International, Inc. underwrote Certificate NAA 2006-AF2 5A1.

107. Sponsor and Controlling Person Defendant Nomura Credit & Capital, Inc. is a Delaware corporation that was and is registered to do business in Massachusetts. Nomura Credit & Capital, Inc. was the Sponsor for the offerings for which Nomura Asset Acceptance Corporation was Depositor and from which the Bank purchased Certificates NAA 2006-AF2 5A1, NAA 2006-AR4 A2, NAA 2007-1 2A1, and NAA 2007-3 A1. As the Sponsor of the PLMBS offerings for which Nomura Asset Acceptance Corporation was Depositor, Defendant Nomura Credit & Capital, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Nomura Asset Acceptance Corporation related to these PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of these Certificates. *See infra* § V.E. Thus, Nomura Credit & Capital, Inc. was a controlling entity of Nomura Asset Acceptance Corporation with respect to these Certificates.

108. Controlling Person Defendant Nomura Holding America, Inc. is a Delaware corporation. Defendants Nomura Credit & Capital, Inc. and Nomura Asset Acceptance

Corporation are indirect subsidiaries of Nomura Holding America, Inc.  Corporate Disclosure

Statement, Dkt. No. 88; Nomura 2007 Annual Report at 52.  Additionally, Defendant Nomura

Securities International, Inc. is a direct subsidiary of Nomura Holding America, Inc.  Corporate

Disclosure Statement, Dkt. No. 88.  As a corporate parent of these entities, Nomura Holding

America, Inc. possessed the practical ability to direct or cause the direction of the management,

policies, and actions of Nomura Asset Acceptance Corporation, Nomura Securities International,

Inc., and Nomura Credit & Capital, Inc. related to the PLMBS offerings, and in fact exercised

such direction and control over the activities of these entities related to the issuance and sale of

the Certificates.  *See infra* § V.E.  Accordingly, Nomura Holding America, Inc. was a controlling

entity of Nomura Asset Acceptance Corporation, Nomura Securities International, Inc., and

Nomura Credit & Capital, Inc.

### 16.    The Residential Funding (GMAC) Entities

109.    Depositor/Issuer Defendant Residential Accredit Loans, Inc. is a Delaware

corporation.  Residential Accredit Loans, Inc. was the Depositor for Certificates RALI 2005-

QA9 NB41, RALI 2006-QA2 1A1, RALI 2006-QA3 A1, RALI 2006-QO10 A1, and RALI

2007-QS6 A29.

110.    Sponsor and Controlling Person Defendant Residential Funding Company, LLC

previously known as Residential Funding Corporation until it changed its name on October 16,

2006 (hereafter together referred to as "Residential Funding Company, LLC"), is a Delaware

limited liability company that was and is registered to do business in Massachusetts.  Residential

Funding Company, LLC was the Sponsor for the offerings for which Residential Accredit Loans,

Inc. was Depositor and from which the Bank purchased Certificates RALI 2006-QO10 A1,

RALI 2007-QS6 A29, RALI 2005-QA9 NB41, RALI 2006-QA2 1A1, and RALI 2006-QA3 A1.

As the Sponsor of the PLMBS offerings for which Residential Accredit Loans, Inc. was

Depositor, Defendant Residential Funding Company, LLC possessed the practical ability to direct or cause the direction of the management, policies, and actions of Residential Accredit Loans, Inc. related to these PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of these Certificates. *See infra* § V.E. Thus, Residential Funding Company, LLC was a controlling entity of Residential Accredit Loans, Inc. with respect to these Certificates.

111.    Residential Funding Company, LLC, doing business as Residential Mortgage Corporation, also originated loans for the offering in which the Bank purchased Certificate LUM 2006-6 A1.  Residential Funding Company, LLC is also the parent company and a controlling entity of Homecomings Financial Network Inc., which is now known as Homecomings Financial, LLC but will together be referred to as "Homecomings Financial Network Inc." Homecomings Financial Network Inc. originated loans for the offerings in which the Bank purchased Certificates RALI 2005-QA9 NB41, RALI 2006-QA2 1A1, RALI 2006-QA3 A1, RALI 2006-QO10 A1, and RALI 2007-QS6 A29.

112.    Controlling Person Defendant GMAC Mortgage Group, Inc., a Delaware corporation, is now known as GMAC Mortgage Group LLC, a Delaware limited liability company.  This entity will be referred to simply as "GMAC Mortgage Group, Inc."  Defendants Residential Funding Company, LLC and Residential Accredit Loans, Inc. are indirect wholly-owned subsidiaries of GMAC Mortgage Group, Inc.  Form S-3/A, Residential Accredit Loans, Inc. at 65 (March 6, 2006).  As a corporate parent of these entities, GMAC Mortgage Group, Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Residential Funding Company, LLC and Residential Accredit Loans, Inc. related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these

entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Additionally, non-defendants Homecomings Financial Network Inc. and GMAC Mortgage Corporation were subsidiaries of GMAC Mortgage Group, Inc.  *See* 2007 Form 10-K, GMAC Inc. Ex-21 (Feb. 27, 2008).  GMAC Mortgage Corporation is now known as GMAC Mortgage, LLC, but this entity will be referred to simply as "GMAC Mortgage Corporation."  GMAC Mortgage Corporation originated loans for the offerings in which the Bank purchased Certificates LUM 2006-6 A1 and RALI 2007-QS6 A29.  Thus, GMAC Mortgage Group, Inc. was a controlling entity of Residential Accredit Loans, Inc., Residential Funding Company, LLC, Homecomings Financial Network Inc., and GMAC Mortgage Corporation.

113.     Controlling Person Defendant GMAC LLC was a Delaware limited liability company that was registered to do business in Massachusetts.  In June 2009, GMAC LLC converted to a Delaware corporation and changed its name to GMAC Inc. and in May 2010, GMAC Inc. changed its name to Ally Financial, Inc.  All references to GMAC LLC are also to GMAC Inc. and Ally Financial, Inc.  Defendants GMAC Mortgage Group, Inc., Residential Accredit Loans, Inc. and Residential Funding Company, LLC are all wholly-owned, indirect subsidiaries of GMAC LLC.  Corporate Disclosure Statement, Dkt. No. 67.  As the corporate parent of these entities, GMAC LLC possessed the practical ability to direct or cause the direction of the management, policies, and actions of Defendants GMAC Mortgage Group, Inc., Residential Accredit Loans, Inc. and Residential Funding Company, LLC related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Thus, GMAC LLC was a controlling entity of Residential Accredit Loans, Inc.; Residential Funding Company, LLC; and

GMAC Mortgage Group, Inc.  GMAC LLC was also the parent company and a controlling entity of Homecomings Financial Network Inc. and GMAC Mortgage Corporation.

### 17.      The UBS Entities

114.      Depositor/Issuer Defendant Mortgage Asset Securitization Transactions, Inc. is a Delaware corporation.  Mortgage Asset Securitization Transactions, Inc. was the Depositor for Certificates MARM 2005-7 2A1, MARM 2005-8 1A1, and MARM 2007-R5 A1.

115.      Underwriter, Corporate Seller, Sponsor, and Controlling Person Defendant UBS Securities LLC is a Connecticut limited liability company which, at all relevant times, has maintained a securities broker-dealer FINRA registration in Massachusetts and was and is registered to do business in Massachusetts.  UBS Securities LLC underwrote Certificates AHM 2005-2 1A1, CWALT 2005-16 A4, CWALT 2006-OA8 1A1, IMM 2005-7 A1, IMSA 2005-2 A1, MARM 2005-8 1A1, MARM 2007-R5 A1, MHL 2006-1 1A2, NAA 2006-AR4 A2, and RALI 2005-QA9 NB41.  UBS Securities LLC also sold Certificate LUM 2006-3 11A1 to the Bank.  UBS Securities LLC was also the Sponsor for an offering for which Mortgage Asset Securitization Transactions, Inc. was Depositor and from which the Bank purchased Certificate MARM 2007-R5 A1. As the Sponsor of this PLMBS offering for which Mortgage Asset Securitization Transactions, Inc. was Depositor, Defendant UBS Securities LLC possessed the practical ability to direct or cause the direction of the management, policies, and actions of Mortgage Asset Securitization Transactions, Inc. related to this PLMBS offering, and in fact exercised such direction and control over its activities related to the issuance and sale of this Certificate.  *See infra* § V.E.  Thus, UBS Securities LLC was a controlling entity of Mortgage Asset Securitization Transactions, Inc. with respect to this Certificate.

116.      Sponsor Defendant UBS Real Estate Securities Inc. is a Delaware corporation that was and is registered to do business in Massachusetts.  UBS Real Estate Securities Inc. was the

Sponsor for the other PLMBS offerings for which Mortgage Asset Securitization Transactions, Inc. was Depositor and from which the Bank purchased Certificates MARM 2005-7 2A1 and MARM 2005-8 1A1. As the Sponsor of the PLMBS offerings for which Mortgage Asset Securitization Transactions, Inc. was Depositor, Defendant UBS Real Estate Securities Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Mortgage Asset Securitization Transactions, Inc. related to these PLMBS offerings, and in fact exercised such direction and control over its activities related to the issuance and sale of these Certificates. *See infra* § V.E. Thus, UBS Real Estate Securities Inc. was a controlling entity of Mortgage Asset Securitization Transactions, Inc. with respect to these Certificates.

117. Controlling Person Defendant UBS Americas Inc. is a Delaware corporation. Defendants Mortgage Asset Securitization Transactions, Inc. and UBS Real Estate Securities Inc. are wholly-owned subsidiaries of UBS Americas Inc. Form 424B5, Mortgage Asset Securitization Transactions, Inc. at *80 (Oct. 31, 2007). Additionally, UBS Americas Inc. is owner of all of UBS Securities LLC's preferred member's interest. *See* UBS Securities LLC, Statement of Financial Condition at 2 (June 30, 2010). As a corporate parent of these entities, UBS Americas Inc. possessed the practical ability to direct or cause the direction of the management, policies, and actions of Defendants Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., and UBS Securities LLC related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates. *See infra* § V.E. Accordingly, UBS Americas Inc. was a controlling entity of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., and UBS Securities LLC.

### 18.    WaMu Capital Corp.

118.    Underwriter Defendant WaMu Capital Corp. is a Washington corporation that was registered to do business in Massachusetts during the relevant period.  WaMu Capital Corp. underwrote Certificates DSLA 2005-AR1 2A1A and DSLA 2005-AR2 2A1A.

### 19.    The Wells Fargo Defendants

119.    Depositor Defendant Wells Fargo Asset Securities Corporation is a Delaware corporation.  Wells Fargo Asset Securities Corporation was the Depositor for Certificate WFMBS 2006 AR12 1A1.

120.    Sponsor and Controlling Person Defendant Wells Fargo Bank, National Association, is a nationally chartered bank and is regulated by the OCC.  Wells Fargo Bank, National Association was the Sponsor for the offering for which Wells Fargo Asset Securities Corporation was Depositor and from which the Bank purchased Certificate WFMBS 2006 AR12 1A1.  Additionally, Defendant Wells Fargo Asset Securities Corporation is a direct, wholly-owned subsidiary of Wells Fargo Bank, National Association.  Form S-3/A, Fargo Asset Securities Corp. at S-26 (March 17, 2006); *accord* Corporate Disclosure Statement, Dkt. No. 38. As its corporate parent and as the Sponsor of the PLMBS offering for which it was Depositor, Wells Fargo Bank, National Association possessed the practical ability to direct or cause the direction of the management, policies, and actions of Wells Fargo Asset Securities Corporation related to the PLMBS offering, and in fact exercised such direction and control over its activities related to the issuance and sale of the Certificate.  *See infra* § V.E. Thus, Wells Fargo Bank, National Association was a controlling entity of Wells Fargo Asset Securities Corporation. Wells Fargo Bank, National Association also was an originator of loans for the offerings in which the Bank purchased Certificates BAFC 2006-D 1A1 and WFMBS 2006-AR12 1A1.

121.     Controlling Person Defendant Wells Fargo & Company is a Delaware corporation.  Defendants Wells Fargo Asset Securities Corporation and Wells Fargo Bank, National Association are indirect, wholly-owned subsidiaries of Wells Fargo & Company.  Form S-3/A, Wells Fargo Asset Securities Corp. at S-25-26 (March 17, 2006).  As a corporate parent of these entities, Wells Fargo & Company possessed the practical ability to direct or cause the direction of the management, policies, and actions of Defendants Wells Fargo Asset Securities Corporation and Wells Fargo Bank, National Association related to the PLMBS offerings, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.  *See infra* § V.E.  Therefore, Wells Fargo & Company was a controlling entity of Wells Fargo Asset Securities Corporation and Wells Fargo Bank, National Association.

### 20.     The Securities Defendants

122.     The Defendants identified in paragraphs 34 through 121 are referred to collectively herein as the "Securities Defendants."

### 21.     The Rating Agency Defendants

123.     Defendant Fitch, Inc. (also doing business as Fitch Ratings) ("Fitch") is a Delaware corporation that was and is registered to do business in Massachusetts.  Fitch provides analysis of global credit markets covering corporate finance, including financial institutions and insurance, structured finance, public finance, global infrastructure and project finance.

124.     Defendant The McGraw-Hill Companies, Inc. is a New York corporation that was and is registered to do business in Massachusetts.  The McGraw-Hill Companies, Inc. maintains an office at 420 Boylston Street in Boston, Massachusetts.  Through its credit rating division, Standard & Poor's Ratings Services, which maintains an office at 225 Franklin Street in Boston, Massachusetts, The McGraw-Hill Companies, Inc. provided global credit ratings, indices, risk

evaluation, investment research and data to investors, corporations, governments, financial institutions, investment managers and advisors. At the time the Bank purchased the Certificates, The McGraw-Hill Companies, Inc. was a provider serving the financial services, education and business information markets through three business segments: McGraw-Hill Education, Financial Services, and Information and Media.

125.    Effective January 1, 2009, The McGraw-Hill Companies, Inc. transferred certain assets and properties associated with its Standard & Poor's division to Standard & Poor's Financial Services LLC. This Complaint refers to The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC collectively as "S&P."

126.    Defendant Moody's Investors Service, Inc. is a Delaware corporation which, at relevant times, was registered to do business in Massachusetts and maintains an office at 175 Federal Street in Boston, Massachusetts. Moody's Investors Service, Inc., which is a wholly-owned subsidiary of Defendant Moody's Corporation, provides credit ratings and research covering debt instruments and securities.

127.    Defendant Moody's Corporation is a Delaware corporation. Moody's Corporation is a provider of credit ratings; credit and economic related research, data and analytical tools; risk management software; and quantitative credit risk measures, credit portfolio management solutions, training and financial credentialing and certification services. This Complaint refers to Moody's Investors Service, Inc. and Moody's Corporation collectively as "Moody's."

C.      **Successor Liability Allegations against Certain Defendants**

1.      **Successor Defendant Bank of America Corporation (Countrywide)**

a.      **Bank of America's merger with Countrywide**

128.    On January 11, 2008, Bank of America Corporation and Countrywide Financial

Corporation announced that they had signed a merger agreement, which had been approved by

the respective companies' boards of directors and was subject to regulatory and Countrywide

stockholder approvals.  *See* Bank of America Corporation Form 8-K (Jan. 11, 2008).  In the press

release filed as an exhibit to the 8-K, Bank of America confirmed its entry into "a definitive

agreement to purchase Countrywide Financial Corp. in an all stock transaction worth

approximately $4 billion."  With respect to the benefits of the merger and integration of the two

companies, the press release stated:

> "We are aware of the issues within the housing and mortgage industries," [Bank
> of America Chairman and Chief Executive Officer Kenneth D.] Lewis continued.
> "The transaction reflects those challenges. Mortgages will continue to be an
> important relationship product, and we now will have an opportunity to better
> serve our customers and to enhance future profitability."  Countrywide's deep
> retail distribution will enhance Bank of America's network of more than 6,100
> banking centers throughout the U.S.

> After closing, Bank of America plans to operate Countrywide separately under the
> Countrywide brand with integration occurring no sooner than 2009.

> "We believe this is the right decision for our shareholders, customers and
> employees," said Countrywide Chairman and Chief Executive Officer Angelo R.
> Mozilo. "Bank of America is one of the largest financial institutions in the U.S.
> and internationally, and we are confident that the combination of Countrywide
> and Bank of America will create one of the most powerful mortgage franchises in
> the world. We have had a long and positive relationship with Bank of America
> and our servicing and origination businesses, as well as other aspects of our
> operations, will be substantially enhanced as a result of this transaction."

129.    The merger became effective on July 1, 2008, when Successor Defendant Bank of

America Corporation acquired Countrywide Financial Corporation and those entities it

controlled, including Depositor/Issuer Defendants CWALT, Inc. and CWMBS, Inc., Underwriter

Defendant Countrywide Securities Corporation, Controlling Person Defendant Countrywide

Financial Corporation, and Sponsor Defendant Countrywide Home Loans, Inc. through an all-

stock merger which was valued at approximately $2.3 billion.  This figure is less than 16% of

Countrywide's book value at the time the transaction was announced.  In this transaction,

Countrywide Financial Corporation merged with and into a Bank of America Corporation

subsidiary, which acquired substantially all Countrywide Financial Corporation assets and

responsibility for all pre-merger liabilities and was re-named Countrywide Financial

Corporation.  *See* Agreement and Plan of Merger by and among Countrywide Financial

Corporation, Bank of America Corporation and Red Oak Merger Corporation (Jan. 11, 2008). As

the consideration for the merger, Countrywide shareholders received shares of Bank of America

Corporation stock and possessed the authority to fully participate in the management of Bank of

America Corporation.  Under the terms of the agreement, shareholders of Countrywide received

0.1822 of a share of Bank of America stock in exchange for each share of Countrywide.

**b.**     **Touting the benefits of the merger, Bank of America rebrands
Countrywide as Bank of America and Countrywide ceases operations**

130.    Bank of America repeatedly touted the benefits of the business combination,

including the benefits of acquiring and incorporating into Bank of America's business model

Countrywide's mortgage capabilities and deeply experienced management team, including

during a January 11, 2008 call with analysts.  According to at least one report, as a result of the

transaction, "Bank of America gained No. 1 market share in the origination of mortgage loans as

well as additional capital markets operations involved in the packaging of mortgages into

securities for investors."  Rick Rothacker, *BofA Exec Tackles Countrywide*, Charlotte Observer

(Oct. 21, 2008).  The benefits to Bank of America were immediate.  Countrywide contributed

$259 million to Bank of America's operating earnings during the third quarter of 2008 alone, exclusive of restructuring and other charges.  *Id.*

131.    There can be no question that Bank of America assumed control of Countrywide and continued the Countrywide enterprise after the merger.  For instance, Bank of America stated that the merger with Countrywide was accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141.  Bank of America Corporation Form 10-K 125 (Nov. 10, 2008).  SFAS 141, which addresses mergers and business combinations, specifies that it "applies to all transactions or other events in which an entity … obtains control of one or more businesses."  SFAS No. 141 at i.  Bank of America repeatedly announced that it intended to combine Countrywide's operations with its own and re-brand those combined operations with the Bank of America name, which it did in fact accomplish promptly.  Countrywide did not survive with substantial assets or continue normal business operations after it was subsumed into Bank of America.

132.    Bank of America issued a press release on July 1, 2008, titled *Bank of America Completes Countrywide Financial Purchase*, in which it announced that the merger had become effective and its plans with respect to combining the two companies and continuing Countrywide operations.  Bank of America stated in part:

> "Mortgages are one of the three main cornerstone consumer financial products along with deposits and credit cards," said Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis. "This purchase significantly increases Bank of America's market share in consumer real estate, and as our companies combine, we believe Bank of America will benefit from excellent systems and a broad distribution network that will offer more ways to meet our customers' credit needs."

> *          *          *

> "Now we begin to combine the two companies and prepare to introduce our new name and way of operating," said Barbara Desoer, president of the combined mortgage, home equity and insurance businesses.

\*   \*   \*

The company reiterated its combined national consumer mortgage division will be based in Calabasas, Calif. The combined company will begin originating mortgage and home equity products under the Bank of America brand by mid-2009.

The company anticipates substantial cost savings from combining the two companies. Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing expenses. In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers.

Press Release, Exhibit 99.1 to Bank of America Corporation Form 8-K (July 1, 2008).

133.    Moreover, Bank of America received everything it needed from Countrywide to maintain and carry on the Countrywide business and client relationships.  For example, Bank of America announced that Barbara Desoer would run the combined mortgage and consumer real estate operations from Calabasas, California, where Countrywide Financial had its headquarters.

134.    Inherent to the transaction was the continuity of the Countrywide business enterprise and management.  For example, Bank of America named a number of Countrywide executives to Bank of America leadership roles and during various interviews and analyst calls, including the January 11, 2008 call, stated its intent to retain a number of managers, including "senior people who are very, very good operators . . . [who would] have big operating roles in this company."  Bank of America announced that Countrywide Financial's incumbent president, David Sambol, would remain for at least some time to work on the transition.

135.    Additionally, in the transaction, Bank of America inherited 1,000 Countrywide mortgage offices (along with the ongoing business liabilities and necessary expenses attendant thereto), the majority of which it stated it intended to keep, other than as necessary to eliminate locations that overlapped with Bank of America.

136.    When one attempts to access Countrywide's former website,
www.countrywide.com, he or she is automatically redirected to a Bank of America website for
home loans, https://www8.bankofamerica.com/home-loans/overview.go.

137.    Bank of America's website, under the tab "Merger History," further advises
visitors that "as a result of the Countrywide acquisition, Bank of America became the nation's
largest mortgage lender and loan servicer."  As discussed below, Bank of America has rebranded
Countrywide's mortgage offerings as Bank of America Home Loans.

138.    To further effect the absorption of Countrywide into Bank of America, on
October 16, 2008, Bank of America announced that Countrywide Financial Corporation would
no longer publicly report its own financial results and that Bank of America was transferring
"substantially all of the assets and operations of Countrywide Financial Corporation and
Countrywide Home Loans, Inc. to other subsidiaries of Bank of America."

139.    On November 10, 2008, Bank of America publicly confirmed through an SEC
filing on Form 8-K the integration of Countrywide Financial Corporation and Countrywide
Home Loans, Inc. with Bank of America's other businesses and operations.  That filing disclosed
that, in a non-arm's length transaction dated November 7, 2008, Bank of America had
transferred substantially all of the assets of Countrywide Financial Corporation and subsidiary
Countrywide Home Loans, Inc. to Bank of America.  Bank of America had previously disclosed
that, as part of this deal, it would "assume debt securities and related guarantees of Countrywide
and [Countrywide Home Loans]."  *See* Bank of America Corporation Form 8-K Item 8.01 (Oct.
6, 2008).  As part of the final consideration for this transfer, Bank of America Corporation
assumed debt securities and related guarantees of Countrywide in an aggregate amount of
approximately $16.6 billion, substituting Bank of America Corporation as the "successor

corporation" and issuer/guarantor of the underlying securities. *See, e.g.*, 6th Supplemental Trust Deed dated Nov. 7, 2008, Exhibit 4.40 to Bank of America Corporation Form 8-K (Nov. 10, 2008) ("Effective on and from the Effective Date, the name of the Issuer and the Guarantor (each as defined in the Trust Deed) shall be 'Bank of America Corporation,' as the successor corporation under the Trust Deed.") and other supplements submitted with the Nov. 7, 2008 Form 8-K. This amount was not sufficient, however, to satisfy Countrywide's liabilities, including the liabilities arising from its issuance of mortgage-backed securities.

140.    The November 7, 2008 8-K neglected to mention that, in addition to retiring the Countrywide name, Countrywide Securities Corporation had recently withdrawn its broker-dealer registration from FINRA. The voluntary withdrawal of registration had occurred on or about October 29, 2008. Absent proper broker-dealer registration, Countrywide Securities Corporation could no longer engage in the broker-dealer activities for which it was formed and has, for all intents and purposes, ceased doing business and constitutes nothing more than an asset-free empty shell corporation. *See, e.g.*, FINRA BrokerCheck Report, Countrywide Securities Corporation 9 (as of Sept. 21, 2010) ("This firm does not engage in other non-securities business").

141.    On April 27, 2009, Bank of America announced that it was retiring the Countrywide name, rebranding Countrywide Home Loans as Bank of America Homes Loans. Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans name. Bank of America Home Loans is the brand name that Bank of America now uses for the Countrywide mortgage origination and securitization operations that Bank of America has absorbed and consolidated with its own operations. The Form 10-K that Bank of America filed on February 26, 2010 lists

Depositor/Issuer Defendants CWALT, Inc. and CWMBS, Inc., Underwriter Defendant

Countrywide Securities Corporation, Sponsor Defendant Countrywide Home Loans, Inc. and

Controlling Person Defendant Countrywide Financial Corporation as Bank of America

subsidiaries.

142.    In a September 30, 2009 press release, Bank of America CEO and President Ken

Lewis reported that "[t]he Merrill Lynch and Countrywide integrations are on track and returning

value already."

143.    The merger had an immediate and favorable impact on Bank of America's

operations and reported financial results.  For example, the Bank of America Corporation 2009

Form 10-K (Feb. 26, 2010) stated in part:

A. "On July 1, 2008, we acquired Countrywide Financial Corporation
(Countrywide) significantly expanding our mortgage origination and servicing
capabilities, making us a leading mortgage originator and servicer."

B. "Revenue, net of interest expense on a fully taxable-equivalent (FTE) basis,
rose to $120.9 billion representing a 63 percent increase from $74.0 billion in
2008 reflecting in part the addition of Merrill Lynch and the full-year impact
of Countrywide."

C. "Net interest income on a FTE basis increased to $48.4 billion compared with
$46.6 billion in 2008. The increase was the result of a favorable rate
environment, improved hedge results and the acquisitions of Countrywide and
Merrill Lynch . . . ."

D. "Noninterest income rose to $72.5 billion compared with $27.4 billion in
2008. Higher trading account profits, equity investment income, investment
and brokerage services fees and investment banking income reflected the
addition of Merrill Lynch while higher mortgage banking and insurance
income reflected the full-year impact of Countrywide."

E. "Noninterest expense increased to $66.7 billion compared with $41.5 billion
in 2008.  Personnel costs and other general operating expenses rose due to the
addition of Merrill Lynch and the full-year impact of Countrywide."

F. "Mortgage banking income increased $4.7 billion driven by higher production
and servicing income of $3.2 billion and $1.5 billion. These increases were
primarily due to increased volume as a result of the full-year impact of

Countrywide and higher refinance activity partially offset by lower MSR results, net of hedges."

G.    "Insurance income increased $927 million due to the full-year impact of Countrywide's property and casualty businesses."

144.    In the October 2009 issue of *Mortgage Banking*, Barbara Desoer described as "the highlight of the year ... when we retired the Countrywide brand and launched the new Bank of America Home Loans brand."  Robert Stowe England, *Profile; Bank of America Home Mortgage*, Mortgage Banking (Oct. 1, 2009).  In the same article, Mary Kanaga, the Countrywide transition executive who oversaw the review process with the new team, described the incorporation of Countrywide in part as follows:  the team had to be aware that it was creating "a mosaic" from pieces of a puzzle, one piece at a time . . . . "Everything counts. Everything has to get there, whether it is the biggest project or the smallest project.  It's very much putting a puzzle together. If there is a missing piece, we have a broken chain and we can't complete the mosaic."

145.    In a report dated June 6, 2011, Bruce Bingham, FASA, Executive Director of Capstone Valuation Services, LLC, for and on behalf of The Bank of New York Mellon, trustee to Countrywide Financial Sponsored Trusts, confirmed the empty shell that Countrywide had become.  In particular, Bingham confirmed that Countrywide Financial Corporation:

A.  "has negative earnings";

B.  has "minimal operating revenues";

C.  "does not originate, securitize, or service real estate loans";

D.  "has no operations that by themselves are economically viable on a go-forward basis"; and

E.  "lack[s] any foreseeable revenue in future years to offset expenses and expected losses."

146.    Bank of America thus effected a series of non-arm's length transactions that were intended to and did in fact integrate Bank of America and the Countrywide entities, including Depositor/Issuer Defendants CWABS, Inc., CWALT, Inc., and  CWMBS, Inc.; Underwriter Defendant Countrywide Securities Corporation; and Sponsor Countrywide Home Loans, Inc., and continued Countrywide's operations through Bank of America and Bank of America subsidiaries.  As a result of these transactions, Countrywide Financial Corporation and its subsidiaries were stripped of ongoing business operations, the ability to generate revenue, as well as income and assets necessary to satisfy liabilities arising from its loan origination and securitization operations.

### c.    Bank of America has assumed Countrywide liabilities

147.    Bank of America expressly or impliedly assumed the liabilities of Countrywide Financial Corporation and its subsidiaries and specifically entered into the Countrywide merger and subsequent asset transfer with full knowledge that it was assuming substantial Countrywide liabilities.

148.    In addition to assuming ongoing business liabilities and necessary expenses attendant thereto, Bank of America assumed numerous other Countrywide-related obligations as part of the merger.  For example, the Merger Agreement provided that Bank of America would provide directors' and officer's insurance for Countrywide officers and directors with respect to preexisting claims and claims arising in the future:

> Parent shall cause the individuals serving as officers and directors of Company or any of its Subsidiaries immediately prior to the Effective Time to be covered for a period of six years from the Effective Time by the directors' and officers' liability insurance policy maintained by Company (provided that Parent may substitute therefor policies of at least the same coverage and amounts containing terms and conditions that are not less advantageous than such policy) with respect to acts or omissions occurring prior to the Effective Time that were committed by such officers and directors in their capacity as such; provided that in no event shall Parent be required to expend annually in the aggregate an amount in excess of

> 250% of the annual premiums currently paid by Company (which current amount
> is set forth in Section 6.7 of the Company Disclosure Schedule) for such
> insurance (the "Insurance Amount"), and provided further that if Parent is unable
> to maintain such policy (or such substitute policy) as a result of the preceding
> proviso, Parent shall obtain as much comparable insurance as is available for the
> Insurance Amount.

Agreement and Plan of Merger § 6.7(c) (Indemnification; Directors' and Officers' Insurance).

149.    Bank of America had actual or circumstantial non-public knowledge of the

potential claims against Countrywide pertaining to the securitization of Countrywide loans that

failed to satisfy stated underwriting standards or were otherwise problematic as set forth herein.

150.    Prior to the merger, Bank of America stated that it would conduct additional due

diligence pertaining to Countrywide's exposure relating specifically to loan securitization

business.

151.    In a Form 8-K filed with the SEC on October 6, 2008, Bank of America discussed

its assumption of Countrywide liabilities, including assumption of debt and guarantees:

> Separately, the Registrant announced that, in connection with the integration of
> Countrywide Financial Corporation ("Countrywide") with its other businesses and
> operations, it intends to transfer substantially all of the assets and operations of
> Countrywide and its subsidiary Countrywide Home Loans, Inc. ("CHL") to other
> subsidiaries of the Registrant. As part of the consideration for such transfer, if
> effected, the Registrant would assume debt securities and related guarantees of
> Countrywide and CHL in an aggregate amount of approximately $21 billion.

152.    Upon completion of the merger, Bank of America Corporation incorporated

Countrywide's mortgage-related securitization results into its own reported financial results.

*See, e.g.,* Bank of America Corporation Form 10-Q 22 (Nov. 6, 2008).  Bank of America

continued reporting such figures until 2010, when it determined that the securitization activities

it assumed from Countrywide were straining its financial performance.  As a result, Bank of

America recommended removal of discussion of any exposure pertaining to Countrywide-

initiated securitizations from its reported results because, "Our exposure to our representations

and warranties is the result of prior loan sales and securitization activities in … Countrywide

Financial Corporation."  Letter from John James (BofA) to Hugh West (SEC) dated August 25,

2010.

154.    In a February 22, 2008 interview, Bank of America spokesman Scott Silvestri told

Corporate Counsel that Bank of America had not overlooked Countrywide's legal expenses and

liabilities when it decided to merge with Countrywide:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-
> to-be largest mortgage lender in the country. Nevertheless, the banking giant says
> that Countrywide's legal expenses were not overlooked during negotiations.  "We
> bought the company and all of its assets and liabilities," spokesman Scott Silvestri
> says.  "We are aware of the claims and potential claims against the company and
> have factored these into the purchase."

154.    A January 23, 2008 *New York Times* article similarly quotes former Bank of

America Chairman and CEO Kenneth D. Lewis acknowledging that Bank of America had

thought long and hard about acquiring Countrywide's liabilities:

> We did extensive due diligence.  We had 60 people inside the company for almost
> a month.  It was the most extensive due diligence we have ever done.  So we feel
> comfortable with the valuation.  We looked at every aspect of the deal, from their
> assets to potential lawsuits and we think we have a price that is a good price.

155.    During the January 11, 2008 analyst call, Bank of America Chief Financial

Officer Joe L. Price echoed this statement:

> Now, as Ken has said the due diligence on this deal was extensive.  We had more
> than 60 people on the ground for the better part of the last 30 days, with more
> focus picking up through the holidays.  The focus of the due diligence, as you
> would expect, was on the mortgage servicing rights, credit, and legal, as well as
> accounting and operational areas.  The results of our due diligence support our
> overall valuation and pricing of the transaction.

156.    On January 13, 2010, Bank of America's Chief Executive Officer and President

Brian Moynihan testified to the Financial Crisis Inquiry Commission (often "FCIC") concerning

the impact of the Countrywide transaction on Bank of America, including the negative and

positive aspects of the acquisition:

> The Countrywide acquisition has positioned the bank in the mortgage business on
> a scale it had not previously achieved.  There have been losses, and lawsuits, from
> the legacy Countrywide operation, but we are looking forward.  We acquired the
> best mortgage servicing platform in the country, and a terrific sales force.

157.    In its 2009 Form 10-K, Bank of America disclosed the following:

> In addition, we face increased litigation risk and regulatory scrutiny as a result of
> the Merrill Lynch and Countrywide acquisitions.  As a result of current economic
> conditions and the increased level of defaults over the prior couple of years, we
> have continued to experience increased litigation and other disputes with
> counterparties regarding relative rights and responsibilities.  These litigation and
> regulatory matters and any related settlements could adversely impact our
> earnings and lead to volatility of our stock price.

158.    Since that time, Bank of America continued its responsibility for liabilities

incurred by Countrywide relating to loans made by Countrywide before the Bank of America

merger.

159.    During Bank of America's July 16, 2010 second quarter 2010 earnings call, Bank

of America Chief Financial Officer Charles Noski stated:

> [W]e increased our reps and warranties expense by 722 million to $1.2 billion as a
> result of our continued evaluation of exposure to repurchases, including our
> exposure to repurchased demands from certain monoline insurers.  Although this
> expense and related reserve are based on a life and loan calculation, the
> environment around repurchases continues to evolve and we will assess this
> reserve based on the facts available to us each quarter.

160.    Similarly, during Bank of America's October 19, 2010 third quarter 2010

earnings call, Noski stated:

> The next category of exposure is loans sold into private label securitizations,
> where the bondholders have some amount of protection from losses through
> insurance written by monoline insurers.  I think it's important to understand that
> each of these reps and warranties counterparties has different contractual rights
> and experience with us, and as such experience from one should not necessarily
> be extrapolated to another.  The monoline insurers wrote protection for

securitizations in both first and second lien transactions on legacy Countrywide loans included in securitization vehicles.

\*       \*       \*

Through September, we've received $4.8 billion of reps and warranty claims related to the monoline-insured deals, of which $4.2 billion remains outstanding, and approximately 550 million were repurchased.  Of the $4.2 billion still outstanding, we have completed our review on $2.7 billion and declined to repurchase based on our assessment of whether a material breach exists.  And we continue to look at the remaining $1.5 billion.  As we noted last quarter, we have had limited engagement with most of the monoline insurers in our repurchase process, which has meaningfully constrained our ability to resolve the open claims.  Also, certain monoline insurers have instituted litigation against Countrywide and Bank of America, which further constrains a normal business relationship. Without this engagement, we believe it is not possible at this time to reasonably estimate future repurchase experience and therefore the liability that may exist in connection with these securitizations.

161.    On November 16, 2010, Moynihan publicly admitted that Bank of America had accepted liability for investors' claims concerning Countrywide's mortgage-backed securities: "There's a lot of people out there with a lot of thoughts about how we should solve this [investor demands for refunds over faulty mortgages], but at the end of the day, we'll pay for the things that Countrywide did."

162.    Similarly, in a December 1, 2010 *Bloomberg* article, in connection with claims for the repurchase of defective loans, Bank of America spokesman Jerry Dubrowski was quoted as stating that Bank of America would "act responsibly" with respect to treatment of Countrywide loans that it acquired in the merger.  Specifically, the article stated:

More than half of the claims at Bank of America stem from mortgages created by Countrywide Financial Corp., acquired in 2008, said Jerry Dubrowski, a spokesman for the bank.  The demands are mostly tied to loans made from 2004 to 2008, when the industry's underwriting standards were more lax, he said.

"You had a lot of limited-documentation loans from Countrywide that were classified as prime but weren't really prime products," said Christopher Thornberg, principal at Beacon Economics LLC in Los Angeles.  "Just because you were prime from a credit standpoint doesn't mean you were being truthful about other parts of your credit profile."

> The lender is examining every disputed mortgage to determine why it soured and whether the firm is at fault, Dubrowski said. The bank will "act responsibly" and repurchase the loan in cases where there were valid defects, he said.

Hugh Son and Dakin Campbell, BofA's 'Sloppy' Prime Mortgages Add to Pressure for Buybacks, Bloomberg (Dec. 1, 2010).

163.    And in a December 11, 2010 *New York Times* profile, Moynihan again publicly admitted that Bank of America would be responsible for Countrywide's liabilities:

> But what about Countrywide?
>
> "A decision was made; I wasn't running the company," Mr. Moynihan says, although he was obviously a top bank official at the time. "Our company bought it and we'll stand up; we'll clean it up."

The profile then noted that Bank of America's securities filings echoed the position taken by Moynihan that Bank of America would be responsible for Countrywide's liabilities:

> In addition to significantly increased revenues due to Countrywide's contributions, Bank of America has reported its payment on claims for defective legacy Countrywide mortgages and announced a $4.4 billion reserve fund to pay for similar claims in the future.

164.    Bank of America has taken responsibility for Countrywide liabilities in numerous settlements achieved to date. For example, during May 2010, Bank of America agreed to pay $600 million to six New York retirement funds to resolve claims that Countrywide failed to properly disclose the riskiness of its lending activities. Shayandi Raice and Marshall Eckblad, *Countrywide's Mess Billed to Bank of America*, Dow Jones Newswires (June 7, 2010).

165.    On June 7, 2010, Bank of America agreed to pay approximately $108 million to settle claims that its Countrywide unit assessed artificially inflated fees to approximately 200,000 Countrywide mortgage customers, even though Bank of America didn't own Countrywide when the alleged improprieties occurred. *Id.*

166.    In addition, on October 18, 2010, the *New York Times* reported that "Bank of America is on the hook for $20 million of the disgorgement [totaling $45 million]" in the

settlement reached between the SEC and former Countrywide CEO Angelo Mozilo.  Peter J.

Henning, *When Disgorgement Comes Cheap*, N.Y. Times (Oct. 18, 2010).  The SEC settlement

resolved claims against Mozilo for his actions at Countrywide that occurred before the Bank of

America merger.  As noted above, the Agreement and Plan of Merger between Bank of America

and Countrywide provided that all indemnification provisions "shall survive the merger and shall

continue in full force and effect in accordance with their terms, and shall not be amended,

repealed or otherwise modified for a period of six years."  *Id.*  According to the New York

Times, "[b]ecause Countrywide would have had to pay Mr. Mozilo's disgorgement, Bank of

America took on the same obligation, even though it had nothing to do with the company's

operations at the time."  *Id.*

167.    On January 3, 2011, Bank of America similarly announced that it had agreed to

pay $2.8 billion to settle claims to repurchase mortgage loans that Fannie Mae and Freddie Mac

had purchased from Countrywide Financial or its subsidiaries. In its press releases and

presentation concerning the settlement, Bank of America admitted that it was paying to resolve

claims concerning "alleged breaches of selling representations and warranties related to loans

sold by legacy Countrywide."

168.    On April 15, 2011, Bank of America announced it had entered into an agreement

to settle mortgage repurchase claims involving 29 residential mortgage-backed securitizations.

Claims arose in significant part from loans originated and securitized by Countrywide before the

Bank of America merger.

169.    On May 16, 2011, the Department of Justice announced it had entered into an

agreement with Bank of America to settle claims under the Servicemembers Civil Relief Act to

resolve allegations that Countrywide had illegally foreclosed upon active duty servicemembers.

Press Release, Department of Justice, Office of Public Affairs, *Justice Department Settles with Bank of America and Saxon Mortgage for Illegally Foreclosing on Servicemembers* (May 26, 2011), *available at* http://www.justice.gov/opa/pr/2011/May/11-crt-683.html.  In connection with the settlement, Terry Laughlin, head of the Bank of America unit managing foreclosures and defaulted loans, stated "[w]hile most cases involve loans originated by Countrywide and the improper foreclosures were taken or started by Countrywide prior to our acquisition, it is our responsibility to make things right."

170.    On June 29, 2011, Bank of America announced its entry into an $8.5 billion settlement with The Bank of New York Mellon, the trustee for the Countrywide-issued first-lien residential mortgage backed securitizations covered by the settlement.  In announcing the settlement, Bank of America stated:

> "This is another important step we are taking in the interest of our shareholders to minimize the impact of future economic uncertainty and put legacy issues behind us," said Bank of America Chief Executive Officer Brian Moynihan.  "We will continue to act aggressively, and in the best interest of our shareholders, to clean up the mortgage issues largely stemming from our purchase of Countrywide."

171.    In sum, with respect to the Countrywide acquisition described above, (a) consideration was provided in stock; (b) successor Bank of America continued the same enterprise after the merger and transfer of the operations of Countrywide Financial Corporation and its subsidiaries; (c) the shareholders of the seller became the shareholders of the purchaser; (d) the assets and operations of Countrywide Financial Corporation and its subsidiaries have been liquidated and absorbed into Bank of America entities; and (e) Bank of America has assumed liabilities necessary to carry on Countrywide business and operations.  Bank of America has therefore completed actual and de facto mergers with Controlling Person Defendant Countrywide Financial Corporation and its subsidiaries, including Depositor/Issuer Defendants CWALT, Inc. and CWMBS, Inc., Underwriter Defendant Countrywide Securities Corporation,

and Sponsor Defendant Countrywide Home Loans, Inc, and has absorbed Countrywide Financial and those entities controlled by it into Bank of America's own operations.  These transactions were designed to disadvantage creditors of Countrywide Financial Corporation and its subsidiaries who have claims against these entities by virtue of their pre-merger and pre-liquidation conduct.  Accordingly, Bank of America Corporation is the successor in liability to Countrywide Financial Corporation and its subsidiaries, including CWALT, Inc.; CWMBS, Inc.; Countrywide Securities Corporation; and Countrywide Home Loans, Inc., and is jointly and severally or otherwise vicariously liable for the misstatements, omissions, and other wrongful conduct of these Defendants.  Accordingly, the Bank seeks to recover any damages it is awarded against Countrywide Financial Corporation; CWALT, Inc.; CWMBS, Inc.; Countrywide Securities Corporation; and Countrywide Home Loans, Inc. from Bank of America Corporation.

## 2. Successor Defendant Capital One Financial Corporation and Capital One, National Association (Chevy Chase)

172.    On December 3, 2008, Successor Defendant Capital One Financial Corporation, a Delaware corporation, entered into an agreement to acquire B.F. Saul Real Estate Investment Trust, a Maryland real estate investment trust, Derwood Investment Corporation, a Maryland corporation, and the B.F. Saul Company Employees' Profit Sharing and Retirement Trust and those they controlled, in particular Sponsor and originator Chevy Chase Bank F.S.B. and its subsidiary Depositor/Issuer Defendant Chevy Chase Funding LLC, through a stock and cash transaction.  The acquisition became effective February 27, 2009.

173.    In its December 4, 2008 announcement of the transaction, Capital One Financial Corporation touted the benefits of the agreement, including the receipt of more than $11 billion in deposits, which helped it ride out the financial crisis:

With the addition of Chevy Chase's $11 billion in deposits, Capital One—the largest retail depository institution headquartered in the Washington D.C. region—will also have the largest branch and ATM network in the area.

. . . .

. . . Capital One expects this transaction will be accretive to operating EPS in 2009 and accretive to GAAP EPS in 2010 . . .

. . . .

"Chevy Chase is a great strategic fit for Capital One and the combination of our two banks is economically compelling.  Chevy Chase provides an opportunity to acquire a well-run retail bank with local scale in one of the best local banking markets in the U.S.  This transaction will enhance our strong deposit base, providing us with greater scope and scale in key Mid-Atlantic banking markets," said Richard D. Fairbank, Chairman and Chief Executive Officer of Capital One.  "At a time when core funding is key, we see our deposit strength as an important element of our continued success.  The integration of Chevy Chase and the continued growth of our banking businesses is our highest priority."

174.    Capital One also announced that, as part of the transaction, Capital One would be taking a net credit mark of $1.75 billion for potential losses in Chevy Chase's loan portfolio. Ultimately, the adjustment exceeded the initial estimate:  "the Company recorded net expected principal losses of approximately $2.2 billion as a component of the fair value adjustment for which actual losses will be applied."  2009 Form 10-K at 30.

175.    Following the acquisition, on July 30, 2009, Chevy Chase Bank F.S.B. was merged with and into one of Capital One Financial Corporation's "principal" subsidiaries, Capital One, National Association.  By reason of the merger, Capital One Financial Corporation and Capital One National Association obtained substantially all Chevy Chase Bank F.S.B. assets and are responsible for the pre-merger liabilities of Chevy Chase Bank F.S.B.  *See, e.g.*, Stock Purchase Agreement by and among Capital One Financial Corporation, B.F. Saul Real Estate Investment Trust, Derwood Investment Corporation, and B.F. Saul Company Employees' Profit

Sharing and Retirement Trust, dated as of December 3, 2008; Capital One Financial Corporation 2009 Annual Report; Capital One Financial Corporation 2009 Form 10-K.

176.    Capital One, National Association, as the surviving entity, retained as operating, financial and statutory subsidiaries a number of entities that were owned by Chevy Chase Bank F.S.B. before the merger, including Chevy Chase Funding LLC.  *See, e.g.*, Letter from Comptroller of the Currency Administrator of National Banks, dated July 14, 2009, granting conditional approval to the conversion and merger applications of Chevy Chase Bank and Capital One, National Association.

177.    Capital One promptly integrated the business and operations of Chevy Chase Bank F.S.B. and its subsidiaries, including Chevy Chase Funding LLC.  For instance, in Capital One Financial Corporation's 2009 Annual Report, investors were advised:

> During the third quarter of 2009, the Company realigned its business segment reporting structure to better reflect the manner in which the performance of the Company's operations is evaluated.
>
> . . . .
>
> The segment reorganization includes the allocation of Chevy Chase Bank to the appropriate segments.

*See also* Capital One 2010 Annual Report at 5 ("We converted Chevy Chase Bank to the Capital One brand in 2010."); 2010 Form 10-K at 1 ("In September 2010, we rebranded Chevy Chase Bank, F.S.B. ("Chevy Chase Bank"), strengthening the Capital One brand in the Washington, D.C. region.").

178.    Following the acquisition, visitors to Chevy Chase's website are automatically redirected to the Capital One website, and have been told that Chevy Chase Bank is "a division of Capital One, N.A." and that "[t]he Chevy Chase Bank site is no longer available.  Please bookmark www.capitalonebank.com for future reference.  You will be redirected to capitalonebank.com momentarily."

179.   In the March 18, 2010 proxy statement to shareholders, Capital One Financial Corporation noted that it was "[c]ontinuing to integrate Chevy Chase Bank to build a scalable bank infrastructure to ensure that the Company is well-positioned to take advantage of opportunities to grow its consumer and commercial banking businesses."

180.   Capital One Financial Corporation further touted the benefits of the transaction in its 2009 10-K and confirmed that it had incorporated Chevy Chase Bank's financials into its own:  "This acquisition improves the Company's core deposit funding base, increases readily available and committed liquidity, adds additional scale in bank operations, and brings a strong customer base in an attractive banking market.  Chevy Chase Bank's results of operations are included in the Company's results after the acquisition date of February 27, 2009."

181.   Capital One Financial Corporation and Capital One, National Association entered into this transaction with full knowledge that it was assuming substantial Chevy Chase liabilities. In fact, Capital One Financial Corporation, in its 2009 Annual Report, referred to Capital One, National Association as the "successor" to Chevy Chase Bank F.S.B., and has taken steps to expressly and impliedly assume Chevy Chase Bank's liabilities, advising investors that "[w]e have established a reserve in the consolidated financial statements for potential losses that are considered to be both probable and reasonably estimable related to the mortgage loans sold by our originating subsidiaries," including Chevy Chase Bank.  Indeed, in its 2009 Form 10-K, Capital One Financial Corporation disclosed that Capital One, National Association, "as successor to Chevy Chase Bank," may be liable to investors who purchased securitized Chevy Chase loans, "in the event that there was improper underwriting or fraud, or in the event that the loans become delinquent shortly after they are originated."  Capital One Financial Corporation further disclosed:

[W]e may be exposed to credit risk associated with sold loans.  We have established a reserve in the consolidated financial statements for potential losses that are considered to be both probable and reasonably estimable related to the mortgage loans sold by our originating subsidiaries.  The adequacy of the reserve and the ultimate amount of losses incurred will depend on, among other things, the actual future mortgage loan performance, the actual level of future repurchase and indemnification requests, the actual success rate of claimants, developments in Company and industry litigation, actual recoveries on the collateral, and macroeconomic conditions (including unemployment levels and housing prices).  Due to uncertainties relating to these factors, we cannot reasonably estimate the total amount of losses that will actually be incurred as a result of our subsidiaries' repurchase and indemnification obligations, and there can be no assurance that our reserves will be adequate or that the total amount of losses incurred will not have a material adverse effect upon the Company's financial condition or results of operations.  For additional information related to the Company's mortgage loan operations, mortgage loan repurchase and indemnification obligations and related reserves, see Item 7 "Management Discussion and Analysis of Financial Conditions and Results of Operations – Valuation of Representation and Warranty Reserve"

182.    In its 2009 10-K, Capital One Financial Corporation described the accounting

treatment of the transaction, including assumption of liabilities, as follows:

The Chevy Chase Bank acquisition is being accounted for under the acquisition method of accounting following the provisions of ASC 805-10/SFAS No. 141(R). . . . ASC 805-10/SFAS No. 141(R) requires an acquirer to recognize the assets acquired, the liabilities assumed, and any noncontrolling interest in the acquire at the acquisition date, at their fair values as of that date, with limited exceptions, thereby replacing SFAS 141's cost-allocation process. This Statement also changes the requirements for recognizing acquisition related costs, restructuring costs, and assets acquired and liabilities assumed arising from contingencies.

Accordingly, the purchase price was allocated to the acquired assets and liabilities based on their estimated fair values at the Chevy Chase Bank acquisition date, as summarized in the table below.  Initial goodwill of $1.1 billion was calculated as the purchase premium after adjusting for the fair value of net assets acquired.  Throughout 2009, the Company continued the analysis of the fair values and purchase price allocation of Chevy Chase Bank's assets and liabilities which resulting in purchase accounting adjustments and an increase to goodwill of $510.9 million.  Goodwill of $1.6 billion represents the value expected from the synergies created through the scale, operational and product enhancement benefits that will result from combining the operations of the two companies.  The change was predominantly related to a reduction in the fair value of net loans at the acquisition date.  As of December 31, 2009, the Company has completed the analysis and considers purchase accounting to be final and the

Company has recast previously presented information as if all adjustments to the purchase price allocation had occurred at the date of acquisition.

183.     In sum, with respect to the Chevy Chase acquisitions described above, (a) consideration was provided in stock and cash; (b) successors Capital One Financial Corporation and Capital One, National Association continued the same enterprise after the merger and transfer of the operations of Chevy Chase Bank F.S.B. and its subsidiaries; (c) the assets and operations of Chevy Chase Bank F.S.B. and its subsidiaries have been absorbed into Capital One entities; and (d) Capital One Financial Corporation and Capital One, National Association have assumed liabilities necessary to carry on Chevy Chase business and operations.  Capital One Financial Corporation and Capital One, National Association have therefore completed de facto and actual mergers with Controlling Person Chevy Chase F.S.B. and its subsidiaries, including Depositor/Issuer Defendant Chevy Chase Funding LLC.  These transactions were designed to disadvantage creditors of Chevy Chase F.S.B. and its subsidiaries who have claims against these entities by virtue of their pre-merger conduct.  Accordingly, Capital One Financial Corporation and Capital One, National Association are the successors in liability to Chevy Chase F.S.B. and its subsidiaries, including Depositor/Issuer Defendant Chevy Chase Funding LLC, and is jointly and severally or otherwise vicariously liable for the misstatements, omissions, and other wrongful conduct of these Defendants and entities alleged herein, including the liability with respect to the Certificates.  Accordingly, the Bank seeks to recover any damages it is awarded against Chevy Chase F.S.B. and its subsidiaries, including Depositor/Issuer Defendant Chevy Chase Funding LLC, from Capital One Financial Corporation and Capital One, National Association.

**3.      Successor Defendants DB Structured Products, Inc. and MIT Holdings, Inc. (MortgageIT)**

184.    On January 2, 2007 Successor Defendant DB Structured Products, Inc.—acting through a wholly owned subsidiary formed solely for the purpose of the acquisition—acquired MortgageIT Holdings, Inc. through a public tender offer to shareholders of MortgageIT Holdings, Inc.  Specifically, DB Structured Products, Inc. entered into a series of agreements whereby DB Structured Products, Inc. paid MortgageIT Holdings Inc. shareholders a cash amount equal to $14.75 per share in exchange for: (a) the shareholders' agreement to vote their shares in favor of the merger between MortgageIT Holdings, Inc. and a DB Structured Products, Inc. subsidiary; and (b) the subsequent cancelation of each share.

185.    Subsequently, the surviving merged entity was merged with and liquidated into Successor Defendant MIT Holdings, Inc. (f/k/a Titan Holdings Corp.), a wholly-owned subsidiary of DB Structured Products Inc.  *See* Form 8-K, MortgageIT Holdings, Inc. (July 12, 2006) ("Under the terms of the Merger Agreement, [MortgageIT Holdings Inc.] is to be acquired by DB Structured Products through a merger of Titan Acquisition and the [MortgageIT Holdings Inc.], with [MortgageIT Holdings Inc.] as the surviving corporation (the "Merger"), followed immediately by the [MortgageIT Holdings Inc.]'s merger with and liquidation into Titan Holdings.").

186.    Pursuant to these agreements, "all the property, rights, privileges, powers and franchises of MortgageIT [Holdings Inc.] shall vest in [MIT Holdings Inc.], and all debts, liabilities, obligations, restrictions, disabilities and duties of MortgageIT [Holdings Inc.] shall become the debts, liabilities, obligations, restrictions, disabilities and duties of [MIT Holdings Inc.]."  *See* Agreement and Plan of Reorganization Dated as of July 11, 2006 among DB Structured Products, Inc., Titan Holdings Corp., Titan Acquisition Corp., and MortgageIT

Holdings, Inc.  Accordingly, MIT Holdings Inc. is a successor in liability to MortgageIT

Holdings, Inc. and is jointly and severally or otherwise vicariously liable for the misstatements,

omissions, and other wrongful conduct of MortgageIT Holdings Inc.  Accordingly, the Bank

seeks to recover any damages it is awarded against Mortgage IT Holdings, Inc. from MIT

Holdings Inc.

187.    Additionally, following these transactions—which were orchestrated and funded

by DB Structured Products, Inc.—DB Structured Products, Inc. promptly integrated the

operations of MortgageIT Holdings, Inc. and its subsidiaries into its Residential Mortgage

Backed Securities business.  In its July 12, 2006 announcement of the transaction, Deutsche

Bank AG, the parent of DB Structured Products, Inc., stressed the financial and operational

benefits of the agreement, such as the loan origination capacities of MortgageIT, Inc., which

originated $29.2 billion in loans in 2005:

> Deutsche Bank . . . announced today the signing of a definitive agreement to
> acquire MortgageIT Holdings, Inc. . . . This acquisition is expected to be earnings
> accretive in 2007 and will add significant platform scale and synergies to
> Deutsche Bank's existing US residential mortgage franchise.  It is a key element
> of the Bank's build-out of a vertically integrated mortgage origination and
> securitization platform.
>
> . . . .
>
> . . . In 2005, MortgageIT grew its loan originations approximately 124% over
> 2004, to $29.2 billion, and is one of the fastest-growing and largest residential
> mortgage loan originators in the US.
>
> . . . .
>
> Upon closing, the operating company, MortgageIT, Inc., will become a part of
> Deutsche Bank's Residential Mortgage Backed Securities (RMBS) business,
> which is based in New York. Deutsche Bank's acquisition of MortgageIT is the
> latest in a series of steps taken to significantly increase its presence in the US
> mortgage markets.

188.     Anshu Jain, head of Global Markets for Deutsche Bank, expressed confidence in that press release that "[t]he MortgageIT team ha[d] built an outstanding business."  He stated: "[W]e are extremely pleased to have them join our effort as we continue to expand our mortgage securitization platform in the US and globally."

189.     The acquisition and incorporation of the lending practices of MortgageIT represented a significant risk.  In Deutsche Bank's Form 6-K filed on April 3, 2008, Deutsche Bank disclosed that, as of December 2007, it had taken on $12.67 billion worth of exposure in its residential mortgage-backed security business—and that this exposure was primarily due to the acquisition of MortgageIT.  Deutsche Bank thereafter announced that it was closing the retail operations and scaling down the wholesale operations of MortgageIT, and on December 11, 2008, Deutsche Bank issued a statement announcing the closure of MortgageIT's remaining wholesale lending operations.

190.     In sum, with respect to the MortgageIT acquisition described above, (a) consideration was provided in cash; (b) successor DB Structured Products Inc. continued the same enterprise after the merger and transfer of the operations of MortgageIT Holdings Inc. and its subsidiaries; (c) the assets and operations of MortgageIT Holdings Inc. and its subsidiaries have been liquidated and absorbed into DB Structured Products entities; and (e) DB Structured Products Inc. has assumed liabilities necessary to carry on MortgageIT business and operations. Therefore, DB Structured Products Inc. has completed actual and de facto mergers with Sponsor and Controlling Person Defendant Mortgage IT Holdings, Inc. and its subsidiaries, including Sponsor and Controlling Person Defendant MortgageIT, Inc. and Depositor/Issuer Defendant MortgageIT Securities Corp., by absorbing MortgageIT Holdings, Inc. and those entities controlled by it, including MortgageIT, Inc. and MortgageIT Securities Corp. into the operations

of DB Structured Products, Inc.  These transactions were designed to disadvantage creditors of MortgageIT Holdings, Inc. and its subsidiaries who have claims against these entities by virtue of their pre-merger and pre-liquidation conduct.  Accordingly, DB Structured Products, Inc. is a successor in liability to MortgageIT Holdings, Inc. and its subsidiaries, including MortgageIT, Inc. and MortgageIT Securities Corp., and is jointly and severally or otherwise vicariously liable for the misstatements, omissions, and other wrongful conduct of these Defendants and entities.  Accordingly, the Bank seeks to recover any damages it is awarded against Mortgage IT Holdings, Inc. and its subsidiaries, including MortgageIT, Inc. and MortgageIT Securities Corp., from DB Structured Products, Inc.

### 4.      Successor Defendant JPMorgan Chase Bank, N.A. (EMC Mortgage Corporation).

191.     Pursuant to a merger agreement effective May 30, 2008, Controlling Person Defendant JPMorgan Chase & Co. acquired Controlling Person Defendant The Bear Stearns Companies Inc. and its subsidiaries, including Defendants Bear, Stearns & Co. and EMC Mortgage Corporation ("EMC"), for nominal consideration in a transaction that was financed in part by a $29 billion non-recourse loan made by taxpayers.  Since this merger, EMC has been wholly owned by JPMorgan Chase & Co.  Additionally, Successor Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank,") is a wholly owned subsidiary of JPMorgan Chase & Co.

192.     JP Morgan Chase & Co. has taken steps to strip EMC of its assets and render it unable to satisfy any judgment against it.  On or about April 1, 2011, JPMorgan Chase & Co. effectuated an intercompany asset sale whereby EMC transferred to its affiliate, JPMC Bank, all of EMC's servicing-related rights and assets (the "Asset Transfer").  *See* Consent Order at 2, *In the Matter of JPMorgan Chase & Co. et al.*, No. 11-023 (Fed. Reserve Bd. Apr. 13, 2011) *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a5.pdf

(last visited June 26, 2012) (defining "the Mortgage Servicing Companies" to mean "EMC and its subsidiaries" and stating that "on or about April 1, 2011, [JPMorgan Chase & Co.] transferred all of the residential mortgage loan servicing rights and certain related assets and liabilities of the Mortgage Servicing Companies to [JPMC Bank]").

193.    Notably, the Federal Reserve's April 2011 Consent Order with JPMorgan Chase & Co. stated that "[f]ollowing consummation of that transfer, the Mortgage Servicing Companies [including EMC] are no longer in the business of residential mortgage loan servicing, and only [JPMC Bank] is conducting residential mortgage loan servicing within the [JPMorgan Chase & Co] organization." *Id.*

194.    Since the Asset Sale, EMC has ceased independent business operations.  EMC's website now states that it was decommissioned on October 31, 2011.  This single remaining page now describes EMC as "a brand of JPMorgan Chase Bank, N.A."[8]  Moreover, following the Asset Transfer (but prior to the decommissioning of the website), the EMC website stated that "JPMorgan Chase Bank, N.A. services loans under the EMC Mortgage name."[9]

195.    The servicing operations EMC sold to JPMC Bank constituted substantially all of EMC's assets and its last remaining operating assets.  Although EMC had specialized in the acquisition, securitization, and disposition of mortgage loans at the time of the securitization of the PLMBS, by the time of the Asset Transfer in April 2011, JPMorgan Chase & Co. had shut down EMC's mortgage-loan acquisition and securitization operations.  Servicing was EMC's last

---

[8] EMC Mortgage® A Brand of JPMorgan Chase Bank, N.A.,
   https://www.emcmortgagecorp.com/EMCMORTGAGE/ (last visited June 25, 2012).
[9] *See* Archive.org, EMC Mortgage® A Brand of JPMorgan Chase Bank, N.A., About Us,
   https://www.emcmortgagecorp.com/EMCMORTGAGE/MainContent/about_us.jsp, (snapshot
   taken July 20, 2011).

remaining business operation, and its servicing business constituted EMC's last remaining substantial asset.

196.     In short, the Asset Transfer orchestrated by the two entities' mutual parent company, JPMorgan Chase & Co, constituted a de facto merger of EMC and JPMC Bank and resulting in JPMC Bank becoming liable as a successor for all of EMC's obligations and liabilities by operation of law.  Successor JPMC Bank continued the same enterprise after the transfer of the assets and operations of EMC, JPMC Bank has assumed liabilities necessary to carry on EMC's business and operations, and the assets and operations of EMC have been liquidated and absorbed into JPMC Bank.  In fact, EMC has been shorn of its assets and has become, in essence, a shell.  These transactions were designed to disadvantage creditors of EMC who have claims against EMC entities by virtue of its pre-Asset Transfer conduct.  By taking these actions, JPMorgan Chase & Co. has subjected its subsidiary, JPMC Bank, to liability as EMC's successor.

**5.     Successor Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated (Banc of America Securities LLC).**

197.     Effective November 1, 2010, Banc of America Securities LLC merged with and into Successor Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation.  All references herein to Banc of America Securities LLC are also to Merrill Lynch, Pierce, Fenner & Smith Incorporated, which is liable as a matter of law as successor to Banc of America Securities LLC by virtue of its status as the surviving entity in its merger with Banc of America Securities LLC.

**6.     Successor Defendant Morgan Stanley Mortgage Capital Holdings LLC (Morgan Stanley Mortgage Capital Inc.).**

198.     Effective June 17, 2007, Morgan Stanley Mortgage Capital Inc. merged with and into Successor Defendant Morgan Stanley Mortgage Capital Holdings LLC, a New York limited

liability company that is registered to do business in Massachusetts.  Since the merger, Morgan

Stanley Mortgage Capital Holdings LLC has continued the business of Morgan Stanley

Mortgage Capital Inc.  All references herein to Morgan Stanley Mortgage Capital Inc. are also to

Morgan Stanley Mortgage Capital Holdings LLC, which is liable as a matter of law as successor

to Morgan Stanley Mortgage Capital Inc. by virtue of its status as the surviving entity in its

merger with Morgan Stanley Mortgage Capital Inc.

**D.      The John Doe Defendants**

199.    Defendants John Doe 1-50 are other Depositor/Issuers, Underwriters, and/or

others who are jointly and severally or otherwise liable for the misstatements, omissions, and

other wrongful conduct alleged herein, including the liability with respect to the Certificates.

The John Doe Defendants may include persons or entities that are not named as defendants at

this time because Plaintiff has insufficient information as to the extent, if any, of their

involvement in and liability for the matters alleged herein.  Plaintiff will amend this Complaint to

allege the true names and capacities of these defendants when ascertained.

**E.      Summary Charts of Defendants and Certificates**

200.    Summary Charts of the Defendants, and the Certificates with which they are

associated, are included in Appendices XI through XVI.

## V.    FACTUAL BACKGROUND

**A.      The Creation of Mortgage-Backed Securities.**

**1.      The Securitization Process**

201.    The PLMBS purchased by the Bank were created in a process known as

"mortgage securitization."  Mortgage securitization is an end-to-end process by which mortgage

loans are acquired from "mortgage originators," pooled together, and securities constituting

interests in the cash flow from the mortgage pools are then sold to investors.  The securities are

referred to as "mortgage pass-through certificates" because the cash flow from the pool of

mortgages is "passed through" to the certificate holders when payments are made by the

underlying mortgage borrowers.

202.    The following graphic illustrates the securitization process:



203.    Securitization involves several entities who perform distinct tasks, though, as was

the case here, many or all of the entities in a securitization may be subsidiaries or affiliates of a

single parent or holding company.

204.    The first step in creating a mortgage pass-through security such as the PLMBS

purchased by the Bank is the acquisition by a "**Depositor**" or "**Depositor/Issuer**" of an

inventory of loans from a "**Sponsor**" or "**Seller**" which organizes and initiates these PLMBS

transactions by acquiring the loans from its own origination unit or from other mortgage

originators in exchange for cash, and participates in marketing and selling the securities to

investors, including the Bank.  The Depositor/Issuer is often a subsidiary or other affiliate of the

Sponsor, and indeed, each Depositor/Issuer Defendant named herein was an affiliate of the

Sponsor, and often also of at least one originator of mortgage loans underlying that security.  *See*

*infra* § V.D.1.  Plaintiff believes and alleges that each Depositor/Issuer named herein was formed

and exists for the purpose of receiving and depositing loans into trusts for PLMBS securitization. The Depositor/Issuer's name is prominently featured in the Offering Documents, including on the first page of the Prospectus Supplement for each PLMBS.

205.    The Sponsor and Depositor then securitize the pool of loans by forming one or more mortgage pools with the inventory of loans, and creating tranches of interests in the mortgage pools with various levels of seniority.  Interests in these tranches are then issued by the Depositor (who then serves as the Issuer) through a trust in the form of bonds, or Certificates. The Depositor/Issuer Defendants, which securitized these PLMBS, were the "issuers" of the securities.[10]

206.    Each tranche has a different level of purported risk and reward, and, often, a different rating.  The most senior tranches typically receive the highest investment-grade rating, triple A.  Junior tranches, which usually have lower ratings, are more exposed to risk, but offer higher potential returns.  The most senior tranches of Certificates often are retired faster than the more junior, or subordinate, tranches, by redirecting all or part of the collateral's principal repayments from junior tranches up to the senior tranches.  Conversely, losses on the underlying loans in the asset pool—whether due to default, delinquency, or otherwise—are allocated first to the most subordinate or junior tranche of Certificate, then to the tranche above that.  This hierarchy in the division of cash flows is referred to as the "flow of funds" or "waterfall."

207.    The Depositor/Issuer and/or Sponsor worked with one or more of the nationally-recognized credit rating agencies—here, one or more of the Rating Agency Defendants—to ensure that each tranche of the Certificate received the rating desired by the Securities

---

[10] *See* 17 C.F.R. § 230.191 ("The depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the issuer for purposes of the asset-backed securities of that issuing entity.").

Defendants.  For PLMBS, this meant a triple-A rating for the senior tranche, and lower ratings for the subordinated tranches.  Triple-A ratings are provided where the credit rating agency purports to determine that the tranche has the necessary level of credit support.  Once the asset pool is securitized, the Certificates are placed with one or more "**Underwriters**" who resell them to investors, such as the Bank.

208.    The following diagram identifies in basic terms the entities involved in the creation and sale of PLMBS:



**2.      Defendants' Access to Loan Files and Due Diligence Obligations.**

209.    Because the cash flow from the loans in the mortgage pool of a securitization is

the source of funds to pay the holders of the Certificates issued by the trust, the credit quality of

the Certificates depends largely on the credit quality of the loans in the mortgage pool.  The

collateral pool for each PLMBS often includes thousands of loans. Detailed information about the credit quality of the loans is supposed to be contained in the "loan files" developed and maintained by the mortgage originators when making the loans. For residential mortgage loans, such as the loans that backed the PLMBS purchased by the Bank, loan files contain documents such as the borrower's application for the loan; verification of income, assets, and employment; references; credit reports; an appraisal of the property that will secure the loan and provide the basis for other measures of credit quality, such as loan-to-value ratios ("LTVs"); and occupancy status. The loan file also generally includes notes from the person who underwrote the loan describing the loan's purported compliance with underwriting guidelines, and documentation of "compensating factors" that justified any departure from those standards.

210. When evaluating whether to purchase PLMBS, investors such as the Bank do not have access to the loan files. Only the Sponsors, Depositors/Issuers, and the Underwriters, together with the trustees and/or servicers, are in a position to have access to the loan files. Consequently, the Sponsors, Depositor/Issuers, and the Underwriters who draft and sign the Offering Documents, and who sell the PLMBS to investors like the Bank, are responsible for gathering and verifying information about the credit quality and characteristics of the loans that are deposited into the trust, and presenting summaries of this information in free writing prospectuses, prospectuses, or other offering documents that are prepared for potential investors. This due diligence process is a critical safeguard for investors and a fundamental legal obligation of the Sponsors, the Depositor/Issuers and the Underwriters. Accordingly, the due diligence process supposedly performed by the Securities Defendants was critical to the Bank's decision to purchase the Certificates. As discussed in more detail below, the Defendants did not use their

access to the loan files in order to ferret out defective loans or to provide an accurate assessment to the Bank regarding the quality and characteristics of the loans.

### 3.   The Rating Process for PLMBS

211.   Like many institutional investors, the Bank was permitted to buy only triple-A-rated securities.  Accordingly, the credit ratings of the tranches of PLMBS were material to the Bank's decision to purchase the Certificates.

212.   For any PLMBS, the process of rating each tranche begins with the Depositor/Issuer and/or the Sponsor and Underwriters providing the credit rating agency with information about the credit quality and characteristics of the loans that are deposited into the trust.

213.   The credit rating agency is then supposed to evaluate, among other things:

A.   The appraised value of the mortgaged property.

B.   The mortgagor's ability to pay.

C.   The experience and underwriting standards of the originators of the underlying loans.

D.   The loan characteristics that, according to the Depositor/Issuer, underlie a particular transaction.

E.   The default rates and historic recovery rates of the loans.

F.   The *concentration* of the loans along a number of variables, which typically include—to name just a few—the extent to which the loans come from any particular geographic area, the extent to which the mortgagors have low FICO

scores[11] or other indications of low credit quality, and the extent to which the loans were "low-document" or "no-document" loans.

G.   The ability of the servicer to perform all the activities for which the servicer will be responsible.

H.   The extent to which the cash flow from trust assets can satisfy all of the obligations of the PLMBS transaction.  The cash flow payments which must be made from the asset pool are interest and principal to investors, servicing fees, and any other expenses for which the Depositor/Issuer is liable.  The credit rating agencies are supposed to stress-test the flow of funds to determine whether the cash flows match the payments that are required to be made to satisfy the Depositor/Issuer's obligations.

214.   After evaluating these objective and verifiable factors, the credit rating agency issues a rating for the tranche.  This rating constitutes a factual representation regarding the risk of the security made in reliance on objectively verifiable facts, including those listed immediately above.  The rating should therefore be a reflection of both the riskiness of the loans in the asset pool and the seniority of the tranche.  If the rating that the credit rating agency assigns to a tranche is not in accord with the Sponsor's target, then the Depositor/Issuer may "credit enhance" the structure.  By using credit enhancement, a Depositor/Issuer may be able to elevate a bond to the highest credit rating.  Such credit enhancement may include:

A.   Adjusting the level of support provided by subordinate tranches.

---

[11] A FICO score is a score developed by the Fair Isaac Corporation to assess consumer credit risk; it is the most widely used credit score in the United States.

B.  Overcollateralization—that is, ensuring that the aggregate principal balance of the mortgages securing the Certificates exceeds the aggregate principal balances of the Certificates secured thereby.

C.  Cash reserve accounts.

D.  Excess spread, which is defined as scheduled cash inflows from the mortgages that exceed the interest service requirements of the related Certificates.

E.  Third-party contracts, under which losses suffered by the asset pool are absorbed by an insurer or other counterparty.

215.    All of the Certificates that the Bank purchased were senior Certificates that were rated triple-A when the Bank purchased them.

**B.    The Mortgage Originators Abandoned Underwriting and Appraisal Standards and Engaged in Predatory Lending.**

**1.    The Shift from "Originate to Hold" to "Originate to Distribute" Securitization Encouraged Mortgage Originators to Disregard Loan Quality.**

216.    As noted above, the fundamental basis upon which mortgage pass-through Certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral for those loans.  If the borrowers cannot pay, and the collateral is insufficient, the cash flow from the Certificate diminishes, and the investors are exposed to losses.  For this reason, the underwriting standards and practices of the mortgage originators who issued loans that back PLMBS—and the representations in the Offering Documents regarding those standards—are critically important to the value of the Certificates and an investor's decision to purchase the Certificates.

217.    Yet, unbeknownst to the Bank, during the period that the Bank purchased the PLMBS, mortgage originators, including those affiliated with the Securities Defendants, were motivated by the financial rewards of securitization to: (a) effectively abandon their stated

underwriting standards; (b) allow pervasive and systematic exceptions to their stated underwriting standards without proper justification; (c) disregard credit risk and quality controls in favor of generating loan volume; (d) pressure and coerce appraisers to inflate their collateral valuations in order to permit loans to close; and (d) engage in predatory lending practices. As has only become clear recently, this was the result of a fundamental shift in the mortgage securitization markets.

218.    Historically, mortgage originators held on to the mortgage loans they provided to borrowers through the term of the loan. Originators would therefore profit from the obligor's payment of interest and repayment of principal, but also bear the risk of loss if the obligor defaulted and the property value was insufficient to repay the loan. The originator had an economic incentive to establish the creditworthiness of the obligor and the true value of the underlying property.

219.    As mortgage securitization emerged in the 1980s and 1990s, it generally fell within the domain of GSEs Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac purchased loans from originators, securitized them, and sold them to investors. Investors in these early GSE securitizations were provided protections because the underlying loans were originated pursuant to strict underwriting guidelines imposed by Fannie Mae and Freddie Mac, and these entities guaranteed that the investors would receive timely payments of principal and interest. Because Fannie Mae and Freddie Mac were perceived as being backed by the federal government, investors viewed the guarantees as diminishing credit risk, if not removing it altogether.

220.    Between 2001 and at least 2006, however, Wall Street investment banks and other large financial institutions moved aggressively into the securitization markets, taking market

share away from the GSEs.  Unlike the GSEs, which focused on "prime" mortgage pools, the

Wall Street banks and large financial institutions focused primarily on "Alt-A" and "subprime"

mortgage pools because of the higher fees that were available.  "Alt-A" mortgage loans were

loans that allegedly met the credit score and other underwriting criteria of the GSEs, but were

ineligible for GSE purchase either because the mortgages exceeded the applicable GSE dollar

limit, were supported by reduced documentation, or contained disqualifying terms, such as

certain types of adjustable rates.  "Subprime" mortgage loans were mortgages that did not meet

the GSE criteria for creditworthiness of the borrower but purportedly satisfied loan underwriting

criteria developed by their originators.

221.    As the Financial Crisis Inquiry Commission (often, "FCIC") reported in April

2010, "[t]he amount of all outstanding mortgages held in [PLMBS] rose notably from only $670

billion in 2004 to over $2,000 billion in 2006."  This statistic demonstrates the dramatic growth

of the PLMBS market during this time.  FCIC, *Preliminary Staff Report: Securitization and the

Mortgage Crisis* 12 (Apr. 7, 2010).

222.    This enormous increase in PLMBS securitization is reflected in the securitization

volume of the Depositors/Issuers of the PLMBS purchased by the Bank.  For example, between

2003 and 2005, the Bear Stearns entities' securitizations of Alt-A mortgages more than tripled,

from $6.7 billion to $22.9 billion, and its subprime securitizations increased from $0.8 billion to

$13.5 billion (a 1675% increase).  This growth was fueled in large part by the growth of EMC

Mortgage Corporation, whose loan volume grew sevenfold between 2000 and 2006.  Other

Sponsors—large financial institutions and Wall Street banks—similarly expanded their

securitization business during the same period.

223. This increase was fueled by the interaction between record high global savings, referred to by Federal Reserve Chairman Ben Bernanke as the "global savings glut," and exceedingly low interest rates. Low interest rates made it easier and more appealing for consumers to take out home mortgage loans. But the low Federal Reserve rate also meant that the global pool of investors received only marginal returns on traditional low-risk investments, in particular U.S. Government Bonds. This created an incentive for financial institutions to create seemingly low-risk investment options that produced returns in excess of those of government bonds. PLMBS securitization was their answer. Thus, following the model created by the GSEs, the large financial institutions began buying pools of mortgages from mortgage originators, securitizing the pools, and selling the securities to global investors. Because mortgage interest rates (and even more so Alt-A and subprime rates) generally exceeded those of U.S. Government bonds, the resulting PLMBS could provide investors with the higher rate of return they were seeking.

224. One complication that the investment banks needed to solve was the rating of the Certificates. Debt securities secured by pools of mortgages made to lower credit quality borrowers would generally fail to meet the investment-grade requirements of most institutional investors. The financial institutions' solution was to structure the financings through the creation of tranches as discussed above. As a general rule, the result was that up to 80% of any particular PLMBS would receive an "investment-grade" rating. The remaining 20% was often purchased by hedge funds and other entities that were able to buy non-investment-grade Certificates. This development opened the floodgates for the securitization and sale of PLMBS.

225. To ensure that the flood of securitizations and sale of PLMBS did not abate, the financial institutions bankrolled the lenders (both the ones they owned and those that were

independent) so that the lenders had ample capital to issue loans.  Indeed, a recent study by the

Center for Public Integrity found that 21 of the top 25 subprime lenders in terms of loan volume

were either owned outright by the biggest banks or former investment houses, or had their

subprime lending financed by those banks, either directly or through lines of credit.  *See Who Is*

*Behind the Financial Meltdown: The Top 25 Subprime Lenders and Their Wall Street Backers*,

The Center for Public Integrity (May 6, 2009),

http://www.publicintegrity.org/investigations/economic_meltdown/.

226.    As the PLMBS market expanded, the traditional "originate to hold" model

morphed into the "originate to distribute" model.  Under the new "originate to distribute" model,

mortgage originators no longer held the mortgage loans to maturity.  Rather, mortgage

originators sold the loans to Wall Street banks and other major financial institutions and shifted

the risk of loss to the investors who purchased an interest in the securitized pool of loans.

227.    The new distribution model was highly profitable for the mortgage originators in

the short term.  By securitizing and selling pools of these mortgages to investors through

Underwriters, the mortgage originators shifted loans and credit risk off their books, earned fees

and, thus, were able to issue more loans.  Additionally, the securitization process enabled the

originators to earn most of their income from transaction and loan-servicing fees, rather than (as

in the traditional model) from the spread between interest rates paid on deposits and interest rates

received on mortgage loans.  This created an unchecked incentive to originate more and more

loans to feed into the securitization machine.

228.    In testimony before the FCIC, Sheila C. Bair, Chair of the Federal Deposit

Insurance Corporation, explained both the misalignment of incentives arising from the sale of

loans and the misalignment created by flawed compensation practices within the origination industry:

> The standard compensation practice of mortgage brokers and bankers was based on the volume of loans originated rather than the performance and quality of the loans made. From the underwriters' perspective, it was not important that consumers be able to pay their mortgages when interest rates reset, because it was assumed the loans would be refinanced, generating more profit by ensuring a steady stream of customers. The long-tail risk posed by these products did not affect mortgage brokers and bankers' incentives because these mortgages were sold and securitized.

229.    The Attorney General for the Commonwealth of Massachusetts came to the same conclusion when she issued the results of her investigation into the subprime mortgage industry, *The American Dream Shattered: The Dream of Homeownership and the Reality of Predatory Lending* ("The Massachusetts Attorney General Predatory Lending Report"). This report explains:

> Historically, the vast majority of home mortgages were written by banks which held the loans in their own portfolios, knew their borrowers, and earned profit by writing good loans and collecting interest over many years. Those banks had to live with their "bad paper" and thus had a strong incentive to avoid making bad loans. In recent years, however, the mortgage market has been driven and funded by the sale and securitization of the vast majority of loans. Lenders now frequently make mortgage loans with the intention to promptly sell the loan and mortgage to one or more entities. . . . The lenders' incentives thus changed from writing good loans to writing a huge volume of loans to re-sell, extracting their profit at the front end, with considerably less regard to the ultimate performance of the loans.

230.    Similarly, as reported in the *Seattle Times*, executives at Washington Mutual (also termed "WaMu" in reference to Washington Mutual Bank and its parent corporation, Washington Mutual, Inc.), an originator of loans underlying some of the Bank's Certificates, recognized and responded to the same incentive.

> Now it [WaMu] began bundling ARMs [adjustable rate mortgages] and certain other mortgages into securities and selling them off—pocketing hundreds of millions of dollars in fees immediately, while offloading any potential repayment problems. . . . [At this time WaMu CEO] Killinger hired Craig Davis,

> American's director of mortgage origination, to run WaMu's lending and
> financial services. Davis, several former WaMu executives said, began pushing
> WaMu to write more adjustable-rate mortgages, especially the lucrative option
> ARMs. "He only wanted production," said Lee Lannoye, WaMu's former
> executive vice president of corporate administration. "It was someone else's
> problem to worry about credit quality, all the details."

Drew DeSilver, *Reckless Strategies Doomed WaMu*, Seattle Times, Oct. 25, 2009, at A1

(hereinafter DeSilver, *Reckless*, Seattle Times).

231.    The statements above provide support for the argument that, as far as lenders were

concerned, their profits were generated by origination of as many loans as possible, and once

these loans were packaged and securitized, repayment risk was someone else's problem.

232.    As Ben Bernanke, Chairman of the Federal Reserve Board, explained in

Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on the
> terms of the sale, much or all of the risks are passed on to the loan purchaser.
> Thus, originators who sell loans may have less incentive to undertake careful
> underwriting than if they kept the loans. Moreover, for some originators, fees tied
> to loan volume made loan sales a higher priority than loan quality. This
> misalignment of incentives, together with strong investor demand for securities
> with high yields, contributed to the weakening of underwriting standards.

**2.      Mortgage Originators Abandoned Underwriting Guidelines to Create Loans
         for Securitization.**

233.    The misalignment of incentives following the shift to the "originate to distribute"

model caused mortgage originators to violate their stated underwriting and appraisal standards,

and to accept, encourage and even fabricate their own untrue information from loan applicants.

This was not a problem limited to one or a few mortgage originators, but rather—contrary to the

incessant touting of "quality underwriting" by mortgage originators during this period—was

pervasive among the mortgage originators at issue here. Mortgage originators and the financial

institutions that bankrolled them sought loan volume, not loan quality, to profit from the

securitization market.

234.   In addition, coincident with the widespread transfer of mortgage default risk to purchasers of mortgage-backed securities, mortgage originators expanded the practice of originating highly risky nontraditional loans.  In a marked departure from traditional mortgage origination procedures, originators offered a variety of reduced documentation programs in which the verification or substantiation of the applicants' statements of income, assets and employment history was limited or non-existent.  While these programs were touted as providing for "streamlined" but nonetheless effective underwriting, the programs—unbeknownst to the Bank—enabled originators to make loans to unqualified borrowers.  When these defective loans were securitized, investors including the Bank were assured that reduced documentation programs were available only where the borrower satisfied certain criteria, such as FICO scores, LTVs, and/or debt-to-income ratios ("DTIs").  In fact, the originators lacked any principled basis on which to evaluate the increased credit risk posed by what would eventually become colorfully and generally accurately known as "Liar Loans," or "NINJA" (for "no income, no job or assets") loans.  Moreover, the widespread granting of exceptions to underwriting standards without legitimate compensating factors meant that the minimal safeguards associated with the reduced documentation programs were often abandoned in the headlong rush to maximize origination volume.  Additionally, mortgage underwriters would often begin the underwriting of an applicant's loan under full documentation procedures, only to transfer the loan applicant to a "No Doc" program upon learning of information that would disqualify the applicant under the full documentation procedures.

235.   John C. Dugan, Acting Comptroller of the Currency, described for the FCIC the consequences of these poor underwriting practices:

> The combination of all the factors I have just described produced, on a nationwide scale, the worst underwritten mortgages in our history. When house prices finally

stopped rising, borrowers could not refinance their way out of financial difficulty. And not long after, we began to see the record levels of delinquency, default, foreclosures, and declining house prices that have plagued the United States for the last two years—both directly and through the spillover effects to financial institutions, financial markets, and the real economy.

### 3. Mortgage Originators Manipulated Appraisals of Collateralized Real Estate to Create Loans for Securitization.

236.　Accurate appraisals prepared in accordance with established appraisal standards are essential for PLMBS investors to evaluate the credit risk associated with their investment. Indeed, an accurate appraisal is necessary to calculate an accurate LTV, which is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made.  The LTV is strongly indicative of the borrowers' likelihood of defaulting.  As a borrower's equity decreases and the corresponding LTV increases—and particularly when equity drops to less than 10% of the property's value and LTVs are greater than 90%—the borrower's incentive to keep the mortgage current, or to maintain the collateral in good condition, decreases dramatically.  Consequently, aggregate LTV calculations are among the most significant characteristics of a mortgage pool because LTVs both define the extent of the investor's "equity cushion" (*i.e.*, the degree to which values may decline without the investor suffering a loss), and are strongly indicative of a borrower's incentive to pay.  In the absence of properly prepared appraisals, the value component of the LTV is unreliable and misleading.  The appraisal practices of the mortgage originators who issued loans that back PLMBS, and the accuracy of the representations in the Offering Documents regarding those practices, therefore, were critically important to the value of the Certificates, and to the investors' decisions to purchase the Certificates.

237.　Appraisers are governed by the Uniform Standards of Professional Appraisal Practice ("USPAP"), which are promulgated by the Appraisal Standards Board.  The USPAP

contain a series of ethical rules designed to ensure the integrity of the appraisal process.  For example, the USPAP Ethics Conduct Rule provides:  "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

238.    The USPAP Ethics Conduct Rule states:  "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

239.    The USPAP Ethics Management Rule states:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

A.  the reporting of a predetermined result;

B.  a direction in assignment results that favors the cause of a client;

C.  the amount of a value opinion;

D.  the attainment of a stipulated result; or

E.  the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

240.    The USPAP Scope of Work Acceptability Rule states:  "An appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased."

241.    The Appraisal Standards Board also issues Advisory Opinions regarding appropriate appraisal conduct.  For example, Advisory Opinion 19 states in part:

Certain types of conditions are unacceptable in any assignment because performing an assignment under such condition violates USPAP.  Specifically, an assignment condition is unacceptable when it:

- precludes an appraiser's impartiality because such a condition destroys the objectivity and independence required for the development of credible results;

- limits the scope of work to such a degree that the assignment results are not credible, given the intended use of the assignment; or

- limits the content of a report in a way that results in the report being misleading.

242.   The USPAP Scope of Work Rule states:  "For each appraisal . . . an appraiser must . . . determine and perform the scope of work necessary to develop credible assignment results."

243.   Additionally, USPAP Standard 1 states:  "In developing a real property appraisal, an appraiser must identify the problem to be solved, determine the scope of work necessary to solve the problem, and correctly complete research and analyses necessary to produce a credible appraisal."

244.   USPAP Standards Rule 2-1 states that "[e]ach written or oral real property appraisal report must "(a) clearly and accurately set forth the appraisal in a manner that will not be misleading; (b) contain sufficient information to enable the intended users of the appraisal to understand the report properly; and (c) clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment."

245.   Despite the importance of accurate appraisals and the requirements that are designed to ensure them, during the time frame that the Bank purchased the PLMBS, the originators routinely manipulated the process for appraising the collateralized real estate properties.  They did so by pressuring and coercing appraisers, and blacklisting those that would not "come back at value."  The prevalence of this problem and its impact on the financial crisis has been extensively investigated and examined in the aftermath of the market collapse.

246.   According to his statements submitted in connection with his April 7, 2010 testimony before the Financial Crisis Inquiry Commission, Richard Bitner, a former executive of

a subprime lender for 15 years and author of the book *Confessions of a Subprime Lender*,

explains:

> With the appraisal process highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted. . . . [E]ither the majority of appraisers were incompetent or they were influenced by brokers to increase the value. . . .
>
> . . . 25% of [the] appraisals that we initially underwrote were so overvalued they defied all logic.  Throwing a dart at a board while blindfolded would've produced more accurate results.
>
> . . . .
>
> If the appraisal process had worked correctly, a significant percentage of subprime borrowers would've been denied due to lack of funds.  Inevitably, this would have forced sellers to drop their exorbitant asking price to more reasonable levels.  The rate of property appreciation experienced on a national basis from 1998 to 2006 was not only a function of market demand, but was due, in part, to the subprime industry's acceptance of overvalued appraisals, coupled with a high percentage of credit-challenged borrowers who financed with no money down.
>
> . . . .
>
> . . . [T]he demand from Wall Street investment banks to feed the securitization machine couple[d] with an erosion in credit standards led the industry to drive itself off the proverbial cliff.

Testimony of Richard Bitner at 9-10 (Apr. 7, 2010), *available at* http://fcic-

static.law.stanford.edu/cdn_media/fcic-testimony/2010-0407-Bitner.pdf (last visited Apr. 15,

2011).

247.    Alan Hummel, Chair of the Appraisal Institute's Government Relations

Committee and Past President of the Appraisal Institute, testified before the Senate Committee

on Banking that the dynamic between mortgage originators and appraisers created a "terrible

conflict of interest" where appraisers "experience[d] systemic problems with coercion" and were

"ordered to doctor their reports or else never see work from those parties again."

248.     In testimony before the House Financial Services Committee, Subcommittee on

Financial Institutions and Consumer Credit, Jim Amorin, President of the Appraisal Institute,

testified similarly that:

> In recent years, many financial institutions have lost touch with fundamental risk
> management practices, including the separation between loan production and risk
> management.  Unfortunately, parties with a vested interest in a transaction are
> often the same people managing the appraisal process within many financial
> institutions: a flagrant conflict of interest.
>
>         . . . .
>
> Another coercion tactic is the threat of being placed on a "blacklist: (aka —
> "exclusionary appraiser list"), commonly used to blackball appraisers.  It is one
> thing to maintain a list of reputable businesses to work with, or to maintain a list
> of firms to avoid as a result of poor performance.  However, [it] is another to
> place an appraiser on a blacklist for refusal to hit a predetermined value.

249.     Confirming the extent of the problem, a survey of 1,200 appraisers conducted by

October Research Corp. found that 90% of appraisers reported that mortgage brokers and others

pressured them to raise property valuations to enable deals to go through during the period at

issue.  The study also found that 75% of appraisers reported negative ramifications if they did

not cooperate, alter their appraisal, and provide a higher valuation.

250.     As a result of widespread appraisal abuse, in 2010, the Dodd-Frank Wall Street

Reform and Consumer Protection Act, section 1472, amended Chapter 2 of the Truth in Lending

Act, 15 U.S.C. §§ 1631 *et seq.*, to specifically prohibit actions that violate "appraisal

independence."   Under the new Act, acts or practices that violate appraisal independence

include:

> (1) any appraisal of a property offered as security for repayment of the consumer
> credit transaction that is conducted in connection with such transaction in which a
> person with an interest in the underlying transaction compensates, coerces,
> extorts, colludes, instructs, induces, bribes, or intimidates a person, appraisal
> management company, firm, or other entity conducting or involved in an
> appraisal, or attempts, to compensate, coerce, extort, collude, instruct, induce,
> bribe, or intimidate such a person, for the purpose of causing the appraised value

assigned, under the appraisal, to the property to be based on any factor other than the independent judgment of the appraiser;

(2) mischaracterizing, or suborning any mischaracterization of, the appraised value of the property securing the extension of the credit;

(3) seeking to influence an appraiser or otherwise to encourage a targeted value in order to facilitate the making or pricing of the transaction; and

(4) withholding or threatening to withhold timely payment for an appraisal report or for appraisal services rendered when the appraisal report or services are provided for in accordance with the contract between the parties.

251.    All of the abuses targeted by the amended Truth in Lending Act were widespread during the time frame that the Bank purchased the PLMBS, and many of these abuses were in fact carried out by the originators, causing the appraisals of the collateralized real estate backing the PLMBS to be unreliable.

### 4.    Mortgage Originators Engaged in Predatory Lending to Initiate Loans for Securitization.

252.    Under state and federal predatory lending laws, predatory loans are characterized by excessively high interest rates or fees, and abusive or unnecessary provisions that do not benefit the borrower, including balloon payments, prepayment penalties, and underwriting that ignores a borrower's repayment ability.  Moreover, according to the Office of the Comptroller of the Currency ("OCC"), "a fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered."  OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 2 (Feb. 21, 2003) ("OCC 2003 Predatory Lending Advisory Letter").  The Securities Defendants represented and warranted that the mortgage pools that backed the PLMBS purchased by the Bank did not contain predatory loans.  This was critically important to the Bank because the Bank was precluded by regulation from purchasing or accepting as collateral any loan that was the result of predatory lending

abuses.  Accordingly, the Bank would not have purchased the PLMBS had it known that the

Certificates were backed by predatory loans.  The representations and warranties in the Offering

Documents about the absence of predatory lending were false.

253.    Predatory lending was part of the mortgage lenders' effort to increase volume at

any cost.  The Wall Street banks and other financial institutions that issued and underwrote

PLMBS depended on a steady stream of higher interest subprime loans, which often were the

result of predatory lending practices.  As Federal Reserve Board Chairman Bernanke explained:

"[a]lthough the high rate of delinquency has a number of causes, it seems clear that unfair or

deceptive acts and practices by lenders resulted in the extension of many loans, particularly high-

cost loans, that were inappropriate for or misled the borrower."

254.    "The truth is that many of us in the industry were deeply distressed by the

growing practice of pushing high risk loans on borrowers who had no reasonable expectation of

being able to repay the mortgage. Disclosures were often less than adequate, and faced with a

bewildering array of loan terms, borrowers tended to trust their mortgage banker or broker. . . .

In our industry, we have frankly seen too much mortgage malpractice."  Scott Stern, CEO of

Lenders One, Testimony before the Senate Banking Committee.

255.    Too often, mortgage loans were issued to "a borrower who ha[d] little or no

ability to repay the loan from sources other than the collateral pledged," a predatory practice

explicitly identified by the Expanded Guidance for Subprime Lending Programs issued by the

OCC, the Board of Governors of the Federal Reserve System ("FRB"), the Federal Deposit

Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS").  The Expanded

Guidance stated:

> Loans to borrowers who do not demonstrate the capacity to repay the loan, as
> structured, from sources other than the collateral pledged are generally considered

unsafe and unsound.  Such lending practices should be criticized in the Report of
Examination as imprudent.

Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001).  Additionally, the

OCC warned:

> When a loan has been made based on the foreclosure value of the collateral, rather
> than on a determination that the borrower has the capacity to make the scheduled
> payments under the terms of the loan, based on the borrower's current and
> expected income, current obligations, employment status, and other relevant
> financial resources, the lender is effectively counting on its ability to seize the
> borrower's equity in the collateral to satisfy the obligation and to recover the
> typically high fees associated with such credit.  Not surprisingly, such credits
> experience foreclosure rates higher than the norm.
>
> [S]uch disregard of basic principles of loan underwriting lies at the heart of
> predatory lending . . . .

OCC 2003 Predatory Lending Advisory Letter at 2.

256.    As detailed below, *see infra* § V.C, numerous investigations have revealed the

extent of predatory lending by the entities that originated the loans underlying the Certificates.

Most recently, the Department of Justice announced on March 12, 2012 that the following parties

agreed to pay $25 billion to settle mortgage-related claims, including allegations of predatory

lending, brought by 49 state attorneys general and the federal government:  Residential Capital,

LLC; Ally Financial, Inc.; GMAC Mortgage, LLC; Bank of America Corporation; Bank of

America, N.A.; BAC Home Loans Servicing, LP; Countrywide Financial Corporation;

Countrywide Home Loans, Inc.; Countrywide Mortgage Ventures, LLC; Countrywide Bank

FSB; Citigroup Inc.; Citibank, N.A.; CitiMortgage, Inc.; J.P. Morgan Chase & Company; J.P.

Morgan Chase Bank, N.A.; Wells Fargo & Company; and Wells Fargo Bank, N.A.  The

complaint alleged, *inter alia*, that "[i]n the course of their origination of mortgage loans . . . the

Banks have engaged in a pattern of unfair and deceptive practices.  Among other consequences,

these practices caused borrowers in the Plaintiff States to enter into unaffordable mortgage loans that led to increased foreclosures in the States."

257.    The Massachusetts Attorney General Predatory Lending Report explains the ramifications of such predatory lending:

> Subprime ARM loans typically carry an artificially low, fixed interest rate for two or three years, sometimes called a "teaser" rate. That initial rate eventually adjusts to a higher, variable rate for the remaining term of the loan, causing monthly payments to increase, often dramatically.  In recent years, many subprime lenders qualified borrowers based only on their ability to make payments during the "teaser" rate period, ignoring the fact that the borrowers would not be able to make payments when the rate adjusted upwards.  As a result, many borrowers had to continually refinance. Borrowers were forced to obtain new loans, each one higher than the last, at increasingly high loan to value (LTV) ratios . . . . Exacerbating the effects of serial refinancing, subprime mortgages often carry burdensome prepayment penalties, as well as high transaction costs including lender and broker commissions and other fees. . . .  [T]his cycle could continue only so long as home valuations continued to increase [].  As soon as real estate prices flattened, however, homeowners—especially those who used high LTV loans—no longer had the same options when monthly payments began to adjust upward.

258.    Singling out one specific common practice, the Report notes that "[w]hen lenders qualify borrowers for ARM loans based only on the 'teaser' rate period, that reflects an utter lack of diligence in determining whether the borrower could actually pay back the loan. This problem is systemic."  According to the Report, this practice was permitted by lax underwriting standards and apparently reached its peak in 2006 (though it also continued into 2007), and was directly in violation of the Interagency Guidance on Nontraditional Mortgage Product Risks issued in 2006, which stated that for "nontraditional" loans, "analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule."  71 Fed. Reg. 58,609, 58,614 (Oct. 4, 2006).

259.    As FDIC Chairman Sheila C. Bair explained in her January 2010 testimony before the Financial Crisis Inquiry Commission:

The well-publicized benefits associated with legitimate rate-reducing mortgage refinancing and rising housing prices conditioned consumers to actively manage their mortgage debt.  An unfortunate consequence of this favorable environment for refinancing was fraud.  Many consumers have only a limited ability to understand details of standard mortgage contracts let alone the complex mortgages that became common during this period.  In this environment, unscrupulous mortgage providers capitalized on the widely advertised benefits associated with mortgage refinance, and took advantage of uninformed consumers by refinancing them into mortgage loans with predatory terms that were not readily transparent to many borrowers.

### 5. Widespread Defaults and Delinquencies Are the Inevitable Consequence of Loans Issued Without Meaningful Underwriting.

260.    High payment defaults and delinquency rates can indicate a systematic disregard for underwriting guidelines by mortgage originators.  When effective underwriting occurs, poor credit risks are screened out.  That is the purpose of underwriting.  In the absence of effective underwriting, loans are made to unqualified borrowers and fraud is not detected.  When borrowers are loaned money without regard to their ability to repay, loan delinquencies (and foreclosures) ensue.  High delinquency rates in loans issued by an originator allow for the reasonable inference that the originator failed to adhere to its stated underwriting guidelines.

261.    Academic studies have shown that the departure from underwriting guidelines that accompanied the explosion in securitizations contributed to substantial increases in early payment defaults and delinquencies.  *See* Benjamin J. Keys et al., *Did Securitization Lead to Lax Screening? Evidence from Subprime Loans*, 125 Q. J.  Econ. 307 (2010) ("[W]e show that a doubling of securitization volume is on average associated with about a 10%-25% increase in defaults . . . within two years of origination . . . [and] a decline in screening standards . . . .").

262.    Data collected on the performance of loans over the past several years and analyzed in these studies show that payment default and delinquency rates have in fact soared as a result of faulty underwriting.  In the chart below, the X axis reflects months since issuance of the loan; the Y axis reflects the percentage of loans delinquent.



**Delinquency Rates by Loan Age & Vintage\***

*Includes loans 90 days or more past due or in foreclosure.
Note: Q1 originations only.
Source: First American Loan Performance.

263.    Review of current performance data of the loan pools backing the Bank's PLMBS similarly shows increased rates of default, delinquency and foreclosure, allowing for the reasonable inference of pervasive underwriting failures by the mortgage originators who issued the loans backing the PLMBS.  *See infra* ¶ 848.  As of March 31, 2011, the rates of default, delinquency, and foreclosure for mortgage loans underlying the Bank's PLMBS are all in the double digits, and many are as high as 49 or 50%.

> **6.     Loan Files Recently Provided by Certain Trustees Confirm the Underwriting Guidelines Were Abandoned.**

264.    As noted above, the Bank did not have access to loan files when it purchased these Certificates.  However, as a financial institution, the Bank has certain post-purchase contractual rights to request the loan files for certain of the Certificates from the trustees or master servicers.  The Bank has sought to exercise this right, but has faced significant resistance from certain trustees, master servicers, and Defendants to obtaining these loan files.  For the most part, despite the Bank's demands, the trustees and master servicers have refused to comply

with their obligation to provide access to the loan files.  However, after much wrangling, the Bank was able to obtain a limited number of loan files for a subset of the PLMBS purchased by the Bank.  The findings of the review of these loan files are startling.  Despite the Defendants' representations regarding their due diligence review of the loan pools and confirmation that loans in the pools were issued pursuant to stated underwriting guidelines, the loan files demonstrate just the opposite.

265.    For example, the trustee for MHL 2006-1 1A2 (a MortgageIT issuance) provided the Bank with loan files for certain of the 855 loans in the pool.  The Bank reviewed 113 loans.  Of this number, a full one third (37) of the loans were identified as exhibiting "obvious material and adverse breach" of the applicable representations and warranties.  Similarly, the trustee for NAA 2006-AF2 5A1 (a Nomura issuance) provided the Bank with loan files for certain of the 631 loans in the pool.  The Bank reviewed 113 loans.  Of this number, over half (60) of the loans were identified as exhibiting "obvious material and adverse breach" of the applicable representations and warranties.  The large number of defective loans in the loan pools strongly evidences the failure of the mortgage originators to apply their stated underwriting guidelines.

266.    The Bank's review of loan files of loans securing other Certificates purchased by the Bank demonstrates that the loan originators abandoned underwriting guidelines and manipulated the appraisal process.  The Bank reviewed certain loan files underlying the following Certificates:  BALTA 2005-9; BALTA 2006-1; DBALT 2006-AR2; DBALT 2006-AR3; DBALT 2006-AR5; JPALT 2006-A2 1A1; JPALT 2007-A2 12A1; MHL 2006-1 1A2; MSM 2006-9AR; MSM 2006-13AX; NAA 2006-AF2 5A1; and NAA 2007-3.

267.    By way of example, the material defects documented with respect to some of these loan files are included in Section V.C, below, and in Appendices VIII and IX.

**C.**     **Federal and State Investigations, Press Reports, Publicly Available Documents Produced in Other Civil Lawsuits, and Analysis of the Loan Pools Underlying the Certificates Identify Systematic Violation of Underwriting Guidelines, Appraisal Guidelines, and Predatory Lending by the Originators Whose Loans Back the PLMBS in this Case.**

268.     There have been numerous investigations in the past few years into the practices of the mortgage originators who issued loans backing the PLMBS purchased by the Bank.  A review of these investigations and related litigation, as well as statements from confidential sources obtained during the Bank's investigation, demonstrate that mortgage originators in general, and those that issued loans that backed the PLMBS purchased by the Bank in particular, systematically violated and ignored their stated underwriting standards, rendering the statements in the Offering Documents with regard to underwriting standards of the mortgage originators misleading.  This evidence is reinforced further by the analysis of the performance of the actual loan pools backing the PLMBS purchased by the Bank, and, where they have been made available, the actual loan files for the loans backing the PLMBS.

269.     Indeed, many of the mortgage originators who issued loans backing the PLMBS purchased by the Bank have been specifically identified as problem lenders.  In materials presented to the FCIC on April 8, 2010, the OCC presented a list of the worst of the subprime lenders based on their mortgage foreclosure rates in the hardest hit metropolitan areas of the country.  *See* OCC, *Activities of the National Banks Related to Subprime Lending*, Attachment 2. Eight of the originators of mortgage loans that back the PLMBS purchased by the Bank were included on the list: Countrywide, Ameriquest Mortgage Co., American Home Mortgage Corp., IndyMac Bank, F.S.B., Greenpoint Mortgage Funding, Wells Fargo, OwnIt Mortgage Solutions, Inc., and Decision One Mortgage.

270.    Abundant additional information now available reveals the extent to which these and other mortgage originators abandoned their stated underwriting guidelines and engaged in predatory lending, as follows.[12]

### 1.    Countrywide Home Loans, Inc.

271.    Countrywide Home Loans, Inc. ("Countrywide") originated underlying mortgage loans securing at least thirty-three of the Certificates purchased by the Bank: ARMT 2006-1 6A1, ARMT 2006-3 4A2, ARMT 2007-2 2A21, BAFC 2005-H 7A1, BAFC 2006-D 1A1, BALTA 2005-9 11A1, BALTA 2006-2 11A1, BALTA 2006-4 11A1, BALTA 2006-5 1A1, BALTA 2006-6 1A1, BALTA 2006-7 1A1, BALTA 2007-1 1A1, BCAP 2006-AA1 A1, CWALT 2005-16 A4, CWALT 2005-86CB A10, CWALT 2006-OA16 A2, CWALT 2006-OA8 1A1, CWALT 2007-OA4 A1, CWALT 2007-OA9 A1, CWHL 2005-2 2A1, DBALT 2006-AR3 A2, DBALT 2006-AR4 A1, HVMLT 2005-10 2A1A, HVMLT 2007-1 2A1A, JPALT 2006-A2 1A1, LUM 2005-1 A1, LUM 2006-6 A1, MARM 2005-7 2A1, MARM 2005-8 1A1, SAMI 2005-AR2 1A1, SAMI 2006-AR4 4A1, SAMI 2006-AR6 1A1 and SAMI 2006-AR7 A1A. Countrywide abandoned its stated underwriting guidelines.

272.    Countrywide was the nation's largest subprime loan originator between 2005 and 2007.  In 2010, Countrywide was identified by the OCC as the eighth worst mortgage originator in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas with the highest rates of delinquency.

---

[12] The Bank profiles in the following section thirteen mortgage loan originators whose abandonment of underwriting guidelines and other non-disclosed origination practices resulted in materially false and misleading statements in the Offering Documents.  The practices of additional mortgage loan originators whose practices were similarly not disclosed in the Offering Documents are set forth in Appendix IX.

a.   **Government actions against Countrywide and documents produced therein demonstrate Countrywide's abandonment of its stated underwriting guidelines.**

273.   On June 4, 2009, the SEC filed a complaint against certain senior executives of

Countrywide's parent corporation, Countrywide Financial Corporation, including President,

David Sambol, Chairman and CEO, Angelo Mozilo, and CFO, Eric Sieracki.   *SEC v. Mozilo et

al.*, No. 09-3994 (C.D. Cal.).[13]   In this complaint, the SEC alleged that these three senior officers

committed securities fraud by hiding from investors "the high percentage of loans it originated

that were outside its own already widened underwriting guidelines due to loans made as

exceptions to guidelines."   That SEC complaint detailed how Countrywide was aware internally

that its own underwriting guidelines were being ignored and that borrowers were lying about

their income in the reduced-documentation application process.   The SEC complaint quoted

internal email and analysis that was not publicly available previously.

274.   According to the SEC:

> [T]he actual underwriting of exceptions was severely compromised.  According to
> Countrywide's official underwriting guidelines, exceptions were only proper
> where "compensating factors" were identified which offset the risks caused by the
> loan being outside of guidelines.  In practice, however, Countrywide used as
> "compensating factors" variables such as FICO and loan to value which had
> already been assessed [in determining the loan to be outside the guidelines].

275.   Countrywide's top-down involvement in the securitization process and complete

abandonment of underwriting standards are confirmed by the documents produced in the SEC

action, including internal emails, memos, minutes, presentations and deposition testimony, which

---

[13] Countrywide Financial Corporation originated mortgage loans through its wholly-owned
subsidiary Countrywide Home Loans, Inc., which this Complaint refers to as "Countrywide"
for simplicity.  *See, e.g.*, Countrywide Financial Corporation 2006 Annual Report at 3 (Form
10-K).  Thus, the allegations from, and evidence produced in, actions against Countrywide
Financial Corporation, when they concern Countrywide Financial Corporation's mortgage
origination business, really concern Countrywide Home Loans, Inc.

only became publicly available as part of the briefing on the Countrywide Defendants' unsuccessful motion for summary judgment.

276.    For example, Countrywide's Chief Risk Officer John McMurray testified as to Countrywide's adoption of a "matching" strategy, under which Countrywide matched whatever product was being offered by other originators in the marketplace.  [Exh. 267]  However, Countrywide's adoption of its competitors' guidelines (without adoption of corresponding credit risk mitigants) rendered Countrywide's origination practices "the most aggressive in the country."  A June 24, 2005 e-mail from McMurray to Sambol (made public recently in the SEC lawsuit) stated that "[b]ecause the matching process includes comparisons to a variety of lenders, our [guidelines] will be a composite of outer boundaries offered across multiple lenders," and that because comparisons are only made to lender guidelines where they are more aggressive and not used where they are less aggressive, CFC's "composite guides are likely among the most aggressive in the industry." [Exh. 106].

277.    As part of that matching strategy, Countrywide adopted a policy of underwriting ever more loans based on exceptions to their underwriting guidelines.  As Sambol explained in a February 13, 2005 email to Countrywide management, Countrywide "should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."  [Exh. 220]  Similarly, an internal Countrywide email from Managing Director, Carlos Garcia, to McMurray and Countrywide's Credit Risk Officer, Clifford Rossi, dated June 2, 2006 states that "[w]e should originate whatever we can sell to investors."  [Exh. 118]

278.    Ever in pursuit of the next deal, Countrywide routinely went beyond and around its publicly-touted Automated Underwriting System, the Countrywide Loan Underwriting Expert

System ("CLUES").  If CLUES rejected an applicant, Countrywide subjected the loan

application to a process of manual underwriting whereby the loan would be sent up the chain for

approval, first to a loan officer, then to the Structured Loan Desk (also referred to as the

"exception desk"), and if still not approved, the loan would be referred to Secondary Marketing

where applications were routinely granted exceptions to stated underwriting guidelines, all in

furtherance of Countrywide's matching strategy.  As former Countrywide Managing Director for

Secondary Marketing, Nathan "Josh" Adler, testified in the SEC action:

> Q. Do you know whether Countrywide sometimes originated loans that were considered to be exceptions to its underwriting guidelines?
>
> A. We did.
>
> Q. To your knowledge, was there a process by which such loans were approved?
>
>         . . . .
>
> A: There generally was, yes.
>
> Q. And what is your understanding of that process?
>
>  A. Well, I was—I was at the tail end of that process.  There was—we had guidelines, we had kind of core guidelines, and then we had these shadow guidelines, which were the kind of the second tier guideline, if you will.  And then there was this third tier which would come to me.  But essentially there were—the tiering of guidelines related to the kind of the exception process.  And there was an underwriting, they called it, Structured Loan Desk process in the divisions where loans would get referred to the Structured Loan Desk if they were outside, I believe, of kind of the core guidelines.  And then if those loans were outside of even the shadow guidelines, then they would be referred to Secondary Marketing to determine if the loan could be sold given the exception that was being asked for.

[Exh. 234]

279.    As the SEC alleged:  "The elevated number of exceptions resulted largely from

Countrywide's use of exceptions as part of its matching strategy to introduce new guidelines and

product changes."  SEC Compl. ¶ 29 (citing July 8, 2008 testimony of John P. McMurray at

373:25-375:6). [SOF 285/Exh. 267]  In order to boost revenue from securitizations, Countrywide

was willing to approve virtually any loan, regardless of deviation from stated underwriting standards, so long as it could package and re-sell the loan in a securitization.  While not publicly disclosed, these facts were well known within Countrywide, including by Countrywide's highest levels of management.

280.    For example, in a May 22, 2005 email to Sambol, McMurray, after noting that "exceptions are generally done at terms even more aggressive than [Countrywide] guidelines," identified a number of concerns regarding credit risk associated with Countrywide's exception loans, including the following:

(a)    "Use of 2nds Liens as Credit Enhancement."  Because many exceptions loans are structured as piggy-back transactions, Countrywide was taking on much of the loan's credit risk through the second lien, which is not sold into the secondary market;

(b)    "R&W [representation and warranty] Exposure."  Although Countrywide sold "much of the credit  risk associated with high risk transactions away to third parties," Countrywide "will see higher rates of default on the riskier transactions and third parties coming back to us seeking a repurchase or indemnification" for losses due to the defaults;

(c)    "Security Performance.  To the extent our securities contain a greater concentration of higher risk transactions than those issued by our competitors, our security performance may be adversely impacted.  The issue here is the extent our concern over security performance drives what we will or won't do on an exception."

281.    McMurray also noted in his email that Countrywide's pricing models were inherently limited because they "are often used to price transactions (e.g., exceptions) beyond the scope of the data used to estimate the models." [SOF 288/Exh. 84]

282.    At a June 28, 2005 Credit Risk Committee meeting, Countrywide senior executives received a presentation informing the attendees that nonconforming exceptions loans accounted for a staggering 40% of Countrywide's loan originations. [SOF 289]

283.    On April 13, 2006, CEO Mozilo issued an email noting that he had "personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."  Specifically, in his email, Mozilo explained that Countrywide was originating home mortgage loans "through our channels with disregard for process [and] compliance with guidelines."

284.    During June 2006, a Credit Risk Leadership package reported that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option ARMs, 37.3% of its subprime first liens, 25.3% of its subprime second liens, and 55.3% of its standalone home equity loans.  [SOF 293/Exhs. 4, 117]

285.    During December 2006, the Credit Risk Leadership package reported similar percentages of loans underwritten on an exceptions basis: 45.4% of Pay-Option ARMs, 35.3% of subprime first liens, 24.1% of subprime second liens, and 52.6% of standalone home equity loans [SOF 294/Exh. 5].

286.    Countrywide's Quality Control group performed a "4506 Audit" for the 10-month period ended on April 30, 2006, comparing the stated income from loan applications to the income reported by that borrower to the Internal Revenue Service [SOF 427/Exhs. 115, 117, 119], and concluded that 50.3% of the stated income loans audited by Countrywide showed a variance in income from the borrowers' IRS filings of greater than 10%.  Of those, 69% had an income variance of greater than 50%.  [SOF 428/Exh. 117]  Available documents confirm that the audit results were widely known within Countrywide, having been distributed to Countrywide management, including its highest ranking officers, and were discussed at the April 24, 2006 Credit Risk Management Committee meeting [SOF 431/Exhs. 115, 117], where

McMurray stated that the income discrepancies revealed in the audit were also being seen at Countrywide Home Loans.  [SOF 432, Exhs. 115, 117]  Rossi, testified that the "vast majority" of the income discrepancies revealed in the 4506 Audit were the result of fraud and misrepresentation. [SOF 434/Exh. 275]

287.    By February 2007, internal risk management at Countrywide "noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone. . . .  Additionally, [a senior risk manager] warned [Sambol] that 'I doubt this approach would play well with regulators, investors, rating agencies etc.  To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines.'"  McMurray email to Sambol dated Feb. 11, 2007. [Exh. 109]

288.    The deterioration of Countrywide's internal quality control process was noted by Countrywide's management and Corporate Credit Risk Committee.  At the March 12, 2007 meeting, it was reported that of the loans reviewed through Countrywide's internal quality control process, 30.3% had deficiencies or were rated high risk, and 11.9% were rated severely unsatisfactory, and that one of the principal causes for such ratings included inadequate DTIs or LTVs, missing income or appraisal documentation, or failure to meet minimum FICO scores. Similarly, at the May 29, 2007 meeting, attendees were informed that loans were being made "outside of any guidelines."  A presentation made at the May 29, 2007 meeting notes that "loans continue to be originated outside guidelines primarily via the Secondary SLD desk, and that there is no formal guidance or governance surrounding SLD approvals."  [Exhs. 133, 55, 176]

289.    A December 2007 internal Countrywide memorandum quoted by the SEC states that "a Countrywide review of loans issued in late 2006 and early 2007 resulted in . . . the finding

that borrower repayment capacity was not adequately assessed by the bank during the

underwriting process . . . .  More specifically, debt-to-income ratios did not consider the impact

of principal [negative] amortization or any increase in interest."  SEC Compl. ¶ 56 (quoting

Mozilo memo dated December 13, 2007).

 290. In employing its "matching" strategy and thereby making as many loans as

possible, regardless of exceptions, Countrywide was able to enjoy tremendous profits from

securitization of the loans, which also shifted the risk of the loans from Countrywide to

investors:

> As indicated in a previous note, when we first started the SLD, the intent
> was to be able to offer at least one option for borrowers who wanted exceptions to
> our underwriting guides.  The thought was that we would offer borrower
> exceptions in our two major loan programs: 30-year fixed rate and 5/1 ARMs.  In
> addition, both of these programs were set up for Alt A and as such we could price
> and sell under these programs.  While this process seemed to have worked well in
> the past, we have been recently seeing increased demand from Production for
> exceptions on all products in general and Pay Option loans in particular.  In
> addition, Production has been expressing frustration that we were only offering
> major exceptions for 5/1 ARMs and 30-year fixed rates.  As such, to the widest
> extent possible, we are going to start allowing exceptions on all requests,
> regardless of loan program, for loans less than $3 million effective immediately.
>
> The pricing methodology we will use will be similar to that which we use
> for 30-year fixed rates and 5-1 Hybrids. We will assume securitization in all
> cases.
>
>  . . . .
>
> The methodology from a saleability point of view will also be similar to
> that used for 30-year fixed rates and 5-1 Hybrids.  We will view the exception
> assuming securitization and will no longer take into account whole loan buyers.
> In the past, this has caused some exceptions to be declined for Ratios, Balances
> and LTV/CLTV[14] combinations.  Provided we can sell all of the credit risk (i.e.
> not be forced to retain a first loss place due to a[n] 80% LTV, 60 Back-end ratios
> $3 million loan) we will approve the loan as a salable loan. Finally, we will not be
> reviewing loans from an underwriting point of view but will rather be relying on

---

[14] "CLTV" means "combined loan-to-value ratio"—the ratio of *all* liens on a property to the
property's total appraised value.

> Production to make certain that the loan[s] meet all other underwriting Guideline and w[i]ll have been reviewed for compliance acceptability and fraud.

July 28, 2005 email from David Spector, Managing Director, to Countrywide Managing Directors and Secondary Marketing Management.

291.    As Nathan Adler, Managing Director of Secondary Markets, testified in the SEC action:

> Q. Was one of the criteria for granting exceptions at the Secondary Loan Desk in Secondary Marketing whether or not the loan could be sold into the secondary market?
>
> A. That was the only criteria that we followed.

292.    The widespread use of exceptions to its underwriting guidelines were well known within Countrywide, but permitted because, as recognized by John McMurray in his May 22, 2005 email discussed above, "CW's approach to exceptions has been lucrative over the past several years."

293.    Yet Countrywide did not publicly disclose the amount of loans it was underwriting on an exception basis for any loan product or division.  Paul Liu, a Countrywide attorney who participated in, and testified to, the legal work involved in the securitization process at Countrywide between 2004 and 2007, including review of offering documents such as prospectus supplements, testified in the SEC action that while the prospectus supplements he reviewed may have stated that "some of those mortgage loans may have . . . been originated with exemptions that have compensating factors," they did not disclose the number or percentage of loans included in each securitization that were underwritten pursuant to exceptions, or even in many cases whether any loans within that securitization were underwritten pursuant to exceptions at all.

294.     Indeed, Countrywide assured investors that the level of exceptions was low. Christopher Brendler, a Stifel Nicholas analyst who initiated coverage of Countrywide in early 2006, testified that Countrywide repeatedly advised conference call and investor presentation participants that it kept its "exceptions low."  Brendler also testified that a low exception rate in the mortgage industry would have been 5% to 10% of total loans—not the extreme number of exceptions that Countrywide made.  Brendler confirmed that such a disclosure would have been material:

> That's—that would have been a very disturbing disclosure, I believe, to know that you're basically seeking out the most aggressive policies and underwriting guidelines of your competitors without consideration for other factors. You're essentially creating a worst of the worst.

[Exh. 242]

295.     On November 3, 2009, the District Court for the Central District of California denied a motion to dismiss the SEC complaint.  Judge Walter specifically noted that "neither Countrywide's disclosures nor a careful review of the context of the statements convince this Court that the alleged omissions or misstatements were immaterial or not misleading as a matter of law."  *SEC v. Mozilo, et al.*, No. 09-3994, slip op., at 10 (C.D. Cal. Nov. 3, 2009).

296.     Subsequently, on September 16, 2010, Judge Walter denied Countrywide's motion for summary judgment.  Among other key determinations, the court found:

> [The] SEC has also presented evidence that Countrywide routinely ignored its official underwriting guidelines to such an extent that Countrywide would underwrite *any* loan it could sell into the secondary mortgage market.  According to the evidence presented by the SEC, Countrywide typically made four attempts to approve a loan.  Countrywide first used an automated underwriting system known as "CLUES", which applied Countrywide's underwriting guidelines as set forth in Countrywide's technical manuals and loan program guides. . . . CLUES would either approve the loan or "refer" it to a loan officer for manual underwriting.  If that loan officer lacked the authority to make an exception to Countrywide's underwriting guidelines, the loan was referred to the Structured Lending Desk, where yet another underwriter, with even more authority to waive guideline requirements, attempted to make the loan.  If that attempt failed, the

loan was referred to Countrywide's Secondary Markets Structured Lending Desk. According to the testimony of the Managing Director of Countrywide Home Loans' Secondary Marketing Division, once the loan was referred to Countrywide's Secondary Markets Structured Lending Desk, the sole criterion used for approving the loan was whether or not the loan could be sold into the secondary market. As a result of this process, a significant percentage (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines. As reported in one Corporate Credit Risk Committee meeting, one third of the loans referred from CLUES missed "major guidelines" and another one third missed "minor" guidelines. In light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines, that Countrywide would originate any loan it could sell, and therefore that the statements regarding the quality of Countrywide's underwriting and loan production were misleading.

*SEC v. Mozilo, et al.*, No. 09-3994, slip op., at 11–12 (C.D. Cal. Sept. 16, 2010) (citations to the record omitted).

297.    In short, evidence presented to the court supported the claim that "Countrywide routinely ignored its official underwriting guidelines, and in practice, Countrywide's only criterion for approving a loan was whether the loan could be sold into the secondary market." *Id.* at 12.

298.    The Attorneys General from many states also filed complaints against Countrywide based on its abusive and predatory lending practices. Among them, the Attorney General of California alleged based on its extensive investigation of Countrywide that the company "viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them." Complaint at 5, *People v. Countrywide Fin. Corp.*, No. LC083076 (Cal. Super. Ct.) ("California Attorney General Countrywide Complaint"). Countrywide, the California Attorney General found, "did whatever it took to sell more loans, faster—including by … disregarding the minimal underwriting criteria it claimed to require." California Attorney General Countrywide Complaint at 20.

299.    For example, the California Attorney General Countrywide Complaint quotes one former California loan officer explaining how stated income loans were sold, with a loan officer telling the borrower "with your credit score of X, for this house, and to make X payment, X is the income that you need to make"—after which the borrower would state that his or her income was X.  *Id.* at 21.

300.    A similar lawsuit instituted by the Illinois Attorney General, *People v. Countrywide Financial Corp.*, No. 08-22994 (Ill. Ch.), detailed how (a) one Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of the Chicago office had inflated incomes; and (b) one of Countrywide's mortgage brokers, One Source Mortgage, Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

301.    The Illinois complaint also detailed how Countrywide created incentives for its employees to increase the number of loans without concern for ability of the borrower to repay the loan.  The *New York Times* described the allegations in the complaint as "paint[ing] a picture of a lending machine that was more concerned with volume of loans than quality."

302.    Among the many other abuses described in the Illinois complaint, the Attorney General found that:

> [t]hrough the securitization process, Countrywide extracted hefty over-head charges, then shifted the risk of the failure of these non-traditional loans to investors.  Moreover, securitization allowed Countrywide to tap those investors for much needed capital to fuel its origination process and reach its goal of capturing more and more market share.  To facilitate the increase in loan origination volume, Countrywide relaxed its underwriting standards even more and sold risky, unaffordable and unnecessarily more expensive mortgage loans to millions of American homeowners.

Testimony of Illinois Attorney General Lisa Madigan before the FCIC, Jan. 14, 2010.

303.     Similar allegations appear in a complaint filed by the Connecticut Attorney

General, *State v. Countrywide Financial Corp.*, No. 08-40390945 (Conn. Super. Ct.).

> On October 6, 2008, Countrywide entities settled lawsuits brought by *eleven* State
> Attorneys General and potential claims by 28 other states, including all of the
> States in which loans backing the PLMBS purchased by the Bank were issued.
> The settlement valued at $8.4 billion resolved charges of violations of predatory
> lending, unfair competition, false advertising, and violations of banking laws, and
> required Countrywide to implement a program to modify certain existing loans,
> particularly high risk loans and pay-option mortgages that were the subject of the
> Attorneys Generals' investigations.

304.     Similarly, as the 2011 FCIC Report just recently revealed based on the FCIC's

extensive investigation:

> Lenders made loans that they knew borrowers could not afford and that could cause
> massive losses to investors in mortgage securities.  As early as September 2004,
> Countrywide executives recognized that many of the loans they were originating could
> result in "catastrophic consequences."  Less than a year later, they noted that certain high-
> risk loans they were making could result not only in foreclosures but also in "financial
> and reputational catastrophe" for the firm. But they did not stop.

FCIC Report at xxii.

> ### b.     Press reports and private actions against Countrywide demonstrate
> ###         Countrywide's abandonment of its stated underwriting guidelines.

305.     Eileen Foster, Countrywide's executive vice president in charge of fraud

investigations, recently told 60 Minutes that fraud at Countrywide "appeared systemic."  60

Minutes, *Prosecuting Wall Street* (CBS television broadcast Dec. 4, 2011).  According to Foster,

"it wasn't just one individual or two or three individuals, it was branches of individuals, it was

regions of individuals."  *Id.*  In 2007, Foster sent a team to the Boston area to search several

branch offices of Countrywide's subprime division.  The investigators rummaged through the

office's recycling bins and found evidence that Countrywide loan officers were forging and

manipulating borrowers' income and asset statements to help them get loans they weren't

qualified for and couldn't afford.  Foster stated that "[a]ll of the-- the recycle bins . . . were full

of . . . signatures that had been cut off of one document and put onto another and then photocopied . . .or faxed and then  . . . thrown in the recycle bin." *Id.*  According to Foster, "it wasn't just the Boston office.  What was going on in Boston was also going on in Chicago, and Miami, and Detroit, and Las Vegas and, . . .Phoenix and in all of the big markets all over Florida." *Id.*

306.    Other cases against Countrywide raise further challenges to Countrywide's underwriting practices—and substantiate the challenges with witness testimony and documentary evidence.  For example, Mark Zachary, a former Regional Vice President of Countrywide Mortgage Ventures, LLC, Countrywide's joint venture with the homebuilding company KB Home, detailed in a complaint how Countrywide blatantly ignored its underwriting policies and procedures.  Compl., *Zachary v. Countrywide Financial Corp.*, No. 08-0214 (S.D. Tex).  Mr. Zachary states that in September of 2006 he informed Countrywide executives that loan officers were helping loan applicants to submit applications with false income amounts.

307.    Zachary's observations about problems with appraisals at KB Home are confirmed by documents reflecting internal correspondence within and between KB Home and Countrywide filed in *Johnson v. KB Home*, No. 09-972 (D. Ariz.).

308.    Countrywide handled all of the mortgage financing and appraisal services for KB Home.

309.    For example, on June 8, 2005, Christina Nickerson, a KB Home salesperson wrote: "We have an appraisal issue at IMR Mesa . . . . [T]he [lender's] appraiser can not obtain value. . . .  I have asked the [lender] for a copy of the appraisal, and I requested that she try a more aggressive appraiser. . . .  My suggestion is that we have [KB Home Mortgage Company, a wholly-owned subsidiary of KB Home] order an appraisal from a KB friendly appraiser and see

what happens." KB Home Director of Sales McLaury responded: "I agree, we need to order an appraisal from our KB friendly appraiser[.]" On June 16, the salesperson heard back: "Here's our appraisal at purchase price[,]" but McLaury complained: "It's $1,966 short isn't it? Can Ernie Carver bump it up?" Soon after, McLaury confirmed that the maneuvering had worked: "Christina and the Mesa Team, the appraisal will come in at the total sales price."

310.    In another instance, in July 2006, KB Home Phoenix Vice President Stacie McDonald asked a KB Home salesman about a home for which an appraisal was low. The salesman responded: "It was approved at $290,000 with a VC of 38%, however, we were able to push appraisal to $300,000 and the addendum for $300,000 was done yesterday."

311.    Similarly, in October 2007, KB Home Director of Sales McLaury instructed "friendly" appraiser Scott Dugan: "Please base your appraisal on today's base sales price, the options/upgrades the buyer purchased ($40,777), and comps in the neighborhood/area, particularly the one lot 44 (66 Lions Den Avenue) that closed at $248,643." Dugan responded: "ok."

312.    KB Home salesperson, Peter Manesiotis, reported to his manager, Gregory Victors: "Appraisal came in low. This is a CW deal. How should we proceed?" Victors responded: "Have Countrywide order a second appraisal. KB will pay for it. Speak to [loan officer] or processor to get someone who knows area. This process just worked at Mesquite. Buyer did not know about first appraisal." Manesiotis then instructed that a new appraisal be ordered and "do not notify the buyer about the first appraisal."

313.    Countrywide senior executives were apparently not just aware but actively involved in this conduct. In an August 9, 2006 email sent after an appraisal was below contract price and below the level that KB Home's hand-picked appraiser, Harry, could reach,

Countrywide/CWKB Vice President, Tim Ryan wrote:  "Eric Sanford the western regional VP of

landsafe is reviewing the appraisal—he is as high as it gets at landsafe. . . .  As soon as I hear I

will let you know.  We are fighting all the way to the top for you."  Ryan later reported: "We

were just informed the original appraisal will be amended to Harry's appraisal. . . .  So CW will

be able to use the $687,000.00 value."  On another occasion Ryan explained one scheme for

generating self-perpetuating excessive appraisals:  "Going forward I have asked ops to request

Harry on homes that are 'decked' out—this way we know max value has been given.  Under the

new rules we cannot do it often, however once a few closing occur—we have comps!"

314.    More evidence has been presented in lawsuits against Countrywide by the leading

insurance companies that insured mortgage-backed securities sold by Countrywide.  On

September 30, 2008, MBIA Insurance, one of the largest providers of bond insurance, filed its

complaint in *MBIA Insurance Corp. v. Countrywide Home Loans* (Sup. Ct. Cty of New York).

This complaint explains how MBIA "provide[d] credit enhancement on the [mortgage-backed

securities]—in the form of guarantee of repayment of principal and interest for the [mortgage-

backed securities] notes in each securitization," and claims MBIA issued such insurance on the

basis of fraudulent representations by Countrywide.

315.    MBIA explains that:

> MBIA's re-underwriting review has revealed that 91% of defaulted or delinquent
> loans in these fifteen Countrywide securitizations show material discrepancies
> from underwriting guidelines. . . .  For example the loan documentation may (i)
> lack key documentation such as verification of borrower income or assets; (ii)
> include an invalid or incomplete appraisal; (iii) demonstrate fraud by the borrower
> on the face of the application; or (iv) reflect that any of the borrower income,
> FICO score, debt, DTI or CLTV ratios, fails to meet stated Countrywide
> guidelines (without any permissible exception).

MBIA specifically notes that "the Defective Loans run across Countrywide's securitizations

from 2004-2007, demonstrating the consistency of Countrywide's disregard for its underwriting

guidelines during this period." On April 27, 2010, the Court denied Countrywide's motion to dismiss MBIA's fraud claims.

316. The September 28, 2010 Complaint filed by monoline insurer Ambac in *Ambac Assurance Corp. v. Countrywide Home Loans* (N.Y. Sup. Ct.) alleges:

> Because Countrywide [Financial Corporation, Countrywide Home Loans, Inc. and Countrywide Securities Corporation] was the nation's leading mortgage originator, its many public pronouncements that its underwriting practices were the industry's gold standard carried significant weight. Countrywide repeatedly asserted that the loans in its portfolio, from which the loans in the transactions at issue were drawn, were originated pursuant to Countrywide's strict underwriting standards that allowed "exceptions" only if compensating factors were present. But what Countrywide concealed is that, contrary to its representations, approval of "exceptions" became the rule. Countrywide failed to disclose that its business model was premised on the perpetual origination and refinancing of loans to borrowers who did not have the ability to make the required payments.

317. Ambac alleges that Countrywide made numerous false and misleading statements and omitted material facts about the quality of Countrywide's loan origination procedures and the collateral underlying the transactions. In particular, "[t]he Prospectus Supplements contained false and misleading statements concerning the quality of Countrywide's loan origination procedures and, in particular, failed to disclose that Countrywide had adopted a practice of making loans to borrowers who had little or no ability to repay their loans." Furthermore, the loan tapes for the transactions provided by Countrywide—which were "large spreadsheets that purported to contain true and accurate information concerning the proposed loan pools, including key metrics for assessing the borrowers' ability to repay their loans and the sufficiency of the properties as collateral," and upon which Ambac was intended to rely to analyze the risks of and pricing for the proposed transactions—contained information that was materially false and misleading "in view of Countrywide's abandonment of its stated underwriting guidelines and its knowledge of pervasive fraud."

318.    The falsity of Countrywide's representations is evidenced by the performance of the underlying loans, which have defaulted at extraordinary rates.  As of September 2010, more than 35,000 loans insured by Syncora, with an aggregate principal balance of more than $1.95 billion, had defaulted or have been charged-off.  Further, by September 2010, Ambac had reviewed the origination files for 6,533 loans for conformance with Countrywide's loan-level representations and warranties and discovered that 6,362 of the loans—more than 97%—materially breached Countrywide's loan-level representations and warranties.

319.    In *Financial Guaranty Insurance Co. v. Countrywide Home Loans, Inc.* (N.Y. Sup. Ct.), Financial Guaranty Insurance Company ("FGIC"), an insurer of Countrywide's mortgage-backed securities, alleges that, with respect to securitization it insured in 2006 and 2007, Countrywide and its corporate affiliates made multiple false misrepresentations and omissions, including that Countrywide: (a) failed to disclose an increase in its exceptions to, and expansion of, its mortgage-underwriting guidelines, including exceptions for which there were no compensating factors; (b) failed to disclose and deliberately concealed changes to its underwriting standards and procedures from those used for mortgage loans included in prior securitizations; (c) engaged in "adverse selection," whereby poor quality loans would be securitized while loans that were expected to perform better were retained on Countrywide's books; (d) failed to disclose mortgage-loan-origination fraud, in which Countrywide and its corporate affiliates were participants or complicit; (e) misrepresented to FGIC the nature of key delinquency information; and (f) made numerous false and misleading public statements concerning the quality of Countrywide's mortgage origination process and securitized mortgage loans.

320.     According to FGIC, beginning in early 2006, at the latest, Countrywide made continuing undisclosed changes in its mortgage loan origination practices, and started originating and securitizing lower-quality, poorly underwritten loans.  These changes resulted in an undisclosed weakening of Countrywide's underwriting guidelines by permitting increased exceptions in originating mortgage loans, and permitting these exceptions without adequate, and in many cases any, compensating factors.  Moreover, FGIC alleges that Countrywide admitted that it not only expanded the exception process, but also engaged in "adverse selection" by retaining fewer exception mortgage loans for its portfolio, while securitizing (for sale to investors) those loans with exceptions.

321.     FGIC's allegations and Countrywide's purported admissions are supported by the analysis of professional residential mortgage loan review experts that were retained by FGIC to review statistically significant samples of mortgage loans from FGIC insured securitizations. These reviews determined that approximately *70%* of the mortgage loans in these securitizations significantly violated one or more of Countrywide's underwriting guidelines or standard mortgage underwriting practices.  Unsurprisingly, the loss rate for mortgage loans found to be in breach of underwriting standards was two-and-a-half to three times the loss rate on non-breaching loans.

322.     Similarly, in *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.* (N.Y. Sup. Ct.), Syncora, an insurer of Countrywide's mortgage-backed securities, alleges that, with respect to Countrywide securitizations it insured between 2004 and 2006:

> in originating the loans in these portfolios, Countrywide, *consistent with its business practices at the time, systematically ignored its own underwriting guidelines* and made imprudent loans that no reasonable underwriter would have made in a single-minded pursuit of generating ever-greater volumes of new loans. As a result, thousands of non-performing loans in the securitized portfolios violated Countrywide's own published guidelines should never have been made.

(emphasis added.)

323.    Syncora alleges that the Countrywide offering documents, including the prospectuses and prospectus supplements, were replete with misrepresentations regarding Countrywide's underwriting process and failed to disclose its routine, material deviations from its stated underwriting guidelines.  Countrywide is also alleged to have materially misrepresented the accuracy of data, including DTIs and CLTVs, provided to Syncora for each securitized loan (commonly referred to as the "loan tape").

324.    Syncora's review of underlying files for 3,700 defaulted loans in two of the securitizations it insured revealed that 2709 of the loans—almost 75%—have severe underwriting defects.  The majority of these loans exceeded or ignored one or more Countrywide underwriting guidelines regarding excessive DTIs; excessive combined loan to value ratios; excessive loan amounts; improper calculation of first-lien debt, improper calculation of property values; patently unreasonable stated incomes; borrower fraud; indiscriminate availability of stated income loans; inflated appraisals; insufficient borrower credit; insufficient cash reserves; and/or missing documents.  Indeed, Countrywide frequently breached a combination of underwriting guidelines for a given loan, which created a "layered risk," greatly increasing the likelihood of default.

325.    With respect to inflated appraisals, Syncora alleges in part:

In a review of non-performing loans in the 2005-K and 2006-D Securitizations, Syncora has found that Countrywide's appraisals of properties secured by non-performing loans show a clear pattern of inflation compared to sales prices achieved for comparable properties in the locale at the time Countrywide obtained its appraisals.  Moreover, despite Countrywide's promise in the contractual documents and the Prospectuses to obtain "independent third party" appraisals, the properties underlying the vast majority of the loans in the Securitizations were appraised by Countrywide's own affiliated appraisal company, Landsafe, Inc. ("Landsafe").  Landsafe, like Countrywide Home Loans, is a subsidiary of Countrywide Financial [Corp.].

326. In sum, the evidence developed in numerous other actions against Countrywide substantiate that Countrywide abandoned its stated underwriting guidelines.

> **c. Confidential sources provide further evidence of Countrywide's abandonment of its stated underwriting guidelines.**

327. Confidential sources provide additional evidence of Countrywide's failure to adhere to its stated underwriting guidelines. For example, confidential sources, such as Confidential source ("CS")-1, a loan officer who worked at Countrywide from 1997 through 2007, CS-2, a former branch manager and regional vice president for Countrywide from September 2005 through December 2007, and CS-4, a former Countrywide branch operation's manager from 2005 to 2010 (after Countrywide was taken over by Bank of America), all confirm that: (a) Countrywide employees faced intense pressure to close loans at any cost; (b) Countrywide increasingly approved risky, low- or no-documentation loans without adequate review; (c) Countrywide failed to adhere to underwriting guidelines; (d) Countrywide routinely approved loans that contained exceptions for which there were no reasonable compensating factors; (e) Countrywide employees pressured appraisers to inflate home values; and (f) Countrywide employees manipulated loan data in order to close loans.

328. Specifically, CS-1 stated that employees at Countrywide always faced pressure to produce and close more loans. Because CS-1's performance was judged only on how many loans he closed each month, and not on long-term performance, he used to joke to friends that his status of employment was continually under scrutiny by his employer: "I'm fired every month, and then every month they re-hire me."

329. CS-1 stated that from 2004 to 2006, Countrywide's underwriting guidelines became "looser and looser and looser." During this period, the minimum credit scores required for prime or Alt-A mortgages fell repeatedly, such that a borrower with a FICO score of 680

could get a mortgage with a 100% LTV based upon stated income/stated assets documentation. CS-1 also stated that Countrywide offered no income/no asset ("NINA") loans, whereby a borrower could obtain a loan without providing any employment, income, or asset documentation, and did so without any effort, or for that matter no way to determine whether the borrower had an ability to repay the loan. CS-1 further stated that Countrywide frequently offered loans to borrowers who had been rejected by other mortgage providers. In fact, Countrywide loan officers often emphasized to prospective borrowers that Countrywide could do loans that other lenders could not.

330.     According to CS-1, Countrywide had an "Exception Desk," whose purpose was to review loans that did not strictly meet the underwriting guidelines. During the 2004-2006 time period, CS-1 stated that, "It got to where loan approvals with exceptions were the norm."

331.     According to both CS-1 and CS-2, Countrywide loan officers pressured appraisers to return values which would allow the loans to be approved. For example, Countrywide loan officers would tell the appraisers that if they did not provide the value the loan officers needed, Countrywide would not send any more work to the appraiser.

332.     Both CS-1 and CS-2 described that, even in circumstances where the appraisers were not directly threatened, Countrywide influenced their appraisal values by telling appraisers exactly what value they needed in order to approve the loan. CS-2 also explained that in other instances, Countrywide provided appraisers with the purchase price of the home and the loan amount so that the appraisers could extrapolate the minimum value needed for the appraisal. CS-2 noted that Countrywide also sent appraisers additional comparables that were higher than those the appraiser initially relied upon.

333.   CS-2 stated as well that Countrywide's underwriting guidelines became "way too easy" to meet.  As a consequence, many of Countrywide's loans ended up in default.  Numerous times, he recalled thinking to himself, "people making this kind of money shouldn't qualify for a $400,000 loan."  For example, he recalled seeing loan applications for $350,000 homes, with $1,900/month loan payments, when the borrowers were making only $3,000/month.  The DTI on such a loan was approximately 63%.  He said such situations were "absurd, but I saw it all the time."

334.   Additionally, CS-2 said that most approved mortgages at Countrywide had 95-100% LTVs, and most borrowers only put down zero to five percent of the purchase price.  Consequently, borrowers had "no skin in the game," and when home values started to drop and the borrowers' loans were for more than the homes were worth, they had no incentive to continue making their mortgage payments.  Moreover, CS-2 said that Countrywide granted numerous mortgages to borrowers with 65% DTIs, and that Countrywide did not require borrowers to have any "reserves" (*i.e.*, cash in their bank accounts)—or, at most, they only had to have one month's reserve—in order to be approved.

335.   CS-2 also stated that Countrywide offered a "Fast and Easy" loan program, which required minimal documentation and thereby allowed mortgages to be approved more quickly.  It was Countrywide's version of the stated income/stated asset mortgage.  CS-2 had "no doubt" that there was a lot of upward manipulation of borrower income in order to qualify borrowers for a Fast and Easy loan.  Indeed, CS-2 reported one employee to Countrywide's Fraud Department when he caught the employee repeatedly entering fraudulently high income.  However, the Countrywide human resources department said that such reported incidents were not enough to fire the employee, and the employee was simply suspended.  While the employee was

suspended, CS-2 examined the employee's loan files and found four to five different applications in which the employee had nearly doubled the borrowers' reported income in order to get the loans approved.

336.    Like CS-1, CS-4 was aware that her bosses were under a lot of pressure to produce a high volume of loans; she noted that there was a big push on volume back then and that bonuses were tied to volume.  In fact, CS-4 was admonished that she was being too difficult with respect to the underwriting rules, and was told that "I had to find a way to make the loans, and not try to find a way to not make them."  CS-4 recalls many times during her tenure when she did not believe a loan should be made, but it nevertheless was pushed through.  By way of example, CS-4 recalls a Countrywide loan officer in her branch who was allowed to originate loans for his family members, notwithstanding that this violated Countrywide policy, and even though the applications only contained names and addresses and no other information.  In fact, it was only after several of these loans closed, and CS-4 complained to her regional manager, that her colleague was told he could no longer make loans to family.

337.    CS-4 also recalls instances in which she spoke with a customer over the telephone regarding missing or questionable information, and was informed by the customer that he or she just put down what the loan officer told him or her to write.  When CS-4 expressed her concerns to the loan officer involved, she was told *not* to contact any customers.  CS-4 recalls a lot of tension between the loan officers and loan processors in the branch, with the loan officers insisting that loans be processed quickly and without questions and becoming angry when loan processors attempted to verify and validate the information on the loan.

338.    CS-5, a loan officer and branch manager for Countrywide, stated that verification of income under Countrywide's Fast and Easy loan program was "a joke."  Moreover, if the

CLUES system—Countrywide's Automated Underwriting System—did not approve a loan at first, loan officers would often simply inflate the numbers until there was an approval. There was no limit to how many times the numbers could be re-entered. In CS-5's experience, loan officers were unlikely to seek exceptions to the underwriting guidelines from the branch manager, since they could simply commit fraud on the "front end"—i.e., by inflating the numbers.

339.    CS-5 also said that 50% of mortgage loans were made without formal appraisals. When appraisals were done, the appraiser was told that if the property did not "come back at value," Countrywide would simply go to another appraiser thereafter. CS-5 said when an appraised property had zoning violations, or other features that would bring down the valuation, the appraiser was told to make sure their photographs of the property didn't include those features.

        **d.**       **The mortgages originated by Countrywide and securitized in the PLMBS purchased by the Bank provide further evidence of Countrywide's abandonment of its stated underwriting guidelines.**

340.    Countrywide originated mortgages that secured at least the Certificates listed above in paragraph 271. As discussed in detail below, the Offering Documents contained serious material misstatements and omissions regarding specific characteristics of the loan pools securing these Certificates, including misstatements with respect to their weighted average LTVs and the percentages of loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the compounded high-risk mortgages that infected the loan pools. Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates – averaging over 49 percent. These circumstances are strong evidence of Countrywide's failure to observe its stated underwriting standards. Countrywide's actual practices—including use of unreliable and biased collateral valuations, in lieu of appraisals, and

routine granting of underwriting exceptions without exceptions—caused it to originate loans whose actual LTVs and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

> **e.      Press reports, government investigations, and related litigation demonstrate that Countrywide engaged in predatory lending.**

341.      The *New York Times* detailed Countrywide's abusive lending practices in a story entitled "Inside the Countrywide Lending Spree":

> On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. "I want to be sure you are getting the best loan possible," the sales representatives would say.

> But providing "the best loan possible" to customers wasn't always the bank's main goal, say some former employees. Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.

> Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

342.      According to *The New York Times*, "Countrywide was willing to underwrite loans that left little disposable income for borrowers' food, clothing and other living expenses." The Company's incentive compensation system encouraged such loans—regardless of the inevitability that the borrower would default and the Company (and the borrower) would be severely harmed.

343.     According to Mark Zachary, a former Regional Vice President of Countrywide's joint venture with KB Home, Countrywide Mortgage Ventures, LLC, the appraiser, as known to Countrywide executives, was being strongly encouraged to inflate appraisal values by as much as 6% to allow the homeowner to "roll up" all closing costs.  Mr. Zachary explained that this resulted in the homeowner being "duped" as to the value of the home.  According to Mr. Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, *i.e.* the borrower owed more than the home's worth.  Thus, the buyer was set up to be more susceptible to defaulting on the loan.  *See supra* ¶¶ 306-307(citing to complaints filed in *Zachary v. Countrywide Fin. Corp.*, No. 08-0214 (S.D. Tex.), and *Johnson v. KB Homes*, No. 09-972 (D. Ariz.)).

344.     Countrywide's incentive compensation system encouraged brokers and sales representatives to place borrowers into the sub-prime category even if they in fact qualified for other loans. As reported in *Bloomberg*, Senator Charles Schumer urged that "Countrywide, the biggest U.S. mortgage lender, should stop paying higher commissions to brokers who steer borrowers to high-cost loans that 'are designed to fail.'"

345.     The Massachusetts Attorney General has detailed "Countrywide's indifference to its borrowers' inability to repay its loans." For example, while "[o]n its website, Countrywide's successor Bank of America suggests when obtaining a mortgage to purchase a home that a borrower have a maximum back-end [DTI] ratio of 36%[,] Countrywide routinely approved loans for borrowers with back-end DTI ratios exceeding 50%."

346.     According to the Massachusetts Attorney General complaint in *Commonwealth v. Countrywide Financial Corp.* (Mass. Super. Ct.), Countrywide allegedly violated Massachusetts' Consumer Protection Law by "originat[ing] loans in such a manner that would lead predictably

to a borrower's default and foreclosure," including the origination of negative amortization

loans, hybrid ARMs where borrowers were not qualified based on the post-teaser rate, stated

income loans, and loans with these features plus prepayment penalties.

347.    Among the conduct alleged and resolved in Countrywide's above-noted

settlement with 39 state Attorneys General were violations of state predatory lending laws by (a)

making loans it could not reasonably have expected borrowers to be able to repay; (b) using high

pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (c)

failing to disclose to borrowers important information about loans, such as refinancing costs, the

availability of lower cost products, the existence of prepayment penalties, and that advertised

rates would adjust upwards sharply as soon as one month after closing.

> **f.    Confidential sources provide further evidence of Countrywide's predatory lending practices.**

348.    Confidential sources also confirmed that Countrywide engaged in predatory

lending practices.  For example, CS-1 said he knew a lot of Countrywide loan officers who

misrepresented to borrowers how a negative amortization loan worked.  On a negative

amortization loan, the monthly payment covered an amount that was less than the total accrued

interest on the loan; any unpaid interest was added on to the end of the loan.  The interest rate on

the negative amortization loans then adjusted upward periodically.  Consequently, if a borrower

continued to make monthly payments that were below the amount of the accrued interest, the

amount of the unpaid interest would skyrocket.  In approximately three years, the amount due

would hit a "ceiling" of 110% to 115% of the original principal balance.  Then Countrywide

would "recast" the loan balance, and adjust the required monthly payment so that it would cover

all of the previously-deferred interest.  As a result, the borrower's monthly payment could rise to

as much as two-and-a-half times the original monthly payment.  Many borrowers fell into problems with such loans.

349.    CS-1 said he knew that Countrywide loan officers misrepresented how these types of loans worked because he used to make calls to Countrywide workers posing as a prospective borrower.  When the Countrywide officers explained the loans to him, their explanations were not accurate.

350.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, at Countrywide variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any of the Offering Documents apprise the Bank that Countrywide abandoned its guidelines and engaged in predatory lending.

**2.    Bear Stearns Residential Mortgage Corporation and EMC Mortgage Corporation**

351.    Bear Stearns Residential Mortgage Corporation ("Bear Stearns Residential Mortgage" or "BSRM"), which was establish by Bear Stearns in 2005 to focus on Alt-A mortgages,  originated underlying mortgage loans securing at least nine of the Certificates purchased by the Bank: BALTA 2007-2 1A1, BALTA 2007-3 1A1, BSMF 2006-AR1 1A1, BSMF 2006-AR2 1A1, BSMF 2006-AR3 1A1, BSMF 2006-AR5 1A1, BSMF 2007-AR1 1A1, BSMF 2007-AR4 1A1, and BSMF 2007-AR5 1A1A. Bear Stearns Residential Mortgage abandoned its stated underwriting guidelines.

352.    EMC Mortgage Corporation ("EMC Mortgage"), a subsidiary of The Bear Stearns Companies, originated or acquired from other originators, reviewed, and resold underlying mortgage loans securing at least twenty three of the PLMBS purchased by the Bank:

BALTA 2005-10 11A1, BALTA 2005-8 11A1, BALTA 2005-9 11A1, BALTA 2006-1 11A1,

BALTA 2006-2 11A1, BALTA 2006-3 1A1, BALTA 2006-4 11A1, BALTA 2006-4 13A1,

BALTA 2006-5 1A1, BALTA 2006-6 1A1, BALTA 2006-7 1A1, BALTA 2007-1 1A1, BALTA

2007-2 1A1, BALTA 2007-3 1A1, BSMF 2006-AR1 1A1, BSMF 2006-AR2 1A1, BSMF 2006-

AR3 1A1, BSMF 2006-AR5 1A1, BSMF 2007-AR1 1A1, BSMF 2007-AR4 1A1, BSMF 2007-

AR5 1A1A, LUM 2005-1 A1 and MARM 2007-R5 A1.

353.    EMC Mortgage was an aggregator of mortgage loans, which means it acquired,

from various sellers, mortgage loans that purportedly complied with EMC's underwriting

guidelines. *See, e.g.*, BALTA 2006-1 Pros. Supp. at S-57 ("Approximately 5,083 of the

mortgage loans in the aggregate have been acquired by the Sponsor from various sellers and

were originated generally in accordance with the following underwriting guidelines established

by the Sponsor.").  EMC Mortgage also abandoned its stated underwriting guidelines.

>   **a.    Press reports, private actions, and confidential sources demonstrate
>   that Bear Stearns Residential Mortgage Corporation and EMC
>   Mortgage Corporation abandoned their stated underwriting
>   guidelines.**

354.    Both Bear Stearns Residential Mortgage and EMC served as mortgage loan

conduits for the massive Bear Stearns mortgage-loan-securitization machine.  The Bear Stearns

entities had no intention of ever holding the loans they originated or purchased.  Rather, the sole

purpose of the origination conduits was to generate the flow of loans into the Bear Stearns

securitization pipeline.

355.    Bear Stearns affiliates provided loan volume, not loan quality, and, indeed,

pushed for increased loan volume at the expense of underwriting standards.  According to the

Wall Street Journal:

> During its first full year of business in 2006, Bear Stearns Residential Mortgage originated 19,715 mortgages for a combined $4.37 billion, according to data compiled by the Federal Reserve and analyzed by The Wall Street Journal.
>
> Bear Stearns Residential Mortgage rejected about 13% of applications, compared with an average denial rate of 29% nationally, according to the Fed data.

Michael Corkery, *Fraud Seen as Driver in Wave of Foreclosures: Atlanta Ring Scams Bear Stearns, Getting $6.8 Million in Loans*, WALL ST. J., Dec. 21, 2007, at Al (Dec. 21, 2007).

356.    Several former EMC analysts have come forward describing how EMC analysts were told to falsify loan-level data for loans acquired by EMC in order to ensure that the loans could be securitized.  As reported by the Atlantic in 2010, two EMC analysts described how "they are encouraged to just make up data like FICO scores if the lenders they purchased loans in bulk from wouldn't get back to them promptly."  Teri Buhl, *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, THE ATLANTIC (May 14, 2010).  These analysts explained that "from Bear's perspective . . . we don't want to waste the resources on deep investigation: that's not how the company makes money.  That's not our competitive advantage—it eats into profits."  *Id.*

357.    According to Matt Van Leeuwen, a mortgage analyst who worked for EMC from 2004 through 2006, the loan files acquired by EMC would often be in such disarray that EMC mortgage analysts would be confused as to whether mortgages should be labeled no-doc or full-doc.  Rather than consulting with the broker who originated the loans, however, the EMC analysis would call Bear Stearn's Wall Street office for guidance.  According to Van Leeuwen:

> I wasn't allowed to make the decision for how to classify the documentation level of the loans . . . .  [A] snap decision would be made up there [in New York] to code a documentation type without in-depth research of the lender's documentation standards.

*Id.*

358.    Moreover, Van Leeuwen sent a series of emails to journalists providing "disturbing accounts of what was happening behind the scenes" at EMC and Bear Stearns.  First Amended Complaint at ¶ 137, *Ambac Assurance Corp. v. EMC Mortgage LLC et al.*, No. 650421/2011 (N.Y. Sup. Ct. July 18, 2011) (citing Email from Matthew Van Leeuwen (EMC Mortgage Corporation Analyst, Trade Support) to Nick Verbitsky (Blue Chip Films), dated March 25, 2009).  Van Leeuwen noted that if there were "outstanding data issues . . . analysts would 'fill in the holes.'"  *Id.*  (citing Email from Matthew Van Leeuwen (EMC Mortgage Corporation Analyst, Trade Support) to Nick Verbitsky (Blue Chip Films), dated March 30, 2009).  For example, "[a] missing credit score would magically become a 680 in Bear's system."  *Id.*

359.    The pressure to acquire more and more loans, regardless of the risks, was emphasized by EMC management.  For example, the Federal Housing Finance Agency ("FHFA") recently obtained access to an April 14, 2006 email sent by EMC's Senior Vice President of Conduit Operations, Jo-Karen Whitlock, in which Whitlock told her staff:

> I refuse to receive any more emails . . . questioning why we're not funding more loans each day. I'm holding each of you responsible for making sure we fund at least 500 each and every day. . . . [I]f we have 500+ loans in this office we MUST find a way to . . . buy them. . . . I expect to see 500+ each day. . . . I'll do whatever is necessary to make sure you're successful in meeting this objective.

Complaint at 416, *Federal Housing Finance Agency v. JPMorgan Chase & Co.*, No. 11-06188 (S.D.N.Y. Sept. 2, 2011).

360.    Moreover, the FHFA also obtained access to an April 5, 2007 email sent from Sherrie Dobbins, an EMC Assistant Manager for Quality Control Underwriting, to Adfitech, a company that reviewed mortgages acquired by EMC, in which Dobbins directed Adfitech to limit its review of mortgages acquired by EMC:

"Effective immediately, in addition to not ordering occupancy inspections and review appraisals, DO NOT PERFORM REVERIFICATIONS OR RETRIEVE CREDIT REPORTS ON THE SECURITIZATION BREACH AUDITS,"

Do not "make phone calls on employment," and

"Occupancy misrep is not a securitization breach."

*Id.* ¶ 414.

361.    The abandonment of underwriting guidelines by EMC and Bear Stearns Residential Mortgage (both with regard to loans originated by them and purchased from other originators) is at the heart of several lawsuits filed by monoline bond insurers from which Bear Stearns entities had obtained insurance on several securitization trusts.  The policies required the insurers to guarantee payment of interest and principle to bond holders in the event of loan defaults within the trusts.  For example, Ambac, which provided bond insurance for four Bear Stearns securitizations, alleged based on substantial discovery obtained in its lawsuit that Bear, Stearns & Co., Inc. was in a position to know of the low quality of loans it aggregated and securitized through EMC and Bear Stearns Residential.

362.    In the course of its investigation and litigation, Ambac obtained loan files from Bear, Stearns & Co., Inc. for many of the loans backing the PLMBS it insured.  Analysis of the loan files by an independent consultant hired by Ambac confirms widespread breaches of representations and warranties with regard to the underwriting of the loans.  Indeed, of the 6,309 loans reviewed, 5,724 breached one or more of EMC's representations and warranties, evidencing a staggering *90%* breach rate.  Defects identified in the analysis include:

- rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- inflated and fraudulent appraisals; and,

- pervasive violations of the loan originators' own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with debt-to-income and loan-to-value ratios above the allowed maximums, or (iv) with relationships to the applicable originator or other non-arm's-length relationships.

363.    Ambac's findings are not unique.  Independent consultants have analyzed loan files from the Bear Stearns securitization pipeline for other monoline bond insurers, and this has produced similar or worse results.  For example, Syncora Guaranty Inc., analyzed hundreds of defaulting loans backing an EMC sponsored PLMBS insured by Syncora, and found material breaches of representations and warranties in *93%* of the loans in one review, and *95%* in another.  *See* Complaint at ¶ 5, *Syncora Guarantee Inc. v. EMC Mortgage Corporation*, No. 09-3106 (S.D.N.Y March 31, 2009).  A subsequent randomly selected sample of 400 loans in Bear Stearns securitizations insured by Syncora demonstrated that **85.5%** of the loans breached one or more representations and warranties regarding loan quality.  *Id.* at ¶ 6.  As explained by Syncora: "The most prevalent and troubling of the breaches indentified by Syncora involve (i) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties and (ii) the loan originator's abject failure to adhere to proper and prudent mortgage-lending practices and its own underwriting guidelines." *Id.*

364.    In fact, the Separate Trustee appointed on behalf of the Trust for the BSMF 2007-AR4 securitization—from which the Bank purchased certificate BSMF 2007-AR4 1A1—recently brought suit against EMC based on breaches of representations and warranties by EMC concerning almost 300 mortgage loans that EMC sold to the trust.  As part of its suit, the

Separate Trustee conducted a review of the loan files for the underlying loans, many of which were originated by EMC, and concluded:

> [A]pproximately three-quarters of the loans in the Trust have been modified or liquidated, or are now seriously delinquent. A review of loan origination documents on certain of the loans that the Trustee obtained from EMC demonstrates that the mortgage loans sold by EMC to the Trust breached the standards set forth in EMC's representations and warranties. In fact, the origination documents clearly demonstrate that EMC and its affiliated mortgage originators *routinely approved mortgage loans despite clear defects in the loan applications*. Those defects included unreasonable and substantial overstatement of income by borrowers; implausible, glaring misstatements of owner occupancy; and pervasive failure of the originators to follow their own mandatory underwriting practices, including basic due diligence, such as verification of borrower assets or employment status.

Complaint ¶ 4, *Bear Stearns Mortgage Funding Trust 2007-AR4  v. EMC Mortgage LLC* (Del. Ch. May 17, 2012) (emphasis added).[15]

365.    Statements of confidential sources further demonstrate the abandonment of underwriting guidelines and predatory lending by EMC and Bear Stearns Residential Mortgage. For example, CS-6 was an underwriter at Bear Stearns Residential Mortgage in 2006.  He reveals that Bear Stearns Residential Mortgage engaged in predatory lending, regularly approving loans without analyzing whether a customer could actually afford the loan.  CS-6 also routinely rejected loans that his managers would later approve—despite the fact that these loans failed to meet underwriting guidelines pertaining to income, assets, or the appraised value of the homes.

366.    Among the loans CS-6 underwrote were what the company called "no ratio loans."  According to applicable guidelines, "no ratio" loans did not require underwriters to analyze whether the customer could actually afford the loan.

---

[15] The Separate Trustee also recently filed a similar suit based on similar evidence against EMC with respect to mortgages underlying the BSMF 2006-AR1 securitization, from which the Bank purchased Certificate BSMF 2006-AR1 1A1.

367. CS-6 stated that Bear Stearns Residential Mortgage also sold stated income and stated asset loans, which did not require any documentation to substantiate income or assets. The underwriter only needed to verify the fact of employment, but did not need to verify income levels.

368. CS-6's branch office of Bear Stearns Residential Mortgage underwrote about $150 million in mortgages every month in 2006. To maintain these numbers, CS-6 was under pressure to process about five loans each day. When CS-6 rejected loans because they did not meet underwriting guidelines as to income, assets, or appraisal values, account executives would often appeal his decision up the line to management. These appeals often resulted in an override of his decision to reject the loan, and its subsequent approval.

369. CS-6 reports that the borrowers who received approved loans from Bear Stearns Residential Mortgage did not fully understand the risks of some of the loans they were getting. "They didn't know they couldn't afford the loan," CS-6 stated.

370. CS-7 worked at EMC's Lewisville, Texas headquarters from 2000 to 2007 as a fraud auditor in the "fraud prevention" department. In addition to CS-7, the "fraud prevention" department had two underwriters and an analyst.

371. CS-7 audited loans that EMC had acquired from other lenders and that it was preparing to bundle and sell to investors as mortgage-backed securities. CS-7 was given a set of approximately 30 to 50 loan files each week to audit and determine whether they contained evidence of fraud. It was part of her job to take the perceived burden off the company's regular underwriters who suspected fraud in the loan files by reviewing the suspect loans, so that the other underwriters could keep their loan reviews and approvals flowing.

372.    CS-7 regularly found fraud in the loan files she reviewed, including inflated

appraisals, altered credit reports, investors using straw buyers for multiple properties and

transactions, and titles that had been doctored.  "There was a lot of misrepresentation and fraud,"

CS-7 said.  Although CS-7 identified these problems throughout the portfolio she reviewed, she

recalls in particular that the loans EMC acquired from Encore Credit—a mortgage originator—

were rampant with fraud.  In fact, there were so many issues with Encore Credit's loans that

EMC decided to buy Encore Credit in 2007.

373.    CS-7 confirmed that loans in which she identified fraud remained in the mortgage

pools that were sold to investors.  These loans "were put in a pool and sold off to someone else.

The 'dirty' loans got lost in the mix."  CS-7 knew this occurred, because she witnessed it.  "I was

sitting right there.  That was the strategy.  If someone on the other end didn't catch it, so be it.  It

made me cringe."

        **b.**      **Evidence from the Bank's review of loan files further indicates that
EMC Mortgage Corporation and Bear Stearns Residential Mortgage
abandoned their stated underwriting guidelines.**

374.    The Bank recently obtained access to and reviewed the loan files for several

mortgage loans acquired by EMC Mortgage and securitized in BALTA 2006-1.  The Bank's

review of these loan files demonstrates that EMC Mortgage abandoned its stated underwriting

standards when it acquired the loans that secure the Certificates.  On information and belief,

EMC Mortgage's abandonment of underwriting practices and failure to require properly

conducted appraisals with respect to acquired mortgage loans was repeated with other mortgage

loans backing the Certificates.

375.    For example, the Bank's review of mortgage loan # 1218082799 reveals

irregularities in the origination demonstrating that this loan was not originated in accordance

with EMC Mortgage's stated underwriting standards.  This loan was a $216,000, "No Income

Verified Assets" mortgage with a 100% combined LTV ("CLTV") secured by property in New Brunswick, NJ. The application contained no information regarding the borrower's income. The borrower had a 620 credit score, and had one outstanding collection account within the prior 12 months. Although Desktop Underwriter ("DU") indicated the borrower should have verified assets sufficient to pay 6 months in PITI (principal, interest, taxes, and insurance), the borrower only had 3.62 months in reserve after subtracting closing costs. Moreover, evidence in the file indicates the property was a "flip": although the seller held title to the property for less than three months, the sale price—and appraised value—was 5% higher than the price originally paid by the seller just three months before.

376. Other loans reviewed by the Bank show similar defects. Loan # 1218081823 was a $194,400 loan secured by property in Seattle, WA. This loan was a "Stated Income Verified Assets" loan, which means that the borrower's income, as stated in the application, must pass a "reasonableness" test performed by the underwriter. The borrower was a 25 year old, unmarried female employed for 1 year with Washington Energy Services as a Project Coordinator; previously she was employed by Starbucks as a Project Manager for 5 years. The borrower's stated income was $6500 per month, which seems inconsistent with the borrower's position, geographic location, level of education, and amount of experience. Moreover, the borrower's verified assets and payment history do not support such an income—borrower had total assets of only $5,025. This loan was in default within 31 days of closing.

377. Finally, a pair of mortgages acquired by EMC Mortgage reveals the extent to which EMC Mortgage had abandoned its underwriting guidelines when acquiring mortgages. EMC acquired two mortgages—the second closing a mere 12 days after the first—that were issued by the same bank to the *same borrower*, who was a 26-year old female with a 641 credit

score.  *See* loan # 1218082552 and # 1218083144.  Both loans were 5/6 LIBOR ARMs with 10-year interest-only periods.  The down payments were funded by second mortgages issued by the same bank; thus the CLTV for each mortgage was 100%.  The application for loan # 1218082552—the *first* of the two mortgages acquired by EMC—listed numerous liabilities, including mortgages on two other properties.  Additionally, although both loans were Full Documentation loans—which typically require verification of 2 years of self employment income—neither loan file contained verification of income.  This is particularly concerning, as both applications state the borrower was self-employed with a stated income of $35,416 *per month*.  Of further note is that although the borrower was employed and living in Georgia, loan # 1218082552 was purportedly financing a primary residence in New Jersey; loan #1218083144, which closed 12 days later, was for a second home in Georgia.  Finally, both loans reflect a lack of proper underwriting approval.  Both loans were processed by DU and were rated "Refer with Caution" due to loan amounts ($420,000 and $463,200) and CLTVs.  The Uniform Underwriting Transmittal Summary for loan #1218083144 inaccurately reflects that the loan received DU approval.  The Uniform Underwriting Transmittal Summary for loan # 1218082552 indicated that the loan received AUS Approval, but the form was unsigned.  Both loans resulted in early payment defaults.

378.    Additionally, the Bank recently obtained access to and reviewed several loan files for mortgage loans originated by Bear Stearns Residential Mortgage Corporation and securitized in BALTA 2005-9.  For example, the Bank's review of mortgage loan # 1218059075 reveals irregularities in the origination demonstrating that this loan was not originated in accordance with Bear Stearns Residential Mortgages' stated underwriting standards.  This loan was a $49,400, 10-year interest only, 99% CLTV second mortgage that reflects numerous material

defects.  BSRM failed to include a form 1008 in this loan file to verify the DTI and other ratings used to qualify the borrower.  Additionally, the borrower's DTI of 57% exceeded the accepted limit, which is typically no more than 50% for borrowers with excellent credit; this DTI would have been higher but for the fact that BSRM failed to factor in the complete loan payment. Moreover, the borrower had insufficient reserves—after close costs were deducted, the borrower had assets sufficient to pay only 1.59 months in PITI (principal, interest, taxes, and insurance). Moreover, this PITI calculation was inaccurate because BSRM failed to factor in taxes and insurance payments.  Other defects include the fact that borrower's existing mortgage did not appear on his credit report and that BSRM could not verify 12 months of prior housing history.

379.  Mortgage loan # 1218059064 was a $178,200 cash-out refinance of a primary residence in Panama City, FL.  This loan was a "Stated Income Verified Assets" loan, which required verification of assets sufficient to pay 2 months in PITI (principal, interest, taxes, and insurance).  However, no verification of assets was included in the loan file.  Moreover, the borrower's credit report reflected that she was 90-days delinquent on an account within 6 months of closing.  BSRM failed to obtain a letter of explanation for this delinquency.

380.  Finally, mortgage loan # 1218059083 was a $228,000 rate and term refinance of an investment property in Gilbert, AZ.  For this loan, BSRM erroneously relied on an inflated appraisal to arrive at the purported 80% LTV ratio.  The appraised value was $285,000.  This value was unreasonable because the borrower had purchased the property less than 9 months earlier for only $232,535.  This reflects a 22 percent increase in value in 9 months.  Additionally, BSRM should have used the sale price rather than the appraised value to calculate the LTV ratio, as the LTV ratio was to be based on the lesser of the purchase price or appraised value.  Properly calculated, the LTV ratio for this loan was 98 percent.

c.   **Bear Stearns Residential Mortgage Corporation and EMC Mortgage Corporation manipulated the appraisal process**

381.    Monoline insurer Syncora recently obtained access to an internal Bear Stearns email that indicated that Bear Stearns securitized mortgages despite the fact that its own re-appraisals revealed "extreme variances between the original appraisals and the reappraised values."  First Amended Complaint at ¶¶ 192-95, *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC*, No. 651566/2011 (N.Y. Sup. Ct. June 24, 2011).  Moreover, this email demonstrated that Bear Stearns secretly securitized HELOCS found to have the ***highest variances***, even though the variances between the original appraisals and the reappraisals fell outside of Bear Stearns' own -15% tolerance level (meaning that the reappraised values were lower than the original appraisal values by 15% or more).  *Id.* (citing email from Jessica Medina (Fidelity Hansen Quality Transaction Manager) to Tammy Brison (Bear Stearns & Co. and EMC Mortgage Corporation Underwriting Coordinator ), dated December 27, 2006 (attaching final results of "PRO Value" appraisal)).

382.    The Bank recently obtained access to and reviewed the appraisal reports for several mortgage loans acquired by EMC and securitized in BALTA 2006-1. The Bank's review of these appraisal reports demonstrates that EMC routinely used appraisals that violated USPAP, and otherwise originated loans based on false and inflated valuations of collateral.

383.    For example, the appraisal report for loan # 1218082799, which was acquired by EMC from Waterfield Financial Corp, reflects that the adjustments in Sales Comparison Analysis have not been explained and analyzed for the comparable sales, in violation of USPAP Standard Rules 1-1(a), 1-1(b) and 1-4(a).  For example, the appraiser increased the value of the comparable properties by $5,000 as an adjustment for the subject property's new windows. However, the appraiser failed to explain or support this adjustment.  Additionally, this appraisal

report reflects a violation of USPAP Standard Rule 1-4(b), which provides that "[w]hen a cost approach is necessary for credible assignment results, an appraiser must . . . develop an opinion of site value by an appropriate appraisal method or technique."  Appropriate appraisal methods require providing support for valuations.  Similarly, the appraiser failed to provide any explanation for his failure to make adjustments to the sale prices of comparable properties for sales concessions, which are costs paid by the seller that usually are paid by the buyer, such as closing costs.[16]  If a seller was forced to make concessions, this generally indicates that the sale price exceeded the actual value of the comparable property, and thus an appropriate adjustment should have been made by the appraiser.  Finally, the appraisal did not provide any reconciliation for the sales comparison approach, in violation of USPAP Standard Rule 1-6.

384.   The appraisal report for loan # 1218082552 reflects an appraised value that is unsupported by the properly adjusted sale prices of comparable properties.  Specifically, the gross living area adjustment for comp. #2 was incorrectly stated as -$7,500.  However, based on the assumptions stated by the appraiser, the adjustment should have been -$32,000. This error would reduce the adjusted value of comp. #2 to $495,000. Based on the correct value of comp. #2 and the low value of comp. #4 ($475,000), the appraised value of the subject property of $525,000 is not supported by the sale prices of comparable properties.  This appraiser made numerous other mistakes, including: failure to adjust for the age of comps; listing adjustments for porch, patio, deck, and fireplace on a single line and with no explanation; failure to adjust for the fact that the subject property had a partial basement whereas 3 of the 4 comps had full basements; and failure to support location, site, and the pool adjustments.

---

[16] Since concessions affect the sales price of the comp, appraisers are required to make adjustments to reflect market reaction to such a concession.

385.    The appraisal report for loan # 1218081823 reflects an ambiguous and incomplete reconciliation of the sales comparison approach, in violation of USPAP Standard Rule 1-6.  The appraiser reported that "[a]ll four sales were given equal consideration."  In other words, the appraiser used an average of the sales prices of the four comps, which is not an acceptable appraisal process.

386.    The appraisal report for loan # 1218083144 reflects questionable adjustments to comparable sale prices.  For example, the appraiser listed view adjustments of +$15,000 for comp. #3, -$20,000 for comp. #4, and +$20,000 for comp. #5 without providing any support in the report.  Moreover, the appraiser used the cost approach to evaluate the subject property, which appears to be an attached condominium, even though it is generally not an acceptable practice to use the cost approach for condominiums.

387.    Additionally, the Bank recently obtained access to and reviewed the appraisal reports for several mortgage loans originated by Bear Stearns Residential Mortgage and securitized in BALTA 2005-9.  The Bank's review of theses appraisal reports demonstrates that BSRM routinely used appraisals that violated USPAP, and otherwise originated loans based on false and inflated valuations of collateral.  For example, the appraiser for mortgage loan # 1218059075 failed to provide any basis to support the conclusion that there were no concessions.  The appraiser did not develop on opinion of site value as required by USPAP Rule 1-4(b) and did not provide a reconciliation for the sales comparison approach as required by USPAP Rule 1-6.

388.    Similarly, the appraiser for mortgage loan # 1218059083 failed to make any adjustments—or explain the lack thereof—for concessions even though the appraiser stated that concessions for all of the comparable properties were made "by seller."  As noted above, this

generally indicates that the sale price for the comparable properties exceeded the actual value of properties, and thus appropriate adjustments should have been made by the appraiser. Additionally, the appraiser increased the value of comparable property no. 2 by $20,000 to reflect inferior upgrades, but failed to provide support for this adjustment in the report.

389.     These are not merely technical violations of USPAP, but rather reflect the very types of manipulative tactics that would be used by an appraiser who was attempting to hit a specific value.

> **d.      The mortgages originated by Bear Stearns Residential Mortgage Corporation and EMC Mortgage Corporation and securitized in the PLMBS purchased by the Bank provide further evidence of these originators' abandonment of their stated underwriting guidelines.**

390.     As discussed in detail below, the Offering Documents contained serious material misstatements and omissions regarding specific characteristics of the loan pools securing the Certificates that included loans originated by Bear Stearns Residential Mortgage and EMC, including misstatements with respect to their weighted average LTVs and the percentages of loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the compounded high-risk mortgages that infected the loan pools.  Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of Bear Stearns Residential Mortgage's and EMC's failure to observe its stated underwriting standards.  Bear Stearns Residential Mortgage's and EMC's actual practices—including the use of unreliable and biased collateral valuations, in lieu of appraisals, and the routine granting of underwriting exceptions without compensating factors— caused them to originate loans whose actual LTVs were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

391.     In summary, far from following their underwriting guidelines and making

occasional, targeted and justified exceptions when other evidence of ability to repay justified a

deviation from the guidelines, at both Bear Stearns Residential Mortgage and EMC, variance

from the stated standards was the norm, and many loans were made with essentially little to no

underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise

the Bank that Bear Stearns Residential Mortgage and EMC abandoned their underwriting

guidelines.

**3.     IndyMac Bank, F.S.B.**

392.     IndyMac Bank, F.S.B. ("IndyMac") originated underlying mortgage loans

securing at least twelve of the Certificates purchased by the Bank: BALTA 2006-4 13A1,

CWALT 2007-OA9 A1, DBALT 2006-AR5 1A1, DBALT 2007-AR1 A1, INDX 2005-AR4

2A1A, INDX 2005-AR8 2A1A, INDX 2005-AR12 2A1A, INDX 2006-AR19 1A1, LUM 2006-

3 11A1, LUM 2006-7 2A1, LXS 2007-9 1A1 and MSM 2007-5AX 2A2.  IndyMac abandoned

its stated underwriting guidelines.

> **a.     Government actions and related lawsuits and investigations
> demonstrate IndyMac's abandonment of its stated underwriting
> guidelines and its predatory lending.**

393.     In 2010, IndyMac was identified by the OCC as the twelfth worst mortgage

originator in the country based on the delinquency rates of the mortgages it originated in the ten

metropolitan areas with the highest rates of delinquency.

394.     As reported in the Audit Report of the Office of Inspector General, Department of

Treasury, IndyMac made loans to borrowers who could not afford to repay them, an indicator of

predatory lending:

> IndyMac often made loans without verification of the borrower's income or
> assets, and to borrowers with poor credit histories. Appraisals obtained by
> IndyMac on underlying collateral were often questionable as well. As an Alt-A

lender, IndyMac's business model was to offer loan products to fit the borrower's needs, using an extensive array of risky option-adjustable-rate-mortgages (option ARMs), subprime loans, 80/20 loans, and other nontraditional products. Ultimately, loans were made to many borrowers who simply could not afford to make their payments.

SAFETY AND SOUNDNESS: MATERIAL LOSS REVIEW OF INDYMAC BANK, FSB, OIG-09-032,

(February 26, 2009).

395.    In describing what it referred to as IndyMac's "Unsound Underwriting Practices,"

the Inspector General's audit explained:

> [A]mong other things, we noted instances where IndyMac officials accepted appraisals that were not in compliance with the Uniform Standard of Professional Appraisal Practice (USPAP). We also found instances where IndyMac obtained multiple appraisals on a property that had vastly different values. There was no evidence to support, or explain why different values were determined. In other instances, IndyMac allowed the borrowers to select the appraiser. As illustrative of these problems, the file for one 80/20, $1.5 million loan we reviewed contained several appraisals with values ranging between $639,000 and $1.5 million. There was no support to show why the higher value appraisal was the appropriate one to use for approving the loan.

396.    The Inspector General's audit contained four examples of examined loans with

serious underwriting failings and questionable appraisals.  These included the following

examples of IndyMac's conduct and the losses resulting from IndyMac's violation of

underwriting standards and reliance on faulty appraisals:

Loan 1

> On May 2, 2007, IndyMac approved a $926,000 stated income loan for the borrower, . . . an adjustable rate mortgage with a 5-year term and a beginning interest rate of 5.875 percent, which was subject to change monthly. . . .

> As a stated income loan, IndyMac performed no verification of the borrower's self-employment income of $50,000 a month ($600,000 annually). IndyMac also did not verify the borrower's assets. . . .

> The loan file contained an appraisal which indicated that the property value was $1.43 million. This value was based on comparable properties that had been improved with single family residences.  However, the comparable properties were located closer to the ocean and bay, and their values were based

on listing price instead of the actual selling price.  The appraised value also did not take in consideration a slowdown in the real estate market.  We saw no evidence in the loan file that IndyMac resolved these and other anomalies with the appraisal.

The borrower made payments totaling $5,389 before defaulting on the loan.  The unpaid principal and interest at the time of foreclosure totaled approximately $1.01 million.  At the time of our review, the property was listed for sale for an asking price of $599,000.

Loan 2

In November 2007, IndyMac approved a $3 million stated income loan, secured by the borrower's primary residence in Scottsdale, Arizona.  The loan proceeds were used to refinance the primary residence which the borrower had owned for 11 years and reported its value as $4.9 million.

As a stated income loan, IndyMac performed no verification of the borrower's reported self-employment income of $57,000 a month ($684,000 annually). Contrary to IndyMac policy, the borrower selected the appraiser who appraised the property at $4.9 million.

Notes in the loan file indicated that the borrower had listed the property for sale in November 2006, first at a price of $4.9 million that was later reduced to $4.5 million before the borrower pulled the property off the market.  Despite this, the appraiser concluded that the value of $4.9 million appeared to be reasonable.  IndyMac accepted the appraiser's value based on a review of online sale and public records.  It did not physically inspect the property.

The borrower made no payments on the loan before default.  The total delinquent loan amount as of November 2008 was $3,015,625.  According to the IndyMac official, the property sold in October 2008 for $2.0 million.

Loan 3

In February 2007, IndyMac provided the borrower a stated income, 80/20 loan, for a combined total of $1.475 million, to purchase a property in Marco Island, Florida.  The combined loan equaled the appraised value of the property.

As a stated income loan, IndyMac performed no verification of the borrower's reported income of $28,500 a month ($342,000 annually).  For 80/20 loans, IndyMac allowed an $800,000/$200,000 maximum loan amount and a maximum combined loan amount of $1 million.  This loan was an exception to IndyMac policy as the combined loan amount of $1,475,000 exceeded the maximum combined loan amount.  The loan exception was approved anyway.

Various appraisals in the loan file contained significant differences with no indication of how they were resolved by IndyMac.  A January 2007 appraisal

valued the property at $1.48 million.  A valuation analysis prepared by an IndyMac employee on January 25, 2007, stated that the skill level of the appraiser was unacceptable—the appraiser had not provided accurate comparable properties to the subject property and did not accurately consider the location of the property.  The IndyMac employee estimated the property value at $1 million and recommended that another appraisal be obtained. Another note in the loan indicated that the IndyMac official overruled the employee's recommendation and the appraisal was accepted.  The IndyMac official, however, adjusted the appraised value approximately 10 percent lower, to $1.33 million, citing as a justification that a property on the same street had sold for $1.97 million.

The borrower made no payments before defaulting on the combined $1.48 million loans.  According to the IndyMac official, the borrower deeded the property to the thrift in lieu of foreclosure.  The IndyMac official estimated in November 2008 that the property was worth about $700,000.

Loan 4

In April 2002, IndyMac approved the borrower for a stated income home equity line of credit of $550,000.  This line of credit was in addition to a 80/20 loan for $3 million that the borrower already had with IndyMac. The borrower reported that the property was worth $5.2 million.

As a stated income loan, IndyMac performed no verification of the borrower's reported gross income of $95,000 a month ($1.14 million annually) as the owner/manager of a limited liability corporation.  The loan notes history did not indicate how IndyMac resolved negative information revealed in credit reports on the borrower.  Two credit reports obtained in March 2002 listed serious and frequent delinquencies. An earlier credit report had noted a discrepancy with the borrower's social security number.

Various appraisals in the loan file also contained significant discrepancies with no indication of how they were resolved by IndyMac.  Specifically, the appraisal for the original 80/20 loan, dated in October 2001, valued the property which the appraisal described as new construction at $5.2 million.  This same value was reported by a second appraisal dated in March 2002.  A third appraisal, dated in April 2002, placed the market value of the home at $508,500. The appraisal stated that the home was less than ½ mile from a hazardous waste facility.  A fourth appraisal, also prepared in April 2002, valued the property at $730,000, with the lowest reasonable value at $590,000 and the highest reasonable at $900,000.  This appraiser also reported that the home was built in 1959.

The borrower made payments totaling about $11,000 before defaulting on the $550,000 home equity line of credit loan.  According to the IndyMac official, the thrift was able to recover approximately $600,000 on both loans. . . .

397.     A June 30, 2008 report issued by the Center for Responsible Lending entitled

INDYMAC: WHAT WENT WRONG? HOW AN "ALT-A" LEADER FUELED ITS GROWTH WITH

UNSOUND AND ABUSIVE MORTGAGE LENDING concluded that IndyMac often ignored its stated

underwriting and appraisal standards and encouraged its employees to approve loans regardless

of the borrower's ability to repay.

398.     The Center for Responsible Lending's report quotes an IndyMac underwriting

team leader, Audrey Streater, as stating of her time at IndyMac: "I would reject a loan and the

insanity would begin. It would go to upper management and the next thing you know it's going

to closing."

399.     The Center for Responsible Lending's report describes the recollection of another

former underwriter for IndyMac, Wesley Miller:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the
> line to a senior vice president and got it okayed.  "There's a lot of pressure when
> you're doing a deal and you know it's wrong from the get-go—that the guy can't
> afford it," Miller told CRL. "And then they pressure you to approve it."  The
> refrain from managers, Miller recalls, was simple: "Find a way to make this
> work."

400.     The Center for Responsible Lending interviewed another former IndyMac

underwriter:

> Scott Montilla, who worked as an underwriter for IndyMac in Arizona . . . says
> that when salespeople went over his head to complain about loan denials, higher-
> ups overruled his decisions roughly half the time.  "I would tell them: 'If you
> want to approve this, let another underwriter do it, I won't touch it—I'm not
> putting my name on it,'" Montilla says. "There were some loans that were just
> blatantly overstated. . . .  Some of these loans are very questionable. They're not
> going to perform."

      **b.**      **Private actions against IndyMac demonstrate IndyMac's
abandonment of its stated underwriting guidelines.**

401.     Multiple insurers of IndyMac-originated loans, including MBIA Insurance

Corporation, FGIC, and Syncora—all of whom have experienced unprecedented losses in

connection with the financial guarantee insurance they provided on IndyMac loans—have filed

suit against IndyMac alleging the abandonment of underwriting standards based, in part, on their

analysis of the loan files for IndyMac loans. Some of the allegations made by the insurers are

virtually identical to the allegations made by the Bank here—namely that IndyMac abandoned its

underwriting standards in its rush to originate (and securitize) as many loans as possible.

402. By way of example, according to MBIA:

> IndyMac had abandoned any reasonable and prudent underwriting standards. In
> an effort to expand its market share during the mortgage lending boom, IndyMac
> systematically abandoned its own underwriting guidelines in pursuit of increased
> loan originations: it knowingly loaned millions of dollars to borrowers who could
> not afford to repay the loans, or who IndyMac personnel knew or should have
> known were including misstatements in their loan applications, often with the
> assistance and encouragement of IndyMac's employees and brokers, or who
> otherwise did not satisfy the basic risk criteria for prudent and responsible lending
> that IndyMac claimed to use.

403. This systematic abandonment of underwriting standards stands in sharp contrast

to the representations made about IndyMac's underwriting standards in numerous documents,

including investor prospectuses and prospectus supplements.

404. MBIA's allegations are supported by reviews of loan files backing PLMBS

insured by MBIA. A review of the loan files of 418 defaulting loans in one of the PLMBS

insured by MBIA indicated that *over 95%* of the defaulting loans failed to comply with

IndyMac's representations and warranties with respect to its underwriting guidelines and

policies. Similarly, a review of 297 defaulting loans in another PLMBS insured by MBIA

indicated that *over 99%* failed to comply with IndyMac's stated underwriting guidelines and

policies.

405. Syncora also analyzed various IndyMac loans backing PLMBS it insured. Out of

the 107 loans analyzed by Syncora, 105 of the loans breached representations and warranties

made by IndyMac to Syncora. These include (a) 83 loans in breach of the representation that

"each Mortgage Loan was originated in all material respects in accordance with the applicable

Originator's underwriting criteria in effect at the time of origination"; (b) 57 loans in breach of

the representation that "each Mortgage Note be a legal, valid and binding obligation, all parties

had full legal capacity to execute the documents and convey real estate to the best of the Seller's

knowledge, and there was no fraud involved in the origination of any Mortgage loan"; and (c) six

loans in breach of the representation that "each Mortgage Loan contain an appraisal conforming

to the standards of the applicable Originator."

406.    In addition to similar allegations of the abandonment of underwriting guidelines

by IndyMac, which are also based on review of loan files, FGIC alleges that IndyMac materially

misrepresented the accuracy of data provided to FGIC for a securitization it insured, including

the owner-occupancy status of a property, the combined LTV for the property, the borrower's

DTI, and the borrower's FICO credit score.  Again, this allegation is supported by evidence

obtained by FGIC from its review of loan files it obtained in the course of its investigation.

407.    The three insurers noted above have not been able to conduct complete analyses

of the loan pools for which they provided insurance because IndyMac, despite its contractual

obligations to the insurers, has refused to provide complete access to the loan files.  For this

reason, all three insurers are seeking judicial relief to gain access to these various loan files.

Similarly, many of the Securities Defendants have repeatedly refused to provide the Bank with

access to the files for the loans underlying its Certificates.

408.    Other entities are also pursuing claims against IndyMac for abandoning its

underwriting guidelines.  For example, in May of 2009, Deutsche Bank National Trust

Company, in its capacity as a trustee, filed suit against IndyMac Bank and the FDIC (in its

corporate capacity as well as in its capacity as receiver and conservator for IndyMac Bank and

IndyMac Federal Bank) over the more than 150,000 mortgage loans that IndyMac Bank had

originated or acquired and sold to the trust.  *See Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 09-

3852 (C.D. Cal.).  Deutsche Bank's complaint asserts claims for breach of contract, breach of the

duty of good faith and fair dealing, and breach of fiduciary duty, and alleges that IndyMac

breached numerous representations and warranties that it made to the trusts, including: (a) selling

mortgage loans into the trusts that failed to comply with IndyMac's credit underwriting standards

and origination process; (b) providing mortgage loan origination files that failed to contain

required documentation; (c) originating mortgage loans that did not comply with applicable law;

and (d) selling mortgage loans into the trusts that did not possess the characteristics set forth in

the schedules to the relevant governing agreements.  Encompassed in the Deutsche Bank case are

three of the IndyMac-originated Certificates purchased by the Bank, INDX 2005-AR4, INDX

2005-AR8, and INDX 2006-AR19.  Hence, like the Bank, the trustee for these very Certificates

contends that IndyMac abandoned its underwriting guidelines, contrary to the statements in the

Offering Documents.

> **c.    Confidential sources provide further evidence of IndyMac's abandonment of its stated underwriting guidelines.**

409.    Confidential sources provide additional evidence of IndyMac's failure to adhere

to its stated underwriting guidelines, as well as appraisal guidelines.

410.    According to CS-9—a former underwriter for IndyMac in Missouri from June

2005 to June 2007—she was required on a daily basis to approve loans that she believed should

not be approved.  IndyMac required underwriters who wanted to deny stated income loans to

obtain management approval for the denial.  As a result, CS-9 was frequently overruled, even

when the income provided in the application was obviously overstated, such as when a cab driver

from Chicago claimed to have $12,000 a month in income.  Upset at being forced to approve

clearly inaccurate loan applications, CS-9 many times noted in the file that "the loan was approved under duress."

411.    CS-9 noted that IndyMac underwriters were under a lot of pressure to approve loans. IndyMac underwriters received bonuses based on the number of loans that they permitted to be funded, not the number of loans that they reviewed. According to CS-9, this structure incentivized the approval of unscrupulous loans and opened the doors to committing fraud on the inside. CS-9 stated that a broker could not commit fraud unless an underwriter approved it, and there were certain underwriters that would approve anything, no matter how blatant, because they wanted a larger paycheck. In fact, in 2007, CS-9 recalled being required, along with the other underwriters in her department, to come in on a Saturday and review the loan files for stated income loans that had been previously funded. CS-9 believes that during this time period a lot of questions were coming up about the loans being reviewed, and CS-9 and her colleagues went through every loan her department had approved to see whether or not the stated salary was within the correct range—as indicated by salary.com—for the job description of the loan applicant. CS-9 found a lot of overstated incomes in the files that had been reviewed by other underwriters—"some of the underwriters would rather see a bigger paycheck than do the right thing."

412.    The statements of CS-10, a former underwriter for IndyMac in California from 2006 to 2008, and CS-11, a former underwriter for IndyMac in New Jersey from 2004 to 2007, further confirm IndyMac's abandonment of underwriting standards. CS-10 stated that on several occasions she suspected that stated-income loan applications contained inflated income information. In particular, she recalls a gardener in California who purportedly made $10,000 a month. Notwithstanding her concerns, because the loan applicant had a sufficiently high FICO

score, IndyMac's automated system—eMITS—approved him for the loan.  When CS-10 questioned this approval, she was informed that because the system approved it, she needed to process the loan.  CS-10 also recalled that the bonus system—which was based on the number of loans funded—incentivized underwriters to quickly approve loans.  Those underwriters who failed to meet their quotas were written up.  Similarly, CS-11 reported that no-documentation and stated income loans were "the norm" during CS-11's tenure as an underwriter, with CS-11 stated that his managers approved loans that CS-11 would not have approved, and were known to overrule CS-11 on loans that he denied.  CS-11 believed that IndyMac did too many no-doc and stated income loans, and approved deals that should not have been approved.

413.    CS-9 also testified as to the loosening of appraisal standards.  When CS-9 first started at IndyMac, the bank had an automated system for scoring appraisals that took into account different factors such as the location of the property and the date of the comparable sales.  Based on the scoring of this data, certain appraisals were sent to IndyMac's appraisal review department, which denied a lot of loans.  According to CS-9, at a certain point management concluded that too many loans were being reviewed and denied, so management relaxed the standards, thereby reducing the number of appraisals automatically sent to the review department.  CS-9 worked on the same floor as the appraisal review department, and recalls talking with appraisal reviewers who complained "a lot" that they had a strong belief that "they weren't seeing appraisals [they should be seeing]," i.e., that suspect appraisals were not being reviewed.

414.    CS-9's statements were confirmed by CS-12, who began working for IndyMac in California as a licensed real estate appraiser trainee and who did appraisals for IndyMac in 2006 and 2007.  CS-12 recalls being blacklisted over her appraisal of a California home with a

separate guest house.  Consistent with standard appraisal practices, CS-12 did not include the

guest house's square footage in the main house, and refused to do so even under pressure from

IndyMac.  CS-12's refusal prompted IndyMac to stop sending her work, and an IndyMac

representative verbally confirmed that she had been placed on a blacklist.

> ### d. The mortgages originated by IndyMac and securitized in the PLMBS purchased by the Bank provide further evidence of IndyMac's abandonment of its stated underwriting guidelines.

415.     IndyMac originated mortgages that secured at least twelve of the Certificates in

this action.  As discussed in detail below, the Offering Documents contained serious material

misstatements regarding specific characteristics of the loan pools securing these Certificates,

including misstatements and omissions with respect to their weighted average LTVs and the

percentages of loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the

compounded high-risk mortgages that infected the loan pools.  Moreover, as described in

paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure

rates.  These circumstances are strong evidence of IndyMac's failure to observe its stated

underwriting standards.  IndyMac's actual practices—including the use of unreliable and biased

collateral valuations, in lieu of appraisals, and the routine granting of underwriting exceptions

without compensating factors—caused it to originate loans whose actual LTVs were far different

from that reported in the Offering Documents, and whose likelihood of default was much higher

than that of loans issued under underwriting standards of the type described in the Offering

Documents.

416.     In summary, far from following its underwriting guidelines and making

occasional, targeted and justified exceptions when other evidence of ability to repay justified a

deviation from the guidelines, variance from the stated standards was the norm at IndyMac, and

many loans were made with essentially little to no underwriting or effort to evaluate ability to

repay.  Nowhere did any Offering Document apprise the Bank that IndyMac abandoned its guidelines and engaged in predatory lending.

### 4.      Washington Mutual Mortgage Securities Corp.

417.    Loans backing two of the Certificates (Certificates JPALT 2006-A1 1A1 and LUM 2007-2 1A1) were originated by Washington Mutual Mortgage Securities Corp., a wholly-owned subsidiary of Washington Mutual Bank, and loans backing Certificate HVMLT 2006-8 2A1A were originated by Washington Mutual Bank.  These originators are referred to individually and collectively herein as "WaMu."

418.    Investigations into the practices of WaMu reveal the depth and breadth of its abandonment of underwriting standards, appraisal standards, and its predatory lending practices.

419.    A review of the investigations and related litigation involving WaMu, as well as confidential source statements obtained during the Bank's investigation, demonstrate that these mortgage originators systematically violated and ignored their stated underwriting guidelines, rendering materially misleading the statements in the Offering Documents regarding underwriting practices, appraisals and LTVs, and predatory lending.  This evidence is reinforced further by the analysis of the performance of the actual loan pools backing the PLMBS purchased by the Bank.

### a.      Government actions and related lawsuits and investigations demonstrate WaMu's abandonment of its stated underwriting guidelines.

420.    As reported at the Senate Subcommittee hearing on Wall Street and the Financial Crisis held on April 13, 2010, identified high risk loan practices by WaMu, concluding:

> **Shoddy Lending Practices.**  WaMu used shoddy lending practices riddled with credit, compliance and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

**Steering Borrowers to High Risk Loans**.  WaMu too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans.

**Securitizing Delinquency-Prone and Fraudulent Loans.**  At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

**Destructive Compensation.**  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, [and] paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties . . . .

421.    A November internal 2005 review of WaMu loans in southern California found "an extensive level of loan fraud . . . virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review."  According to the *Seattle Times*, "[a]t one California office, 58 percent of loans examined in an internal review were fraudulent; at another, 83 percent."  Drew DeSilver, *WaMu Execs Saw Warning Signs of Deteriorating Loans*, Seattle Times, Apr. 12, 2010, at A1.

422.    A WaMu PowerPoint presentation presented to Kerry Killinger, Steve Rotella and many other WaMu executives was disclosed at the April 13, 2010 hearing before the Senate Subcommittee on Investigations.  The presentation, which examined the risk management of WaMu's home loan division, examined 187 loan files that had made a first payment default.  The presentation revealed that of these 187 files, there was "confirmed fraud" on 115.  17 were "highly suspect."  133, or 71%, "had credit evaluation or loan decision errors."  58, or almost one-third, "had appraisal discrepancies or issues that raised concerns."  Of the 187 loans, 112 had required no documentation of income; out of these 112, 80 were identified "for lack of reasonableness of income."

423.    Another internal memorandum presented at the Senate Subcommittee hearings, titled "So. California Emerging Markets Targeted Loan Review Results," explained that "[o]f the 129 detailed loan review[s] that have been conducted to date, 42% of the loans reviewed contained suspect activity or fraud, virtually all of it attributable to some sort of employee malfeasance or failure to execute company policy. . . .  On average, 78% of the funded retail broker loans reviewed were found to contain fraud . . . principally centered in misrepresentation of loan qualifying data and appraisal issues."

424.    Another exhibit at the April 13, 2010 Senate Subcommittee hearing explained how: "[o]ne Sales Associate admitted that during that crunch time some of the Associates would 'manufacture' asset statements from previous loan docs and submit them to the LFC [Loan Fulfillment Center].  She said the pressure was tremendous from the LFC to get them the docs since the loan had already funded and pressure from the Loan Consultants to get the loans funded [sic]."

425.    At one point, the *Seattle Times* reports that over three quarters of WaMu's $58.9 billion portfolio of option-ARM loans had been issued as limited documentation loans.  Drew DeSilver, *Big Dreams of WaMu Dashed By Risky Loans*, Seattle Times, Sept. 21, 2008 at H1.

426.    As explained in the *Seattle Times*, WaMu increasingly favored "low-documentation" loans, "lean[ing] more and more heavily on credit scores, which could be ascertained while the borrower was still on the phone." Nancy Erken, a WaMu loan consultant in Seattle, is quoted as stating that at WaMu at this time "the big saying was 'a skinny file is a good file.'"  She also explained how she would try to document borrowers' ability to afford their loans but that her experience was that when she would "take the files over to the processing center in

Bellevue . . . . [T]hey'd tell me 'Nancy, why do you have all this stuff in here? We're just going to take this stuff and throw it out.'"  DeSilver, *Reckless*, Seattle Times, *supra* ¶ 230 at A1.

427.    In a 2005 memo obtained by the *Seattle Times*, WaMu risk managers were told they needed to "shift ways of thinking" so they would no longer be a "regulatory burden" on lending operations and instead act as a "customer service" to support growth.  *Id.*

428.    The *Seattle Times* further reported that Dale George, a senior credit-risk officer in Irvine, California attended an "all hands" meeting of risk managers where Melissa Martinez, WaMu's chief compliance and risk oversight officer, emphasized "the softer side of risk management."  George explained that the message was: "They weren't going to have risk management get in the way of what they [production] wanted to do, which was basically lend the customers more money."  *Id*.

429.    WaMu Senior Mortgage Underwriter Keysha Cooper, who started at WaMu in 2003 and left in 2007, was quoted by the *New York Times* explaining that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify. Instead it was 'how many loans did you guys close and fund?'"  Cooper continued to explain how the pressure became intense in 2007 and admitted that "I swear 60 percent of the loans I approved I was made to . . . .  If I could get everyone's name, I would write them apology letters."  Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. Times, Nov. 1, 2008 at BU1.

430.    Another *Seattle Times* report quotes Mary Kay Morse, a 20-year veteran at WaMu whose job was to persuade independent brokers to make option ARM loans, stating, as to option-ARMs: "I hated that loan . . . .  It's just not a good loan. It wasn't good for the borrower."  She continued that whereas at one time: "I always felt like I worked for a really honest industry that

cared for the borrowers they dealt with," in her opinion the corporate culture had changed to:

"[w]e just want to do the most we can to make money for the bank."  David Heath, *Hometown*

*Bank Turned Predatory,* Seattle Times, Oct. 26, 2009, at A1.

431.    The reason for WaMu's adoption of these highly risky and unsuitable products

was simple.  As the *Seattle Times* explained:

> As demand [for traditional loans] waned, lenders tried to entice business by slashing profit margins on conventional mortgages, such as the 30-year fixed. WaMu's chief business was making home loans, yet it lost money on that segment in the third quarter of 2003.
>
> By November, WaMu had eliminated 4,500 full-time jobs in home lending and ousted the division head. By year's end, its mortgage business had shrunk with alarming speed, down by about half from the summer.
>
> After [Kerry] Killinger [WaMu's CEO] finished speaking, Chief Financial Officer Tom Casey got up and presented WaMu's solution.
>
> WaMu had other types of loans, such as subprime and home-equity lines of credit, that remained highly profitable.  He noted there was even a specialty loan for borrowers with good credit that remained lucrative, the option ARM.
>
> As Casey explained it, the bank recently had beefed up its commissions and retrained its sales force to push option ARMs.  In just the past few months, they had climbed from 15 to 35 percent of its mortgage business.
>
> The loan—mind-numbingly complex and highly risky for both the bank and its customers—originally was created for the savviest and most risk-tolerant of borrowers.

*Id.*

432.    Unsurprisingly, given its predatory practices and abandonment of any genuine

underwriting standards, the *Seattle Times* reported that "WaMu's subprime loans failed at the

highest rates in the nation. . . .   In the 10 hardest hit cities, more than a third of WaMu subprime

loans went into foreclosure."  DeSilver, *Reckless*, Seattle Times, *supra* ¶ 230 at A1.

### b. WaMu manipulated the appraisal process.

433.     WaMu manipulated the appraisal process to inflate the reported value of real estate properties thereby artificially depressing the LTVs based on the appraisals.  Multiple government investigations, including ones by the Senate Permanent Subcommittee on Investigations and the New York Attorney General's office, have examined the appraisal practices of WaMu.  The internal documents recently released to the public by these investigations reveal that: (1) appraisal fraud infected the origination of mortgages; and (2) WaMu actively pressured appraisers to inflate their appraisals or manipulated the appraisals themselves so that more loans could close and subsequently be securitized.

434.     Internal WaMu documents released by the Senate Subcommittee on Investigations demonstrate that appraisal fraud infected its mortgage origination process. According to an internal WaMu memorandum presented at the April 2010 Senate Subcommittee hearing regarding a review of loans from 2003-2005, *78%* of the funded retail broker loans reviewed by WaMu's Risk Mitigation department were found to contain fraud that principally involved misrepresentation of loan qualifying data and appraisal issues.

435.     One specific example of appraisal fraud for a WaMu originated loan involved an appraisal value for a property that apparently was based on both the value of the property *and the value of another house located in Mexico*.  As WaMu's internal "Fraud Risk" PowerPoint notes, the inclusion of this additional house might explain why the appraisal value of $400,000 was so much higher than the $240,000 sales price of the property.  Moreover, the appraisal omitted other important information, including that the property use was "illegal" because there was a third unpermitted unit on the property.  This appraisal was not referred to an underwriter because the WaMu office manager waived the requirement for an underwriter to review the appraisal.

436.     Another specific example for a WaMu originated loan involved an appraisal that contained false data regarding the subject property's site and building sizes as well as numerous warning signs that the appraisal was unreliable.  The borrowers were refinancing a first mortgage that they had previously obtained from WaMu a year earlier.  According to the Fraud Report, the appraisal contained multiple red flags.  The property had appreciated in value by *90%* (from $322,000 to $610,000) in a *single year*; the occupancy type was an investment property; the automated valuation model ("AVM") reflected a more probable value of $400,000.  Further, the "comparables"—properties with characteristics similar to the appraised property—did not appear comparable; two out of the three "comparable" properties were located 3-4 miles away, and the comparable properties were given large upward adjustments in value to account for differences in design, functionality, square footage and lot size.  Notwithstanding these warnings, the appraisal was not reviewed by underwriters.  The Fraud Report also notes that the refinancing transaction was a "cash out refinance," and that the funds from this refinancing were needed *to close another loan that WaMu was processing for the borrower*.  In other words, not one, but two transactions were dependent upon the appraisal coming in at value, even if that meant a 90% increase in the appraised value over the course of a single year.

437.     Another internal document dated December 2006 states that "[WaMu subsidiary] Long Beach [Mortgage] represents a real problem for WaMu," and forwards the results of "post-funding review team" tasked with reviewing, on a monthly basis, 275 loans within 15 days of funding.  The review team identified, as a "top five priority" issue "[a]ppraisal deficiencies that could impact value and were not addressed."  The review also emphasized that both the Corporate Credit Review department and the Senior Credit Officer Subprime were focused on "two key facts"—that "[t]he non accrual rate had increased year over year from 3.53% to

6.13%," and that "[o]n a vintage basis the deterioration was accelerating in recent vintages with each vintage since 2002 having performed worse than the prior vintage." As noted above, LTVs and a borrower's equity in his or her home are strongly indicative of a borrower's likelihood of defaulting. To the degree that inflated appraisals understate the LTVs, and overstate a borrower's equity, one would expect to find increasing rates of non-accrual correlated with increasingly unreliable appraisals.

438.    On November 1, 2007, the New York Attorney General filed *People v. First Am. Corp. and First Am. eAppraiseIT*, No. 46796/2007 (N.Y. Sup. Ct.) ("eAppraiseIT Compl."), alleging that eAppraiseIT colluded with WaMu to inflate the appraisal value of homes.

439.    eAppraiseIT was one of two appraisal management firms hired by WaMu in the Spring of 2006 when WaMu decided to close its internal appraisal office. WaMu was eAppraiseIT's largest client, and on information and belief, eAppraiseIT performed appraisals for loans included in the loan pools for Certificates purchased by the Bank.

440.    The New York Attorney General's complaint, which relies on multiple internal documents and emails—many of which have only recently become publicly available—demonstrates that WaMu actively encouraged the manipulation of appraisals to facilitate the origination of more and more mortgages for securitization. In 2009, the trial court denied eAppraiseIT's motion to dismiss, finding that the complaint sufficiently alleged a violation of New York law, "insofar as the intentional misleading of consumers in this state relating to the accuracy and independence of appraisals constitutes fraudulent and deceptive business practices that the [Attorney General] may seek redress for." *People v. First Am. Corp.*, 24 Misc. 3d 672, 682 (N.Y. Sup. Ct. 2009).

441.   From its inception, the relationship between WaMu and eAppraiseIT was focused on undermining the appraisal process by pressuring appraisers to come in "at value"—provide appraisals that were equal to or greater than a property's purchase price in order for a transaction to close.  WaMu's efforts to pressure appraisers included: (1) excessive "Reconsideration of Value" requests to reconsider appraisals that were too low to permit a loan to be funded; (2) demanding that "business managers"—many of whom were former WaMu employees—have the authority to overrule appraisals that were too low; (3) constantly complaining that appraisals by eAppraiseIT appraisers were lower than appraisals from eAppraiseIT's chief competitor; (4) making clear to senior management at First American (eAppraiseIT's parent company) that any expanded business relationship was contingent upon the "resolution" of the appraisal issue to WaMu's satisfaction; and (5) ultimately creating a blacklist designed to punish appraisers who failed to inflate their appraisals to come in "at value."

442.   According to the New York Attorney General's complaint, and the internal documents referenced therein:

- WaMu retained eAppraiseIT in Spring 2006, after WaMu decided to close its internal appraisal office and terminate its staff appraisers.  WaMu quickly became eAppraiseIT's largest client.

- From the beginning, WaMu possessed the ability to pressure eAppraiseIT's staff and third party appraisers to increase their valuations.  WaMu had a contractual arrangement with eAppraiseIT whereby WaMu could challenge an independent appraiser's conclusions by requesting a "Reconsideration of Value," if WaMu disagreed with an appraisal.  WaMu frequently ordered Reconsiderations of Value from eAppraiseIT.

- eAppraiseIT also hired approximately 50 former WaMu appraisers as eAppraiseIT staff appraisers and Appraisal Business Managers.  At WaMu's request, these "business managers" were authorized to override and revise the values reached by staff and third party appraisers.  According to a September 29, 2006 email from a WaMu executive to senior executives at eAppraiseIT, the business managers would be responsible for "proactively making a decision to override and correct the third party appraiser's value or reviewer's value cut, when considered appropriate and supported."

- Almost immediately after retaining eAppraiseIT, WaMu's loan production staff began to complain that eAppraiseIT's appraisals were too low.  On August 9, 2006, eAppraiseIT's President informed WaMu executives that "[w]e need to address the [Reconsideration of Value] issue . . . . The Wamu internal staff we are speaking with admonish us to be certain we solve the [Reconsideration of Value] issue quickly or we will all be in for some pretty rough seas."

- The following week, eAppraiseIT's Executive Vice President informed eAppraiseIT's President that WaMu's loan officers would often pressure WaMu internal appraisal field managers for a "extra few thousand," or "tell[] them specifically what they needed," or "would ask for several [Reconsiderations of Value] on the same property."  According to the vice president, "[h]aving loan officers ask for a few thousand dollars because it is within the range is something we do not currently do for any client . . . . It is also direct pressure on the appraiser for a higher value without any additional information."

- During the latter part of 2006, WaMu repeatedly complained to eAppraiseIT regarding low appraisals.  On December 2, 2006, an internal eAppraiseIT communication notes that "we know [WaMu is] going to complain about the excessive number of low values because the majority of orders are not going to [WaMu's] preferred appraisers."

- By December 2006, WaMu had reassigned all of its Northern California appraisal work to Lender Services, Inc. and away from eAppraiseIT.  One eAppraiseIT executive told his colleagues that WaMu's criticism stemmed from the fact that "values are coming in lower with [eAppraiseIT]," than with Lender Services, Inc., its top competitor for WaMu work, and that "[t]he [WaMu] managers indicated that if the loan consultants had a choice they would prefer to use [Lender Services] over eAppraiseIT because they feel they will have less problem with the values."

- In addition to pressuring eAppraiseIT regarding low appraisals, WaMu also indicated to First American, eAppraiseIT's parent company, that WaMu would be open to expanding its business relationship with First American, provided the appraisal issues were "resolved."  According to a First American executive, the President of WaMu mortgage told him that "if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship."

- In early 2007, WaMu directed eAppraiseIT to stop using panels of staff and third party appraisers to perform WaMu appraisals, and demanded that eAppraiseIT use "Proven Appraisers" selected by WaMu.  The President of eAppraiseIT explained to First American executives the reason for this change:  "Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating the need for a[] [Reconsideration of Value]."

173

- eAppraiseIT's President informed the First American executives that "we have agreed to roll over and just do it." The President of eAppraiseIT also wrote to WaMu's executives stating that "Wamu proven appraisers bring the value in a greater majority of time . . . . I am fine with that, of course, and will happily assign Wamu orders to Wamu proven appraisers instead of eAppraiseIT's approved panel appraisers whenever possible."

- Internal eAppraiseIT communications indicate that WaMu's *lending department* was in charge of selecting the preferred appraisers. An eAppraiseIT Appraisal Specialist contacted the Executive Vice President, the Chief Operating Office and the Chief Appraiser about two "good, solid long-time wonderful appraisers" that were removed from the WaMu panel "for no apparent reason" after having "value issues." The Chief Appraiser informed him that "[t]he probability that a loan officer requested him to be removed is pretty high I think because that is what they did with the Master List; they sent it out to Lending to choose."

- eAppraiseIT was willing to accede to WaMu's demands that its lending department select its appraisers, despite knowing that these demands violated federal law and professional appraisal standards by compromising appraiser independence. eAppraiseIT's President expressly acknowledged that "[w]e view this [agreeing to WaMu's demands] as a violation of the OCC, OTS, FDIC, and USPAP influencing regulation."

443.   In addition, documents that have only recently become publicly available demonstrate WaMu's efforts to manipulate the appraisal process.

444.   The Bank has reviewed an August 10, 2010 affidavit by Peter Gailitis, a former Chief Appraiser for eAppraiseIT. Mr. Gailitis was promoted to Chief Appraiser in 2006, and was Chief Appraiser during the time period that WaMu outsourced its appraisal business to eAppraiseIT.

445.   The Gailitis Affidavit indicates that from the beginning of eAppraiseIT's relationship with WaMu in Spring 2006, WaMu began pressuring eAppraiseIT appraisers to inflate their appraisals. (*Id.*, ¶¶ 5, 6) According to Mr. Gailitis, shortly after eAppraiseIT began performing appraisals for WaMu loans, Mr. Gailitis began receiving "many complaints" from WaMu managers over the "allegedly low values" being provided by eAppraiseIT appraisers. (*Id.* ¶ 6)

446.     One of WaMu's primary methods for increasing appraisals was to flood eAppraiseIT with requests for Reconsiderations of Value.  According to Mr. Gailitis, WaMu submitted considerably more Reconsiderations of Value than any other eAppraiseIT client, with the volume from WaMu loan officers reaching *four hundred* Reconsiderations of Value per month at one point.  (*Id.*, ¶ 6)  WaMu loan officers would file a Reconsideration of Value simply because the appraised value of a property was too low for a loan to close, and use the Reconsideration of Value as a tool for obtaining a sufficient increase in value for the transaction to go forward.  (*Id.*, ¶ 6)

447.     In addition to abusing the Reconsideration of Value process, WaMu also sought to use its considerable economic leverage to manipulate the appraisal process.  Mr. Gailitis testified that WaMu was eAppraiseIT's largest client, and that WaMu management would pass along the complaints regarding low appraisals to eAppraiseIT management, along with a threatened loss of business if the complaints from WaMu's retail divisions did not stop.  (*Id.*, ¶ 7)

448.     An internal email from David Feldman, the Executive Vice President of eAppraiseIT, to Anthony Merlo, the President, also makes clear that WaMu's manipulation of the appraisal process pre-dated its relationship with eAppraiseIT.  (Aug. 15, 2006 email from Mr. Feldman to Mr. Merlo.)  According to Mr. Feldman, WaMu had an "extra few thousand" policy under which loan officers would ask for, and apparently receive, increases in appraisals of a few thousand dollars if the inflated appraisal was still "within the range."  Mr. Feldman emphasized that this was something that eAppraiseIT does "not currently do for any client," and that it constitutes "direct pressure on the appraiser for a higher value without any additional information."  Mr. Feldman also noted that the WaMu staff he spoke with indicated that this "policy was abused in many ways including calling the [appraisal field manager] and telling

them specifically what they needed," or asking for multiple Reconsiderations of Value on the same property (a practice that became so prevalent that the appraisal field managers began allowing only one Reconsideration of Value for free and then charging $175 for each additional one).

449.    A fall 2006 email from eAppraiseIT President Merlo to executives at First American (eAppraiseIT's parent company) and WaMu further illustrates WaMu's efforts to manipulate the process and eAppraiseIT's concerns.  (Sept. 13, 2006 email from Mr. Merlo to Mr. Sando.)  Mr. Merlo's email forwards various instances of WaMu pressure on appraisers, including WaMu production staff regularly contacting appraisers to "argue and often berate them" over their appraisals, or informing appraisers that if they do not increase their valuations, the appraisal request will be given to another appraiser to get the appropriate "price."  Mr. Merlo warns that these efforts to pressure appraisers are "getting outrageously unethical and now borderline dangerous," and he implores WaMu's executives to "respond [with] what you will do to have this stopped within the WaMu organization."  As Mr. Merlo candidly acknowledges, WaMu's actions are "pure pressure to commit fraud."

450.    Notwithstanding President Merlo's concerns, WaMu continued its efforts to manipulate the appraisal process.  In April 2007, eAppraisetIT expressed concern that WaMu loan production staff had "a great deal to do with selecting appraisers," which was "directly in contradiction" with the interagency guidelines adopted by the OTS, the agency responsible for regulating WaMu.  (Apr. 17, 2007 memo to WAMU Oversight Team)

    **c.    WaMu engaged in predatory lending.**

451.    At WaMu, mortgage originators were paid more for originating loans that carried higher profit margins for WaMu and had commensurately higher risk.  As James G. Vanasek,

WaMu Bank's former Chief Credit Officer/Chief Risk Officer, testified to the Senate Permanent Subcommittee on Investigations:

> Because of the compensation systems rewarding volume vs. quality and the independent structure of the loan originators, I am confident that at times borrowers were coached to fill out applications with overstated incomes or net worth adjusted to meet the minimum underwriting policy requirements.

452.    In a document entitled "2007 Product Strategy," WaMu noted that it must "maintain a compensation structure that supports the high margin product strategy." The *Seattle Times* reported how a 2007 compensation grid revealed that "the company paid the highest commissions on option-ARMs, subprime loans and home-equity loans. A $300,000 option ARM, for example, would earn a $1,200 commission, versus $960 for a fixed rate loan of the same amount. The rates increased as a consultant made more loans. . . ." DeSilver, *Reckless*, Seattle Times, *supra* ¶ 230. Likewise, a WaMu "Retail Loan Consultant 2007 Incentive Plan" explained that "[i]ncentive tiers reward high margin products... such as the Options ARM, Non-prime referrals and Home Equity Loans . . . ."

453.    In April 2010, the Senate Permanent Subcommittee on Investigations held a series of hearings into the causes of the financial crisis. The Senate Subcommittee concluded that WaMu often steered borrowers into home loans with low initial payments they could afford only in the short term, if at all, presuming that rising home prices would enable those borrowers to refinance or sell their homes before the loan payments ballooned beyond a level they could not afford. Internal compensation schemes encouraged such conduct because loan officers and loan processors were rewarded for originating high risk loans and for placing borrowers in high interest loans with large prepayment penalties.

454. The details of how WaMu paid brokers to press borrowers into buying unsuitable loans at high interest rates, and often pressured borrowers to refinance from a fixed rate loan into a variable rate loan with higher interest rates, is illustrated by the story of Bob Houk:

Usually, Bob Houk's wife handled the family's money matters. But after being diagnosed with a brain tumor, she was in and out of the hospital, so he took over. In late 2006, he received a postcard with WaMu's logo on it.

Houk already had a 30-year WaMu mortgage at a fixed rate of 4.6 percent. But the postcard promised to lower the monthly payments on their Bainbridge Island home with an adjustable-rate mortgage starting at only 1 percent interest.

He liked the idea of cutting expenses. A son was in college, his wife was on disability from her job as a nurse, and Houk, a physician assistant at Group Health, worked only part time to be at her side.

Houk called the number on the card, reached an independent mortgage broker in California, and made all the arrangements over the phone. Soon someone came to his house with papers to sign. Houk was impressed at how easy the process was.

But a couple of months later, Houk noticed something on his monthly statement that gave him a sick feeling. Instead of one low monthly payment, there were now options. His minimum monthly payment of only $1,018 was there. But there were also higher-priced options for paying interest only or for paying interest and principal. Just covering the interest that month would cost him about $1,000 more.

The 1 percent interest rate Houk thought he was getting was only good for the first month. It had reset to 7.4 percent, nearly 3 percentage points above his previous WaMu loan. This was buried in the fine print in a sheaf of legal documents he had signed. "Who in their right mind would give up a 4.6 percent loan?" Houk said. "I felt totally duped."

Houk said he called Washington Mutual, but the woman he talked to said nothing could be done. WaMu just gets the loan from the broker, he recalled her saying, so the bank's not responsible.

To drum up customers for these overpriced loans, WaMu offered hefty commissions to its sales force.

Loan officers working inside WaMu were rewarded with higher commissions for signing up a borrower for an option ARM rather than a conventional loan.

> But WaMu made the vast majority of its option ARMs through its network of independent mortgage brokers. They worked in a loosely regulated industry. In many states, the job required no education, no background check and no oversight. While there are reputable brokers, the industry suddenly attracted a motley crew, who could make six figures in a year in commissions.

> WaMu did not reward brokers for getting its customers the best deal.  Just the opposite.  The worse the terms were for borrowers, the more WaMu paid the brokers.

> A WaMu daily rate sheet obtained by The Seattle Times shows how lavish the rewards could be. On an option ARM, WaMu would reward brokers as much as 3 percent of the loan amount—more than triple the standard commission at the time.

> Brokers would get an additional point—1 percent of the loan—for roughly every half-point in higher interest the borrower paid. So the broker would get 3 percent of the loan if he could get the borrower to pay 1.5 percent above the market rate.

> WaMu could afford to pay such high commissions, called "yield spread premiums," because the money actually came from the borrower in the form of higher interest rates and prepayment penalties.

> Houk's broker, for example, got paid a commission of $9,498 on a $316,000 loan, according to loan documents.

Heath, *supra* ¶ 430 at A1.

455.    Moreover, WaMu was among 14 lenders named by the NAACP in a complaint alleging "systematic, institutionalized racism in sub-prime home mortgage lending."  According to the lawsuit, African American homeowners who received sub-prime mortgage loans from these lenders were more than 30 percent more likely to be issued a higher rate loan than Caucasian borrowers with the same qualifications.  In January 2009, the court denied a motion to dismiss, finding that the plaintiff had sufficiently pled a disparate impact claim.

456.    Of particular note among the many other cases against WaMu with regard to its loan origination practices, in September of 2010, Deutsche Bank National Trust Company, in its capacity as a trustee, filed suit alleging breach of contract and seeking a declaratory judgment

and damages over 99 different trusts created, sponsored and/or serviced by WaMu, and which

included loans originated by WaMu.  *See* Am. Compl., *Deutsche Bank Nat'l Trust Co. v. FDIC*,

No. 09-cv-1656-RMC (D.D.C. Sept. 8, 2010).  The allegations in Deutsche Bank's complaint are

very similar to the ones made by the Bank here.  These allegations include that WaMu engaged

in "shoddy lending practices," "performed inadequate underwriting," and securitized

"delinquency prone and fraudulent loans."  The trustee's contract claim is based on numerous

breaches of representations and warranties, including representations and warranties that the

loans complied with laws prohibiting predatory lending, that the loans were written in

accordance with the seller's underwriting guidelines as described in the prospectus supplement,

that appraisals were conducted generally in accordance with WaMu's underwriting guidelines,

that the LTV for each mortgage loan was no greater than 100% at the time of origination, and

that "to the best of the seller's knowledge, no misrepresentation, negligence, fraud or similar

occurrence with respect to a Mortgage loan has taken place on the part of any person, including

without limitation, the Mortgagor, any appraiser, builder or developer, or any other party

involved in the origination of the mortgage loan."

> **d.    Confidential sources provide further evidence of WaMu's failures to
> adhere to its stated underwriting guidelines, predatory lending, and
> manipulation of the appraisal process.**

457.    Confidential sources such as CS-13 provide further evidence that WaMu

abandoned its stated underwriting guidelines. CS-13 worked at WaMu from 1987 until the fall of

2006.  During her time at WaMu, CS-13 held such positions as personal financial manager,

assistant branch manager, and branch manager.  In these capacities, CS-13 worked in consumer

lending, including loan origination.

458.    CS-13 saw many "stated income" loans at WaMu.  If the borrower had false

documents or if CS-13 believed that the borrower's income would not be high enough (as

evidenced by paystubs) to qualify for a loan, CS-13 would instruct the borrower not to show her the documents and she would simply offer a "stated income" loan.

459.    CS-13 also said that WaMu underwriters frequently made exceptions on the loans in order to approve them; moreover, she knew who the "lenient" underwriters were and would direct her loans to them so that they would be approved.  CS-13 used different tactics in order to get loans approved by the underwriter; for example, she would write the documents up in a special way so that the loans would always be approved, even if a borrower was not strong enough to otherwise qualify.

460.    Even if loans were declined by certain underwriters, CS-13 said she could always ask for the loan to be reviewed again.  Sometimes she would call the borrower to tell them why a loan was denied, and the borrower would come back with new facts or new documentation. According to CS-13, there was a lot of "fudging" that took place in those situations.

461.    CS-13 also confirmed that during the time period she was employed at WaMu, including 2005 and 2006, appraisals were manipulated to reach a value necessary for the loan to close.  CS-13 would order appraisals from the WaMu appraisal department by saying "this is what I need," or "this is what the customer thinks it's worth."  CS-13 was trained to forward all information on the application to the appraisers, including the homeowner's estimate of value, even if the estimated home value looked high.  The FDIC's Office of Inspector General has found this practice to be inconsistent with "standard residential appraisal methods" because providing the homeowner's estimate of the value of the home to the independent appraiser biases the appraiser's evaluation.  (Evaluation of Federal Regulatory Oversight of Washington Mutual Bank at p. 11, Report No. EVAL-10-002 (April 2010)).  Pursuant to USPAP Rule 1-2(b),

appraisers must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased.

462.    While CS-13 normally submitted appraisal requests to the appraisal department for a coordinator to handle, CS-13 could, and did, request specific appraisers if she needed a certain value in a certain neighborhood. CS-13 knew the appraisers' reputations for being high or low with respect to certain neighborhoods, and she used that knowledge in requesting certain appraisers in order to get the value the client needed for the loan to close.

463.    If an appraisal came back lower than what was needed to close the deal, CS-13 had several options available to increase the appraisal. If the appraisal was close to the required value, CS-13 would call the appraiser and negotiate for a higher number. For some of the time CS-13 worked at WaMu, the appraisal department was either in the same building or across the street, which allowed CS-13 to walk to the appraisal department and directly negotiate with the appraisers to see what could be done to increase the value of the appraisal so the loan could close.

464.    If the appraisal was significantly lower than the required value, CS-13 would tell the customer to find additional comparable properties within a two-mile radius to justify increasing the appraisal value, even though standard practice generally required a comparable to be within a one mile radius of the property. If there were not any comparables within a two-mile radius that would justify an increase, the customer would pull higher value comparables from even farther afield.

465.    In addition to CS-13, CS-14 provided additional evidence confirming the manipulation of appraisals by WaMu. CS-14 was a staff appraiser at eAppraiseIT from 2002

until February 2007.  CS-14 appraised homes for a variety of lender who used eAppraiseIT's services, including WaMu.

466.     According to CS-14, after WaMu closed its in-house appraisal department and chose eAppraiseIT as one of its two preferred appraisal management companies, eAppraiseIT hired several former WaMu appraisers to serve as "business managers."  These business managers supervised the eAppraiseIT staff appraisers and were also "in contact" with WaMu loan officers.

467.     According to CS-14, prior to WaMu retaining eAppraiseIT, the eAppraiseIT staff appraisers were left alone and were not routinely pressured to increase values.  After eAppraiseIT hired WaMu's former appraisers as managers, they pressured everyone, including CS-14, to increase appraisal values.  Beginning in approximately mid-2006, CS-14 began reporting to a business manager in Arizona.  CS-14's manager was in touch with WaMu loan officers who complained about CS-14's low valuations on refinancing transactions.  CS-14's manager then called her, advised her of the complaints, and informed her that she was tired of getting complaints from the loan officers about CS-14's low values.

468.     CS-14's manager constantly pressured her to increase values by modest amounts, telling her that "just a couple thousand more and the loan would go through," or "[t]here's got to be something you're not looking at."  In many instances, CS-14's manager would tell her that WaMu had requested she look at other comparables that simply were not comparable, and force CS-14 to explain why the comparables WaMu identified were not appropriate.  CS-14 estimates that this occurred for 75% of the appraisals she performed for WaMu.

469.     CS-14 eventually asked not to be assigned any WaMu appraisals, despite the fact that roughly 50% of her workload was WaMu transactions.  While eAppraiseIT had other clients,

her business manager nevertheless informed her that she "wouldn't get any work."  In February

2007, CS-14 left eAppraiseIT.  Based on CS-14's experience, "eAppraiseIT prostituted

themselves for WaMu.  I can't understand why they didn't treat WaMu like any other lender."

470.    The statements of CS-15 also confirms the pressure that WaMu exerted on

eAppraiseIT and the appraisers working for eAppraiseIT.  CS-15 is an independent real estate

appraiser who received assignments from WaMu through eAppraiseIT.  CS-15 believes that he

performed work for WaMu between approximately November 2005 and April 2007.  CS-15

stated that after WaMu closed its in-house appraisal department, a former WaMu appraiser was

hired by eAppraiseIT to serve as his district or regional manager.  CS-15 also noted that many

former WaMu staff appraisers were hired in similar manager capacities at eAppraiseIT.

471.    According to CS-15, "within the individual purview of the district manager, it was

commonplace for them to come back for revision or reconsideration [of an appraisal].  It was

understood that when they asked, you complied."  CS-15 believes that as a conservative

estimate, 10% of the reports he wrote for WaMu resulted in a value adjustment that CS-15 made

at the request of the eAppraiseIT manager.

472.    CS-16 and CS-17 provided statements regarding what occurred if an appraiser

refused to bow to WaMu pressure.  CS-16 was an independent appraiser that received

assignments through eAppraiseIT, LSI, and directly from WaMu.  CS-16 was placed on WaMu's

list of "approved appraisers," and estimates that around 75% of her appraisals were for WaMu.

473.    CS-16 recalls being pressured by WaMu to increase appraisal values on several

occasions, and she believes that this pressure occurred between November 2005 and April 2007.

CS-16 would be told that she was missing the sales price by a small amount, and that because the

market was going up, her appraisal should also increase.  On one occasion, an appraisal was reassigned from CS-16 to a staff appraiser because her appraisals were too conservative.

474.    CS-16 was ultimately removed from the "approved appraiser" list because of her view that the market was declining in value.  The standard appraisal form that CS-16 used included a section on market condition, and required appraisers to check a box indicating whether market values were stable, increasing, or decreasing at the time the appraisal was made. Sometime between November 2005 and April 2007, CS-16 indicated that property values were decreasing.  According to CS-16, this was a "big no-no," because if the market was in decline, WaMu would not be able to resell the loan on the secondary market, or if they did, the loan would have to be discounted.  WaMu "hassled" CS-16 for her conclusion, and a WaMu employee even called her to try to convince her that market values were not declining.  WaMu subsequently removed CS-16 from the approved appraiser list—informing her via a telephone call—and she never received work from WaMu again.

475.    CS-17 is an independent appraiser and has prepared appraisals for a variety of lenders, including WaMu.  In the spring of 2006, in connection with a WaMu loan application, CS-17 appraised a home for $2.2 million. While CS-17's supervisor reviewed the appraisal, and agreed with the valuation, a WaMu staff appraiser subsequently sent CS-17 a letter indicating that she disagreed with the valuation, and was increasing it by $500,000 to $2.7 million.  CS-17 was confident that his appraisal was accurate, in part because it was based on comparable properties on the same street as the subject property, and contacted the WaMu's chief appraiser in the area to express his concerns about the inflated appraisal.  Far from being concerned, WaMu's chief appraiser informed CS-17 that WaMu "could change the value to anything it wanted."

476.    After this incident, CS-17's assignments for WaMu decreased, even though he believed he remained on the "panel" of preferred appraisers.  CS-17 also recalls an instance where a WaMu appraisal was assigned to him, only to be reassigned thirty minutes later at the request of the WaMu loan officer, who believed that CS-17 was "too conservative."  According to CS-17, this behavior was "typical"—it was either "their way or the highway."

477.    Prior to 2002, WaMu administrative staff reviewed appraisals using checklists to assist them in finding risky characteristics that warranted further review by a certified appraiser. Starting in 2001 or 2002, WaMu began automating its appraisal review process by using OPTISValue.  After 2002, all appraisals were automatically reviewed by the OPTISValue system.  OPTISValue performed the initial appraisal screening that humans had previously done, thus eliminating human involvement from the first stage of review, and creating a system where certain appraisals would be automatically approved without ever being reviewed by a person.

478.    According to CS-19, a senior staff appraiser at WaMu from 1999 until September 2006, OPTIS was programmed with a "consistently changing" checklist of "lower risk" characteristics that were used to determine whether an appraisal would be approved or flagged for secondary review.  As time went on, CS-19 found that appraisal standards grew "more lax" and that WaMu was "internally trying to speed up funding as much as possible."

479.    CS-19 also explained that OPTISValue automatically approved a huge percent of appraisals; CS-19 estimates that more than 50% of all appraisals sent to WaMu were never looked at by any human.  Both in-house production appraisers and fee appraisers knew that if "they came in with a value that worked"—a value that was equal to or greater than the purchase price—their appraisal would never be questioned because OPTISValue would approve it without any review.  The use of an automated system, coupled with increasingly relaxed appraisal

standards, resulted in inflated appraisals. CS-19 recalls seeing a "whole bunch of appraisals with inflated values," and was aware of loans that were supported with inflated or otherwise fraudulent appraisals that were still approved.

480. The confidential source statements quoted above demonstrate that WaMu routinely accepted—in fact demanded—appraisals that were conducted in violation of USPAP standards. Because WaMu insisted upon certain results, negotiated results with appraisers, and pressured appraisers to increase values, the resulting appraisals simply were not performed with "impartiality, objectivity, and independence" as required by the USPAP Ethics Conduct Rule. Instead, appraisers routinely allowed the "intended use of an assignment or a client's objectives to cause the assignment results to be biased" in violation of the USPAP Scope of Work Acceptability Rule. Additionally, by threatening appraisers regarding the availability of future work and removing appraisers from the list of accepted appraisers, WaMu forced appraisers to violate the USPAP Ethics Management Rule, which precludes the acceptance of assignments that are contingent upon either "the reporting of a predetermined result" or "a direction in assignment results that favors the cause of a client." Ultimately, the systemic coercion of appraisers caused a fundamental violation of USPAP Standard 1, which requires that appraisers "correctly complete research and analyses necessary to produce a credible appraisal." As discussed in public reports and confirmed by confidential sources, WaMu's appraisal abuse was standard operating procedure for both companies.

      **e.**     **The mortgages originated by WaMu and securitized in the PLMBS purchased by the Bank provide further evidence of WaMu's abandonment of its stated underwriting guidelines.**

481. WaMu originated the mortgages that secured at least 3 securities purchased by the Bank. As discussed in detail below, the Offering Documents contained serious material misstatements and omissions regarding specific characteristics of the loan pools securing these

Certificates, including misstatements with respect to their weighted average LTVs and the percentages of loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the compounded high-risk mortgages that infected the loan pools.  Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of WaMu's failure to observe its stated underwriting standards.  WaMu's actual practices—including the use of unreliable and biased collateral valuations in lieu of appraisals and the routine granting of underwriting exceptions without compensating factors—caused it to originate loans whose actual LTVs were far different from those reported in the Offering Documents.  As a result, the likelihood of default for these loans was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

482.     In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was in fact the norm at WaMu, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank of WaMu's pervasive and systematic disregard of its stated underwriting guidelines, failure to adhere to standard appraisal practices, and rampant predatory lending.

**5.     Wells Fargo Bank, N.A.**

483.     Wells Fargo Bank, N.A. ("Wells Fargo") originated underlying mortgage loans securing at least two of the Certificates purchased by the Bank:  BAFC 2006-D 1A1 and WFMBS 2006-AR 12 1A1. Wells Fargo Bank, N.A. abandoned its stated underwriting guidelines.

a.    **Investigations, lawsuits and confidential sources demonstrate that Wells Fargo abandoned underwriting guidelines.**

484.    In 2010, Wells Fargo was identified by the OCC as the fourteenth worst mortgage originator in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas with the highest rates of delinquency.  In denying in part a motion to dismiss in *In re Wells Fargo Mortgage-Backed Securities Litigation*, No. 3:09-1376 (N.D. Cal.) ("*Wells Fargo* Complaint"), the court found that plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting process."

485.    The *Wells Fargo* Complaint is supported by numerous statements from confidential sources substantiating the allegations that Wells Fargo abandoned underwriting guidelines, increasingly made exceptions without compensating factors, sacrificed underwriting standards to loan volume, and manipulated loan information in order to close loans without regard to borrowers' ability to repay the loans.

486.    Confidential sources contacted in connection with the Bank's investigation provide additional evidence of Wells Fargo's repeated failure to adhere to its state underwriting guidelines.  Statements by confidential sources confirm that: (a) Wells Fargo underwriters faced intense pressure to close loans at any cost; (b) Wells Fargo increasingly approved risky, low- or no-documentation loans without adequate review; (c) Wells Fargo routinely approved loans that contained exceptions for which there were no reasonable compensating factors; (d) Wells Fargo employees approved loans with inflated appraisal values; and (e) Wells Fargo employees manipulated data in order to close loans.

487.    Confidential sources include CS-20 and CS-21.  CS-20 worked as an underwriter at Wells Fargo for five years and left the company in approximately 2006.  She helped start one

of Wells Fargo's wholesale lending offices.  The wholesale lending office received mortgage applications from various brokers in the area and then underwrote, approved, and funded such mortgages.  CS-21 was an underwriting manager at a Wells Fargo branch in California from 2004 until late 2007, when Wells Fargo closed the branch.  The branch was a "MAP" center, which was a location where Wells Fargo loans were registered, underwritten, processed, closed, and shipped out for sale in pools.

488.    Wells Fargo employees increasingly disregarded the credit risk of loans and quality controls in favor of generating loan volume.  According to CS-21, this was because loan officers and underwriters at Wells Fargo received commissions and/or bonuses based on the number of loans closed.

489.    Among Wells Fargo's abuses of underwriting standards, confidential sources detailed a practice of approving risky loans based upon little or no documentation.  CS-20 explained that underwriters at Wells Fargo's branches used two Automated Underwriting Systems (often, "AUS"), which were pre-programmed with the minimum credit scores, LTVs and DTIs, cash reserve levels, and documentation levels needed for the borrower to qualify for the various mortgage products that Wells Fargo offered.  If these AUS returned an "approve" or "accept" result, then Wells Fargo typically approved the application and funded the mortgage.  CS-20 commented that she was skeptical of the "approvals" that came from the AUS, and often thought to herself, "How did it approve *this*?"  The systems approved borrowers who "never should have been approved."

490.    For example, the AUS would approve a borrower with recent late payments, a 50-55% DTI, a 650 credit score, and no cash reserves.  CS-20 would have questioned such an application.  However, so long as the AUS approved the loan, the underwriters in Wells Fargo's

branches were not required to look any deeper.  In CS-20's view, the integrity of mortgage origination "all fell apart when the AUS became the standard."  She explained that by the mid-2000s, when the AUS were being relied upon almost exclusively, she no longer agreed with the loans that were being approved because the underwriting guidelines had become so loose.

491.   According to CS-20, her superiors at Wells Fargo "didn't want to hear" her concerns about mortgages being approved for borrowers with questionable credit, high debt levels, high LTVs, or minimal cash reserves.  Throughout her time with Wells Fargo, the origination and underwriting emphasis was completely sales-oriented.  According to CS-20, the motto at the company was "sales rules," and underwriters had no say in the kinds of borrowers that the AUS approved.

492.   The only time human underwriters were involved in the underwriting process was when the AUS recommended a loan for "refer" instead of "accept."  A result of "refer" meant that the application did not meet the underwriting guidelines programmed into the AUS.  These loans required manual underwriting, and most of the time they were still approved.

493.   CS-20 stated that underwriters at Wells Fargo were pressured to approve applications on which the AUS returned a "refer" result because "sales rules."  Underwriters were pressured to approve the loans because if they did not, they were at risk of suddenly being fired.  As stated by CS-20, "The loan officer or broker would go to the Operations Manager and complain, and suddenly people [underwriters] were no longer there."  Additionally, underwriters received e-mails directly from the outside mortgage brokers or loan officers indicating that they weren't happy with the underwriter's decision not to approve an application.  Many mortgage brokers expected the underwriter to approve all of his or her loans.  In general, CS-20 stated that

the mortgage brokers and loan officers "learned how to get away with what they needed in order to get the loans approved."

494. CS-20 explained that, in deciding whether to approve loans, underwriters disregarded whether the borrower had the ability to repay the loan: "We were just supposed to ignore all the warning signs." Thus, even for government loan programs, LTVs were in the range of 95-100%, FICO scores were as low as 550 to 560, and DTIs were as high as 55%. Cash reserves were only required "sometimes." Many of the conventional loans that CS-20 underwrote between 2004 and 2006 were stated income/stated asset or no-income/no-asset loans.

495. Confidential sources also described Wells Fargo's standard practice of approving exceptions that deviated from its underwriting guidelines. According to CS-21, 30-40% of the time, Wells Fargo loan officers issued exceptions to underwriting guidelines on loans that otherwise would have been rejected.

496. CS-21 noticed that the exceptions that Wells Fargo granted increased in late 2006 or early 2007, in conjunction with Wells Fargo's decision to tighten its underwriting guidelines. Wells Fargo's sales staff could not understand why a loan that would have been approved the prior year could not be approved in the current year, and did not accept the tightened guidelines. According to CS-21, the sales staff "wouldn't take 'no' for an answer," and therefore placed tremendous pressure on the Wells Fargo underwriters to approve their loans. Even where the Wells Fargo underwriters would deny requests for exceptions, Wells Fargo's sales staff would take their loans to lead underwriters and risk managers to have the decisions overridden. According to CS-21, the increase in exceptions countered Wells Fargo's efforts to tighten the underwriting guidelines.

497.    Evidence also exists that Wells Fargo employees also manipulated loan data in order to close loans and generate volume.  For example, CS-21 was aware of circumstances in which loan files were doctored in order for the loans to be approved.

498.    Confidential sources also detailed how mortgages approved by Wells Fargo were based upon inflated appraisal values.  According to CS-20, the outside mortgage brokers who brought the loans to her branch for approval chose the appraisers that they wanted to use.  The outside brokers, loan officers, and appraisers all had a vested interest in the appraised value being accepted and the mortgage application being approved by Wells Fargo, since they all made money off of the transaction.  Consequently, they all had a "let's make a deal mentality" about reaching an appraisal value that supported the amount of the mortgage loan.

499.    CS-23 has been a licensed appraiser in Washington since 1992.  In the spring of 2007, CS-23 was given an assignment by Rels Valuation—the appraisal management firm used by Wells Fargo—to appraise a home on the outskirts of Seattle.  CS-23's appraisal noted that the house was being remodeled, that the remodel was incomplete, and that the house was consequently not habitable.  After submitting his appraisal, CS-23 was contacted by both Wells Fargo underwriters and Rels customer service representatives, ordering him to change his appraisal to state that the house remodel was complete.  This pressure culminated with CS-23 receiving a phone call from a Rels Valuation Area Manager informing him that "you appraisers take USPAP [the uniform appraisal standards] too seriously," and that if CS-23 failed to alter his appraisal, he would be blacklisted.  When CS-23 refused on the grounds that changing the appraisal would violate appraisal standards, he was blacklisted and ceased receiving work from Wells Fargo.

500.    CS-24, who formerly worked as a review resolution coordinator for Rels Valuation from February 2007 to July 2010, confirms the problematic nature of the appraisal process.  According to CS-24, Wells Fargo had an unwritten "Five Percent Rule," whereby if a Rels review appraiser came up with a new value that was within 5% of the original value, the higher value was automatically accepted.

501.    CS-24 also testified that from the beginning of his tenure at Rels in 2007, until the implementation of the new Federal Home Valuations Code of Conduct in 2009, pressure from Wells Fargo officers occurred quite frequently, with CS-24 receiving at least one call a day from a review appraiser complaining that a Wells Fargo loan officer contacted him or her directly. CS-24 also sat near 18 review resolution analysts that were tasked with resolving appraisals in which the original appraiser and the review appraiser could not agree on the value.  On multiple occasions, CS-24 recalls a Rels national review manager arguing with the review analysts and telling them what he believed was the correct value.  CS-24 believes that this constituted undue pressure on review analysts.  According to CS-24, "[o]n the one hand the review manager was trying to run a delicate balancing act with the client, Wells Fargo.  But on the other hand, you have to draw the line.  Most of the stuff that I saw I felt like it was a little over the line."

502.    CS-24 also emphasized that not every appraisal ordered by Rels Valuation for Wells Fargo was reviewed by human eyes.  Rels relied on a computer program, called ACE, to identify problematic appraisals.  While the system caught clerical errors or omissions, appraisals containing "egregious violations of USPAP" were sometimes not identified until after the loan had closed.

      **b.**     **The mortgages originated by Wells Fargo and securitized in the PLMBS purchased by the Bank provide further evidence of Wells Fargo's abandonment of its stated underwriting guidelines.**

503.    Wells Fargo originated mortgages that secured at least two of the Certificates. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing this Certificate, including misstatements with respect to its weighted average LTV and the percentages of loans with LTVs in excess of 100%, 90% and 80%.  Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of Wells Fargo's failure to observe its stated underwriting standards.  Wells Fargo's actual practices—including the use of unreliable and biased collateral valuations, in lieu of appraisals, and the routine granting of underwriting exceptions without compensating factors—caused it to originate loans whose actual LTVs were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

504.    Thus, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was the norm at Wells Fargo, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay. Nowhere did any Offering Document apprise the Bank that Wells Fargo abandoned its underwriting guidelines.

      **c.**     **Investigations, lawsuits and confidential sources demonstrate that Wells Fargo engaged in predatory lending.**

505.    In July 2009, the Attorney General for the State of Illinois brought a lawsuit in Cook County Circuit Court alleging that Wells Fargo "steer[ed minority applicants] into high

cost subprime or riskier mortgage loans while White borrowers with similar incomes received lower cost or less risky mortgages" and that Wells Fargo "engaged in deceptive practices by misleading Illinois borrowers about their mortgage terms, misrepresenting the benefits of refinancing, and repeatedly refinancing borrowers' mortgages, also known as loan flipping, without any real benefit to consumers."

506.    The Illinois Attorney General's complaint in *People v. Wells Fargo & Co.*, No. 09-26434 (Ill. Cir. Ct.), details how borrowers were "plac[ed] into subprime mortgages, even though they qualified for prime mortgages with better terms," with the result that "[i]nstead of the affordable mortgages that these borrowers should have received, they were sold mortgages that were unaffordable and unsuitable."  The complaint also details how Wells Fargo rewarded its employees for steering borrowers away from prime mortgages and into subprime loans, creating an incentive to sell borrowers higher cost sub-prime loans even if they qualified for prime loans, and "failed to maintain proper controls to ensure that borrowers were not placed into mortgages that were riskier or more expensive than the mortgage loans for which they were qualified."

507.    On April 7, 2010 the City of Memphis filed its First Amended Complaint in *City of Memphis v. Wells Fargo Bank*, No. 09-2857 (W.D. Tenn.), alleging violations of the Fair Housing Act and of the Tennessee Consumer Protection Act arising from Wells Fargo's discriminatory lending practices.  The Complaint attaches sworn declarations from six former Wells Fargo employees providing evidence of discriminatory and predatory lending practices.

508.    Doris Dancy, a former Wells Fargo credit manager explained how she was provided with lists of leads who were predominantly minorities despite her branch being "in an area where a lot of white people lived" and how she was required to present a misleading sales

pitch that did not disclose that "we were actually just giving them a new more expensive loan

that put their house at risk." She detailed how her "district manager pressured the credit

managers . . . to convince our leads to apply for a loan, even if we knew they could not afford the

loan or did not qualify for the loan." She stated that "I knew that Wells Fargo violated its own

underwriting guidelines in order to make these loans to these customers." She was instructed by

her district manager "to conceal the details of the loan." Eventually she resigned because she

"decided that the practices were too unethical for me to participate any longer. I hated to go to

work, and found myself crying at the end of the day." Another Wells Fargo credit manager,

Mario Taylor, testified how:

> [B]ranch managers told us how to mislead borrowers. For example we were told
> to make "teaser rate" loans without informing the borrower that the rate was
> adjustable. . . . We were told not to tell the customer what was in the fine print.
> In many cases income documents were falsified in order to qualify a borrower for
> a loan. I know that some managers, including one of my branch managers,
> changed pay stubs and used white-out on documents to alter the borrower's
> income so it would look like the customer qualified for the loan. Borrowers were
> not told about prepayment penalties. [O]ne of my branch managers told me not to
> disclose . . . fees to borrowers.

509. Camille Thomas, a Wells Fargo loan processor, explained that "[i]t was the

practice at the Wells Fargo offices where I worked to target African Americans for subprime

loans. . . . Elderly African Americans were thought to be highly vulnerable and were frequently

targeted for subprime loans with high interest rates." She confirmed Ms. Taylor's testimony that

"credit managers and branch managers made 'teaser rate' loans without informing the borrower

that the loan had an adjustable rate. . . . In many cases documents were actually falsified to

inflate a borrower's income so that the borrower would appear to meet the debt-to-income

requirements. I know that at least one branch manager engaged in this practice."

510.    Tony Pashal, a Wells Fargo loan officer, described the case of one borrower who had a 2/28 adjustable rate mortgage and was seeking to refinance in 2006 before his "teaser rate" for the first two years expired. He explained that:

> I determined that the borrower qualified for a prime loan. The borrower had an excellent credit score and for this reason I suspected that he had previously qualified for a prime loan in 2004 but had been inappropriately placed by Wells Fargo into a subprime ARM at that time.  In working with the borrower in 2006, I informed my branch manager, Dave Zolnak, that the borrower qualified to refinance into a prime fixed-rate loan.  Mr. Zolnak told me I should instead refinance the borrower into another subprime ARM.  I refused [and was written up with] a negative performance evaluation in my personnel folder.

511.    Elizabeth Jacobson, who worked at Wells Fargo Home Mortgage from 1998 until December 2007 and who "was the top subprime loan officer" at Wells Fargo for many years, signed a declaration that was filed in *City of Baltimore v. Wells Fargo Bank*, No. 08-00062 (D. Md. Oct. 21, 2010), in which she asserted:

> The commission and referral system at Wells Fargo was set up in a way that made it more profitable for a loan officer to refer a prime customer for a subprime loan than to make the prime loan directly to the customer. . . .  When I got referrals it was my job to figure out how to get the customer into a subprime loan. I knew that many of the referrals I received could qualify for a prime loan. . . .  [Loan officers] used their discretion to steer loan customers to subprime loans by telling the customer, for example, that this was the only way for the loan to be processed quickly; that there would be less paperwork or documentation requirements; or that they would not have to put any money down.  Customers were not told about the added costs, or advised about what was in their best interest. . . .

> According to company policy, we were not supposed to solicit 2/28 customers for re-finance loans for two years after we made a 2/28 subprime loan. . . .  [M]y area manager told his subprime loan officers to ignore this rule and go ahead and solicit 2/28 customers within the two year period, even though this violated our agreement with secondary market investors.  The result was that Wells Fargo was able to cash in on the pre-payment penalty by convincing the subprime customer to refinance his or her 2/28 loan within the initial two-year period. . . .  Wells Fargo qualified borrowers for subprime loans by underwriting all adjustable rate mortgage (ARM) loans, including 2/28 loans, with the assumption that the borrower would pay the teaser rate for the full life of the loan even though this lower rate only applied during the first two or three years of the loan. . . .

I also know that there were some loan officers who did more than just use the discretion that the system allowed to get customers into subprime loans. Some [loan officers] actually falsified the loan applications in order to steer prime borrowers to subprime loan officers. These were loan applicants who either should not have been given loans or who qualified for a prime loan. One means of falsifying loan applications that I learned of involved cutting and pasting credit reports from one applicant to another. I was aware of [loan officers] who would "cut and paste" the credit report of a borrower who had already qualified for a loan into the file of an applicant who would not have qualified for a Wells Fargo subprime loan because of his or her credit history. I was also aware of subprime loan officers who would cut and paste W-2 forms. This deception by the subprime loan officer would artificially increase the creditworthiness of the applicant so that Wells Fargo's underwriters would approve the loan. I reported this conduct to management and was not aware of any action that was taken to correct the problem . . . .

Underwriters, like loan officers, had a financial incentive to approve subprime loans than [sic], even if the customer could qualify for a prime loan, because they too got paid more if a subprime loan went through.

*Id.*

512.    Jacobson also described how Wells Fargo intentionally targeted African

American borrowers with expensive, subprime loans:

Many of the customers who were referred to me by [prime loan officers] came from Prince George's County. Some came from Baltimore. I would estimate that a large majority of my customers were African American. Subprime managers joked that Prince George's County was the "subprime capitol of Maryland." I remember managers saying that they felt "so lucky to have P.G. County because it is the subprime capitol of Maryland."

I know that Wells Fargo Home Mortgage tried to market subprime loans to African Americans in Baltimore. I am aware from my own personal experience that one strategy used to target African-American customers was to focus on African-American churches. The Emerging Markets unit specifically targeted black churches. Wells Fargo had a program that provided a donation of $350 to the non-profit of the borrower's choice for every loan the borrower took out with Wells Fargo. Wells Fargo hoped to sell the African American pastor or church leader on the program because Wells Fargo believed that African American church leaders had a lot of influence over their ministry, and in this way would convince the congregation to take out subprime loans with Wells Fargo. . . . Subprime loan officers did not market or target white churches for subprime loans.

513.    Confidential sources confirmed that Wells Fargo engaged in predatory lending practices.  For example, CS-21 mentioned that Wells Fargo's underwriters did not fully inform borrowers of the risks of the loans.  In addition, as the above discussion shows, Wells Fargo routinely issued loans to borrowers who lacked the ability to repay the loans in violation of predatory lending restrictions.

### 6.    Ameriquest Mortgage Company

514.    Ameriquest Mortgage Company ("Ameriquest") originated underlying mortgage loans securing at least one of the Certificates purchased by the Bank: CMLTI 2005-9 1A1. Ameriquest abandoned its stated underwriting guidelines.

### a.    Investigations and lawsuits demonstrate that Ameriquest abandoned underwriting guidelines and engaged in predatory lending.

515.    Ameriquest was the wholly-owned retail lending subsidiary of ACC Capital Holdings ("ACC"), one of the nation's largest subprime lenders.  Ameriquest was the largest subprime lender in 2003, 2004, and 2005.  In 2010, Ameriquest was identified by the OCC as the ninth worst mortgage originator in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas with the highest rates of delinquency.

516.    Ameriquest's management pressured employees to generate loan volumes at all costs: "Up and down the line, from loan officers to regional managers and vice presidents, Ameriquest's employees scrambled at the end of each month to push through as many loans as possible to pad their monthly production numbers, boost their commissions, and meet [founder] Roland Arnall's expectations.  Arnall was a man 'obsessed with loan volume,' former aides recalled, a mortgage entrepreneur who believed 'volume solved all problems.'"  Michael Hudson, *The Monster: How a Gang of Predatory Lenders and Wall Street Bankers Fleeced America—and Spawned a Global Crisis* 2 (2010) (hereinafter "The Monster").

517.     In the 2010 book *All the Devils Are Here: The Hidden History of the Financial Crisis* (hereinafter "*Devils*"), authors Bethany McClean and Joe Nocera describe how this obsession with loan volume was formalized in Ameriquest's pay structure.  Ameriquest loan officers received a small base salary "but made most of their money on commissions typically 15 percent of all the revenue they generated.  And the perks were fabulous. Every year Ameriquest hosted an event called the Big Spin in Las Vegas for hundreds of top producers.  In 2004, Jim Belushi was the emcee and the rock band Third Eye Blind played. . . . The company also gave its top three hundred loan officers an all-expenses-paid trip to Hawaii in 2005."  *Devils* at 129.

518.     In order to satisfy the demand for increased loan volume, Ameriquest routinely abandoned its underwriting guidelines.  According to McClean and Nocera, at Ameriquest "[t]he creditworthiness of the borrowers mattered a lot less than whatever the loan officer thought he could get away with."  *Id.* at 131.  Ameriquest employees would "finess[e] the official mortgage paperwork with a variety of misrepresentations, exaggerating borrowers' incomes and their home values."  The Monster at 156.  "Loan officers pressured appraisers to inflate valuations by $10,000 or $20,000, and sometimes by $100,000 or $200,000, and to lie on their reports about the properties' defects."  *Id.*  Michael Filip, an appraiser in New Jersey, recalled one instance in which an Ameriquest loan officer demanded a $500,000 valuation in a town where the most expensive house was worth no more than $425,000.  *Id.*  Filip said that Ameriquest loan officers "got mean and angry. It was almost like a different breed of people.  They were just nasty, aggressive, yelling loan officers."  *Id.*

519.     Ed Parker, the former head of Ameriquest's Mortgage Fraud Investigations Department, told the FCIC that fraudulent loans were very common at the company. "No one was watching. The volume was up and now you see the fallout behind the loan origination

process," he told the FCIC.  FCIC Report at 161 n.29.  In fact, Parker detected fraud at the

company within one month of starting his job there in January 2003.  One of the more serious

problems Parker discovered involved Ameriquest's branch in Grand Rapids, Michigan.  Parker's

review of loan files uncovered the following pattern:

> An appraiser would turn in his report on a piece of property and the mortgage
> application would be declined because the home value wasn't high enough to
> support the loan. Then, a day later, a week later, two weeks later, a second and
> sometimes third appraisal would be submitted. This time, it would hit the value
> needed to get the loan approved. Most of loans had been made based on "verbal
> appraisals," meaning the appraiser had simply telephoned in the value and
> promised to send a written report later; in some cases, however, the written report
> still hadn't appeared.

The Monster at 232.

520.    Although Parker wrote up these and other findings, senior management did

nothing with the reports he sent. He heard that other departments were complaining he "looked

too much" into the loans. In November 2005, he was downgraded from "manager" to

"supervisor," and was laid off in May 2006.  FCIC Report at 12 n.52.

521.    As recently addressed in testimony to the FCIC, a Minnesota assistant attorney

general, Prentiss Cox, asked Ameriquest to produce information about its loans in late 2003. He

received about 10 boxes of documents. He pulled one file at random, and stared at it. He pulled

out another and another. He noted file after file where the borrowers were described as "antiques

dealers"—in his view, a blatant misrepresentation of employment.  In another loan file, he

recalled in an interview with the FCIC, an octogenarian disabled borrower who used a walker

was described in the loan application as being employed in "light construction."  As Mr. Cox

testified to the FCIC, "It didn't take Sherlock Holmes to figure out this was bogus."  As he tried

to figure out why Ameriquest would make such obviously fraudulent loans, a friend suggested

that he "look upstream." Cox suddenly realized that the lenders were simply generating product

to ship to Wall Street to sell to investors. "I got that it had shifted," Cox recalled. "The lending

pattern had shifted." *Id.* at 12 nn.53-54.

522.    As has recently come to light, Ameriquest often engaged in predatory lending

practices in order to close these risky loans.  Specifically, employees falsified documents, forged

borrowers' signatures on government-required disclosure forms, and misrepresented the terms of

loans in order to induce borrowers to take out loans they could not afford.  The Monster at 2-3.

"Ameriquest often mailed out disclosures that were inaccurate, lowballing the interest rates and

fees or failing to reveal that the loan carried an adjustable rate." *Id.* at 156.  Moreover,

Ameriquest employees would tell customers that any disclosures they did receive were generic,

pro forma sample paperwork that had nothing to do with the loan being offered. *Id.* "One

former employee recalled that managers conned inexperienced loan officers into misleading

customers about the Good Faith Estimate. 'We'd have conference calls with our area manager,'

he said. 'They just basically told us: 'Oh, that's the worst case scenario. It doesn't have any thing

to do with the loan.' We all just kinda ran with that.'" *Id.*

523.    In fact, "Ameriquest's deals were so overpriced and loaded with nasty surprises

that getting customers to sign often required an elaborate web of psychological ploys, outright

lies, and falsified papers.  'Every closing that we had really was a bait and switch,' a loan officer

who worked for Ameriquest in Tampa, Florida, recalled.  ''Cause you could never get them to

the table if you were honest.'" *Id.* at 3.

524.    An August 2007 *Business Week* article discusses the case of Mary Overton of

Brooklyn, New York.  Without her knowledge or understanding, Ameriquest created false tax

returns, employment records, and a 401(k) to make her appear qualified for a loan as part of a

scheme to coerce her to sign a loan which she could not afford.

525.   A former Ameriquest loan officer interviewed on National Public Radio recalled how at her office in Tampa, Florida, in order to close a loan "at any cost," "managers encouraged loan officers to conceal the actual cost and interest rate on loans" and would "white out income numbers on W2s and bank statements and fill in bigger amounts basically to qualify people for loans that they couldn't afford."  This practice was known as "taking the loan to the Art Department."  The National Public Radio broadcast stated that other former Ameriquest employees confirmed this same conduct occurring around the country.

526.   According to the 2011 FCIC Report, Christopher Cruise, a Maryland-based corporate educator who trained loan officers for companies that were expanding mortgage originations, coached about 10,000 loan originators a year, including at Ameriquest and Countrywide.  Most of their newly hired loan officers were young, with no mortgage experience, fresh out of school and with previous jobs "flipping burgers," he told the FCIC. Given the right training, however, the best of them could "easily" earn millions.

527.   As the FCIC Report quotes Cruise: "I was a sales and marketing trainer in terms of helping people to know how to sell these products to, in some cases, frankly unsophisticated and unsuspecting borrowers," he said.  He taught originators, including originators at Ameriquest, the new playbook: "You had no incentive whatsoever to be concerned about the quality of the loan, whether it was suitable for the borrower or whether the loan performed. In fact, you were in a way encouraged not to worry about those macro issues." He added, "I knew that the risk was being shunted off. I knew that we could be writing crap. But in the end it was like a game of musical chairs. Volume might go down but we were not going to be hurt."  FCIC Report at 7-8 nn.26-27.

528.     Marc S. Savitt, a past president of the National Association of Mortgage Brokers, told the FCIC that while most mortgage brokers looked out for borrowers' best interests and steered them away from risky loans, about 50,000 of the newcomers to the field nationwide were willing to do whatever it took to maximize the number of loans they made. He added that some loan origination firms, such as Ameriquest, were "absolutely" corrupt. *Id.* at 4 n.66.

529.     Moreover, Ameriquest was among 14 lenders named by the NAACP in a complaint alleging "systematic, institutionalized racism in sub-prime home mortgage lending." According to the lawsuit, African American homeowners who received sub-prime mortgage loans from these lenders were more than 30 percent more likely to be issued a higher rate loan than Caucasian borrowers with the same qualifications.  In January of 2009 the court denied a motion to dismiss, finding that the plaintiff had sufficiently pled a disparate impact claim.

> **b.     The mortgages originated by Ameriquest and securitized in the PLMBS purchased by the Bank provide further evidence of Ameriquest's abandonment of its stated underwriting guidelines.**

530.     As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pool securing Certificate CMLTI 2005-9 1A1, including misstatements with respect to the percentages of loans with LTVs in excess of 100%, 90% and 80%.  Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of Ameriquest's failures to observe their stated underwriting standards.  Ameriquest's actual practices—including the use of unreliable and biased collateral valuations, in lieu of appraisals, and the routine granting of underwriting exceptions without compensating factors— caused it to originate loans whose actual LTVs were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

531.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was the norm at Ameriquest, and Ameriquest approved numerous loans with essentially little to no underwriting screens applied to the loans or effort to evaluate the borrowers' ability to repay.

532.    Nowhere did any Offering Document apprise the Bank that Ameriquest abandoned its underwriting guidelines and the extent to which it engaged in predatory lending.

**7.    Aurora Loan Services LLC and Lehman Brothers Bank, F.S.B.**

533.    Aurora Loan Services LLC and Lehman Brothers Bank, F.S.B. (collectively, "Aurora") originated underlying mortgage loans securing at least four of the Certificates purchased by the Bank: LXS 2005-8 1A2, LXS 2007-9 1A1, and LXS 2007-11 A1.  Aurora abandoned its stated underwriting guidelines.

**a.    Evidence produced in the Lehman Brothers bankruptcy case demonstrates that Aurora abandoned its stated underwriting guidelines.**

534.    The Examiner's Report issued in the Lehman Brothers bankruptcy case provided useful insight into—and disclosed numerous internal Lehman Brothers documents regarding— the mortgage origination practices of Lehman's subsidiary Aurora. *See* Report of Anton R. Valukas, Examiner, *In Re Lehman Brothers Holdings Inc.*, No. 08-13555 (S.D.N.Y. Bankr. March 11, 2010) ("Examiner's Report").

535.    Among the Examiner's many findings was that, despite assertions that Lehman was reducing its subprime mortgage operations in favor of supposedly safer Alt-A mortgages, in reality Lehman and Aurora were continuing to originate loans that were as risky as subprime loans, but were doing so under the label "Alt-A."  The Examiner summarized these findings as follows:

> Even as Lehman was tightening standards on its subprime originations through
> BNC, Lehman was also using its Aurora subsidiary to expand its Alt-A lending.
> Moreover, Aurora's Alt-A lending reached borrowers of lesser credit quality than
> those who historically had been considered Alt-A borrowers.  The vehicle for that
> aspect of the Aurora business plan was the Mortgage Maker product. As
> Mortgage Maker expanded to more than half of Aurora's Alt-A production by
> February 2007, many of Aurora's loans denominated as Alt-A came more and
> more to resemble the subprime loans that Lehman was supposedly exiting by
> tightening origination standards at BNC.

Examiner's Report at 87.

536.    Richard McKinney, who was the head of Lehman's Securitized Products Division

in the United States, was aware of inconsistency between the "Alt-A" label and the subprime-

like performance of many of Aurora's loans.  In fact, in an email sent in February 2007 to the

CEO of Aurora, Thomas L. Wind, McKinney expressed concern that "we are creating worse

performance than subprime, while the rating agencies assume our performance should be

substantially better."  E-mail from Richard McKinney, Lehman, to Thomas L. Wind, Aurora, et

al. (Feb. 12, 2007).  In that same e-mail, McKinney noted that "[o]ur aggregate LXS (mostly

Mortgage Maker) performance has worsened vs. largest competitor on '06 production."

McKinney was particularly concerned about the "bucket" of limited documentation loans with

greater than 95% LTV, which "is not only worse than [Countrywide Financial Corp.], but

underperforms the aggregate subprime market."  *Id.*  Finally, McKinney remarked that the

Lehman XS trust [LXS], which issued the PLMBS purchased by the Bank, "will take the bottom

quality Mortgage Maker product."  *Id.*

537.    Similarly, Aurora Vice President Russell V. Brady suggested in January of 2007

that Aurora needed to "[d]etermine whether a segment of the [Mortgage] Maker population

should be serviced similar to subprime."  Russell V. Brady, Aurora, Response to LXS

Performance Issues (Jan. 24, 2007), at p. 1.  Moreover, as the Examiner's report noted, Lehman

managers began referring to the Mortgage Maker product as "Alt-B," which "was not an

accepted term or categorization in the business" but was used "as a way of differentiating the

riskier mortgages in the Mortgage Maker program from what had more traditionally been

considered Alt–A mortgages . . . ."  Examiner's Report at 88.

538.    Numerous other documents revealed in the Examiner's Report demonstrate that

Lehman Brothers was aware that the quality of its mortgage originations was deteriorating.  A

February 2007 presentation prepared by Lehman's residential mortgage analyst, Dimitrios

Kritikos, warned that "[t]he product mix of Aurora Production has shifted substantially in the last

6 months from Alt-A to MortgageMaker (Alt-B)" and that "FICOs, LTVs, DTIs, and

Documentation levels have deteriorated as the rest of the industry." Dimitrios Kritikos, Lehman,

Selected trends from Aurora Risk Review (Feb. 2, 2007), at 2.  The presentation further noted:

> While the industry is moving away from high CLTVs [combined loan-to-value
> ratios on multiple liens] and non-owner occupied properties, Aurora is gaining
> considerable share, especially during the last three months.  On the non-owner
> occupied segment, there is a significant shift to the 100% CLTV product.

*Id*.  A similar presentation from March 2007 discussed the previous month's loan originations as

follows:

> Mortgage Maker production is at an all time high of 55%, while Alt-A has
> dropped to 40% . . . .  Overall FICOs are at an all time low at 703, with DTIs and
> CLTVs to an almost all time high at 39.5% and 91.5% . . . . No Ratio loans . . .
> currently run at 14%, with more than half on the 100% financing. No Doc
> production runs at 11%, with one third of which is also 100% CLTV. Non Owner
> Occupied loans increased to 18%, with almost half of it in 100% CLTV (this
> segment has more than doubled in volume since Sept-06). Stated and No Ratio
> loans with low FICOs (<640) hit an all time high with 4.3% and 1.2% of the
> production, while Stated-Stated and No Doc with low FICOs (<660) remained flat
> at 2.3% and 0.8% respectively.

Dimitrios Kritikos, Lehman, Risk Review: Aurora and BNC February 2007 (Mar. 19, 2007), at

6-9.

539.    Kritikos also sent numerous emails to Jeffery Goodman, Lehman's Managing

Director of Risk Management, in early 2007 warning about the deteriorating quality of Aurora's

mortgage originations:

- "I have pointed out in the past that Aurora's product is far from Alt-A anymore. The traditional Alt-A program is only 40% of Aurora's production, with half of it in 100% financing. This product generally performs well. My concern is the rest 60% of production, that has 100% financing in lower FICOs with non-full documentation and/or investment properties." E-mail from Dimitrios Kritikos, Lehman, to Jeffery Goodman, (Mar. 12, 2007).

- "I am really concerned with the dramatic change of the product mix, especially the last 3 months. While the rest of the industry is tightening credit and increasing pricing in these areas, we are moving in the opposite direction. Although I understand that we need to take risk to get > reward, the areas where Aurora is growing are not the right ones. To put things in perspective, more than 50% of Aurora's current originations are 100% financing - 80% of that is in non full documentation loans. Extensive analysis has been done on both first payment defaults and long term performance on a lot of these segments. My biggest concern is the high CLTV, stated-stated program which has double or triple "bad" performance compared to the other segments. This segment has really taken off the last 3 months and, in my opinion, needs to get shut down." Email from Dimitrios Kritikos, Lehman, to Jeffrey Goodman, Lehman (Feb. 2, 2007).

- "I can see performance for Aurora originated loans to become even worse in 2007. Looking at the trends on originations and linking them to first payment defaults, the story is ugly: The last 4 months, Aurora has originated the riskiest loans ever, with every month been riskier than the one before – the industry meanwhile has pulled back during that time. The proposed guideline changes that are on the table today are not sufficient to rein in the bad performance." E-mail from Dimitrios Kritikos, Lehman, to Jeffrey Goodman, Lehman (Jan. 31, 2007).

540.    Finally, the Examiner's Report revealed the misalignment of incentives within

Lehman that helped fuel the departure from its underwriting guidelines. In his interview with the

Examiner, Michael Gelband, Lehman's head of fixed-income products, stated that "in general,

MCD [Lehman Mortgage Capital Division] had an incentive to continue to push for originations

because it was rewarded when its origination volumes were high and the risk was shifted to the

Securitized Products Group after the mortgages were originated."  Examiner's Interview of Michael Gelband, Aug. 12, 2009, at 11.

### b.     Confidential sources provide additional evidence of Aurora's abandonment of its stated underwriting guidelines.

541.     CS-27 worked as a Regional Operations Manager for Aurora in New Jersey from June 2004 through April 2005.  CS-27 explained that the majority of loans Aurora underwrote were Alt-A loans, based on stated income and stated assets.  She said that Aurora has systems in place to detect fraud and prevent underwriting bad loans.  However, because Aurora put an emphasis on volume, and brokers "were trying to push anything they could," a lot of bad loans were approved by Aurora and pushed through its system anyway.

542.     CS-27 said that that there were a lot of exceptions granted for the loans Aurora underwrote.  "We had a lot of leeway to make exceptions," she said.  "Exceptions were rampant."  Aurora had internal guidelines that clarified which employees, in which position, could make which types of exceptions.  For example, an underwriter could only grant exceptions on credit scores that were short two or three points from the required number in the underwriting guidelines for a specific product.  Supervisors, however, were authorized to deviate five points from a required credit score, while managers, like CS-27, who worked at Aurora's regional operations center, could deviate up to ten points off the required credit score.  Any deviation greater than ten points had to be approved by Aurora's Credit Policy Committee in Denver.  CS-27 said that a similar system was in place for exceptions on LTVs.

543.     CS-27 participated in monthly conference calls with all of the other managers of Aurora's regional operations centers.  During these calls, each manager would go over projections for how many loans they expected to close in the coming month and explain why.  They would also discuss new loan products or changes to guidelines.  Every quarter all of the

managers for the regional operations centers would also meet at Aurora's offices in Denver. CS-27 estimates that exceptions were made on at least fifty percent of the loans that Aurora underwrote.  Although exceptions were not as high in her New Jersey office ("because we were new"), she learned through conversations with managers of other regional Aurora offices that they granted more exceptions.

544.    For example, when she made visits to Aurora's Gaithersburg, Maryland office for training, CS-27 noticed the high number of exceptions that office generated.  CS-27 also learned through conversations with her colleagues and other managers that the manager of the Gaithersburg, Maryland office was compromising standards in order to push loans through.  CS-27 said that the Gaithersburg managers was "pushing loans through and over-riding underwriters' decisions" to decline loans.   "Sometimes the Quality Control results were swept under the rug if fraud was found because the branch was doing so well," she added.

545.    CS-27 also explained that when Aurora utilized "compensating factors," the factor on which Aurora relied was supposed to be part of the loan file or related to borrower-supplied information.  However, Aurora would count as a "compensating factor" not factual information originating from the borrower, but the amount of fees or costs it could extract from the transaction, based on the borrower's otherwise unlikely ability to meet underwriting guidelines.  For example, Aurora would count as a "compensating factor" justifying approval of the loan whether it could count an extra quarter point for pricing for the loan, or add a prepayment penalty.  CS-27 said that these types of "compensating factors" did not decrease the risk of the borrower defaulting.  Rather, it made the loan more attractive for Aurora to sell to investors, because Aurora would make more money on the loan.

546.   CS-27 said that although Aurora had good policies in writing, they did not work as well in practice.  For example, the underwriting guidelines called for underwriters to perform a "reasonability test" for stated income, stated asset loans regarding a borrower's income.  However, the guidelines never told the underwriters how to do this.  CS-27 said that there should have been specific recommendations for underwriters to check salaries on websites such as Salary.com and the U.S. Department of Labor's website.

   c.   **The mortgages originated by Aurora and securitized in the PLMBS purchased by the Bank provide further evidence of Aurora's abandonment of its stated underwriting guidelines.**

547.   As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing the Certificates for which Aurora originated loans, including misstatements with respect to the percentages of loans with LTVs in excess of 100%, 90% and 80%.  Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of Aurora's failures to observe their stated underwriting standards.  Aurora's actual practices—including an emphasis on loan quantity rather than quality, the use of unreliable and biased collateral valuations, in lieu of appraisals,, and the routine granting of underwriting exceptions without compensating factors—caused it to originate loans whose characteristics were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

548.   In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, at Aurora variance from the stated standards was the norm, and many loans were made with essentially little to no underwriting or effort to evaluate ability to

repay.  Furthermore, Aurora manipulated the use of the term "compensating factors," approving loans that did not otherwise meet underwriting guidelines by adding a financial penalty to the loan, in the form of extra points or prepayment penalties, thereby increasing Aurora's profit when it securitized the loan, while also penalizing borrowers with high costs and fees and increasing the likelihood of default.

549.    Nowhere did any Offering Document apprise the Bank that Aurora abandoned its underwriting guidelines and that it engaged in predatory lending.

### 8.    Chase Home Finance LLC and JPMorgan Chase Bank, N.A.

550.    Chase Home Finance LLC ("Chase Home Finance") and/or JPMorgan Chase Bank, N.A. (collectively the "Chase Originators") originated underlying mortgage loans securing at least five of the Certificates purchased by the Bank: JPALT 2006-A1 1A1, JPALT 2006-A2 1A1, JPALT 2006-A3 1A1 and JPALT 2007-A2 12A1.  The Chase Originators abandoned their stated underwriting guidelines.

551.    The Chase Originators' departure from their stated underwriting standards has been confirmed by JP Morgan Chase & Co. ("JPMC") Chairman and CEO, Jamie Dimon.  In his January 13, 2010 testimony before the FCIC, Dimon stated that "the underwriting standards of our mortgage business should have been higher."  Dimon confessed that JPMC, the parent company of the Chase Originators, "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios."

### a.    Investigations and confidential sources demonstrate that the Chase Originators abandoned their stated underwriting guidelines.

552.    In an undated internal memorandum that became public in March 2008, Chase Originator employees circulated tips for using "Cheats & Tricks" to allow Chase loan originators

to circumvent the Chase Originators' in-house automated loan underwriting system to get risky loans approved. The memo provides that the secret to getting risky loans approved is to inflate the borrower's income or to otherwise falsify their loan application.

553.   The memo suggests that the Chase Originators' automated loan-origination system, called "Zippy," "can be adjusted" to "get the findings you need" by trying some of these "handy steps":

> (1) In the income section of your 1003, make sure you input all income in base income. DO NOT break it down by overtime, commissions or bonus.

> (2) NO GIFT FUNDS! If your borrower is getting a gift [to cover some or all of the down payment], add it to a bank account along with the rest of the assets. Be sure to remove any mention of gift funds on the rest of your 1003.

> (3) If you do not get Stated/Stated, try resubmitting with slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the same for assets.

554.   Thus, according to the memo, Chase Originator employees should "never fear" if they "do not get stated income / stated asset findings" on the first attempt because they can try and try again until they get their desired result. By lumping contingent income with base income, concealing the receipt of gifts (which are typically required to be specifically disclosed in loan applications), and artificially inflating income, Chase loan originators were able to approve countless loans that otherwise would not have satisfied Zippy's stated underwriting guidelines.

555.   As the "Zippy Cheats & Tricks" memo reveals, "If you get a "refer" or if you DO NOT get Stated Income / Stated Asset findings. . . . Never Fear!! ZiPPY can be adjusted (just ever so slightly). Try these steps next time you use Zippy! You just might get the findings you need!!"

556. Confidential sources confirm this prevailing attitude of using "cheats and tricks" designed to game the system and approve loans that are not in accordance with stated underwriting guidelines. These confidential source statements provide evidence that (1) the Chase Originators' employees faced intense pressure to close loans at any cost; (2) the Chase Originators' employees manipulated loan data in order to close loans; (3) the Chase Originators approved loans based upon inflated appraisal values; and (4) the Chase Originators failed to adhere to their stated underwriting guidelines.

557. CS-3 was a loan processor and assistant to the branch manager at a Florida branch of Chase Home Finance from April 2006 until August 2007. She stated that Chase Home Finance employees faced enormous pressure to close loans because their salaries were dependent solely upon quantity. For example, loan officers only received a salary their first two months at the company. After the second month, their income was based upon commissions for the number of loans they closed; if they did not close loans, they did not receive a paycheck. CS-29 echoed similar comments, and said that staff underwriters at JPMorgan Chase received a salary plus bonus pay that was based on the quantity of funded loans.

558. According to CS-3, branch and regional managers pressured loan officers to meet monthly quotas. If a loan officer worked two months without closing a loan, he or she could be fired. Thus, "loan officers walked around on eggshells at month end" for fear of losing their job or not getting the commission that fed their families.

559. Underwriters at Chase Home Finance also received monthly bonuses based upon the volume of loans closed, and management pressured such underwriters to close loans. CS-3's regional manager would send the branch managers below him to Chase Home Finance's underwriting office in New Jersey "to work the magic" and close the loans.

560.     Due to the pressure that was placed upon Chase Home Finance employees to close loans at any cost, many employees inflated borrowers' income and modified loan files in order to push loans through.  "It was very common to take stuff out of the loan file" in order to get a loan approved, said CS-3.  For example, loan officers removed bank statements, paystubs, or other documents which showed the borrower's income so that the loans would not be hindered in closing.

561.     According to CS-3, "loan officers knew [the borrowers] were making less income" than was stated on the loans because, acting on orders from the branch manager, the loan officers inflated the borrowers' income.  As an example, CS-3 stated: "You'd see a guy that owned a pizzeria that was making millions and you knew there was just no way."

562.     Knowledge of the inflated incomes flowed to management at Chase Home Finance because loan officers often brought their loans to the branch manager for help and instruction on how to make them close.  In fact, said CS-3, "The branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work."  Branch managers also called the regional managers above them to help close problem loans.

563.     CS-3 summed up the overall attitude at the Chase Home Finance branch where she worked: "It's okay to do what you have to do to get the loans closed."

564.     The statements of CS-28, a senior loan underwriter at Chase Home Finance from December 2004 to August 2005, illustrate similar problems, including that Chase Home Finance closed loans based upon stated incomes that were false and inflated.  CS-28 recalled circumstances in which mortgage brokers changed applicants' stated incomes before they submitted the loan files to Chase Home Finance.  Then, after the loans closed and weren't

performing, Chase Home Finance would contact the borrower and "hear the borrower say, 'I never said I make that much.'"

565. CS-28 also said that he commonly reviewed loan files that contained "questionable" statements of income. In fact, "[i]t happened daily," said CS-28, and "[y]ou'd see self-employed people, like a landscaper, who stated they made $10,000 a month," without an adequate savings history or FICO score. When CS-28 determined that the stated income was "not do-able," based upon his review of the website salary.com or an occupational jobs handbook, he notified his manager or other supervisors. "There was never any push-back. They wanted the loans booked and funded." However, he was always told that "it meets the FICO score and savings history guidelines so we do the loan." It was "one size fits all." According to CS-28, "It really wasn't common sense-based, but based on the FICO scores you could sell the loan to investors. They wanted quantity, not quality." Loans were issued based on "FICO and income. This was not common-sense underwriting. It was not based on risk, but almost like on the game show "Let's Make a Deal": they made a deal based on satisfaction of these two criteria" only.

566. In addition to approving loans based upon inflated incomes, CS-28 also said that Chase Home Finance employees approved loans based upon inflated appraisal values. According to CS-28, Chase Home Finance employees were "not allowed to contest appraisals that appeared to be inflated." As a result of the housing bubble, appraisers over adjusted and ensured that the appraisals came in at or above the sales price. For example, CS-28 said he recalled one subdivision in California in which homes sold in the second phase of the subdivision build-out doubled the value of those sold in the first phase, which had occurred just a few months earlier. In this regard, CS-28 said, "[t]he first phase appraisals were valued at

$200,000.  The second phase, based on speculative investors buying and selling, pushed the

values to $400,000.  You'd look at the comps and there would be two inside the 'division' and

one outside, but you couldn't contest the value."

567.    CS-29, a senior underwriter at JPMorgan Chase Bank, N.A. from April 2001 to

June 2008, stated that managers at JPMorgan Chase Bank, N.A. often overturned the decisions of

lower-level underwriters to reject stated-income loans.  According to CS-29, "If the manager felt

the income made sense and the underwriter didn't, the manager could overturn it."

> **b.      The mortgages originated by the Chase Originators and securitized in the PLMBS purchased by the Bank provide further evidence of abandonment of their stated underwriting guidelines.**

568.    The Chase Originators originated mortgages that secured at least five Certificates

in this action. As discussed in detail below, the Offering Documents contained serious material

misstatements regarding specific characteristics of the loan pools securing these Certificates,

including misstatements and omissions with respect to their weighted average LTVs and the

percentages of loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the

compounded high-risk mortgages that infected the loan pools.  Moreover, as described in

paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure

rates.  These circumstances are strong evidence of the Chase Originators' failures to observe

their stated underwriting standards.  The Chase Originators' actual practices—including the use

of unreliable and biased collateral valuations, in lieu of appraisals, and the routine granting of

underwriting exceptions without compensating factors—caused them to originate loans whose

actual LTVs were far different from that reported in the Offering Documents, and whose

likelihood of default was much higher than that of loans issued under underwriting standards of

the type described in the Offering Documents.

569.     In summary, far from following their underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was the norm at the Chase Originators, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank that the Chase Originators abandoned their underwriting guidelines.

9.     **American Home Mortgage and American Home Mortgage Investment Corporation**

570.     American Home Mortgage Corporation and American Home Mortgage Investment Corporation (collectively, "AHM") originated underlying mortgage loans securing at least fourteen of the Certificates purchased by the Bank: AHM 2005-2 1A1, AHMA 2006-6 A1A, AHMA 2007-2 A1, AHMA 2007-5 A1, DBALT 2006-AR2 1A1, DBALT 2006-AR2 1A2, DBALT 2006-AR5 1A1, DBALT 2007-AR1 A1, HVMLT 2006-7 2A1A, JPALT 2007-A2 12A1, LUM 2006-7 2A1, MARM 2005-8 1A1, MSM 2006-16AX 2A1 and NAA 2007-3 A1. AHM abandoned its stated underwriting guidelines.

a.     **Investigations, lawsuits and confidential sources demonstrate that AHM abandoned its stated underwriting guidelines.**

571.     In 2010, AHM was identified by the OCC as the eleventh worst mortgage originator in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas with the highest rates of delinquency.

572.     The *Wells Fargo* Complaint specifically identifies an internal AHM email sent on November 2, 2006, from Steve Somerman, an AHM Senior Vice President of Product and Sales Support in California, stating that AHM would make a loan to virtually anyone, regardless of the borrower's ability to verify income, assets or even employment.  The email specifically urged loan officers to make stated income loans, no income loans, no asset loans, and "No Doc" loans.

573.    Some AHM employees told Newsday that AHM founder Michael Strauss' "mission of becoming the nation's top mortgage bank created such pressure to resell loans that some loan documents could not be thoroughly scrutinized to ensure their validity."  Daniel Wagner and Tami Luhby, *Inside the Loan Crisis: Quick rise, quicker fall*, Newsday (Aug. 12, 2007).  One former employee, Shawn Nuzzo, said that AHM branches were generating loans of questionable quality, and noted that the focus was always on reselling loans, not evaluating the riskiness of loans.  *Id.*

574.    In fact, AHM's compensation structure encouraged loan officers to produce a high volume of loans rather than scrutinize the quality of loans.  The complaint in *In re American Home Mortgage Securities Litigation*, No. 07-MD-1898 (June 3, 2008) ("*AHM* Complaint") cites an internal presentation entitled "Incentive Compensation" that discussed incentive-based compensation measures to be implemented in 2005.  *Id.* ¶ 81.  Specifically, underwriters were required to review and approve 5 loans per day and 100 loans per month in order to qualify for incentive compensation.  *Id.*

575.    The *Wells Fargo* Complaint details how an internal AHM "Credit Update" presentation dated from October 2005 detailed revised credit factors to be used in making loans to high risk borrowers.  The Credit Update sets forth the new "guideline interpretations" under a heading "Where We Are Now" which included:

- Not requiring verification of income sources on stated income loans;

- Reducing the time that need have passed since the homeowner was in bankruptcy or credit counseling;

- Reducing the documentation required for self-employed borrowers; and

- Broadening the acceptable use of second and third loans to cover the full property value.

These new guideline interpretations, which were not disclosed in the Offering Documents, relaxed substantially, or sometimes rendered meaningless, AHM's prior underwriting guidelines.

576.    The *AHM* Complaint cites an internal AHM presentation entitled "Credit Update" dated October 2005.  In the "Policy Statement Guidelines" section of this presentation is the directive that loan officers should "[o]btain the least amount of documentation required" and "[a]lways accept copies of documents vs. originals."  *Id*. ¶ 87.

577.    The *AHM* Complaint also cites internal documents that detail AHM's underwriting guidelines.  These guidelines permitted the issuance of no document loans worth up to $1 million to borrowers with FICO scores of 620.  *AHM* Complaint at ¶ 92.  Moreover, no document loans were available for borrowers with FICO scores as low as 600.  *Id.*

578.    The *AHM* Complaint cites the internal "Program Overview" document for AHM's Choice Loan program, which details a loan product specifically targeted towards "borrowers with more serious credit issues," including "recent bankruptcies or foreclosures, little or no traditional credit, and FICO scores as low as 500."  *AHM* Complaint at ¶ 93.  Amazingly, this product offered "100% financing on all doc types."  *Id.*  This product was promoted in a May 27, 2005 e-mail from an AHM Product Support executive, Kenneth Hefner, in response to an inquiry from an AHM loan officer: "We use Investor XX for a number of different reasons . . . FICOs down to 500 with a sliding scale for Mtg lates, BK seasoning, and other derog credit . . . ."  *Id.* ¶ 94.  Hefner concluded the email by noting "there are many instance where Choice programs can yield better pricing than A-paper and close loans with much less documentation than what might be needed for a conventional loan."  *Id.* ¶ 95.

579. A January 11, 2005 e-mail from Robert Trahan, a Senior Vice President in Product Support, touted how AHM would approve 100% LTV loans to borrowers who were one day out of bankruptcy and who had FICO scores as low as 580. *Id.* ¶ 96.

580. AHM loan officers were encouraged to "play around" with the structure of products so they could close loans. The *AHM* Complaint cites an October 4, 2006 internal email from Melissa Johnston to AHM managers, loan officers and underwriters that states: "Loan Soft was created to give the Loan Officers the ability to structure and restructure loans until they find a solution on how to do the loan. The LO can play around with the loan all they want in Loan Soft as long as it has NOT been released to processing." *Id.* ¶ 99.

581. Notably, even certain of the Defendants acknowledged that AHM abandoned its stated underwriting guidelines. For example, monoline insurer Ambac Assurance Corp. recently discovered that an executive at Defendant Bear, Stearns & Co. wrote an e-mail in March 2006 in which he stated he "would strongly discourage doing post close [due diligence] for any trade with [American Home Mortgage]. You will end up with a lot of repurchases." First Amended Complaint at ¶ 134, *Ambac Assurance Corp. v. EMC Mortgage LLC et al.*, No. 650421/2011 (N.Y. Sup. Ct. July 18, 2011) (citing Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) dated March 28, 2006).

582. Confidential source statements confirm the abandonment of its stated underwriting guidelines at AHM. CS-31 worked as an underwriter at American Brokers Conduit, a wholesale originator that was a division of American Home Mortgage Investment Corporation, in its Charlotte, North Carolina office from June 2006 to August 2007.

583. CS-31 was expected every day to review five residential home loans originated by independent brokers. "There was a push in the wholesale office to get loans closed," CS-31 said.

584.   CS-31 objected to closing loans that lacked documentation, such as documentation of sufficient income or asset verification. Her supervisor derided her for being such a stickler. "She felt like I over-scrutinized the loans," CS-31 said. "I thought that was what was needed." CS-31 also said that her supervisor did not like it when CS-31 rejected a loan because it failed to meet guidelines. Her supervisor sometimes would override her decisions.

585.   CS-31 was verbally reprimanded for rejecting too many loans. "I was spoken to more than once because I would not approve loans that did not meet the guidelines."

> **b.    Evidence from the Bank's review of loan files further indicates that AHM abandoned its stated underwriting guidelines.**

586.   The Bank recently obtained access to and reviewed loan files for a number of mortgage loans originated by AHM and securitized in DBALT 2006-AR5. The Bank's review of these loan files demonstrates that AHM abandoned its stated underwriting standards when it acquired the loans that secure the Certificates. On information and belief, AHM's abandonment of underwriting practices and failure to require properly conducted appraisals with respect to acquired mortgage loans was repeated with other mortgage loans backing the Certificates.

587.   For example, the Bank's review of mortgage loan # 1158052477—a $276,500, 10-year interest only, 100% CLTV mortgage securing the purchase of a second home in Las Vegas, NV—reveals irregularities in the origination demonstrating that this loan was not originated in accordance with AHM's stated underwriting standards. First, the subject property was appraised at $395,000 even though it last sold a mere *3 months* earlier for $333,000. This $62,000 appreciation (19 percent) in 3 months should have indicated to AHM that this property was a "flip." The loan file did not include any indication that there had been upgrades to the property. In fact, the loan file failed to provide any explanation for this sudden increase in value. Additionally, the appraisal report indicates "functional obsolescence" of the swimming pool on

the subject property.  Had the more reasonable $333,000 value been used to calculate the LTV and CLTV, the loan would have had an LTV of 83% and a CLTV of 119%.

588.    The Bank's review of this loan also revealed that the borrower's stated income was unreasonable.  The borrower was a 23 year old unmarried male had been employed for 2 years as a loan officer with First Worldwide Funding in California.  He stated that his income was $18,333 monthly—more than *four times* the median income for his position.  According to 2006 data from the Bureau of Labor Statistics for California, the 90% percentile of wage earners, multiplied by a 125% premium to apply a conservative calculation, would be $11,150 per month, not $18,333 as stated in the borrower's application.  If this more realistic figure had been used in assessing the borrower's creditworthiness, the borrower's DTI would have been 56%.

589.    Similarly, the Bank's review of mortgage loan  # 1158052538 reveals that the borrower had insufficient funds for closing and insufficient reserves.  This loan was a $169,396, 10-year interest only, 100% CLTV, "Stated Income Full Asset" loan issued by AHM.  Although this loan required the borrower to have *verified* assets sufficient to pay 2 months in PITI (principal, interest, taxes, and insurance), AHM's verification showed that the borrower's average 2-month balance was only $976.98.  This amount was insufficient to cover even 1 month in PITI, which was calculated as $2,082.08.  AHM inappropriately relied on the fact that the borrower had received a sudden influx of money in his checking account in the month prior to closing, even though there was no explanation in the file explaining the large increase in funds compared to the low average monthly balance.

### c.    AHM manipulated the appraisal process

590.    The Bank's review of appraisal reports for mortgage loans originated by AHM and securitized in DBALT 2006-AR5 demonstrates that AHM routinely used appraisals that

violated USPAP, and otherwise originated loans based on false and inflated valuations of collateral.

591.    For example, as noted above, the appraisal for mortgage loan # 1158052477 reflected an unreasonable and unexplained appreciation of 19% in a 3 month period of time.  A Review of this appraisal report demonstrates that the appraiser violated USPAP in his/her effort to support such an inflated value.  First, the appraiser increased the value of comparable sales Nos. 2 and 3 by $8,900 and $7,100, respectively, without providing any explanation other than the following conclusory statement:  "Site: Comps 2 & 3 are inferior."  Similarly, the appraiser failed to made any adjustments for sales concessions, even though the appraisal file recognizes that the seller of comparable property No. 2 made a $10,650 concession.  As noted above, when a seller is forced to make concessions, it generally indicates that the sale price exceeded the actual value of the comparable property, and thus an appropriate adjustment should have been made by the appraiser.  Finally, the appraisal did not provide any reconciliation for the sales comparison approach, in violation of USPAP Standard Rule 1-6.

592.    Similarly, the appraiser for loan # 1158052538 failed to provide any explanation for his failure to make adjustments to the sale prices of comparable properties for sales concessions.  The appraisal report reflects that the appraiser did not explain or analyze the adjustments made with respect to the values of comparable sales, in violation of USPAP Standard Rules 1-1(a), 1-1(b) and 1-4(a).  Additionally, this appraisal report reflects a violation of USPAP Standard Rule 1-4(b), which provides that "[w]hen a cost approach is necessary for credible assignment results, an appraiser must . . . develop an opinion of site value by an appropriate appraisal method or technique."  Appropriate appraisal methods require providing support for valuations.  Contrary to this requirement, the appraiser merely stated, without any

support:  "Site value is derived from direct market analysis."  Finally, when in deriving an

appraised value from the comparable sales, the appraiser used an average of the comparable

sales, which is not an acceptable appraisal practice.  This violated USPAP Standard Rule 1-6.

593.    Moreover, CS-31 saw appraisals on properties in Atlanta that she felt were

inflated.  However, she did not have an option to order a second appraisal.  "We couldn't do

anything about it," she said.  When CS-31 brought to her managers' attention a loan with what

she thought was an inflated appraisal, they did not want her to do any further research.  Instead,

they usually approved it on the spot.  "We could take it to the managers and if they felt it was

okay, we went with it."

594.    Finally, facts cited by investors in other civil complaints support these allegations.

For example, the Amended Complaint in *Massachusetts Bricklayers v. Deutsche Alt-A

Securities, Inc., et al.*, No. 08-03178 (E.D.N.Y June 18, 2009), cites a former AHM Vice

President from March 2003 through May 2007, who described how loan officers pressured

appraisers to come up with the "right number."  *Id.* ¶ 92.  Similarly, the Complaint filed in

*Phoenix Light SF Limited et al. v. Ace Securities Corp, et al.*, No. 650422/2012 (N.Y. Sup. Ct.

May 14, 2012) cited statements of an independent appraiser from Florida who was approved to

perform appraisals for AHM.  This appraiser stated that she was told by brokers and/or lender

that "we need this number, or you will never work for us again."  *Id.* ¶ 170.

**d.    The mortgages originated by AHM and securitized in the PLMBS
purchased by the Bank provide further evidence of AHM's
abandonment of its stated underwriting guidelines.**

595.    AHM originated mortgages that secured at least 12 Certificates in this action. As

discussed in detail below, the Offering Documents contained serious material misstatements and

omissions regarding specific characteristics of the loan pools securing these Certificates,

including misstatements with respect to their weighted average LTVs and the percentages of

226

loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the compounded high-risk mortgages that infected the loan pools.  Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of AHM's failure to observe its stated underwriting standards. AHM's actual practices—including the use of unreliable and biased collateral valuations, in lieu of appraisals, and the routine granting of underwriting exceptions without compensating factors—caused it to originate loans whose actual LTVs were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

596.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was the norm at AHM, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank that AHM abandoned its underwriting guidelines.

### 10.    MortgageIT, Inc.

597.    MortgageIT, Inc. ("MortgageIT") originated underlying mortgage loans securing at least eleven of the Certificates purchased by the Bank: CWALT 2006-OA16 A2, DBALT 2006-AR3 A2, DBALT 2006-AR4 A1, DBALT 2007-AR1 A1, LUM 2006-6 A1, MARM 2005-7 2A1, MHL 2005-5 A1, MHL 2006-1 1A2, MSM 2006-16AX 2A1, RALI 2006-QA2 1A1 and RALI 2006-QA3 A1. MortgageIT abandoned its stated underwriting guidelines.

### a. The Bank's review of loan files demonstrates that MortgageIT abandoned its stated underwriting guidelines.

598. The Bank recently obtained access to and reviewed the loan files for numerous mortgage loans originated by MortgageIT and securitized in MHL 2006-1 1A2.[17]  The Bank's review of these loan files demonstrates that MortgageIT abandoned its stated underwriting standards.  On information and belief, MortgageIT's abandonment of underwriting practices and failure to properly conduct appraisals with respect to these mortgage loans was repeated with other mortgage loans also backing this security.

599. For example, the Bank's review of a mortgage loan (#40507819), secured by property in Las Vegas, Nevada, reveals irregularities in the origination of this loan demonstrating that MortgageIT did *not* originate this loan in accordance with stated underwriting standards. The loan was originated without appropriate approvals of employment or income, despite red flags in the loan file indicating that these representations were falsified.  The loan was not originated through an arms-length transaction, and a disqualifying prior delinquency on a prior mortgage loan was overlooked, all in violation of MortgageIT's underwriting guidelines.

600. The mortgage loan application for this property lists the borrower's employment as the self-employed owner of SK Appraisals working out of the home in Las Vegas, Nevada for the past two years, and with three years working in the field.  However, the borrower's credit report does not reference this line of work and refers only to Ryan, Inc., and lists the borrower's occupation as a construction foreman or superintendent.  For loan approval, the borrower needed to provide either a letter from a certified public accountant ("CPA") to prove the borrower had been self-employed for two years, or an appraisal license showing employment for 2 years.  The

---

[17] MortgageIT's abandonment of underwriting guidelines with respect to four of these loan files is described here.  By way of example only, an additional six loan files originated by MortgageIT, which also reflect its abandonment of underwriting guidelines, are described in the attached Appendix VIII.

CPA letter in the file dated January 9, 2006 indicates that the CPA prepared the borrower's tax return for only the prior year.  The CPA letter bears a handwritten note indicating the letter is not acceptable.  The loan file also contains a copy of the appraiser report confirming the borrower had been licensed since June 30, 2005, which is less than the 2 years required according to MortgageIT 206 Gold ARM guidelines posted December 13, 2005.

601.    The mortgage loan application lists stated earnings of $22,577 per month, or $270,924 annually.  Additional red flags were present in the loan file to indicate the borrower's income was overstated.  The borrower had minimal verified assets in relation to his stated monthly earnings, and had only $4,112 in the business bank account, with no average balance available.  Furthermore, the borrower had only been licensed for a short period of time, which would not appear sufficient to build a clientele to command the higher income stated.  There was also no evidence the borrower employed a staff that would create a greater earning potential.

602.    The borrower filed Chapter 13 bankruptcy on January 17, 2008.  The statement of financial affairs filed with the bankruptcy court discloses the borrower's 2005 income as $69,030, or one-fourth of the amount stated when the loan was originated.  Evaluating the borrower's 2005 income results in a DTI at the time of loan origination of 80.7%, which well exceeds the maximum allowed rate of 40%.

603.    Considering the lack of evidence of the borrower's employment as stated for the required length of time, the excessive income stated for the length of time employed, and the subsequent evidence that the borrower's income was overstated, it is clear that the mortgage loan underwriter did not ensure that the borrower's income could support the monthly housing expense and all recurring monthly obligations.

604.     In addition, the guidelines under which this mortgage loan was originated require a housing history with no delinquencies for the past 24 months.  The credit report dated October 19, 2005 confirms a 30-day delinquency on another loan with another lender in February, 2004.  The borrower wrote a letter of explanation indicating he was disputing the reporting.  The borrower indicates the delinquency occurred during a refinance transaction in February 2004 and that the loan was paid in full in March 2004.  The borrower indicates the loan officer recommended not paying the mortgage in February 2004 due to the impending loan payoff.  Although the credit report confirms the delinquency occurred in February 2004, the loan was not paid in full until August 2004.  Regardless of the specific circumstances of the payoff, the borrower's explanation confirms that the borrower did not make the February 2004 payment in a timely manner, making the approval of this loan a violation of the underwriter's guidelines.

605.     Finally, this mortgage loan was not an arms-length transaction.  Shelley Prather is listed as the agent for the broker on this loan.  Ms. Prather completed the application, the request for verification of deposit, and ordered the appraisal.  The borrower's bankruptcy filing confirms the borrower is married to Shelley Kinner, also known as Shelley Prather.

606.     The Bank's review of the loan file (#40433485) relating to a property in Sacramento, California also reveals irregularities in the origination of this loan demonstrating that MortgageIT did *not* originate this loan in accordance with stated underwriting standards.  For example, MortgageIT did not ensure that the borrower's income would support its total housing expense and all recurring monthly debt.  The borrower misrepresented the real estate it owned and its related liabilities.  Although MortgageIT lent this borrower funds for the subject property ("Property A"), which was indicated as the borrower's primary residence, and which transaction closed on October 20, 2005, public records reveal that on October 18, 2005 the same

borrower purchased an additional property ("Property B") also in Sacramento, which transaction was a matter of public record as of October 19, 2005, but which was not reflected in the loan file. The borrower took out two loans on Property B totaling $308,000, neither of which were reflected in or accounted for in the loan file for Property A.  Based on these underwriting failures, MortgageIT was unable to ensure the borrower's ability to repay its ongoing housing payment and all recurring debt, which is a breach of the MortgageIT Underwriting Guidelines as described in the Offering Documents for this security.

607.    The Bank's review of a third mortgage loan (#40469047), secured by property in Columbus, Ohio, also reveals irregularities in the origination of this loan demonstrating that MortgageIT did *not* originate this loan in accordance with stated underwriting standards.  For example, MortgageIT approved and closed this loan under program A36SI-3PIO with guidelines (ALT-A Ver. 06/21/05 Rev. 09/19/05) using Stated Income/Stated Asset documentation.  The maximum LTV allowed under that program for cash out refinance transactions is 70%. However, MortgageIT allowed this loan to close at an LTV of 80%, exceeding the guidelines for maximum LTV based on this loan's criteria.  Based on these underwriting failures, MortgageIT did not adhere to its stated underwriting standards.

608.    The Bank's review of a fourth mortgage loan (#40457227), secured by property in Los Angeles, California, also reveals irregularities in the origination of this loan demonstrating that MortgageIT did *not* originate this loan in accordance with stated underwriting standards. For example, the borrower's housing payment is increasing from pre-purchase rent of $1,250/month to $5,067/month, or an over ***400% increase*** on a monthly basis.  This borrower reports its highest credit limit on its credit report as $11,000.  The borrower's credit profile as reflected on the credit report in the loan file does not demonstrate any current or past credit

history showing that this first time home buyer has the capacity to carry this amount of debt service. Accordingly, by failing to ensure that this borrower had the capacity to make its ongoing monthly payments to service its housing debt, MortgageIT failed to adhere to its stated underwriting guidelines.

### b. MortgageIT Manipulated the Appraisal Process.

609. The Bank's review of mortgage loan (#40457227) further demonstrates that MortgageIT did not require compliance with USPAP. Specifically, the property value reflected in the loan file is not well supported. The property transferred in June 2004 for $519,000 and for the subject transaction just over a year later in October 2005 for $850,000. Although the subject property had been refurbished, the appraiser did not use comparables that supported the stated value. The appraiser used six comparable properties—only one of which is acceptable (at five blocks east) based on distance from the subject property. The other five comparable properties are one to two miles south of the subject property, in a different marketing area. In addition, the value of this property, as determined by the AVM as of the date of the subject transaction, is $547,000. These are not merely technical violations of USPAP, but rather reflect the very types of manipulative tactics that would be used by an appraiser who was attempting to hit a specific value.

610. Additionally, in *Roland Rodriguez, by Helen G. Schwartz, as Trustee in Bankruptcy v. Independent Appraisals, LLC, et al.*, No. SUCV2011-01411-A (Commw. Ct. Mass., Suffolk Cty June 13, 2011) plaintiff alleges that Defendants, including MortgageIT, coerced the plaintiff "to purchase a dilapidated property at a grossly inflated price using massive 'no document' mortgages that the mortgage originators quickly unloaded in the secondary market for a substantial profit" while "leaving [plaintiff] with enormous mortgage indebtedness on a residential property whose true condition and market value were dramatically less than what

232

each lead [plaintiff] to believe." *Id.* at 1-2.  As part of this scheme, a mortgage broker submitted three loan applications to Mortgage IT, along with an appraisal.  *Id.* ¶ 86.  MortgageIT approved two mortgages totaling $440,000 for plaintiff to purchase the property, even though the appraisal reports contained numerous errors, including:

> i.  inaccurate descriptions of the Optioned Property and/or the neighborhood in which it was located;
>
> ii.  inaccurate descriptions of the comparable properties ("Comparables") that were used to judge the market value of the Optioned Property; and
>
> iii.  selection of Comparables that were not similar to the Optioned Property, were substantially larger and superior in style to the Optioned Property and/or located in a more expensive or secluded neighborhood than the Optioned Property.

*Id.* ¶ 28.  Thus the appraisal, conducted in December 2006, supported the sale price of $440,000 even though the property had been on the market since at least April 20, 2006 at a price significantly lower than the sale price and had not sold.  *Id.* ¶¶ 62-65, 69-70.  In fact, after being unable to sell the property at $429,000, the price was relisted at reduced prices three different times, finally being listed at $360,000 on August 31, 2006.  *Id.*

> **c.  Investigations and lawsuits demonstrate that MortgageIT engaged in predatory lending.**

611.  In the First Amended Complaint in *Royster v. MortgageIT, Inc. et al.*, No. 11-00262 (C.D. Cal. Apr. 26, 2011), plaintiff alleges that MortgageIT "concealed information from Plaintiff, including but not limited  . . . the final exact interest rate . . .; how and when any adjustments to that interest rate . . . would occur; what index or basis would be used for calculating any such interest rate adjustments . . . ; the negative effect to his home equity in the event that the scheduled or option ARM monthly payments were not sufficient to pay all accruing interest."  *Id.* ¶ 48.

612.    In *Mayes v. MortgageIT Inc., et al.*, No. 07-06142 (S.D. Cal. Aug. 20, 2007),
plaintiff—"an 81 year old financially unsophisticated senior . . . with limited education . . . [and]
diminished cognitive abilities to ascertain meaningful information from documents due to his
education and age"—alleged that MortgageIT engaged ACE Mortgage Funding, LLC "to solicit
uneducated and financially unsophisticated seniors with false promises that the seniors could
obtain a mortgage loan at an interest rate of 1.25%." *Id.* ¶ 1.  What Plaintiff received, however,
were "two loans both with adjustable interest rates that included negative amortization,
prepayment penalties and balloon payments." *Id.* ¶ 31.  Defendants, in turn, collected a total of
$29,922 in various fees.  *Id.*

613.    Moreover, to accomplish this predatory scheme, plaintiff alleged that MortgageIT
and ACE used a "Stated Income Loan" and falsely stated plaintiff's income as $9,352.  *Id.* ¶ 34.
In reality, plaintiff's monthly income totaled only $1,700 ($1,200 from social security and $500
from a pension).  *Id.* ¶ 33.

> **d.**     **The mortgages originated by MortgageIT and securitized in the
> PLMBS purchased by the Bank provide further evidence that
> MortgageIT abandoned its stated underwriting guidelines.**

614.    MortgageIT originated mortgages that secured numerous Certificates.  As
discussed in detail below, the Offering Documents contained serious material misstatements and
omissions regarding specific characteristics of the loan pools securing these Certificates,
including misstatements with respect to their weighted average LTVs and the percentages of
loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the compounded
high-risk mortgages that infected the loan pools.  Moreover, as described in paragraph 848
below, these securities have exhibited excessive delinquency and foreclosure rates.  These
circumstances are strong evidence of MortgageIT's failure to observe its stated underwriting
standards.  MortgageIT's actual practices—including the use of unreliable and biased collateral

valuations, in lieu of appraisals, and the routine granting of underwriting exceptions without compensating factors—caused it to originate loans whose actual LTVs were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

615.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was the norm at MortgageIT, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank that MortgageIT abandoned its underwriting guidelines.

## 11.   Silver State

616.    Silver State Financial Services, Inc. and Silver State Mortgage (collectively, "Silver State") originated underlying mortgage loans securing at least three of the Certificates purchased by the Bank: NAA 2006-AR4 A2, NAA 2006-AF2 5A1, and NAA 2007-1 2A1.  Silver State abandoned its stated underwriting guidelines.

**a.     Evidence from the Bank's review of loan files and a journalistic investigation indicates that Silver State abandoned its stated underwriting guidelines.**

617.    The Bank recently obtained access to and reviewed the loan file for a mortgage loan on property in Las Vegas, Nevada (#1256031676), underwritten by Silver State Financial Services, Inc., and securitized in NAA 2006-AF2 5A1.  On information and belief, Silver State's abandonment of its underwriting practices with respect to this mortgage loan was repeated by Silver State with other mortgage loans that also back securities the Bank purchased.

618.     Further analysis regarding this borrower has uncovered debts that were not disclosed in the loan file, the disclosure of which would have placed the loan outside of the lender's underwriting guidelines.  The loan application for this mortgage fails to reveal the borrower's ownership interest in a second home at a different address in Las Vegas, which obligation the borrower incurred one month prior.  The borrower's obligation on the second property was substantial.  The loan on the borrower's second property is for $400,000 with monthly payments of $2,625.  In addition, the loan application fails to reveal a second lien that the borrower also originated a month prior, in the amount of $100,000, with a monthly payment of $1,175.  In addition, the borrower had taxes and insurance obligations on this property of over $375/month.  If these debts had been included in the borrower's loan application, it would have increased the borrower's DTI to 61%.  The loan application misrepresented the outstanding obligations owed at the time of this transaction, the inclusion of which would have resulted in the DTI exceeding the lender's underwriting guidelines.

619.     Similarly, as noted below, the Bank's review of mortgage loan #1346547, which was originated by Silver State and later acquired by Morgan Stanley and securitized in MSM 2006-13AX, reveals irregularities in the origination demonstrating that this loan was not originated in accordance with MSMC's stated underwriting standards.  *See infra* ¶¶ 640-642.

620.     In May 2008, Public Radio International aired an episode of *This American Life* entitled "The Giant Pool of Money" exploring the relationship between the financial crisis and mortgage-backed securities.  The episode included an interview with Mike Garner, who was hired to work at Silver State Mortgage straight from his previous job as a bartender, having no experience or knowledge of the mortgage industry.  As Garner explained, he "was as green as you could be."  Nonetheless, Silver State tasked Garner with purchasing mortgages from brokers,

bundling two or three hundred of them together at a time, and selling them to Wall Street banks.

When Garner started, the mortgages he bought and packaged were standard mortgages that

required a down payment and proof of a steady income.  However, Garner described that as the

mortgage-backed-securities market began to take off, the guidelines governing his purchase of

mortgages became looser and looser.  He described the shift to "stated income, stated assets"

loans, under which individual income is not verified, but rather "loan officers would have an

accountant they could call up and say 'Can you write a statement saying a truck driver can make

this much money?'"  Garner stated that "[t]hen the next one came along, and it was no income,

verified assets."  Accordingly,

> You don't have to tell the people what you do for work.  All you have to do is
> state you have a certain amount of money in your bank account. And then, the
> next one is just no income, no asset.  You don't have to state anything.  Just have
> to have a credit score and a pulse.

621.    Garner further described the process by which Silver State accepted lower and

lower quality loans.  Silver State employees would complain to Garner about loans that some

other mortgage company offered but that Silver State was not allowed to offer.  Garner stated:

> Three of them would show up at your door first thing in the morning and say, I
> lost ten deals last week to Meridian Bank.  They've got this loan.  Look at the
> guidelines for this loan.  Is there any way we can do this?  We're losing deals left
> and right.

Garner would then "get on the phone and start calling all these [Wall S]treet firms or

Countrywide and say 'Would you buy this loan?' Finally, you'd find out who was buying

them."  According to Garner:

> [O]nce I got a hit, I'd call back and say, "Hey, Bear Stearns is buying this loan,
> I'd like to give you the opportunity to buy it too."  Once one person buys them, all
> the rest of them follow suit.

622.    Moreover, Sponsor and Controlling Person Defendant CitiMortgage, Inc. filed

suit against Silver State, admitting that between 2004 and 2006, Silver State sold CitiMortgage

"48 loans (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentations made by the borrower, Silver State, Silver State's directors, officers, employees, agents, independent contractors and/or affiliates; (b) where [CitiMortgage] has discovered discrepancies regarding property ownership, mortgage or other debts, and occupancy; (c) that suffer from first payment/early payment defaults; and/or (d) that have turned out to be otherwise defective or not in compliance with the [CitiMortgage] Manual or trade confirmation."  Complaint, *CitiMortgage Inc. v. Silver State Financial Services, Inc. d/b/a Silver State Mortgage*, No. 07-01533 (E.D. Mo. Aug. 29, 2007).

### b.      Silver State manipulated the appraisal process.

623.    As noted below, the Bank recently obtained access to and reviewed the appraisal report for loan # 1127122567, which was originated by Silver State and subsequently acquired by Morgan Stanley and securitized in MSM 2006-13AX.  The Bank's review revealed numerous violations of USPAP of the type that would be committed by an appraiser who was attempting to hit a specific value.  *See infra* ¶ 655.

624.    Investigations and lawsuits further demonstrate that Silver State manipulated the appraisal process. For example, the Amended Complaint filed in *City of Ann Arbor Employees' Ret. Sys. V. Citigroup Mort. Loan Trust, Inc.*, No. 08-1418 (E.D.N.Y. Apr. 6, 2009) (*"Ann Arbor* Complaint"*) describes a $176,400 mortgage issued by Silver State on a home purportedly appraised at $196,000, giving the property a LTV ratio of approximately 90% ($176,400/$196,000).  However, taking into account the true value of the home, the true LTV was actually 105% ($176,400/$168,400).  *Id.* ¶ 77.

625.    The *Ann Arbor* Complaint cites statements from a real estate appraiser in Las Vegas who conducted over 300 appraisals that in his opinion were inflated for Countrywide, Wells Fargo, Silver State, Aames, Argent and Ameriquest Mortgage ("Ameriquest"). *Id.* ¶ 81.

According to this appraiser, typically the appraisals demanded by these lenders were 15% to 25% over the actual market.  *Id.*

626.    Finally, the *Ann Arbor* Complaint details how Silver State permitted appraisers to use comparable property value from higher priced areas not within the neighborhood of the property under appraisal.  *Id.* ¶ 155.  On December 23, 2010, the *Ann Arbor* court denied defendants' motion to dismiss, noting, in part, that "[t]he SAC also includes specific examples of mortgages based upon inflated property appraisals, resulting in understated ratios." Memorandum and Order, *City of Ann Arbor Employees' Ret. Sys. V. Citigroup Mort. Loan Trust, Inc.*, No. 08-1418 (E.D.N.Y. Dec. 23, 2010).

        **c.**      **The mortgages originated by Silver State and securitized in the PLMBS purchased by the Bank provide further evidence of Silver State's abandonment of its stated underwriting guidelines.**

627.    Silver State originated mortgages that secured at least four Certificates in this action. As discussed in detail below, the Offering Documents contained serious material misstatements regarding specific characteristics of the loan pools securing these Certificates, including misstatements with respect to the weighted average LTVs of the mortgage pools and the percentages of loans with LTVs in excess of 100%, 90% and 80%.  Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and foreclosure rates.  These circumstances are strong evidence of Silver State's failure to observe its stated underwriting standards.  Silver State's practices caused it to originate loans whose actual LTVs were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

628.    In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a

deviation from the guidelines, variance from the stated standards was the norm at Silver State, and many loans were made with essentially little to no underwriting or effort to evaluate ability to repay. Nowhere did any Offering Document apprise the Bank that Silver State abandoned its underwriting guidelines.

### 12. Alliance Bancorp

629. Alliance Bancorp originated underlying mortgage loans securing at least one of the Certificates, NAA 2006-AF2 5A1. Alliance Bancorp abandoned its stated underwriting guidelines.

630. The Bank has recently obtained access to and reviewed the loan files for nine mortgage loans underwritten by Alliance Bancorp and securitized in NAA 2006-AF2 5A1.[18] The Bank's review of these loan files demonstrates that: (1) the originator did not follow stated underwriting guidelines in determining the borrower's ability to pay; (2) the borrower had significant undisclosed debts that were not taken into account in the underwriting process; and (3) the appraised values on the properties were unsupported or inadequately supported and therefore did not adhere to stated underwriting guidelines. On information and belief, Alliance Bancorp's abandonment of underwriting practices and failure to properly conduct appraisals with respect to these mortgage loans were repeated with other mortgage loans also backing this security.

631. The Bank's review of the loan file (#1256031968) secured by property in Antioch, California, is a cash-out refinance underwritten by Alliance Bancorp. With respect to the borrower's ability to pay, in this cash out refinance of the borrower's primary residence, the loan was approved using "No Ratio" documentation. The loan application lists two employers,

---

[18] The abandonment of underwriting guidelines with respect to three of these loan files are described here. The other six are described in the attached Appendix VIII.

for which the borrower is a "radiologic tech" and an "x-ray technician."  Although there are verbal verifications of employment, it is unclear if these are full-time positions.  The borrower owns six investment properties, three of which he purchased in 2005.  His total monthly debt service for his investment properties alone is $25,738.  The credit report confirmed the borrower was 120 days delinquent on an account with OMAX/CBUSA in the amount of $1,081.  The account was to have been paid in full at closing.  The HUD-1 confirms the debt was not paid, but is marked as "Buyer $1,081 POC."  Furthermore, the preliminary report shows that the borrower was delinquent on the property taxes for the subject property.  The delinquent taxes were also to have been paid at closing and are marked "Buyer $4,436.79 POC."  The monthly obligations excluding the investment properties are $9,406.62.  The borrower would need to earn upwards of $15,677 per month, or over $188,000 per year, in his capacity as an x-ray or CT technician to maintain a 60% DTI for the subject transaction and consumer debt alone.  No rental income is listed on the application for the rental properties.  The borrower would have required income of $58,574 per month, or over $702,000 per year, in order to maintain a DTI of 60% when accounting for all obligations.  The salary estimated for a radiological technician in Antioch, CA in the 75th percentile is $90,389.  Even assuming both positions were full time and the borrower's salary was in this top range, the borrower would still be over a 60% DTI considering the subject transaction and consumer debt alone.  Alliance Bancorp did not ensure the borrower's ability to manage the monthly obligations with the closing of this transaction.

632.    With respect to the borrower's undisclosed debts, the loan application for this cash out refinance does not correctly reflect all of the borrower's investment properties.  The borrower also owns another property in Antioch, California, which is not listed on the schedule of real estate owned.  Alliance Bancorp did not include the debt for the property as it appears on

the credit report.  The loan application also fails to disclose the acquisition of a property in El

Dorado Hills, California.  The website www.MERSonline.org confirms the borrower became

indebted on a first and second mortgage on this property in the amounts of $588,000 and

$147,000, respectively, on March 13, 2006.  The Real Estate Owned report also indicates the

borrower purchased a property located in Rancho, California on February 17, 2006, which was

not disclosed in the loan application.

633.    With respect to the unsupported value of this cash out refinance, although the

property last sold on April 7, 2004 for $649,500, it was appraised at $1,050,000 less than two

years later, on February 7, 2006.  This represents an appreciation of 61% in less than two years.

A field review completed on March 7, 2006 suggests that this appraisal is high, based on

comparables supposedly within one mile of the subject property.  However, a search of Google

Maps confirms the distance to the first comparable is 1.8 miles, and the distance to the second

comparable is 1.6 miles.  The second comparable was a sale that is approximately 10 months old.

Furthermore, all of the comparables are located on larger lots.  A retro value was obtained from

DataVerify which estimates the value at origination at $787,000, which is a variance of 25%.

634.    The Bank's review of the loan file (#1256031472) secured by property in

Henderson, New York was also underwritten by Alliance Bancorp and securitized in NAA 2006-

AF2 5A1.  Plaintiff's review of this loan file reveals irregularities in the origination of this loan

demonstrating that the originator did not satisfy its guideline requirement of obtaining a full

appraisal and a review appraisal.  The transaction is a cash-out refinance of the borrower's

primary residence.  The first appraisal assigned a value to the property of $2,800,000 on

December 12, 2005.  An additional appraisal on the same date completed by Brian Hineline also

values the property at $2,800,000.  A review of the appraisals confirms that the appraisers used

exactly the same comparable and adjustments in arriving at the appraised value. The appraisals are identical in almost every detail. Both confirm that the property was purchased on August 26, 2004 for $1,550,000, and therefore represent an increase of $1,250,000 in less than 16 months. The appraisers did not give any explanation for the increase in value, and list neighborhood values as stable. The invoice on Brian Hineline's appraisal listed a cost of $1,200, which is high for a standard appraisal fee. Given the similarities in the two appraisals which suggest that they were simply copied, the lender did not adequately meet its guideline requirement of obtaining a full appraisal and review appraisal.

635. The Bank's review of the loan file (#1256032007) secured by property in Vallejo, California, was also underwritten by Alliance Bancorp and securitized in NAA 2006-AF2 5A1. The loan file for this property included only a final title policy and recorded mortgage. Without any credit documentation, the lender was not able to evaluate the borrower's creditworthiness or ability to repay the loan. This loan was not originated in accordance with the lender's stated underwriting guidelines.

636. In summary, far from following its underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, these examples indicate that at Alliance Bancorp, variance from the stated standards was the norm, and many loans were made with inflated appraisals and essentially little to no underwriting or effort to evaluate ability to repay. Nowhere did any Offering Document apprise the Bank that Alliance Bancorp abandoned its underwriting guidelines.

### 13. Morgan Stanley Mortgage Capital Inc.

637. Morgan Stanley Mortgage Capital Inc. ("MSMC") is an aggregator of mortgage loans, which means it acquired, from various correspondent lenders, mortgage loans that

purportedly complied with MSMC's underwriting guidelines.  *See, e.g.*, MSM 2006-13AX Pros.

Supp. at  S-28 ("The MSMC Mortgage Loans are Mortgage Loans purchased by MSMC that

were underwritten by various correspondents generally in accordance with MSMC's loan

purchasing guidelines.").  MSMC acquired the underlying mortgage loans securing at least seven

of the Certificates purchased by the Bank: MSM 2006-13AX A1, MSM 2006-16AX 2A1, MSM

2006-8AR 1A2, MSM 2006-9AR A3, MSM 2007-2AX 2A2, MSM 2007-5AX 2A2 and MSM

2007-7AX 2A1.  MSMC abandoned its stated underwriting guidelines by routinely purchasing

mortgage loans that failed to comply with its loan purchasing guidelines.

638.    According to a company press release, beginning in October 2007, MSMC was

combined with Morgan Stanley & Co. Incorporated's servicing and loan origination business.

### a.    The Bank's review of loan files demonstrates that MSMC abandoned its stated underwriting guidelines.

639.    The Bank recently obtained access to and reviewed the loan files for numerous

mortgage loans acquired by MSMC and securitized in MSM 2006-13AX.  The Bank's review of

these loan files demonstrates that MSMC abandoned its stated underwriting standards when it

acquired the loans that secure the Certificates.  On information and belief, MSMC's

abandonment of underwriting practices and failure to require properly conducted appraisals with

respect to acquired mortgage loans was repeated with other mortgage loans backing the

Certificates.

640.    For example, the Bank's review of mortgage loan # 1127122567, acquired by

MSMC from Silver State Mortgage, reveals irregularities in the origination demonstrating that

this loan was not originated in accordance with MSMC's stated underwriting standards.  This

loan—an Alt-A loan secured by property in Las Vegas, Nevada—was a "No Ratio" loan, which

means the borrower did not have to supply income or asset information as long as the lender

received a verbal verification of the borrower's employment.  "No Ratio" loans typically require salaried borrowers to have a minimum of 2 years employment in the same business / line of work.  However, neither the application nor the verbal verification of employment ("VVOE") verified this.  In fact, the VVOE reflected that the borrower had changed employment less than 30 days prior to closing.  Specifically, although the application stated that the borrower was employed at a company called Emachinery, the VVOE disclosed that the borrower worked for The Standridge Group.  The VVOE indicated that the borrower started with Standridge on May 1, 2006 – 26 days prior to closing.

641.    Additionally, the borrower was a first time homebuyer.  Many times, in the case of Alt-A loans, first time homebuyers must satisfy additional requirements regarding FICO, credit history, and prior mortgage history or real estate ownership.  However, there was no reference to any of these documents in the loan file.  Because the borrower was 20 years old and had been renting for the previous 2 years, it is highly unlikely that she met these heightened guidelines.

642.    The Bank's review also uncovered red flags regarding the borrower's credit score and debt-to-income ratio ("DTI").  The Combined LTV ("CLTV") on this property was 100%.  Although many Alt-A programs require a high FICO in order to qualify for a 100% CLTV loan, here the borrower's FICO was a mere 623.  Moreover, although a DTI calculation is not required in the case of a "No Ratio" loan, the borrower's income would have had to be $10,124 per month in order for her to have a standard 45% DTI.  These red flags, in conjunction with the lack of employment and income documentation and the borrower's lack of mortgage history, indicate that this loan was materially defective and did not comply with MSMC's stated underwriting standards.

643.    MSMC acquired a pair of mortgages (loan Nos. 1127122583 and 1127122586)—the second closing a mere *2 days* after the first—that were issued by the same bank to the *same two borrowers*.  These mortgages were cash out refinances of investment properties, which should have been a red flag to MSMC because the borrowers could have been cashing out equity from investment properties for living expenses.  Although both mortgages were Stated Income Verified Assets loans, neither loan file <u>reflected</u> any verification of the borrowers' assets.  Moreover, where a borrower's sole source of income is from unearned income sources, mortgages typically must be underwritten with Full/Alt documentation so that an underwriter can perform a full analysis on the borrower's cash flow.  Here, however, the borrowers were issued Stated Income loans despite the fact that all of B1's income is generated from rental income and his real estate schedule reflected a net monthly *loss* of $637.47.

644.    The loan file for loan # 1127122747 reflects numerous red flags, including a note in the file from Appintelligence Reporting, a fraud prevention and identification verification company, noting the following issues: "Potential Identity Issue; Self-employment Alert; Identity Alert; Potential Occupancy Issue."  The loan was approved without any letter of explanation.

645.    The loan file for loan #1127122853 reflects a miscalculated DTI.  Although the borrower's house payment is correct and the other debt calculation is correct, the underwriter added the negative cash flow from other investment properties incorrectly.  The calculation included an investment property that was being closed simultaneously with this loan and the underwriter included rental income in the calculations.  The loan file did not reflect a lease agreement for the other property or this loan.  Moreover, the payment for the subject loan as used in the DTI calculation was $3,034, but it was actually $4,129 dues to a second mortgage in the transaction. Therefore, when you remove the non-existent rental income and add the second

mortgage, the actual DTI is 66.3%, not 47% as stated in the loan file.  Additionally, this property

had a CLTV of 100%, which typically is not permitted for investment properties.

646.     Loan # 1127123007 was a $319,960 mortgage issued to two borrowers, one of

whom was unemployed and the other having a 645 credit score.  This was a Stated Income

Verified Assets loan, which typically requires the underwriter to evaluate the reasonableness of

the borrower's stated income. Here, the first borrower stated he had a *monthly* income of

$27,600.  Although the borrower's stated employment was the owner of a trucking company,

numerous facts in the file should have raised red flags.  First, the borrower's driver's license is a

Commercial Driver's License, implying that he is a truck driver, not a manager of a large

trucking company.  Second, his business was relocating from California to Texas, which

indicates that he likely was a sole proprietor.  Using 2006 data from the Bureau of Labor

Statistics for Texas, the 90% percentile of wage earners, multiplied by a 125% premium to apply

a conservative calculation, would be $66,025 per year or $5,502 per month.  Thus, the

underwriter should have questioned the reasonableness of the borrower's stated income.

Moreover, the borrower's credit report reflects $933,656 in real estate loans, $104,137 in

installment loans, and $56,506 in revolving debt for a total indebtedness of $1,094,299.  In

addition, the borrower had 47 inquiries in the last 90 days, which reflects multiple credit checks

from creditors, and there was a letter in the file stating that he had been unsuccessful in obtaining

credit in Texas.

        **b.**      **An investigation by the Massachusetts Attorney General provides evidence that Morgan Stanley & Co. Inc. abandoned its stated underwriting guidelines.**

647.     In 2010, the Massachusetts Attorney General came to an "Assurance of

Discontinuance" with Morgan Stanley & Co. Incorporated ("Morgan Stanley & Co.") stemming

from Morgan Stanley & Co.'s funding of unfair and defective loans originated by one of the

entities from whom Mortgage Stanley & Co. purchased loans for aggregation into loan pools underlying PLMBS, New Century Financial Corporation ("New Century").  *See* Assurance of Discontinuance, *In re Morgan Stanley & Co.*, No. 10-2538 (Mass. Dist. Ct. June 24, 2010). These allegations were based on the results of an investigation into the financing, purchase, and securitization of residential mortgage loans by Morgan Stanley & Co. and its affiliates during the period of late 2005 through the first half of 2007.

648.    Morgan Stanley & Co. provided funding to New Century for new loan originations through warehouse facilities, which were lines of credit that gave New Century access to cash and "enabled New Century to quickly convert loans into cash to make additional loans." *Id.* ¶ 10.  "This enabled New Century to make more loans than it could have using only its own capital."  *Id.*  Of the investment banks providing billions of dollars, in the aggregate, in financing to New Century, Morgan Stanley & Co.'s warehouse line of credit was the largest; it committed to provide up to $3 billion of funding during 2006 and 2007.  *Id.* ¶ 12.  Morgan Stanley subsequently acted as an Underwriter for New Century's securitizations and purchased New Century's loans.

649.    With respect to certain unfair and risky ARM loans issued by New Century, the Massachusetts Attorney General found that "Morgan Stanley was aware that New Century typically qualified borrowers based on the teaser rate, and that New Century made no effort to qualify borrowers at the Fully Indexed Rate." *Id.* ¶ 19.  Such policies and procedures are presumptively unfair under Massachusetts law because state laws require a mortgage lender to determine ability to repay in accordance with the terms of the loan.  Morgan Stanley & Co. conducted an analysis in 2006, based on a 2005 internal research report that predicted that, upon reset, borrowers could expect an increase in their DTI by a factor of 1.36.  *Id.* ¶ 20.  Morgan

Stanley & Co. found "[o]n this basis, a 2006 'teaser'-based DTI ratio of 41% converts into a DTI of 56% at reset, and a 2006 teaser-based DTI ratio of 43% converts into a reset DTI ratio of 58%." *Id.* According to the Massachusetts Attorney General, "Morgan Stanley considered borrowers with DTI ratios in excess of 55% to be unable to afford their loans . . . ." *Id.* However, if this same calculus had been performed to estimate the post-reset DTI of the loans purchased by Morgan Stanley & Co., 41% would have had fully indexed DTIs greater than 55%, and 29% would have had fully indexed DTIs over 60%. *Id.* All told, "about 45% of the borrowers would not have qualified [for purchase by Morgan Stanley] had the borrower's ability to pay been assessed using Morgan Stanley's reset DTI analysis." *Id.*

650.    The Massachusetts Attorney General found that, as a result of Morgan Stanley & Co.'s due diligence process, it was aware of quality problems with the subprime loans it was purchasing from New Century by late 2005, including "sloppy underwriting for many loans and stretching of underwriting guidelines to encompass or approve loans not written in accordance with the guidelines." *Id.* ¶ 23. Although Morgan Stanley & Co. began rejecting greater numbers of New Century loans in late 2005 and early 2006, it reversed course by April of 2006 when faced with the prospect of losing New Century's business. At that point, one of Morgan Stanley & Co.'s senior bankers purchased 228 loans that Morgan Stanley & Co.'s diligence team had initially rejected. *Id.* ¶ 25. According to the Massachusetts Attorney General, "Morgan Stanley's diligence teams began to be more responsive to New Century's desire to include additional loans in the purchase pools." *Id.*

651.    Consequently, "the large majority" of the loans in Morgan Stanley & Co.'s 2006-2007 New Century pools "were identified by Clayton as having some type of exception. Most loans had multiple exceptions." *Id.* ¶ 26. Moreover, in instances where Clayton found "material

exceptions" to the guidelines, Clayton found that only 9% had sufficient compensating factors to offset such exceptions. *Id.* ¶ 27. Nonetheless, Morgan Stanley & Co. "waived exceptions on and purchased a large number of the loans found by Clayton to violate guidelines without sufficient compensating factors."[19] *Id.* ¶ 28. In fact, in the last three quarters of 2006, Morgan Stanley & Co. "waived more than half of all material exceptions found by Clayton" and "purchased a substantial number of New Century loans found by Clayton to violate guidelines without sufficient compensating factors." *Id.* Moreover, the Massachusetts Attorney General found that "loans with certain exceptions such as high DTIs or high LTVs or CLTVs that were in excess of underwriting guidelines but within a tolerance found acceptable to Morgan Stanley were purchased without a review by Clayton for compensating factors." *Id.* ¶ 29.

652. The Massachusetts Attorney General also found significant defects in Morgan Stanley & Co.'s valuation diligence process. Morgan Stanley & Co. employed "broker price opinions" to confirm the value of properties securing loans purchased from New Century. Despite Morgan Stanley & Co.'s stated policy to not purchase and securitize loans where the LTV or CLTV exceeded 100%, the Attorney General found that Morgan Stanley & Co. purchased and securitized "numerous loans where the LTV or CLTV based on the [broker-price-opinion]-checked value . . . exceeded that threshold." *Id.* ¶ 34. Overall, 31% of the New Century loans securitized by Morgan Stanley & Co. in 2006 and 2007 upon which broker price opinions were received had broker-price-opinion-based CLTVs greater than 100%. *Id.* Of those loans, 60% had CLTVs greater than 105%, and 19% had CLTVs greater than 120%. *Id.*

653. Finally, the Massachusetts Attorney General discovered misrepresentations of the stated income for mortgages purchased by Morgan Stanley & Co. from New Century. "As early

---

[19] Clayton is a third party due-diligence firm. *See infra* § V.D.4.

as October 2005, Morgan Stanley & Co.'s diligence team determined, in reviewing and rejecting loans for purchase, that the stated income on a number of New Century loans was unreasonable." *Id.* ¶ 39.  Clayton found that of the New Century loans it reviewed that were stated income loans, "[o]n average, the stated income of these borrowers was approximately 42% higher than the income of fully documented borrowers." *Id.*

**c.**  **MSMC acquired mortgages based upon artificially inflated appraisals.**

654.    The Bank recently obtained access to and reviewed the appraisal reports for numerous mortgage loans acquired by MSMC and securitized in MSM 2006-13AX. The Bank's review of these appraisal reports demonstrates that MSMC routinely used appraisals that violated USPAP, and otherwise originated loans based on false and inflated valuations of collateral.

655.    For example, the appraisal report for loan # 1127122567, which was acquired by MSMC from Silver State Mortgage, reflects that adjustments in Sales Comparison Analysis have not been explained and analyzed for the comparable sales, in violation of USPAP Standard Rules 1-1(a), 1-1(b) and 1-4(a).  Additionally, this appraisal report reflects a violation of USPAP Standard Rule 1-4(b), which provides that "[w]hen a cost approach is necessary for credible assignment results, an appraiser must . . . develop an opinion of site value by an appropriate appraisal method or technique."  Appropriate appraisal methods require providing support for valuations.  Contrary to this requirement, the appraiser merely stated, without any support:

> In estimating site value, the Appraiser has relied on personal knowledge of the local market. This knowledge is based on prior and/or current analysis of site sales and /or extraction of site values from sales of improved properties.

Similarly, the appraiser failed to provide any explanation for his use of a gross rent multiplier of 273 under the income approach, in violation of USPAP Standard Rule 1-4(c).  Finally, the appraisal did not provide any reconciliation for the sales comparison approach, in violation of USPAP Standard Rule 1-6.

656. Similarly, the appraisal report for loan # 1127123276 contains a number of violations of USPAP Standard Rules 1-1(a), 1-1(b) and 1-4(a). First, the appraiser stated there was no adjustment made for concessions for each of the comparables, but failed to provide any explanation for these decisions. Second, although it is common practice to verify the details of the transaction with one or more of the parties involved, there is no indication in the appraisal report that this was done.

657. Moreover, the appraisal report for loan #1127122853 reflects inconsistencies in the adjustments to the sale prices of comparable properties. For example, although the appraiser made adjustments to comparable sale Nos. 1 and 3 for gross living area at $40 per square foot, not such adjustments were made for comparable sales Nos. 2 and 4. Additionally, comparable sale No. 4 should have been adjusted for site size and -$10,000 for an additional bath, the appraiser made no adjustment for site size and only -$5,000 for the bath adjustment.

658. These are not merely technical violations of USPAP, but rather reflect the very types of manipulative tactics that would be used by an appraiser who was attempting to hit a specific value.

> **d. The mortgages originated by MSMC and securitized in the PLMBS purchased by the Bank provide further evidence that Morgan Stanley Mortgage abandoned its stated underwriting guidelines.**

659. MSMC originated (or aggregated) mortgages that secured at least the seven Certificates set forth above. As discussed in detail below, the Offering Documents contained serious material misstatements and omissions regarding specific characteristics of the loan pools securing these Certificates, including misstatements with respect to their weighted average LTVs and the percentages of loans with LTVs in excess of 100%, 90% and 80%, and the failure to disclose the compounded high-risk mortgages that infected the loan pools. Moreover, as described in paragraph 848 below, these securities have exhibited excessive delinquency and

foreclosure rates.  These circumstances are strong evidence of MSMC's failure to perform adequate due diligence with respect to the mortgages it purchased for deposit in the mortgage pools to determine if the mortgages were originated in accordance with stated underwriting standards.  MSMC's failure to perform adequate due diligence caused the deposit into the mortgage pool of mortgages whose actual LTVs were far different from that reported in the Offering Documents, and whose likelihood of default was much higher than that of loans issued under underwriting standards of the type described in the Offering Documents.

660.    In summary, far from assuring compliance with the underwriting guidelines described in the Offering Documents, MSMC purchased and deposited in the mortgage pools loans that had been originated under practices where variance from the stated standards was the norm; many of the loans were made with essentially little to no underwriting or effort to evaluate ability to repay.  Nowhere did any Offering Document apprise the Bank that MSMC's due diligence permitted this abandonment of stated underwriting guidelines and that it engaged in predatory lending.

### 14.    Other Mortgage Originators Originating Loans Underlying the PLMBS Also Abandoned Their Stated Underwriting Guidelines and Engaged in Predatory Lending in Order to Issue Loans for Securitization

661.    Other mortgage originators who originated loans underlying the Certificates in this action, including those whose origination practices are outlined in Appendix IX, also abandoned their stated underwriting guidelines, did not conduct appraisals in conformance with applicable requirements, and engaged in predatory lending.  The practices of these originators were not disclosed in the Offering Documents, rendering them materially false and misleading, as set forth in more detail below.

**D.**     **The Securitization Process Was Plagued by Conflicts of Interest and Misplaced Incentives**

662.     A handful of large financial institutions dominated every aspect of the mortgage securitization process.  They owned many of the mortgage originators, and funded the lending activities of many of the originators they did not own outright.  As a result, these financial institutions—and the Sponsors, Depositors and Underwriters that were divisions of these financial institutions—were in a position to scrutinize the practices of the originators and examine closely the mortgages placed in the pools.  Indeed, they had the legal responsibility to do so and to provide investors with complete and accurate information.

**1.**     **The Vertical Integration of Many of the Firms Involved in the Issuance of the PLMBS Purchased by the Bank Provided the Securities Defendants with Access to Information Regarding the Abandonment of Underwriting Guidelines, the Manipulation of the Appraisal Process, and Predatory Lending Practices.**

663.     Many of the PLMBS purchased by the Bank were issued by vertically integrated firms which were involved in several if not all of the stages of the securitization of the PLMBS—loan origination, sponsoring, obtaining credit ratings, issuing, underwriting, and/or selling the securities.  The following table summarizes the vertical integration of the entities involved in various stages of origination, securitization and sales of the PLMBS purchased by the Bank.

| Controlling Entities | Certificate | Roles of Affiliated Entities | |
|---|---|---|---|
| Bank of America Corporation | BAFC 2005-H 7A1 BAFC 2006-D 1A1 | Sponsor: | Bank of America, National Association |
| | | Originator: | Bank of America, National Association |
| | | Underwriter: | Banc of America Securities LLC |
| | | Depositor: | Banc of America Funding Corporation |
| | | Servicer: | Bank of America, National Association |

254

| Controlling Entities | Certificate | Roles of Affiliated Entities | |
|---|---|---|---|
| Barclays Bank PLC | BCAP 2006-AA1 A1 | Underwriter:<br>Depositor: | Barclays Capital Inc.<br>BCAP LLC |
| The Bear Stearns Companies Inc. | SAMI 2006-AR4 4A1<br>SAMI 2006-AR6 1A1<br>SAMI 2006-AR7 A1A<br>SAMI 2005-AR6 2A1<br>SAMI 2005-AR3 1A1<br>SAMI 2005-AR2 1A1<br>LUM 2005-1 A1<br>LUM 2006-3 11A1<br>LUM 2006-7 2A1<br>BSMF 2006-AR1 1A1<br>BSMF 2006-AR2 1A1<br>BSMF 2006-AR3 1A1<br>BSMF 2006-AR5 1A1<br>BSMF 2007-AR1 1A1<br>BSMF 2007-AR4 1A1<br>BSMF 2007-AR5 1A1A<br>BALTA 2005-8 11A1<br>BALTA 2005-9 11A1<br>BALTA 2005-10 11A1<br>BALTA 2006-1 11A1<br>BALTA 2006-2 11A1<br>BALTA 2006-3 1A1<br>BALTA 2006-4 11A1<br>BALTA 2006-4 13A1<br>BALTA 2006-5 1A1<br>BALTA 2006-6 1A1<br>BALTA 2006-7 1A1<br>BALTA 2007-1 1A1<br>BALTA 2007-2 1A1<br>BALTA 2007-3 1A1<br>GPMF 2005-AR1 A2<br>GPMF 2005-AR2 A1<br>GPMF 2005-AR4 4A1A<br>GPMF 2006-AR3 4A1 | Sponsor:<br>Corporation<br>Originator:<br><br>Originator:<br>Corporation<br>Underwriter:<br>Depositor:<br><br>Depositor:<br><br><br>(Master)<br>Servicer: | EMC Mortgage<br><br>Bear Stearns Residential<br>Mortgage Corporation<br>EMC Mortgage<br><br>Bear, Stearns & Co. Inc<br>Bear Stearns Asset<br>Backed Securities I LLC<br>Structured Asset<br>Mortgage Investments II<br>Inc.<br><br>EMC Mortgage<br>Corporation |
| Chevy Chase Bank, F.S.B. | CCMFC 2006-2A A1<br>CCMFC 2007-1A A1<br>CCMFC 2007-2A A1 | Sponsor:<br>Originator:<br>Originator:<br><br>Depositor:<br><br>Master<br>Servicer: | Chevy Chase Bank, F.S.B.<br>Chevy Chase Bank, F.S.B.<br>B.F. Saul Mortgage<br>Company<br>Chevy Chase Funding<br>LLC<br><br>Chevy Chase Bank, F.S.B. |

| Controlling Entities | Certificate | Roles of Affiliated Entities | |
|---|---|---|---|
| Citigroup Inc.<br><br>Citigroup Financial Products, Inc.<br><br>CitiMortgage, Inc. | CMALT 2007-A4 1A7<br>CMLTI 2005-9 1A1 | Sponsor:<br>Sponsor:<br><br>Originator:<br>Underwriter:<br><br>Depositor:<br><br>Depositor:<br><br>Master Servicer:<br>Trust Administrator:<br>Paying Agent:<br>Transfer Agent:<br>Authenticating Agent:<br>Certificate Registrar: | CitiMortgage, Inc.<br>Citigroup Global Markets              Realty Corp.<br>CitiMortgage, Inc.<br>Citigroup Global Markets, Inc.<br>Citicorp Mortgage Securities, Inc.<br>Citigroup Mortgage Loan Trust Inc.<br><br>CitiMortgage, Inc.<br><br>CitiMortgage, Inc.<br>Citibank, N.A.<br>Citibank, N.A.<br><br>Citibank, N.A.<br><br>Citibank, N.A. |
| Countrywide Financial Corporation | CWALT 2005-16 A4<br>CWALT 2005-86CB A10<br>CWALT 2006-OA8 1A1<br>CWALT 2006-OA16 A2<br>CWALT 2007-OA4 A1<br>CWALT 2007-OA9 A1<br>CWHL 2005-2 2A1 | Sponsor:<br><br>Originator:<br><br>Depositor:<br>Depositor:<br>Underwriter:<br><br>Master Servicer: | Countrywide Home Loans, Inc.<br>Countrywide Home Loans, Inc.<br>CWALT, Inc.<br>CWMBS, Inc.<br>Countrywide Securities Corporation<br><br>Countrywide Home Loans Servicing LP |
| Credit Suisse Holdings (USA), Inc.<br><br>Credit Suisse (USA), Inc. | ARMT 2006-1 6A1<br>ARMT 2006-2 6A1<br>ARMT 2006-3 4A2<br>ARMT 2007-1 5A1<br>ARMT 2007-2 2A21 | Sponsor:<br><br>Sponsor:<br><br>Originator:<br><br>Originator:<br><br>Depositor:<br><br>Underwriter: | Credit Suisse Securities (USA) LLC<br>DLJ Mortgage Capital, Inc.<br>Credit Suisse Financial Corporation<br>DLJ Mortgage Capital, Inc.<br>Credit Suisse First Boston Mortgage Securities Corp.<br>Credit Suisse Securities (USA) LLC |

| Controlling Entities | Certificate | Roles of Affiliated Entities | |
|---|---|---|---|
| DB U.S. Financial Market Holding Corporation | MHL 2005-5 A1<br>MHL 2006-1 1A2<br>DBALT 2006-AR2 1A1<br>DBALT 2006-AR2 1A2<br>DBALT 2006-AR3 A2<br>DBALT 2006-AR4 A1<br>DBALT 2006-AR5 1A1<br>DBALT 2007-AR1 A1 | Sponsor:<br><br>Sponsor:<br>Sponsor:<br><br>Originator:<br>Depositor:<br><br>Depositor:<br><br>Underwriter:<br><br>Custodian: | DB Structured Products, Inc.<br>MortgageIT, Inc.<br>Mortgage IT Holdings, Inc.<br>MortgageIT, Inc.<br>Deutsche Alt-A Securities, Inc.<br>Mortgage IT Securities Corp.<br>Deutsche Bank Securities Inc.<br>Deutsche Bank National Trust Company |
| Greenwich Capital Holdings, Inc | DSLA 2005-AR1 2A1A<br>DSLA 2005-AR2 2A1A<br>HVMLT 2007-1 2A1A<br>HVMLT 2006-8 2A1A<br>HVMLT 2006-7 2A1A<br>HVMLT 2005-10 2A1A<br>MHL 2006-1 1A2 | Sponsor:<br><br>Depositor:<br><br>Underwriter: | Greenwich Capital Financial Products, Inc.<br>Greenwich Capital Acceptance, Inc.<br>Greenwich Capital Markets, Inc. |
| Impac Mortgage Holdings, Inc.<br><br>Impac Funding Corporation | IMSA 2006-2 1A2A<br>IMSA 2005-2 A1<br>IMM 2005-7 A1 | Sponsor:<br><br>Sponsor:<br><br>Originator:<br><br>Depositor:<br>Depositor:<br><br>Master Servicer: | Impac Funding Corporation<br>Impac Mortgage Holdings, Inc.<br>Impac Funding Corporation<br>IMH Assets Corp.<br>Impac Secured Assets Corp.<br>Impac Funding Corporation |
| JPMorgan Chase & Co.<br><br> JPMorgan Securities Holdings LLC, | JPALT 2006-A2 1A1<br>JPALT 2006-A1 1A1<br>JPALT 2007-A2 12A1<br>JPALT 2006-A3 1A1<br>JPMMT 2005-ALT1 2A1 | Sponsor:<br><br>Originator:<br>Originator:<br><br>Depositor:<br><br>Underwriter:<br>Custodian:<br><br>Servicer: | J.P. Morgan Mortgage Acquisition Corp.<br>Chase Home Finance LLC<br>JPMorgan Chase Bank, N.A.<br>J.P. Morgan Acceptance Corporation I<br>J.P. Morgan Securities Inc.<br>JPMorgan Chase Bank, N.A.<br>JPMorgan Chase Bank, N.A. |

| Controlling Entities | Certificate | Roles of Affiliated Entities | |
|---|---|---|---|
| Merrill Lynch & Co., Inc | MANA 2007-A3 A2A | Sponsor: | Merrill Lynch Mortgage Lending, Inc. |
| | | Depositor: | Merrill Lynch Mortgage Investors, Inc. |
| | | Underwriter: | Merrill Lynch, Pierce, Fenner & Smith Incorporated |
| Morgan Stanley | MSM 2006-13AX A1 MSM 2006-16AX 2A1 MSM 2006-8AR 1A2 MSM 2006-9AR A3 MSM 2007-2AX 2A2 MSM 2007-5AX 2A2 MSM 2007-7AX 2A1 | Sponsor: | Morgan Stanley Mortgage Capital Inc. |
| | | Originator: | Morgan Stanley Mortgage Capital Inc. |
| | | Depositor: | Morgan Stanley Capital I Inc. |
| | | Underwriter: | Morgan Stanley & Co. Inc. |
| | | Servicer: | Morgan Stanley Credit Corp. |
| Nomura Holding America, Inc. | NAA 2006-AF2 5A1 NAA 2006-AR4 A2 NAA 2007-1 2A1 NAA 2007-3 A1 | Sponsor: | Nomura Credit & Capital, Inc. |
| | | Depositor: | Nomura Asset Acceptance Corporation |
| | | Underwriter: | Nomura Securities International, Inc. |
| GMAC LLC GMAC Mortgage Group, Inc. | RALI 2006-QO10 A1 RALI 2007-QS6 A29 RALI 2005-QA9 NB41 RALI 2006-QA2 1A1 RALI 2006-QA3 A1 LUM 2006-6 A1 | Sponsor: | Residential Funding Company, LLC |
| | | Originator: | Homecomings Financial, LLC |
| | | Originator: | GMAC Mortgage Corporation |
| | | Originator: | Residential Funding Company, LLC |
| | | Depositor: Loans, | Residential Accredit |
| | | | Inc. |
| | | Master Servicer: | Residential Funding Company, LLC |
| | | Servicer: | GMAC Mortgage Corporation |
| | | Servicer: | Homecomings Financial, LLC |

| Controlling Entities | Certificate | Roles of Affiliated Entities | |
|---|---|---|---|
| UBS Americas Inc. | MARM 2005-7 2A1 MARM 2005-8 1A1 MARM 2007-R5 A1 | Sponsor: | UBS Real Estate Securities Inc. |
| | | Sponsor: | UBS Securities LLC |
| | | Depositor: | Mortgage Asset Securitization |
| | | Transactions, | |
| | | | Inc. |
| | | Underwriter: | UBS Securities LLC |
| Wells Fargo & Company  Wells Fargo Bank, National Association | WFMBS 2006-AR12 1A1 | Sponsor: | Wells Fargo Bank, National Association |
| | | Originator: | Wells Fargo Bank, National Association |
| | | Depositor: | Wells Fargo Asset Securities Corp. |
| | | Master Servicer: | Wells Fargo Bank, National Association |

664.    Between 2005 and 2007, the number of vertically integrated firms grew significantly because investment banks and other issuers of mortgage-backed securities sought to ensure a steady supply of mortgage loans for securitization and sale to investors.  Yet, as a result of the direct involvement in the origination of the loans they securitized, the vertically integrated firms, and specifically, the Sponsor, Depositor/Issuer and Underwriter affiliates of the firms, had access to and ignored red flags raised by information regarding the underwriting abuses of the mortgage originators.

665.    For example, in securitizing the SAMI, LUM, BSMF, BALTA, and GPMF Certificates, EMC Mortgage Corporation—as Sponsor of the issuances—should have known what its affiliates EMC Mortgage Corporation and Bear Stearns Residential Mortgage Corporation were doing when they originated the underlying mortgage loans.  The same is true for the other vertically integrated entities listed above, many of whom, like the EMC and Bear Stearns entities, had corporate affiliates that originated the substandard loans underlying the Certificates purchased by the Bank, or had corporate affiliates that served as Sponsors that

purchased and assembled the substandard loans into securities that were sold to the Bank.

Unfortunately, the vertical integration of these firms created enormous incentives for affiliated

originators and Sponsors to loosen standards so that more loans could be issued and more

securitizations sold.  In this regard, the Sponsor, Depositor/Issuer, and Underwriter Defendants

should have been aware of the quality of the loans they were bundling for securitization and

selling to investors, like the Bank.

666.    Rather than use their superior access to information about the underlying

mortgage pools, the Sponsor, Depositor/Issuer and/or Underwriter Defendants at the vertically

integrated firms accepted defective loans that their affiliates purchased or originated for

securitization.  The reason was straightforward.  They made more money that way—on the front

end, when issuing the loans, and on the back end, when securitizing them.  Adequate due

diligence and exclusion of defective loans would have cut into their profits and slowed down the

securitization machine.

667.    Moreover, even those Securities Defendants that did not have corporate affiliates

involved in concocting the risky PLMBS sold to the Bank still had corporate affiliates intimately

involved in the creation and marketing of mortgage-backed securities.  Given these corporate

affiliations, all of the Securities Defendants should have known, and failed to disclose, the

substantial risks associated with mortgage-backed securities.

**2.      Financial Ties Between the Investment Banks and Non-Bank Lenders
         Provided the Securities Defendants with Access to Information Regarding
         the Mortgage Originators' Failure to Adhere to Underwriting Guidelines
         and Predatory Lending Practices.**

668.    Even where the parties involved in the securitization were not all affiliated under

a single parent—for example, where a Sponsor purchased the loans from an unaffiliated

mortgage originator—the Sponsor, Depositor/Issuer, and Underwriter Defendants had access to

abundant information about the mortgage originators' abandonment of underwriting guidelines and predatory lending practices. This was the result of the close financial ties between the unaffiliated mortgage lenders and the financial institutions that funded them.

669.   Examples of this relationship are the credit facilities that mortgage originators maintained with the financial institutions involved in the securitization and underwriting of the PLMBS backed by those originators' loans. For example, Countrywide Financial Corp., collectively with its origination subsidiary, Countrywide Home Loans, Inc., had credit agreements with Bank of America, J.P. Morgan Chase, Citicorp USA (part of Citigroup), Barclays, and Deutsche Bank, which funded Countrywide's origination business. *See* John Dunbar & David Donald, *The Roots of the Financial Crisis: Who Is to Blame?* (May 6, 2009), http://www.publicintegrity.org/investigations/economic_meltdown/articles/entry1286 (noting that 21 of the 25 largest subprime lenders were financed by Wall Street banks).

670.   Mortgage originators, including those that issued loans backing the PLMBS purchased by the Bank, depended on credit facilities of this sort to fund their operations. The originators borrowed from these credit facilities, pursuant to "warehouse agreements" so that they could continue to make loans to home buyers. When loans were sold, the originators repaid the warehouse agreements. When loans serving as collateral lost value, the financial institutions made margin calls requiring the originators to pay cash to the institutions. In connection with this process, the mortgage originators provided the financial institutions with documents about the underlying loans, including performance characteristics and early warning signs of poor credit quality. The files were then passed to other divisions of the financial institutions for review and securitization. *See* Mortgage Bankers Association Warehouse Flowchart: Securitization, *available at*

http://www.mbaa.org/files/ResourceCenter/WarehouseLending/FlowchartSecuritization.pdf (last visited Apr. 15, 2011).

671.    The financial institutions also entered into purchase agreements with unaffiliated originators so that the financial institutions were assured access to batches of mortgage loans to securitize, and the originators were guaranteed a buyer for the mortgage loans they made.  As part of the agreement, the financial institutions typically set the prices and quantities of the types of loans they wanted to buy, and also gained access to loan information prior to purchase.

672.    The investment banks that operated credit facilities for non-bank lenders and entered into purchase agreements did not limit their activities to just funding the lenders.  To the contrary, they funded the lenders so that the lenders could issue more loans for the investment banks to purchase and securitize.  These inter-relationships are illustrated by the warehouse lines of credit that were extended to AHM, an originator of loans that backed many Certificates in this action:

| Certificate | **Warehouse Line of Credit with: | Sponsor of the PLMBS | Depositor/Issuer of the PLMBS | Underwriter Defendant for the PLMBS |
|---|---|---|---|---|
| LUM 2006-7 2A1 | Barclays Bank PLC | | | Barclays Capital Inc. |
| LUM 2006-7 2A1 | Bear, Stearns & Co. Inc | | | Bear, Stearns & Co. Inc |
| DBALT 2006-AR5 1A1; DBALT 2007-AR1 A1 | Deutsche Bank | DB Structured Products, Inc. | Deutsche Alt-A Securities, Inc. | Deutsche Bank Securities Inc. |
| HVMLT 2006-7 2A1A | Greenwich Capital Financial Products, Inc. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Markets, Inc. |

| Certificate | **Warehouse Line of Credit with: | Sponsor of the PLMBS | Depositor/Issuer of the PLMBS | Underwriter Defendant for the PLMBS |
|---|---|---|---|---|
| JPALT 2007-A2 12A1 | J.P. Morgan Chase | J.P. Morgan Mortgage Acquisition Corp. | J.P. Morgan Acceptance Corporation I | J.P. Morgan Securities Inc. |

**Source:* American Home Mortgage Investment Corp., 2006 Annual Report (Form 10-K), at 57-58 (March 1, 2007).

673.     As the chart shows, the same investment banks that offered warehouse lines of credit to AHM purchased the loans as Sponsor, deposited them into trusts as Depositor, securitized and issued them as Issuer, and as Underwriter underwrote the securities backed by the loans.  Because the investment banks were involved in several if not all of the steps of securitization, they had access to information about the problems in the loan pools.

674.     In addition, the Sponsor, Depositor/Issuer and Underwriter Defendants had access to knowledge about the mortgage originators' practices as a result of their direct role negotiating with the originators regarding the quality and characteristics of the loans in the mortgage pools they purchased.

**3.     Conflicts of Interest Undermined Adequate Due Diligence and Disclosure to Investors.**

675.     The multiple roles of large financial institutions in the securitization process created conflicts of interest that encouraged these institutions not to engage in adequate due diligence on the loan pools.  For example, these financial institutions did not use their influence and control over the mortgage origination process to ensure that underwriting guidelines were followed, because to do so might have jeopardized repayment of their warehouse lines of credit.  By keeping the mortgage origination wheel turning, these financial institutions (by and through the Certificates' Sponsors, the Depositor/Issuer Defendants, and the Underwriter Defendants) not only ensured repayment on existing warehouse lines, but also paved the way for ever-increasing

lines in the future, with additional short-term profits.  While these financial institutions

eventually shut down their lines of credit, they did so only after the originators' financial

condition deteriorated to the point that the financial institutions faced the risk of non-payment on

their lines of credit.  Ironically, this risk was created by ever increasing numbers of repurchase

demands by the financial institutions themselves for defective loans sold to the banks by the

originators.

676.    For example, Merrill Lynch Mortgage Capital, an affiliate of Underwriter

Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc., provided warehouse lines of credit to

subprime originator OwnIt.  Pleadings filed in OwnIt's bankruptcy reveal that Merrill Lynch

Mortgage Capital was a secured creditor on its warehouse line of credit to OwnIt for $633

million.

677.    Furthermore, papers filed in OwnIt's bankruptcy proceedings show that Merrill

Lynch LP Holdings, Inc., another affiliate of Defendant Underwriter Merrill Lynch, Pierce,

Fenner & Smith, Inc., holds an unsecured mortgage repurchase claim against OwnIt, arising

from its right to compel repurchases of mortgage loans it purchased from OwnIt.  The amount of

such claim is estimated at $92.96 million, which is 20% of the principal balance of the mortgages

loans subject to repurchase.

678.    Similar conflicts prevented the investment banks from insisting on compliance

with underwriting guidelines when they purchased loans at "loan auctions."  At the loan

auctions, the mortgage originators set a date and time for the Sponsors to purchase a block of

mortgage loans.  In advance of the auction, the mortgage originator provided certain potential

bidders with a bid stipulation sheet that described the general characteristics of the loan pool

being auctioned and the variance rate of the pool.  The investment banks depended on the

auctions to feed loans into their securitization machines.  But investment banks feared that they would lose access to the bid stipulations sheets and other information from mortgage originators if they conducted rigorous quality reviews of the subject mortgages and rejected loans as being non-compliant with the mortgage originators' stated guidelines.  Thus, to curry favor with the mortgage originators and assure a continued pipeline of mortgages (however flawed) for securitization, the parties who should have protected the quality of the mortgages being deposited into the pools instead failed to conduct adequate due diligence.

679.    Simply put, as a result of corporate affiliations and conflicted relationships in the industry, the investment banks, by and through the Securities Defendants, including the Sponsors and affiliated Depositor/Issuers, and Underwriters, failed to appropriately fulfill their due diligence function with respect to the mortgages placed in the pools.  Rather than conducting the appropriate due diligence on the loan pools, and either rejecting loans that failed to meet underwriting standards or adequately disclosing the true risks of the Certificates, the Securities Defendants utilized the securitization process to pass the risk of default down the line to investors, such as the Bank, through the use of materially false and misleading Offering Documents.

**4.    The Sponsor Defendants, Underwriter Defendants, and Mortgage Originators Limited Third-Party Firms' Due Diligence and Misused the Results of That Due Diligence.**

680.    Due diligence reviews were purportedly performed at three different levels of the securitization chain.  First, certain of the mortgage originators purportedly conducted post-purchase due diligence reviews of a sampling of mortgages they acquired from third-party originators.  Second, with respect to certain PLMBS backed by mortgages acquired by Sponsors from unaffiliated originators, the Sponsor Defendants purportedly conducted due diligence reviews of the mortgages prior to their acquisition and securitization.  Third, the Underwriter

Defendants conducted due diligence reviews of a sample of the mortgage loans in the loan pools

prior to selling the PLMBS.  In each case, these due diligence reviews allegedly were undertaken

to ensure that the mortgages were of adequate credit quality and that they were underwritten in

compliance with applicable underwriting standards.  However, in reality, these entities ignored

and manipulated the data they received regarding the poor quality of the mortgages.

> **a.**    **The Securities Defendants, Underwriter Defendants, and mortgage
> originators used third-party due diligence providers to review the
> mortgage loans securing the PLMBS.**

681.    Information obtained from press reports, government investigations and

confidential sources demonstrates that the Sponsor and Underwriter Defendants, as well as

certain mortgage originators, retained third-party due diligence firms to conduct loan pool due

diligence, yet both limited the due diligence process and disregarded the results of the process.

682.    The two firms that dominated the third-party due diligence market were Clayton

Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan").  Upon information and belief, both

Clayton and Bohan were retained by the Sponsor Defendants and certain mortgage originators to

conduct third-party reviews of loans pools they purchased.  Additionally, these firms were hired

by the Underwriter Defendants to review the quality of the mortgage loans underlying the

PLMBS before they sold the Certificates to investors, including the Bank.  In 2006, Clayton

monitored over $418 billion in loans underlying mortgage-backed Certificates, which

represented 22.8% of the total outstanding U.S. non-GSE mortgage-backed Certificates at such

date.  During 2006, 2005, and 2004, Clayton worked with each of the ten largest non-GSE

mortgage-backed securities Underwriters, as ranked by *Inside MBS & ABS* magazine*,* which

accounted for 73%, 73%, and 78% of total underwriting volume during those respective periods.

683.    Confidential sources, who worked at Clayton during the relevant time period and

were familiar with the identity of Clayton's clients and the due diligence performed by Clayton

during the relevant time period, named several different entities they knew had hired Clayton to perform due diligence on loan pools. These confidential sources include: CS-35, an underwriting consultant at Clayton from 1999 until 2006, who underwrote mortgage-backed securities for a "lot of investment banks" that hired Clayton; and CS-37, who worked as a valuation specialist at Clayton from January 2006 until March 2008 and reviewed appraisals and properties in loan files on behalf of investment banks that hired Clayton.

684. Together, CS-35 and CS-37 confirmed that Clayton was hired to perform due diligence on underlying loan pools by such sponsors, underwriters, and originators as Morgan Stanley, RBS Greenwich, Countrywide, Nomura, Washington Mutual, Deutsche Bank, and Lehman Brothers. Media reports also indicate that Clayton Holdings did work for Goldman Sachs and Merrill Lynch. Gretchen Morgenson, *Raters Ignored Proof of Unsafe Loans*, N.Y. Times, Sept. 26, 2010.

685. Less information is publicly available about Bohan's due diligence business because it is a privately held company. However, press reports and confidential sources confirm that Bohan provided third-party loan pool due diligence to a large number of financial institutions. For example, CS-38, who worked as an underwriter at Bohan from 2003 to 2006 and reviewed loans that Bohan's clients were considering for securitization, said that Bohan's clients included Morgan Stanley, Chase, Deutsche Bank, J.P. Morgan, and others.

> **b. The Sponsor Defendants, Underwriter Defendants, and mortgage originators directed the due diligence process and were provided with detailed reports describing the results of the process, and thus should have known that loan pools included defective loans.**

686. The sponsors, underwriters, and originators that retained Clayton and Bohan, and other third-party due diligence firms for loan pool review, maintained close contact with and influence over the process. As explained by Vicki Beal, Senior Vice President of Clayton

Holdings in her September 23, 2010 written testimony before the FCIC, the loan review process

is conducted as follows:

- A client reviews a pool of loans and selects a sample of loans for diligence review. . . .

- Client hires Clayton to perform diligence on the sample. Client gives Clayton's Client Services Manager instructions on the type and scope of review and the time frame for the deal.

- Client sends or has sent to Clayton a tape containing loan information from the originator, which Clayton programmers "crack" and load into our CLAS system.

- At the end of each day, the lead underwriter generates reports for the client that summarize Clayton's findings, including exception reports.

687.    Confidential sources confirm that due diligence reports are provided to the

financial institutions that retained the third-party due diligence firms.  According to CS-37,

Clayton's clients "had access to our [Clayton's] databases," and "could see everything."

688.    As Ms. Beal reported to the FCIC: "The work product produced by Clayton is

comprised of reports that include loan-level data reports and loan exception reports.  Such

reports are "works for hire," the property of our clients and provided exclusively to our clients."

Thus, on information and belief, the financial institutions that hired Clayton (including many of

the Sponsor Defendants, Underwriter Defendants, and originators of the mortgage loans

underlying the Certificates) should have known about the red flags that these third-party firms

identified.

689.    Similarly, Bohan employed "lead" underwriters who communicated directly with

the financial institutions that retained them to review loan pools.  As was the case with Clayton,

CS-38 said that many of the sponsors and underwriters sent Bohan's underwriters to the

originator's sites to review the loans that were being considered for inclusion in a mortgage pool

and subsequent securitization.  CS-38 also explained that the PLMBS sponsors and underwriters

268

often had representatives present at Bohan during loan reviews and had access to Bohan's computer system and could view which loans were being approved or rejected.

690.    The third-party due diligence process should have provided the Sponsor and Underwriter Defendants with extensive information about loan pool defects.  As reported by the *Los Angeles Times*, Clayton and Bohan employees (including eight former loan reviewers who were cited in the article) "raised plenty of red flags about flaws so serious that mortgages should have been rejected outright—such as borrowers' incomes that seemed inflated or documents that looked fake—but the problems were glossed over, ignored, or stricken from reports."  E. Scott Reckard, *Sub-Prime Mortgage Watchdogs Kept on Leash; Loan Checkers Say Their Warnings of Risk Were Met with Indifference*, L.A. Times, March 17, 2008, at C1.

691.    The Bank's recent review of certain loan files underlying the PLMBS—*see supra* § V.C; Apps. VIII, IX—makes clear that numerous red flags regarding the abandonment of stated underwriting guidelines and other material misstatements in the Offering Documents, which describe the loan pools on which the Bank's securities are based, were fully discoverable and should have been known by the Sponsor and Underwriter Defendants when they sold the securities to the Bank.  Yet, despite their access to this information, the Sponsor and Underwriter Defendants neither disclosed these facts to the Bank in the Offering Documents, nor sought to substitute or replace the defective loans.  Rather, they simply passed along the pools of loans to unsuspecting investors, like the Bank.

692.    Thus, on information and belief, the investment banks (including the Sponsor and Underwriter Defendants) should have known about the red flags that the third-party firms identified.

### c.  The Sponsor Defendants and mortgage originators limited the due diligence performed on the loan pools.

693.  As Ms. Beal testified with regard to Clayton, the client financial institutions determined the type and scope of review performed on the loan pools.  The FCIC Report found that the sponsor financial institutions who hired Clayton "ineffectively sampled loans they were purchasing to package and sell to investors."  FCIC Report at xxii.

694.  Clayton employees were instructed to review fewer loans in the loan pools as the securitization market grew.  Frank P. Filipps, Clayton's chairman and CEO, stated that "[e]arly in the decade, a securities firm might have asked Clayton to review 25 to 40 percent of the sub-prime loans in a pool, compared with typically 10% in 2006."  *See supra*, Reckard at C1.  For example, monoline insurer Ambac Assurance Corp. recently uncovered internal emails in which Bear, Stearns & Co. executives issued a directive to reduce the due diligence conducted by Bear Stearns on MBS deals "in order to make us more competitive on bids with larger sub-prime sellers."  First Amended Complaint at ¶ 134, *Ambac Assurance Corp. v. EMC Mortgage LLC et al.*, No. 650421/2011 (N.Y. Sup. Ct. July 18, 2011) (citing Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) conveying instruction from Mary Haggerty (Bear Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) to reduce due diligence, dated Feb. 11, 2005).

695.  According to Ms. Beal's 2010 testimony before the FCIC, as the securitization markets grew even more frenzied and "lenders and securitizers were trying to sell off as much as they could before the market collapsed, that figure reached as low as 5 percent."

696.  Bohan President Mark Hughes stated: "By contrast, loan buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."  *See* Reckard, *supra*, at C1.

697.    As explained by Paul Muolo and Matthew Padilla:

There were two reasons the [Wall] Street firms reviewed only a small sample of the loans they were buying . . . . The most important reason was the relationship with the lender.  "The lower the sample you requested [of the lender], the more likely it was that you'd win the bid."  . . . .  Lenders like Aegis and First Franklin had so many Street firms interested in buying their subprime and alt-A mortgages they could tell potential suitors that if they wanted to win the bid for the loan pool they should agree to review just a fraction of the mortgages.

Paul Muolo & Matthew Padilla, *Chain of Blame* 228 (2010).

698.    Even though the third-party due diligence providers were instructed to review smaller samples of the mortgage pools over time, the demand for mortgage-backed certificates was so great that, in the aggregate, the third-party due diligence firms were reviewing staggering quantities of loans.  According to *Chain of Blame*, "[i]n 2006, rank-and-file clerks hired by Clayton vetted a million individual mortgages for Wall Street firms."  *Id.*

> d.    **The Sponsor Defendants and mortgage originators manipulated the due diligence results.**

699.    Third-party due diligence firms felt pressured to depart from the standards so that loans were not tagged as defective.  For example, Bohan employees felt pressured to leave information out of their reports that detailed non-compliant or predatory loans that should have been excluded from the pool.  CS-38, a Bohan underwriter, explained that many underwriters at Bohan did not include in their reviews the borrower's fee associated with rebates on wholesale loans.  A rebate is negative points on a loan, whereby a borrower pays the lender for a higher interest rate in order to have lower up-front costs.  The Bohan employees left such information out of their reports because if they mentioned it, the loans would often be considered predatory. CS-38 recalled one rebate situation in which the borrower refinanced a property three times over a one-year period.  When she reviewed the loan on the third refinancing, she discovered that the borrower was seeking the loan to pay off $5,000 in bills and to obtain $8,000 cash, but the rebate

fees totaled $12,000. CS-38 thought the loan was ultimately included in the mortgage pool because nothing was wrong with the loan, except that the borrower was getting nothing out of it and was "an older person that was being taken advantage of."

700. Moreover, recent testimony before the FCIC reveals that the Sponsor Defendants and mortgage originators routinely "waived" the defects identified by the due diligence providers. In other words, the Sponsor Defendants simply ignored the defects and included defective loans in the mortgage pools underlying the PLMBS. During 2006 and the first half of 2007, Clayton reviewed 911,039 loans submitted by sponsor and originator clients, including Countrywide, Decision One, and New Century for securitization by its clients (including Bank of America, JPMorgan Chase, Citigroup, Deutsche Bank, Goldman Sachs, Morgan Stanley, Bear, Stearns. and Lehman Brothers). Clayton determined that 28%, or 255,802, of the mortgages they reviewed did not satisfy applicable underwriting guidelines. Of this number, Clayton's Wall Street clients "waived" 39%, or 100,653, of those loans. *See* Testimony of Beal, Johnson, and supporting waiver reports documents, attached hereto at Appendix II.

701. Clayton provided the FCIC with documents showing the defect and waiver rate of the financial institutions that had retained Clayton to conduct loan pool due diligence. Clayton's documents reveal the following rejection and waiver rates for entities that were involved in the securitization of the PLMBS purchased by the Bank:

| Client: | Percentage of Mortgages Initially Rejected by Clayton: | Percentage of Rejected Mortgages Subsequently Waived by Client: |
|---|---|---|
| Bank of America | 30% | 27% |
| Barclays | 27% | 28% |
| Bear Stearns EMC Mortgage Corporation | 16% | 42% |

| Client: | Percentage of Mortgages Initially Rejected by Clayton: | Percentage of Rejected Mortgages Subsequently Waived by Client: |
|---|---|---|
| Citigroup | 41% | 31% |
| Countrywide | 26% | 12% |
| Credit Suisse | 37% | 32% |
| Citigroup | 42% | 31% |
| Deutsche Bank | 35% | 50% |
| Goldman Sachs | 23% | 29% |
| Greenwich | 18% | 53% |
| HSBC | 27% | 62% |
| JP Morgan Chase | 27% | 51% |
| Lehman | 26% | 37% |
| Merrill | 23% | 32% |
| Morgan Stanley | 37% | 56% |
| Nomura | 38% | 58% |
| UBS | 20% | 33% |
| WaMu | 27% | 29% |

702.    The 2011 FCIC Report reveals that Clayton would approve no more than 54% of the loans it reviewed as satisfying stated underwriting standards.  FCIC Report at 166.  In testimony before the FCIC in September 2010, Keith Johnson said that "54% to me says there [was] a quality control issue in the factory" for mortgage-backed securities.  Johnson concluded that Clayton's clients often waived in loans to preserve their business relationship with the loan originator, because a high number of rejections might lead the originator to sell the loans to a competitor.  *Id*.

703.    Thus, the Sponsor Defendants and mortgage originators improperly used the purported "due diligence" review to waive loans that they should have known were defective.

**e.** **The Sponsor Defendants and mortgage originators misused the results of the limited diligence that was performed**

704. Ironically, while third-party reviewers state that the sponsoring financial institutions pressured them to make exceptions for seemingly defective loans, these financial institutions often utilized information about these defective loans to negotiate a lower price for the pool of loans from the seller (*i.e.* originator of the loans).

705. CS-38, who worked as an underwriter at Bohan from 2003 to 2006, confirmed that Bohan's review was used in price negotiations between the Sponsor Defendants and the mortgage originators. The Sponsors could request a discount if Bohan's reviewers rejected a large number of the loans. This is not to say that the financial institutions actually eliminated all of the defective loans from the pools. To the contrary, they obtained a lower price for the pools from the originators because the defective loans *stayed in the pools*.

**f.** **The Offering Documents failed to disclose the manipulation of the due diligence process.**

706. The Offering Documents failed to state that: (1) Clayton had informed the Sponsor and Underwriter Defendants that a substantial percentage of loans in the loans pools backing PLMBS were defective; (2) that the Sponsor and Underwriter Defendants, nonetheless, waived the defects as to a substantial percentage of these loans; and (3) that the Sponsor Defendants used the due diligence reports to negotiate a lower price for the loans pools. As Keith Johnson, the former President of Clayton, testified to the FCIC, Clayton "looked at a lot of prospectuses" and the firm wasn't aware of any disclosure to investors of Clayton's "alarming findings." The 2011 FCIC Report concurs: the disclosures in the Offering Documents were "insufficient for investors to know what criteria the mortgages they were buying actually did meet." FCIC Report at 169.

707.    In fact, the Sponsors and originators took actions to hide the waivers of defective

loans.  For example, Ambac recently uncovered internal emails in which EMC Mortgage

Corporation directed its underwriting managers who communicated with the due diligence firms

to "purg[e] all of the older reports on the trade leaving only the final reports."  First Amended

Complaint at ¶ 130, *Ambac Assurance Corp. v. EMC Mortgage LLC et al.*, No. 650421/2011

(N.Y. Sup. Ct. July 18, 2011) (citing Email from Jose Carrion (EMC Mortgage Corporation,

Subprime Underwriting Manager) to Karen Whitlock (EMC Mortgage Corporation Senior Vice

President, Conduit Operations) dated May 17, 2006).

### 5.    The Sponsor Defendants' Own Due Diligence Identified Defective Loans in the Mortgage Pools Backing PLMBS.

708.    Likewise, in its investigation into the "causes . . . of the current financial and

economic crisis in the United States," the FCIC examined Citigroup's securitization practices.

The FCIC heard testimony from Richard M. Bowen III, the former Senior Vice President and

Chief Underwriter for Correspondent and Acquisitions for CitiFinancial Mortgage (Citigroup's

subprime mortgage lending subsidiary from 2002-2005) and starting in 2006, Business Chief

Underwriter for Correspondent Lending in Citigroup's Consumer Lending Group.  In the latter

position, Mr. Bowen supervised 220 professional underwriters and exercised direct oversight

over the underwriting of more than $90 billion of mortgages annually.

709.    Mr. Bowen testified that each year since 2005, Citigroup's mortgage operation

systematically acquired tens of billions of dollars of risky loans that violated Citigroup's own

underwriting criteria and were likely to default.  He also testified that Citigroup's Wall Street

Chief Risk Officer routinely overruled underwriters' rejections of pools of mortgages that did not

satisfy Citigroup's underwriting criteria for purchase, causing Citigroup to purchase billions of

dollars of loan pools that fell short of underwriting standards. Mr. Bowen testified that "[d]uring 2006 and 2007, I witnessed business risk practices which made a mockery of Citi credit policy."

710. Mr. Bowen reported that he discovered that of the $50 billion of prime mortgages purchased in 2006, "over 60% of these mortgages purchased and sold were defective." He testified further that he "started issuing warnings in June of 2006 and attempted to get management to address these critical risk issues. These warnings continued through 2007 and went to all levels of the Consumer Lending Group." Bowen later told CBS's 60 Minutes that he "did everything [he] could" to inform Citigroup management of these concerns, including "e-mail, weekly reports, meetings, presentations, [and] individual conversations." 60 Minutes, *Prosecuting Wall Street* (CBS television broadcast Dec. 4, 2011). Despite these warnings, however, Bowen told 60 Minutes that "[t]he volumes increased through 2007 and the rate of defective mortgages increased to an excess of 80 percent." *Id.*

711. Mr. Bowen recommended that Citigroup not purchase Ameriquest, because his due diligence found that the loans originated by Ameriquest's affiliate, Argent, did not meet the standards they had represented to Citigroup. Specifically, Mr. Bowen testified that "we sampled the loans that were originated by [Ameriquest affiliate] Argent and we found large numbers that did not—that were not underwritten according to the representations that were there."

712. Mr. Bowen submitted with his testimony an email that he sent to Citigroup's then CEO, Robert Rubin, in late 2007 documenting his concerns. One email indicated, among abundant other information of abuses, that:

> During 2006-7 there were pools of mortgage loans aggregating $10 billion which were purchased from large mortgage companies with significant numbers of files identified as "exceptions" (higher risk and substantially outside of our credit policy criteria). These exceptions were approved by the Wall Street Channel Chief Risk Officer, many times over underwriting objections and with the files having been turned down by underwriting. These pools involved files aggregated

and originated by Merrill Lynch, Residential Funding Corp, New Century, First
NLC and others.

*Available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0407-Bowen.pdf.

Citigroup disregarded the red flags and completed the acquisition.

713.    Citigroup's practices were not unique.  For example, on June 24, 2010, the

Massachusetts Attorney General announced that Morgan Stanley had agreed to pay $102 million

to the Commonwealth and borrowers in the Commonwealth to settle charges related to "Morgan

Stanley's role in facilitating predatory lending by New Century."  The Attorney General reported

that: "our investigation revealed that Morgan Stanley backed loans for homeowners that they

knew, or should have known, were destined to fail and they failed to disclose the riskiness of

those loans to investors."  She noted as well that:

> Morgan Stanley funded, purchased and securitized New Century loans. Morgan
> developed an intimate knowledge of New Century's business over time.  And
> they uncovered signals pretty early on that the lending practices of New Century
> were not sound.  Morgan Stanley continued to fund and securitize subprime loans
> even as New Century's bad loans were causing the lender to collapse . . . .

Attorney General Martha Coakley, Transcript of Press Conference (June 24, 2010),

*available at* http://www.mass.gov/Cago/docs/press/2010_06_24_ms_settlement_

attachment4.pdf.

714.    Upon information and belief, the Sponsor Defendants should have known as a

result of the red flags generated by their own due diligence as well by third-party due diligence

firms that the pools of loans they purchased and sold in securitizations were far riskier than was

represented to investors, including the Bank.

**E.      The Controlling Person Defendants Controlled the Management, Activities, and
         Policies of the Controlled Entities.**

715.    The Controlling Person Defendants directed or caused the direction of the

management, policies, and actions of their controlled entities related to the PLMBS offerings.

First, the vertical integration of the Controlling and Controlled firms gave the Controlling Person Defendants the power and control necessary to employ their subsidiaries in key steps of the securitization process.  Second, the nature of the close relationships between affiliated PLMBS sponsors and depositors enabled the Sponsor Defendants to control their affiliated Depositor/Issuer Defendants throughout the securitization process.  Finally, Control Person Defendant Bear, Stearns & Co. exercised complete domination and control of affiliate EMC Mortgage Corporation throughout the securitization process.

716.    The Controlling Person Defendants' control, position, and influence over the controlled Defendants gave them access to the material facts and omissions concealed from the Bank with regard to the underlying mortgage pools.

> **1.     The Vertical Integration of Many of the Firms Involved in the Issuance of the PLMBS Enabled the Controlling Person Defendants to Control the Controlled Entities.**

717.    The Controlling Person Defendants, many of which had a 100% or substantial majority direct or indirect ownership in the respective Depositor/Issuer Defendants, Underwriter Defendants, Sponsor Defendants (to the extent the Controlling Person Defendant was other than a Sponsor), and/or originators, as well as the other entities identified herein, *see supra* § IV.B, had the power to, and did, conduct and participate, directly and indirectly, in the management and control of all aspects of the management and policies of the Controlled Entities.

718.    These Controlling Person Defendants used this power and control to employ their wholly-owned subsidiaries in the key steps of the securitization process.  *See supra* § V.D.1.  Unlike typical arms' length securitizations, these Securitizations involved various subsidiaries and affiliates of the Controlling Person Defendants at virtually each step in the securitization chain.  *Id.*

719.    As part of this process, the Controlling Person Defendants created the respective

Depositor/Issuer Defendants as their special purpose entities ("SPEs") for the purpose of issuing

the Certificates that are the subject of this action.  As Defendant Merrill Lynch explained:

> SPEs . . . are often used when entering into or facilitating securitization
> transactions. Merrill Lynch's involvement with SPEs used to securitize financial
> assets includes: structuring and/or establishing SPEs; selling assets to SPEs;
> managing or servicing assets held by SPEs; underwriting, distributing, and
> making loans to SPEs; making markets in securities issued by SPEs; engaging in
> derivative transactions with SPEs; owning notes or certificates issued by SPEs;
> and/or providing liquidity facilities and other guarantees to SPEs.

Form 10-K, Merrill Lynch & Co., at 99 (Feb. 26, 2007).  As Bear Stearns explained, although

these SPEs "are generally not controlled by their equity owners," the Controlling Person Entities

nonetheless orchestrated the actions of these SPEs by virtue of the fact that "the establishing

documents govern all material decisions."  Form 10-K, The Bear Stearns Companies, Inc., at 57

(Feb. 13, 2007).

720.    The other Controlling Person Defendants established the Issuer/Depositor entities

using similar arrangements:

A.  Form 10-K, Bank of America Corporation, at 114 (Feb. 28, 2007) ("The
Corporation securitizes sells and services interests in residential mortgage
loans . . . . The securitization vehicles are Qualified Special Purpose Entities
(QSPEs).");

B.  Form 10-K, The Bear Stearns Companies, Inc., at 57 (Feb. 13, 2007) ("In the
normal course of business, the Company enters into arrangements with special
purpose entities ("SPEs") . . . . The Company's primary involvement with
SPEs relates to securitization transactions in which transferred assets,
including commercial and residential mortgages, . . . are sold to an SPE and
repackaged into securities . . .");

C.  Form 10-K, Citigroup Inc., at 91-92 (Feb. 22, 2008) ("Markets & Banking is
active in structuring and underwriting residential and commercial mortgage-
backed securitizations. In these transactions, the Company or its customer
transfers loans into a bankruptcy-remote SPE.");

D.  Form 10-K, Countrywide Financial Corp., at 66 (March 1, 2007) ("Our
mortgage loan securitizations are normally structured as sales as specified by

SFAS 140, and as such involve the transfer of the mortgage loans to qualifying special-purpose entities that are not subject to consolidation.");

E.  Form 10-Q, Credit Suisse (USA) Inc. at 54 (Nov. 14, 2006) ("We . . .originate and purchase residential mortgages . . . and sell these assets directly or through affiliates to special purpose entities that are, in most cases, qualified special purpose entities, or QSPEs. These QSPEs issue securities that are backed by the assets transferred to the QSPEs . . .");

F.  Form 10-K, GMAC LLC at 49 (March 13, 2007) ("We use off-balance sheet entities as an integral part of our operating and funding activities. The arrangements include the use of qualifying special purpose entities (QSPEs) and variable interest entities (VIEs) for securitization transactions, mortgage warehouse facilities and other mortgage-related funding programs.");

G.  Form 10-K, JPMorgan Chase & Co., at 59 (March 1, 2007) ("JPMorgan Chase is involved with several types of off–balance sheet arrangements, including special purpose entities ("SPEs") . . . . For example, SPEs are integral to the markets for mortgage-backed securities . . .");

H.  Form 10-K, Morgan Stanley, at 128 (Jan. 29, 2008) ("Special purpose entities ("SPEs"), also known as variable interest entities ("VIEs") are typically used in such securitization transactions.");

I.  Form 10-K, Wells Fargo & Co. at 92 (Feb. 29, 2008) ("In the normal course of creating securities to sell to investors, we may sponsor special-purpose entities that hold, for the benefit of the investors, financial instruments that are the source of payment to the investors.").

721.   The Controlling Person Defendants next used—and directed—their Sponsor subsidiaries—which were also Controlling Person Defendants—to control the activities of these Issuer/Depositor entities.  *See infra* § V.E.2.

722.   The Controlling Person Defendants profited substantially from this vertically integrated approach to mortgage-backed securitization.  For example, in 2006 Controlling Person Defendant Bank of America Corporation reported "$341 million in gains on loans converted into securities and sold, of which gains of $329 million were from loans originated by the Corporation."  Form 10-K, Bank of America Corporation, at 128 (Feb. 28, 2007).  These profits were not earned directly by Bank of America Corporation, but rather were derived from the

activities of controlled entities, including Defendants Banc of America Funding Corporation,

Banc of America Securities LLC, and Bank of America, N.A.  For example, the loans underlying

these securities were not originated directly by Bank of America Corporation, but rather were

originated by controlled entity Bank of America N.A.  *Id.* at 50 ("[T]he Corporation operated its

banking activities primarily under two charters: Bank of America, N.A. and FIA Card Services,

N.A.")  Similarly, these loans were not converted into securities directly by Bank of America

Corporation, but rather were issued and underwritten by controlled entity Banc of America

Securities LLC.  *Id.* at 35 ("Underwriting debt and equity, securities research and certain market-

based activities are executed through Banc of America Securities, LLC which is a primary dealer

in the U.S. and several other countries.").  Yet, as noted above, Bank of America Corporation

saw substantial profits from these originations and securitizations.

723.    Like Bank of America Corporation, the other Controlling Person Defendants also

profited from the securitization activities of their controlled entities:

A. Form *See, e.g.*, Form 10-K, The Bear Stearns Companies, Inc., at 36 (Feb. 13, 2007) ("Fixed income revenues increased 20.6% to $3.62 billion for fiscal 2006 from $3.00 billion for fiscal 2005, primarily attributable to an increase in net revenues in the mortgage-backed securities . . . ");

B. Form 10-K, Citigroup Inc., at 88 (Feb. 22, 2008) ("The Company recognized gains related to the securitization of these mortgage and other consumer loan products of $423 million, $384 million, and $324 million in 2007, 2006 and 2005, respectively.");

C. Form 10-K, Countrywide Financial Corp., at 66 (March 1,  2007) ("During 2006, the Capital Markets Segment generated revenues totaling $394.6 million from its conduit activities, primarily managing the acquisition and sale or securitization of loans on behalf of the Mortgage Banking Segment.");

D. Form 10-Q, Credit Suisse (USA) Inc. at 15 (Nov. 14, 2006) (reflecting gains from the securitization of residential mortgage loans of $20 million and $28 million for the nine month periods ending September 30, 2006 and September 30, 2005, respectively);

E.  Form 10-K, GMAC LLC at 88-89 (March 13, 2007) (reflecting pre-tax gains on securitization of residential mortgages of $825 million, $513 million, and $602 million in 2006, 2005, and 2004, respectively);

F.  Form 10-K, Impac Mortgage Holdings, Inc. at 53 (March 14, 2007) ("The acquisition and origination of mortgages were primarily financed through the issuance of $5.9 billion of securitized mortgage borrowings.");

G.  Form 10-K, JPMorgan Chase & Co., at 63 (March 1, 2007) ("[I]n 2006 the Firm securitized approximately $16.8 billion of residential mortgage loans . . . resulting in pretax gains on securitizations of $85 million . . . .");

H.  Form 10-K, Merrill Lynch & Co., at 99 (Feb. 26, 2007) ("For the years ended December 29, 2006 and December 30, 2005, Merrill Lynch received $148.8 billion and $91.1 billion, respectively, of proceeds, and other cash inflows, from securitization transactions, and recognized net securitization gains of $535.5 million and $425.4 million, respectively, in Merrill Lynch's Consolidated Statements of Earnings.");

I.  Form 10-K, Morgan Stanley, at 130 (Jan. 29, 2008) ("During fiscal 2007, fiscal 2006 and fiscal 2005, the Company received proceeds from new securitization transactions of $64 billion, $68 billion and $65 billion, respectively . . .");

J.  Form 10-K, Wells Fargo & Co. at 92 (Feb. 29, 2008) ("We recognized net gains of $10 million and $399 million from sales of financial assets in securitizations in 2007 and 2006, respectively.").

724.   The Controlling Person Defendants often touted their extensive activity and experience in the securitization market, particularly in initiating securitization of residential mortgage loans they originated or acquired:

A.  Form 10-K, Bank of America Corporation, at 128 (Feb. 28, 2007) ("The Corporation securitizes a portion of its residential mortgage loan originations in conjunction with or shortly after loan closing. . . . In 2006 and 2005, the Corporation converted a total of $65.5 billion (including $15.5 billion originated by other entities) and $95.1 billion (including $15.9 billion originated by other entities), of commercial mortgages and first residential mortgages into mortgage-backed securities . . .");

B.  Form 10-K, The Bear Stearns Companies, Inc., at 8 (Feb. 13, 2007) ("The Company is a leading underwriter of and market-maker in, residential and commercial mortgages and is active in all areas of secured lending, structured finance and securitization products."); *Id.* at 52 ("The Company also maintains a series of committed credit facilities, which permit borrowing on a

secured basis, to support liquidity needs for the financing of investment-grade and non-investment-grade . . . residential mortgages . . . .");

C. Form 10-K, Citigroup Inc., at 81 (Feb. 22, 2008) ("The company maintains active securitization programs and reviews the securitization capacity and underlying documentation for these assets on a regular basis.");

D. Form 10-K, Countrywide Financial Corp., at 1 (March 1, 2007) ("Countrywide Financial Corporation . . . is a holding company which, through its subsidiaries . . . , is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.");

E. Form 10-Q, Credit Suisse (USA) Inc. at 14 (Nov. 14, 2006) ("The Company originates and purchases residential mortgages . . . for the purpose of securitization.");

F. Form 10-K, GMAC LLC at 36 (March 13, 2007) ("We sell most of the mortgage loans we originate or purchase. In 2006 we sold $152.7 billion in mortgage loans."); *Id* at 5 ("[W]e utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy");

G. Form 10-K, Impac Mortgage Holdings, Inc. at 3 (March 14, 2007) ("The mortgage operations acquire, originate, sell and securitize primarily Alt-A adjustable rate mortgages (ARMs) and fixed rate mortgages (FRMs) from correspondents, mortgage brokers and retail customers.");

H. Form 10-K, Merrill Lynch & Co., at 99 (Feb. 26, 2007) ("In the normal course of business, Merrill Lynch securitizes: commercial and residential mortgage loans . . .");

I. Form 10-K, Morgan Stanley, at 128 (Jan. 29, 2008) ("The Company may act as underwriter of the beneficial interests issued by securitization vehicles. Underwriting net revenues are recognized in connection with these transactions.");

J. Form 10-K, Wells Fargo & Co. at 92 (Feb. 29, 2008) ("We routinely originate, securitize and sell into the secondary market home mortgage loans.").

725.    Additionally, statements in the Controlling Person Defendants' SEC filings show control through comprehensive involvement with the Controlled Entities' operations:

A. Form 10-K, Bank of America Corporation, at 1 (Feb. 28, 2007) ("Through our banking subsidiaries . . . and various nonbanking subsidiaries throughout the United States . . . we provide a diversified range of banking and nonbanking

financial services and products"); *Id.* at 35 ("We also work with our commercial and corporate issuer clients to provide debt and equity underwriting and distribution capabilities . . . . Underwriting debt and equity, securities research and certain market-based activities are executed through Banc of America Securities, LLC . . .");

B.  Form 10-K, The Bear Stearns Companies, Inc., at 3 (Feb. 13, 2007) ("The Company is a holding company that through its broker-dealer and international bank subsidiaries, principally Bear, Stearns & Co. Inc. . . . , is a leading investment banking, securities and derivatives trading, clearance and brokerage firm . . . . [T]he Company also conducts significant activities through other wholly-owned subsidiaries, including: . . . EMC Mortgage Corporation . . . .");

C.  Form 10-K, Citigroup Inc., at 80 (Feb. 22, 2008) ("As a financial holding company, substantially all of Citigroup's net earnings are generated within its operating subsidiaries.");

D.  Form 10-K, Countrywide Financial Corp., at F-76, F-75 (March 1, 2007) ("The Capital Markets Segment includes the operations of Countrywide Securities Corporation"; "The Loan Production Sector is comprised of three lending channels of Countrywide Home Loans.");

E.  Form 10-Q, Credit Suisse (USA) Inc. at 54 (Nov. 14, 2006) ("These QSPEs are generally sponsored by our subsidiaries. Our principal broker-dealer subsidiary, CS Securities, underwrites and makes markets in these mortgage-backed and asset-backed securities.");

F.  Form 10-K, Impac Mortgage Holdings, Inc. at 2 (March 14, 2007) ("We operate four core businesses: the Long-Term Investment Operations conducted by IMH [Impac Mortgage Holdings, Inc.] and IMH Assets [Corp.]; the Mortgage Operations conducted by IFC [Impac Funding Corporation], and ISAC [Impac Secured Assets Corp] . . .");

G.  Form 10-K, JPMorgan Chase & Co., at 3 (March 1, 2007) ("The Firm also conducts securities underwriting, dealing and brokerage activities through JPMorgan Securities.");

H.  Form 10-K, Merrill Lynch & Co., at 21 (Feb. 26, 2007) ("ML & Co., . . . through its subsidiaries, is one of the world's leading wealth management, capital markets and advisory companies . . ."); *Id.* at 64 ("[Merrill Lynch, Pierce, Fenner & Smith Incorporated] provides corporate, institutional, and government clients with a wide variety of financial services including underwriting the sale of securities");

I.  Form 10-K, Morgan Stanley, at 2 (Jan. 29, 2008) ("Morgan Stanley provides financial advisory and capital-raising services to a diverse group of corporate and other institutional clients globally, primarily through wholly-owned

subsidiaries that include Morgan Stanley & Co. Incorporated."); *Id* at 5 (describing Morgan Stanley & Co. Incorporated as "Morgan Stanley's principal U.S. broker-dealer.");

*See also* Final Transcript, GMAC LLC – Sale of Controlling Interest in GMAC Investor Conference Call (Dec. 1, 2006) (GMAC LLC CEO Eric Feldstein noted that GMAC had "begun to integrate certain of GMAC mortgage operations . . . with RFC operations . . . to drive some cost efficiencies.").

726.    As demonstrated below, the Controlling Person Defendants also shared overlapping management with their controlled entities:

A. **Bank of America**:  (1) Kenneth D. Lewis was Chairman, Chief Executive Officer, President, and a director of Bank of America Corporation and also served as Chairman, Chief Executive Officer, President, and a director of Bank of America, N.A.; (2) Brian T. Moynihan was President of Global Wealth and Investment Management for Bank of America Corporation, and also served as President of Global Wealth and Investment Management and a director of Bank of America, N.A; (3) Amy Woods Brinkley has been the Global Risk Executive for Bank of America Corporation since April 2002, and also serves as Global Risk Executive and a director of Bank of America, N.A.

B. **Citigroup**:  Susan Mills was Vice President and Managing Director of Citigroup Mortgage Loan Trust Inc., and signed a number of Shelf Registration Statements on its behalf, including the Shelf Registration Statement for CMLTI_2005-9_1A1; she is also the head of Citigroup Global Markets, Inc.'s Mortgage Finance Group.

C. **Credit Suisse**:  (1) Andrew A. Kimura served as President and Director of Credit Suisse First Boston Mortgage Securities Corp and was also a managing director and co-head of structured products at Credit Suisse USA; (2) Jeffrey A. Altabef  served as Vice President and Director of Credit Suisse First Boston Mortgage Securities Corp. and was also a managing director for real estate finance and securitization at Credit Suisse USA; (3) Bruce Kaiserman served as an officer of Credit Suisse First Boston Mortgage Securities Corp. and was also a Director and Vice President of DLJ Mortgage Capital, Inc.; (4) Michael A. Marriott served as a Director of Credit Suisse First Boston Mortgage Securities Corp and was also a managing director and co-head of structured products at Credit Suisse USA.  Kimura, Altabef, and Marriott signed a number of Shelf Registration Statements on behalf of Credit Suisse First Boston Mortgage Securities Corp, including the Shelf Registration Statements for Certificates ARMT 2006-1 6A1, ARMT 2006-2 6A1, ARMT 2007-1 5A1, and ARMT 2007-2 2A21.

D. **GMAC**:  (1) in 2007, David Applegate served as (a) President of GMAC Mortgage Group, Inc.; (b) the Chairman and CEO of GMAC-RFC Holding Company, LLC, the direct parent of Residential Funding Company, LLC; and (c) the Principal Executive Officer of Residential Accredit Loans, Inc., on whose behalf he signed the Registration Statements for Certificate RALI 2007-QS6 A29; (2)  Bruce Paradis served as CEO of GMAC-RFC Holding Company, LLC while also serving as the Director, President, and CEO of Residential Accredit Loans, Inc., on whose behalf he signed the Registration Statements for Certificates RALI 2005-QA9 NB41, RALI 2006-QA2 1A1, RALI 2006-QA3 A1, and RALI 2006-QO10 A1; (3) Eric A. Feldstein served as CEO of GMAC LLC and Chairman of Residential Capital Corporation, "the recently formed parent company of GMAC Mortgage and Residential Funding Corporation," *See* Form 8-K, Residential Capital, LLC (10/20/2005); and (4) Sanjiv Khattri was the Executive Vice President and CFO of GMAC LLC and the CFO of GMAC-RFC Holding Company, LLC.

E. **Greenwich**:  (1) Joseph N. Walsh served as President, Managing Director, and Director of Greenwich Capital Acceptance, Inc and was President and Director of Greenwich Capital Financial Products, Inc. and the Head of Mortgage and Asset-Backed Trading, Origination and Finance at Greenwich Capital Markets, Inc.; (2) Carol P. Mathis was Chief Financial Officer and Managing Director of Greenwich Capital Acceptance, Inc. and was Director of Greenwich Capital Financial Products, Inc. and Managing Director and Chief Financial Officer of Greenwich Capital Markets, Inc.  Walsh and Mathis signed a number of Shelf Registration Statements on behalf of Greenwich Capital Acceptance, Inc, including the Shelf Registration Statements for Certificates DSLA 2005-AR2 2A1A, HVMLT 2005-10 2A1A, HVMLT 2006-7 2A1A, HVMLT 2006-8 2A1A, HVMLT 2007-1 2A1A, and MHL 2006-1 1A2.  Additionally, Mathis signed the Shelf Registration Statement for Certificate DSLA 2005-AR1 2A1A.

F. **Morgan Stanley**:  David R. Warren was a Managing Director in the Mortgage Capital Markets group and the Global Head of the Structured Credit Trading group at Morgan Stanley. He also served as President and Director at Morgan Stanley Capital I Inc.  Mr. Warren signed a number of the Shelf Registration Statements on behalf of Morgan Stanley Capital I Inc., including the Shelf Registration Statement for Certificates MSM 2006-13ARX A1, MSM 2006-16AX 2A1, MSM 2006-8AR 1A2, MSM 2006-9AR A3, MSM 2007-2AX 2A2, MSM 2007-5AX 2A2, MSM 2007-7AX 2A1.

G. **UBS:**  (1) David Martin was the President and CEO of MASTR, and is the Global Head of Residential Mortgage Backed Securitizations and Asset Backed Securitizations for UBS Americas; (2) Peter Slagowitz was (a) a Managing Director of MASTR; (b) a Managing Director and Head of Loan Conduits for UBS AG, which wholly owns UBS Americas; and (c) a Managing Director at UBS Real Estate; (3) Per Dyrvik was a Managing Director and Principal Accounting and Financial Officer of MASTR and was

a Managing Director of UBS Securities and also Managing Director at UBS
AG and at UBS Americas; and (4) Hugh Corcoran was a Managing Director
of MASTR and was a Managing Director of UBS Securities.  Martin,
Slagowitz, Dyrvik, and Corcoran signed a number of Shelf Registration
Statements on behalf of MASTR, including the Shelf Registration Statements
for Certificates MARM 2005-7 2A1 and MARM 2005-8 1A1.

727.    The Controlling Person Defendants also frequently and prominently identified

themselves in the Offering Documents, and the Officers and/or directors of the Controlling

Person Defendants frequently signed the respective registration statements, as noted above.

728.    In addition, the Controlling Person Defendants were frequently parties to the

agreements necessary to the securitizations, such as the Pooling and Servicing Agreement,

Mortgage Loan Purchase Agreement, Servicing Agreement, Assignment, Assumption and

Recognition Agreement, including amendments, restatements and exhibits thereto—agreements

that frequently:

A.  Were between vertically integrated entities;

B.  Were signed by the same officer or director of the Controlling Person
    Defendant on behalf of the Controlled Entity;

C.  For purposes of providing formal notice under the agreement, identified a
    single individual and/or address as the notice recipient for two or more parties
    to the agreement; and

D.  Provided for indemnification by the Controlling Person Defendant.

729.    In sum, the Controlling Person Defendants controlled, influenced, or participated

in essentially all material aspects relating to the acquisition, structure and sale of the Certificates

purchased by the Bank identified herein.

**2.      The Sponsor Defendants Controlled Their Affiliated Depositors.**

730.    As discussed above, the Sponsor Controlling Person Defendants—who

themselves were subsidiaries of, and controlled by, their parent Controlling Person Defendants—

organized and initiated each PLMBS transaction by: (1) acquiring the loans, either from their

own origination units or from other mortgage originators in exchange for cash, *see supra* ¶¶ 204, 208; (2) conducting due diligence reviews of these mortgages, *see supra* § V.D.4; and (3) pooling and structuring the loans in preparation for securitization. *See, e.g.*, BALTA 2006-1 Pros. Sup. S-47 ("Subsequent to purchase by the Sponsor, performing loans are pooled together by product type and credit parameters and structured into RMBS.").

731.     The Sponsor Controlling Person Defendants then transferred these mortgage pools to their affiliated Depositor/Issuer entities. *See, e.g.*, *id.* at S-38 ("All of the mortgage loans will be acquired by the Depositor on the date of issuance of the Offered Certificates from the Sponsor, an affiliate of the Depositor and the underwriter, pursuant to the Mortgage Loan Purchase Agreement.").  The Depositor/Issuer Defendants then established the trusts underlying the Certificates pursuant to Pooling and Servicing Agreements executed by, among others, the Depositor/Issuer Defendants and the Sponsor Controlling Defendants. *See, e.g.*, *id.* at  S-6 ("The depositor will establish a trust with respect to the Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-1, pursuant to a pooling and servicing agreement dated as of January 1, 2006, among the depositor, the master servicer, the securities administrator, the trustee and the sponsor.").

732.     Thus, the Sponsor Defendants controlled, influenced, or participated in essentially all material aspects relating to the issuance of the Certificates by the Depositor.

**3.     Bear, Stearns & Co. Controlled Affiliate EMC Mortgage Corporation.**

733.     Finally, Controlling Person Defendant Bear, Stearns & Co. exercised complete domination and control of affiliate EMC Mortgage Corporation ("EMC").  EMC did not operate separately from Bear, Stearns & Co.  In fact, Bear, Stearns & Co. often represented EMC as an integrated element of its securitization business.  For example, Bear,  Stearns & Co. gave monoline insurer Ambac marketing materials dated June 2005 in which it answered the question

"Why purchase RMBS from Bear Stearns?" by referring to the "Integral role played by Bear Stearns' affiliate, EMC Mortgage Corporation (EMC)." *See* Amended Complaint ¶ 84, *Ambac Assurance Corp. v. EMC Mortgage LLC et al.*, No. 650421/2011 (N.Y. Sup. Ct. July 18, 2011) (citing Investor Presentation, dated June 2005, ABK-EMC01515471-561). That slide specifically assured investors that "EMC acts as principal and makes mortgage reps and warranties, rather than passing on reps and warranties from smaller underlying sellers." *Id.* Additionally, the front cover of the presentation, titled "Bear Stearns RMBS Platform," listed an EMC website and included Bear, Stearns & Co. Inc.'s name and address. *Id.* As explained by Ambac, the presentation then provided an organizational chart of "Bear Stearns' Residential Mortgage Team" that showed "a seamless reporting line from EMC up to Bear, Stearns & Co.'s Chairman and CEO." *Id.*

734.    EMC was a sham entity with no legitimate business purpose other than to shield Bear, Stearns & Co. from liability for its risky PLMBS products. Although Bear, Stearns & Co. held out EMC as an adequately capitalized corporation capable of backing the representations and warranties it made to Bear Stearns's securitization participants, documents cited by monoline insurer Assured Guaranty Corp make clear that EMC was not adequately capitalized for its corporate undertaking. Specifically, EMC did not set sufficient reserves for its repurchase liabilities to securitization trusts. For example, Assured cited an EMC Independent Auditors Report for 2005 and 2006 that stated that, with respect to EMC's liability for its representation and warranty breaches to securitization counterparties, "[t]he contingencies triggering the obligation to indemnify are not generally expected to occur," and "it is unlikely that the Company will have significant losses under these arrangements." See Complaint ¶ 302, *Assured Guaranty Corp. v. EMC Mortgage LLC et al.*, No. 650805/2012 (Sup. Ct. N.Y. County Mar. 15,

2012) (citing EMC Mortgage Corporation and Subsidiaries, Independent Auditors' Report, Consolidated Financial Statements as of and for the Years Ended November 30, 2006 and 2005, EMC-AMB 012128918-947).  Additionally, in his October 3, 2011 deposition, Thomas Marano, Bear Stearns former Senior Managing Director who was responsible for its mortgage-securitization business, stated "I do not recall [EMC] establishing reserves for breaches of rep and warranty on securitization trusts."  *Id.* (citing /3/2011 Marano Deposition Tr. at 123).

735.    Moreover, Bear, Stearns & Co. siphoned off EMC's corporate funds to offset losses on Bear, Stearns & Co.'s trading books, as if the funds belonged to Bear, Stearns & Co. Assured recently gained access to EMC Claims Settlements Report for the month ended November 30, 2006, which showed an allocation of $6.7 million in cash obtained by EMC in claims settlements with sellers to offset markdown losses on Bear, Stearns & Co.'s FIXED and ARMS trading desks.  *Id.* ¶ 302 (citing EMC Mortgage Corp. Claims Settlements Report for the month ending 11/30/2006, EMC-AMB 003673312).  Additionally, at his October 6, 2011 deposition, Jeffrey Verschleiser, Bear, Stearns & Co. former Senior Managing Director and Head of its ABS & Wholeloan Desk, stated: "EMC was a subsidiary of Bear Stearns so if there was a fee earned, it was just an intercompany transfer. . . . [I]t's just one pocket to the other."  Id. (citing 10/6/2011 Verschleiser Deposition Tr. at 83-84).

736.    In sum, Bear, Stearns & Co. exercised complete domination and control of EMC, and controlled all material aspects of EMC's activities relating to the acquisition, structure and sale of the Certificates purchased by the Bank identified herein.

**F.    The Rating Agency Defendants Knew, and the Securities Defendants Should Have Known, That the Credit Ratings Materially Misstated the Credit Risk of the PLMBS.**

737.    As noted in the Offering Documents, the credit ratings assigned to the PLMBS "address the likelihood of the receipt of all payments on the mortgage loans by the related

Certificate holders." *See infra* § VI.D.3.  A triple-A (or "AAA") credit rating is the highest possible rating assigned by the credit rating agencies.  According to S&P's definitions, an "AAA" rating represents an "[e]xtremely strong capacity to meet financial commitments."  Thus, for a PLMBS tranche to receive a triple-A credit rating, the mortgages underlying the tranche must be of such high quality that there is the highest possible likelihood that the Certificate holders will receive all payments on the mortgages.

738.    The triple-A credit ratings of the PLMBS played a crucial role in the Bank's purchase of PLMBS.  Indeed, by policy and regulatory guidance, the Bank could only purchase triple-A-rated tranches of the Certificates.  Without the triple-A rating, no purchase would have occurred.

739.    The Securities Defendants well understood (and banked on) the important role the credit ratings played in the PLMBS markets.  They featured the ratings prominently in the Offering Documents and discussed at length the ratings received by the different tranches of the PLMBS, and the bases for the ratings.  Yet, as explained below, the Rating Agency Defendants knew that the triple-A ratings assigned to the PLMBS did not accurately portray their credit risk, as they knew they were the result of flawed models, abandoned underwriting guidelines, Rating Agency capture, and the Rating Agency Defendants' obsession with market share.  Moreover, as explained below, the Securities Defendants should have known the Offering Documents' statements with respect to these ratings were misleading because of their direct involvement in— and manipulation of—the rating process and their awareness of the poor credit quality of the underlying loan collateral.

1.      **The Rating Agency Defendants Knew That the Credit Ratings Were
Inaccurate Because They Were Based on Underwriting Standards That the
Rating Agency Defendants Knew Had Been Abandoned.**

740.    The Rating Agency Defendants knew that many mortgage originators had
abandoned their stated mortgage underwriting guidelines, yet declined to factor underwriting
abandonment into their ratings of the PLMBS.  As a result, the Rating Agency Defendants knew
that the ratings were false when made.

741.    Based on its investigation, the bi-partisan Senate Subcommittee on Investigations
found that from 2004 to 2007, the Rating Agency Defendants "knew of increased credit risks due
to mortgage fraud, lax underwriting standards, and unsustainable housing price appreciation, but
failed adequately to incorporate those factors into their credit rating models."  S. Subcomm. on
Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial
Collapse* 245-46 (2011) (hereinafter S. Subcomm., *Anatomy of a Financial Collapse* ).  For
example, the Subcommittee uncovered internal rating agency emails from the summer and fall of
2006 noting that "underwriting fraud[,] appraisal fraud and the general appetite for new product
among originators [are] resulting in loans being made that shouldn't be made"; and that "this is
like another banking crisis potentially looming." *Id.* at 269-70.

742.    As recently reported by the Subcommittee, an outside mortgage broker wrote to
Susan Barnes, the head of the S&P group that rated PLMBS, in June 2005 advising her that
"attention to loan risk" had drastically deteriorated among mortgage originators.  *Id.* at 269.

743.    In a recently disclosed email chain from August 2006 that commented on an
article about problems in the mortgage market, Richard Koch, a director in the S&P Servicer
Evaluation Group, wrote: "I'm not surprised; there has been rampant appraisal and underwriting
fraud in the industry for quite some time as pressure has mounted to feed the origination
machine." *Id.*  Another S&P director in the same group wrote in an October 2006 internal email

about a news article entitled, "More Home Loans Go Sour – Though New Data Show Rising Delinquencies, Lenders Continue to Loosen Mortgage Standards": "Pretty grim news as we suspected – note also the 'mailing in the keys and walking away' epidemic has begun – I think things are going to get mighty ugly next year!" *Id.* In September 2006, an S&P employee emailed colleagues saying that the head of the S&P Surveillance Group, the group in charge of monitoring the performance of previously rated securities, "told me that broken down to loan level what she is seeing in losses is as bad as high 40's – low 50%." *Id.*

744.    S&P became so concerned with the abandonment of underwriting standards that, when it was asked to rate certificates backed by subprime loans originated by Fremont Investment and Loan, one analyst asked his supervisors whether he should treat Fremont collateral differently. *Id.* at 516. However, just as in the case of underwriting abandonment by other mortgage originators, the analyst was told to ignore his concerns. Specifically, one of his supervisors responded, "we don't treat their collateral any differently." *Id.* Another supervisor said that as long as there were current FICO scores for the borrowers, then the analyst was "good to go," no matter how little documentation the origination process required and regardless of any other characteristic of the mortgage loans. *Id.* Although Fremont Investment and Loan is not identified in the Offering Documents as a relevant originator in this case, its abandonment of underwriting guidelines was typical of the originators at issue here. More importantly, the Rating Agency Defendants' knowledge of, and failure to respond to, such underwriting abandonment occurred with respect to countless mortgage originators, including those who originated the mortgages serving as collateral for the PLMBS purchased by the Bank.

2.      **The Credit Ratings Were Compromised by Conflicts of Interest,**
        **Manipulation and Misinformation.**

745.     The Rating Agency Defendants received enormous revenues from the Sponsors,

Depositors, and Underwriters who paid them for rating the products they sold. Between 2002 and

2007, Moody's gross revenues from RMBS and CDO ratings more than tripled, going from over

$61 million to over $260 million.  S. Subcomm., *Anatomy of a Financial Collapse* at 31.  S&P's

gross revenues for RMBS and mortgage related CDO ratings quadrupled during this time, going

from over $64 million in 2002, to over $265 million in 2006.  *Id.*  "Altogether, revenues from the

three leading credit rating agencies more than doubled from nearly $3 billion in 2002 to over $6

billion in 2007."  *Id.*

746.     As the Senate Subcommittee on Investigations concluded, "[t]he problem . . . was

that neither [Moody's nor S&P] had a financial incentive to assign tougher credit ratings to the

very securities that for a short while increased their revenues, boosted their stock prices, and

expanded their executive compensation."  S. Subcomm., *Anatomy of a Financial Collapse* at

272.  Specifically, each Rating Agency Defendant knew that it would lose potential revenue if it

assigned lower credit ratings to PLMBS deals because: (a) the Securities Defendants could take

their business to rival Rating Agencies that were willing to issue higher ratings; and/or (b)

stricter credit rating standards industry-wide would ultimately mean that fewer total PLMBS

deals could be securitized, as each triple-A rating would require a greater proportion of the finite

pool of high-quality collateral.

747.     According to comments recently submitted to the SEC by William J. Harrington,

a former Senior Vice President in Moody's derivative products group, "[t]his conflict of interest

permeates all levels of employment, from entry-level analyst to the Chairman and Chief

Executive Officer of Moody's Corporation."  William J. Harrington, Comment on SEC Proposed

Rules for Nationally Recognized Statistical Rating Organizations, File No. S7-18-11, at 10 (Aug. 8, 2011) (hereinafter "Harrington Comment").  Ultimately, Harrington said, "[t]he ongoing, unresolved conflict of interest plays out in the formation of Moody's opinions. These public opinions of Moody's are often at odds with its private opinions." *Id.*

### a.    Ratings Shopping

748.    The conflict of interest between increased revenues and reliable ratings was exploited by the Securities Defendants through a process that became known as "ratings shopping."  Specifically, the Securities Defendants would not hire the Rating Agency Defendants until after the Rating Agency Defendants provided a preliminary rating, for which the Rating Agency Defendants were paid only a nominal fee.  Because the Securities Defendants typically needed to procure ratings from only two of the three Ratings Agencies, this pre-rating practice created what were essentially bidding wars—contests in which the Securities Defendants would hire only the agencies that would provide the desired ratings while requiring the least demanding credit enhancements.[20]  As the Rating Agency Defendants were not paid until they were hired, and even then only after they closed the transaction, these bidding wars put tremendous pressure on the Rating Agency Defendants to lower their standards in order to win business. Consequently, "ratings shopping" jeopardized the integrity and independence of the rating process.

749.    This pressure is evident in the following recently released email from 2006, in which a UBS banker warned an S&P senior manager not to use a new, more conservative rating model for CDOs:

> [H]eard you guys are revising your residential mbs [mortgage backed security] rating methodology - getting very punitive on silent seconds. [H]eard your ratings

---

[20] As noted above, *see supra* § V.A.3, credit enhancements were used to increase the size of the tranches that were worthy of triple-A—or other investment grade—credit ratings.

> could be 5 notches back of [Moody's] equivalent. [G]onna kill your resi[dential]
> biz. [M]ay force us to do moodyfitch only cdos!

S. Subcomm., *Anatomy of a Financial Collapse*, at 278.  According to former team managing director Gary Witt, "they would threaten you all of the time. … It's like, 'Well, next time, we're just going to go with Fitch and S&P.'"  FCIC Report at 210.

750.    Ultimately, the pressure worked—"conflicts of interest . . . placed achieving market share and increased revenues ahead of ensuring accurate ratings."  S. Subcomm., *Anatomy of a Financial Collapse* at 5-6.  The Senate Subcommittee on Investigations concluded that "[t]he rating agencies weakened their standards as each competed to provide the most favorable rating to win business and greater market share. The result was a race to the bottom." *Id.* at 243.  According to the report, "[t]he evidence collected by the Subcommittee indicates that the pressure exerted by investment banks frequently impacted the ratings process, enabling the banks to obtain more favorable treatment than they otherwise would have received.  S. Subcomm., *Anatomy of a Financial Collapse* at 278.  "In many instances," the Subcommittee concluded, this special treatment "cross[ed] over from the healthy give and take involved in complex analysis to concessions made to prevent the loss of business."  *Id.* at 280.

751.    For example, as recently disclosed to the Senate Subcommittee, in 2004 several S&P employees were feeling intense pressure after having lost "a huge Mizuho RMBS deal to Moody's due to a huge difference in the required credit support level."  *Id.* at 279.  The employees concluded that "[t]here's no way we can get back on this one but we need to address this now in preparation for the future deals."  *Id.*  The email went on to remark that team leaders "think that the only way to compete is to have a paradigm shift in thinking . . ."  Permanent Subcommittee on Investigations, Exhibit #2.  In another internal email dated August 17, 2004, Managing Director Gale Scott wrote "[w]e are meeting with your group this week to discuss

adjusting criteria for rating CDOs of real estate assets . . . because of the ongoing threat of losing deals." Permanent Subcommittee on Investigations, Exhibit #3.

752.    As recently disclosed by the Senate Subcommittee, in February of 2007, Moody's bowed to pressure from a Chase investment banker who complained that a transaction would receive a lower rating from Moody's than it was slated to receive from another rating agency. Rather than affirming Moody's initial rating, the Moody's manager informed the banker that Moody's "is looking into some adjustments to [Moody's] methodology that should be a benefit to you folks." S. Subcomm., *Anatomy of a Financial Collapse* at 280.

753.    Moreover, documents recently disclosed to the Senate Subcommittee demonstrate that because the Securities Defendants were repeat customers, the granting of exceptions one time would often increase the pressure for the Rating Agency Defendants to grant similar—or greater—exceptions in the future. For example, in August 2006, an investment banker from Morgan Stanley made the following request of S&P: "When you went from [model] 2.4 to 3.0, there was a period of time where you would rate on either model. I am asking for a similar 'dual option' window for a short period. I do not think this is unreasonable." S. Subcomm., *Anatomy of a Financial Collapse* at 280-81. In May 2006, Richard Michalek, a Moody's analyst, sent an email to Yuri Yoshizawa, the Senior Managing Director of Moody's Derivatives Group, in which he expressed concern about the "precedential effects" of certain "fixes," stating that "I am worried that . . . they [Credit Suisse] are taking advantage of the 'light' review and the growing sense of 'precedent.'" S. Subcomm., *Anatomy of a Financial Collapse* at 282.

> **b.    The Rating Agency Defendants Knew that Ratings Shopping Reduced the Quality of Their Ratings.**

754.    Contrary to their denials, the Rating Agency Defendants were willfully complicit in this ratings shopping process. S&P Managing Director Richard Gugliada told Bloomberg of

S&P's involvement in a "market-share war where criteria were relaxed." *Race to Bottom at Moody's, S&P Secured Subprime's Boom, Bust*, Bloomberg.com (Sept. 25, 2008).  Gugliada said of this relaxation of standards in pursuit of profits: "I knew it was wrong at the time. … It was either that or skip the business.  That wasn't my mandate. My mandate was to find a way.  Find the way." *Id.*

755.    Similarly, former Moody's Managing Director Jerome Fons testified that "[Moody's] knew that they were being bullied into caving in to bank pressure from the investment banks and originators of these things. … Moody's allow[ed] itself to be bullied.  And, you know, they willingly played the game. …"  FCIC Report at 210.  "The only way to get market share was to be easier," said Fons.  *Devils* 118.  A former structured finance executive at Moody's confirmed, stating: "No rating agency could say, 'We're going to change and be more conservative.'  You wouldn't be in business for long if you did that.  We all understood that." *Devils* 118.

756.    Richard Michalek, a former Moody's vice president and senior credit officer, testified to the FCIC that "[t]he threat of losing business to a competitor, even if not realized, absolutely tilted the balance away from an independent arbiter of risk towards a captive facilitator of risk transfer."  FCIC Report at 210.

757.    Raymond McDaniel, Moody's CEO, realized that the market-share war had undermined the Ratings Agencies' work product.  In an internal presentation prepared for Moody's Board of Directors in October 2007, he noted that "[a]nalysts and MDs [managing directors] are continually "pitched" by bankers, issuers, investors – all with reasonable arguments – whose views can colour credit judgment, sometimes improving it, other times degrading it (we 'drink the kool-aid')."  *Moody's CEO Warned Profit Push Posed Risk to*

*Quality of Ratings*, Wall St. J., Oct. 23, 2008.  Importantly, McDaniel acknowledged that "[c]oupled with strong internal emphasis on market share & margin focus, this does constitute a 'risk' to ratings quality."  *Id.*

758.    In an October 2007 internal memorandum recently made available to the FCIC, Moody's Chief Credit Officer Andrew Kimball explained:

> Ideally, competition would be primarily on the basis of ratings quality, with a second component of price and a third component of service.  Unfortunately, of the three competitive factors, rating quality is proving the least powerful given the long tail in measuring performance. . . . The real problem is not that the market does underweights [sic] ratings quality but rather that, in some sectors, it actually penalizes quality by awarding rating mandates based on the lowest credit enhancement needed for the highest rating. Unchecked, competition on this basis can place the entire financial system at risk. It turns out that ratings quality has surprisingly few friends: issuers want high ratings; investors don't want rating downgrades; and bankers game the rating agencies for a few extra basis points on execution.

FCIC Report at 210-11.

759.    As these examples illustrate, the Rating Agency Defendants were aware that their clients were able to—and did—manipulate the system to receive the highest possible rating without actually structuring their deals so as to merit that rating.

### c.    Management Pressure to Close Deals

760.    The Rating Agency Defendants were not merely reluctant participants in the ratings shopping game.  Rather, management of the Rating Agency Defendants actively encouraged—and in some cases coerced—their employees to increase revenues and expand market share *at all costs*, even if it entailed deterioration in ratings quality. The Senate Subcommittee on Investigation noted that "[m]ultiple former Moody's and S&P employees told the Subcommittee that, in the years leading up to the financial crisis, gaining market share, increasing revenues, and pleasing investment bankers bringing business to the firm assumed a

higher priority than issuing accurate RMBS and CDO credit ratings." S. Subcomm., *Anatomy of a Financial Collapse* at 273.

761.    At Moody's the increased pressure from management corresponded with the rise of Brian Clarkson, the former president of Moody's Investors Service who became co-chief operating officer in 2004 and then president in August 2007.  According to the FCIC, employees at Moody's "identified a new focus on market share directed by . . . Brian Clarkson."  FCIC Report at 207.  Jerome Fons, a former managing director who was responsible for assembling an internal history of Moody's, stated that Moody's "became so focused, particularly the structured area, on revenues, on market share, and the ambitions of Brian Clarkson, that they willingly looked the other way, traded the firm's reputation for short-term profits."  *Id.*  Mark Froeba, former senior vice president, testified to the FCIC:

> When I joined Moody's in late 1997, an analyst's worst fear was that we would contribute to the assignment of a rating that was wrong. . . . When I left Moody's, an analyst's worst fear was that he would do something, or she, that would allow him or her to be singled out for jeopardizing Moody's market share.

FCIC Report at 208.  The change in corporate culture was confirmed by Eric Kolchinsky, a former managing director, who told the FCIC that the culture at Moody's went "from [a culture] resembling a university academic department to one which values revenues at all costs."  FCIC Report at 207.

762.    In *All the Devils Are Here*, authors Bethany McClean and Joe Nocera describe how Clarkson was promoted to advance an agenda of "using structured finance to boost revenues, market share, and—above all—Moody's stock price."  *Devils* at 115.  McClean and Nocera describe that according to former analysts, Clarkson emphasized "caring about whether the issuers—meaning the small group of investment banks who mattered—were happy with the ratings they got."  *Id.*

763.    Clarkson consistently emphasized the importance of market share.  For example, former team managing director Gary Witt recalled that he received a monthly email from Clarkson "that outlined basically my market share in the areas that I was in charge of."  FCIC Report at 208.  Importantly, these emails made clear that Moody's management was actively monitoring instances where Moody's lost out on deals to S&P and Fitch.  *See id.* (quoting Witt: "I believe it listed the deals that we did, and then it would list the deals like S&P and/or Fitch did that we didn't do that was [sic] in my area.").  Witt further explained that at times he would have to justify, either verbally or in writing, why Moody's did not rate specific deals.  *Id.*  Eric Kolchinsky, one of the senior Managing Directors in charge of the business line that rated subprime backed CDOs, confirmed that "managers would be expected to justify 'missing' the deals which were not rated."  S. Subcomm., *Anatomy of a Financial Collapse* at 275-76.  Similarly, former Senior Vice President William Harrington explained that Brian Clarkson would frequently "station[] himself in a well-traveled hallway with a checklist of complaint [sic] ready for whichever analyst happened by."  Harrington Comment at 55.

764.    Mark Froeba, a Senior Vice President in Moody's CDO group, told the Senate Subcommittee on Investigations that Clarkson used fear and intimidation tactics to make analysts spend less time on the ratings process and more time working cooperatively with investment bankers.  S. Subcomm., *Anatomy of a Financial Collapse* at 274.  Harrington described Moody's "long-standing intimidation and harassment of analysts," noting that "there are no incentives for an analyst to police a [ratings] committee other than self-respect, but there are serious disincentives for her to challenge management in any way."  Harrington Comment at 8.  According to Harrington, "[m]anagement also explicitly threatened the job security of analysts who 'impeded deals.'"  *Id.* at 16.  In fact, Harrington recalled that "[Brian] Clarkson had

expressed pride in having fired much of the previous RMBS Group for not having sufficient market share." *Id.* at 67. Similarly, Eric Kolchinsky stated that "[i]t was an unspoken understanding that loss of market share would cause a manager to lose his or her job." *Id.* at 275. Another former managing director says that Clarkson used to tell people, "We're in business and we have to pay attention to market share. If you ignore market share, I'll fire you." *Devils* at 116.

765.    A Moody's senior analyst, Richard Michalek, confirmed that Clarkson used "fear and intimidation," and described a meeting with Clarkson in which Clarkson talked about having fired an analyst who was deemed too conservative in his analysis and ratings. Clarkson asked Michalek "to convince him why [Clarkson] shouldn't fire [him]." S. Subcomm., *Anatomy of a Financial Collapse* at 275. Michalek later said: "[T]he primary message of the conversation was plain: further complaints from the 'customers' would very likely abruptly end my career at Moody's." *Id.*

766.    Moody's executives also harassed and ignored Moody's Compliance Department, as part of their efforts to maximize market share. Scott McCleskey, Moody's former chief compliance officer, wrote a letter to the SEC in March 2009 stating that the guidance from Moody's Compliance Department was "routinely ignored if that guidance meant making less money or . . . address[ing] conflicts of interest between the [Rating Agency Defendants'] ratings side and the business-development side." Letter from Scott McCleskey to Michael Macchiarolio, Mar. 12, 2009, *available at* http://democrats.oversight.house.gov/images/stories/ Hearings/Committee_on_Oversight/McCleskey_letter.pdf. McCleskey recounted the following story to the FCIC about an evening when he and Brian Clarkson were dining with the board of

directors after the company had announced strong earnings, particularly in the business of rating

mortgage-backed securities and CDOs:

> So Brian Clarkson comes up to me, in front of everybody at the table, including
> board members, and says literally, "How much revenue did Compliance bring in
> this quarter? Nothing. Nothing." … For him to say that in front of the board,
> that's just so telling of how he felt that he was bulletproof. … For him, it was all
> about revenue.

FCIC Report at 208.

767.    According to the Senate Subcommittee on Investigation, "[t]he drive for market

share was similarly emphasized at S&P."  S. Subcomm., *Anatomy of a Financial Collapse* at

276.  Frank Raiter, a former S&P Managing Director in charge of the RMBS Ratings Group,

stated that "[f]ocus was directed at collecting market share and revenue data on a monthly basis

from the various structured finance rating groups and forwarded to the finance staff at S&P."  *Id.*

In a 2004 internal email, S&P management stated that they were "meeting with your group this

week to discuss adjusting criteria for rating CDOs of real estate assets this week because of the

ongoing threat of losing deals."  *Id.*

768.    Thus, FCIC concluded that "the rating agencies placed market share and profit

considerations above the quality and integrity of their ratings."  FCIC Report at 212.  The Senate

Subcommittee on Investigations concluded although

> the credit rating agencies were aware of problems in the mortgage market,
> including an unsustainable rise in housing prices, the high risk nature of the loans
> being issued, lax lending standards, and rampant mortgage fraud[,] . . . . [i]t was
> not in the[ir] short term economic interest . . . to provide accurate credit ratings
> for high risk RMBS . . . , because doing so would have hurt their own revenues.

S. Subcomm., Anatomy of a Financial Collapse at 244.

769.    Ultimately, this meant that  "the pressure came from two directions: in-house

insistence on increasing market share and direct demands from the issuers and investment

bankers, who pushed for better ratings with fewer conditions."  FCIC Report at 210.

### d.      Manipulation of the Committee Process

770.     The credit rating process was particularly susceptible to pressures to increase market share because credit ratings were not derived solely from application of mathematical formulas, but rather were assigned by committees.  As the FCIC explained, when the initial quantitative analysis was complete, the lead analyst on the deal convened a rating committee of other analysts and managers to assess the deal and determine the overall ratings for the securities. FCIC Report at 121.  According to former Senior Vice President William Harrington, "[u]pon conclusion of the deliberations, the committee chair polls each voting member in reverse order of title for her opinion as to which individual rating symbol is appropriate for the issue at hand.  All such opinions are weighted equally and tallied with the Moody's opinion determined by a simple majority."  Harrington Comment at 13.

771.     In a recently released internal memorandum from October 2007 sent to McDaniel, in a section titled "Conflict of Interest: Market Share," Moody's Chief Credit Officer Andrew Kimball noted the fact that "[r]atings are assigned by committee, not individuals" and expressed concern that "entire committees, entire departments, are susceptible to market share objectives." FCIC Report at 210.  As the Senate Subcommittee on Investigation found, "modeling results could be altered by the subjective judgment of analysts and their supervisors.  This subjective factor, while unavoidable due to the complexity and novelty of the transactions being rated, rendered the process vulnerable to improper influence and inflated ratings."  S. Subcomm., *Anatomy of a Financial Collapse* at 288.

772.     Manipulation of the committee process happened frequently.  In May 2005, an S&P analyst, Michael Drexler, wrote the following in an internal email complaining about a committee's rating decision:

> Chui told me that while the three of us voted "no," in writing, that there were 4
> other "yes" votes. … [T]his is a great example of how the criteria process is NOT
> supposed to work. Being out-voted is one thing (and a good thing, in my view),
> but being out-voted by mystery voters with no "logic trail" to refer to is another.
> ... Again, this is exactly the kind of backroom decision-making that leads to
> inconsistent criteria . . .

S. Subcomm., *Anatomy of a Financial Collapse* at 294.

773.    Manipulation of the committee process was also common at Moody's.  Former

Senior Vice President William Harrington told the SEC that "management rewarded lenient

voting with respect to all asset classes," noting that "[t]he goal of management is to mold

analysts into pliable corporate citizens who cast their committee votes in line with the

unchanging corporate credo of maximizing earnings of the largely captive franchise."

Harrington Comment at 8.  Harrington stated that he "participated in numerous committees

where management maneuvered for a prescribed result through intimidation of other voting

members." *Id.* at 14.  These intimidation tactics included "belittling opposing views, interrupting

while others speak, making evident that they didn't consider the committee memo to be relevant,

. . . seek[ing] to have aspects of others' opinions deemed 'irrelevant' to the opinion at hand," and

"challeng[ing] a member with a possible ramification of her opinion along the lines of 'with your

view, you should be suggesting that the entire methodology be up for grabs and we're not here to

do that.'" *Id.* at 14-15.  Thus, according to Harrington:

> Members of committees vote one opinion for publication and keep their private
> opinions to themselves. A committee member who votes differently, *i.e.* one who
> votes the same opinion for publication as she holds privately, earns her own self-
> respect. She also courts retaliation from management.

Harrington Comment at 10.

### e.    Manipulation of Staffing and Resource Allocation

774.    Management further manipulated the rating process by hiring inexperienced

analysts who were more susceptible to intimidation from management.  According to Harrington,

"[d]uring the heyday of CDO issuance from 2005 to 2006, management also stopped hiring senior analysts and instead hired junior analysts who, while possessing the raw talent to grow into competent analysts, were too inexperienced to perform the tasks to which they were assigned." Harrington Comment at 16. Importantly, Harrington explained that "a junior analyst asked to lead the rating of a CDO could not possibly possess sufficient confidence, tactical sense or gravitas to challenge a banker, collateral manager or Moody's manager intent on pumping out another debauched CDO." *Id.*

775. Moreover, as part of their drive to maximize revenues, the Rating Agency Defendants refused to hire sufficient staff—or otherwise commit sufficient resources—to adequately rate residential-mortgage-backed financial products. The Senate Subcommittee on Investigations found that "despite record profits from 2004 to 2007, Moody's and S&P failed to assign sufficient resources to adequately rate new products and test the accuracy of existing ratings." S. Subcomm., *Anatomy of a Financial Collapse* at 245-46. The FCIC found that at Moody's, "the increase in the CDO group's workload and revenue was not paralleled by a staffing increase." FCIC Report at 149. According to team managing director Gary Witt, "[w]e were under-resourced, you know, we were always playing catch-up." *Id.* Similarly, Frank L. Raiter, who from 1995 until 2005 was a Managing Director at S&P and head of its Residential Mortgage Rating Group, stated in prepared testimony before the Senate Subcommittee on Investigations that "in the residential ratings group[,] . . . between 1995 and 2005[,] rating volumes grew five or six fold without similar increases in staffing. Rating production was achieved at the expense of maintaining criteria quality."

776. According to journalists McClean and Nocera, "analysts in structured finance were working twelve to fifteen hours a day. They made a fraction of the pay of even a junior

investment banker.  There were far more deals in the pipeline than they could possibly handle."

*Devils* at 123.  Moreover, according to McClean and Nocera, "[a]t both Moody's and S&P,

former employees say there was a move away from hiring people with backgrounds in credit and

toward hiring recent business school graduates or foreign engineers with green cards to keep

costs down."  *Id*.

> **f.      The Rating Agency Defendants Further Manipulated Their Ratings
> By Using Inaccurate, Outdated Models.**

777.      As noted above, each rating committee's evaluation of a PLMBS began with a

preliminary rating derived from a computer model.  *See supra* § V.F.2.d.  To ensure that the

committees assigned "competitive" final ratings, the Rating Agency Defendants used outdated

models that they knew turned out artificially inflated preliminary ratings.

778.      Specifically, the models relied on pre-2000 data—reliance that, for a number of

reasons, produced wildly inaccurate results.  First, this pre-2000 data ignored the dramatic

changes in the mortgage industry following 2000: increased lending to riskier borrowers,

increased origination of riskier kinds of mortgage loans, and a dramatic rise in housing prices.

Second, the pre-2000 data, as the Congressional Research Service reported in 2009, was based

on a "benign period of economic moderation in financial markets and rising house prices."

Congressional Research Serv., *Credit Rating Agencies and Their Regulation* 7 (2009); *accord* S.

Subcomm, *Anatomy of a Financial Collapse* at 288-89.  They were useless in predicting the

likelihood of default in a time of macroeconomic crisis and falling housing prices.

779.      The models had other flaws, too.  The Rating Agency Defendants failed to

account for any risk of a nationwide decline in home prices, and they miscalculated the

interdependence among loan defaults—the likelihood that an economic storm would sink more

than one financial ship.

780.    The Rating Agency Defendants knew of these flaws, but refused to fix them because they knew that continuing to use the old models would facilitate their effort to expand market share.  In 2007, for example, Vickie Tillman, an S&P Executive Vice President, stated before the Senate Banking Committee: "We are fully aware that, for all our reliance on our historically rooted data that sometimes went as far back as the Great Depression, some of that data has proved no longer to be as useful or reliable as it has historically been."

781.    Frank Raiter, the former Managing Director of Residential Mortgage Backed Securities Ratings at S&P, testified that S&P had developed "a new version of the model" in 2001 "using approximately 2.5 million loans with significant performance information."  Written Statement of Frank L. Raiter Before the Committee on Oversight and Government Reform, United States House of Representatives (Oct. 22, 2008).  Although Raiter characterized this new model as "by far the best yet developed," he stated that the new model "was not implemented due to budgetary constraints."  *Id.*  Moreover, a fourth version of the model based on approximately 9.5 million loans covering "the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories" was developed by early 2004, but had not been implemented at the time of Raiter's testimony.  *Id.*

782.    Raiter explained that these models were not adopted because, "[b]y 2001, the focus at S&P was profits for the parent company, McGraw-Hill—it was not on incurring additional expense."  *Id.*  Moreover, Raiter explained that "the RMBS group enjoyed the largest ratings market share among the three major rating agencies (often 92% or better), and improving the model would not add to S&P's revenues."  *Id.*

783.    In fact, S&P management openly expressed concern about how a criteria change could impact market share and cause S&P to lose business.  For example, in a 2004 email chain

among members of S&P's Analytical Policy Board, which set standards for the ratings process, Gale Scott, a senior S&P manager, wrote:

> I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision and if so, how much? We should have an effective way of measuring the impact of our decision over time. . . . I think the criteria process must include appropriate testing and feedback from the marketplace.

S. Subcomm, *Anatomy of a Financial Collapse* at 277.

784.    In 2005, in response to an email stating that S&P's ratings model needed to be adjusted to account for the higher risks associated with subprime loans, a director in RMBS research, Frank Parisi, wrote that S&P could have released a different ratings model, LEVELS 6.0, months ago "if we didn't have to massage the sub-prime and Alt-A numbers to preserve market share." *Id.* at 276-77.

785.    Similarly, in an April 27, 2008 article in the New York Times Magazine, Mark Adelson, a former Managing Director in Moody's structured finance division, criticized Moody's use of historical data about 30-year fixed mortgages to predict defaults and delinquencies in the new mortgage market—describing it as "observing 100 years of weather in Antarctica to forecast the weather in Hawaii." Jerome Fons, a former Managing Director of Credit Policy at Moody's, testified before the House Oversight Committee on October 22, 2008 that when evidence arose that previously assigned ratings of PLMBS were inaccurate, the Rating Agency Defendants "did not update their models or their thinking."

786.    Eric Kolchinsky, a former managing director at Moody's, testified before the House Oversight and Government Reform Committee on September 30, 2009 that "[m]ethodologies produced by Moody's for rating structured finance securities are inadequate and do not realistically reflect the underlying credits. Rating models are put together in a haphazard fashion and are not validated if doing so would jeopardize revenues."

787.    Moody's CEO Brian Clarkson was not interested in updating the models or acquiring more up-to-date data.  Clarkson wrote an internal email in 2000 criticizing those inside Moody's who had advocated buying more data, stating: "We want more data when most of the time we rate MBS deals using arbitrary rule of thumb?!!"  S. Subcomm, *Anatomy of a Financial Collapse* at 290.  Clarkson went on to state: "I have not seen anything that sets forth the gains in revenue from such spending."  *Id.*  Unsurprisingly, Moody's did not purchase new loan data for a four-year period between 2002 and 2006.  *Id.*  Thus, by 2005, an internal Moody's employee survey "found that the company's employees felt that Moody's should have been spending more resources on improving its models."  *Id.* at 290-91.

788.    Thus, as the FCIC concluded, "Moody's … relied on flawed and outdated models to issue erroneous ratings on mortgage-related securities, failed to perform meaningful due diligence on the assets underlying the securities, and continued to rely on those models even after it became obvious that the models were wrong." FCIC Report at 126.  The Rating Agency Defendants knew that their ratings of PLMBS—and the models upon which they were based—did not accurately reflect the likelihood of payment.

**3.      Subsequent Downgrades Confirm That the Investment-Grade Ratings Reported in the Offering Documents Were Unjustifiably High and Knowingly Misstated the True Credit Risk of the PLMBS Purchased by the Bank.**

789.    The Bank purchased only triple-A-rated tranches of PLMBS.  As noted above, the triple-A rating denotes extremely strong credit quality.  Historically, investments with triple-A ratings had a very low expected default rate.  The default rate on investment-grade corporate bonds from 1981 to 2008, for example, averaged about 0.08%, with no year's default rate higher than 0.51%.

790.    However, beginning in the summer of 2008, the vast majority of the PLMBS purchased by the Bank were downgraded. All of the triple-A rated Certificates purchased by the Bank (originally valued at over $5.5 billion) now have been downgraded to non-investment-grade ratings, *i.e.* junk status. *See infra* ¶ 899.

791.    Together with the information that has recently come to light, this summer-of-2008 downgrade of triple-A rated PLMBS indicates that the ratings set forth in the Offering Documents were false, unreliable, and inflated. As the SEC has noted,

> As the performance of these securities continued to deteriorate, the three rating agencies most active in rating these instruments downgraded a significant number of their ratings. The rating agencies['] performance in rating these structured finance products raised questions about the accuracy of their credit ratings generally as well as the integrity of the ratings process as a whole.

*Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies by the Staff of the Securities and Exchange Commission* at 2 (July 2008).

792.    In July 2007, when S&P and Moody's first began to downgrade mortgage-backed securities (securities not owned by the Bank), both agencies announced changes in ratings methodology and acknowledged the risky origination practices underlying the PLMBS they had rated. For example, on July 10, 2007, S&P announced it was revising the methodologies used to rate numerous mortgage-backed securities because the performance of the underlying collateral "call[ed] into question" the accuracy of the loan data "regarding the loan and borrower characteristics." Importantly, S&P assured investors that, in the future, it would seek to review and minimize the incidence of potential underwriting abuse given "the level of loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 vintage" of mortgage-backed securities.

793.    One day later, on July 11, 2007, Moody's announced that it was also revising its methodology used to rate PLMBS, and that it anticipated downgrades of certain PLMBS not

owned by the Bank.  As noted above, Moody's did in fact significantly downgrade many

PLMBS, noting "aggressive underwriting" used in the origination of the collateral.

794.    The Rating Agency Defendants knew of the likelihood of downgrades well-before

they announced these changes in methodology in July 2007.  For example, in a recently

disclosed February 2007 email, Ernestine Warner, S&P's head of global surveillance, wrote to

Peter D'Erchia an S&P managing director:

> I talked to Tornmy yesterday and he thinks that the [RMBS] ratings are not going
> to hold through 2007 . . . He asked me to begin discussing taking rating actions
> earlier on the poor performing deals . . . . I have been thinking about this for much
> of the night.

*Devils* 296-97.  A similar March 18, 2007 internal email stated:

> To give you a confidential tidbit among friends the subprime brou haha is
> reaching serious levels - tomorrow morning key members of the RMBS rating
> division are scheduled to make a presentation to Terry McGraw CEO of McGraw-
> Hill Companies and his executive committee on the entire subprime situation and
> how we rated the deals and are preparing to deal with the fallout (downgrades).

Permanent Subcommittee on Investigations, Hearing on Wall Street and the Financial Crisis: The

Role of Credit Rating Agencies, Exhibit 1d (April 23, 2010).

795.    Despite these concerns, the Rating Agency Defendants continued to issue triple-A

ratings for PLMBS, including a number of the PLMBS at issue here.  In fact, Moody's and S&P

pushed out record numbers of PLMBS ratings in the first weeks of July 2007, just days before

they began to downgrade, en masse, the ratings of PLMBS not owned by the Bank.  This

prompted the Senate Subcommittee on Investigations to note:  "The timing of this surge of new

ratings on the eve of the mass downgrades is troubling, and raises serious questions about

whether S&P and Moody's quickly pushed these ratings through to avoid losing revenues before

the mass downgrades began."  S. Subcomm, *Anatomy of a Financial Collapse* at 263.  As

demonstrated above, these late triple-A ratings merely represented a continuation of a blind pursuit for market share that caused the ratings for all of the PLMBS to be substantially inflated.

### 4.   Other Actions of the Rating Agency Defendants Further Demonstrate that They Knew Their Ratings Were Inaccurate.

796.    Additionally, the actions of the Rating Agency Defendants further demonstrate that they knew that the PLMBS they rated triple-A were not worthy of their highest credit ratings.  For example, according to former Senior Vice President William Harrington, "Moody's management insisted that its quarterly monitoring fees and all other amounts owed by a structured finance issuance be paid at a very senior level in its priority of payments, ahead of payments of interest and principal to rated notes, including those rated Aaa at issuance." Harrington at 5.  Had Moody's been confident that the triple-A rated tranches of these deals were in fact worthy of their highest credit rating, there would have been no need for Moody's management to insist that it receive priority payment status.  As these deals are structured, however, "Moody's is paid the vast majority of its monitoring fees . . . no matter how little remains for distribution to rated notes and no matter how far the notes have been downgraded." *Id.*

797.    Harrington also described how Moody's management tracked negative feedback received from external constituents regarding Moody's analysts since 2004 "without taking remedial action and without reflecting this view in annual evaluations."  Harrington at 5-6 (citing a 2009 group meeting at which Doug Lucas and Andy Kimball "presented data that showed that external constituents had regarded analysts at Moody's, S&P and Fitch in declining respect from 2004 onwards.").

5.       **The Rating Agency Defendants Knew That Their PLMBS Ratings Fundamentally Differed from Their Ratings of Corporate Bonds.**

798.     Neither the Rating Agency Defendants nor the Securities Defendants disclosed to investors that the ratings of PLMBS were materially different from, and less reliable than, standard corporate bond ratings.  Instead, the Rating Agency Defendants represented that the credit ratings were comparable to corporate bonds.  Moody's stated in a 2004 presentation that, "The comparability of these opinions holds regardless of the country of the issuer, its industry, asset class, or type of fixed-income debt."  A May 2007 S&P document on rating methodology stated: "Our ratings represent a uniform measure of credit quality globally and across all types of debt instruments.  In other words, an 'AAA' rated corporate bond should exhibit the same degree of credit quality as an 'AAA' rated securitized debt issue."

799.     However, the Rating Agency Defendants did not simply estimate expected loss and/or probability of default in determining the PLMBS ratings in this case, as they do with corporate bonds.  Rather, they employed mathematical credit risk models based on random event simulations to determine the estimated loss distributions associated with the great many separate assets that back the PLMBS.  These models required the Rating Agency Defendants to make many estimates and assumptions regarding each of the various assets, including the degree to which losses or defaults on these assets would be correlated with each other.

800.     Unlike the assumptions the Rating Agency Defendants use for rating other instruments, such as corporate bonds, the assumptions used to rate the PLMBS in this case were based on historical data that the Rating Agency Defendants knew were dramatically incomplete and outdated.  *See supra* § V.F.2.f.  Moreover, as noted above, the final ratings assigned to the PLMBS were not based strictly on the results of these models, but were assigned by committees

314

whose opinions were tainted by fear and intimidation, a blind pursuit of market share, and willful disregard for the abandonment of underwriting guidelines.

801.    In short, unlike their ratings of corporate bonds, the Rating Agency Defendants' ratings of the PLMBS had very little to do with an estimate of expected loss and/or probability of default.  Thus, the Rating Agency Defendants knowingly misrepresented that their PLMBS ratings were as accurate as their ratings of other instruments.

###    6.    The Bank Reasonably Relied on the Credit Ratings Reported in the Offering Documents.

802.    Fitch; Moody's Investors Service, Inc.; and Standard & Poor's Ratings Services are "Nationally Recognized Statistical Rating Organizations," or NRSROs—a special status that the SEC created in 1975 to distinguish the most credible and reliable rating agencies and to ensure the integrity of the ratings process.  According to the SEC, the "single most important criterion" in their granting of NRSRO status is that "the rating organization is recognized in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings."  Further, in grating NRSRO status, the SEC determines that the rating organization is independent from the firms whose issuances it rates.

803.    The market—including both sophisticated and unsophisticated investors—has come to rely on the Rating Agency Defendants for accurate and unbiased assessments of credit quality.  Moreover, as the Senate Subcommittee on Investigations noted, "[t]he more complex and opaque the structured finance instruments became, the more reliant investors were on high credit ratings for the instruments to be marketable."  S. Subcomm., *Anatomy of a Financial Collapse* at 29-30.

804.    Rating Agency Defendants themselves acknowledged the importance of Credit Ratings in the context of structured financial products, including PLMBS.  As Moody's CEO

Raymond McDaniel explained: "Ratings facilitate [the broad marketability of bonds] . . . because many [large U.S. investors] have prudential investment guidelines that rely in part upon ratings as a measure of desired portfolio quality."  Testimony of Raymond W. McDaniel Before U.S. Senate Subcommittee on Banking, Housing and Urban Affairs (Feb 8. 2005).  McDaniel further acknowledged that "ratings were incorporated into various legislative and regulatory frameworks" to "promote the objectives of market efficiency and investor protection."  *Id.*  Similarly, S&P's former Vice President Vickie A. Tillman ("Tillman") declared in a letter to the editor of the Wall Street Journal that "[o]ur credit ratings provide objective, impartial opinions on the credit quality of bonds." "How S&P Protects Integrity of Credit Ratings," Wall Street Journal (Sept. 17, 2007).

805.    In a 2008 White Paper on Rating Competition and Structured Finance, Jerome Fons, a former Moody's Managing Director in charge of Credit Policy, noted that the "details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny."  This lack of publicly available information made "[t]he role of rating agencies . . . particularly important to the structured finance process.  Investors rely on agency ratings when making purchase decisions because of the opacity [in the structured finance market]."  Fons, White Paper on Rating Competition and Structured Finance (Jan. 10, 2008).

806.    Fons testified before Congress that "[p]otential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool" whereas "rating agencies had a reputation, earned over nearly one century, of being honest arbiters of risk."  Testimony of Jerome S. Fons Before the U.S. House of Representatives Committee on Oversight and Government Reform (Oct. 22, 2008).

807.     It was thus reasonable for the Bank to rely on the Rating Agency Defendants' ratings of the PLMBS.  The Bank did not know, and reasonably could not have known, that the credit ratings were knowingly inflated.  The Bank did not know that the credit ratings were impaired by conflicts of interest and were susceptible of manipulation.  Moreover, the Bank did not know that the ratings did not in fact address the risk of the Certificates and the likelihood of payment by borrowers on the underlying mortgage loans.  Indeed, no disclosure informed the Bank that the rating was the unreliable result of inaccurate information, coercion, and deficient modeling, as opposed to a legitimate evaluation of credit risk.

808.     The Rating Agency Defendants continued to assure the market of the integrity of their ratings of mortgage-backed securities long after the PLMBS were purchased by the Bank. In a letter to the editor of The Wall Street Journal dated September 17, 2007, Vickie Tillman, then Executive Vice President of Credit Market Services at S&P, stated:  "We have numerous safeguards in place that have helped us effectively manage" potential conflicts of interest.  "Our credit ratings provide objective, impartial opinions on the credit quality of bonds."  Tillman likewise testified before the Senate Committee on Banking, Housing and Urban Affairs on September 26, 2007:

> S&P maintains rigorous policies and procedures designed to ensure the integrity of our analytical processes. For example, analysts are not compensated based upon the amount of revenue they generate.  Nor are analysts involved in negotiating fees.  Similarly, individuals responsible for our commercial relationships with issuers are not allowed to vote at rating committees.  These policies, and others, have helped ensure our long-standing track record of excellence.

809.     As noted above, the Rating Agency Defendants also assured the market that the ratings assigned to PLMBS were just as reliable as ratings assigned to corporate bonds.  *See supra* § V.F.5.

810.    At the time these statements were made in September 2007, all of the PLMBS retained their investment-grade ratings.

**G.    The Proper Steps Were Not Taken To Ensure That the Mortgage Loans Underlying the Trusts Were Enforceable.**

811.    For PLMBS to have any value, the issuing trust must own and be able to enforce the mortgage loans that back the PLMBS.  If the trust cannot enforce the loans, they are effectively worthless—and so are the PLMBS secured by those loans.  In essence, the purported "mortgage-backed securities" would not be "backed" by mortgages at all.

812.    The power to enforce the loans comes only through valid possession of both the promissory note—which defines the terms of the borrower's promise to pay back the loan—and the mortgage—which is a lien against the underlying property and serves as security to the note. If a promissory note has not been paid on time, the holder may enforce the promissory note through foreclosure on the mortgage.

813.    Before a purported mortgage holder can foreclose on a mortgaged property, state law generally requires that the purported holder—if it is not the original mortgagee—prove that it is a valid assignee of the promissory note and mortgage.  The assignment, or chain of assignment, must trace back without gaps to the original mortgagee, it must be in writing, and it must identify the mortgage that is assigned.

814.    The issuing trust of a PLMBS is not the original holder of the promissory notes and mortgages.  Rather, when a mortgage loan is originated, the originator is the holder of both the promissory note and the mortgage.  Thus, as the securitization process moves forward and each  mortgage loan is sold to a sponsor and/or depositor and then to an issuing trust of a PLMBS, *see supra* § V.A.1, it is critical that both the promissory note and the mortgage be

validly assigned each time the loan changes possession.  Absent valid assignment, the trust will have no authority to enforce the loans.

815.    Whether a mortgage loan has been validly assigned to the issuing trust is determined by state law, as well as the pooling and servicing agreement, indenture trust agreement, or other agreement under which the issuing trust operates.  State law generally requires that the promissory note, a negotiable instrument, be assigned by endorsement.  *See* U.C.C. §§ 3-201, 3-301.  Each of the assignments made, or purportedly made, in the securitization process must be valid before the trust may enforce a mortgage loan.

816.    Pooling and servicing agreements ("PSAs") usually add the further requirement that the assignments of the note and mortgage be made at the time the securitization closes and the trust is formed.  *See, e.g.*, Pooling and Servicing Agreement, Bear Stearns ALT-A Trust 2006-4 §§ 2.01(a), (b), Oct. 6, 2006 ("The Depositor concurrently with the execution and delivery of this Agreement, sells, transfers and assigns to the Trust without recourse all its right, title and interest in and to . . . the Mortgage Loans . . . .  In connection with the above transfer and assignment, the Sponsor hereby deposits with the Trustee . . . with respect to each Mortgage Loan . . . the original Mortgage Note, endorsed without recourse . . . to the order of the Trustee, . . . the original mortgage . . . , [and] all intervening assignments of the Security Instrument . . . .").[21]

817.    Under the applicable common law of trusts, an attempt to convey a mortgage loan to a trust in violation of these requirements would be void.  Specifically, the applicable pooling and servicing agreements state that the agreements—and the resulting trusts—shall be governed

---

[21] The Security Instrument is defined as "A written instrument creating a valid first lien on a Mortgaged Property securing a Mortgage Note, which may be any applicable form of mortgage, deed of trust, deed to secure debt or security deed, including any riders or addenda thereto."

by the laws of the state of New York. *See, e.g.*, *id* at § 11.06. New York law provides that any transaction in contravention of the applicable trust documents is void. Accordingly, an attempt to convey a mortgage loan to a trust would be void if the depositor and/or sponsor failed to comply with the PSA's requirements that the mortgage and the corresponding note be assigned to the Trustee *at the time the trust is formed*.

818. Moreover, New York law provides that a trustee's authority is limited to that set forth in the documents that create the trust. Because the trustee only has power to enforce mortgages properly conveyed to the trust, the trustee would be unable to enforce any mortgage loan that was improperly conveyed in violation of the PSA.

819. The Offering Documents for all of the PLMBS in this action represented that the issuing trust could legally enforce the mortgage loans in its loan pool. *See infra* § VI.G.2. However, a material number of the promissory notes and mortgages underlying the issuing trusts have not been validly assigned so as to be enforceable. Because these assignments have not been made within the particular time periods required by the applicable pooling and servicing agreements, these mortgages and promissory notes are unenforceable by the trusts. Thus the Offering Documents are materially false and misleading.

**1. Federal and State Investigations and Publicly Available Documents Produced in Other Civil Lawsuits Indicate that the Originators, Sponsors, Depositors, and Issuing Trusts Routinely Failed to Properly Assign Mortgages and Promissory Notes.**

820. There have been numerous investigations into the failures of the Securities Defendants to properly assign promissory notes and mortgages. A review of these investigations and related litigation demonstrates that the originators, sponsors, depositors, and issuing trusts routinely failed to properly assign promissory notes and mortgages during the securitization process.

821.    The best known example of this is *Kemp v. Countrywide Home Loans, Inc. (In re Kemp)*, No. 08-18700 (Bankr. D.N.J.), in which Linda DeMartini—whom Countrywide had employed for a decade and who testified that in her employment, she had been "involved in every aspect of the servicing," and "had to know about everything"[22]—testified, on direct examination, that failure to deliver the promissory note to the trust was normal operating procedure for Countrywide.[23]   Accordingly, the U.S. Bankruptcy Court for the District of New Jersey, applying New Jersey law, held that because the debtor's mortgage loan had not been physically transferred to the issuing trust's trustee, or properly indorsed, it was enforceable by neither the issuing trust's trustee nor the trustee's agent.  *Kemp v. Countrywide Home Loans, Inc. (In re Kemp)*, 440 B.R. 624, 630-34 (Bankr. D.N.J. 2010).

822.    Similarly, *U.S. Bank N.A. v. Ibanez*, 941 N.E. 2d 40 (Mass. 2011), consisted of two consolidated cases arising out of two different mortgages purportedly assigned to two different mortgage-backed trusts.  In both, there was no evidence that, prior to the foreclosure sales, the mortgage had ever been assigned to the relevant Depositors.  *See id*. at 52.

---

[22] *Kemp*, Hr'g Tr. 45:7, 45:9-10 (Aug. 11, 2009).
[23] As DeMartini testified:

> Q.  [I]s it generally the custom . . . for [the trust] to hold the documents?
> A.  No.  They would stay with us as the servicer.
>       . . .
> Q.  So I believe you testified Countrywide was the originator of this loan?
> A.  Yes.
>       . . .
> Q.  So the physical documents were retained within the corporate entity Countrywide or Bank of America?
> A.  Correct.
> Q.  . . . [W]ould you say that this is standard operating procedure in the mortgage banking business?
> A.  Yes.  It would be . . . the normal course of business . . . , as we're the ones that are doing all the servicing, and that would include retaining the documents.

*Id*. at 14:5-15:6.

823.     On December 1, 2011, the Commonwealth of Massachusetts brought an

enforcement action against Bank of America, NA.; BAC Home Loans Servicing, LP; BAC GP,

LLC; JPMorgan Chase Bank, N.A.; Citibank, N.A.; Citimortgage, Inc.; GMAC Mortgage, LLC;

and Wells Fargo Bank, N.A., alleging that these banks "repeatedly failed to strictly adhere to

Massachusetts statutory requirements in conducting foreclosures, and knowingly foreclosed on

mortgages . . . even though they were neither the mortgagee, nor the holder of the mortgage, at

the time they initiated foreclosure proceedings."  Complaint, *Commonwealth of Massachusetts v.*

*Bank of America, N.A., et al.*, No. 11-4363 (Mass. Super. Ct. Suffolk Co., Dec. 1, 2011).

824.     The Massachusetts complaint, relying on foreclosure records, cited numerous

instances in which the Defendants sought to foreclose on mortgages without properly holding the

relevant mortgages.  For example, on October 6, 2008, Chase Home Finance LLC filed a

foreclose action on a loan originated by JPMorgan Chase Bank, N.A. in Hancock, Massachusetts

in June 2007.  However, "[a]s of October 6, 2008, when Chase Home Finance filed the Hancock

Foreclosure Complaint, and as of February 6, 2009, when Chase Home Finance obtained the

Hancock Order, it was not the holder of the Hancock Mortgage."  *Id.* ¶¶ 31-34.  Rather, "[i]t was

not until March 15, 2009 that Chase Home Finance received an assignment of the Hancock

Mortgage from JPMorgan Chase Bank, N.A., making Chase Home Finance the holder of the

mortgage."  *Id.* ¶ 34.  Similarly, the complaint describes another instance where:

> [I]t was not until July 2, 2008, at least six months after filing the Mascot Street
> Foreclosure Complaint and more than three months after the property was sold at
> auction, that Chase Home Finance received an assignment of the Mascot Street
> Mortgage from JPMorgan Chase Bank, N.A., making Chase Home Finance the
> holder of the mortgage.

*Id.* ¶ 42.

825.     The Complaint details similar examples with respect to the other defendants.  For

example, on February 27, 2008, Citibank, N.A., as trustee for certificate holders of Bear Steams

Asset Backed Securities Trust 2007-SD2, filed a complaint to foreclose on a mortgage originated by Washington Mutual Bank in Boston. *Id.* ¶ 54-55. WaMu subsequently assigned the mortgage to EMC Mortgage Corporation. *Id.* However, Citibank, N.A. did not receive an assignment of the mortgage from EMC until November 17, 2008, more than nine months after it filed the foreclosure complaint, and long after the standard time limit of a pooling and servicing agreement. *Id.* ¶ 59. "To confuse matters further, on November 14, 2008, just three days prior to the November 17, 2008 assignment from EMC to Citibank, N.A., WAMU executed an Assignment of Mortgage purporting to assign the . . . Mortgage to Citibank, NA," *Id.* ¶ 60.

826.    Similarly, GMAC Mortgage, LLC foreclosed upon a Dorchester mortgage, caused notices of sale to be published, and sold the property at auction, all before it received an assignment of the mortgage. *Id.* ¶¶ 67-73. On February 26, 2009 Bank of America, N.A. filed a complaint to foreclose on an Oxford mortgage that had been originated by Town and Country in 2005 and subsequently assigned to Ameriquest Mortgage Company and then to MERS. *Id.* ¶¶ 98-99. However, it was not until September 15, 2009—nearly seven months later—that Bank of America received an assignment of the Oxford mortgage. *Id.* ¶ 101.

827.    Likewise, Wells Fargo was not the holder of a Sturbridge mortgage when if filed a complaint to foreclose on March 10, 2008. *Id.* ¶¶ 103-107. It was not until April 18, 2008, that Wells Fargo received an assignment, making it the proper holder of the mortgage. *Id.*

828.    Other states and governmental agencies have also investigated similar practices. Most notably, the Department of Justice announced on March 12, 2012 that the following parties agreed to pay $25 billion to settle foreclosure-related claims brought by 49 state attorneys general and the federal government: Residential Capital, LLC; Ally Financial, Inc.; GMAC Mortgage, LLC; Bank of America Corporation; Bank of America, N.A.; BAC Home Loans

Servicing, LP; Countrywide Financial Corporation; Countrywide Home Loans, Inc.;

Countrywide Mortgage Ventures, LLC; Countrywide Bank FSB; Citigroup Inc.; Citibank, N.A.;

CitiMortgage, Inc.; J.P. Morgan Chase & Company; J.P. Morgan Chase Bank, N.A.; Wells Fargo

& Company; and Wells Fargo Bank, N.A.  The complaint alleged, *inter alia*, that the "Banks'

failure to follow appropriate foreclosure procedures" included "preparing, executing, notarizing

or presenting false and misleading documents. . .  as part of the foreclosure process (including,

but not limited to, affidavits, declarations, certification, substitutions of trustees, and

*assignments*)" (emphasis added).

829.    In April 2012 the Board of Governors of the Federal Reserve System entered into

Consent Orders with numerous banking institutions regarding the servicing and foreclosure

practices of their subsidiaries.  Specifically, these Consent Orders stated that these entities

"[l]itigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures

without always confirming that documentation of ownership was in order at the appropriate time,

including confirming that the promissory note and mortgage document were properly endorsed

or assigned and, if necessary, in the possession of the appropriate party."  These Consent Orders

were entered with the following relevant originators, sponsors, or control person entities:  Ally

Financial Inc. (f/k/a/ GMAC Inc. and GMAC LLC) (regarding the practices of Ally Financial

Inc. through its subsidiaries, including GMAC Mortgage, LLC); JPMorgan Chase & Co.

(regarding the practices of JP Morgan Chase & Co. through its subsidiaries, including EMC

Mortgage Corp.); Morgan Stanley (regarding the practices of Morgan Stanley through its

subsidiary Saxon Mortgage Services, Inc.); and Sun Trust Banks (regarding the practices of

originator SunTrust Mortgage, Inc.).

830.    A 2010 report issued by the Office of the Attorney General of the State of Florida noted numerous problems with mortgage assignments, including assignments that were "[n]ot executed by the authorized person," "[s]ignatures not witnessed properly by the 'witnesses,'" and "[s]ignatures not properly notarized by a notary."  Office of the Attorney General, Economic Crimes Division, *Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases* at 26 (2010). The report noted countless instances of fraud, including forged signatures on mortgage assignments.  *Id.* at 27-35.  One of the more egregious examples included the purported signatures of Linda Green, which appear on hundreds of thousands of mortgages assignments. *Id.*  Not only did these purported signatures vary wildly from document to document, but Linda Green purportedly signed documents on behalf of *dozens* of banks and mortgage companies, including American Home Mortgage Servicing, Inc,; American Home Acceptance; Argent Mortgage Company; Bank of America; Citi Residential Lending; and Wells Fargo Bank, N.A. *Id.* at 35.

831.    Multiple decisions have come down from courts across the country in which failures of transfer or assignment prevented financial institutions from foreclosing on behalf of issuing trusts.  *See, e.g.*, *In re Mims*, 438 B.R. 52 (Bankr. S.D.N.Y. 2010); *Deutsche Bank Nat'l Trust Co. v. Tarantola (In re Tarantola)*, No. 09-09703, 2010 WL 3022038 (Bankr. D. Ariz. July 29, 2010); *In re Weisband*, 427 B.R. 13 (Bankr. D. Ariz. 2010); *Wells Fargo Bank, N.A. v. Marchione*, 887 N.Y.S.2d 615 (App. Div. 2009); *IndyMac Bank F.S.B. v. Garcia*, 28 Misc. 3d 1202(A) (N.Y. Sup. Ct. 2010); *Deutsche Bank Nat'l Trust Co. v. McRae*, 894 N.Y.S.2d 720 (Sup. Ct. 2010); *Citigroup Global Markets Realty Corp. v. Bowling*, 25 Misc. 3d 1244(A) (N.Y. Sup. Ct. 2009); *HSBC Bank USA, N.A. v. Miller*, 889 N.Y.S.2d 430 (Sup. Ct. 2009); *Deutsche Bank Nat'l Trust Co. v. Abbate*, 25 Misc. 3d 1216(A) (N.Y. Sup. Ct. 2009); *In re Adams*, 693

S.E.2d 705 (N.C. Ct. App. 2010); *HSBC Bank USA v. Thompson*, No. 23761, 2010 WL 3451130 (Ohio. Ct. App. Sept. 3, 2010); *Bank of N.Y. v. Gindele*, No. C-090251, 2010 WL 571981 (Ohio Ct. App. Feb. 19, 2010).

832.    According to the *New York Times*, the United States Trustee Program—the division of the Department of Justice responsible for overseeing the administration of bankruptcy cases—has taken the unusual step of intervening in bankruptcy proceedings to force the mortgage companies to prove that they own, or otherwise have the standing required to enforce, the mortgages on which they are seeking to foreclose.  *See* Gretchen Morgenson, *Don't Just Tell Us, Show Us That You Can Foreclose*, N.Y. Times, Nov. 27, 2010.  The *Times* article noted the Trustee's intervention in two Atlanta bankruptcy cases, one involving Wells Fargo and the other involving J.P. Morgan Chase.

## 2.    The Assignment Problems Were Systemic.

833.    These failures were systemic in the industry.  In fact, the City and County of San Francisco's Office of the Assessor-Recorder recently released the results of an audit (the "S.F. Audit") of 382 residential mortgage loans that had been foreclosed upon  (the "subject loans") which "identified one or more irregularities in 99% of the subject loans."[24]  San Francisco Office of the Assessor-Recorder, *Foreclosure in California: A Crisis of Compliance* at 1 (Feb, 2012). Because of the predominant market share of the originators of the mortgages underlying the PLMBS at issue in this Complaint—21 of the originators of the mortgage loans underlying the PLMBS at issue in this complaint accounted for 80.3% of all mortgage originations in 2006[25]—

---

[24] These 382 residential mortgage loan transactions resulted in foreclosure sales that occurred from January 2009 through October 2011.  Over this period, there were 2,405 foreclosure sales. The subject loans represented approximately 16% of total foreclosure sales during this time period.

[25] For example, the nationwide market share of the largest originators of loans underlying the PLMBS in 2006 was as follows:  Countrywide Financial – 15.5%; Wells Fargo Home

and because of the predominant market share of the relevant servicers at the time of the S.F. Audit—servicers affiliated with the relevant originators or Securities Defendants serviced at least 65.3% of all mortgages in 2009[26]—the Bank alleges on information and belief that the findings of the S.F. Audit apply with respect to the entities responsible for the assignment of the mortgages and promissory notes underlying the PLMBS purchased by the Bank.

834.    The S.F. Audit found that 75% of the loans had irregularities related to the assignment of the mortgage. *Id.* Specifically, for 6% of the subject loans, two or more conflicting assignments of the mortgage were recording, purporting to transfer ownership to two or more separate entities. *Id* at 6. In 23% of the subject loans, "the foreclosure documents contradict the findings of a securitization audit regarding who is the true, current owner of this loan." *Id.* ("Specifically, federal securities data regarding the ownership of the loan contradict the documents filed at the County Recorder's office.") Moreover, the S.F. Audit found that with respect to 27% of the subject loans, there was "evidence to suggest that the original or prior owner of the loan may not have signed the Assignment and that it instead was improperly signed by an employee of the Servicer or Trustee." *Id.* at 7. Similarly, "11% of the time [the S.F. Audit] found evidence to suggest the prior owner of a subject loan may not have signed the Assignment and that instead the assignee signed also as assignor." *Id.* With respect to these last

---

Mortgage – 13.3%; Washington Mutual – 6.6%; CitiMortgage Inc.– 6.2%; Chase Home Finance – 5.8%; Bank of America Mtg. – 5.6%; Wachovia Corp. – 3.5%; Residential Capital Group – 3.2%; IndyMac – 3.0%; GMAC Residential Holding Corp – 2.5%; EMC Mortgage – 2.4%; American Home Mortgage  Corp.– 2.0%; and SunTrust Mortgage Inc. 1.9%. Inside Mortgage Finance Publication, THE 2010 MORTGAGE MARKET STATISTICAL ANNUAL, 47 (2010).

[26] The nationwide market share of the relevant servicers in 2009 was as follows:  Bank of America – 20.1%; Wells Fargo – 16.7%; Chase – 13%; Citi – 6.7%; GMAC – 3.2%; SunTrust Mortgage – 1.6%; PHH Mortgage – 1.4%; Aurora Bank, FSB – 0.9%; American Home Mortgage Servicing – 0.8%; Goldman Sachs Bank USA – 0.5%; Capital One Financial (GreenPoint Mortgage) – 0.4%.  Inside Mortgage Finance Publication, THE 2010 MORTGAGE MARKET STATISTICAL ANNUAL, 174 (2010).

two categories of loans, the Audit found that it was likely that "the chain of title to such loans has been broken and the written transfers from the original owners to the current entities claiming to be Beneficiary do not exist." *Id.*

835.   The failure to properly assign mortgages or mortgage loans is also shown by the recent drop in foreclosures system-wide, which is attributable to lack of necessary documentation. *See, e.g.*, Dan Levy & John Gittelsohn, *Foreclosure Filings Hit Three-Year Low As U.S. Servicers in "Dysfunction"*, Bloomberg News, Mar. 9, 2011, http://www.bloomberg.com/news/2011-03-10/foreclosure-filings-drop-to-3-year-low-as-u-s-servicers-in-dysfunction-.html.  In addition, in the Fall of 2010, major financial institutions such as Bank of America (which acquired Countrywide) and J.P. Morgan Chase, both originators of mortgages underlying the Certificates purchased by the Bank, announced they were suspending mortgage foreclosures because they had discovered significant problems in their ability to locate and document the ownership of mortgage notes.

836.   In addition, major financial institutions have reserved hundreds of millions, if not billions, of dollars to address litigation and losses stemming from the financial crisis and foreclosure problems.

837.   Also telling is a recent proposal by a group friendly to the mortgage industry to enact federal legislation to loosen the standards for foreclosure.  Jason Gold & Anne Kim, Third Way, *Fixing "Foreclosure-gate"* (Jan. 2011), *available at* http://content.thirdway.org/publications/362/Third_Way_Memo_-_Fixing_Foreclosure-gate.pdf. The proposal would not be necessary if the industry's house were in order.

## VI.   DEFENDANTS' MATERIAL UNTRUE STATEMENTS AND OMISSIONS IN CONNECTION WITH THE SALE OF PLMBS TO THE BANK

838.    As detailed above, the Sponsor Defendants purchased mortgage loans and deposited them into issuing trusts, from which the Depositor/Issuer Defendants issued Certificates, and the Underwriter Defendants and other Securities Defendants offered and sold the Certificates to the Bank through the Offering Documents for each securitization.  The Depositor/Issuer and Underwriter Defendants drafted the Offering Documents.  In addition, each Sponsor, Depositor/Issuer, and Underwriter Defendant was identified in these documents as the Sponsor, Depositor/Issuer or Underwriter, respectively, of the Certificates, and approved the versions of these documents that were delivered to the Bank.

839.    The Offering Documents contained extensive material misstatements and omissions of material fact with regard to the underwriting guidelines and practices purportedly applied by the mortgage originators whose loans backed the PLMBS purchased by the Bank, the appraisal process underlying the loan-to-value ratios ("LTVs"), predatory lending abuses by the mortgage originators, and a number of key characteristics of the mortgage pools that pertain to the risk of the Certificates.  These misstatements are not predictions of future events or subjective opinions.  Rather, these misstatements constitute misrepresentations of material facts that were false when made.  Moreover, the misstatements all concern information that the Bank did not have access to and could not independently verify—this information was only available to the Defendants, and thus the Bank relied upon the Securities Defendants to accurately present the information.  Specifically, the misstatements and omissions of material fact are as follows:

A.     **The Securities Defendants Misrepresented Underwriting Guidelines Utilized by Mortgage Lenders**

1.     **The Materiality of Underwriting Guidelines**

840.     As alleged above, an originator's underwriting standards, and the extent to which an originator departs from its standards, are key indicators of the risk of the mortgage loans made by that originator.  And because mortgage loans back the PLMBS that are issued to investors such as the Bank, the loan underwriting standards are also material to assessing the risk of the PLMBS.  For these reasons, the originators' underwriting standards as described in the Offering Documents were material to the Bank's decision to purchase the PLMBS.

2.     **Misstatements Regarding Underwriting Guidelines**

841.     The Offering Documents contained material untrue or misleading statements and omissions regarding the underwriting guidelines allegedly employed in the origination of the mortgage loans that secure the PLMBS.  Fundamentally, the Offering Documents misrepresented that the mortgage originators applied their stated underwriting guidelines.  The initial Prospectus for each Certificate, which was typically filed with the Registration Statement and incorporated by reference in the Free Writing Prospectus, contained representations substantially similar to the following: "The loans will have been originated in accordance with the underwriting criteria specified in the related prospectus supplement." *See, e.g.*, JPALT 2006-4 Pros at 18.  More specifically, these Prospectuses typically stated that "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property, home improvements or manufactured home, as applicable, as collateral." *See, e.g.*, JPALT 2006-4 Pros at 22.  These statements were materially misleading because, as described above, the mortgage originators routinely

disregarded their own underwriting guidelines and thus originated mortgages with no regard for the borrower's credit standing or repayment ability.

842.    Moreover, the Offering Documents made numerous misrepresentations and omissions regarding each originator's application of its specific underwriting standards. Appendix III attached hereto and incorporated herein sets forth examples of these misstatements and omissions, as contained in the Offering Documents for each Certificate, and provides the reasons each is materially misleading.  For example, the Offering Documents for Certificate BAFC 2006-D 1A1 contain the following materially misleading statements and omissions regarding mortgages originated or acquired by Countrywide Home Loans:

A.    Countrywide's underwriting standards were used "to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." BAFC 2006-D Pros. Sup. S-57.

B.    "For all mortgage loans originated or acquired by Countrywide":

Countrywide . . . obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. ***All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.***

BAFC 2006-D Pros. Sup. S-58 (emphasis added).

C.    "[A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses . . . to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits," which vary "depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower." BAFC 2006-D Pros. Sup. S-57-58.

D.      Under its Standard Underwriting Guidelines, Countrywide "generally permits a

debt-to-income ratio based on the borrower's monthly housing expenses of up to 33%

and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%."

BAFC 2006-D Pros. Sup. S-59.

E.      "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

if compensating factors are demonstrated by a prospective borrower."  BAFC 2006-D

Pros. Sup. S-58.

F.      According to Countrywide's "Full Documentation Program," "the underwriter

*verifies the information contained in the application relating to employment, income,*

*assets or mortgages*." BAFC 2006-D Pros. Sup. S-58 (emphasis added).

G.      "A prospective borrower ***may be eligible*** for a loan approval process that limits or

eliminates Countrywide Home Loans' standard disclosure or verification requirements or

both."  BAFC 2006-D Pros. Sup. S-58 (emphasis added).

843.    These statements were materially misleading for multiple reasons, which are

described in further detail in Appendix III hereto.  Fundamentally, they grossly distort the

underwriting process that was actually employed by indicating that it was a principled process

that followed stated standards and employed enumerated safeguards.  Unfortunately, as

described above, both Countrywide and the other originators of mortgage loans that secured the

PLMBS purchased by the Bank effectively abandoned their stated underwriting standards in an

effort to maximize their mortgage origination volume.  Thus Countrywide and other originators

did not follow the underwriting standards set forth or otherwise referred to in the Offering

Documents.  "Exceptions" to standards became the rule.  Reduced documentation was employed

not to streamline the process where the borrower met eligibility requirements or where otherwise

warranted, but instead to mask the borrower's disqualification. Requirements for verification of borrower income, assets, or employment were routinely ignored. Measurements of LTV and DTI were meaningless because the appraised values were unreliable and the borrowers' income assertions were unverified and total debt obligations undisclosed.

844. In addition, the statements were materially misleading because they fail to disclose that Countrywide lacked any reasonable basis for its determination of "acceptable limits" for DTIs. Due to the industry's inexperience with lending to borrowers with increased credit risks, including the explosion in Alt-A, subprime and other nontraditional lending as described *supra*, § V.B.1, Countrywide lacked sufficient data regarding historical patterns of borrower behavior in relation to default experience for similar types of borrower profiles. Consequently, Countrywide's assignment of "maximum acceptable debt-to-income ratio" had no reliable connection to the actual risk of default presented by borrowers assigned to each classification. But Countrywide, and others in the industry, continued to use this data to construct "models" to justify their ever-less rigorous underwriting programs, and continued to present these models and programs to investors as prudent, thoroughly tested and well-grounded in reliable and objective data.

845. The statements were further materially misleading because they fail to disclose that Countrywide, like the other originators of mortgages that secured the PLMBS purchased by the Bank, lacked adequate procedures and practices to monitor or evaluate their mortgage loan underwriters' exercise of judgment, or to provide appropriate training and education to their mortgage loan underwriters.

846. The Securities Defendants should have known that the originators abandoned underwriting guidelines because: (a) they were vertically integrated with the mortgage

originators that originated the loans underlying the Certificates purchased by the Bank, *see supra* § V.D.1; (b) their corporate affiliates served as depositors, sponsors, and underwriters for other PLMBS deals, including deals backed by loans originated by the originators that originated the loans underlying the Certificates purchased by the Bank, *see supra* § V.D.2; (c) their corporate affiliates sought to use the knowledge of the violations of underwriting standards to their advantage in purchasing loan pools at reduced prices, *see supra* § V.D.4.e; and (d) they performed due diligence reviews on the mortgage pools underlying the certificates.  *See supra* § V.D.4.

3. **Evidence Demonstrating Misstatements in the Offering Documents Regarding the Originators' Underwriting Practices.**

a. **Government investigations, actions and settlements, confidential sources, and evidence developed in other private lawsuits demonstrate systematic and pervasive abandonment of stated underwriting practices by the originators.**

847.    As alleged in detail above, the failure of the mortgage originators who issued the loans backing the PLMBS purchased by the Bank to apply their stated underwriting guidelines, to ensure that compensating factors justified exceptions, and to obtain accurate appraisals is well documented in government investigations and lawsuits, press reports, and statements of confidential sources who are former employees of the mortgage originators.  Additional evidence has been generated by the many other private lawsuits against many of the same Securities Defendants in connection with the sale of mortgage-backed securities and related Certificates. This evidence—and the allegations herein based on this evidence—demonstrates that the statements in the Offering Documents regarding the mortgage originators' underwriting and appraisal practices are false and misleading.  Contrary to the representations in the Offering Documents, the mortgage originators did not genuinely attempt to determine the borrowers'

ability to pay, or the adequacy of the collateral provided for the loans they issued, but instead abandoned these efforts in order to issue and sell for securitization as many loans possible.

> **b.  Analysis of loans that backed the PLMBS purchased by the Bank demonstrates the abandonment of stated underwriting practices by the originators.**

848.  Analysis of the specific loans that remain in the mortgage pools show high rates of delinquency and foreclosure evidencing a pervasive disregard of underwriting guidelines in the origination of those loans.  The following table shows the percentages of the loans in the mortgage pools as of March 31, 2011, as to which the borrower was at least 90 days delinquent, foreclosure proceedings were pending, or the mortgage holder had recovered title from the borrower.  While the percentages on this table are stark evidence of the flawed underwriting employed in the origination of the mortgages in the pools, they in fact understate the problem because they do not include mortgages that were foreclosed prior to March 31, 2011, but as to which the mortgage holder no longer held title to the underlying property as of this date.

| Sponsor | Total Delinquency (%) |
|---|---|
| **American Home Mortgage Acceptance, Inc.** | |
| AHM 2005-2 1A1 | 32.50 |
| **Average** - American Home Mortgage Acceptance, Inc. | **32.50** |
| | |
| **American Home Mortgage Corp.** | |
| AHMA 2006-6 A1A | 35.80 |
| AHMA 2007-2 A1 | 36.87 |
| AHMA 2007-5 A1 | 35.19 |
| **Average** - American Home Mortgage Corp. | **35.95** |
| | |
| **Bank of America, National Association** | |
| BAFC 2005-H 7A1 | 31.57 |
| BAFC 2006-D 1A1 | 38.75 |
| **Average** - Bank of America, National Association | **35.16** |

| Sponsor | Total Delinquency (%) |
|---|---|
| **Barclays Bank PLC** | |
| BCAP 2006-AA1 A1 | 46.70 |
| **Average -** Barclays Bank PLC | **46.70** |
| | |
| **Chevy Chase Bank, FSB** | |
| CCMFC 2006-2A A1 | 23.34 |
| CCMFC 2007-1A A1 | 32.76 |
| CCMFC 2007-2A A1 | 32.62 |
| **Average -** Chevy Chase Bank, FSB | **29.57** |
| | |
| **Citigroup Global Markets Realty Corp.** | |
| CMLTI 2005-9 1A1 | 32.75 |
| **Average -** Citigroup Global Markets Realty Corp. | **32.75** |
| | |
| **CitiMortgage, Inc.** | |
| CMALT 2007-A4 1A7 | 19.02 |
| **Average -** CitiMortgage, Inc. | **19.02** |
| | |
| **Countrywide Home Loans, Inc.** | |
| CWALT 2005-16 A4 | 45.68 |
| CWALT 2005-86CB A10 | 27.75 |
| CWALT 2006-OA16 A2 | 59.43 |
| CWALT 2006-OA8 1A1 | 58.15 |
| CWALT 2007-OA4 A1 | 56.73 |
| CWALT 2007-OA9 A1 | 52.61 |
| CWHL 2005-2 2A1 | 48.75 |
| **Average -** Countrywide Home Loans, Inc. | **49.87** |
| | |
| **Credit Suisse Securities (USA) LLC** | |
| ARMT 2006-2 6A1 | 46.64 |
| **Average -** Credit Suisse Securities (USA) LLC | **46.64** |
| | |
| **DB Structured Products, Inc.** | |
| DBALT 2006-AR2 1A1 | 29.43 |
| DBALT 2006-AR2 1A2 | 29.43 |
| DBALT 2006-AR3 A2 | 38.21 |
| DBALT 2006-AR4 A1 | 37.50 |
| DBALT 2006-AR5 1A1 | 43.96 |
| DBALT 2007-AR1 A1 | 53.66 |
| **Average -** DB Structured Products, Inc. | **38.70** |

| Sponsor | Total Delinquency (%) |
|---|---|
| **DLJ Mortgage Capital, Inc.** | |
| ARMT 2006-1 6A1 | 44.85 |
| ARMT 2006-3 4A2 | 52.41 |
| ARMT 2007-1 5A1 | 45.30 |
| ARMT 2007-2 2A21 | 40.66 |
| **Average** - DLJ Mortgage Capital, Inc. | **45.81** |
| | |
| **EMC Mortgage Corporation** | |
| BALTA 2005-10 11A1 | 49.79 |
| BALTA 2005-8 11A1 | 36.84 |
| BALTA 2005-9 11A1 | 39.62 |
| BALTA 2006-1 11A1 | 37.40 |
| BALTA 2006-2 11A1 | 56.97 |
| BALTA 2006-3 1A1 | 47.55 |
| BALTA 2006-4 11A1 | 51.34 |
| BALTA 2006-4 13A1 | 55.12 |
| BALTA 2006-5 1A1 | 52.33 |
| BALTA 2006-6 1A1 | 54.91 |
| BALTA 2006-7 1A1 | 47.61 |
| BALTA 2007-1 1A1 | 60.48 |
| BALTA 2007-2 1A1 | 54.35 |
| BALTA 2007-3 1A1 | 52.79 |
| BSMF 2006-AR1 1A1 | 49.99 |
| BSMF 2006-AR2 1A1 | 47.48 |
| BSMF 2006-AR3 1A1 | 51.44 |
| BSMF 2006-AR5 1A1 | 48.35 |
| BSMF 2007-AR1 1A1 | 45.39 |
| BSMF 2007-AR4 1A1 | 49.74 |
| BSMF 2007-AR5 1A1A | 49.15 |
| GPMF 2005-AR1 A2 | 44.24 |
| GPMF 2005-AR2 A1 | 43.10 |
| GPMF 2005-AR4 4A1A | 53.42 |
| GPMF 2006-AR3 4A1 | 37.10 |
| SAMI 2005-AR2 1A1 | 47.38 |

| Sponsor | Total Delinquency (%) |
|---|---|
| SAMI 2005-AR3 1A1 | 43.76 |
| SAMI 2005-AR6 2A1 | 40.43 |
| SAMI 2006-AR4 4A1 | 59.67 |
| SAMI 2006-AR6 1A1 | 63.86 |
| SAMI 2006-AR7 A1A | 61.39 |
| **Average** - EMC Mortgage Corporation | **49.45** |
| | |
| **Greenwich Capital Financial Products, Inc.** | |
| DSLA 2005-AR1 2A1A | 34.90 |
| DSLA 2005-AR2 2A1A | 26.24 |
| HVMLT 2005-10 2A1A | 50.26 |
| HVMLT 2006-7 2A1A | 39.89 |
| HVMLT 2006-8 2A1A | 41.17 |
| HVMLT 2007-1 2A1A | 60.86 |
| **Average** - Greenwich Capital Financial Products, Inc. | **42.22** |
| | |
| **Impac Funding Corporation** | |
| IMSA 2005-2 A1 | 20.91 |
| IMSA 2006-2 1A2A | 21.39 |
| **Average** - Impac Funding Corporation | **21.15** |
| | |
| **Impac Mortgage Holdings, Inc** | |
| IMM 2005-7 A1 | 18.94 |
| **Average** - Impac Mortgage Holdings, Inc | **18.94** |
| | |
| **IndyMac Bank, F.S.B.** | |
| INDX 2005-AR12 2A1A | 31.62 |
| INDX 2005-AR4 2A1A | 30.00 |
| INDX 2005-AR8 2A1A | 29.70 |
| INDX 2006-AR19 1A1 | 40.13 |
| **Average** - IndyMac Bank, F.S.B. | **32.86** |
| | |
| **J.P. Morgan Mortgage Acquisition Corp.** | |
| JPALT 2006-A1 1A1 | 47.14 |
| JPALT 2006-A2 1A1 | 44.42 |
| JPALT 2006-A3 1A1 | 42.57 |
| JPALT 2007-A2 12A1 | 57.51 |
| JPMMT 2005-ALT1 2A1 | 23.05 |
| **Average** - J.P. Morgan Mortgage Acquisition Corp. | **42.94** |

| Sponsor | Total Delinquency (%) |
|---|---|
| **Lehman Brothers Holdings Inc.** | |
| LXS 2005-8 1A2 | 32.44 |
| LXS 2007-11 A1 | 43.33 |
| LXS 2007-9 1A1 | 53.61 |
| **Average** - Lehman Brothers Holdings Inc. | **43.13** |
| | |
| **Luminent Mortgage Capital, Inc.** | |
| LUM 2006-3 11A1 | 33.24 |
| LUM 2006-6 A1 | 43.60 |
| LUM 2006-7 2A1 | 41.77 |
| LUM 2007-2 1A1 | 36.85 |
| **Average** - Luminent Mortgage Capital, Inc. | **38.87** |
| | |
| **Mercury Mortgage Finance Statutory Trust** | |
| LUM 2005-1 A1 | 36.35 |
| **Average** - Mercury Mortgage Finance Statutory Trust | **36.35** |
| | |
| **Merrill Lynch Mortgage Lending, Inc.** | |
| MANA 2007-A3 A2A | 42.52 |
| **Average** - Merrill Lynch Mortgage Lending, Inc. | **42.52** |
| | |
| **Morgan Stanley Mortgage Capital Inc.** | |
| MSM 2006-13AX A1 | 40.41 |
| MSM 2006-16AX 2A1 | 42.07 |
| MSM 2006-8AR 1A2 | 48.07 |
| MSM 2006-9AR A3 | 35.77 |
| MSM 2007-2AX 2A2 | 39.29 |
| MSM 2007-5AX 2A2 | 37.66 |
| MSM 2007-7AX 2A1 | 43.70 |
| **Average** - Morgan Stanley Mortgage Capital Inc. | **41.00** |
| | |
| **MortgageIT Holdings, Inc.** | |
| MHL 2005-5 A1 | 15.86 |
| **Average** - MortgageIT Holdings, Inc. | **15.86** |
| | |
| **MortgageIT, Inc.** | |
| MHL 2006-1 1A2 | 23.05 |
| **Average** - MortgageIT, Inc. | **23.05** |

| Sponsor | Total Delinquency (%) |
|---|---|
| **Nomura Credit & Capital, Inc.** | |
| NAA 2006-AF2 5A1 | 45.64 |
| NAA 2006-AR4 A2 | 39.96 |
| NAA 2007-1 2A1 | 46.23 |
| NAA 2007-3 A1 | 51.28 |
| **Average** - Nomura Credit & Capital, Inc. | **45.78** |
| | |
| **Residential Funding Company, LLC** | |
| RALI 2006-QO10 A1 | 52.31 |
| RALI 2007-QS6 A29 | 31.57 |
| **Average** - Residential Funding Company, LLC | **41.94** |
| | |
| **Residential Funding Corporation** | |
| RALI 2005-QA9 NB41 | 17.92 |
| RALI 2006-QA2 1A1 | 21.64 |
| RALI 2006-QA3 A1 | 30.22 |
| **Average** - Residential Funding Corporation | **23.26** |
| | |
| **Thornburg Mortgage Home Loans, Inc.** | |
| TMST 2007-1 A2A | 17.63 |
| **Average** - Thornburg Mortgage Home Loans, Inc. | **17.63** |
| | |
| **UBS Real Estate Securities Inc.** | |
| MARM 2005-7 2A1 | 18.90 |
| MARM 2005-8 1A1 | 23.75 |
| **Average** - UBS Real Estate Securities Inc. | **21.33** |
| | |
| **UBS Sec, LLC** | |
| MARM 2007-R5 A1 | 19.31 |
| **Average** - UBS Sec, LLC | **19.31** |
| | |
| **Wells Fargo Bank, N.A.** | |
| WFMBS 2006-AR12 1A1 | 17.22 |
| **Average** - Wells Fargo Bank, N.A. | **17.22** |
| | |
| **Total Average** | **40.77** |

849.    Analysis of three key metrics with respect to individual mortgage loans provides

further evidence of the abandonment of stated underwriting guidelines.  The LTV, DTI and

credit score ("FICO") metrics are each key indicators of the riskiness of a loan and, according to the statements in the Offering Documents, were fundamental components of the underwriting process. Because the underwriting process as described in the Offering Documents was ostensibly aimed at assessing the risk of default on a mortgage, the mortgages should exhibit a balancing of these key risk indicators—for example, mortgages with higher LTVs or DTIs should tend to exhibit compensating higher FICO scores. But analysis of the underlying mortgages indicates otherwise. The Bank has been able to obtain individual loan FICO score and LTV information for 111 of the Certificates, and individual loan DTI information for 78 of the Certificates. The Bank has analyzed these loans to see how the data are *correlated*—that is, the extent to which changes in one metric are associated with changes in another. The Bank has also analyzed whether the loans exhibit *more than one* high-risk characteristic—also known as "compounded" high-risk characteristics.

850. Mortgage underwriting of the type described in the Offering Documents, which balances negative characteristics against compensating positive ones, should result in discernible correlation among the DTI, LTV and FICO metrics. This means that (a) higher LTVs should correlate with higher FICO scores and lower DTIs; (b) higher DTIs should correlate with higher FICO scores and lower LTVs; and (c) lower FICO scores should correlate with lower LTVs and lower DTIs.

851. However, the Bank's analysis of the individual loan level data indicates otherwise. For 63 of the Certificates, there is either no correlation between higher LTVs and higher FICOs, or the correlation is *negative*: *i.e.*, higher LTVs, denoting higher risk, are associated with *lower* FICOs, which also denote higher risk. In addition, for 50 of the Certificates as to which the Bank has been able to obtain FICO and DTI information for

individual loans, there is no correlation between higher DTIs and higher FICOs, or the correlation is *negative*: *i.e.*, higher DTIs are correlated with *lower* FICOs.  Further, for 65 of the Certificates as to which the Bank has been able to obtain LTV and DTI information for individual loans, there is either no correlation between higher LTVs and lower DTIs, or the correlation is *negative*: *i.e.*, higher LTVs are correlated with *higher* DTIs.  These results are summarized on the following table:

| Certificates Exhibiting No Correlation or a Negative Correlation Between Higher LTVs and Higher FICOs | Certificates Exhibiting No Correlation or a Negative Correlation Between Higher LTVs and Lower DTIs | Certificates Exhibiting No Correlation or a Negative Correlation Between Higher DTIs Higher FICOs |
|---|---|---|
| AHMA 2007-5 A1 | AHM 2005-2 1A1 | AHM 2005-2 1A1 |
| ARMT 2007-1 5A1 | AHMA 2007-2 A1 | AHMA 2007-2 A1 |
| BAFC 2005-H 7A1 | BAFC 2005-H 7A1 | BAFC 2006-D 1A1 |
| BAFC 2006-D 1A1 | BAFC 2006-D 1A1 | BALTA 2005-10 11A1 |
| BALTA 2006-3 1A1 | BALTA 2005-10 11A1 | BALTA 2005-9 11A1 |
| BALTA 2006-5 1A1 | BALTA 2005-9 11A1 | BALTA 2006-2 11A1 |
| BALTA 2006-7 1A1 | BALTA 2006-1 11A1 | BALTA 2006-3 1A1 |
| BCAP 2006-AA1 A1 | BALTA 2006-2 11A1 | BALTA 2006-4 11A1 |
| BSMF 2006-AR1 1A1 | BALTA 2006-3 1A1 | BALTA 2006-4 13A1 |
| BSMF 2006-AR3 1A1 | BALTA 2006-4 11A1 | BALTA 2006-5 1A1 |
| BSMF 2007-AR4 1A1 | BALTA 2006-4 13A1 | BALTA 2006-6 1A1 |
| BSMF 2007-AR5 1A1A | BALTA 2006-6 1A1 | BALTA 2006-7 1A1 |
| CMALT 2007-A4 1A7 | BALTA 2006-7 1A1 | BALTA 2007-1 1A1 |
| CWALT 2005-16 A4 | BALTA 2007-1 1A1 | BALTA 2007-2 1A1 |
| CWALT 2006-OA16 A2 | BALTA 2007-2 1A1 | BCAP 2006-AA1 A1 |
| CWALT 2007-OA4 A1 | BALTA 2007-3 1A1 | BSMF 2006-AR3 1A1 |
| CWALT 2007-OA9 A1 | BCAP 2006-AA1 A1 | DBALT 2006-AR2 1A1 |
| CWHL 2005-2 2A1 | BSMF 2006-AR1 1A1 | DBALT 2006-AR4 A1 |

| Certificates Exhibiting No Correlation or a Negative Correlation Between Higher LTVs and Higher FICOs | Certificates Exhibiting No Correlation or a Negative Correlation Between Higher LTVs and Lower DTIs | Certificates Exhibiting No Correlation or a Negative Correlation Between Higher DTIs Higher FICOs |
|---|---|---|
| DBALT 2006-AR2 1A1 | BSMF 2006-AR2 1A1 | DBALT 2006-AR5 1A1 |
| DBALT 2006-AR4 A1 | BSMF 2006-AR3 1A1 | DBALT 2007-AR1 A1 |
| DBALT 2006-AR5 1A1 | BSMF 2006-AR5 1A1 | GPMF 2005-AR2 A1 |
| DBALT 2007-AR1 A1 | BSMF 2007-AR1 1A1 | GPMF 2005-AR4 4A1A |
| DSLA 2005-AR1 2A1A | DBALT 2006-AR2 1A1 | HVMLT 2005-10 2A1A |
| DSLA 2005-AR2 2A1A | DSLA 2005-AR1 2A1A | DSLA 2005-AR1 2A1A |
| GPMF 2005-AR2 A1 | DSLA 2005-AR2 2A1A | GPMF 2006-AR3 4A1 |
| GPMF 2005-AR4 4A1A | DBALT 2006-AR3 A2 | HVMLT 2006-7 2A1A |
| GPMF 2006-AR3 4A1 | DBALT 2006-AR4 A1 | IMSA 2005-2 A1 |
| HVMLT 2005-10 2A1A | DBALT 2006-AR5 1A1 | IMM 2005-7 A1 |
| HVMLT 2006-7 2A1A | DBALT 2007-AR1 A1 | INDX 2005-AR12 2A1A |
| HVMLT 2006-8 2A1A | GPMF 2005-AR2 A1 | LXS 2005-8 1A2 |
| HVMLT 2007-1 2A1A | GPMF 2005-AR4 4A1A | LUM 2006-7 2A1 |
| IMSA 2005-2 A1 | GPMF 2006-AR3 4A1 | MANA 2007-A3 A2A |
| IMM 2005-7 A1 | HVMLT 2005-10 2A1A | MARM 2007-R5 A1 |
| INDX 2005-AR12 2A1A | HVMLT 2006-7 2A1A | MHL 2006-1 1A2 |
| JPALT 2006-A1 1A1 | HVMLT 2007-1 2A1A | MSM 2006-13AX A1 |
| LXS 2005-8 1A2 | IMSA 2005-2 A1 | MSM 2006-16AX 2A1 |
| LUM 2006-6 A1 | IMM 2005-7 A1 | MSM 2006-8AR 1A2 |
| LUM 2006-7 2A1 | INDX 2005-AR12 2A1A | MSM 2006-9AR A3 |
| LUM 2007-2 1A1 | LXS 2005-8 1A2 | MSM 2007-2AX 2A2 |
| MARM 2005-7 2A1 | LXS 2007-9 1A1 | MSM 2007-5AX 2A2 |
| MARM 2005-8 1A1 | LXS 2007-11 A1 | MSM 2007-7AX 2A1 |
| MANA 2007-A3 A2A | LUM 2006-3 11A1 | NAA 2006-AF2 5A1 |
| MHL 2006-1 1A2 | LUM 2006-6 A1 | NAA 2006-AR4 A2 |
| MHL 2005-5 A1 | LUM 2006-7 2A1 | NAA 2007-1 2A1 |

| Certificates Exhibiting No Correlation or a Negative Correlation Between Higher LTVs and Higher FICOs | Certificates Exhibiting No Correlation or a Negative Correlation Between Higher LTVs and Lower DTIs | Certificates Exhibiting No Correlation or a Negative Correlation Between Higher DTIs Higher FICOs |
|---|---|---|
| MSM 2006-8AR 1A2 | MARM 2007-R5 A1 | RALI 2006-QO10 A1 |
| MSM 2007-2AX 2A2 | MHL 2006-1 1A2 | RALI 2007-QS6 A29 |
| MSM 2007-7AX 2A1 | MSM 2006-13AX A1 | SAMI 2005-AR6 2A1 |
| NAA 2006-AF2 5A1 | MSM 2006-16AX 2A1 | SAMI 2006-AR6 1A1 |
| NAA 2006-AR4 A2 | MSM 2006-8AR 1A2 | TMST 2007-1 A2A |
| NAA 2007-3 A1 | MSM 2006-9AR A3 | |
| RALI 2005-QA9 NB41 | MSM 2007-2AX 2A2 | |
| RALI 2006-QA2 1A1 | MSM 2007-5AX 2A2 | |
| RALI 2006-QA3 A1 | MSM 2007-7AX 2A1 | |
| RALI 2007-QS6 A29 | NAA 2006-AF2 5A1 | |
| SAMI 2005-AR2 1A1 | NAA 2006-AR4 A2 | |
| SAMI 2005-AR3 1A1 | RALI 2006-QO10 A1 | |
| SAMI 2005-AR6 2A1 | RALI 2007-QS6 A29 | |
| SAMI 2006-AR4 4A1 | SAMI 2005-AR3 1A1 | |
| SAMI 2006-AR6 1A1 | SAMI 2005-AR6 2A1 | |
| SAMI 2006-AR7 A1A | SAMI 2006-AR4 4A1 | |
| WFMBS 2006-AR12 1A1 | SAMI 2006-AR6 1A1 | |
| | SAMI 2006-AR7 A1A | |
| | TMST 2007-1 A2A | |

853.    The absence of correlation among these important risk measures, and the presence of negative correlations among them, indicate that the risk factors present in a loan application were *not* appropriately balanced.  This is contrary to the assurances in the Offering Documents. Those assurances were thus demonstrably false and materially misleading.

**B.    The Securities Defendants Misrepresented the Appraisal Process and LTVs That Were Based Upon Those "Appraisals."**

   **1.    The Materiality of Representations Regarding Appraisals and LTVs**

854.    The LTV of a mortgage loan is the ratio of the amount of the mortgage loan to the value of the mortgaged property when the loan is made.  For example, a loan of $200,000 secured by property valued at $500,000 has an LTV of 40%; a loan of $450,000 on the same property has an LTV of 90%.  The LTV is one of the most important measures of the risk of a mortgage loan because it is a primary determinant of the likelihood of default.  The lower the LTV, the greater the borrower's equity relative to the value of the house.  Thus, when an LTV is low, it is less likely that a decline in the property's value will wipe out the owner's equity and give the owner an incentive to stop making mortgage payments and abandon the property (a "strategic default").  Additionally, lower LTVs indicate that the losses on loans that do default will be less severe—*i.e.*, loans with lower LTVs provide a greater equity "cushion" because there is an increased likelihood that the proceeds of foreclosure will cover the unpaid balance on the mortgage loan.

855.    Because the numerator (the amount of the loan) is predetermined, the key to an accurate LTV is an accurate denominator (the value of the property).  The key to an accurate denominator, in turn, is an accurate appraisal of the property.  In a purchase of a property, the denominator in the LTV is usually determined by choosing the lower of the purchase price or the appraised value. In a refinancing or home equity loan, the denominator is always an appraised value because there is no purchase price.  Accordingly, an inflated appraisal will inflate the denominator of the LTV.  Here, as explained below, what the Offering Documents refer to as "appraisals" are in fact not appraisals at all because they fail to satisfy the definition of an appraisal as set forth in controlling regulations.  For example, it is not an "appraisal"—as that

term is defined in the regulations—to conclude based on pressure from the mortgage underwriter that a home's value is equal to its purchase price. The originators accepted inflated valuations, whether based on appraisals performed without regard for applicable appraisal standards, or through alternative valuation processes aimed at producing the result necessary to permit the loan to be made.

856.    A denominator that is too high will understate, sometimes greatly, the risk of a loan. In the example above, if the property's actual value is $500,000, but is valued incorrectly at $550,000, then the LTV of the $200,000 loan falls from 40% to 36.4%, and the LTV of the $450,000 loan falls from 90% to 81.8%. In either case, an LTV that is based upon an improperly inflated appraisal value understates the risk of the loan.

857.    Additionally, it is important to note that at higher LTVs or higher loan amounts, even minor inflations in a property's value can translate into significantly riskier loans. In the example above, although the risk of a loan with an LTV of 40% is greater than the risk of one with an LTV of 36.4%, both imply a relatively safe loan because of the large equity cushions. By contrast, a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%. In the case of a loan with an LTV of 81.8%, there is an equity cushion of 18.2% of the value of the property, while in the case of the 90% LTV loan, the equity cushion is only 10%—just over half as much. Thus, in the example in the preceding paragraph, the $50,000 overstatement in the appraisal has a far more dramatic effect on the risk profile of the $450,000 loan than on the $200,000 loan.

858.    Because the riskiness of the underlying loans in the asset pool (including the risk of default and the severity of the losses on default) impacts the risk of the associated PLMBS, aggregate LTV metrics are material to an investor's decision to purchase PLMBS, and

specifically, were material to the Bank.  The sole source of payment on the Certificates is the cash flow from the mortgage loans that back them.  If borrowers fail to make their payments, there is less cash to pay the investors in the Certificates.  The safety of the Certificates consequently depends upon the quality of the loans, and a key indicator of loan quality is an LTV resulting from an appraisal conducted in accordance with governing standards.  If the LTVs of the mortgage loans in the asset pool of the securitization are not based on appraisals conducted in accordance with governing standards, as the Bank alleges here, the ratings of the Certificates sold in that securitization will also be incorrect.  Investors will therefore be misled about the risk of investing in a particular PLMBS.

859.  LTVs also serve as indicators of prepayment patterns—that is, the number of borrowers who pay off their mortgage loans before maturity.  LTVs thus predict the expected lives of the loans and the associated PLMBS that are backed by the loans.  Prepayment patterns affect many aspects of the PLMBS that are material to the investors purchasing them, such as the life of the Certificate and the timing and amount of cash that the investor will receive during that life.

860.  Even seemingly minor differences in the aggregate LTV metrics had a significant effect on both the risk and rating of each Certificate sold in the securitization.  For example, assume the Offering Documents assert that the loan pool had a weighted average LTV (*i.e.*, the average of the LTVs for the mortgages in the pool, weighted by each mortgage's principal amount) of 80%.  If the true weighted average LTV (after correcting flawed procedures in "appraisals" that overstated the value of the properties securing the mortgages) were actually 82%, the Offering Documents' assertion would constitute a material misstatement of the risk

profile of the mortgage pool—and the PLMBS it secured—because the equity cushion (and the borrowers' equity interest in the properties) would be eroded by 10 percent.

861.    Finally, because an LTV is only as reliable as the appraisal used to determine the value of the collateral, individual and aggregate LTVs are meaningless to PLMBS investors unless the appraisals underlying the LTVs are done in accordance with governing standards. Thus statements regarding the valuation of collateral—including that "appraisals" were conducted in calculating the LTVs and that such appraisals conformed to uniform standards—are material to an investor's decision to purchase PLMBS, and specifically, were material to the Bank:

> Mortgage bankers and investors consider the property appraisal one of the most important documents contained in the loan file since it establishes the value of the property securing the mortgage loan.  In fact, investors put review of the appraisal on the same level as the review of credit.  The appraisal assists the mortgage banker in assessing the collateral risk . . . .  Obviously, the ultimate investor wants to mitigate such risk and relies on the appraisal to ensure that the property falls within the investor's valuation parameters.

Handbook of Mortgage Lending 165 (Mortgage Bankers Ass'n of Am. 2003).

862.    Furthermore, assertions that appraisals conformed to the applicable standards are material to PLMBS investors like the Bank because investors like the Bank have no reasonable means of verifying the LTVs asserted in the Offering Documents at the time of sale.  When conducted in accordance with governing standards, appraisals and their resulting LTVs are based on knowledge of particular facts that are not available to investors in mortgage-backed securities—an investor simply does not have access to the data, let alone the time and resources, necessary to conduct an independent valuation of each piece of collateral underlying each Certificate.

863.    Statements regarding appraiser independence and impartiality are important: they provide assurance that the LTVs were not artificially inflated due to mortgage originator manipulation.  Likewise, statements in the Offering Documents that the appraisals conformed to USPAP or Fannie Mae and Freddie Mac standards, including requirements that appraisals be independently and impartially conducted, indicate that the appraisals and the aggregate data included in the Offering Documents based on the appraisals properly assess the value of the collateral, and provide a reliable measure of the risk of the loan pools.

## 2.    Misstatements Regarding Appraisals and LTVs

864.    As set forth below, the Offering Documents contained numerous material untrue or misleading statements regarding LTVs and the "appraisal" upon which the LTVs were based, including: (a) the LTVs were based upon appraisals; and (b) the LTVs were based upon appraisals conducted in conformance with appraisal standards, including USPAP.  Moreover, because the LTVs were not based on appraisals that conformed with applicable standards but rather were based upon "appraisals" that the appraisers knew did not accurately reflect the value of the collateral, the statements in the Offering Documents regarding the aggregated LTVs of the mortgage pools were materially untrue and misleading.

865.    The Securities Defendants should have known that the appraisals were inflated and were the product of manipulation and coercion in violation of the requirements of the USPAP because: (a) the Securities Defendants were vertically integrated with the mortgage originators that originated the loans underlying the Certificates purchased by the Bank, *see supra* § V.D.1, (b) their corporate affiliates served as depositors, sponsors, and underwriters for other PLMBS deals, including deals backed by loans originated by the originators that originated the loans underlying the Certificates purchased by the Bank, *see supra* § V.D.2; (c) their corporate affiliates sought to use the knowledge of the inaccurate appraisals and other violations of

underwriting standards to their advantage in purchasing loan pools at reduced prices, *see supra*

§ V.D.4.e; and (d) they performed due diligence reviews on the mortgage pools underlying the

certificates.  *See supra* § V.D.4.  Moreover, because they should have known of the manipulation

of the appraisal process in the origination of mortgage loans, the Securities Defendants should

have known that the collateral valuations were unreliable and that statements made in the

Offering Documents based in whole or in part on the collateral values, including statements

regarding LTVs and credit ratings, were false and misleading.

### a.      The Offering Documents falsely state that the LTVs were based upon appraisals

866.    The Prospectus or Prospectus Supplement for each Certificate states that the LTV

represents a "ratio" or "fraction," the numerator of which is the "principal balance" or "principal

amount" of the mortgage loan, and the denominator of which is the "lesser" or "least" of (1) the

"sales price" or "purchase price" or "selling price" of the mortgaged property and (2) the

"appraised value" or "appraisal" or "the appraised value determined in an appraisal" or "the

appraised value . . . as established by an appraisal."  *See* Appendix VII.

867.    These are false statements of material fact because, contrary to the Securities

Defendants' representations that the LTVs were based on "appraisals" or "appraised values," in

reality the biased and coerced valuations of collateral that the Securities Defendants labeled as

"appraisals" failed to meet the federally required definition of "appraisal" applicable to entities

that are regulated by the Office of Thrift Supervision (OTS), the Office of the Comptroller of the

Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), or the Board of Governors

of the Federal Reserve System (FRB) (collectively the "Bank Regulators").  Thus, the LTVs were

not based on appraisals at all, as that term is used and understood in the industry.

868. The following originators of the mortgages underlying the PLMBS were regulated by the Bank Regulators:

A. Bank of America, National Association, First National Bank of Nevada, and Wells Fargo Bank, National Association, are "national banking associations" chartered with the OCC pursuant to 12 U.S.C. § 21. Therefore, under 12 U.S.C. § 1813(q)(1), the OCC is the "appropriate Federal banking agency" with jurisdiction to regulate these banks.

B. Downey Savings and Loan Association, F.A., First Federal Bank of California, IndyMac Bank, F.S.B., Ohio Savings Bank, and Washington Mutual Bank are "federal savings associations" within the meaning of 12 U.S.C. § 1813(b) and 12 U.S.C. § 1462(5). Pursuant to 12 U.S.C. § 1813(q)(4), the OTS is the "appropriate Federal banking agency" with jurisdiction to regulate these originators.

C. First Republic Bank was a "state nonmember bank" within the meaning of 12 U.S.C. § 1813(e). Pursuant to 12 U.S.C. § 1813(q), the FDIC is the "appropriate Federal banking agency" with jurisdiction to regulate this originator.

D. GreenPoint Mortgage Funding, Inc., was a subsidiary of North Fork Bank, which was a "state nonmember bank" within the meaning of 12 U.S.C. § 1813(e). Any subsidiary of such a "state nonmember bank" is regulated by the FDIC. *See* 12 U.S.C. § 1831a(d)(1); 12 C.F.R. § 362.4(a).

E. Subsidiaries of "bank holding companies" are regulated by the FRB pursuant to 12 U.S.C. §§ 1813(q), 1841(n). *See also* 12 C.F.R. §§ 225.21-225.28. Countrywide Home Loans, Inc., Decision One Mortgage Company LLC, and OwnIt Mortgage Solutions were nonbank subsidiaries of the following "bank holding companies" within the meaning of 12 U.S.C. §§ 1841 and 1843, and thus were regulated by the FRB:

| Originator | Controlling "Bank Holding Company" |
|---|---|
| Countrywide Home Loans, Inc. | Countrywide Financial Corporation[27] |
| Decision One Mortgage Company, LLC | HSBC North America |
| OwnIt Mortgage Solutions | Bank of America Corporation |

---

[27]Countrywide Financial Corporation was a "bank holding company" until March 12, 2007.

F.  Morgan Stanley Mortgage Capital, Inc., was a non-savings association subsidiary of Morgan Stanley, which was a "Thrift Holding Company" or "savings and loan holding company" within the meaning of 12 U.S.C. §§ 1813(w) and 1467a(a)(1)(D).  A non-savings association subsidiary of a holding company is regulated by the OTS.  *See* 12 U.S.C. § 1467a; 12 C.F.R. §§ 584.2, 584.2-1.

G.  Credit Suisse Financial Corporation and DLJ Mortgage Capital, Inc., were subsidiaries of Credit Suisse Group, a foreign "financial holding company" pursuant to 12 U.S.C. § 3106(a).  *See also* 12 C.F.R. § 225.90. Subsidiaries of "financial holding companies" are regulated by the FRB pursuant to 12 U.S.C. §§ 1813(q), 1841(n).

H.  SunTrust Mortgage, Inc. is a subsidiary of SunTrust Bank, which is a "state member bank" within the meaning of 12 U.S.C. § 1813(d).  Any subsidiary of a "state member bank" is regulated by the FRB.  *See* 12 U.S.C. §§ 330, 1831a(d)(1); 12 C.F.R. § 362.4(a).

I.  Subsidiaries of "national banking associations" are regulated by the OCC pursuant to 12 U.S.C. § 24a and 12 C.F.R. §§ 5.34, 5.39.  Chase Home Finance LLC, First Horizon Home Loan Corporation, National City Mortgage Co., and Wachovia Mortgage Corporation were subsidiaries of the following "national banking associations," and hence were regulated by the OCC:

| Originator | Controlling "National Banking Association" |
| --- | --- |
| Chase Home Finance LLC | JPMorgan Chase Bank, National Association |
| First Horizon Home Loan Corporation | First Tennessee Bank National Association |
| National City Mortgage Co. | National City Bank[28] |
| Wachovia Mortgage Corporation | Wachovia Bank, National Association |

869.    Each of the Bank Regulators has issued regulations pursuant to Title XI of the

Financial Institutions Reform Recovery and Enforcement Act of 1989, 12 U.S.C. § 1339, that

govern the appraisal practices of the institutions they regulate.  These regulations define an

---

[28] National City Bank was a national bank until it was acquired by PNC Bank, N.A., on November 11, 2009.

"appraisal" as a "written statement *independently and impartially prepared* by a qualified

appraiser setting forth an opinion as to the market value of an adequately described property as

of a specific date(s)."  12 C.F.R. § 564.2 (OTS); 12 C.F.R. § 34.42 (OCC); 12 C.F.R. § 323.2

(FDIC); 12 C.F.R. § 225.62 (FRB) (emphasis added).  Therefore, by representing that the LTVs

were based on "appraisals" of the collateral, the Securities Defendants represented that the LTVs

were based on independent and impartial valuations of the collateral.

  870. The Bank Regulators define appraiser independence as follows:

> (a) Staff appraisers.  If an appraisal is prepared by a staff appraiser,
> that *appraiser must be independent of the lending, investment, and
> collection functions* and not involved, except as an appraiser, in the
> federally related transaction, and *have no direct or indirect
> interest, financial or otherwise, in the property* . . . .
>
> (b) Fee appraisers. (1) If an appraisal is prepared by a fee
> appraiser, the appraiser shall be engaged directly by the regulated
> institution or its agent, and *have no direct or indirect interest,
> financial or otherwise, in the property or the transaction* . . . .

12 C.F.R. § 564.5 (OTS); 12 C.F.R. § 34.45 (OCC); 12 C.F.R. § 323.5 (FDIC); 12 C.F.R. §

225.65 (FRB) (emphasis added).  In 2005 the Bank Regulators further elaborated on the

standards for appraiser independence, stating that "[l]oan production staff should not select

appraisers."  Additionally, the Bank Regulators specified that although loan production staff may

use a "revolving, board approved list to select a residential appraiser," the "[s]taff responsible for

the development and maintenance of the list should be independent of the loan production

process."  *See "Frequently Asked Questions on the Appraisal Regulations and the Interagency

Statement on Independent Appraisal and Evaluation Functions."* (Questions 3, 5).

  871. The Securities Defendants' statements in the Offering Documents are materially

misleading because the LTVs were not based on impartial and independent appraisals, but rather

were the result of manipulation and coercion by loan production staff.  As described above in

sections V.B and V.C, the originators' loan production staff pressured and coerced appraisers to

inflate values, demanded and obtained the ability to have "business managers" overrule staff and

third party appraisers, and routinely fed improper information to appraisers in an effort to

manipulate their valuations, all of which served to undermine the independence of the appraisal

process.  Contrary to the interagency guidance, the originators' lending departments constantly

pressured appraisers to increase their valuations, made clear that their continued access to work

from these originators depended upon the appraisers coming in "at value," and in some cases

simply overruled appraisers that refused to cooperate.  The originators ultimately resorted to

using lists of approved appraisers that excluded appraisers whose appraisals in the past had come

in "too low" and who were unwilling to increase their appraisals to satisfy the lending

departments.  All of this resulted in appraisers having an indirect financial interest in each

property they appraised, since their ability to obtain future work was impacted by their

willingness to come in "at value" for each property they appraised.  Simply put, as a result of this

coercion, appraisers provided appraisals that they did not believe accurately reflected the value

of the appraised property, but nevertheless was sufficiently high—i.e., "at value"—to enable the

deal to close.  Because these valuations were not "independently and impartially prepared" as

required by the federal definition of "appraisal," the Securities Defendants made false statements

of material fact in the Offering Documents by stating that the LTVs were based on "appraisals"

or "appraised values."

### b.    Misstatements regarding the standards to which the purported "appraisals" conformed

872.    In addition, the Offering Documents contained materially untrue or misleading

statements and omissions regarding the standards to which the purported "appraisals"

conformed.  The underwriting guidelines for each of the following originators—as stated in the

Offering Documents—state that the appraisals are required to conform to USPAP:  American Home Mortgage Corp; Ameriquest Mortgage Company; Aurora Loan Services LLC; Lehman Brothers Bank, F.S.B.; Bear Stearns Residential Mortgage Corporation; Credit Suisse Financial Corporation; DLJ Mortgage Capital; Decision One Mortgage; Downey Savings and Loan Association, F.A., EMC Mortgage Corporation; First Horizon Home Loan Corporation; First National Bank of Nevada; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; Morgan Stanley Mortgage Capital, Inc.; MortgageIT, Inc.; National City Mortgage Co.; Silver State Mortgage; Silver State Financial Services, Inc.; and Washington Mutual Mortgage Securities Corp.  *See* Appendix III.

873.    Additionally, the underwriting guidelines for each of the following originators—as stated in the Offering Documents—state that the appraisals conformed to Fannie Mae and Freddie Mac appraisal standards:  Countrywide; Just Mortgage, Inc.; Metrocities Mortgage LLC; PHH Mortgage Corporation; SouthStar Funding LLC; Thornburg Mortgage Home Loans, Inc.; and WinStar Mortgage Partners, Inc.  *See* Appendix III.  The Fannie Mae and Freddie Mac appraisal standards require that appraisals be conducted in accordance with USPAP.  *See* 2006 Single Family Selling Guide, Part XI, 102.02.

874.    These statements in the Offering Documents were materially misleading because the mortgage originators routinely accepted—and in fact overtly sought—valuations of collateral that were conducted in violation of the appraisal standards of USPAP, Fannie Mae and Freddie Mac.  For example, as detailed above, the USPAP requires that an appraiser "perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."  Similarly, the Fannie Mae appraisal standards provide that "it is essential that a lender obtain an independent, disinterested examination."  As alleged in paragraph 871 and

further described in sections V.B and V.C, the appraisals used by the mortgage originators were the product of manipulation and coercion and thus were not impartial, objective, and independent as required by USPAP.

875.    Additionally, USPAP precludes acceptance of an appraisal assignment where compensation is contingent upon "reporting a predetermined result" or "a direction in assignment results that favors the cause of a client."  Similarly, it is an "unacceptable appraisal practice" under Fannie Mae standards to develop and report an appraisal "that favors either the cause of the client . . . [or] the attainment of a specific result . . . in order to receive compensation . . . and/or in anticipation of receiving future assignments."  However, these are precisely the conditions that loan production staff for the mortgage originators forced upon appraisers when they repeatedly pressured appraisers to increase their valuations, implicitly or explicitly linked the receipt of continued work to "at value" appraisals, and even threatened to place appraisers on a blacklist if they did not "come back at value."

<strong>c.    Misstatements regarding aggregate LTVs</strong>

876.    The statements in the Offering Documents regarding the aggregate LTVs of the mortgage pools were materially untrue and misleading because the LTVs were based on: (1) "appraisals" that were not conducted in conformance with applicable appraisal standards; and/or (2) "appraisals" that the appraisers knew were inaccurate and bore no reasonable relationship to the actual value of the underlying property.  These statements concern the extent to which loans in the pools underlying each Certificate had LTVs in excess of 100%, 90% or 80%, and the weighted average LTV of the pools.  Section VI.B.3.b below sets forth those materially untrue and misleading statements as well as the reasons each is misleading.

356

3.     **Evidence Demonstrating Misstatements about Appraisals and LTVs in the Offering Documents**

   a.     **Government investigations, press reports, and confidential sources demonstrate systemic and pervasive appraisal manipulation by the mortgage originators**

877.    As alleged in detail above, *see supra* §§ V.B and V.C, the mortgage originators' failure to obtain accurate appraisals for the loans backing the PLMBS has been well documented in government investigations and lawsuits, press reports, and statements of confidential sources. As alleged above, this evidence demonstrates that the mortgage originators manipulated the appraisal process and undermined the independence and impartiality of appraisers that is crucial to the determination of credible collateral valuations. Moreover, this evidence demonstrates that, as a result of this coercion, the appraisers routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying property. This evidence—and the allegations herein based on this evidence—demonstrates that the statements in the Offering Documents regarding the appraisal process and the resulting LTVs are false and misleading. Specifically, the Offering Documents misrepresented that the LTVs were based upon appraisals conducted pursuant to governing standards when, in fact, the "appraisals" underlying the LTVs were not appraisals at all—they were not independent assessments of a property's value, but rather were simply coerced or otherwise misleading statements from appraisers to enable loans to close.

   b.     **Analysis of loans that backed the PLMBS purchased by the Bank demonstrate that appraisals were materially inflated and the LTVs were materially understated.**

878.    As part of its investigation of the claims asserted herein, the Bank has analyzed the LTVs of mortgage loans that secure each of the PLMBS that it purchased. The Bank has tested the LTVs as represented in the Offering Documents against the LTVs that would have

been calculated had the properties been valued at the time of loan origination in accordance with accepted and reliable appraisal practices (as was represented in the Offering Documents). To perform this analysis, the Bank has employed an industry-standard automated valuation model ("AVM") that reliably calculates the values of the subject properties as of the date of mortgage loan origination. AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review and servicing. AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties. Specifically, the AVM draws upon a database of 500 million sales covering ZIP codes that represent 98.7% of the homes, occupied by 99.8% of the population, in the United States, and calculates a valuation based on criteria including the type, condition, and location of the property, as well as the actual sale prices of comparable properties in the same locale shortly before the closing date of the subject mortgage. Extensive independent testing of the AVM confirms that the AVM is a highly reliable and accurate means of determining the value that would have been determined for a property as of a historical date had that property been valued in accordance with accepted and reliable appraisal practices.

879. This analysis demonstrates stark misstatements in the LTV information as represented in the Offering Documents. Specifically, as demonstrated below, the LTVs that would have been calculated had the properties been valued at the time of loan origination in accordance with accepted and reliable appraisal practices were substantially higher than the LTVs reported in the Offering Documents. Because the LTV calculation is simply a ratio of loan amount to value, and because the loan amounts are unquestioned, the reason for the discrepancies is inescapable: the LTVs represented in the Offering Documents were the result of inflated and unreliable collateral valuations that were misleadingly labeled as "appraisals." Had

the collateral valuation practices comported with the Bank Regulators' definition of "appraisal" and the interagency guidance on appraiser independence, as well as with and with the USPAP and Fannie Mae/ Freddie Mac standards as represented in the Offering Documents, the resulting aggregate LTVs would have been materially different from those represented in the Offering Documents and the Certificates would not have been triple-A rated.

880.    Moreover, the fact that the LTV data reported in the Offering Documents deviates so significantly from the results of the Bank's loan-loan level analysis further supports the conclusion that appraisers knowingly inflated their valuations.  Independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

881.    The following summarizes four types of material LTV-related understatements contained in the Offering Documents:  the percentage of loans with over 100% LTV; the percentage of loans with over 90% LTV; the percentage of loans with over 80% LTV; and the weighted average LTV for the mortgage pool.  Each is a distinct and significant representation in the Offering Documents.

882.    The 100% LTV representation is obviously significant because loans with over 100% LTV afford the lender no equity cushion and leave the lender with inadequate collateral from the outset.  The Offering Documents consistently assured the Bank that there were no such loans in the mortgage pools.  As the following table indicates, the recalculated LTVs (which, based on the AVM, indicate what the reported LTV would have been had proper appraisal methods been employed) indicate that in each pool there was a material number of mortgage loans with LTVs in excess of 100%:

| Certificate | % of Loans with Greater than 100% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 100% LTV | Offering Documents Understatement |
|---|---|---|---|
| AHM 2005-2 1A1 | 0.00% | 20.17% | 20.17% |
| ARMT 2006-1 6A1 | 0.00% | 15.51% | 15.51% |
| ARMT 2006-2 6A1 | 0.00% | 14.88% | 14.88% |
| ARMT 2006-3 4A2 | 0.00% | 11.90% | 11.90% |
| ARMT 2007-1 5A1 | 0.00% | 16.98% | 16.98% |
| ARMT 2007-2 2A21 | 0.00% | 20.75% | 20.75% |
| AHMA 2006-6 A1A | 0.00% | 27.02% | 27.02% |
| AHMA 2007-2 A1 | 0.00% | 39.66% | 39.66% |
| AHMA 2007-5 A1 | 0.00% | 39.35% | 39.35% |
| BCAP 2006-AA1 A1 | 0.00% | 14.40% | 14.40% |
| BSMF 2006-AR1 1A1 | 0.00% | 11.72% | 11.72% |
| BSMF 2006-AR2 1A1 | 0.00% | 16.30% | 16.30% |
| BSMF 2006-AR3 1A1 | 0.00% | 15.38% | 15.38% |
| BSMF 2006-AR5 1A1 | 0.00% | 14.18% | 14.18% |
| BSMF 2007-AR1 1A1 | 0.00% | 21.17% | 21.17% |
| BSMF 2007-AR4 1A1 | 0.00% | 23.85% | 23.85% |
| BSMF 2007-AR5 1A1A | 0.00% | 20.45% | 20.45% |
| BALTA 2005-8 11A1 | 0.00% | 10.20% | 10.20% |
| BALTA 2005-9 11A1 | 0.00% | 13.17% | 13.17% |
| BALTA 2005-10 11A1 | 0.19% | 14.33% | 14.14% |
| BALTA 2006-1 11A1 | 0.04% | 14.53% | 14.49% |
| BALTA 2006-2 11A1 | 0.00% | 12.70% | 12.70% |
| BALTA 2006-3 1A1 | 0.00% | 13.08% | 13.08% |
| BALTA 2006-4 11A1 | 0.00% | 14.35% | 14.35% |
| BALTA 2006-5 1A1 | 0.00% | 13.01% | 13.01% |
| BALTA 2006-6 1A1 | 0.00% | 11.84% | 11.84% |
| BALTA 2006-7 1A1 | 0.00% | 17.81% | 17.81% |
| BALTA 2007-1 1A1 | 0.00% | 18.86% | 18.86% |
| BALTA 2007-2 1A1 | 0.00% | 24.26% | 24.26% |
| BALTA 2007-3 1A1 | 0.00% | 26.37% | 26.37% |
| BAFC 2005-H 7A1 | 0.00% | 8.84% | 8.84% |
| BAFC 2006-D 1A1 | 0.00% | 13.27% | 13.27% |
| CMLTI 2005-9 1A1 | 0.00% | 23.61% | 23.61% |
| CMALT 2007-A4 1A7 | 0.00% | 11.36% | 11.36% |
| CWALT 2005-16 A4 | 0.00% | 14.29% | 14.29% |
| CWALT 2005-86CB A10 | 0.00% | 5.47% | 5.47% |
| CWALT 2006-OA16 A2 | 0.00% | 18.89% | 18.89% |

| Certificate | % of Loans with Greater than 100% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 100% LTV | Offering Documents Understatement |
|---|---|---|---|
| CWALT 2006-OA8 1A1 | 0.00% | 19.26% | 19.26% |
| CWALT 2007-OA4 A1 | 0.00% | 20.86% | 20.86% |
| CWALT 2007-OA9 A1 | 0.00% | 21.37% | 21.37% |
| CWHL 2005-2 2A1 | 0.00% | 4.88% | 4.88% |
| DBALT 2006-AR2 1A1 | 0.00% | 11.85% | 11.85% |
| DBALT 2006-AR3 A2 | 0.00% | 16.11% | 16.11% |
| DBALT 2006-AR4 A1 | 0.00% | 11.33% | 11.33% |
| DBALT 2006-AR5 1A1 | 0.00% | 12.50% | 12.50% |
| DBALT 2007-AR1 A1 | 0.00% | 8.96% | 8.96% |
| DSLA 2005-AR1 2A1A | 0.00% | 3.61% | 3.61% |
| DSLA 2005-AR2 2A1A | 0.00% | 10.98% | 10.98% |
| GPMF 2005-AR1 A2 | 0.00% | 7.38% | 7.38% |
| GPMF 2005-AR2 A1 | 0.00% | 5.95% | 5.95% |
| GPMF 2005-AR4 4A1A | 0.00% | 7.86% | 7.86% |
| HVMLT 2005-10 2A1A | 0.00% | 10.94% | 10.94% |
| HVMLT 2006-7 2A1A | 0.00% | 28.82% | 28.82% |
| HVMLT 2006-8 2A1A | 0.00% | 15.84% | 15.84% |
| HVMLT 2007-1 2A1A | 0.00% | 30.14% | 30.14% |
| IMSA 2005-2 A1 | 0.00% | 11.59% | 11.59% |
| IMSA 2006-2 1A2A | 0.00% | 9.81% | 9.81% |
| IMM 2005-7 A1 | 0.00% | 15.54% | 15.54% |
| INDX 2005-AR4 2A1A | 0.00% | 10.17% | 10.17% |
| INDX 2005-AR8 2A1A | 0.00% | 4.23% | 4.23% |
| INDX 2005-AR12 2A1A | 0.00% | 5.88% | 5.88% |
| INDX 2006-AR19 1A1 | 0.00% | 5.19% | 5.19% |
| JPMMT 2005-ALT1 2A1 | 0.00% | 12.36% | 12.36% |
| JPALT 2006-A1 1A1 | 0.00% | 17.26% | 17.26% |
| JPALT 2006-A2 1A1 | 0.00% | 14.29% | 14.29% |
| JPALT 2006-A3 1A1 | 0.00% | 16.38% | 16.38% |
| JPALT 2007-A2 12A1 | 0.00% | 20.32% | 20.32% |
| LUM 2005-1 A1 | 0.00% | 9.09% | 9.09% |
| LUM 2006-6 A1 | 0.00% | 14.38% | 14.38% |
| LUM 2006-7 2A1 | 0.00% | 23.23% | 23.23% |
| LUM 2007-2 1A1 | .0017% | 23.50% | 23.33% |
| LXS 2005-8 1A2 | 0.00% | 10.60% | 10.49% |
| LXS 2007-9 1A1 | 0.00% | 10.64% | 12.24% |
| LXS 2007-11 A1 | 0.00% | 23.36% | 25.93% |

| Certificate | % of Loans with Greater than 100% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 100% LTV | Offering Documents Understatement |
|---|---|---|---|
| MARM 2005-7 2A1 | 0.00% | 10.26% | 10.26% |
| MARM 2005-8 1A1 | 0.00% | 10.64% | 10.64% |
| MANA 2007-A3 A2A | 0.00% | 18.75% | 18.75% |
| MHL 2005-5 A1 | 0.00% | 7.24% | 7.24% |
| MSM 2006-13AX A1 | 0.00% | 10.25% | 10.25% |
| MSM 2006-16AX 2A1 | 0.00% | 9.35% | 9.35% |
| MSM 2006-8AR 1A2 | 0.00% | 14.17% | 14.17% |
| MSM 2006-9AR A3 | 0.00% | 9.96% | 9.96% |
| MSM 2007-2AX 2A2 | 0.00% | 10.83% | 10.83% |
| MSM 2007-5AX 2A2 | 0.00% | 20.72% | 20.72% |
| MSM 2007-7AX 2A1 | 0.00% | 16.10% | 16.10% |
| MHL 2006-1 1A2 | 0.00% | 9.76% | 9.76% |
| NAA 2007-1 2A1 | 0.00% | 18.44% | 18.44% |
| NAA 2007-3 A1 | 0.00% | 16.14% | 16.14% |
| NAA 2006-AF2 5A1 | 0.00% | 20.24% | 20.24% |
| NAA 2006-AR4 A2 | 0.00% | 10.67% | 10.67% |
| RALI 2005-QA9 NB41 | 0.00% | 7.69% | 7.69% |
| RALI 2006-QA2 1A1 | 0.00% | 9.30% | 9.30% |
| RALI 2006-QA3 A1 | 0.00% | 7.19% | 7.19% |
| RALI 2006-QO10 A1 | 0.00% | 25.63% | 25.63% |
| RALI 2007-QS6 A29 | 0.00% | 12.70% | 12.70% |
| SAMI 2005-AR2 1A1 | 0.00% | 7.32% | 7.32% |
| SAMI 2005-AR3 1A1 | 0.00% | 13.68% | 13.68% |
| SAMI 2005-AR6 2A1 | 0.00% | 12.23% | 12.23% |
| SAMI 2006-AR4 4A1 | 0.00% | 17.43% | 17.43% |
| SAMI 2006-AR6 1A1 | 0.00% | 20.44% | 20.44% |
| SAMI 2006-AR7 A1A | 0.00% | 19.66% | 19.66% |
| TMST 2007-1 A2A | 0.00% | 21.11% | 21.11% |
| WFMBS 2006-AR12 1A1 | 0.00% | 9.93% | 9.93% |

883.    The following table compares the representations in the Offering Documents with respect to the percentage of the mortgages in the subject pools with LTVs greater than 90%, to the percentages of mortgages in the pools in which the LTV calculated using the AVM exceeds 90%.  An LTV in excess of 90% represents an extremely risky mortgage for the investor, as the

borrower has little equity in the property and there is a significant risk that upon foreclosure the collateral will be inadequate to pay the debt.  Accordingly, for each of the Certificates listed in the following table, the statement regarding the mortgages in the subject pool with LTVs in excess of 90% was materially misleading.

| Certificate | % of Loans with Greater than 90% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 90% LTV | Offering Documents Understatement |
|---|---|---|---|
| AHM 2005-2 1A1 | 5.24% | 38.24% | 33.00% |
| ARMT 2006-1 6A1 | 2.83% | 30.6% | 27.8% |
| ARMT 2006-2 6A1 | 3.24% | 32.5% | 29.3% |
| ARMT 2006-3 4A2 | 2.36% | 29.0% | 26.7% |
| ARMT 2007-1 5A1 | 5.40% | 37.2% | 31.8% |
| ARMT 2007-2 2A21 | 5.73% | 41.5% | 35.8% |
| AHMA 2006-6 A1A | 6.66% | 49.4% | 42.7% |
| AHMA 2007-2 A1 | 11.73% | 63.5% | 51.8% |
| AHMA 2007-5 A1 | 0.09% | 57.8% | 57.7% |
| BCAP 2006-AA1 A1 | 0.46% | 37.6% | 37.1% |
| BSMF 2006-AR1 1A1 | 0.25% | 32.8% | 32.6% |
| BSMF 2006-AR2 1A1 | 0.06% | 34.8% | 34.8% |
| BSMF 2006-AR3 1A1 | 0.00% | 40.8% | 40.8% |
| BSMF 2006-AR5 1A1 | 0.09% | 38.8% | 38.7% |
| BSMF 2007-AR1 1A1 | 0.14% | 51.1% | 51.0% |
| BSMF 2007-AR4 1A1 | 0.44% | 44.0% | 43.6% |
| BSMF 2007-AR5 1A1A | 0.10% | 41.7% | 41.6% |
| BALTA 2005-8 11A1 | 0.69% | 23.1% | 22.4% |
| BALTA 2005-9 11A1 | 1.50% | 29.6% | 28.1% |
| BALTA 2005-10 11A1 | 1.48% | 27.5% | 26.0% |
| BALTA 2006-1 11A1 | 1.52% | 33.3% | 31.8% |
| BALTA 2006-2 11A1 | 0.33% | 34.4% | 34.1% |
| BALTA 2006-3 1A1 | 1.26% | 31.8% | 30.5% |
| BALTA 2006-4 11A1 | 0.83% | 38.3% | 37.4% |
| BALTA 2006-5 1A1 | 0.50% | 31.8% | 31.3% |
| BALTA 2006-6 1A1 | 0.21% | 26.2% | 26.0% |
| BALTA 2006-7 1A1 | 1.98% | 40.5% | 38.5% |
| BALTA 2007-1 1A1 | 6.93% | 37.7% | 30.8% |
| BALTA 2007-2 1A1 | 10.76% | 41.7% | 31.0% |
| BALTA 2007-3 1A1 | 4.38% | 46.2% | 41.8% |

| Certificate | % of Loans with Greater than 90% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 90% LTV | Offering Documents Understatement |
|---|---|---|---|
| BAFC 2005-H 7A1 | 1.77% | 18.4% | 16.6% |
| BAFC 2006-D 1A1 | 0.00% | 24.8% | 24.8% |
| CMLTI 2005-9 1A1 | 0.00% | 44.4% | 44.4% |
| CMALT 2007-A4 1A7 | 0.09% | 31.1% | 31.0% |
| CWALT 2005-16 A4 | 0.94% | 22.4% | 21.5% |
| CWALT 2005-86CB A10 | 1.72% | 14.1% | 12.3% |
| CWALT 2006-OA16 A2 | 3.93% | 38.9% | 35.0% |
| CWALT 2006-OA8 1A1 | 2.10% | 37.8% | 35.7% |
| CWALT 2007-OA4 A1 | 1.77% | 42.3% | 40.6% |
| CWALT 2007-OA9 A1 | 0.95% | 42.7% | 41.8% |
| CWHL 2005-2 2A1 | 1.27% | 16.3% | 15.0% |
| DBALT 2006-AR2 1A1 | 2.73% | 26.8% | 24.0% |
| DBALT 2006-AR3 A2 | 0.54% | 32.9% | 32.3% |
| DBALT 2006-AR4 A1 | 1.62% | 27.3% | 25.7% |
| DBALT 2006-AR5 1A1 | 1.72% | 29.8% | 28.1% |
| DBALT 2007-AR1 A1 | 0.71% | 31.3% | 30.6% |
| DSLA 2005-AR1 2A1A | 0.07% | 21.84% | 21.77% |
| DSLA 2005-AR2 2A1A | 0.09% | 9.64% | 9.55% |
| GPMF 2005-AR1 A2 | 0.09% | 19.6% | 19.5% |
| GPMF 2005-AR2 A1 | 0.09% | 17.9% | 17.8% |
| GPMF 2005-AR4 4A1A | 0.27% | 22.7% | 22.4% |
| GPMF 2006-AR3 4A1 | 0.18% | 33.33% | 33.15% |
| HVMLT 2005-10 2A1A | 1.43% | 24.0% | 22.5% |
| HVMLT 2006-7 2A1A | 17.28% | 47.6% | 30.4% |
| HVMLT 2006-8 2A1A | 7.68% | 32.7% | 25.0% |
| HVMLT 2007-1 2A1A | 2.80% | 52.1% | 49.3% |
| IMSA 2005-2 A1 | 4.18% | 24.2% | 20.0% |
| IMSA 2006-2 1A2A | 7.63% | 22.9% | 15.3% |
| IMM 2005-7 A1 | 4.43% | 33.2% | 28.7% |
| INDX 2005-AR4 2A1A | 0.35% | 15.3% | 14.9% |
| INDX 2005-AR8 2A1A | 0.00% | 11.3% | 11.3% |
| INDX 2005-AR12 2A1A | 0.06% | 13.73% | 13.67% |
| INDX 2006-AR19 1A1 | 1.44% | 25.3% | 23.9% |
| JPMMT 2005-ALT1 2A1 | 9.89% | 24.7% | 14.8% |
| JPALT 2006-A1 1A1 | 10.47% | 38.7% | 28.2% |
| JPALT 2006-A2 1A1 | 2.62% | 34.7% | 32.1% |
| JPALT 2006-A3 1A1 | 3.47% | 25.9% | 22.4% |

| Certificate | % of Loans with Greater than 90% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 90% LTV | Offering Documents Understatement |
|---|---|---|---|
| JPALT 2007-A2 12A1 | 2.67% | 33.5% | 30.8% |
| LUM 2005-1 A1 | 9.02% | 18.2% | 9.2% |
| LUM 2006-6 A1 | 2.71% | 36.3% | 33.6% |
| LUM 2006-7 2A1 | 2.56% | 46.5% | 43.9% |
| LUM 2007-2 1A1 | 0.00% | 41.0% | 41.0% |
| LXS 2005-8 1A2 | 0.28% | 40.85% | 24.20% |
| LXS 2007-9 1A1 | 0.41% | 32.98% | 30.20% |
| LXS 2007-11 A1 | 0.13% | 38.32% | 46.17% |
| MARM 2005-7 2A1 | 2.32% | 21.8% | 19.5% |
| MARM 2005-8 1A1 | 2.61% | 25.5% | 22.9% |
| MANA 2007-A3 A2A | 2.38% | 36.5% | 34.1% |
| MHL 2005-5 A1 | 0.41% | 18.60% | 18.19% |
| MSM 2006-13AX A1 | 1.39% | 28.3% | 26.9% |
| MSM 2006-16AX 2A1 | 1.91% | 25.2% | 23.3% |
| MSM 2006-8AR 1A2 | 0.43% | 28.3% | 27.9% |
| MSM 2006-9AR A3 | 0.88% | 24.7% | 23.8% |
| MSM 2007-2AX 2A2 | 2.35% | 27.5% | 25.2% |
| MSM 2007-5AX 2A2 | 5.18% | 37.8% | 32.7% |
| MSM 2007-7AX 2A1 | 4.86% | 32.2% | 27.3% |
| MHL 2006-1 1A2 | 0.66% | 17.1% | 16.4% |
| NAA 2007-1 2A1 | 3.96% | 37.5% | 33.5% |
| NAA 2007-3 A1 | 1.21% | 40.7% | 39.5% |
| NAA 2006-AF2 5A1 | 16.96% | 38.1% | 21.1% |
| NAA 2006-AR4 A2 | 2.39% | 26.7% | 24.3% |
| RALI 2005-QA9 NB41 | 0.00% | 23.1% | 23.1% |
| RALI 2006-QA2 1A1 | 1.18% | 25.0% | 23.8% |
| RALI 2006-QA3 A1 | 0.51% | 20.9% | 20.4% |
| RALI 2006-QO10 A1 | 2.24% | 44.4% | 42.1% |
| RALI 2007-QS6 A29 | 2.50% | 32.8% | 30.3% |
| SAMI 2005-AR2 1A1 | 2.81% | 20.3% | 17.5% |
| SAMI 2005-AR3 1A1 | 2.51% | 22.1% | 19.6% |
| SAMI 2005-AR6 2A1 | 2.14% | 24.5% | 22.3% |
| SAMI 2006-AR4 4A1 | 2.30% | 36.7% | 34.4% |
| SAMI 2006-AR6 1A1 | 2.90% | 40.3% | 37.4% |
| SAMI 2006-AR7 A1A | 3.17% | 41.6% | 38.4% |
| TMST 2007-1 A2A | 1.17% | 33.9% | 32.7% |
| WFMBS 2006-AR12 1A1 | 0.02% | 27.15% | 27.13% |

884.     The following table compares the representations in the Offering Documents with respect to the percentage of the mortgages in the subject pool with LTVs greater than 80%, to the percentages of mortgages in the pools in which the LTV calculated using the AVM exceeds 80%.  The 80% LTV metric is very significant to a PLMBS investor such as the Bank, because in traditional mortgage underwriting an LTV in excess of 80% was generally considered as affording the lender little value cushion to protect against borrower default and loss upon foreclosure.  Accordingly, for each of the Certificates listed in the following table, the statement regarding the percentage of mortgages in the subject pool with LTVs in excess of 80% was materially misleading.

| Certificate | % of Loans with Greater than 80% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 80% LTV | Offering Documents Understatement |
|---|---|---|---|
| AHM 2005-2 1A1 | 8.87% | 57.98% | 49.11% |
| ARMT 2006-1 6A1 | 6.36% | 66.1% | 59.8% |
| ARMT 2006-2 6A1 | 8.25% | 64.4% | 56.1% |
| ARMT 2006-3 4A2 | 7.29% | 62.6% | 55.3% |
| ARMT 2007-1 5A1 | 9.43% | 70.9% | 61.5% |
| ARMT 2007-2 2A21 | 12.31% | 73.8% | 61.5% |
| AHMA 2006-6 A1A | 24.31% | 72.5% | 48.2% |
| AHMA 2007-2 A1 | 40.71% | 82.7% | 42.0% |
| AHMA 2007-5 A1 | 42.04% | 77.8% | 35.7% |
| BCAP 2006-AA1 A1 | 2.73% | 72.8% | 70.1% |
| BSMF 2006-AR1 1A1 | 1.76% | 76.6% | 74.8% |
| BSMF 2006-AR2 1A1 | 4.23% | 78.5% | 74.3% |
| BSMF 2006-AR3 1A1 | 4.55% | 78.5% | 73.9% |
| BSMF 2006-AR5 1A1 | 3.91% | 76.9% | 73.0% |
| BSMF 2007-AR1 1A1 | 3.14% | 84.7% | 81.5% |
| BSMF 2007-AR4 1A1 | 2.01% | 70.6% | 68.6% |
| BSMF 2007-AR5 1A1A | 2.24% | 67.4% | 65.2% |
| BALTA 2005-8 11A1 | 2.58% | 59.2% | 56.6% |
| BALTA 2005-9 11A1 | 3.80% | 60.1% | 56.3% |
| BALTA 2005-10 11A1 | 4.11% | 55.8% | 51.7% |

| Certificate | % of Loans with Greater than 80% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 80% LTV | Offering Documents Understatement |
|---|---|---|---|
| BALTA 2006-1 11A1 | 3.91% | 61.5% | 57.6% |
| BALTA 2006-2 11A1 | 1.68% | 65.1% | 63.4% |
| BALTA 2006-3 1A1 | 3.65% | 68.2% | 64.6% |
| BALTA 2006-4 11A1 | 2.60% | 72.7% | 70.1% |
| BALTA 2006-5 1A1 | 1.80% | 68.7% | 66.9% |
| BALTA 2006-6 1A1 | 1.04% | 62.0% | 61.0% |
| BALTA 2006-7 1A1 | 3.61% | 72.9% | 69.3% |
| BALTA 2007-1 1A1 | 10.09% | 69.3% | 59.2% |
| BALTA 2007-2 1A1 | 15.50% | 74.9% | 59.4% |
| BALTA 2007-3 1A1 | 8.04% | 80.2% | 72.2% |
| BAFC 2005-H 7A1 | 4.24% | 51.0% | 46.8% |
| BAFC 2006-D 1A1 | 0.00% | 59.3% | 59.3% |
| CMLTI 2005-9 1A1 | 46.59% | 68.1% | 21.5% |
| CMALT 2007-A4 1A7 | 3.34% | 60.6% | 57.3% |
| CWALT 2005-16 A4 | 4.49% | 52.0% | 47.6% |
| CWALT 2005-86CB A10 | 4.67% | 45.3% | 40.6% |
| CWALT 2006-OA16 A2 | 8.76% | 64.4% | 55.7% |
| CWALT 2006-OA8 1A1 | 9.08% | 65.2% | 56.1% |
| CWALT 2007-OA4 A1 | 8.74% | 64.4% | 55.7% |
| CWALT 2007-OA9 A1 | 3.78% | 66.7% | 62.9% |
| CWHL 2005-2 2A1 | 2.71% | 47.2% | 44.4% |
| DBALT 2006-AR2 1A1 | 10.53% | 55.9% | 45.4% |
| DBALT 2006-AR3 A2 | 2.01% | 61.7% | 59.7% |
| DBALT 2006-AR4 A1 | 4.61% | 64.0% | 59.4% |
| DBALT 2006-AR5 1A1 | 3.33% | 64.9% | 61.6% |
| DBALT 2007-AR1 A1 | 1.14% | 65.7% | 64.5% |
| DSLA 2005-AR1 2A1A | 8.12% | 54.02% | 45.90% |
| DSLA 2005-AR2 2A1A | 5.77% | 38.55% | 32.78% |
| GPMF 2005-AR1 A2 | 2.01% | 55.7% | 53.7% |
| GPMF 2005-AR2 A1 | 2.35% | 58.3% | 56.0% |
| GPMF 2005-AR4 4A1A | 2.59% | 57.2% | 54.6% |
| GPMF 2006-AR3 4A1 | 2.63% | 65.85% | 63.22% |
| HVMLT 2005-10 2A1A | 5.69% | 51.0% | 45.4% |
| HVMLT 2006-7 2A1A | 22.32% | 74.1% | 51.8% |
| HVMLT 2006-8 2A1A | 10.95% | 58.4% | 47.5% |
| HVMLT 2007-1 2A1A | 4.97% | 80.8% | 75.9% |
| IMSA 2005-2 A1 | 13.30% | 54.6% | 41.3% |

| Certificate | % of Loans with Greater than 80% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 80% LTV | Offering Documents Understatement |
|---|---|---|---|
| IMSA 2006-2 1A2A | 11.00% | 50.5% | 39.5% |
| IMM 2005-7 A1 | 12.96% | 65.8% | 52.8% |
| INDX 2005-AR4 2A1A | 1.55% | 37.3% | 35.7% |
| INDX 2005-AR8 2A1A | 0.24% | 39.4% | 39.2% |
| INDX 2005-AR12 2A1A | 0.83% | 49.67% | 48.84% |
| INDX 2006-AR19 1A1 | 5.21% | 60.4% | 55.2% |
| JPMMT 2005-ALT1 2A1 | 15.45% | 57.3% | 41.9% |
| JPALT 2006-A1 1A1 | 23.08% | 62.5% | 39.4% |
| JPALT 2006-A2 1A1 | 7.21% | 69.4% | 62.2% |
| JPALT 2006-A3 1A1 | 11.58% | 63.8% | 52.2% |
| JPALT 2007-A2 12A1 | 6.72% | 67.7% | 61.0% |
| LUM 2005-1 A1 | 15.57% | 51.5% | 35.9% |
| LUM 2006-6 A1 | 8.94% | 58.9% | 50.0% |
| LUM 2006-7 2A1 | 21.78% | 73.7% | 52.0% |
| LUM 2007-2 1A1 | 0.00% | 74.5% | 74.5% |
| LXS 2005-8 1A2 | 1.76% | 57.95% | 54.18% |
| LXS 2007-9 1A1 | 2.04% | 75.53% | 71.43% |
| LXS 2007-11 A1 | 0.93% | 75.70% | 84.26% |
| MARM 2005-7 2A1 | 6.95% | 52.6% | 45.6% |
| MARM 2005-8 1A1 | 4.58% | 54.3% | 49.7% |
| MANA 2007-A3 A2A | 4.39% | 74.0% | 69.6% |
| MHL 2005-5 A1 | 1.06% | 53.49% | 52.43% |
| MSM 2006-13AX A1 | 4.86% | 67.2% | 62.4% |
| MSM 2006-16AX 2A1 | 4.42% | 61.2% | 56.7% |
| MSM 2006-8AR 1A2 | 3.43% | 60.7% | 57.3% |
| MSM 2006-9AR A3 | 3.67% | 66.2% | 62.6% |
| MSM 2007-2AX 2A2 | 5.62% | 57.5% | 51.9% |
| MSM 2007-5AX 2A2 | 9.55% | 70.7% | 61.2% |
| MSM 2007-7AX 2A1 | 7.43% | 72.0% | 64.6% |
| MHL 2006-1 1A2 | 1.97% | 69.5% | 67.5% |
| NAA 2007-1 2A1 | 7.78% | 72.8% | 65.0% |
| NAA 2007-3 A1 | 2.98% | 71.2% | 68.2% |
| NAA 2006-AF2 5A1 | 22.82% | 62.5% | 39.7% |
| NAA 2006-AR4 A2 | 4.66% | 68.4% | 63.8% |
| RALI 2005-QA9 NB41 | 0.84% | 63.5% | 62.6% |
| RALI 2006-QA2 1A1 | 3.73% | 61.6% | 57.9% |
| RALI 2006-QA3 A1 | 2.89% | 55.4% | 52.5% |

| Certificate | % of Loans with Greater than 80% LTV Per the Offering Documents | Recalculated % of Loans with Greater than 80% LTV | Offering Documents Understatement |
|---|---|---|---|
| RALI 2006-QO10 A1 | 5.68% | 71.3% | 65.6% |
| RALI 2007-QS6 A29 | 8.61% | 65.6% | 57.0% |
| SAMI 2005-AR2 1A1 | 8.09% | 43.1% | 35.0% |
| SAMI 2005-AR3 1A1 | 7.83% | 55.8% | 48.0% |
| SAMI 2005-AR6 2A1 | 3.81% | 54.0% | 50.1% |
| SAMI 2006-AR4 4A1 | 11.70% | 67.0% | 55.3% |
| SAMI 2006-AR6 1A1 | 11.54% | 73.5% | 61.9% |
| SAMI 2006-AR7 A1A | 11.62% | 77.0% | 65.3% |
| TMST 2007-1 A2A | 2.50% | 57.8% | 55.3% |
| WFMBS 2006-AR12 1A1 | 0.71% | 57.62% | 56.91% |

885.    The following table lists mortgage pools securing the PLMBS purchased by the Bank in which the representation contained in the related Offering Documents with respect to the weighted average LTV of the mortgage pool securing those PLMBS was materially understated. The weighted average LTV representation is significant because it provides the investor with an important gauge as to the overall riskiness of the mortgage pool.

| Certificate | Weighted Average LTV Per Offering Documents | AVM Calculated Weighted Average LTV | Offering Documents Understatement |
|---|---|---|---|
| AHM 2005-2 1A1 | 73.52% | 84.78% | 11.26% |
| AHMA 2006-6 A1A | 76.73% | 87.13% | 10.40% |
| AHMA 2007-2 A1 | 79.48% | 93.68% | 14.20% |
| AHMA 2007-5 A1 | 79.04% | 90.60% | 11.56% |
| ARMT 2006-1 6A1 | 77.47% | 83.58% | 6.11% |
| ARMT 2006-2 6A1 | 76.31% | 82.78% | 6.47% |
| ARMT 2006-3 4A2 | 77.51% | 83.60% | 6.09% |
| ARMT 2007-1 5A1 | 78.00% | 87.11% | 9.11% |
| ARMT 2007-2 2A21 | 78.95% | 86.99% | 8.04% |
| BAFC 2006-D 1A1 | 75.94% | 80.51% | 4.57% |
| BALTA 2005-10 11A1 | 77.21% | 82.67% | 5.46% |
| BALTA 2005-8 11A1 | 78.08% | 82.53% | 4.45% |

| Certificate | Weighted Average LTV Per Offering Documents | AVM Calculated Weighted Average LTV | Offering Documents Understatement |
|---|---|---|---|
| BALTA 2005-9 11A1 | 77.70% | 83.53% | 5.83% |
| BALTA 2006-1 11A1 | 75.42% | 83.94% | 8.52% |
| BALTA 2006-2 11A1 | 77.52% | 84.70% | 7.18% |
| BALTA 2006-3 1A1 | 77.32% | 83.35% | 6.03% |
| BALTA 2006-4 11A1 | 75.20% | 86.01% | 10.81% |
| BALTA 2006-4 13A1 | 77.38% | 84.55% | 7.17% |
| BALTA 2006-5 1A1 | 76.69% | 84.39% | 7.70% |
| BALTA 2006-6 1A1 | 75.69% | 83.76% | 8.07% |
| BALTA 2006-7 1A1 | 75.47% | 87.29% | 11.82% |
| BALTA 2007-1 1A1 | 78.11% | 87.23% | 9.12% |
| BALTA 2007-2 1A1 | 78.86% | 90.74% | 11.88% |
| BALTA 2007-3 1A1 | 77.28% | 92.84% | 15.56% |
| BCAP 2006-AA1 A1 | 74.18% | 84.81% | 10.63% |
| BSMF 2006-AR1 1A1 | 77.78% | 85.92% | 8.14% |
| BSMF 2006-AR2 1A1 | 77.83% | 85.41% | 7.58% |
| BSMF 2006-AR3 1A1 | 77.40% | 88.22% | 10.82% |
| BSMF 2006-AR5 1A1 | 77.64% | 86.55% | 8.91% |
| BSMF 2007-AR1 1A1 | 77.45% | 89.60% | 12.15% |
| BSMF 2007-AR4 1A1 | 74.02% | 82.27% | 8.25% |
| BSMF 2007-AR5 1A1A | 72.43% | 82.01% | 9.58% |
| CMALT 2007-A4 1A7 | 71.91% | 78.89% | 6.98% |
| CWALT 2005-16 A4 | 74.09% | 78.99% | 4.90% |
| CWALT 2006-OA16 A2 | 75.12% | 85.05% | 9.93% |
| CWALT 2006-OA8 1A1 | 75.31% | 82.62% | 7.31% |
| CWALT 2007-OA4 A1 | 73.10% | 87.35% | 14.25% |
| CWALT 2007-OA9 A1 | 74.29% | 83.45% | 9.16% |
| CWHL 2005-2 2A1 | 73.70% | 75.35% | 1.65% |
| DBALT 2006-AR2 1A1 | 76.43% | 80.29% | 3.86% |
| DBALT 2006-AR3 A2 | 76.12% | 84.95% | 8.83% |
| DBALT 2006-AR4 A1 | 75.99% | 82.84% | 6.85% |
| DBALT 2006-AR5 1A1 | 76.52% | 83.27% | 6.75% |
| DBALT 2007-AR1 A1 | 75.65% | 82.65% | 7.00% |
| DSLA 2005-AR2 2A1A | 73.86% | 77.04% | 3.18% |
| GPMF 2005-AR1 A2 | 76.41% | 78.13% | 1.72% |
| GPMF 2005-AR4 4A1A | 76.02% | 79.08% | 3.06% |
| GPMF 2006-AR3 4A1 | 77.47% | 83.59% | 6.12% |
| HVMLT 2005-10 2A1A | 74.63% | 80.46% | 5.83% |

| Certificate | Weighted Average LTV Per Offering Documents | AVM Calculated Weighted Average LTV | Offering Documents Understatement |
|---|---|---|---|
| HVMLT 2006-7 2A1A | 75.27% | 88.01% | 12.74% |
| HVMLT 2006-8 2A1A | 75.14% | 79.36% | 4.22% |
| HVMLT 2007-1 2A1A | 74.64% | 90.75% | 16.11% |
| IMM 2005-7 A1 | 76.90% | 81.11% | 4.21% |
| INDX 2005-AR12 2A1A | 73.15% | 78.06% | 4.91% |
| JPALT 2006-A1 1A1 | 77.87% | 82.29% | 4.42% |
| JPALT 2006-A2 1A1 | 76.88% | 84.82% | 7.94% |
| JPALT 2006-A3 1A1 | 76.03% | 82.66% | 6.63% |
| JPALT 2007-A2 12A1 | 76.22% | 88.06% | 11.84% |
| LUM 2005-1 A1 | 76.15% | 78.46% | 2.31% |
| LUM 2006-3 11A1 | 76.97% | 80.57% | 3.60% |
| LUM 2006-6 A1 | 73.96% | 81.61% | 7.65% |
| LUM 2006-7 2A1 | 76.56% | 85.93% | 9.37% |
| LUM 2007-2 1A1 | 79.01% | 87.20% | 8.19% |
| LXS 2005-8 1A2 | 75.89% | 81.62% | 5.73% |
| LXS 2007-11 A1 | 78.34% | 87.97% | 9.63% |
| MANA 2007-A3 A2A | 77.34% | 83.25% | 5.91% |
| MARM 2005-7 2A1 | 75.25% | 78.92% | 3.67% |
| MARM 2005-8 1A1 | 71.84% | 80.25% | 8.41% |
| MHL 2005-5 A1 | 74.99% | 77.64% | 2.65% |
| MHL 2006-1 1A2 | 76.92% | 82.98% | 6.06% |
| MSM 2006-13AX A1 | 77.52% | 83.58% | 6.06% |
| MSM 2006-16AX 2A1 | 76.78% | 81.16% | 4.38% |
| MSM 2006-8AR 1A2 | 74.58% | 80.70% | 6.12% |
| MSM 2006-9AR A3 | 76.83% | 82.27% | 5.44% |
| MSM 2007-2AX 2A2 | 76.98% | 80.47% | 3.49% |
| MSM 2007-5AX 2A2 | 77.44% | 87.69% | 10.25% |
| MSM 2007-7AX 2A1 | 77.31% | 85.53% | 8.22% |
| NAA 2006-AF2 5A1 | 77.54% | 79.57% | 2.03% |
| NAA 2006-AR4 A2 | 76.38% | 82.14% | 5.76% |
| NAA 2007-1 2A1 | 77.67% | 86.92% | 9.25% |
| NAA 2007-3 A1 | 77.27% | 86.28% | 9.01% |
| RALI 2005-QA9 NB41 | 75.99% | 80.67% | 4.68% |
| RALI 2006-QA2 1A1 | 76.76% | 81.14% | 4.38% |
| RALI 2006-QA3 A1 | 75.65% | 78.88% | 3.23% |
| RALI 2006-QO10 A1 | 74.76% | 86.52% | 11.76% |
| RALI 2007-QS6 A29 | 74.02% | 80.12% | 6.10% |

| Certificate | Weighted Average LTV Per Offering Documents | AVM Calculated Weighted Average LTV | Offering Documents Understatement |
|---|---|---|---|
| SAMI 2005-AR2 1A1 | 73.17% | 76.09% | 2.92% |
| SAMI 2005-AR3 1A1 | 75.50% | 78.08% | 2.58% |
| SAMI 2005-AR6 2A1 | 73.52% | 79.07% | 5.55% |
| SAMI 2006-AR4 4A1 | 73.91% | 80.49% | 6.58% |
| SAMI 2006-AR6 1A1 | 74.37% | 85.00% | 10.63% |
| SAMI 2006-AR7 A1A | 75.68% | 86.55% | 10.87% |
| TMST 2007-1 A2A | 68.62% | 83.84% | 15.22% |
| WFMBS 2006-AR12 1A1 | 72.67% | 80.58% | 7.91% |

**C.    The Offering Documents Were Materially Misleading Because They Failed to Inform Investors of the Presence of Compounded High-Risk Mortgages in the Loan Pools.**

886.    The Bank has analyzed the individual loan data it has been able to obtain to assess the extent to which the loan pools contained loans—referred to herein as "Compounded High-Risk Mortgages"—that exhibited multiple high risks (*i.e.*, above the 75th percentile in the pool) for two or more of the LTV, DTI or FICO metrics, which are the key quantitative metrics generally employed in the underwriting process, but which did not exhibit compensating low risk for the remaining metric.  If the risk-balancing underwriting described in the Offering Documents had been employed, the loan pools would be expected to contain few, if any, Compounded High-Risk Mortgages—for high risk in one metric would be compensated for by low risk in one or more other metrics.

887.    The Bank's analysis indicates that for the vast majority of the loan pools, the incidence of Compounded High-Risk Mortgages was much higher than what would be expected if risk balancing underwriting of the type described in the Offering Documents had been employed.  For example, for the following 99 Certificates, the incidence of Compounded High-Risk Mortgages is greater than 80% of the rate that would be expected if the LTV, DTI and

FICO metrics were independent measures.  Risk-balancing underwriting of the type described in the Offering Documents should produce an incidence much lower than 80% of the independent rate, however.  Accordingly, the incidence of Compounded High-Risk Mortgages in the pools securing the following certificates indicates that the Offering Documents' statements regarding risk balancing underwriting were materially misleading:

| | | |
|---|---|---|
| AHM 2005-2 1A1 | CWHL 2005-2 2A1 | LUM 2006-3 11A1 |
| AHMA 2007-2 A1 | DBALT 2006-AR5 1A1 | LUM 2006-7 2A1 |
| ARMT 2006-1 6A1 | DBALT 2006-AR2 1A1 | MANA 2007-A3 A2A |
| ARMT 2006-2 6A1 | DBALT 2006-AR3 A2 | MARM 2007-R5 A1 |
| ARMT 2006-3 4A2 | DBALT 2006-AR4 A1 | MHL 2005-5 A1 |
| BAFC 2006-D 1A1 | DBALT 2007-AR1 A1 | MHL 2006-1 1A2 |
| BAFC 2005-H 7A1 | DSLA 2005-AR1 2A1A | MSM 2006-13AX A1 |
| BCAP 2006-AA1 A1 | DSLA 2005-AR2 2A1A | MSM 2006-16AX 2A1 |
| BALTA 2005-8 11A1 | GPMF 2005-AR1 A2 | MSM 2006-8AR 1A2 |
| BALTA 2005-9 11A1 | GPMF 2005-AR2 A1 | MSM 2006-9AR A3 |
| BALTA 2005-10 11A1 | GPMF 2005-AR4 4A1A | MSM 2007-2AX 2A2 |
| BALTA 2006-1 11A1 | GPMF 2006-AR3 4A1 | MSM 2007-7AX 2A1 |
| BALTA 2006-2 11A1 | HVMLT 2006-8 2A1A | MSM 2007-5AX 2A2 |
| BALTA 2006-3 1A1 | HVMLT 2005-10 2A1A | NAA 2006-AF2 5A1 |
| BALTA 2006-4 11A1 | HVMLT 2006-7 2A1A | NAA 2006-AR4 A2 |
| BALTA 2006-4 13A1 | HVMLT 2007-1 2A1A | NAA 2007-1 2A1 |
| BALTA 2006-5 1A1 | IMSA 2005-2 A1 | NAA 2007-3 A1 |
| BALTA 2006-6 1A1 | IMSA 2006-2 1A2A | RALI 2005-QA9 NB41 |
| BALTA 2006-7 1A1 | IMM 2005-7 A1 | RALI 2006-QA2 1A1 |
| BALTA 2007-1 1A1 | INDX 2005-AR4 2A1A | RALI 2006-QA3 A1 |
| BALTA 2007-2 1A1 | INDX 2005-AR8 2A1A | SAMI 2005-AR2 1A1 |
| BALTA 2007-3 1A1 | INDX 2005-AR12 2A1A | RALI 2006-QA2 1A1 |
| BSMF 2006-AR5 1A1 | INDX 2006-AR19 1A1 | RALI 2006-QA3 A1 |
| BSMF 2007-AR4 1A1 | JPALT 2006-A1 1A1 | RALI 2007-QS6 A29 |
| BSMF 2007-AR5 1A1A | JPALT 2006-A2 1A1A | SAMI 2005-AR2 1A1 |
| BSMF 2006-AR2 1A1 | JPALT 2007-A2 12A1 | SAMI 2005-AR3 1A1 |
| CMALT 2007-A4 1A7 | LUM 2007-2 1A1 | SAMI 2005-AR6 2A1 |
| CMLTI 2005-9 1A1 | MARM 2005-7 2A1 | SAMI 2006-AR4 4A1 |
| CWALT 2005-16 A4 | MARM 2005-8 1A1 | SAMI 2006-AR6 1A1 |
| CWALT 2005-86CB A10 | LXS 2005-8 1A2 | SAMI 2006-AR7 A1A |
| CWALT 2006-OA8 1A1 | LXS 2007-9 1A1 | TMST 2007-1 A2A |
| CWALT 2007-OA4 A1 | LXS 2007-11 A1 | |
| CWALT 2007-OA9 A1 | | |

888.    Further, the Bank's analysis indicates that for 74 of the Certificates the incidence of Compounded High-Risk Mortgages in the pool was *above 100% of* the rate that would be expected if the metrics were independent.  This data indicates that, contrary to the Offering Documents, risk-balancing underwriting was not employed.  It also indicates that the underwriting process employed was so deeply flawed that it produced more mortgages at extremely high risk of failure than would have resulted from a random process.  For these 74 Certificates, not only were the statements in the Offering Documents regarding the underwriting process misleading, but the failure to disclose the incidence of Compounded High-Risk Mortgages was itself a materially misleading omission.

889.    The following table lists the certificates for which the incidence of Compounded High-Risk Mortgages in the pool was *above 100% of* the rate that would be expected if the metrics were independent, and lists the actual incidence of Compounded High-Risk Mortgages in the pool as a percentage of the rate that would be expected from a random distribution:

| Certificate | Actual Incidence of Compounded High Risk Loans as a Percentage of Independent Compounded High-Risk Incidence | Certificate | Actual Incidence of Compounded High Risk Loans as a Percentage of Independent Compounded High-Risk Incidence |
|---|---|---|---|
| AHM 2005-2 1A1 | 117% | HVMLT 2006-7 2A1A | 116% |
| ARMT 2006-2 6A1 | 125% | HVMLT 2007-1 2A1A | 108% |
| ARMT 2006-3 4A2 | 138% | IMSA 2005-2 A1 | 102% |
| BCAP 2006-AA1 A1 | 173% | IMSA 2006-2 1A2A | 146% |
| BAFC 2005-H 7A1 | 103% | IMM 2005-7 A1 | 158% |
| BAFC 2006-D 1A1 | 115% | INDX 2005-AR4 2A1A | 155% |
| BSMF 2007-AR5 1A1A | 119% | INDX 2005-AR8 2A1A | 178% |
| BALTA 2005-9 11A1 | 125% | INDX 2005-AR12 2A1A | 135% |
| BALTA 2005-10 11A1 | 145% | INDX 2006-AR19 1A1 | 176% |

| Certificate | Actual Incidence of Compounded High Risk Loans as a Percentage of Independent Compounded High-Risk Incidence | Certificate | Actual Incidence of Compounded High Risk Loans as a Percentage of Independent Compounded High-Risk Incidence |
|---|---|---|---|
| BALTA 2006-1 11A1 | 115% | LXS 2005-8 1A2 | 129% |
| BALTA 2006-2 11A1 | 131% | LXS 2007-9 1A1 | 115% |
| BALTA 2006-3 1A1 | 116% | LXS 2007-11 A1 | 111% |
| BALTA 2006-4 11A1 | 110% | LUM 2006-3 11A1 | 113% |
| BALTA 2006-4 13A1 | 112% | MANA 2007-A3 A2A | 102% |
| BALTA 2006-5 1A1 | 158% | MARM 2005-7 2A1 | 124% |
| BALTA 2006-6 1A1 | 134% | MARM 2005-8 1A1 | 125% |
| BALTA 2006-7 1A1 | 138% | MHL 2005-5 A1 | 163% |
| BALTA 2007-1 1A1 | 110% | MSM 2006-13AX A1 | 116% |
| BALTA 2007-2 1A1 | 107% | MSM 2006-16AX 2A1 | 135% |
| BALTA 2007-3 1A1 | 109% | MSM 2006-8AR 1A2 | 132% |
| CMALT 2007-A4 1A7 | 117% | MSM 2006-9AR A3 | 107% |
| CMLTI 2005-9 1A1 | 113% | MSM 2007-2AX 2A2 | 131% |
| CWALT 2005-16 A4 | 149% | MSM 2007-7AX 2A1 | 112% |
| CWALT 2005-86CB A10 | 104% | MHL 2006-1 1A2 | 109% |
| CWHL 2005-2 2A1 | 152% | NAA 2006-AF2 5A1 | 145% |
| DBALT 2006-AR5 1A1 | 137% | NAA 2006-AR4 A2 | 131% |
| DBALT 2006-AR2 1A1 | 164% | NAA 2007-3 A1 | 128% |
| DBALT 2006-AR3 A2 | 123% | RALI 2005-QA9 NB41 | 273% |
| DBALT 2006-AR4 A1 | 150% | RALI 2006-QA2 1A1 | 134% |
| DBALT 2007-AR1 A1 | 123% | RALI 2007-QS6 A29 | 112% |
| DSLA 2005-AR1 2A1A | 114% | SAMI 2005-AR2 1A1 | 216% |
| GPMF 2005-AR1 A2 | 118% | SAMI 2005-AR3 1A1 | 123% |
| GPMF 2005-AR2 A1 | 136% | SAMI 2005-AR6 2A1 | 113% |
| GPMF 2005-AR4 4A1A | 135% | SAMI 2006-AR4 4A1 | 112% |
| GPMF 2006-AR3 4A1 | 131% | WFMBS 2006-AR12 1A1 | 168% |
| HVMLT 2005-10 2A1A | 126% | | |

890.    As the foregoing tables indicate, the risk profiles of the loans backing a substantial majority of the Certificates were seriously affected by the presence of Compounded High-Risk Mortgages.  The number of Compounded High-Risk Mortgages not only indicates

that the statements in the Offering Documents regarding mortgage underwriting were materially

misleading, but also indicates that the risk of default in the loan pools was materially higher than

was indicated by the averages and other pool-level data provided in the Offering Documents.

Omitting to disclose information with respect to the presence and extent of Compounded High-

Risk Mortgages caused the Offering Documents to be materially misleading.

**D.    Defendants' Statements Regarding the Triple-A Rating of the PLMBS Were False and Misleading.**

**1.    The Materiality of the Credit Rating Process and Ratings**

891.    The Bank only was authorized to purchase investment-grade, triple-A-rated

tranches of the Certificates.  Hence, the ratings issued by the Rating Agency Defendants were

manifestly material to the Bank's decision to purchase the PLMBS.  The ratings were not mere

subjective opinions.  Rather, they were factual representations that purported to assess the risk of

the Certificates based on factual information pertaining to the loans in the mortgage pools and

modeling based on this factual information and the likelihood that the Bank would receive the

payments contemplated by the Certificates.  Thus, the ratings provided material information for

investors, including the Bank.

**2.    False Representations That the Certificates the Bank Purchased Would Not Be Issued Unless They Earned Triple-A Ratings**

892.    As alleged above, the Rating Agency Defendants knew, and the Securities

Defendants should have known, that the ratings were unreliable and substantially understated the

riskiness of the mortgage loans which underlie the PLMBS.  Consequently, the Rating Agency

Defendants knew, and the Securities Defendants should have known, that the PLMBS did not in

fact possess the characteristics necessary to qualify for accurate, bona fide triple-A ratings.

893.    All the Offering Documents for the PLMBS in this action stated that it was "a

condition to the issuance of the offered certificates" purchased by the Bank that those

Certificates received triple-A ratings. *See* Appendix IV. The representation that the Certificates the Bank purchased would not have been issued unless they had received triple-A ratings was misleading because the Certificates had not received accurate, bona fide triple-A ratings. The triple-A ratings the Certificates received were fundamentally flawed because they were based on information about the underlying assets that was factually inaccurate.

### 3.    Misstatements about the Credit Rating Process and Ratings

894.    The Offering Documents misstated and omitted information about the ratings issued by the Rating Agency Defendants and the rating process. The Offering Documents for each Certificate contained disclosures regarding the ratings process, and the purpose and bases of the ratings. Appendix IV attached hereto and incorporated herein sets forth examples of those statements and omissions. For example, the Prospectus Supplement for JPMMT 2005-ALT1, dated August 25, 2005 states:

> The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related Certificate holders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates. Ratings on such certificates do not, however, constitute a statement regarding frequency of prepayments of the Mortgage Loans.

JPMMT 2005-ALT1 Pros. Sup. S-65-66.

895.    These disclosures, however, were incomplete, inaccurate, and misleading. Specifically, the Offering Documents misrepresented and omitted the following material information:

- The ratings did not "take into consideration the credit quality of the mortgage pool," because the credit ratings were based on false factual information about the underwriting standards, the "appraisals" and their resulting LTVs, and similar characteristics of the loan.

- The ratings did not "address the likelihood of the receipt of all payments on the mortgage loans by the related Certificate holders," because—for the reasons just given—the ratings did not take into consideration the true characteristics of the mortgage loans, and thus could not address the true likelihood of the receipt of distribution on those loans.

- The ratings did not—and were not intended to—"address the likelihood of the receipts of all payments on the mortgage loans by the related Certificate holders" because the Rating Agency Defendants allowed their own interests in revenues and market share to pre-determine the ratings assigned to the Certificates.

- The Offering Documents did not disclose the Rating Agency Defendants' conflicts of interest, which compromised the rating process;

- The Offering Documents did not disclose that executives and other senior officers of the Rating Agency Defendants pressured and coerced their managers and analysts to emphasize market share over ratings quality;

- The Offering Documents did not disclose the manipulation of ratings committee deliberations;

- The Offering Documents did not disclose the manipulation of the credit rating process and "ratings shopping" by Depositors/Issuers and Underwriters;

- The Offering Documents did not disclose that the credit ratings were based on false and misleading information with respect to underwriting standards, LTVs and other matters pertaining to the mortgages that secured the PLMBS purchased by the Bank;

- The Offering Documents did not disclose the scope and limitations of the Rating Agency Defendants' rating models, including that they relied on outdated data and failed to adequately protect against misinformation provided by issuers and borrowers;

- The Offering Documents did not disclose that the Rating Agency Defendants failed to devote adequate resources to the rating process;

- The Offering Documents did not disclose that the investment-grade ratings given to the PLMBS were not, in fact, comparable to investment-grade ratings given to corporate bonds or other instruments;

- The Offering Documents did not disclose that the investment-grade ratings stated and discussed in Offering Documents failed to reflect the true credit risk of the PLMBS purchased by the Bank.

896.     In sum, the ratings provided by the Rating Agency Defendants did not assess the likelihood of the receipt of all payments on the mortgage loans by the related Certificate holders, the credit quality of the related mortgage pool, or the extent to which the payment stream on the mortgage pool was adequate to make the payments required by such Certificates.  As a result, the triple-A ratings assigned to the Certificates, as well as the statements in the Offering Documents regarding those ratings and the rating process, materially misled the Bank regarding the true risk of the Certificates it purchased.

897.     As explained above, the Rating Agency Defendants knew that the triple-A ratings assigned to the PLMBS did not accurately portray their credit risk.  *See supra* § V.F.  Also as explained above, the Securities Defendants should have known the Offering Documents' statements with respect to these ratings were misleading because of their direct involvement in— and manipulation of—the rating process, *see id.*, and their awareness of the poor credit quality of the underlying loan collateral.  All of these foregoing facts they knew by virtue of their access to information held by their corporate affiliates and their intimate involvement in the securitization and due diligence process.  *See supra* § V.D.

### 4.     Evidence Demonstrating Misstatements about the Ratings and Ratings Process

898.     As alleged in detail above, the credit ratings were based on false information about underwriting standards, flawed models, rating agency capture, and pervasive conflicts of interest, including an internal obsession with market share.  *See supra* § V.F.  Furthermore, as alleged above, the Securities Defendants reverse-engineered the rating process through ratings shopping, and through their direct involvement in the rating process.  *Id.*  As set forth above, these allegations are all well documented in government investigations, other litigation, and press reports.  This evidence—and the allegations herein based on this evidence—demonstrates that

the statements in the Offering Documents regarding the ratings and the rating process are false and misleading.

899.    In addition, the downgrades of the PLMBS purchased by the Bank from triple-A to junk status indicate that the initial ratings were incorrect and without any legitimate basis. The following table sets forth the original face amounts and ratings of the securities that are the subject of this action, and the first date on which such securities' ratings were downgraded to below investment-grade:

| Certificate | Original Face Value | Original Rating by Fitch | Original Rating by Moody's | Original Rating by S&P | Date of First Downgrade to Junk Status |
|---|---|---|---|---|---|
| AHM 2005-2 1A1 | $50,000,000 | NR | Aaa | AAA | 8/23/10 |
| AHMA 2006-6 A1A | $49,500,000 | NR | Aaa | AAA | 2/23/09 |
| AHMA 2007-2 A1 | $40,000,000 | NR | Aaa | AAA | 2/23/09 |
| AHMA 2007-5 A1 | $75,000,000 | NR | Aaa | AAA | 2/23/09 |
| ARMT 2006-1 6A1 | $75,000,000 | NR | Aaa | AAA | 2/4/09 |
| ARMT 2006-2 6A1 | $33,000,000 | NR | Aaa | AAA | 2/4/09 |
| ARMT 2006-3 4A2 | $25,000,000 | NR | Aaa | AAA | 2/4/09 |
| ARMT 2007-1 5A1 | $40,000,000 | NR | Aaa | AAA | 2/4/09 |
| ARMT 2007-2 2A21 | $25,000,000 | NR | Aaa | AAA | 9/2/08 |
| BAFC 2005-H 7A1 | $80,000,000 | AAA | NR | AAA | 12/18/08 |
| BAFC 2006-D 1A1 | $40,000,000 | AAA | NR | AAA | 2/26/09 |
| BALTA 2005-10 11A1 | $67,000,000 | NR | Aaa | AAA | 2/11/09 |
| BALTA 2005-8 11A1 | $50,000,000 | NR | Aaa | AAA | 2/11/09 |
| BALTA 2005-9 11A1 | $50,000,000 | NR | Aaa | AAA | 9/2/09 |
| BALTA 2006-1 11A1 | $49,656,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2006-2 11A1 | $54,000,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2006-3 1A1 | $48,000,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2006-4 11A1 | $61,000,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2006-4 13A1 | $79,000,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2006-5 1A1 | $25,000,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2006-6 1A1 | $50,000,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2006-7 1A1 | $68,000,000 | NR | Aaa | AAA | 1/30/09 |
| BALTA 2007-1 1A1 | $26,520,000 | NR | Aaa | AAA | 10/27/08 |
| BALTA 2007-2 1A1 | $46,000,000 | NR | Aaa | AAA | 10/6/08 |
| BALTA 2007-3 1A1 | $50,000,000 | NR | Aaa | AAA | 11/5/08 |
| BCAP 2006-AA1 A1 | $50,000,000 | NR | Aaa | AAA | 1/29/09 |
| BSMF 2006-AR1 1A1 | $74,594,000 | NR | Aaa | AAA | 2/23/09 |

| Certificate | Original Face Value | Original Rating by Fitch | Original Rating by Moody's | Original Rating by S&P | Date of First Downgrade to Junk Status |
|---|---|---|---|---|---|
| BSMF 2006-AR2 1A1 | $22,000,000 | NR | Aaa | AAA | 2/23/09 |
| BSMF 2006-AR3 1A1 | $20,348,000 | NR | Aaa | AAA | 2/23/09 |
| BSMF 2006-AR5 1A1 | $85,207,000 | NR | Aaa | AAA | 2/23/09 |
| BSMF 2007-AR1 1A1 | $30,000,000 | NR | Aaa | AAA | 2/23/09 |
| BSMF 2007-AR4 1A1 | $58,000,000 | NR | Aaa | AAA | 9/1/09 |
| BSMF 2007-AR5 1A1A | $15,000,000 | NR | Aaa | AAA | 9/2/09 |
| CCMFC 2006-2A A1 | $40,000,000 | NR | Aaa | AAA | 4/13/09 |
| CCMFC 2007-1A A1 | $45,000,000 | NR | Aaa | AAA | 8/13/09 |
| CCMFC 2007-2A A1 | $20,000,000 | NR | Aaa | AAA | 4/13/09 |
| CMALT 2007-A4 1A7 | $27,000,000 | AAA | Aaa | NR | 12/16/08 |
| CMLTI 2005-9 1A1 | $25,000,000 | AAA | NR | AAA | 3/24/09 |
| CWALT 2005-16 A4 | $100,000,000 | NR | Aaa | AAA | 11/23/10 |
| CWALT 2005-86CB A10 | $60,500,000 | NR | Aaa | AAA | 2/20/09 |
| CWALT 2006-OA16 A2 | $30,000,000 | NR | Aaa | AAA | 2/19/09 |
| CWALT 2006-OA8 1A1 | $25,000,000 | NR | Aaa | AAA | 2/19/09 |
| CWALT 2007-OA4 A1 | $28,786,000 | AAA | Aaa | AAA | 2/19/09 |
| CWALT 2007-OA9 A1 | $70,000,000 | NR | Aaa | AAA | 2/19/09 |
| CWHL 2005-2 2A1 | $80,000,000 | NR | Aaa | AAA | 12/5/10 |
| DBALT 2006-AR2 1A1 | $50,000,000 | NR | Aaa | AAA | 2/2/09 |
| DBALT 2006-AR2 1A2 | $50,000,000 | NR | Aaa | AAA | 2/2/09 |
| DBALT 2006-AR3 A2 | $25,000,000 | NR | Aaa | AAA | 9/17/08 |
| DBALT 2006-AR4 A1 | $73,000,000 | NR | Aaa | AAA | 2/2/09 |
| DBALT 2006-AR5 1A1 | $48,000,000 | NR | Aaa | AAA | 2/2/09 |
| DBALT 2007-AR1 A1 | $97,965,000 | NR | Aaa | AAA | 2/2/09 |
| DSLA 2005-AR1 2A1A | $25,000,000 | NR | Aaa | AAA | 12/3/10 |
| DSLA 2005-AR2 2A1A | $30,000,000 | NR | Aaa | AAA | 12/3/10 |
| GPMF 2005-AR1 A2 | $50,000,000 | NR | Aaa | AAA | 12/9/10 |
| GPMF 2005-AR2 A1 | $25,000,000 | NR | Aaa | AAA | 8/19/09 |
| GPMF 2005-AR4 4A1A | $47,837,000 | NR | Aaa | AAA | 2/20/09 |
| GPMF 2006-AR3 4A1 | $12,086,000 | NR | Aaa | AAA | 2/20/09 |
| HVMLT 2005-10 2A1A | $30,000,000 | NR | Aaa | AAA | 4/9/09 |
| HVMLT 2006-7 2A1A | $40,000,000 | NR | Aaa | AAA | 2/20/09 |
| HVMLT 2006-8 2A1A | $37,384,000 | NR | Aaa | AAA | 2/20/09 |
| HVMLT 2007-1 2A1A | $25,000,000 | NR | Aaa | AAA | 2/20/09 |
| IMM 2005-7 A1 | $39,370,000 | NR | Aaa | AAA | 4/13/09 |
| IMSA 2005-2 A1 | $75,000,000 | NR | Aaa | AAA | 2/20/09 |
| IMSA 2006-2 1A2A | $79,384,000 | NR | Aaa | AAA | 6/18/09 |
| INDX 2005-AR4 2A1A | $19,745,000 | NR | Aaa | AAA | 2/20/09 |
| INDX 2005-AR8 2A1A | $49,000,000 | NR | Aaa | AAA | 2/20/09 |
| INDX 2005-AR12 2A1A | $50,000,000 | NR | Aaa | AAA | 12/1/10 |
| INDX 2006-AR19 1A1 | $75,000,000 | NR | Aaa | AAA | 11/11/08 |

| Certificate | Original Face Value | Original Rating by Fitch | Original Rating by Moody's | Original Rating by S&P | Date of First Downgrade to Junk Status |
|---|---|---|---|---|---|
| JPALT 2006-A1 1A1 | $29,250,000 | AAA | Aaa | AAA | 1/29/09 |
| JPALT 2006-A2 1A1 | $47,787,000 | AAA | Aaa | AAA | 12/17/08 |
| JPALT 2006-A3 1A1 | $50,000,000 | AAA | Aaa | AAA | 1/29/09 |
| JPALT 2007-A2 12A1 | $20,000,000 | AAA | Aaa | AAA | 12/16/08 |
| JPMMT 2005-ALT1 2A1 | $109,751,000 | AAA | NR | AAA | 8/6/09 |
| LUM 2005-1 A1 | $25,250,000 | NR | Aaa | AAA | 2/20/09 |
| LUM 2006-3 11A1 | $30,858,000 | NR | Aaa | AAA | 2/20/09 |
| LUM 2006-6 A1 | $20,000,000 | NR | Aaa | AAA | 2/20/09 |
| LUM 2006-7 2A1 | $60,000,000 | NR | Aaa | AAA | 2/20/09 |
| LUM 2007-2 1A1 | $50,000,000 | NR | Aaa | AAA | 2/20/09 |
| LXS 2005-8 1A2 | $75,000,000 | NR | Aaa | AAA | 8/14/09 |
| LXS 2007-11 A1 | $75,000,000 | NR | Aaa | AAA | 9/2/08 |
| LXS 2007-9 1A1 | $50,000,000 | NR | Aaa | AAA | 9/2/08 |
| MANA 2007-A3 A2A | $30,000,000 | NR | Aaa | AAA | 8/8/08 |
| MARM 2005-7 2A1 | $85,000,000 | NR | Aaa | AAA | 2/20/09 |
| MARM 2005-8 1A1 | $71,987,000 | NR | Aaa | AAA | 2/20/09 |
| MARM 2007-R5 A1 | $75,000,000 | NR | Aaa | AAA | 5/15/09 |
| MHL 2005-5 A1 | $45,000,000 | NR | Aaa | AAA | 8/5/10 |
| MHL 2006-1 1A2 | $40,000,000 | NR | Aaa | AAA | 8/4/08 |
| MSM 2006-13AX A1 | $72,500,000 | NR | Aaa | AAA | 2/4/09 |
| MSM 2006-16AX 2A1 | $24,000,000 | NR | Aaa | AAA | 2/4/09 |
| MSM 2006-8AR 1A2 | $74,000,000 | NR | Aaa | AAA | 2/4/09 |
| MSM 2006-9AR A3 | $73,000,000 | NR | Aaa | AAA | 7/24/09 |
| MSM 2007-2AX 2A2 | $15,000,000 | NR | Aaa | AAA | 10/6/08 |
| MSM 2007-5AX 2A2 | $28,250,000 | NR | Aaa | AAA | 8/21/08 |
| MSM 2007-7AX 2A1 | $45,563,000 | NR | Aaa | AAA | 8/21/08 |
| NAA 2006-AF2 5A1 | $81,610,000 | NR | Aaa | AAA | 7/25/08 |
| NAA 2006-AR4 A2 | $146,940,000 | NR | Aaa | AAA | 7/25/08 |
| NAA 2007-1 2A1 | $107,500,000 | NR | Aaa | AAA | 10/6/08 |
| NAA 2007-3 A1 | $70,000,000 | NR | Aaa | AAA | 10/30/08 |
| RALI 2005-QA9 NB41 | $76,103,000 | NR | Aaa | AAA | 2/20/09 |
| RALI 2006-QA2 1A1 | $100,000,000 | NR | Aaa | AAA | 10/6/08 |
| RALI 2006-QA3 A1 | $50,000,000 | NR | Aaa | AAA | 1/29/09 |
| RALI 2006-QO10 A1 | $25,000,000 | NR | Aaa | AAA | 2/20/09 |
| RALI 2007-QS6 A29 | $29,710,479 | AAA | Aaa | AAA | 10/27/08 |
| SAMI 2005-AR2 1A1 | $48,000,000 | NR | Aaa | AAA | 2/23/09 |
| SAMI 2005-AR3 1A1 | $72,000,000 | NR | Aaa | AAA | 3/1/10 |
| SAMI 2005-AR6 2A1 | $75,000,000 | NR | Aaa | AAA | 12/14/10 |
| SAMI 2006-AR4 4A1 | $67,607,000 | NR | Aaa | AAA | 2/23/09 |
| SAMI 2006-AR6 1A1 | $50,000,000 | NR | Aaa | AAA | 2/23/09 |
| SAMI 2006-AR7 A1A | $97,500,000 | NR | Aaa | AAA | 2/23/09 |

| Certificate | Original Face Value | Original Rating by Fitch | Original Rating by Moody's | Original Rating by S&P | Date of First Downgrade to Junk Status |
|---|---|---|---|---|---|
| TMST 2007-1 A2A | $30,000,000 | NR | Aaa | AAA | 5/1/09 |
| WFMBS 2006-AR12 1A1 | $50,000,000 | AAA | Aaa | NR | 4/6/09 |

**E.    The Securities Defendants Misrepresented the Mortgage Originators' Compliance with Predatory Lending Restrictions.**

**1.    The Materiality of Predatory Lending Practices and the Issuance of Loans that Violate Other State and Federal Lending Statutes.**

900.    By regulatory directive, the Bank was not permitted to purchase PLMBS backed by mortgage pools that contained predatory loans.  The Federal Housing Finance Board Advisory Bulletin, 2005-AB-08 (August 25, 2005) states that:

> As Government Sponsored Enterprises (GSEs), the FHLBanks carry out their housing finance mission by serving as a source of liquidity for the nation's housing and community investment needs.  Predatory lending practices that erode homeowners' equity in their homes or contribute to homeowners losing their homes are inconsistent with advancing homeownership and are incompatible with the FHLBanks' responsibility to carry out their housing finance mission in a safe and sound manner.

> . . . .

> Each FHLBank must have in place comprehensive anti-predatory lending policies to govern the FHLBank's purchasing of mortgages and calculating the level of advances that can be made to its members.

> In developing those policies, the FHLBanks must review the predatory lending policies of other large financial institutions, including other GSEs.  The FHLBanks must also review HUD's regulation on the types of loans that may be used in meeting the GSE housing goals, as well as any predatory lending guidance developed by other federal and state regulators, including their members' primary federal regulators.  *To ensure that the FHLBanks do not support predatory practices, the FHLBanks' policies must preclude purchasing mortgages that violate applicable federal, state, or local predatory lending laws or including such loans when calculating the level of advances that can be made to a member.*

(emphasis added).

901.    On July 10, 2007, the OCC, FRB, FDIC, OTS and the National Credit Union Administration (collectively, "the Agencies") issued their Final Guidance – Statement on Subprime Mortgage Lending (72 Fed. Reg. 37569).  The Agencies' Guidance required that "institutions should ensure that they do not engage in the types of predatory lending practices discussed in the Expanded Subprime Guidance," and explained:

Typically predatory lending involves at least one of the following elements:

- Making loans based predominantly on the foreclosure or liquidation value of a borrower's collateral rather than on the borrower's ability to repay the mortgage according to its terms;

- Inducing a borrower to repeatedly refinance a loan in order to charge high points and fees each time the loan is refinanced ("loan flipping"); or

- Engaging in fraud or deception to conceal the true nature of the mortgage loan obligation, or ancillary products, from an unsuspecting or unsophisticated borrower.

902.    The same Guidance states that: "Institutions should develop strong control procedures to monitor whether actual practices are consistent with their policies and procedures." In addition to monitoring, the Guidance notes that, "[i]nstitutions also should design compensation programs that avoid providing incentives for originations inconsistent with sound underwriting and consumer protection principles, and that do not result in the steering of consumers to these products to the exclusion of other products for which the consumer may qualify."

903.    In keeping with the regulatory guidance of the Federal Housing Finance Board, the Bank required that as to any security it purchased, the Offering Documents warrant that none of the underlying mortgages violated any state or federal law concerning predatory lending.

904.    Thus, statements in the Offering Documents representing and warranting that the mortgage pools did not contain loans that violated state or federal predatory lending laws were material to the Bank's decision to purchase the PLMBS.

**2.      Misstatements about Predatory Lending Compliance**

905.    The Offering Documents contained material untrue or misleading statements and omissions regarding compliance with applicable predatory lending laws.  For example, the initial Prospectuses filed with the Registration Statements contained representations similar to the following:  "The seller will warranted that the loans in the trust do not include any mortgage loan in violation of HOEPA [Federal Home Ownership and Equity Protection Act] or similar state laws."  JPALT 2006-3 Pros. at 10.

906.    The Prospectus Supplements contained similar representations.  For example, the Prospectus Supplement for BALTA 2006-3 1A1, dated April 27, 2006, states:

> On the closing date, the sponsor will represent that each mortgage loan at the time it was made complied in all material respects with all applicable laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all predatory lending laws . . . .

BALTA 2006-3 Pros. Sup. S-47.  Appendix V attached hereto and incorporated herein sets forth statements in the Offering Documents for other Certificates regarding compliance with applicable predatory lending laws.  These statements were materially misleading because the originators routinely engaged in predatory lending practices, and thus the loan pools underlying the Certificates included mortgages that do not comply with state and federal predatory lending laws.

907.    The Securities Defendants should have known that the originators engaged in predatory lending practices because: (a) they were vertically integrated with the mortgage originators that originated the loans underlying the Certificates purchased by the Bank, *see supra*

§ V.D.1; (b) their corporate affiliates served as depositors, sponsors, and underwriters for other

PLMBS deals, including deals backed by loans originated by the originators that originated the

loans underlying the Certificates purchased by the Bank, *see supra* § V.D.2; and (c) they

performed due diligence reviews on the mortgage pools underlying the certificates.  *See supra*

§ V.D.4.

**3.      Evidence Demonstrating Misstatements about Predatory Lending Practices of the Mortgage Originators**

**a.      Government investigations, actions and settlements, confidential sources and evidence developed in other private lawsuits demonstrate predatory lending by the mortgage originators.**

908.      As alleged in detail above, predatory lending practices by mortgage originators,

including those who issued the loans backing the PLMBS purchased by the Bank, is well

documented in government investigations and lawsuits, press reports, and statements of

confidential sources who are former employees of the mortgage originators.  Additional evidence

has been generated by the many other private lawsuits against many of the same Securities

Defendants in connection with the sale of mortgage-backed securities and related Certificates.

This evidence—and the allegations herein based on this evidence—demonstrates that the

statements in the Offering Documents regarding compliance with state and federal predatory

lending rules are false and misleading.  Contrary to the representations in the Offering

Documents, the mortgage originators underlying these PLMBS engaged in predatory lending,

and often issued loans to borrowers who lacked the ability to make the required payments.

Indeed, eight of the lenders classified by the OCC as the "worst of the worst" based on

foreclosure rates in the ten hardest hit metropolitan areas issued loans that backed PLMBS

purchased by the Bank.

b.     **Analysis of loans that backed the PLMBS purchased by the Bank demonstrate that loans in the mortgage pools were the result of predatory lending.**

909.    An examination of the underlying mortgage loans that back the PLMBS purchased by the Bank provides strong evidence of the violation of predatory lending restrictions by the mortgage originators.  This evidence takes several forms.  First, given that the issuance of a loan to a borrower who is not qualified for the loan is itself a form of predatory lending, delinquency in the mortgage pools suggest predatory lending.  Hence the data presented in paragraph 848 provides strong evidence of predatory lending practices of the mortgage originators who issued loans that back the PLMBS purchased by the Bank.

910.    For many of the securities purchased by the Bank the data is telling. For example, mortgage loans underlying the securities sponsored by Defendants Countrywide Home Loans, Inc. and EMC Mortgage Corporation reflected total delinquencies as of March 31, 2011 averaging over 49%.  As of the same date, total delinquencies for mortgage loans underlying the securities sponsored by Defendant Nomura Credit & Capital, Inc. average over 45%.

911.    This analysis demonstrates that the representation and warranty of no predatory lending or high cost loans made with respect to that pool are materially inaccurate and misleading.

F.     **The Securities Defendants Misrepresented the Due Diligence Performed on the Mortgage Pools That Backed the PLMBS Purchased by the Bank.**

1.     **The Materiality of Due Diligence on the Mortgage Pools**

912.    As alleged in detail above, the Bank did not have access to the mortgage loan files when it purchased the Certificates; it was the Securities Defendants that had access to this information.  Consequently, the Bank was dependent on representations made by the Securities Defendants regarding the quality of the mortgage loans backing the PLMBS it purchased.

913.    The Securities Defendants made two types of representations regarding the due diligence reviews performed upon the acquisition of mortgages that were originated by third-party originators.  First, the Securities Defendants represented that certain of the originators that are identified in the Offering Documents conducted post-purchase due diligence reviews of a sampling of mortgages they acquired from third-party originators.  Second, with respect to certain PLMBS backed by mortgages acquired by Sponsors from unaffiliated originators, the Securities Defendants represented that the Sponsors conducted due diligence reviews of the mortgages prior to their acquisition and securitization.  In both cases, these due diligence reviews allegedly were undertaken to ensure that the mortgages were of adequate credit quality and that they were underwritten in compliance with applicable underwriting standards.

914.    The representations regarding the underwriting standards employed by the originators and those regarding the Sponsor's due diligence reviews of the mortgage loans provided the Bank with critical reassurances that the overall credit quality of the mortgage pools securing the PLMBS it purchased were as represented in the Offering Documents.  The Bank relied on these representations in making its decisions to purchase these Certificates.

### 2.    Misstatements about Due Diligence

915.    The Offering Documents provided to the Bank contained material untrue or misleading statements and omitted material information regarding the due diligence purportedly conducted by the Sponsors and originators when they acquired mortgages from third-party originators.  For example, Banc of America Funding 2006-D Trust Prospectus Supplement, provides the following with respect to mortgages acquired by Countrywide from third-parties:

> Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards.  Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide

Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans.  The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

BAFC 2006-D Pros. Sup. S-57.  Substantially similar provisions regarding each mortgage originator's due diligence reviews of acquired mortgages were included in the Offering Documents for many of the PLMBS purchased by the Bank.  Appendix VI attached hereto and incorporated herein sets forth those statements.

916.    Additionally, as an example of the representations made regarding a Sponsor's due diligence reviews of acquired mortgages, the prospectus supplement for BALTA 2006-1 11A1, dated January 30, 2006, provides:

Performing loans acquired by the Sponsor are subject to varying levels of due diligence prior to purchase.  Portfolios may be reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws. Performing loans purchased will have been originated pursuant to the Sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the Sponsor.

BALTA 2006-1 Pros. Sup. S-47.

917.    Substantially similar provisions were included in the Offering Documents for many of the PLMBS purchased by the Bank.  Appendix VI attached hereto and incorporated herein sets forth those statements.  These statements were materially misleading because they omit to state the following information:

A.  The Sponsors and originators skewed the due diligence process by limiting the type and scope of review performed and pressuring the third-party due diligence firms to ignore deviations from the applicable underwriting criteria if alleged "compensating factors" were present;

B.  The level of due diligence performed by Sponsors and originators of mortgages backing PLMBS deviated substantially from the level of due diligence performed by purchasers of mortgages who retained those mortgages as investments;

C. Due diligence review conducted by third-party firms often overlooked questionable claims by borrowers in stated income and other reduced documentation loans;

D. The third-party due diligence firms informed the Sponsors that a substantial percentage of loans in the loans pools backing PLMBS were defective;

E. The Sponsors nonetheless waived the defects as to a substantial percentage of these loans;

F. In many cases, these reportedly defective loans were not removed from PLMBS deals, but rather were used by the Sponsors to negotiate lower prices for the pools of mortgages they acquired and subsequently securitized; and

G. Where defective loans in the sample were removed from the pool, the Sponsors conducted no further review to ensure that none of the remaining mortgages was plagued by similar defects as those in the sample.

### 3. Evidence of Misstatements about Due Diligence

918.     As alleged in detail above, *see supra* §§ V.D.3, V.D.4, V.D.5, the limitations that Sponsors and originators placed on the third-party due diligence process—and the extent to which they disregarded the results of that process—are documented by public testimony and press reports, as well as by confidential source statements.  This evidence—and the allegations herein based on this evidence—demonstrates, and the Securities Defendants should have known, that the statements in and omissions from the Offering Documents regarding the due diligence review process were materially false and misleading.

### G. The Securities Defendants Misrepresented That Mortgages and Mortgage Loans Were Validly Assigned and Transferred to the Issuing Trusts

### 1. The Materiality of Valid Assignment and Transfer

919.     PLMBS have value because they are backed by both income streams from loans and by the collateral that secure the loans.  If mortgage loans and mortgages are not enforceable by the trust that issues the PLMBS, then the PLMBS have no value.  For that reason, representations about the valid assignment and transfer of mortgage loans and mortgages were material to the Bank's decision to purchase the PLMBS.

### 2.      Misstatements Regarding Valid Assignment and Transfer

920.    The Offering Documents misrepresented that all promissory notes had been or

would be validly transferred to the trusts that issued the PLMBS.

921.    By way of example, the Offering Documents for CWALT 2005-86CB state:

[T]he depositor will sell, transfer, assign, set over and otherwise convey without
recourse to the trustee in trust for the benefit of the certificateholders all right,
title and interest of the depositor in and to all other assets included in Alternative Loan
Trust 2005-86CB, including all principal and interest received on or with respect
to the Closing Date Mortgage Loans . . . .

In connection with the transfer and assignment of a mortgage loan, the depositor
will deliver or cause to be delivered to the trustee, or a custodian for the trustee, . .
. the original mortgage note . . . endorsed in blank without recourse . . . .

The trustee will review each mortgage file relating to the Closing Date Mortgage
Loans within 90 days of the closing date . . . , and if any document in a mortgage
file is found to be missing or defective in a material respect and [the defect is not
cured within 90 days of notice, the defective mortgage loan must be repurchased].

    . . . .

At the time of issuance of the certificates of a series, the depositor will cause the
mortgage loans comprising the related trust fund to be assigned to the trustee,
together with all principal and interest received by or on behalf of the depositor on
or with respect to the mortgage loans after the cut-off date, other than principal
and interest due on or before the cut-off date and other than any retained interest
specified in the related prospectus supplement. . . .  In addition, the depositor will
deliver or cause to be delivered to the trustee (or to the custodian) for each
mortgage loan the mortgage note endorsed without recourse in blank or to the
order of the trustee, except that the depositor may deliver or cause to be delivered
a lost note affidavit in lieu of any original mortgage note that has been lost . . . .

    . . . .

The trustee (or the custodian) will review the mortgage loan documents within [90
days] . . . .  Generally, if the document is found to be missing or defective in any
material respect, the trustee (or the custodian) will notify the master servicer and
the depositor, and the master servicer will notify the related seller.  If the seller
cannot cure the omission or defect within [90 days], the seller will be obligated to
purchase the related mortgage loan from the trustee at the purchase price or, if so
specified in the related prospectus supplement, replace the mortgage loan with
another mortgage loan that meets specified requirements.

CWALT 2005-86CB Pros. Sup. S-24; CWALT 2005-86CB Pros. 44-45.

922.    As many cases and investigations show, *see supra* § V.G, the procedures

specified in the Offering Documents were not followed.  Mortgage notes were not properly

endorsed by the originators, such that the Depositor could in turn properly endorse the note.

Possession of the notes was not transferred to the trustee, custodian, or agent of the trustee.

923.    Further, where the procedure was not followed, the defective loans have not been

repurchased or substituted, as represented in the Offering Documents.

924.    The Offering Documents also misrepresented that all mortgages had been or

would be validly assigned to the trusts that issued the PLMBS.

925.    By way of example, the Offering Documents for CWALT 2005-86CB state:

> [T]he depositor will deliver or cause to be delivered to the trustee (or to the
> custodian) for each mortgage loan . . . the mortgage, deed of trust or similar
> instrument with evidence of recording indicated on it (except for any mortgage
> not returned from the public recording office, in which case the depositor will
> deliver or cause to be delivered a copy of the mortgage together with a certificate
> that the original of the mortgage was delivered to the recording office or some
> other arrangement will be provided for), [and] an assignment of the mortgage to
> the trustee in recordable form . . . .

CWALT 2005-86CB Pros. 44.

926.    The procedures specified in the Offering Documents were not followed.  The

mortgages were not properly assigned and physical transfer of the mortgages was not effected.

*See supra* § V.G.

927.    Further, where the procedures were not followed, the defective loans were not

repurchased or substituted, as represented in the Offering Documents.

928.    The Securities Defendants should have known that of the failures in the

assignment process because they were vertically integrated with multiple entities in the

securitization chain.  *See supra* § V.D.

**3.     A Material Number of Mortgages and Mortgage Loans Were Not Validly Transferred or Assigned to the Issuing Trusts.**

929.    As alleged above, *see supra* V.G, a material number of the promissory notes backing the PLMBS were not validly transferred to the trust, as is necessary before those notes can be enforced under applicable state law.

930.    Also as alleged above, a material number of the mortgages backing the PLMBS were not validly assigned to the trust, as is necessary before those mortgages may be enforced under applicable state law.  *Id.*

931.    Thus, statements in relevant Offering Documents that mortgages and mortgage loans were validly assigned and transferred to the issuing trust were false and misleading.

**H.     The Bank's Claims Are Timely**

932.    The Bank could not have discovered the factual basis for its common law claims prior to April 20, 2008, let alone its statutory claims prior to April 20, 2007.

933.    Prior to April 2008, the Bank did not suspect any wrongdoing, nor did it possess any knowledge that it had been harmed or the causes of this harm.  The first permanent downgrade by *any* rating agency of *any* of the Certificates to *anything* other than triple-A status came on April 24, 2008, when two Certificates, IMSA 2005-2 A1 and IMSA 2006-2 1A2A, were downgraded by Moody's from "Aaa" to "Aa1" and "A2," respectively.[29]  The latter two ratings are both investment-grade: "Aa1" is defined by Moody's to denote a "very low credit risk" and "A2" is defined to denote a "low credit risk."

---

[29] Another Certificate, BALTA 2007-2 1A1, was downgraded by S&P on November 16, 2007 from "AAA" to "AA+," a very high investment-grade rating—indeed, AA+ is S&P's second-highest possible rating. At the same time as S&P made this downgrade, however, S&P also indicated that the Certificate was on "watch" status for an *upgrade*—and a mere five days later, the Certificate was upgraded back to AAA.  S&P's rating of that Certificate stayed at AAA until October 6, 2008, almost a year later.

934.    Moreover, none of the Bank's Certificates had been downgraded to junk prior to April 20, 2008.  The earliest downgrade to junk occurred in July 2008, and the majority of the Certificates were not downgraded to junk until 2009 or 2010.

935.    In early 2008—in response to general market conditions, and not because it had any reason at the time to doubt the veracity of Defendants' representations in the Offering Documents—the Bank began "stress testing" its investments in PLMBS.  Based on this stress testing, the Bank concluded that the depressed market values associated with its PLMBS holdings were due to illiquidity experienced in the MBS markets, and were not due to other-than-temporary impairments ("OTTI") due to credit.  The Bank did not recognize any OTTI on its PLMBS investment until the beginning of 2009.

936.    The Bank did not have reason to believe that the Offering Documents contained the material misrepresentations and omissions alleged in this Complaint.  General articles about problems in the mortgage industry, and complaints by other investors did not indicate to the Bank that it had been harmed, or that any such harm was wrongfully caused.  To the contrary, the Bank believed that its triple-A-rated certificates were safe, and that the Offering Documents accurately described the risk characteristics of the securities and the loans backing the securities.  The Bank reasonably believed that increased defaults and delinquencies in the pools of loans backing the securities were the result of market forces, and not due to the abandonment of underwriting guidelines by the mortgage originators who issued the loans backing the Certificates, as the Bank later determined based on events that occurred after April 20, 2008.

937.    Defendants did not inform the Bank prior to April 20, 2008, or at any time thereafter that the Offering Documents contained the material misrepresentations and omissions alleged in this Complaint.  To the contrary, Defendants consistently maintained in press releases,

public statements, securities filings, and lawsuits that their securitization practices were appropriate, and likewise, the mortgage originators who issued the loans backing the Certificates at no time indicated that they abandoned their stated underwriting guidelines, and, to the contrary consistently maintained that they adhered to their stated underwriting guidelines.

938.    The majority of sources upon which the Bank bases its claims were not reasonably available until after April 2008.  These include:  (1) the January 2011 Financial Crisis Inquiry Commission's *Final Report on the Causes of the Financial and Economic Crisis in the United States*, and the April 13, 2011 U.S. Senate's Permanent Subcommittee on Investigations report, entitled *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*; (2) internal documents or testimony of corporate executives revealed from other government investigations or lawsuits; (3) statements from confidential sources who were former employees of mortgage originators or the defendants; (4) an automated valuation model analysis of the loan-to-value ratios conducted by an independent consultant retained by the Bank; (5) a compound risk analysis conducted by a statistician retained by the Bank; (6) a review of the limited loan files the Bank has access to; (7) evidence referenced in other complaints—such as monoline insurers—based on review of loan files that the plaintiff had the right to review pre-suit, or obtained in discovery.

939.    Many of those sources would not have been available before April 2008 even if the Bank had had a reason to seek them out.  To expose Defendants' violations, it has taken formal discovery and other judicial processes; congressional committees, administrative agencies, and attorneys general with subpoena and other investigatory powers; and monoline insurers with contractually guaranteed access to loan files.  The Bank, by contrast, has no pre-lawsuit subpoena power.

# VII.   COUNTS

## FIRST CAUSE OF ACTION
### Primary Violations of the Massachusetts Uniform Securities Act

940.    The Bank incorporates by reference and realleges each and every allegation in this

Complaint as if set forth herein.

941.    This cause of action is alleged against the following Defendants in connection

with the sale of the following securities:

| Corporate Defendant | As | Certificate(s) |
| --- | --- | --- |
| Banc of America Funding Corporation | Depositor/Issuer | BAFC 2005-H 7A1 |
| | | BAFC 2006-D 1A1 |
| Barclays Capital Inc. | Underwriter | BCAP 2006-AA1 A1 |
| | | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| | | LUM 2006-6 A1 |
| | | LUM 2006-7 2A1 |
| | | RALI 2007-QS6 A29 |
| BCAP LLC | Depositor/Issuer | BCAP 2006-AA1 A1 |
| Bear Stearns Asset Backed Securities I LLC | Depositor/Issuer | BALTA 2006-1 11A1 |
| Bear, Stearns & Co. Inc. | Underwriter/Corporate Seller | AHM 2005-2 1A1 |
| | | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-1 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |
| | | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | CWHL 2005-2 2A1 |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |

| **Corporate Defendant** | **As** | **Certificate(s)** |
|---|---|---|
| Bear, Stearns & Co. Inc. (con't) | Underwriter/Corporate Seller (con't) | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| | | LUM 2005-1 A1 |
| | | LUM 2006-3 11A1 |
| | | LUM 2006-6 A1 |
| | | LUM 2006-7 2A1 |
| | | MHL 2005-5 A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |
| | | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |
| | | TMST 2007-1 A2A |
| Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| Citicorp Mortgage Securities, Inc. | Depositor/Issuer | CMALT 2007-A4 1A7 |
| Citigroup Global Markets Inc. | Underwriter/Corporate Seller | CMLTI 2005-9 1A1 |
| | | GPMF 2006-AR3 4A1 |
| | | LUM 2007-2 1A1 |
| | | MARM 2005-7 2A1 |
| | | RALI 2006-QA2 1A1 |
| Citigroup Mortgage Loan Trust Inc. | Depositor/Issuer | CMLTI 2005-9 1A1 |
| Countrywide Securities Corp. | Underwriter | AHMA 2006-6 A1A |
| | | AHMA 2007-2 A1 |
| | | AHMA 2007-5 A1 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2007-OA9 A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| Credit Suisse First Boston Mortgage Securities Corp. | Depositor/Issuer | ARMT 2006-1 6A1 |
| | | ARMT 2006-2 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Credit Suisse Securities (USA) LLC | Underwriter | ARMT 2006-1 6A1 |
| | | ARMT 2006-2 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |
| | | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| | | MHL 2006-1 1A2 |
| | | TMST 2007-1 A2A |
| | | WFMBS 2006-AR12 1A1 |
| CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2006-OA8 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | CWALT 2007-OA9 A1 |
| CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| Deutsche Alt-A Securities, Inc. | Depositor/Issuer | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| Deutsche Bank Securities Inc. | Underwriter/Corporate Seller | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| | | JPMMT 2005-ALT1 2A1 |
| | | RALI 2006-QA3 A1 |
| Goldman, Sachs & Co. | Underwriter | AHM 2005-2 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | RALI 2006-QO10 A1 |
| Greenwich Capital Acceptance, Inc. | Depositor/Issuer | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |
| | | MHL 2006-1 1A2 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Greenwich Capital Markets, Inc. | Underwriter | AHM 2005-2 1A1 |
| | | CMALT 2007-A4 1A7 |
| | | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |
| | | INDX 2005-AR12 2A1A |
| | | INDX 2005-AR4 2A1A |
| | | INDX 2005-AR8 2A1A |
| | | LUM 2007-2 1A1 |
| | | MHL 2006-1 1A2 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | TMST 2007-1 A2A |
| IMH Assets Corp. | Depositor/Issuer | IMM 2005-7 A1 |
| Impac Secured Assets Corp. | Depositor/Issuer | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| J.P. Morgan Acceptance Corporation I | Depositor/Issuer | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| | | JPMMT 2005-ALT1 2A1 |
| J.P. Morgan Securities Inc. | Underwriter | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| Merrill Lynch Mortgage Investors, Inc. | Depositor/Issuer | MANA 2007-A3 A2A |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | Underwriter | IMSA 2006-2 1A2A |
| | | INDX 2006-AR19 1A1 |
| | | MANA 2007-A3 A2A |
| | | MHL 2005-5 A1 |
| | | NAA 2006-AF2 5A1 |
| Morgan Stanley & Co. Inc. | Underwriter | CMALT 2007-A4 1A7 |
| | | CWALT 2005-86CB A10 |
| | | LUM 2005-1 A1 |
| | | MSM 2006-13AX A1 |
| | | MSM 2006-16AX 2A1 |
| | | MSM 2006-8AR 1A2 |
| | | MSM 2006-9AR A3 |
| | | MSM 2007-2AX 2A2 |
| | | MSM 2007-5AX 2A2 |
| | | MSM 2007-7AX 2A1 |
| Morgan Stanley Capital I Inc. | Depositor/Issuer | MSM 2006-13AX A1 |
| | | MSM 2006-16AX 2A1 |
| | | MSM 2006-8AR 1A2 |
| | | MSM 2006-9AR A3 |
| | | MSM 2007-2AX 2A2 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| | | MSM 2007-5AX 2A2 |
| | | MSM 2007-7AX 2A1 |
| Mortgage Asset Securitization Transactions, Inc. | Depositor/Issuer | MARM 2005-7 2A1 |
| | | MARM 2005-8 1A1 |
| | | MARM 2007-R5 A1 |
| MortgageIT Securities Corp. | Depositor/Issuer | MHL 2005-5 A1 |
| Nomura Asset Acceptance Corporation | Depositor/Issuer | NAA 2006-AF2 5A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |
| Nomura Securities International, Inc. | Underwriter | NAA 2006-AF2 5A1 |
| Residential Accredit Loans, Inc. | Depositor/Issuer | RALI 2005-QA9 NB41 |
| | | RALI 2006-QA2 1A1 |
| | | RALI 2006-QA3 A1 |
| | | RALI 2006-QO10 A1 |
| | | RALI 2007-QS6 A29 |
| Structured Asset Mortgage Investments II Inc. | Depositor/Issuer | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |
| | | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |
| | | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | LUM 2005-1 A1 |
| | | LUM 2006-3 11A1 |
| | | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| UBS Securities LLC | Underwriter/Corporate Seller | AHM 2005-2 1A1 |
| | | CWALT 2005-16 A4 |
| | | CWALT 2006-OA8 1A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | LUM 2006-3 11A1 |
| | | MARM 2005-8 1A1 |
| | | MARM 2007-R5 A1 |
| | | MHL 2006-1 1A2 |
| | | NAA 2006-AR4 A2 |
| | | RALI 2005-QA9 NB41 |
| WaMu Capital Corp. | Underwriter | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| Wells Fargo Asset Securities Corp. | Depositor/Issuer | WFMBS 2006-AR12 1A1 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| Bank of America Corporation | Countrywide Securities Corp. | Underwriter | AHMA 2006-6 A1A |
| | | | AHMA 2007-2 A1 |
| | | | AHMA 2007-5 A1 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2007-OA9 A1 |
| | | | IMM 2005-7 A1 |
| | | | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| | CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2006-OA8 1A1 |
| | | | CWALT 2007-OA4 A1 |
| | | | CWALT 2007-OA9 A1 |
| | CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| Capital One Financial Corporation | Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| Capital One, National Association | Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| DB Structured Products, Inc. | MortgageIT Securities Corp. | Depositor/Issuer | MHL 2005-5 A1 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | Banc of America Securities LLC | Underwriter | BAFC 2005-H 7A1 |
| | | | BAFC 2006-D 1A1 |
| | | | NAA 2007-3 A1 |
| | | | WFMBS 2006-AR12 1A1 |

942.     Under Massachusetts General Laws, Chapter 110A, Section 410(a)(2), any person

who "offers or sells a security by means of any untrue statement of a material fact or any

omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," is liable to the purchaser of the security.

943.    The Depositors, Underwriters, and/or Corporate Sellers are sellers of the Certificates because they issued, marketed, and/or sold the Certificates to the public for their own financial benefit.

944.    The Underwriter Defendants sold the Certificates to the public pursuant to firm commitment, best efforts, or other underwriting agreements entered into with the Depositor/Issuers.  Accordingly, the Underwriter Defendants solicited the purchase of the Certificates from the Bank, motivated at least in part by a desire to serve their own financial interests.  The Underwriter Defendants received discounts, commissions, fees, and/or other compensation for the sale of the Certificates.

945.    The Depositor/Issuer Defendants also solicited the purchase of the Certificates from the Plaintiff motivated at least in part by a desire to serve their own financial interests or those of the securities owner.  Specifically, the proceeds from the sale of the Certificates flowed back to the Depositor/Issuer Defendants so that they could acquire the mortgage assets backing the Certificates or use the proceeds for their general corporate purposes.  *See, e.g.*, CWALT 2006-OA8 at 120 ("Use of Proceeds": "We expect the proceeds to the depositor from the sale of the offered certificates to be approximately $625,247,685 plus accrued interest, before deducting issuance expenses payable by the depositor. The depositor will apply the net proceeds of the sale of these classes of certificates against the purchase price of the Mortgage Loans.").

946.   Moreover, the Depositor/Issuer Defendants participated in the preparation of the Offering Documents and were well positioned to control the flow of information to the purchasers, including the Bank.

947.   With respect to the publicly offered Certificates, the Depositor/Issuer Defendants solicited purchases of their registered securities, including the Certificates, by means of a registration statement containing a prospectus that they prepared and publicly filed.  The name of the Depositor/Issuer Defendants appeared on the first page of the prospectus and prospectus supplement that were used to solicit the Bank's purchase of each Certificate.  In fact, Items 1102 and 1103 of Regulation AB required that the outside front cover of the prospectus identify the depositor, and issuing entity.  *See* 17 C.F.R. §§ 229.1102 and 229.1103.

948.   Moreover, with respect to publicly offered Certificates sold after December 1, 2005, the Depositor/Issuer Defendants knowingly accepted liability under § 12(a)(2) of the Securities Act of 1933 when they filed the shelf registration statements for the offering of the Certificates.  Specifically, they were required to state in the registration statements that, "regardless of the underwriting method used to sell the securities to the purchaser," the "undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser" if the securities are offered or sold to such purchaser by means of any of the following communications:

(i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424 (§ 230.424 of this chapter);

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

      (iv) Any other communication that is an offer in the offering made by the
      undersigned registrant to the purchaser.

17 C.F.R. 229.512(a)(6).  *See, e.g.*, Pre-Effective Amendment No. 2 to Form S-3 Registration

Statement under the Securities Act of 1933, Registration Statement No. 333-130684 at II-4;

Amendment No. 3 to Registration Statement under the Securities Act of 1933, Registration No.

333-131600 at II-5 – II-6; Form S-3/A Amendment No. 1 to Registration Statement Under the

Securities Act of 1933, Registration No. 333-132232.

      949.    With respect to the Certificates sold pursuant to private placement memoranda,

the Depositor/Issuer Defendants prepared the private placement memoranda and the name of the

Depositor/Issuer Defendants appeared on the first page of the private placement Memoranda.

Moreover, the Depositor/Issuer Defendants exerted control over the content and dissemination of

offering materials, even when the Certificates were sold pursuant to firm commitment

underwritings.  *See* MARM 2007-R5 at v (offerees such as Plaintiff could not disclose the

contents of the confidential offering memoranda "without the prior written consent of the

depositor and the initial purchaser.").  Additionally, in the private placement memoranda, the

Depositor/Issuer Defendants stated that they would answer questions and make information

available directly to the purchasers regarding the sale of the certificates.  *See* MARM 2007-R5 at

i and v (Depositor prepared the memorandum and agreed to make representatives available "to

answer questions concerning the trust estate" as well as other information that investors

requested); CCMFC 2006-2A at i ("Officers of the Depositor will be available to answer

questions concerning the trust, the insurance policy, the swap agreements and the MI policies

and will, upon request, make available such other information as investors may reasonably

request."); CCMFC 2007-2A at i (same); CCMFC 2007-1A at i (the Depositor prepared the

private placement memorandum and officers of the Depositor "will be available to answer

questions concerning the trust, the insurance policy, the swap agreements and the MI policies and will, upon request, make available such other information as investors may reasonably request.").

950. The Defendants named in this First Count offered to sell and sold the Certificates to the Bank in the Commonwealth of Massachusetts, when they directed their offers to sell the securities to the Bank at its offices in the Commonwealth of Massachusetts.

951. The Defendants named in this First Count offered and sold the Certificates to the Bank by means of false and misleading statements of material fact and omissions of material facts necessary to make the statements made not misleading.

952. As set forth in more detail in Section VI above and Appendices III – VI referenced therein, the statements set forth in the Offering Documents were materially false and misleading. The material misstatements and omissions pertain to the following non-exclusive list: (a) adherence to the originators' stated underwriting guidelines, and related matters; (b) inflation of LTVs of the mortgage loans in the collateral pools and violations of USPAP and other applicable appraisal standards(c) the rating process by which triple-A ratings were assigned; (d) compliance with predatory lending restrictions; (e) the purported due diligence on the loan pools that backed the PLMBS; (f) the enforceability of the mortgages; and (g) the compounded high-risk of the mortgage loans within the underlying mortgage pools. As set forth above, the Defendants named in this First Count had access to the underlying loan files and the purported "due diligence" review on which these statements are based, and thus should have known of these untruths and omissions in the Offering Documents.

953. The Bank did not know, and in the exercise of due diligence could not have known, of these untruths and omissions when it purchased the Certificates. The Bank did not

have access to the underlying loan files, or the purported "due diligence" review on which these statements were allegedly based.

954.     The Bank did not and could not reasonably have known of the material misstatements and omissions alleged herein earlier than four years before the date of filing this action.  *See supra* § VI.H.

955.     The Bank will elect its remedy before the entry of judgment.  For each security, the Bank will seek statutory damages, including interest, or will make or arrange a tender before entry of judgment.

## SECOND CAUSE OF ACTION

### Joint and Several Liability under the Massachusetts Uniform Securities Act

956.     The Bank incorporates by reference and realleges each and every allegation in this Complaint as if fully set forth herein.

957.     This cause of action is alleged against the following Defendants in connection with the sale of the following securities:

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| Bank of America Corporation | Banc of America Funding Corporation | Depositor/Issuer | BAFC 2005-H 7A1 |
| | | | BAFC 2006-D 1A1 |
| | Banc of America Securities LLC | Underwriter/ Corporate Seller | BAFC 2005-H 7A1 |
| | | | BAFC 2006-D 1A1 |
| | | | NAA 2007-3 A1 |
| | | | WFMBS 2006-AR12 1A1 |
| | Bank of America, N.A. | Corporate Controlling Person | BAFC 2005-H 7A1 |
| | | | BAFC 2006-D 1A1 |
| Bank of America, N.A. | Banc of America Funding Corporation | Depositor/Issuer | BAFC 2005-H 7A1 |
| | | | BAFC 2006-D 1A1 |
| Bear, Stearns & Co. Inc. | EMC Mortgage Corporation | Corporate Controlling Person | BALTA 2005-10 11A1 |
| | | | BALTA 2005-8 11A1 |
| | | | BALTA 2005-9 11A1 |
| | | | BALTA 2006-1 11A1 |
| | | | BALTA 2006-2 11A1 |
| | | | BALTA 2006-3 1A1 |
| | | | BALTA 2006-4 11A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| Bear, Stearns & Co. Inc. (con't) | EMC Mortgage Corporation (con't) | Corporate Controlling Person (con't) | BALTA 2006-4 13A1 |
| | | | BALTA 2006-5 1A1 |
| | | | BALTA 2006-6 1A1 |
| | | | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |
| | | | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |
| | | | BSMF 2007-AR5 1A1A |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| Citigroup Financial Products, Inc. | Citigroup Global Markets Inc. | Underwriter/ Corporate Seller | CMLTI 2005-9 1A1 |
| | | | GPMF 2006-AR3 4A1 |
| | | | LUM 2007-2 1A1 |
| | | | MARM 2005-7 2A1 |
| | | | RALI 2006-QA2 1A1 |
| | Citigroup Global Markets Realty Corp. | Corporate Controlling Person | CMLTI 2005-9 1A1 |
| | Citigroup Mortgage Loan Trust Inc. | Depositor/Issuer | CMLTI 2005-9 1A1 |
| Citigroup Global Markets Realty Corp. | Citigroup Mortgage Loan Trust Inc. | Depositor/Issuer | CMLTI 2005-9 1A1 |
| Citigroup Inc. | Citicorp Mortgage Securities, Inc. | Depositor/Issuer | CMALT 2007-A4 1A7 |
| | Citigroup Financial Products, Inc. | Corporate Controlling Person | CMLTI 2005-9 1A1 |
| | | | GPMF 2006-AR3 4A1 |
| | | | LUM 2007-2 1A1 |
| | | | MARM 2005-7 2A1 |
| | | | RALI 2006-QA2 1A1 |
| | Citigroup Global Markets Inc. | Underwriter/ Corporate Seller | CMLTI 2005-9 1A1 |
| | | | GPMF 2006-AR3 4A1 |
| | | | LUM 2007-2 1A1 |
| | | | MARM 2005-7 2A1 |
| | | | RALI 2006-QA2 1A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| Citigroup Inc. (con't) | Citigroup Global Markets Realty Corp. | Corporate Controlling Person | CMLTI 2005-9 1A1 |
| | Citigroup Mortgage Loan Trust Inc. | Depositor/Issuer | CMLTI 2005-9 1A1 |
| | CitiMortgage, Inc. | Corporate Controlling Person | CMALT 2007-A4 1A7 |
| CitiMortgage, Inc. | Citicorp Mortgage Securities, Inc. | Depositor/Issuer | CMALT 2007-A4 1A7 |
| Countrywide Financial Corporation | Countrywide Home Loans, Inc. | Corporate Controlling Person | CWALT 2005-16 A4 CWALT 2005-86CB A10 CWALT 2006-OA16 A2 CWALT 2006-OA8 1A1 CWALT 2007-OA4 A1 CWALT 2007-OA9 A1 CWHL 2005-2 2A1 |
| | Countrywide Securities Corp. | Underwriter | AHMA 2006-6 A1A AHMA 2007-2 A1 AHMA 2007-5 A1 CWALT 2005-86CB A10 CWALT 2006-OA16 A2 CWALT 2007-OA9 A1 IMM 2005-7 A1 IMSA 2005-2 A1 IMSA 2006-2 1A2A |
| | CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 CWALT 2005-86CB A10 CWALT 2006-OA16 A2 CWALT 2006-OA8 1A1 CWALT 2007-OA4 A1 CWALT 2007-OA9 A1 |
| | CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| Countrywide Home Loans, Inc. | CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 CWALT 2005-86CB A10 CWALT 2006-OA16 A2 CWALT 2006-OA8 1A1 CWALT 2007-OA4 A1 CWALT 2007-OA9 A1 |
| | CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| Credit Suisse (USA), Inc. | Credit Suisse First Boston Mortgage Securities Corp. | Depositor/Issuer | ARMT 2006-1 6A1 ARMT 2006-2 6A1 ARMT 2006-3 4A2 ARMT 2007-1 5A1 ARMT 2007-2 2A21 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| Credit Suisse (USA), Inc. (con't) | Credit Suisse Securities (USA) LLC | Corporate Controlling Person | ARMT 2006-2 6A1 |
| | | Underwriter | ARMT 2006-1 6A1 |
| | | | ARMT 2006-2 6A1 |
| | | | ARMT 2006-3 4A2 |
| | | | ARMT 2007-1 5A1 |
| | | | ARMT 2007-2 2A21 |
| | | | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| | | | MHL 2006-1 1A2 |
| | | | TMST 2007-1 A2A |
| | | | WFMBS 2006-AR12 1A1 |
| | DLJ Mortgage Capital, Inc. | Corporate Controlling Person | ARMT 2006-1 6A1 |
| | | | ARMT 2006-3 4A2 |
| | | | ARMT 2007-1 5A1 |
| | | | ARMT 2007-2 2A21 |
| Credit Suisse Holdings (USA), Inc. | Credit Suisse (USA), Inc. | Corporate Controlling Person | ARMT 2006-1 6A1 |
| | | | ARMT 2006-2 6A1 |
| | | | ARMT 2006-3 4A2 |
| | | | ARMT 2007-1 5A1 |
| | | | ARMT 2007-2 2A21 |
| | | | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| | | | MHL 2006-1 1A2 |
| | | | TMST 2007-1 A2A |
| | | | WFMBS 2006-AR12 1A1 |
| | Credit Suisse First Boston Mortgage Securities Corp. | Depositor/Issuer | ARMT 2006-1 6A1 |
| | | | ARMT 2006-2 6A1 |
| | | | ARMT 2006-3 4A2 |
| | | | ARMT 2007-1 5A1 |
| | | | ARMT 2007-2 2A21 |
| | Credit Suisse Securities (USA) LLC | Corporate Controlling Person/ Underwriter | ARMT 2006-2 6A1 |
| | | | ARMT 2006-1 6A1 |
| | | | ARMT 2006-2 6A1 |
| | | | ARMT 2006-3 4A2 |
| | | | ARMT 2007-1 5A1 |
| | | | ARMT 2007-2 2A21 |
| | | | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| | | | MHL 2006-1 1A2 |
| | | | TMST 2007-1 A2A |
| | | | WFMBS 2006-AR12 1A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| Credit Suisse Holdings (USA), Inc. (con't) | DLJ Mortgage Capital, Inc. | Corporate Controlling Person | ARMT 2006-1 6A1<br>ARMT 2006-3 4A2<br>ARMT 2007-1 5A1<br>ARMT 2007-2 2A21 |
| Credit Suisse Securities (USA) LLC | Credit Suisse First Boston Mortgage Securities Corp. | Depositor/Issuer | ARMT 2006-2 6A1 |
| DB Structured Products, Inc. | Deutsche Alt-A Securities, Inc. | Depositor/Issuer | DBALT 2006-AR2 1A1<br>DBALT 2006-AR2 1A2<br>DBALT 2006-AR3 A2<br>DBALT 2006-AR4 A1<br>DBALT 2006-AR5 1A1<br>DBALT 2007-AR1 A1 |
| DB U.S. Financial Market Holding Corporation | DB Structured Products, Inc. | Corporate Controlling Person | DBALT 2006-AR2 1A1<br>DBALT 2006-AR2 1A2<br>DBALT 2006-AR3 A2<br>DBALT 2006-AR4 A1<br>DBALT 2006-AR5 1A1<br>DBALT 2007-AR1 A1 |
| | Deutsche Alt-A Securities, Inc. | Depositor/Issuer | DBALT 2006-AR2 1A1<br>DBALT 2006-AR2 1A2<br>DBALT 2006-AR3 A2<br>DBALT 2006-AR4 A1<br>DBALT 2006-AR5 1A1<br>DBALT 2007-AR1 A1 |
| | Deutsche Bank Securities Inc. | Underwriter/ Corporate Seller | DBALT 2006-AR2 1A1<br>DBALT 2006-AR2 1A2<br>DBALT 2006-AR3 A2<br>DBALT 2006-AR4 A1<br>DBALT 2006-AR5 1A1<br>DBALT 2007-AR1 A1<br>JPMMT 2005-ALT1 2A1<br>RALI 2006-QA3 A1 |
| DLJ Mortgage Capital, Inc. | Credit Suisse First Boston Mortgage Securities Corp. | Depositor/Issuer | ARMT 2006-1 6A1<br>ARMT 2006-3 4A2<br>ARMT 2007-1 5A1<br>ARMT 2007-2 2A21 |
| EMC Mortgage Corporation | Bear Stearns Asset Backed Securities I LLC | Depositor/Issuer | BALTA 2006-1 11A1 |
| | Structured Asset Mortgage Investments II Inc. | Depositor/Issuer | BALTA 2005-10 11A1<br>BALTA 2005-8 11A1<br>BALTA 2005-9 11A1<br>BALTA 2006-2 11A1<br>BALTA 2006-3 1A1<br>BALTA 2006-4 11A1<br>BALTA 2006-4 13A1<br>BALTA 2006-5 1A1<br>BALTA 2006-6 1A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| EMC Mortgage Corporation (con't) | Structured Asset Mortgage Investments II Inc. (con't) | Depositor/Issuer (con't) | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |
| | | | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |
| | | | BSMF 2007-AR5 1A1A |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| GMAC LLC | GMAC Mortgage Group, Inc. | Corporate Controlling Person | RALI 2005-QA9 NB41 |
| | | | RALI 2006-QA2 1A1 |
| | | | RALI 2006-QA3 A1 |
| | | | RALI 2006-QO10 A1 |
| | | | RALI 2007-QS6 A29 |
| | Residential Accredit Loans, Inc. | Depositor/Issuer | RALI 2005-QA9 NB41 |
| | | | RALI 2006-QA2 1A1 |
| | | | RALI 2006-QA3 A1 |
| | | | RALI 2006-QO10 A1 |
| | | | RALI 2007-QS6 A29 |
| | Residential Funding Company, LLC | Corporate Controlling Person | RALI 2005-QA9 NB41 |
| | | | RALI 2006-QA2 1A1 |
| | | | RALI 2006-QA3 A1 |
| | | | RALI 2006-QO10 A1 |
| | | | RALI 2007-QS6 A29 |
| GMAC Mortgage Group, Inc. | Residential Accredit Loans, Inc. | Depositor/Issuer | RALI 2005-QA9 NB41 |
| | | | RALI 2006-QA2 1A1 |
| | | | RALI 2006-QA3 A1 |
| | | | RALI 2006-QO10 A1 |
| | | | RALI 2007-QS6 A29 |
| | Residential Funding Company, LLC | Corporate Controlling Person | RALI 2005-QA9 NB41 |
| | | | RALI 2006-QA2 1A1 |
| | | | RALI 2006-QA3 A1 |
| | | | RALI 2006-QO10 A1 |
| | | | RALI 2007-QS6 A29 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| Greenwich Capital Financial Products, Inc. | Greenwich Capital Acceptance, Inc. | Depositor/Issuer | DSLA 2005-AR1 2A1A |
| | | | DSLA 2005-AR2 2A1A |
| | | | HVMLT 2005-10 2A1A |
| | | | HVMLT 2006-7 2A1A |
| | | | HVMLT 2006-8 2A1A |
| | | | HVMLT 2007-1 2A1A |
| Greenwich Capital Holdings, Inc. | Greenwich Capital Acceptance, Inc. | Depositor/Issuer | DSLA 2005-AR1 2A1A |
| | | | DSLA 2005-AR2 2A1A |
| | | | HVMLT 2005-10 2A1A |
| | | | HVMLT 2006-7 2A1A |
| | | | HVMLT 2006-8 2A1A |
| | | | HVMLT 2007-1 2A1A |
| | | | MHL 2006-1 1A2 |
| | Greenwich Capital Financial Products, Inc. | Corporate Controlling Person | DSLA 2005-AR1 2A1A |
| | | | DSLA 2005-AR2 2A1A |
| | | | HVMLT 2005-10 2A1A |
| | | | HVMLT 2006-7 2A1A |
| | | | HVMLT 2006-8 2A1A |
| | | | HVMLT 2007-1 2A1A |
| | Greenwich Capital Markets, Inc. | Underwriter | AHM 2005-2 1A1 |
| | | | CMALT 2007-A4 1A7 |
| | | | DSLA 2005-AR1 2A1A |
| | | | DSLA 2005-AR2 2A1A |
| | | | HVMLT 2005-10 2A1A |
| | | | HVMLT 2006-7 2A1A |
| | | | HVMLT 2006-8 2A1A |
| | | | HVMLT 2007-1 2A1A |
| | | | INDX 2005-AR12 2A1A |
| | | | INDX 2005-AR4 2A1A |
| | | | INDX 2005-AR8 2A1A |
| | | | LUM 2007-2 1A1 |
| | | | MHL 2006-1 1A2 |
| | | | NAA 2006-AR4 A2 |
| | | | NAA 2007-1 2A1 |
| | | | TMST 2007-1 A2A |
| Impac Funding Corporation | Impac Secured Assets Corp. | Depositor/Issuer | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| Impac Mortgage Holdings, Inc | IMH Assets Corp. | Depositor/Issuer | IMM 2005-7 A1 |
| | Impac Funding Corporation | Corporate Controlling Person | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| | Impac Secured Assets Corp. | Depositor/Issuer | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| J.P. Morgan Mortgage Acquisition Corp. | J.P. Morgan Acceptance Corporation I | Depositor/Issuer | JPALT 2006-A1 1A1 |
| | | | JPALT 2006-A2 1A1 |
| | | | JPALT 2006-A3 1A1 |
| | | | JPALT 2007-A2 12A1 |
| | | | JPMMT 2005-ALT1 2A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| JPMorgan Chase & Co. | J.P. Morgan Acceptance Corporation I | Depositor/Issuer | JPALT 2006-A1 1A1 JPALT 2006-A2 1A1 JPALT 2006-A3 1A1 JPALT 2007-A2 12A1 JPMMT 2005-ALT1 2A1 |
| | J.P. Morgan Mortgage Acquisition Corp. | Corporate Controlling Person | JPALT 2006-A1 1A1 JPALT 2006-A2 1A1 JPALT 2006-A3 1A1 JPALT 2007-A2 12A1 JPMMT 2005-ALT1 2A1 |
| | J.P. Morgan Securities Inc. | Underwriter | JPALT 2006-A1 1A1 JPALT 2006-A2 1A1 JPALT 2006-A3 1A1 JPALT 2007-A2 12A1 |
| | JPMorgan Securities Holdings LLC | Corporate Controlling Person | JPALT 2006-A1 1A1 JPALT 2006-A2 1A1 JPALT 2006-A3 1A1 JPALT 2007-A2 12A1 JPMMT 2005-ALT1 2A1 |
| JPMorgan Securities Holdings LLC | J.P. Morgan Acceptance Corporation I | Depositor/Issuer | JPALT 2006-A1 1A1 JPALT 2006-A2 1A1 JPALT 2006-A3 1A1 JPALT 2007-A2 12A1 JPMMT 2005-ALT1 2A1 |
| | J.P. Morgan Securities Inc. | Underwriter | JPALT 2006-A1 1A1 JPALT 2006-A2 1A1 JPALT 2006-A3 1A1 JPALT 2007-A2 12A1 |
| Merrill Lynch & Co., Inc. | Merrill Lynch Mortgage Investors, Inc. | Depositor/Issuer | MANA 2007-A3 A2A |
| | Merrill Lynch Mortgage Lending, Inc. | Corporate Controlling Person | MANA 2007-A3 A2A |
| | Merrill Lynch, Pierce, Fenner & Smith Incorporated | Underwriter | IMSA 2006-2 1A2A INDX 2006-AR19 1A1 MANA 2007-A3 A2A MHL 2005-5 A1 NAA 2006-AF2 5A1 |
| Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Depositor/Issuer | MANA 2007-A3 A2A |
| Morgan Stanley | Morgan Stanley & Co. Inc. | Corporate Controlling Person | MSM 2006-13AX A1 MSM 2006-16AX 2A1 MSM 2006-8AR 1A2 MSM 2006-9AR A3 MSM 2007-2AX 2A2 MSM 2007-5AX 2A2 MSM 2007-7AX 2A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| Morgan Stanley (con't) | Morgan Stanley & Co. Inc. (con't) | Underwriter | CMALT 2007-A4 1A7 |
| | | | CWALT 2005-86CB A10 |
| | | | LUM 2005-1 A1 |
| | | | MSM 2006-13AX A1 |
| | | | MSM 2006-16AX 2A1 |
| | | | MSM 2006-8AR 1A2 |
| | | | MSM 2006-9AR A3 |
| | | | MSM 2007-2AX 2A2 |
| | | | MSM 2007-5AX 2A2 |
| | | | MSM 2007-7AX 2A1 |
| | Morgan Stanley Capital I Inc. | Depositor/Issuer | MSM 2006-13AX A1 |
| | | | MSM 2006-16AX 2A1 |
| | | | MSM 2006-8AR 1A2 |
| | | | MSM 2006-9AR A3 |
| | | | MSM 2007-2AX 2A2 |
| | | | MSM 2007-5AX 2A2 |
| | | | MSM 2007-7AX 2A1 |
| Morgan Stanley & Co. Inc. | Morgan Stanley Capital I Inc. | Depositor/Issuer | MSM 2006-13AX A1 |
| | | | MSM 2006-16AX 2A1 |
| | | | MSM 2006-8AR 1A2 |
| | | | MSM 2006-9AR A3 |
| | | | MSM 2007-2AX 2A2 |
| | | | MSM 2007-5AX 2A2 |
| | | | MSM 2007-7AX 2A1 |
| MortgageIT, Inc. | MortgageIT Securities Corp. | Depositor/Issuer | MHL 2005-5 A1 |
| Nomura Credit & Capital, Inc. | Nomura Asset Acceptance Corporation | Depositor/Issuer | NAA 2006-AF2 5A1 |
| | | | NAA 2006-AR4 A2 |
| | | | NAA 2007-1 2A1 |
| | | | NAA 2007-3 A1 |
| Nomura Holding America, Inc. | Nomura Asset Acceptance Corporation | Depositor/Issuer | NAA 2006-AF2 5A1 |
| | | | NAA 2006-AR4 A2 |
| | | | NAA 2007-1 2A1 |
| | | | NAA 2007-3 A1 |
| | Nomura Credit & Capital, Inc. | Corporate Controlling Person | NAA 2006-AF2 5A1 |
| | | | NAA 2006-AR4 A2 |
| | | | NAA 2007-1 2A1 |
| | | | NAA 2007-3 A1 |
| | Nomura Securities International, Inc. | Underwriter | NAA 2006-AF2 5A1 |
| Residential Funding Company, LLC | Residential Accredit Loans, Inc. | Depositor/Issuer | RALI 2005-QA9 NB41 |
| | | | RALI 2006-QA2 1A1 |
| | | | RALI 2006-QA3 A1 |
| | | | RALI 2006-QO10 A1 |
| | | | RALI 2007-QS6 A29 |
| The Bear Stearns Companies Inc. | Bear Stearns Asset Backed Securities I LLC | Depositor/Issuer | BALTA 2006-1 11A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| The Bear Stearns Companies Inc. (con't) | Bear, Stearns & Co. Inc. | Underwriter/ Corporate Seller | AHM 2005-2 1A1 |
| | | | BALTA 2005-10 11A1 |
| | | | BALTA 2005-8 11A1 |
| | | | BALTA 2005-9 11A1 |
| | | | BALTA 2006-1 11A1 |
| | | | BALTA 2006-2 11A1 |
| | | | BALTA 2006-3 1A1 |
| | | | BALTA 2006-4 11A1 |
| | | | BALTA 2006-4 13A1 |
| | | | BALTA 2006-5 1A1 |
| | | | BALTA 2006-6 1A1 |
| | | | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |
| | | | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |
| | | | BSMF 2007-AR5 1A1A |
| | | | CWHL 2005-2 2A1 |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | IMM 2005-7 A1 |
| | | | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| | | | LUM 2005-1 A1 |
| | | | LUM 2006-3 11A1 |
| | | | LUM 2006-6 A1 |
| | | | LUM 2006-7 2A1 |
| | | | MHL 2005-5 A1 |
| | | | NAA 2006-AR4 A2 |
| | | | NAA 2007-1 2A1 |
| | | | NAA 2007-3 A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| | | | TMST 2007-1 A2A |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| The Bear Stearns Companies Inc. (con't) | EMC Mortgage Corporation | Corporate Controlling Person | BALTA 2005-10 11A1 |
| | | | BALTA 2005-8 11A1 |
| | | | BALTA 2005-9 11A1 |
| | | | BALTA 2006-1 11A1 |
| | | | BALTA 2006-2 11A1 |
| | | | BALTA 2006-3 1A1 |
| | | | BALTA 2006-4 11A1 |
| | | | BALTA 2006-4 13A1 |
| | | | BALTA 2006-5 1A1 |
| | | | BALTA 2006-6 1A1 |
| | | | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |
| | | | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |
| | | | BSMF 2007-AR5 1A1A |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| | Structured Asset Mortgage Investments II Inc. | Depositor/Issuer | BALTA 2005-10 11A1 |
| | | | BALTA 2005-8 11A1 |
| | | | BALTA 2005-9 11A1 |
| | | | BALTA 2006-2 11A1 |
| | | | BALTA 2006-3 1A1 |
| | | | BALTA 2006-4 11A1 |
| | | | BALTA 2006-4 13A1 |
| | | | BALTA 2006-5 1A1 |
| | | | BALTA 2006-6 1A1 |
| | | | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |

| Corporate Controlling Person | Controlled Entities | Role of Controlled Entities: | Certificate(s) |
|---|---|---|---|
| The Bear Stearns Companies Inc. (con't) | Structured Asset Mortgage Investments II Inc. (con't) | Depositor/Issuer (con't) | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |
| | | | BSMF 2007-AR5 1A1A |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | LUM 2005-1 A1 |
| | | | LUM 2006-3 11A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| UBS Americas Inc. | Mortgage Asset Securitization Transactions, Inc. | Depositor/Issuer | MARM 2005-7 2A1 |
| | | | MARM 2005-8 1A1 |
| | | | MARM 2007-R5 A1 |
| | UBS Real Estate Securities Inc. | Corporate Controlling Person | MARM 2005-7 2A1 |
| | | | MARM 2005-8 1A1 |
| | UBS Securities LLC | Underwriter/ Corporate Seller | AHM 2005-2 1A1 |
| | | | CWALT 2005-16 A4 |
| | | | CWALT 2006-OA8 1A1 |
| | | | IMM 2005-7 A1 |
| | | | IMSA 2005-2 A1 |
| | | | LUM 2006-3 11A1 |
| | | | MARM 2005-8 1A1 |
| | | | MARM 2007-R5 A1 |
| | | | MHL 2006-1 1A2 |
| | | | NAA 2006-AR4 A2 |
| | | | RALI 2005-QA9 NB41 |
| UBS Real Estate Securities Inc. | Mortgage Asset Securitization Transactions, Inc. | Depositor/Issuer | MARM 2005-7 2A1 |
| | | | MARM 2005-8 1A1 |
| Wells Fargo & Company | Wells Fargo Asset Securities Corp. | Depositor/Issuer | WFMBS 2006-AR12 1A1 |
| | Wells Fargo Bank, N.A. | Corporate Controlling Person | WFMBS 2006-AR12 1A1 |
| Wells Fargo Bank, N.A. | Wells Fargo Asset Securities Corp. | Depositor/Issuer | WFMBS 2006-AR12 1A1 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| Bank of America Corporation | Countrywide Financial Corporation | Corporate Controlling Person | AHMA 2006-6 A1A |
| | | | AHMA 2007-2 A1 |
| | | | AHMA 2007-5 A1 |
| | | | CWALT 2005-16 A4 |
| | | | CWALT 2005-86CB A10 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| Bank of America Corporation (con't) | Countrywide Financial Corporation (con't) | Corporate Controlling Person (con't) | CWALT 2006-OA16 A2 |
| | | | CWALT 2006-OA8 1A1 |
| | | | CWALT 2007-OA4 A1 |
| | | | CWALT 2007-OA9 A1 |
| | | | CWHL 2005-2 2A1 |
| | | | IMM 2005-7 A1 |
| | | | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| | Countrywide Home Loans, Inc. | Corporate Controlling Person | CWALT 2005-16 A4 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2006-OA8 1A1 |
| | | | CWALT 2007-OA4 A1 |
| | | | CWALT 2007-OA9 A1 |
| | | | CWHL 2005-2 2A1 |
| Capital One Financial Corporation | Chevy Chase Bank, FSB[30] | Corporate Controlling Person | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| Capital One, National Association | Chevy Chase Bank, FSB[30] | Corporate Controlling Person | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| DB Structured Products, Inc. | MortgageIT Holdings, Inc.[31] | Corporate Controlling Person | MHL 2005-5 A1 |
| | MortgageIT, Inc. | Corporate Controlling Person | MHL 2005-5 A1 |
| JPMorgan Chase Bank, N.A. | EMC Mortgage Corporation | Corporate Controlling Person | BALTA 2005-10 11A1 |
| | | | BALTA 2005-8 11A1 |
| | | | BALTA 2005-9 11A1 |
| | | | BALTA 2006-1 11A1 |
| | | | BALTA 2006-2 11A1 |
| | | | BALTA 2006-3 1A1 |
| | | | BALTA 2006-4 11A1 |
| | | | BALTA 2006-4 13A1 |
| | | | BALTA 2006-5 1A1 |
| | | | BALTA 2006-6 1A1 |
| | | | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |
| | | | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |

[30] Chevy Chase Bank FSB is a non-defendant Corporate Controlling Person of Depositor/Issuer Chevy Chase Funding LLC.  *See supra* ¶ 52.

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. (con't) | EMC Mortgage Corporation (con't) | Corporate Controlling Person (con't) | BSMF 2007-AR5 1A1A |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| MIT Holdings Corporation | MortgageIT Holdings, Inc.[31] | Corporate Controlling Person | MHL 2005-5 A1 |
| Morgan Stanley Mortgage Capital Holdings LLC | Morgan Stanley Mortgage Capital Inc.[32] | Corporate Controlling Person | MSM 2006-13AX A1 |
| | | | MSM 2006-16AX 2A1 |
| | | | MSM 2006-8AR 1A2 |
| | | | MSM 2006-9AR A3 |
| | | | MSM 2007-2AX 2A2 |
| | | | MSM 2007-5AX 2A2 |
| | | | MSM 2007-7AX 2A1 |

958.    Under Massachusetts General Laws, Chapter 110A, Section 410(b), "[e]very person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, [and] every person occupying a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller.

959.    The Corporate Controlling Person Defendants named in this count are liable under Massachusetts General Laws, Chapter 110A, Section 410(b) because, as set forth *supra* in § V.E  above and elsewhere herein, they directly or indirectly controlled the Depositor, Underwriter, or other Seller identified in the First Cause of Action above, each of which is liable as a seller under Massachusetts General Laws, Chapter 110A, Section 410.  The Corporate Controlling Entity Defendants possessed, directly or indirectly, the power to direct or cause the

---

[31] MortgageIT Holdings, Inc. is a non-defendant Corporate Controlling Person of Depositor/Issuer MortgageIT Securities Corp. and of Corporate Controlling Person MortgageIT, Inc.  *See supra* ¶ 75.

[32] Morgan Stanley Mortgage Capital Inc. is a non-defendant Corporate Controlling Person of Depositor/Issuer Morgan Stanley Capital I Inc.  *See supra* ¶ 103.

direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise.

960.    As controlling persons pursuant to Massachusetts General Laws, Chapter 110A, Section 410(b), the Corporate Controlling Person Defendants are jointly and severally liable with the controlled entity to the Bank for the violations of Massachusetts General Laws, Chapter 110A, Section 410(a) alleged herein.

961.    The Bank did not and could not reasonably have known of the facts giving rise to this cause of action any earlier than four years before the date of filing this action.  *See supra* § VI.H.

962.    The Bank will elect its remedy before the entry of judgment.  For each security, the Bank will seek statutory damages, including interest, or will make or arrange a tender before entry of judgment.

### THIRD CAUSE OF ACTION

### Negligent Misrepresentation by Certain Securities Defendants

963.    The Bank incorporates by reference and realleges each and every allegation in this Complaint as if fully set forth herein.

964.    This cause of action is alleged against the following Defendants in connection with the sale of the following securities:

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Banc of America Funding Corporation | Depositor/Issuer | BAFC 2005-H 7A1 |
| | | BAFC 2006-D 1A1 |
| Bank of America, N.A. | Sponsor | BAFC 2005-H 7A1 |
| | | BAFC 2006-D 1A1 |
| Barclays Capital Inc. | Underwriter | BCAP 2006-AA1 A1 |
| | | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| | | LUM 2006-6 A1 |
| | | LUM 2006-7 2A1 |
| | | RALI 2007-QS6 A29 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| BCAP LLC | Depositor/Issuer | BCAP 2006-AA1 A1 |
| Bear Stearns Asset Backed Securities I LLC | Depositor/Issuer | BALTA 2006-1 11A1 |
| Bear, Stearns & Co. Inc. | Underwriter/ Corporate Seller | AHM 2005-2 1A1 |
| | | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-1 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |
| | | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | CWHL 2005-2 2A1 |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |
| | | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| | | LUM 2005-1 A1 |
| | | LUM 2006-3 11A1 |
| | | LUM 2006-6 A1 |
| | | LUM 2006-7 2A1 |
| | | MHL 2005-5 A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |
| | | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |
| | | TMST 2007-1 A2A |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| Citicorp Mortgage Securities, Inc. | Depositor/Issuer | CMALT 2007-A4 1A7 |
| Citigroup Global Markets Inc. | Underwriter/Corporate Seller | CMLTI 2005-9 1A1 |
| | | GPMF 2006-AR3 4A1 |
| | | LUM 2007-2 1A1 |
| | | MARM 2005-7 2A1 |
| | | RALI 2006-QA2 1A1 |
| Citigroup Global Markets Realty Corp. | Sponsor | CMLTI 2005-9 1A1 |
| Citigroup Mortgage Loan Trust Inc. | Depositor/Issuer | CMLTI 2005-9 1A1 |
| CitiMortgage, Inc. | Sponsor | CMALT 2007-A4 1A7 |
| Countrywide Home Loans, Inc. | Sponsor | CWALT 2005-16 A4 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2006-OA8 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | CWALT 2007-OA9 A1 |
| | | CWHL 2005-2 2A1 |
| Countrywide Securities Corp. | Underwriter | AHMA 2006-6 A1A |
| | | AHMA 2007-2 A1 |
| | | AHMA 2007-5 A1 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2007-OA9 A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| Credit Suisse First Boston Mortgage Securities Corp. | Depositor/Issuer | ARMT 2006-1 6A1 |
| | | ARMT 2006-2 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |
| Credit Suisse Securities (USA) LLC | Sponsor | ARMT 2006-2 6A1 |
| | Underwriter | ARMT 2006-1 6A1 |
| | | ARMT 2006-2 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |
| | | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| | | MHL 2006-1 1A2 |
| | | TMST 2007-1 A2A |
| | | WFMBS 2006-AR12 1A1 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2006-OA8 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | CWALT 2007-OA9 A1 |
| CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| DB Structured Products, Inc. | Sponsor | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| Deutsche Alt-A Securities, Inc. | Depositor/Issuer | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| Deutsche Bank Securities Inc. | Underwriter/ Corporate Seller | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| | | JPMMT 2005-ALT1 2A1 |
| | | RALI 2006-QA3 A1 |
| DLJ Mortgage Capital, Inc. | Sponsor | ARMT 2006-1 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |
| EMC Mortgage Corporation | Sponsor | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-1 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| EMC Mortgage Corporation (con't) | Sponsor (con't) | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |
| | | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |
| Goldman, Sachs & Co. | Underwriter | AHM 2005-2 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | RALI 2006-QO10 A1 |
| Greenwich Capital Acceptance, Inc. | Depositor/Issuer | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |
| | | MHL 2006-1 1A2 |
| Greenwich Capital Financial Products, Inc. | Sponsor | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |
| Greenwich Capital Markets, Inc. | Underwriter | AHM 2005-2 1A1 |
| | | CMALT 2007-A4 1A7 |
| | | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |
| | | INDX 2005-AR12 2A1A |
| | | INDX 2005-AR4 2A1A |
| | | INDX 2005-AR8 2A1A |
| | | LUM 2007-2 1A1 |
| | | MHL 2006-1 1A2 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | TMST 2007-1 A2A |
| IMH Assets Corp. | Depositor/Issuer | IMM 2005-7 A1 |
| Impac Funding Corporation | Sponsor | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| Impac Mortgage Holdings, Inc. | Sponsor | IMM 2005-7 A1 |
| Impac Secured Assets Corp. | Depositor/Issuer | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| J.P. Morgan Acceptance Corporation I | Depositor/Issuer | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| | | JPMMT 2005-ALT1 2A1 |
| J.P. Morgan Mortgage Acquisition Corp. | Sponsor | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| | | JPMMT 2005-ALT1 2A1 |
| J.P. Morgan Securities Inc. | Underwriter | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| Merrill Lynch Mortgage Investors, Inc. | Depositor/Issuer | MANA 2007-A3 A2A |
| Merrill Lynch Mortgage Lending, Inc. | Sponsor | MANA 2007-A3 A2A |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | Underwriter | IMSA 2006-2 1A2A |
| | | INDX 2006-AR19 1A1 |
| | | MANA 2007-A3 A2A |
| | | MHL 2005-5 A1 |
| | | NAA 2006-AF2 5A1 |
| Morgan Stanley & Co. Inc. | Underwriter | CMALT 2007-A4 1A7 |
| | | CWALT 2005-86CB A10 |
| | | LUM 2005-1 A1 |
| | | MSM 2006-13AX A1 |
| | | MSM 2006-16AX 2A1 |
| | | MSM 2006-8AR 1A2 |
| | | MSM 2006-9AR A3 |
| | | MSM 2007-2AX 2A2 |
| | | MSM 2007-5AX 2A2 |
| | | MSM 2007-7AX 2A1 |
| Morgan Stanley Capital I Inc. | Depositor/Issuer | MSM 2006-13AX A1 |
| | | MSM 2006-16AX 2A1 |
| | | MSM 2006-8AR 1A2 |
| | | MSM 2006-9AR A3 |
| | | MSM 2007-2AX 2A2 |
| | | MSM 2007-5AX 2A2 |
| | | MSM 2007-7AX 2A1 |
| Mortgage Asset Securitization Transactions, Inc. | Depositor/Issuer | MARM 2005-7 2A1 |
| | | MARM 2005-8 1A1 |
| | | MARM 2007-R5 A1 |
| MortgageIT Securities Corp. | Depositor/Issuer | MHL 2005-5 A1 |
| MortgageIT, Inc. | Sponsor | MHL 2006-1 1A2 |
| Nomura Asset Acceptance Corporation | Depositor/Issuer | NAA 2006-AF2 5A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Nomura Credit & Capital, Inc. | Sponsor | NAA 2006-AF2 5A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |
| Nomura Securities International, Inc. | Underwriter | NAA 2006-AF2 5A1 |
| Residential Accredit Loans, Inc. | Depositor/Issuer | RALI 2005-QA9 NB41 |
| | | RALI 2006-QA2 1A1 |
| | | RALI 2006-QA3 A1 |
| | | RALI 2006-QO10 A1 |
| | | RALI 2007-QS6 A29 |
| Residential Funding Company, LLC | Sponsor | RALI 2005-QA9 NB41 |
| | | RALI 2006-QA2 1A1 |
| | | RALI 2006-QA3 A1 |
| | | RALI 2006-QO10 A1 |
| | | RALI 2007-QS6 A29 |
| Structured Asset Mortgage Investments II Inc. | Depositor/Issuer | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |
| | | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |
| | | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | LUM 2005-1 A1 |
| | | LUM 2006-3 11A1 |
| | | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |
| UBS Real Estate Securities Inc. | Sponsor | MARM 2005-7 2A1 |
| | | MARM 2005-8 1A1 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| UBS Securities LLC | Sponsor | MARM 2007-R5 A1 |
| | Underwriter/ Corporate Seller | AHM 2005-2 1A1 |
| | | CWALT 2005-16 A4 |
| | | CWALT 2006-OA8 1A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | LUM 2006-3 11A1 |
| | | MARM 2005-8 1A1 |
| | | MARM 2007-R5 A1 |
| | | MHL 2006-1 1A2 |
| | | NAA 2006-AR4 A2 |
| | | RALI 2005-QA9 NB41 |
| WaMu Capital Corp. | Underwriter | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| Wells Fargo Asset Securities Corp. | Depositor/Issuer | WFMBS 2006-AR12 1A1 |
| Wells Fargo Bank, N.A. | Sponsor | WFMBS 2006-AR12 1A1 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| Bank of America Corporation | Countrywide Home Loans, Inc. | Sponsor | CWALT 2005-16 A4 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2006-OA8 1A1 |
| | | | CWALT 2007-OA4 A1 |
| | | | CWALT 2007-OA9 A1 |
| | | | CWHL 2005-2 2A1 |
| | Countrywide Securities Corp. | Underwriter | AHMA 2006-6 A1A |
| | | | AHMA 2007-2 A1 |
| | | | AHMA 2007-5 A1 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2007-OA9 A1 |
| | | | IMM 2005-7 A1 |
| | | | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| | CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2006-OA8 1A1 |
| | | | CWALT 2007-OA4 A1 |
| | | | CWALT 2007-OA9 A1 |
| | CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| Capital One Financial Corporation | Chevy Chase Bank, FSB | Sponsor | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| | Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| Capital One, National Association | Chevy Chase Bank, FSB | Sponsor | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| | Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| DB Structured Products, Inc. | MortgageIT Holdings, Inc. | Sponsor | MHL 2005-5 A1 |
| | MortgageIT Securities Corp. | Depositor/Issuer | MHL 2005-5 A1 |
| | MortgageIT, Inc. | Sponsor | MHL 2006-1 1A2 |
| JPMorgan Chase Bank, N.A. | EMC Mortgage Corporation | Sponsor | BALTA 2005-10 11A1 |
| | | | BALTA 2005-8 11A1 |
| | | | BALTA 2005-9 11A1 |
| | | | BALTA 2006-1 11A1 |
| | | | BALTA 2006-2 11A1 |
| | | | BALTA 2006-3 1A1 |
| | | | BALTA 2006-4 11A1 |
| | | | BALTA 2006-4 13A1 |
| | | | BALTA 2006-5 1A1 |
| | | | BALTA 2006-6 1A1 |
| | | | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |
| | | | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |
| | | | BSMF 2007-AR5 1A1A |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | Banc of America Securities LLC | Underwriter/ Corporate Seller | BAFC 2005-H 7A1 |
| | | | BAFC 2006-D 1A1 |
| | | | NAA 2007-3 A1 |
| | | | WFMBS 2006-AR12 1A1 |
| MIT Holdings Corporation | MortgageIT Holdings, Inc. | Sponsor | MHL 2005-5 A1 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| Morgan Stanley Mortgage Capital Holdings LLC | Morgan Stanley Mortgage Capital Inc. | Sponsor | MSM 2006-13AX A1 |
| | | | MSM 2006-16AX 2A1 |
| | | | MSM 2006-8AR 1A2 |
| | | | MSM 2006-9AR A3 |
| | | | MSM 2007-2AX 2A2 |
| | | | MSM 2007-5AX 2A2 |
| | | | MSM 2007-7AX 2A1 |

965.    As set forth above, in the course of their business dealings, the Defendants named in this Third Count supplied false information for the guidance of others, including the Bank, regarding the collateral underlying the Certificates and the underwriting guidelines that were supposedly applied in originating the mortgage loans underlying those Certificates.  These material misrepresentations pertain to the following non-exclusive list: (a) adherence to the originators' stated underwriting guidelines; and related matters; (b) inflation of the LTVs of the mortgage loans in the collateral pools and violations of USPAP and other applicable appraisal standards; (c) the rating process by which triple-A ratings were assigned; (d) compliance with predatory lending restrictions; (e) purported due diligence on the loan pools that backed the PLMBS; (f) the enforceability of the mortgages; and (g) the compounded high-risk of the mortgage loans within the underlying mortgage pools.

966.    The Bank relied on these material misrepresentations in making its decision to purchase the securities.

967.    The Defendants named in this Third Count supplied this information with the intent to benefit, guide, or otherwise influence the decisions of a limited number of institutional investors, including the Bank—or alternatively supplied the information knowing that the immediate recipients thereof intended to supply it to benefit, guide, or otherwise influence the decisions of a limited number of institutional investors, including the Bank—to purchase the Certificates.

968.    These Defendants (1) should have known that the information supplied was false when made; (2) failed to exercise reasonable care or competence in obtaining, verifying, or communicating this false information; or (3) were negligent in failing to discover the falsity of those statements.

969.    The Defendants named in this Third Count were in a position of superior knowledge as to these representations because such Defendants had access to the loan files on which these statements were based, as well as the purported "due diligence" review of the loan files, whereas the Bank did not have access to either the loan files or the purported "due diligence" review.  Accordingly, the Bank's reliance on these representations by these Defendants in making its decision to purchase the securities was justified.

970.    The Bank did not and could not reasonably have known of these Defendants' misrepresentations alleged herein earlier than three years before the date of filing this action.  *See supra* § VI.H.

971.    As a result of these Defendants' misrepresentations alleged herein, the Bank has suffered damages in an amount to be proven at trial, plus interest.

## FOURTH CAUSE OF ACTION

### Violations of the Massachusetts General Law c. 93A by Certain Securities Defendants

972.    The Bank incorporates by reference and realleges each and every allegation in this Complaint as if set forth herein.

973.    This cause of action is alleged against the following Defendants in connection with the sale of the following securities:

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Banc of America Funding Corporation | Depositor/Issuer | BAFC 2005-H 7A1 |
| | | BAFC 2006-D 1A1 |
| Bank of America, N.A. | Sponsor | BAFC 2005-H 7A1 |
| | | BAFC 2006-D 1A1 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Barclays Capital Inc. | Underwriter | BCAP 2006-AA1 A1 |
| | | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| | | LUM 2006-6 A1 |
| | | LUM 2006-7 2A1 |
| | | RALI 2007-QS6 A29 |
| BCAP LLC | Depositor/Issuer | BCAP 2006-AA1 A1 |
| Bear Stearns Asset Backed Securities I LLC | Depositor/Issuer | BALTA 2006-1 11A1 |
| Bear, Stearns & Co. Inc. | Underwriter/Corporate Seller | AHM 2005-2 1A1 |
| | | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-1 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |
| | | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | CWHL 2005-2 2A1 |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |
| | | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| | | LUM 2005-1 A1 |
| | | LUM 2006-3 11A1 |
| | | LUM 2006-6 A1 |
| | | LUM 2006-7 2A1 |
| | | MHL 2005-5 A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |

| **Corporate Defendant** | **As** | **Certificate(s)** |
|---|---|---|
| Bear, Stearns & Co. Inc. (con't) | Underwriter/Corporate Seller (con't) | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |
| | | TMST 2007-1 A2A |
| Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| Citicorp Mortgage Securities, Inc. | Depositor/Issuer | CMALT 2007-A4 1A7 |
| Citigroup Global Markets Inc. | Underwriter/Corporate Seller | CMLTI 2005-9 1A1 |
| | | GPMF 2006-AR3 4A1 |
| | | LUM 2007-2 1A1 |
| | | MARM 2005-7 2A1 |
| | | RALI 2006-QA2 1A1 |
| Citigroup Global Markets Realty Corp. | Sponsor | CMLTI 2005-9 1A1 |
| Citigroup Mortgage Loan Trust Inc. | Depositor/Issuer | CMLTI 2005-9 1A1 |
| CitiMortgage, Inc. | Sponsor | CMALT 2007-A4 1A7 |
| Countrywide Home Loans, Inc. | Sponsor | CWALT 2005-16 A4 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2006-OA8 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | CWALT 2007-OA9 A1 |
| | | CWHL 2005-2 2A1 |
| Countrywide Securities Corp. | Underwriter | AHMA 2006-6 A1A |
| | | AHMA 2007-2 A1 |
| | | AHMA 2007-5 A1 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2007-OA9 A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| Credit Suisse First Boston Mortgage Securities Corp. | Depositor/Issuer | ARMT 2006-1 6A1 |
| | | ARMT 2006-2 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Credit Suisse Securities (USA) LLC | Sponsor | ARMT 2006-2 6A1 |
| | Underwriter | ARMT 2006-1 6A1 |
| | | ARMT 2006-2 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |
| | | CCMFC 2006-2A A1 |
| | | CCMFC 2007-1A A1 |
| | | CCMFC 2007-2A A1 |
| | | MHL 2006-1 1A2 |
| | | TMST 2007-1 A2A |
| | | WFMBS 2006-AR12 1A1 |
| CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 |
| | | CWALT 2005-86CB A10 |
| | | CWALT 2006-OA16 A2 |
| | | CWALT 2006-OA8 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | CWALT 2007-OA9 A1 |
| CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| DB Structured Products, Inc. | Sponsor | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| Deutsche Alt-A Securities, Inc. | Depositor/Issuer | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| Deutsche Bank Securities Inc. | Underwriter/Corporate Seller | DBALT 2006-AR2 1A1 |
| | | DBALT 2006-AR2 1A2 |
| | | DBALT 2006-AR3 A2 |
| | | DBALT 2006-AR4 A1 |
| | | DBALT 2006-AR5 1A1 |
| | | DBALT 2007-AR1 A1 |
| | | JPMMT 2005-ALT1 2A1 |
| | | RALI 2006-QA3 A1 |
| DLJ Mortgage Capital, Inc. | Sponsor | ARMT 2006-1 6A1 |
| | | ARMT 2006-3 4A2 |
| | | ARMT 2007-1 5A1 |
| | | ARMT 2007-2 2A21 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| EMC Mortgage Corporation | Sponsor | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-1 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |
| | | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |
| | | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |
| Goldman, Sachs & Co. | Underwriter | AHM 2005-2 1A1 |
| | | CWALT 2007-OA4 A1 |
| | | RALI 2006-QO10 A1 |
| Greenwich Capital Acceptance, Inc. | Depositor/Issuer | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |
| | | MHL 2006-1 1A2 |
| Greenwich Capital Financial Products, Inc. | Sponsor | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Greenwich Capital Markets, Inc. | Underwriter | AHM 2005-2 1A1 |
| | | CMALT 2007-A4 1A7 |
| | | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| | | HVMLT 2005-10 2A1A |
| | | HVMLT 2006-7 2A1A |
| | | HVMLT 2006-8 2A1A |
| | | HVMLT 2007-1 2A1A |
| | | INDX 2005-AR4 2A1A |
| | | INDX 2005-AR8 2A1A |
| | | INDX 2005-AR12 2A1A |
| | | LUM 2007-2 1A1 |
| | | MHL 2006-1 1A2 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | TMST 2007-1 A2A |
| IMH Assets Corp. | Depositor/Issuer | IMM 2005-7 A1 |
| Impac Funding Corporation | Sponsor | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| Impac Mortgage Holdings, Inc. | Sponsor | IMM 2005-7 A1 |
| Impac Secured Assets Corp. | Depositor/Issuer | IMSA 2005-2 A1 |
| | | IMSA 2006-2 1A2A |
| J.P. Morgan Acceptance Corporation I | Depositor/Issuer | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| | | JPMMT 2005-ALT1 2A1 |
| J.P. Morgan Mortgage Acquisition Corp. | Sponsor | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| | | JPMMT 2005-ALT1 2A1 |
| J.P. Morgan Securities Inc. | Underwriter | JPALT 2006-A1 1A1 |
| | | JPALT 2006-A2 1A1 |
| | | JPALT 2006-A3 1A1 |
| | | JPALT 2007-A2 12A1 |
| Merrill Lynch Mortgage Investors, Inc. | Depositor/Issuer | MANA 2007-A3 A2A |
| Merrill Lynch Mortgage Lending, Inc. | Sponsor | MANA 2007-A3 A2A |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | Underwriter | IMSA 2006-2 1A2A |
| | | INDX 2006-AR19 1A1 |
| | | MANA 2007-A3 A2A |
| | | MHL 2005-5 A1 |
| | | NAA 2006-AF2 5A1 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Morgan Stanley & Co. Inc. | Underwriter | CMALT 2007-A4 1A7 |
| | | CWALT 2005-86CB A10 |
| | | LUM 2005-1 A1 |
| | | MSM 2006-13AX A1 |
| | | MSM 2006-16AX 2A1 |
| | | MSM 2006-8AR 1A2 |
| | | MSM 2006-9AR A3 |
| | | MSM 2007-2AX 2A2 |
| | | MSM 2007-5AX 2A2 |
| | | MSM 2007-7AX 2A1 |
| Morgan Stanley Capital I Inc. | Depositor/Issuer | MSM 2006-13AX A1 |
| | | MSM 2006-16AX 2A1 |
| | | MSM 2006-8AR 1A2 |
| | | MSM 2006-9AR A3 |
| | | MSM 2007-2AX 2A2 |
| | | MSM 2007-5AX 2A2 |
| | | MSM 2007-7AX 2A1 |
| Mortgage Asset Securitization Transactions, Inc. | Depositor/Issuer | MARM 2005-7 2A1 |
| | | MARM 2005-8 1A1 |
| | | MARM 2007-R5 A1 |
| MortgageIT, Inc. | Sponsor | MHL 2006-1 1A2 |
| MortgageIT Securities Corp. | Depositor/Issuer | MHL 2005-5 A1 |
| Nomura Asset Acceptance Corporation | Depositor/Issuer | NAA 2006-AF2 5A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |
| Nomura Credit & Capital, Inc. | Sponsor | NAA 2006-AF2 5A1 |
| | | NAA 2006-AR4 A2 |
| | | NAA 2007-1 2A1 |
| | | NAA 2007-3 A1 |
| Nomura Securities International, Inc. | Underwriter | NAA 2006-AF2 5A1 |
| Residential Accredit Loans, Inc. | Depositor/Issuer | RALI 2005-QA9 NB41 |
| | | RALI 2006-QA2 1A1 |
| | | RALI 2006-QA3 A1 |
| | | RALI 2006-QO10 A1 |
| | | RALI 2007-QS6 A29 |
| Residential Funding Company, LLC | Sponsor | RALI 2005-QA9 NB41 |
| | | RALI 2006-QA2 1A1 |
| | | RALI 2006-QA3 A1 |
| | | RALI 2006-QO10 A1 |
| | | RALI 2007-QS6 A29 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| Structured Asset Mortgage Investments II Inc. | Depositor/Issuer | BALTA 2005-10 11A1 |
| | | BALTA 2005-8 11A1 |
| | | BALTA 2005-9 11A1 |
| | | BALTA 2006-2 11A1 |
| | | BALTA 2006-3 1A1 |
| | | BALTA 2006-4 11A1 |
| | | BALTA 2006-4 13A1 |
| | | BALTA 2006-5 1A1 |
| | | BALTA 2006-6 1A1 |
| | | BALTA 2006-7 1A1 |
| | | BALTA 2007-1 1A1 |
| | | BALTA 2007-2 1A1 |
| | | BALTA 2007-3 1A1 |
| | | BSMF 2006-AR1 1A1 |
| | | BSMF 2006-AR2 1A1 |
| | | BSMF 2006-AR3 1A1 |
| | | BSMF 2006-AR5 1A1 |
| | | BSMF 2007-AR1 1A1 |
| | | BSMF 2007-AR4 1A1 |
| | | BSMF 2007-AR5 1A1A |
| | | GPMF 2005-AR1 A2 |
| | | GPMF 2005-AR2 A1 |
| | | GPMF 2005-AR4 4A1A |
| | | GPMF 2006-AR3 4A1 |
| | | LUM 2005-1 A1 |
| | | LUM 2006-3 11A1 |
| | | SAMI 2005-AR2 1A1 |
| | | SAMI 2005-AR3 1A1 |
| | | SAMI 2005-AR6 2A1 |
| | | SAMI 2006-AR4 4A1 |
| | | SAMI 2006-AR6 1A1 |
| | | SAMI 2006-AR7 A1A |
| UBS Real Estate Securities Inc. | Sponsor | MARM 2005-7 2A1 |
| | | MARM 2005-8 1A1 |
| UBS Securities LLC | Sponsor | MARM 2007-R5 A1 |
| | Underwriter/Corporate Seller | AHM 2005-2 1A1 |
| | | CWALT 2005-16 A4 |
| | | CWALT 2006-OA8 1A1 |
| | | IMM 2005-7 A1 |
| | | IMSA 2005-2 A1 |
| | | LUM 2006-3 11A1 |
| | | MARM 2005-8 1A1 |
| | | MARM 2007-R5 A1 |
| | | MHL 2006-1 1A2 |
| | | NAA 2006-AR4 A2 |
| | | RALI 2005-QA9 NB41 |

| Corporate Defendant | As | Certificate(s) |
|---|---|---|
| WaMu Capital Corp. | Underwriter | DSLA 2005-AR1 2A1A |
| | | DSLA 2005-AR2 2A1A |
| Wells Fargo Asset Securities Corp. | Depositor/Issuer | WFMBS 2006-AR12 1A1 |
| Wells Fargo Bank, N.A. | Sponsor | WFMBS 2006-AR12 1A1 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| Bank of America Corporation | Countrywide Home Loans, Inc. | Sponsor | CWALT 2005-16 A4 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2006-OA8 1A1 |
| | | | CWALT 2007-OA4 A1 |
| | | | CWALT 2007-OA9 A1 |
| | | | CWHL 2005-2 2A1 |
| | Countrywide Securities Corp. | Underwriter | AHMA 2006-6 A1A |
| | | | AHMA 2007-2 A1 |
| | | | AHMA 2007-5 A1 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2007-OA9 A1 |
| | | | IMM 2005-7 A1 |
| | | | IMSA 2005-2 A1 |
| | | | IMSA 2006-2 1A2A |
| | CWALT, Inc. | Depositor/Issuer | CWALT 2005-16 A4 |
| | | | CWALT 2005-86CB A10 |
| | | | CWALT 2006-OA16 A2 |
| | | | CWALT 2006-OA8 1A1 |
| | | | CWALT 2007-OA4 A1 |
| | | | CWALT 2007-OA9 A1 |
| | CWMBS, Inc. | Depositor/Issuer | CWHL 2005-2 2A1 |
| Capital One Financial Corporation | Chevy Chase Bank, FSB | Sponsor | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| | Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| Capital One, National Association | Chevy Chase Bank, FSB | Sponsor | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| | Chevy Chase Funding LLC | Depositor/Issuer | CCMFC 2006-2A A1 |
| | | | CCMFC 2007-1A A1 |
| | | | CCMFC 2007-2A A1 |
| DB Structured Products, Inc. | MortgageIT Holdings, Inc. | Sponsor | MHL 2005-5 A1 |
| | MortgageIT Securities Corp. | Depositor/Issuer | MHL 2005-5 A1 |
| | MortgageIT, Inc. | Sponsor | MHL 2006-1 1A2 |

| Successor Defendant | Succeeded Entity | As | Certificate(s) |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | EMC Mortgage Corporation | Sponsor | BALTA 2005-10 11A1 |
| | | | BALTA 2005-8 11A1 |
| | | | BALTA 2005-9 11A1 |
| | | | BALTA 2006-1 11A1 |
| | | | BALTA 2006-2 11A1 |
| | | | BALTA 2006-3 1A1 |
| | | | BALTA 2006-4 11A1 |
| | | | BALTA 2006-4 13A1 |
| | | | BALTA 2006-5 1A1 |
| | | | BALTA 2006-6 1A1 |
| | | | BALTA 2006-7 1A1 |
| | | | BALTA 2007-1 1A1 |
| | | | BALTA 2007-2 1A1 |
| | | | BALTA 2007-3 1A1 |
| | | | BSMF 2006-AR1 1A1 |
| | | | BSMF 2006-AR2 1A1 |
| | | | BSMF 2006-AR3 1A1 |
| | | | BSMF 2006-AR5 1A1 |
| | | | BSMF 2007-AR1 1A1 |
| | | | BSMF 2007-AR4 1A1 |
| | | | BSMF 2007-AR5 1A1A |
| | | | GPMF 2005-AR1 A2 |
| | | | GPMF 2005-AR2 A1 |
| | | | GPMF 2005-AR4 4A1A |
| | | | GPMF 2006-AR3 4A1 |
| | | | SAMI 2005-AR2 1A1 |
| | | | SAMI 2005-AR3 1A1 |
| | | | SAMI 2005-AR6 2A1 |
| | | | SAMI 2006-AR4 4A1 |
| | | | SAMI 2006-AR6 1A1 |
| | | | SAMI 2006-AR7 A1A |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | Banc of America Securities LLC | Underwriter/ Corporate Seller | BAFC 2005-H 7A1 |
| | | | BAFC 2006-D 1A1 |
| | | | NAA 2007-3 A1 |
| | | | WFMBS 2006-AR12 1A1 |
| MIT Holdings Corporation | MortgageIT Holdings, Inc. | Sponsor | MHL 2005-5 A1 |
| Morgan Stanley Mortgage Capital Holdings LLC | Morgan Stanley Mortgage Capital Inc. | Sponsor | MSM 2006-13AX A1 |
| | | | MSM 2006-16AX 2A1 |
| | | | MSM 2006-8AR 1A2 |
| | | | MSM 2006-9AR A3 |
| | | | MSM 2007-2AX 2A2 |
| | | | MSM 2007-5AX 2A2 |
| | | | MSM 2007-7AX 2A1 |

974.    Under Massachusetts General Laws, Chapter 93A, Section 11, "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any

trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may . . . bring an action" for relief.

975.    In connection with their offer and sale of these securities to the Bank, the Defendants named in this Fourth Count made numerous documents available to the Bank at its office in Boston, Massachusetts.  For issuances that were not private placement deals, the Offering Documents that such Defendants sent to the Bank included the prospectus, free writing prospectus, and prospectus supplement filed with the SEC for each securitization, registration statements, summary term sheets, and other documents.  For private placement deals, the Offering Documents included private placement memoranda.  In these Offering Documents, such Defendants made misrepresentations and omissions of fact that a reasonable person would find deceptive, the truth about which facts was reasonably ascertainable by Defendants but not by the Bank.

976.    As detailed above, Defendants' conduct was immoral, unethical, oppressive, and unscrupulous, and fell within the penumbra of common law, statutory, or other established concepts of unfairness.

977.    Both the Bank and the Defendants named in this Fourth Count were engaged in trade or commerce at the time of the misrepresentations and omissions described above, and the interaction between the parties was commercial in nature.

978.    The deceptive conduct complained of herein occurred primarily and substantially within Massachusetts.  Defendants engaged in the deceptive conduct in Massachusetts by sending Offering Documents that contained misleading statements and omissions to the Bank in Massachusetts and by deceiving the Bank in Massachusetts.  The Bank received and acted upon the deceptive communications in Massachusetts.  Additionally, the Bank learned of and suffered

losses in Massachusetts.  These deceptive practices negatively impacted the ability of the Bank

to perform its mission in Massachusetts, including with respect to the Bank's approximately 240

member institutions located in Massachusetts.

979.    The Bank did not and could not reasonably have known of such Defendants'

material misstatements and omissions alleged herein earlier than four years before the date of

filing this action. *See supra* § VI.H.

980.    As a result of such Defendants' deceptive acts, the Bank suffered a loss of money

or property in an amount to be proved at trial.

## FIFTH CAUSE OF ACTION

### Fraud by Rating Agency Defendants

981.    The Bank incorporates by reference and realleges each and every allegation in this

Complaint as if set forth herein.

982.    The Bank alleges fraud against the Rating Agency Defendants.  The following

table specifies which ratings were fraudulent, what such ratings were, who issued such ratings,

and the date on which the ratings were communicated to the Bank:

| Certificate | Rating by Fitch | Rating by Moody's | Rating by S&P | Date of Communication of the Rating |
|---|---|---|---|---|
| AHM 2005-2 1A1 | Not rated | Aaa | AAA | 6/13/05 |
| AHMA 2006-6 A1A | Not rated | Aaa | AAA | 10/13/06 |
| AHMA 2007-2 A1 | Not rated | Aaa | AAA | 2/21/07 |
| AHMA 2007-5 A1 | Not rated | Aaa | AAA | 6/26/07 |
| ARMT 2006-1 6A1 | Not rated | Aaa | AAA | 2/27/06 |
| ARMT 2006-2 6A1 | Not rated | Aaa | AAA | 4/27/06 |
| ARMT 2006-3 4A2 | Not rated | Aaa | AAA | 6/28/06 |
| ARMT 2007-1 5A1 | Not rated | Aaa | AAA | 2/23/07 |
| ARMT 2007-2 2A21 | Not rated | Aaa | AAA | 5/23/07 |
| BAFC 2005-H 7A1 | AAA | Not rated | AAA | 10/26/05 |
| BAFC 2006-D 1A1 | AAA | Not rated | AAA | 4/26/06 |
| BALTA 2005-8 11A1 | Not rated | Aaa | AAA | 8/4/05 |
| BALTA 2005-9 11A1 | Not rated | Aaa | AAA | 9/7/05 |

| Certificate | Rating by Fitch | Rating by Moody's | Rating by S&P | Date of Communication of the Rating |
|---|---|---|---|---|
| BALTA 2005-10 11A1 | Not rated | Aaa | AAA | 11/7/05 |
| BALTA 2006-1 11A1 | Not rated | Aaa | AAA | 1/6/06 |
| BALTA 2006-2 11A1 | Not rated | Aaa | AAA | 1/25/06 |
| BALTA 2006-3 1A1 | Not rated | Aaa | AAA | 4/27/06 |
| BALTA 2006-4 11A1 | Not rated | Aaa | AAA | 5/18/06 |
| BALTA 2006-4 13A1 | Not rated | Aaa | AAA | 6/6/06 |
| BALTA 2006-5 1A1 | Not rated | Aaa | AAA | 7/11/06 |
| BALTA 2006-6 1A1 | Not rated | Aaa | AAA | 8/29/06 |
| BALTA 2006-7 1A1 | Not rated | Aaa | AAA | 10/3/06 |
| BALTA 2007-1 1A1 | Not rated | Aaa | AAA | 1/18/07 |
| BALTA 2007-2 1A1 | Not rated | Aaa | AAA | 2/23/07 |
| BALTA 2007-3 1A1 | Not rated | Aaa | AAA | 4/25/07 |
| BCAP 2006-AA1 A1 | Not rated | Aaa | AAA | 8/30/06 |
| BSMF 2006-AR1 1A1 | Not rated | Aaa | AAA | 7/18/06 |
| BSMF 2006-AR2 1A1 | Not rated | Aaa | AAA | 9/6/06 |
| BSMF 2006-AR3 1A1 | Not rated | Aaa | AAA | 10/3/06 |
| BSMF 2006-AR5 1A1 | Not rated | Aaa | AAA | 12/5/06 |
| BSMF 2007-AR1 1A1 | Not rated | Aaa | AAA | 1/3/07 |
| BSMF 2007-AR4 1A1 | Not rated | Aaa | AAA | 4/27/07 |
| BSMF 2007-AR5 1A1A | Not rated | Aaa | AAA | 6/4/07 |
| CCMFC 2006-2A A1 | Not rated | Aaa | AAA | 5/19/06 |
| CCMFC 2007-1A A1 | Not rated | Aaa | AAA | 3/13/07 |
| CCMFC 2007-2A A1 | Not rated | Aaa | AAA | 5/25/07 |
| CMALT 2007-A4 1A7 | AAA | Aaa | Not rated | 4/25/07 |
| CMLTI 2005-9 1A1 | AAA | Not rated | AAA | 9/29/05 |
| CWALT 2005-16 A4 | Not rated | Aaa | AAA | 3/8/05 |
| CWALT 2005-86CB A10 | Not rated | Aaa | AAA | 12/27/05 |
| CWALT 2006-OA16 A2 | Not rated | Aaa | AAA | 8/4/06 |
| CWALT 2006-OA8 1A1 | Not rated | Aaa | AAA | 5/1/06 |
| CWALT 2007-OA4 A1 | AAA | Aaa | AAA | 3/15/07 |
| CWALT 2007-OA9 A1 | Not rated | Aaa | AAA | 7/27/07 |
| CWHL 2005-2 2A1 | Not rated | Aaa | AAA | 12/9/04 |
| DBALT 2006-AR2 1A1 | Not rated | Aaa | AAA | 6/29/06 |
| DBALT 2006-AR2 1A2 | Not rated | Aaa | AAA | 6/29/06 |
| DBALT 2006-AR3 A2 | Not rated | Aaa | AAA | 7/28/06 |
| DBALT 2006-AR4 A1 | Not rated | Aaa | AAA | 9/18/06 |
| DBALT 2006-AR5 1A1 | Not rated | Aaa | AAA | 9/22/06 |
| DBALT 2007-AR1 A1 | Not rated | Aaa | AAA | 1/9/06 |
| DSLA 2005-AR1 2A1A | Not rated | Aaa | AAA | 2/23/05 |
| DSLA 2005-AR2 2A1A | Not rated | Aaa | AAA | 4/26/05 |
| GPMF 2005-AR1 A2 | Not rated | Aaa | AAA | 3/9/05 |
| GPMF 2005-AR2 A1 | Not rated | Aaa | AAA | 4/11/05 |

| Certificate | Rating by Fitch | Rating by Moody's | Rating by S&P | Date of Communication of the Rating |
|---|---|---|---|---|
| GPMF 2005-AR4 4A1A | Not rated | Aaa | AAA | 7/18/05 |
| GPMF 2006-AR3 4A1 | Not rated | Aaa | AAA | 4/27/06 |
| HVMLT 2005-10 2A1A | Not rated | Aaa | AAA | 8/26/05 |
| HVMLT 2006-7 2A1A | Not rated | Aaa | AAA | 7/19/06 |
| HVMLT 2006-8 2A1A | Not rated | Aaa | AAA | 7/27/06 |
| HVMLT 2007-1 2A1A | Not rated | Aaa | AAA | 1/30/07 |
| IMM 2005-7 A1 | Not rated | Aaa | AAA | 9/9/05 |
| IMSA 2005-2 A1 | Not rated | Aaa | AAA | 12/20/05 |
| IMSA 2006-2 1A2A | Not rated | Aaa | AAA | 6/28/06 |
| INDX 2005-AR4 2A1A | Not rated | Aaa | AAA | 1/19/05 |
| INDX 2005-AR8 2A1A | Not rated | Aaa | AAA | 4/18/05 |
| INDX 2005-AR12 2A1A | Not rated | Aaa | AAA | 6/2/05 |
| INDX 2006-AR19 1A1 | Not rated | Aaa | AAA | 5/25/06 |
| JPALT 2006-A1 1A1 | AAA | Aaa | AAA | 2/24/06 |
| JPALT 2006-A2 1A1 | AAA | Aaa | AAA | 4/27/06 |
| JPALT 2006-A3 1A1 | AAA | Aaa | AAA | 6/6/06 |
| JPALT 2007-A2 12A1 | AAA | Aaa | AAA | 5/23/07 |
| JPMMT 2005-ALT1 2A1 | AAA | Not rated | AAA | 9/26/05 |
| LUM 2005-1 A1 | Not rated | Aaa | AAA | 10/25/05 |
| LUM 2006-3 11A1 | Not rated | Aaa | AAA | 4/27/06 |
| LUM 2006-6 A1 | Not rated | Aaa | AAA | 9/27/06 |
| LUM 2006-7 2A1 | Not rated | Aaa | AAA | 12/18/06 |
| LUM 2007-2 1A1 | Not rated | Aaa | AAA | 4/26/07 |
| LXS 2005-8 1A2 | Not rated | Aaa | AAA | 11/15/05 |
| LXS 2007-11 A1 | Not rated | Aaa | AAA | 6/28/07 |
| LXS 2007-9 1A1 | Not rated | Aaa | AAA | 4/20/07 |
| MANA 2007-A3 A2A | Not rated | Aaa | AAA | 3/22/07 |
| MARM 2005-7 2A1 | Not rated | Aaa | AAA | 8/26/05 |
| MARM 2005-8 1A1 | Not rated | Aaa | AAA | 12/22/05 |
| MARM 2007-R5 A1 | Not rated | Aaa | AAA | 9/21/07 |
| MHL 2005-5 A1 | Not rated | Aaa | AAA | 10/20/05 |
| MHL 2006-1 1A2 | Not rated | Aaa | AAA | 2/17/06 |
| MSM 2006-13AX A1 | Not rated | Aaa | AAA | 9/13/06 |
| MSM 2006-16AX 2A1 | Not rated | Aaa | AAA | 10/17/06 |
| MSM 2006-8AR 1A2 | Not rated | Aaa | AAA | 5/18/06 |
| MSM 2006-9AR A3 | Not rated | Aaa | AAA | 7/19/06 |
| MSM 2007-2AX 2A2 | Not rated | Aaa | AAA | 1/16/07 |
| MSM 2007-5AX 2A2 | Not rated | Aaa | AAA | 2/26/07 |
| MSM 2007-7AX 2A1 | Not rated | Aaa | AAA | 4/16/07 |
| NAA 2006-AF2 5A1 | Not rated | Aaa | AAA | 7/28/06 |
| NAA 2006-AR4 A2 | Not rated | Aaa | AAA | 11/30/06 |
| NAA 2007-1 2A1 | Not rated | Aaa | AAA | 4/24/07 |

| Certificate | Rating by Fitch | Rating by Moody's | Rating by S&P | Date of Communication of the Rating |
|---|---|---|---|---|
| NAA 2007-3 A1 | Not rated | Aaa | AAA | 6/27/07 |
| RALI 2005-QA9 NB41 | Not rated | Aaa | AAA | 8/26/05 |
| RALI 2006-QA3 A1 | Not rated | Aaa | AAA | 4/13/06 |
| RALI 2006-QO10 A1 | Not rated | Aaa | AAA | 12/13/06 |
| RALI 2006-QA2 1A1 | Not rated | Aaa | AAA | 2/24/06 |
| RALI 2007-QS6 A29 | AAA | Aaa | AAA | 4/25/07 |
| SAMI 2005-AR2 1A1 | Not rated | Aaa | AAA | 4/5/05 |
| SAMI 2005-AR3 1A1 | Not rated | Aaa | AAA | 6/3/05 |
| SAMI 2005-AR6 2A1 | Not rated | Aaa | AAA | 7/28/05 |
| SAMI 2006-AR4 4A1 | Not rated | Aaa | AAA | 5/8/06 |
| SAMI 2006-AR6 1A1 | Not rated | Aaa | AAA | 6/2/06 |
| SAMI 2006-AR7 A1A | Not rated | Aaa | AAA | 7/11/06 |
| TMST 2007-1 A2A | Not rated | Aaa | AAA | 2/16/07 |
| WFMBS 2006-AR12 1A1 | Not rated | Aaa | AAA | 8/24/06 |

983.    The ratings were communicated to the Bank by means of a preliminary term sheet, a prospectus supplement, a free writing prospectus, or through Bloomberg.

984.    These ratings were material to the Bank's decision to purchase the above-named PLMBS because without the investment-grade ratings that the Rating Agency Defendants gave the PLMBS, the Bank, by policy, could not have purchased the PLMBS.

985.    The Bank reasonably and justifiably relied upon the ratings.  *See supra* § V.F.6. As the U.S. District Court for the Southern District of New York recently noted: "[T]he market at large, including sophisticated investors, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status and, at least in this case, the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 181 (S.D.N.Y. 2009).

986.    By providing ratings, the Rating Agency Defendants represented that they had a basis in fact to provide a rating.  As alleged above, *see supra* § V.F.1, because the Rating

Agency Defendants knew that the underwriting standards on which they based their ratings had been abandoned in practice, they knew that they lacked a basis in fact to provide the ratings that they did.

987.    Further, the Rating Agency Defendants did not genuinely believe their own ratings.  As alleged above, *see supra* § V.F, the Rating Agency Defendants knew that the ratings were the result of flawed models, willful disregard for the abandonment of underwriting guidelines, Rating Agency capture, and the Rating Agency Defendants' obsession with market share.  Thus, they did not believe that their ratings indicated the likelihood that the Bank would receive the payments contemplated under the Certificates.

988.    The Rating Agency Defendants also represented that their PLMBS ratings were as reliable as their ratings of other instruments, such as corporate bonds.  However, as alleged above, *see supra* § V.F.5, they knew that this representation was not true.

989.    The Rating Agency Defendants had a financial incentive to assign the PLMBS the fraudulent ratings that they assigned.  *See supra* § V.F.2.

990.    The Rating Agency Defendants knew that investors such as the Bank could buy only investment-grade-rated PLMBS, and knew that the Securities Defendants required the senior tranches of each PLMBS to be rated Triple-A.  *See supra* §§ V.F, VI.D.2.  Moreover, the Rating Agencies knew that institutional investors, including the Bank, relied heavily upon their Credit Ratings when purchasing structured financial products, including the PLMBS.  *See supra* at V.F.6.  Thus the Rating Agency Defendants had reason to expect that a class of institutional investors—which included the Bank—would purchase the PLMBS in reliance on their misrepresentations and omissions.

991.     The Rating Agency Defendants therefore assigned the false ratings to the PLMBS for the purpose of increasing their revenues while knowing that they would be used to induce a limited number of institutional investors, including the Bank, to purchase the Certificates at issue in this Fifth Cause of Action.

992.     As a result of the Rating Agency Defendants' materially misleading misrepresentations and omissions and the Bank's justifiable reliance thereon, the Bank suffered damages in an amount to be proved at trial.

993.     Those misrepresentations and omissions were the proximate cause of the Bank's injury.

994.     The Bank did not and could not reasonably have known of the Rating Agency Defendants' material misstatements and omissions alleged herein earlier than three years before the date of filing this action. *See supra* § VI.H.

## SIXTH CAUSE OF ACTION

**Violations of Massachusetts General Law c. 93A by the Rating Agency Defendants**

995.     The Bank incorporates by reference and realleges each and every allegation in this Complaint as if set forth herein.

996.     Under Massachusetts General Laws, Chapter 93A, Section 11, "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may . . . bring an action in superior court" for relief.

997.      In connection with their offer and sale of these securities to the Bank, the Rating Agency Defendants assigned ratings to the PLMBS—ratings that were communicated to the Bank at its office in Boston, Massachusetts.  The Rating Agency Defendants that assigned those

ratings, the PLMBS to which the ratings were assigned, what the ratings were, and when the ratings were communicated to the Bank are listed above in paragraph 982.

998.    For the reasons given above, these ratings lacked a basis in fact and the Rating Agency Defendants did not believe their ratings were reliable.  *See supra* § V.F.  Accordingly, the ratings were deceptive.

999.    The truth about the ratings was not, however, reasonably ascertainable by the Bank.

1000.   The ratings that the Rating Agency Defendants assigned to the PLMBS were an integral part of the issuance of the PLMBS.  Without those ratings, the PLMBS would not have been issued.

1001.   Further, the Rating Agency Defendants played a role in structuring the PLMBS.

1002.   As detailed above, Defendants' conduct was immoral, unethical, oppressive, and unscrupulous, and fell within the penumbra of common law, statutory, or other established concepts of unfairness.

1003.   Both the Bank and the Rating Agency Defendants were engaged in trade or commerce at the time of the misrepresentations and omissions described above, and the interaction between the parties was commercial in nature, in that the Rating Agency Defendants were rating securities that were being offered for sale, and were assigning those ratings for pay.

1004.   The actions and transactions that constitute the Rating Agency Defendants' deceptive acts occurred primarily and substantially within Massachusetts when the Offering Documents containing these deceptive statements were transmitted to the Bank in Massachusetts. The Rating Agency Defendants' misrepresentations and omissions reached the Bank, and the Bank was deceived, in Massachusetts.  The Bank received and acted upon the deceptive

communications in Massachusetts.  Additionally, the Bank learned of and suffered losses in

Massachusetts.  These deceptive practices negatively impacted the ability of the Bank to perform

its mission in Massachusetts, including with respect to the Bank's approximately 240 member

institutions located in Massachusetts.

1005.   The Rating Agency Defendants' unfair and deceptive acts and practices

complained of here were willful or knowing, in that those acts and practices constituted

fraudulent representations made in knowing disregard of the truth.

1006.   The Bank did not and could not reasonably have known of the Rating Agency

Defendants' material misstatements and omissions alleged herein earlier than four years before

the date of filing this action.  *See supra* § VI.H.

1007.   As a result of the Rating Agency Defendants' deceptive acts, the Bank suffered a

loss of money or property in an amount to be proved at trial.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation by Moody's and S&P

1008.   The Bank incorporates by reference and realleges each and every allegation in this

Complaint as if set forth herein.

1009.   The Bank alleges negligent misrepresentation against Moody's and S&P with

respect to the following PLMBS, which were issued in private-placement deals:

| Certificate | Rating by Moody's | Rating by S&P | Date of Communication of the Rating |
|---|---|---|---|
| CCMFC 2006-2A A1 | Aaa | AAA | 5/19/06 |
| CCMFC 2007-1A A1 | Aaa | AAA | 3/13/07 |
| CCMFC 2007-2A A1 | Aaa | AAA | 5/25/07 |
| MARM 2007-R5 A1 | Aaa | AAA | 9/21/07 |

1010.   The ratings that Moody's and S&P assigned these PLMBS were false and misleading for the reasons given above in Sections V.F and VI.D.

1011.   These ratings were supplied for the guidance of investors, including the Bank.

1012.   Moody's and S&P assigned these ratings in the course of their business as raters of equity and debt issuances.  Moody's and S&P had a pecuniary interest in the ratings.

1013.   Moody's and S&P supplied this information with the intent to benefit, guide or otherwise influence the decisions of a limited number of institutional investors, including the Bank—or alternatively supplied the information knowing that the immediate recipients thereof intended to supply it to benefit, guide, or otherwise influence the decisions of a limited number of institutional investors, including the Bank—to purchase the Certificates at issue in this Seventh Cause of Action.

1014.   The Bank relied on the ratings in making its decision to purchase the Certificates, which reliance was reasonable and justifiable.  *See supra* § V.F.6.

1015.   Moody's and S&P held special expertise in rating PLMBS and had a duty to conduct a reasonable investigation of the truthfulness of their ratings—and of their representations regarding the ratings.

1016.   Thus, Moody's and S&P should have known that the information they supplied regarding their ratings of the Certificates was false when they supplied it.  However, Moody's and S&P failed to exercise reasonable care or competence in investigating the truthfulness of their ratings and of their representations regarding the ratings, and were negligent in failing to discover the falsity of those representations.  Moody's and S&P failed to exercise reasonable care in rating the PLMBS at issue in this Seventh Cause of Action.

1017.   The credit ratings were solicited and paid for by Sponsors, Depositors and/or Underwriters of the PLMBS at issue in this Seventh Cause of Action.

1018.   The ratings were not offered for free or as part of a report for a general-interest publication.

1019.   The ratings of the PLMBS at issue in this Seventh Cause of Action were not a matter of public interest or concern.

1020.   The Bank did not and could not reasonably have known of Moody's or S&P's material misstatements alleged herein earlier than three years before the date of filing this action. *See supra* § VI.H.

1021.   As a result of Moody's and S&P's misrepresentations alleged herein, the Bank has suffered damages in an amount to be proven at trial, plus interest, costs, and attorneys' fees.

## VIII.   PRAYER FOR RELIEF

1022.   WHEREFORE, the Bank prays for relief as follows:

1023.   On the first cause of action, for primary violations of the Massachusetts Uniform Securities Act, relief in the form of damages and/or statutory recovery upon tender, plus interest, attorneys' fees, and costs;

1024.   On the second cause of action, for joint and several liability under the Massachusetts Uniform Securities Act, relief in the form of damages and/or statutory recovery upon tender, plus interest, attorneys' fees, and costs; and

1025.   On the third cause of action, damages in an amount to be determined at trial;

1026.   On the fourth cause of action, damages in an amount to be determined at trial, plus attorneys' fees;

1027.   On the fifth cause of action, damages in an amount to be determined at trial;

1028.   On the sixth cause of action, three times the amount of damages determined at trial, plus attorneys' fees;

1029.   On the seventh cause of action, damages in an amount to be determined at trial;

1030.   Reasonable attorneys' fees and expenses or costs of suit, including expert witness fees; and

1031.   Such other and further relief as permitted by law or equity or as the Court may deem just.

## IX.   DEMAND FOR JURY TRIAL

1032.   The Bank demands a jury trial as to all issues and claims so triable.

Dated:  June 29, 2012

By /s/ Lynn Lincoln Sarko
Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Derek W. Loeser
dloeser@kellerrohrback.com
Amy Williams-Derry
awilliams-derry@kellerrohrback.com
Elizabeth A. Leland
bleland@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900, Fax (206) 623-3384

Thomas G. Shapiro, BBO No. 454680
tshapiro@shulaw.com
Adam M. Stewart, BBO No. 661090
astewart@shulaw.com
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA  02109
(617) 439-3939, Fax:  (617) 439-0134

KELLER ROHRBACK P.L.C.
Gary A. Gotto
ggotto@kellerrohrback.com
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012
(602) 248-0088, Fax (602) 248-2822

***Attorneys for Plaintiff Federal Home Loan Bank
of Boston***

## GLOSSARY

| | |
|---|---|
| **Adjustable-rate mortgage:** | See "ARM." |
| **ARM:** | *Adjustable-rate mortgage*.  Also called a "variable rate mortgage." A mortgage loan whose interest rate changes periodically over time, rather than being fixed. |
| **AUS:** | *Automated Underwriting System*.  A computer program that takes the data an employee enters about a prospective borrower, or data the program retrieves itself, and processes that data through an algorithm to determine whether the borrower qualifies for a credit product. |
| **Automated Underwriting System:** | See "AUS." |
| **AVM:** | *Automated valuation model*.  An industry-standard valuation model that reliably calculates the value of real property. |
| **Bank:** | The Federal Home Loan Bank of Boston. |
| **Board of Governors of the Federal Reserve System:** | See "FRB." |
| **CDO:** | *Collateralized debt obligation*.  A structured, asset-backed security often composed of portions of mortgage-backed securities. |
| **Certificates:** | Synonymous with "PLMBS" (see below). |
| **CLTV:** | *Combined loan-to-value ratio*.  The ratio of all mortgage loans taken out on a real property to the total appraised value of that property. |
| **Collateralized debt obligation:** | See "CDO." |
| **Combined loan-to-value ratio:** | See "CLTV." |
| **Corporate seller:** | A corporate entity that sold a PLMBS directly to the Bank but that was not an Underwriter for that PLMBS. |

| | |
|---|---|
| **Depositor (or Depositor/Issuer):** | The entity that acquires mortgage loans and securitizes a pool of such loans.  Interests in the pool are then issued by the Depositor through a trust in the form of securities. |
| **DTI:** | *Debt-to-income*.  The ratio of a borrower's debt to his or her income—generally calculated as the ratio of a borrower's monthly debt payments to the borrower's monthly income. |
| **FCIC:** | *Financial Crisis Inquiry Commission*.  A ten-member federal commission that investigated the causes of the financial crisis and issued a report on the crisis on January 27, 2011. |
| **FDIC:** | *Federal Deposit Insurance Corporation*.  An independent federal agency that insures deposits at financial institutions, examines and supervises some of those institutions, and shuts down failing institutions. |
| **Federal Deposit Insurance Corporation:** | See "FDIC." |
| **FGIC:** | *Financial Guaranty Insurance Company*, a private insurer of mortgage-backed securities. |
| **FICO:** | A score developed by the Fair Isaac Corporation to assess consumer credit risk; the most widely used credit score in the United States. |
| **FINRA:** | *Financial Institutions Regulatory Authority*.  A non-governmental, self-regulatory organization that performs financial regulation of member brokerage firms and exchange markets. |
| **Flow of Funds:** | Synonymous with "waterfall" (see below). |
| **FRB:** | *Board of Governors of the Federal Reserve System*. |
| **GSE:** | *Government-sponsored enterprise*.  An entity such as the Federal National Mortgage Association (Fannie Mae) or the Federal Home Loan Mortgage Corporation (Freddie Mac). |
| **LTV:** | *Loan-to-value*.  The ratio of the amount of a mortgage loan to the total appraised value of real property. |
| **Moody's:** | Collectively, Moody's Investors Service, Inc. and Moody's Corporation. |

**Nationally Recognized**
**Statistical Rating**
**Organization:**          See "NRSRO."

**NINA:**                 *No income, no assets loan*.  A loan whose underwriting requires no proof of income or assets.

**NINJA:**                *No income, no job or assets loan*.  A loan whose underwriting requires no proof of income, employment or assets.

**No doc:**               A "no document" loan.  The borrower is not required to submit proof of income, employment, and assets.

**NRSRO:**                *Nationally Recognized Statistical Rating Organization*.  A special status that the SEC created in 1975 to distinguish the most credible and reliable rating agencies.  The status of NRSRO has since been clarified and codified by the Credit Rating Agency Reform Act of 2006.

**Office of the**
**Comptroller of the**
**Currency:**             See "OCC."

**Office of Thrift**
**Supervision:**          See "OTS."

**OCC:**                  *Office of the Comptroller of the Currency*.  Independent bureau within the U.S. Department of Treasury that charters, regulates and supervises all national banks and certain branches and agencies of foreign banks.

**Offering Documents:**   Registration statements, prospectuses, free writing prospectuses, supplemental prospectuses, private placement memoranda and other written offering materials—the documents by means of which the securities at issue in this case were sold to the Bank.

**Option ARM:**           An *adjustable-rate mortgages* (q.v.) that typically permits borrowers to select from among a wide range of monthly payment choices.  Because the borrower is allowed to make a monthly payment that is less than the accrued interest, the risk associated with Option ARMs is "negative amortization," in which the unpaid interest is added to the outstanding principal, thus increasing the overall loan balance.

**OTS:**                  *Office of Thrift Supervision*.  Independent bureau within the U.S. Department of Treasury that regulates all federally chartered and many state-chartered savings and loans ("thrifts") and their holding companies.

**Overcollateralization:**    The practice of ensuring that the aggregate principal balance of the mortgage pool that secures the PLMBS exceeds the aggregate principal balances of the PLMBS secured thereby.

**PLMBS:**    *Private Label Mortgage-Backed Securities.*  Securities that are issued by private entities (rather than government-sponsored enterprises), and that entitle the security holder to income payments from pools of mortgage loans.  As used in this Complaint, "PLMBS" usually refers to the specific PLMBS at issue in this action—those purchased by the Bank.

**Rating Agency Defendants:**    The three credit rating agencies that rated the PLMBS at issue in this case.

**Reconsideration of Value:**    A contractual arrangement that Washington Mutual Bank had with an appraisal management firm, eAppraiseIT.  Under the arrangement, Washington Mutual could challenge an independent appraiser's conclusions by requesting a *Reconsideration of Value*—a second opinion from eAppraiseIT—if Washington Mutual disagreed with the appraisal.

**S&P:**    Collectively, The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC.

**Securities Defendants:**    The Sponsors, Depositors/Issuers, and Underwriters who packaged, marketed, offered and/or sold the PLMBS to the Bank.

**Sponsor (or Seller):**    An entity that originates mortgage loans itself or purchases loans from mortgage originators and then sells its loans to the Depositor.

**Tranche:**    The securities at issue in this case are divided into segments, or "tranches," with laddered payment priority and varying return potential.

**Underwriter:**    An entity that purchases the PLMBS from the issuing trust and resells them to investors such as the Bank.

**USPAP:**    *Uniform Standards of Professional Appraisal Practice.*  A series of ethical rules promulgated by the Appraisal Standards Board designed to ensure the integrity of the appraisal process.

**Waterfall:**    Income from a PLMBS's underlying mortgage pool is allocated first to the most senior tranche, and then to the second-most senior, and so on.  This hierarchy in the division of cash flows is called a *waterfall*.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing.


/s/ Lynn Lincoln Sarko                    

Dated:  June 29, 2012                    Lynn Lincoln Sarko