# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FEDERAL HOME LOAN BANK OF
BOSTON,

              Plaintiff,

    v.

ALLY FINANCIAL INC. et al.,

              Defendants.

Civil Action No.11-10952-GAO

## PLAINTIFF'S OPPOSITION TO THE CREDIT RATING DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  BACKGROUND ................................................................................................... 2

III.  PLEADING STANDARD..................................................................................... 6

IV.  ARGUMENT ........................................................................................................ 8

A.  Massachusetts Law Applies to the Bank's Claims. ............................... 8

B.  The Bank Has Sufficiently Alleged that the Rating Agencies
Committed Fraud. ................................................................................ 11

1.  The credit ratings were actionable misrepresentations. .......... 11

a.  The ratings falsely implied they were based in fact. ................... 12

b.  The Rating Agencies possessed superior
knowledge. .................................................................. 15

c.  The Rating Agencies did not believe their ratings of
the Certificates. .......................................................... 16

2.  The Bank has pleaded sufficient facts demonstrating that
the Rating Agencies knew their ratings were false. ................. 17

a.  The Bank does not need to plead facts unique to
each Certificate. ......................................................... 21

b.  The Bank has adequately pleaded that the Rating
Agencies knew that mortgage originators
abandoned underwriting guidelines. ........................... 23

c.  The Federal Rules do not require redundant
pleading. ..................................................................... 25

d.  The Bank has not pleaded fraud by hindsight............. 26

e.  The Bank has sufficiently pleaded these claims with
respect to Fitch. ......................................................... 28

3.  The Rating Agencies provided their ratings for the purpose
of inducing the Bank and other investors to purchase the
Certificates. ............................................................................ 31

4.  The Bank's reliance on the credit ratings was justifiable. ....... 34

5. Although not required, the Bank has sufficiently pleaded loss causation. ..................................................... 37

C. The Bank has Stated a Claim of Negligent Misrepresentation. ......................... 40

 1. S&P and Moody's owed the Bank a duty of care. ................................. 41

 2. The Bank's negligent misrepresentation claims are not preempted. .............................................................. 43

 3. The First Amendment does not bar the Bank's negligent misrepresentation claims ....................................... 47

D. The Bank Has Stated a Claim Under Chapter 93A ........................... 50

 1. Defendants fail to establish their affirmative defense as a matter of law. ....................................................... 50

 2. The Bank and the Rating Agencies shared a commercial relationship. .................................................... 52

 3. A chapter 93A claim is independent of common-law claims. ............................................................. 53

V. THIS COURT HAS PERSONAL JURISDICTION OVER EACH RATING AGENCY ............................................................ 54

A. This Court Has General Personal Jurisdiction Over Each Rating Agency. ............................................................ 55

 1. Legal standard. ............................................................ 55

 2. *Goodyear* does not modify *International Shoe's* general jurisdiction test with respect to the Bank's theory of jurisdiction. ............................................................ 56

 3. Each Rating Agency has continuous and systematic contacts with Massachusetts, and satisfies the long-arm statute. ............................................................... 58

  a. Moody's ............................................................ 60

  b. S&P ............................................................... 61

  c. Fitch ............................................................. 62

  d. These systematic contacts establish general jurisdiction. ................................................. 63

4.     This Court's exercise of jurisdiction is reasonable and comports with due process....................................................................... 63

   a.     Burden........................................................................................... 64

   b.     Massachusetts' Interest ................................................................. 64

   c.     Plaintiff's Interest......................................................................... 64

   d.     The Judicial System's Interest ..................................................... 65

   e.     Substantive Social Policies .......................................................... 65

B.    Alternatively, the Court Should Allow the Bank to Conduct Jurisdictional Discovery........................................................................................ 66

VI.    CONCLUSION............................................................................................................. 69

# TABLE OF AUTHORITIES

## Cases

*Abu Dhabi Commercial Bank v. Credit Suisse*,
   No. 115417/2010 (N.Y. Sup. Ct. Aug. 4, 2011) ............................................................. 19, 33

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) ........................................................................... passim

*Altria Grp., Inc. v. Good*,
   555 U.S 70 (2008) ................................................................................................................ 47

*Amcel Corp. v. Int'l Executive Sales, Inc.*,
   170 F.3d 32 (1st Cir. 1999) ................................................................................................. 50

*American Home Assurance Co. v. Sport Maska, Inc.*,
   808 F. Supp. 67 (D. Mass. 1992) ........................................................................................ 59

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
   785 F. Supp. 2d 799 (N.D. Cal. 2011) ......................................................................... passim

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................................... 6, 7

*Bank of America, N.A. v. Deloitte & Touche, LLP*,
   21 Mass. L. Rptr. 677, 2006 WL 3725566 (Mass. Super. Ct. 2006) ................................... 10

*Barrett v. Lombardi*,
   239 F.3d 23 (1st Cir. 2001) ................................................................................................. 67

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005) ............................................................................................................ 45

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................................. 6

*Boit v. Gar-Tec Prods., Inc.*,
   967 F.2d 671 (1st Cir. 1992) ............................................................................................... 55

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984) ............................................................................................................ 48

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) ............................................................................................................ 44

*BT Triple Crown Merger Co. v. Citigroup Global Markets Inc.*,
   No. 600899/08, 2008 WL 1970900 (N.Y. Sup. Ct. 2008) ................................................... 52

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)................................................................................................ 64

*Bushkin Assocs., Inc. v. Raytheon Co.*,
  473 N.E.2d 662 (Mass. 1985) ......................................................................... 9, 11

*Capital Ventures Int'l v. UBS Sec. LLC*,
  No. 11-11937, 2012 WL 4469101 (D. Mass. Sept. 28, 2012) ............................ 25

*Chase-Walton Elastomers Inc. v. Bennett*,
  No. 02-1304, 2002 WL 31235508 (Mass. Super. Ct. Oct. 1, 2002) .................... 59

*Cheng v. Sunoco, Inc.*,
  No. 09-40041, 2010 WL 5437235 (D. Mass. Dec. 22, 2010).............................. 33

*Church of Scientology Int'l v. Behar*,
  238 F.3d 168 (2d Cir. 2001)............................................................................... 48

*Clinton Hosp. Ass'n v. Corson Group, Inc.*,
  907 F.2d 1260 (1st Cir. 1990) ....................................................................... 51, 52

*Cold Spring Harbor Laboratory v. Ropes & Gray LLP*,
  840 F. Supp. 2d 473 (D. Mass. 2012) ................................................................ 10

*Computer Sys. Eng'g, Inc. v. Qantel Corp.*,
  740 F.2d 59 (1st Cir. 1984)................................................................................... 9

*Compuware Corp. v. Moody's Investors Services, Inc.*,
  499 F.3d 520 (6th Cir. 2007) ........................................................................ 14, 49

*Connecticut v. Moody's Corp.*,
  No. X04HHDCV10, 2012 WL 2149408 (Conn. Super. Ct. May 10, 2012).................. 45, 47

*Crisp Human Capital Ltd. v. Authoria Inc.*,
  613 F. Supp. 2d 136 (D. Mass. 2009) ............................................................. 7, 11

*Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*,
  918 N.E.2d 36 (Mass. 2009) ......................................................................... 12, 40

*Cummings v. HPG Int'l, Inc.*,
  244 F.3d 16 (1st Cir. 2001)................................................................................. 12

*David v. Belmont*,
  197 N.E. 83 (Mass. 1935) ................................................................................... 37

*Davidson v. Cao*,
  211 F. Supp. 2d 264 (D. Mass. 2002) ................................................................... 8

v

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
    290 F.3d 42 (1st Cir. 2002)...................................................................................... 55

*D'Jamoos v. Atlas Aircraft Ctr., Inc.*,
    No. 08-108, 2008 WL 5083798 (D.N.H. 2008).................................................... 67

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985)................................................................................................ 48

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................ 39

*Eaves v. Designs for Finance, Inc.*,
    785 F. Supp. 2d 229 (S.D.N.Y. 2011)................................................................... 40

*Ezenia! Inc. v. Datacraft Mex., S.A.*,
    Nos. 033390, 86763, 2004 WL 3091658 (Mass. Super. Ct. 2004)...................... 52

*Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan Sec. LLC*,
    No. 09-016892, 2010 WL 7928643 (Pa. Com. Pl. Nov. 29, 2010) ...................... 16

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
    --- F. Supp. 2d ---, No. 11-6188, 2012 WL 5395646 (S.D.N.Y. Nov. 5, 2012) ................. 27

*First Marblehead Corp. v. House*,
    473 F.3d 1 (1st Cir. 2006)....................................................................................... 34

*Fishman Transducers v. Paul*,
    684 F.3d 187 (1st Cir. 2012)................................................................................... 52

*Fiske v. Sandvik Mining*,
    540 F. Supp. 2d 250 (D. Mass. 2008) ............................................................ 59, 60

*Gade v. Nat'l Solid Waste Mgmt. Ass'n*,
    505 U.S. 88 (1992).................................................................................................. 47

*Gavett v. Roto-Rooter Services, Co.*,
    No. 01-10385, 2001 WL 1688896  (D. Mass. Nov. 27, 2001) ............................. 42

*Gayle v. City of New York*,
    703 N.E.2d 758 (N.Y. 1998)................................................................................... 38

*Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*,
    825 F. Supp. 2d 1082 (D.N.M. 2011) .................................................. 30, 31, 47, 49

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)................................................................................................ 48

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   131 S. Ct. 2846 (2011) ............................................................................ 56, 57, 58, 63

*Gopen v. Am. Supply Co., Inc.*,
   407 N.E.2d 1255 (Mass. App. Ct. 1980) ........................................................ 12, 16

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999) .................................................................. 8, 20, 27

*Greebel*,
   182 F.R.D. ................................................................................................. 26

*Greenleaf Arms Realty Trust I, LLC v. New Boston Fund, Inc.*,
   962 N.E.2d 221 (Mass. App. Ct. 2012) ........................................................ 11, 31

*Group of Former Emps. of Sprague Caribe v. Am. Annuity Grp., Inc.*,
   388 F.Supp.2d 3 (D.P.R. 2005) .......................................................................... 66

*Hannon v. Beard*,
   524 F.3d 275 (1st Cir. 2008) ............................................................................. 55

*Harlow v. Children's Hosp.*,
   432 F.3d 50 (1st Cir. 2005) ............................................................................... 60

*Harrelson v. Seung Heun Lee*,
   798 F. Supp. 2d 310 (D. Mass. 2011) .................................................... 56, 63, 65

*Heller v. Silverbranch Constr. Corp.*,
   382 N.E.2d 1065 (Mass. 1978) .......................................................................... 53

*Hill v. Gozani*,
   638 F.3d 40 (1st Cir. 2011) ................................................................................. 7

*Hinchey v. NYNEX Corp.*,
   979 F. Supp. 40 (D. Mass. 1997) ....................................................................... 12

*HSH Nordbank AG v. UBS AG*,
   95 A.D.3d 185 (N.Y. App. Div. 2012) ............................................................... 37

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988) ............................................................................................. 48

*Illinois v. McGraw-Hill Co.*,
   No. 12-02535, 2012 WL 5440768 (Ill. Cir. Ct. Nov. 7, 2012) ................. 44, 46, 47

*Imprimis Investors, LLC v. KPMG Peat Marwick LLP*,
   868 N.E.2d 143 (Mass. Ct. App. 2007) ............................................................. 53

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ........................................................................... 8, 18

*In re Credit Suisse First Boston Corp.*,
    431 F.3d 36 (1st Cir. 2005) ................................................................................ 17

*In re Credit Suisse First Boston Corp.*,
    No. 02-12056, 2005 WL 852455 (D. Mass. Mar. 31, 2005) ......................... 17, 22

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    511 F. Supp. 2d 742 (S.D. Tex. 2005) ................................................................ 49

*In re Fitch, Inc.*,
    330 F.3d 104 (2d Cir. 2003) ............................................................................... 15

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011) ............................................................................... 14

*In re Lehman Bros. Sec. & ERISA Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010) ................................................................ 26

*In re Merrill Lynch & Co., Inc.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003) ........................................................... 19, 22

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    No. 09-2030, 2011 WL 536437 (S.D.N.Y. Feb. 9, 2011) ............................... 28, 42

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009), *opinion corrected on denial of
    reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) ..................................... 20

*In re Nat'l Century Financial Enterprises, Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) ............................................................... 52

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
    580 F. Supp. 2d 630 (S.D. Ohio 2008) ..................................................... 14, 47, 49

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    307 F. Supp. 2d 145 (D. Maine 2004) ................................................................ 66

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    582 F.3d 156 (1st Cir. 2009) ............................................................................... 53

*In re Pharm. Indus. Average Wholesale Price Litigation*,
    230 F.R.D 61 (D. Mass. 2005) ........................................................................... 10

*In re Stratus Computer, Inc. Sec. Litig.*,
    No. 89-2075, 1992 WL 73555 (D. Mass. Mar. 27, 1992) ................................... 26

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ................................................................................................ 57, 58

*Int'l Totalizing Sys., Inc. v. PepsiCo, Inc.*,
  560 N.E.2d 749 (Mass. App. Ct. 1990) .......................................................................... 33

*Isham v. Perini Corp.*,
  665 F. Supp. 2d 28 (D. Mass. 2009) .............................................................................. 18

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*,
  175 F.3d 848 (10th Cir. 1999) ................................................................................ 14, 49

*Kattar v. Demoulas*,
  739 N.E.2d 246 ............................................................................................................ 53

*Keds Corp. v. Renee Int'l Trading Corp.*,
  888 F.2d 215 (1st Cir. 1989) ......................................................................................... 59

*Kennedy v. Josephthal & Co.*,
  814 F.2d 798 (1st Cir. 1987) ......................................................................................... 37

*King Cnty., Wash. v. IKB Deutsche Industriebank AG* ("*IKB I*"),
  708 F. Supp. 2d 334 (S.D.N.Y. 2010) ...................................................................... 38, 39

*King Cnty., Wash. v. IKB Deutsche Industriebank AG* ("*IKB II*"),
  863 F. Supp. 2d 288 (S.D.N.Y. 2012) .................................................................... passim

*Kuwaiti Danish Computer Co. v. Digital Equip., Co.*,
  781 N.E.2d 787 (Mass. 2003) ........................................................................................ 51

*Landgraf v. USI Film Products*,
  511 U.S. 244 (1994) ...................................................................................................... 44

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*,
  951 F. Supp. 1071 (S.D.N.Y. 1996) ............................................................................... 40

*Laub v. Faessel*
  745 N.Y.S.2d 534 (N.Y. App. Div. 2002) ....................................................................... 39

*Lawson v. Affirmative Equities Co.*,
  341 F. Supp. 2d 51 (D. Mass. 2004) .............................................................................. 12

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................................... 38, 39

*Loan v. FDIC*
  717 F. Supp. 964 (D. Mass. 1989) ................................................................................. 26

*Marram v. Kobrick Offshore Fund, Ltd.*,
    809 N.E.2d 1017 (Mass. 2004) ...................................................................... 12

*Mass. Employers Ins. Exch. v. Propac-Mass, Inc.*,
    648 N.E.2d 435 (Mass. 1995) ........................................................................ 54

*Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
    142 F.3d 26 (1st Cir. 1998) ............................................................................ 55

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011) .................................................................................. 11

*McEneaney v. Chestnut Hill Realty Corp.*,
    650 N.E.2d 93 (Mass. App. Ct. 1995) ................................................. 12, 13, 14

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................................ 45, 46

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ......................................................................................... 47

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008) ................................................................... 8, 22, 28

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ...................................................................................... 45

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008) ............................................................. 39

*New England College v. Drew University*,
    No. 08-424, 2009 WL 395753 (D.N.H. Feb. 17, 2009) ....................................... 66

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................................... 48

*Noonan v. Winston Co.*,
    135 F.3d 85 (1st Cir. 1998) ............................................................................ 59

*Nowak v. Tak How Invs., Ltd.*,
    94 F.3d 708 (1st Cir. 1996) ............................................................................ 64

*NPS, LLC v. Ambac Assurance Corp.*,
    706 F. Supp. 2d 162 (D. Mass. 2010) .............................................................. 42

*Nycal Corp. v. KPMG Peat Marwick LLP.*,
    688 N.E.2d 1368 (Mass. 1998) ............................................................. 41, 42, 43

*Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Services LLC*,
   No. 11-4203, 2012 WL 5990337 (6th Cir. Dec. 3, 2012)............................................. 22, 23

*Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Services, LLC*,
   813 F. Supp. 2d 871 (S.D. Ohio 2011) ................................................................. 21, 26, 42

*Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*,
   196 F.3d 284 (1st Cir. 1999)............................................................................................ 56

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011).................................................................................... passim

*Pritzker v. Yari*,
   42 F.3d 53 (1st Cir. 1994)................................................................................................ 65

*Quinn v. McGraw-Hill Companies, Inc.*,
   168 F.3d 331 (7th Cir. 1999) ..................................................................................... 36, 37

*Reisman v. KPMG Peat Marwick LLP*,
   787 N.E.2d 1060 (Mass. App. Ct. 2003) ................................................................. passim

*Renwood Winery, Inc. v. Landmark Label, Inc.*,
   No. 04-1402, 2005 WL 2757537 (Mass. Ct. App. Oct. 25, 2005)..................................... 52

*RGJ Assocs., Inc. v. Stainsafe, Inc.*,
   338 F. Supp. 2d 215 (D. Mass. 2004) ............................................................................... 51

*Rice v. Charles Schwab*,
   No. 10-00398, 2010 WL 5156654 (C.D. Cal. Oct. 22, 2010)........................................... 22

*Rodi v. S. New England Sch. of Law*,
   389 F.3d 5 (1st Cir. 2004)........................................................................................... 12, 34

*Rodi v. S. New England School of Law*,
   532 F.3d 11 (1st Cir. 2008)............................................................................................... 35

*Rosenthal v. MPC Computers, LLC*,
   493 F. Supp. 2d 182 (D. Mass. 2007) ......................................................................... 59, 63

*Sandstrom v. ChemLawn Corp.*,
   904 F.2d 83 (1st Cir. 1990)............................................................................................... 60

*Saturn Mgmt. LLC v. GEM-Atreus Advisors, LLC*,
   754 F. Supp. 2d 272 (D. Mass. 2010) ......................................................................... 64, 65

*Sawtelle v. Farrell*,
   70 F.3d 1381 (1st Cir. 1995)............................................................................................. 55

*Serabian v. Amoskeag Bank Shares, Inc.*,
  24 F.3d 357 (1st Cir. 1994) ................................................................. 20

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996) .................................................................. 7

*Sherburn v. Meade*,
  21 N.E.2d 946 (Mass. 1939) ................................................................. 50

*SNCB Corporate Fin. Ltd. v. Schuster*,
  877 F. Supp. 820 (S.D.N.Y.1994) ......................................................... 12

*Snyder v. ADS Aviation Maint.*,
  No. 9700968, 2000 WL 145110 (Mass. Super. Ct. Jan. 10, 2000) ...................... 59

*Snyder v. Phelps*,
  131 S. Ct. 1207 (2011) ........................................................................ 48

*Sonoran Scanners, Inc. v. Perkinelmer, Inc.*,
  590 F. Supp. 2d 196 (D. Mass. 2008) .................................................... 53

*Spencer v. Doyle*,
  733 N.E.2d 1082 (Mass. Ct. App. 2000) ............................................... 52

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002) ............................................................................. 46

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ........................................................................... 48

*Starr v. Fordham*,
  648 N.E.2d 1261 (Mass. 1995) ............................................................ 12

*Steinhilber v. Alphonse*,
  501 N.E.2d 550 (N.Y. 1986) ............................................................... 12

*Stolzoff v. Waste Sys. Int'l, Inc.*,
  792 N.E.2d 1031 (Mass. App. Ct. 2003 ....................................... 12, 15, 16, 50

*Stone/Cong. v. Town of Andover*,
  No. 95-4510, 1997 WL 11737 (Mass. Dist. Ct. Jan. 3, 1997) .......................... 41

*Stoneridge Control Devices, Inc. v. Teleflex, Inc.*,
  No. 021554, 2004 WL 389105 (Mass. Super. Ct. Feb. 17, 2004) ...................... 52

*Suna v. Bailey Corp.*,
  107 F.3d 64 (1st Cir. 1997) .................................................................... 8

*Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*,
   116 F.3d 962 (1st Cir. 1997) ................................................................................ 66, 67

*Technical Support Servs., Inc. v. Int'l Bus. Machines Corp.*,
   856 N.Y.S.2d 26 (Table), 2007 WL 4500382 (N.Y. Sup. Ct. 2007) .................................... 34

*Telford v. Iron World Mfg., LLC*,
   680 F. Supp. 2d 337 (D. Mass. 2010) ................................................................................ 10

*Ticketmaster-New York, Inc. v. Alioto*,
   26 F.3d 201 (1st Cir. 1994) ................................................................................ 55, 65

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*,
   524 F.3d 315 (1st Cir. 2008) ................................................................................ 50

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   692 F. Supp. 2d 387 (S.D.N.Y. 2010) ................................................................................ 28

*U.S. ex rel. Gagne v. City of Worcester*,
   565 F.3d 40 (1st Cir. 2009) ................................................................................ 7, 24

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
   360 F.3d 220 (1st Cir. 2004) ................................................................................ 8

*U.S. v. Swiss Am. Bank, Ltd.*,
   274 F.3d 610 (1st Cir. 2001) ................................................................................ 56, 66, 67

*Ultramares Corp. v. Touche*,
   174 N.E. 441 (N.Y. 1931) ................................................................................ 43

*Uncle Henry's Inc v. Plaut Consulting Co.*,
   399 F.3d 33 (1st Cir. 2005) ................................................................................ 51

*United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.*,
   960 F.2d 1080 (1st Cir. 1992) ................................................................................ 56

*Veilleux v. Nat'l Broad. Co.*,
   206 F.3d 92 (1st Cir. 2000) ................................................................................ 48

*White v. Guarente*,
   372 N.E.2d 315 (N.Y. 1977) ................................................................................ 43

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ................................................................................ 46

## Statutes

15 U.S.C. § 45 ...................................................................................................................... 45

15 U.S.C. § 78o ............................................................................................................... 45, 46

15 U.S.C. § 78o-7 ........................................................................................................... 44, 45

15 U.S.C. § 78u-4 .................................................................................................................. 8

M.G.L. c. 223A, § 3 ............................................................................................. 55, 56, 59, 63

M.G.L. c. 93A, § 11 ............................................................................................................ 50

## Rules

Fed. R. Civ. P. 8 ..................................................................................................... 7, 8, 17, 22

Fed. R. Civ. P. 8(a) ................................................................................................... 7, 25, 39

Fed. R. Civ. P. 9(b) ............................................................................... 6, 7, 8, 11, 22, 25, 30, 32, 34, 39

## Regulations

17 C.F.R. § 230.144A .......................................................................................................... 42

## Other Authorities

5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed.
    2004) ............................................................................................................................ 7

Restatement (Second) of Conflict of Laws § 148 (1971) ..................................................... 9, 10

Restatement (Second) of Torts § 531 (1977) ...................................................................... 32, 33

Restatement (Second) of Torts § 552 (1977) ...................................................................... 41, 42

## CITATION FORMS FOR RELEVANT PAPERS

| Paper | Citation Form Used in This Opposition |
|---|---|
| Am. Compl. for Rescission and Damages (the "Complaint") | Compl. |
| Plaintiff's Opposition to Defendants' Joint Motion to Dismiss the Amended Complaint ("Joint Opposition") | J. Opp. |
| The [Credit] Rating Agencies' Joint Memorandum of Law in Support of Their Motion to Dismiss Complaint for Failure to State a Claim | CR Mem. |
| Defendants Moody's Corporation and Moody's Investors Service, Inc.'s Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint for Lack of Personal Jurisdiction | Moody's Mem. |
| The Mcgraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC's Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint for Lack of Personal Jurisdiction | S&P Mem. |
| Defendant Fitch, Inc.'s Memorandum of Law in Further Support of the Rating Agencies' Motion to Dismiss the Amended Complaint, and in Support of Fitch's Motion to Dismiss for Lack of Personal Jurisdiction | Fitch Mem. |

# I.    INTRODUCTION

By policy and regulatory guidance, the Federal Home Loan Bank of Boston (the "Bank")
could purchase only triple-A-rated PLMBS.[1]  Here, each of the PLMBS purchased by the Bank
(the "Certificates") was rated triple-A by S&P,[2] Moody's,[3] and/or Fitch (collectively, the "Rating
Agencies" or "Defendants").  These triple-A ratings, the highest possible long-term ratings,
purportedly took into consideration the quality of mortgage collateral and the likelihood of
payment by the borrowers, and signified an "extremely strong capacity to meet financial
commitments."  This was not the case.  Unbeknownst to the Bank, these ratings were not based
on accurate factual data and in fact were not believed to be accurate by the Rating Agencies that
issued them.  The Rating Agencies knew these triple-A ratings were the result of flawed models,
abandoned underwriting guidelines, and the Rating Agencies' obsession with market share.  In
issuing ratings known to be false, the Rating Agencies committed fraud.

Defendants ignore the ample, particular facts pleaded in support of these allegations, and
erroneously equate the Complaint with insufficient pleadings dismissed in other litigation.
Contrary to the Rating Agencies' distortion of the Complaint, the Bank's "core allegation" is not
merely that the ratings were "inaccurate because they were based on flawed models" and data,
nor are the Bank's claims premised on the fact that the ratings "*turned out*" to be false.  CR
Mem. 2.  Rather, the Bank has alleged *with detailed factual support* that the Rating Agencies
knew their ratings were flawed *when they issued the ratings*.  This distinguishes the Complaint
from the actions on which Defendants base their motion to dismiss.

Defendants also make repeated, misleading references to the Bank's sophistication in

---

[1] These securities are referred to as "private label mortgage-backed securities" ("PLMBS")
because they were issued by private entities instead of U.S. government-sponsored enterprises.
[2] The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services, LLC.
[3] Moody's Corporation and Moody's Investors Service, Inc.

unrelated aspects of the housing market while ignoring their own superior knowledge and access to information—as raters of credit risk—regarding the *specific* mortgages and Certificates at issue.

Defendants' legal arguments are equally meritless.  For example, Defendants: (i) misstate the requirements for pleading knowledge and scienter; (ii) seek to apply New York law because it requires a plaintiff to clear additional hurdles; (iii) emphasize the general rule that opinions are not actionable while paying short shrift to three well-recognized exceptions that apply here; and (iv) characterize the Bank's allegations as pleading "fraud by hindsight" while ignoring ample factual allegations contemporaneous with the issuance of the ratings.  Defendants should not be permitted to distort fact and law to avoid liability for their fraudulent triple-A credit ratings.[4]

Finally, this Court has general jurisdiction over each of the Rating Agencies because each Rating Agency has continuous and systematic businss contacts with Massachusetts and derives significant revenue from its business in the Commonwealth.

## II.   BACKGROUND

The Rating Agencies did not believe their ratings of the Certificates.  Indeed, the Rating Agencies knew, *inter alia* that: (1) their ratings were based on mortgage underwriting guidelines that had been abandoned; (2) the accuracy of their ratings was undermined by ratings shopping and pervasive conflicts of interest; (3) senior managers within the Rating Agencies exerted pressure on ratings analysts to issue ratings they did not believe; and (4) their ratings were based on inaccurate, outdated data and models that management refused to update—despite the availability of better data and models—because they knew it would threaten their market share.

<u>Underwriting Abandonment</u>:  The Rating Agencies knew the originators of the mortgages

---

[4] These claims are not time-barred for the same reasons set forth in the Bank's Joint Opposition.  J. Opp. at 90-95.

underlying the Certificates abandoned underwriting guidelines.  Compl. ¶¶ 740-44.  The bi-partisan Senate Subcommittee on Investigations ("Senate Subcommittee") uncovered internal Rating Agency emails from 2006 that acknowledged "underwriting fraud[, and] appraisal fraud . . . [are] resulting in loans being made that shouldn't be made."  *Id.* ¶ 741.  For example, in an August 2006 email, Richard Koch, a director in S&P's Servicer Evaluation Group, wrote: "I'm not surprised; there has been rampant appraisal and underwriting fraud in the industry for quite some time." *Id.* ¶ 743.  The Senate Subcommittee found that from 2004 to 2007, the Rating Agencies "knew of increased credit risks due to mortgage fraud, lax underwriting standards, and unsustainable housing price appreciation," *id.* ¶ 741, but refused to change their ratings because "[i]t was not in the[ir] short term economic interest . . . to provide accurate credit ratings for high risk RMBS." *Id.* ¶ 768.

Ratings Shopping:  The Rating Agencies knew that if they did not assign triple-A ratings—even to unworthy PLMBS—they would lose business to rival rating agencies that were willing to issue higher ratings.  *Id.* ¶ 746.  Indeed, each Rating Agency was required to submit preliminary ratings of each PLMBS and was hired to rate that deal only if it agreed to provide the highest ratings to the largest number of the deals' tranches.  *Id.* ¶ 748.  This process, known as "ratings shopping," was rampant throughout the industry, *id.* ¶¶ 748-53,[5] and caused the Rating Agencies to issue inflated ratings.  *Id.* ¶¶ 750-53.[6]  According to the Senate Subcommittee:

---

[5]*E.g.*, *id.* ¶ 749 (in a 2006 email, a UBS banker warned an S&P senior manager not to use a more conservative model because it "may force us to do moodyfitch only cdos"); *id.* (Gary Witt, a former Moody's team managing director, stated "they would threaten you all of the time. ... It's like, 'Well, next time, we're just going to go with Fitch and S&P.'").

[6] *See, e.g.*, *id.* ¶ 751 (2004 email conversation among S&P employees describing intense internal pressure after losing "a huge Mizuho RMBS deal to Moody's" and concluding that "we need to address this now in preparation for future deals"); *id.* ¶ 752 (February 2007 email in which a Moody's manager bowed to pressure from investment banker who complained that Moody's rating was lower than its competitors); *id.* ¶ 753 (August 2006 email from an investment banker requesting that S&P grant the same exception to its model as it had granted previously).

> The evidence . . . indicates that the pressure exerted by investment banks frequently impacted the ratings process, enabling the banks to obtain more favorable treatment than they otherwise would have received . . . .  In many instances [this process] cross[ed] over from the healthy give and take involved in complex analysis to concessions made to prevent the loss of business.

*Id.* ¶ 750.  William J. Harrington, a former Moody's Senior Vice President, told the SEC that because of "[t]he ongoing, unresolved conflict of interest," the "public opinions of Moody's are *often at odds with its private opinions*." *Id.* ¶ 747 (emphasis added).

The Rating Agencies knew that ratings shopping caused them to issue ratings that did not reflect credit risk.  *Id.* ¶¶ 754-59.[7]  Richard Michalek, a former Moody's vice president, testified that "[t]he threat of losing business to a competitor, even if not realized, absolutely tilted the balance away from an independent arbiter of risk towards a captive facilitator of risk transfer." *Id.* ¶ 756.[8]  Similarly, according to S&P Managing Director Richard Gugliada, S&P was involved in a "market-share war where criteria were relaxed . . . I knew it was wrong at the time . . . .  It was either that or skip the business. . . .  My mandate was to find a way." *Id.* ¶ 754.

Management Pressure to Issue False Ratings: Rating Agency management actively encouraged—and in some cases coerced—their employees to expand market share at all costs, even if it entailed knowingly issuing false ratings. *Id.* ¶¶ 760-76.[9]  Managing directors had to justify to chief operation officer Brian Clarkson, either verbally or in writing, why Moody's did not rate specific deals. *Id.* ¶ 763.  Two different Senior Vice Presidents testified that Clarkson

---

[7] *See, e.g.*, *id.* ¶ 755 (a former structured finance executive at Moody's stated: "No rating agency could say, 'We're going to change and be more conservative.' You wouldn't be in business for long if you did that."); *id.* (former Moody's Managing Director Jerome Fons testified that "[Moody's] knew that they were being bullied into caving in to bank pressure. . . . Moody's allow[ed] itself to be bullied. And, you know, they willingly played the game . . . .").

[8] Moody's CEO Raymond McDaniel specifically acknowledged that such pressure "can colour credit judgment" and that sometimes "we 'drink the kool-aid.'" *Id.* ¶ 757.

[9] "Multiple former Moody's and S&P employees told the Subcommittee that, in the years leading up to the financial crisis, gaining market share [and] increasing revenues . . . assumed a higher priority than issuing accurate RMBS and CDO credit ratings." *Id.* ¶ 760.

used fear and intimidation tactics to manipulate analysts' ratings.  *Id*. ¶ 764.  According to

William Harrington, "[m]anagement . . . explicitly threatened the job security of analysts who

'impeded deals,'" and "Clarkson had expressed pride in having fired much of the previous

RMBS Group for not having sufficient market share."  *Id*.  One senior analyst described a

meeting in which Clarkson talked about having fired an analyst for being too conservative and

asked the analyst "to convince [Clarkson] why he shouldn't fire [him]."  *Id.* ¶ 765.

According to the Senate Subcommittee, "[t]he drive for market share was similarly

emphasized at S&P."  *Id.* ¶ 767.  S&P management sent monthly reports to analysts outlining

market share.  *Id.*.  In a recently released 2004 internal email, S&P management stated that they

were "meeting with your group this week to discuss adjusting criteria for rating CDOs of real

estate assets this week because of the ongoing threat of losing deals."  *Id.*

This manipulation extended to the ratings committees, which were groups of analysts and

managers that voted on final ratings.  *Id.* ¶ 770.  One S&P analyst explained in a May 2005 email

that committee members were "being out-voted by mystery votes with no 'logic trail.'"  *Id.*

¶ 772.  William Harrington stated that he "participated in numerous committees [at Moody's]

where management maneuvered for a prescribed result through intimidation of other voting

members."  *Id.* ¶ 773 (listing intimidation tactics).  Thus, according to Harrington, "[m]embers of

committees vote one opinion for publication and keep their private opinions to themselves.  A

committee member who votes differently . . . courts retaliation from management."  *Id.*

<u>Management Refused to Replace Inaccurate Models Because it Would Threaten Market</u>

<u>Share</u>:  To ensure that the committees assigned "competitive" final ratings, the Rating Agencies

used outdated models that they knew turned out artificially inflated preliminary ratings. *Id.*

¶ 777.  These models relied on pre-2000 data that ignored dramatic changes in the mortgage

industry, including increased lending to riskier borrowers, increased origination of riskier loans, and a dramatic rise in housing prices. *Id.* ¶ 778.  Mark Adelson, a former Managing Director in Moody's structured finance division, explained that Moody's use of historical data about 30-year fixed mortgages to predict defaults and delinquencies in the new mortgage market was as reliable as "observing 100 years of weather in Antarctica to forecast the weather in Hawaii." *Id.* ¶ 785.

The Rating Agencies developed new models as early as 2001. *Id.* ¶ 781.  However, the Rating Agencies refused to implement these models, or otherwise update their data, because they knew it would lead to lower ratings and therefore shrink their market share. *See id.* ¶¶ 777-88. According to Frank Raiter, the former Managing Director of RMBS Ratings at S&P, these models were not adopted because, "[b]y 2001, the focus at S&P was profits for the parent company, McGraw-Hill . . . . [I]mproving the model would not add to S&P's revenues." *Id.* ¶ 782.  In 2005 Frank Parisi, a director in RMBS research, wrote that S&P could have released a different ratings model months earlier "if we didn't have to massage the sub-prime and Alt-A numbers to preserve market share." *Id.* ¶ 784.  Similarly, Brian Clarkson criticized those inside Moody's who advocated acquiring more up-to-date data, stating in an email from 2000: "We want more data when most of the time we rate MBS deals using arbitrary rule of thumb?!!" *Id.* ¶ 787.  Clarkson continued:  "I have not seen anything that sets forth the gains in revenue from such spending." *Id*. Unsurprisingly, Moody's did not purchase new loan data between 2002 and 2006. *Id.*

### III.   PLEADING STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In the context of a fraud claim, Rule 9(b) requires a plaintiff to state "with particularity the

circumstances constituting fraud." *Id*.  This means "a plaintiff must identify the fraudulent statement or representation, the person making the statement, and when the statement was made."  *Crisp Human Capital Ltd. v. Authoria Inc.*, 613 F. Supp. 2d 136, 140 (D. Mass. 2009).

Despite these heightened pleading standards, the following principles still apply.  First, "in determining the adequacy of a complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence."  *Shaw v. Digital Equip. Corp*., 82 F.3d 1194, 1225 (1st Cir. 1996).  Second, "as with any 12(b)(6) inquiry, 'we accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the plaintiffs' favor."  *Hill v. Gozani*, 638 F.3d 40, 55 (1st Cir. 2011) (applying Rule 9(b)).  Third, the court must consider "the complaint as a whole" rather than particular factual allegations in isolation.  *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009).  So long as the "complaint as a whole is sufficiently particular," Rule 9(b) has been satisfied even if "some questions remained unanswered."  *Id.*

Rule 9(b) also explicitly provides that "intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  As *Iqbal* explained, this means that in pleading knowledge or intent, a plaintiff need only satisfy the requirements of Rule 8.  *Iqbal*, 556 U.S. at 687 ("[T]he general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b)." (quoting 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed. 2004))).  Thus, a plaintiff need only plead facts sufficient to support a "plausible" inference of scienter.  *Iqbal*, 556 U.S. at 678.

Defendants erroneously assert that the Bank must "plead with particularity 'facts that give rise to a *strong* inference of fraudulent intent.'"  CR Mem. 7.  This strong inference standard is inconsistent with both *Iqbal* and the plain language of Rule 9(b), and improperly seeks to

7

impose the heightend pleading requirements of the Private Securities Litigation Reform Act

("PSLRA").  The PSLRA applies only to federal claims under the Exchange Act.  15 U.S.C. §

78u-4.  As the Bank has not asserted any federal claims, the PSLRA does not apply here.  To the

extent the First Circuit ever required allegations supporting a "strong" inference of scienter under

Rule 9(b),[10] such a rule is inconsistent with *Iqbal*'s holding that Rule 8 applies to pleading of

knowledge and intent.  Indeed, the First Circuit subsequently clarified that the "strong inference"

language used in the PSLRA "differs from the general rule applied to other cases [under Rule

9(b)] that a reasonable inference [of intent] is sufficient." *Mississippi Pub. Employees' Ret. Sys.*

*v. Boston Scientific Corp.*, 523 F.3d 75, 86 (1st Cir. 2008).

Finally, "Rule 9(b) pleading standards may be relaxed . . . when the opposing party is the

only practical source for discovering the specific facts supporting a pleader's conclusion." *U.S.*

*ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 229 (1st Cir. 2004) (citation and

quotation marks omitted).  "[F]or . . . allegations of fraud, if the facts would be peculiarly within

the defendants' control, a court may allow some discovery before requiring that plaintiff plead

individual acts of fraud with particularity." *Id*. (citation and quotation marks omitted).

## IV.   ARGUMENT

### A.   Massachusetts Law Applies to the Bank's Claims.

While Defendants seek to impose New York law, CR Mem. 7-11, Massachusetts' choice-

of-law principles compel application of Massachusetts substantive law.  *See, e.g.*, *Davidson v.*

*Cao*, 211 F. Supp. 2d 264, 273 (D. Mass. 2002) (federal court adjudicating a state-law claim

---

[10] In *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997), the court stated that "to serve the
purposes of Rule 9(b), we require plaintiffs to allege facts that give rise to a strong inference of
fraudulent intent." *Id.*  The First Circuit subsequently clarified that although "the PSLRA
requires [a] complaint to state with particularity facts that give rise to a 'strong inference,'"
Rule 9(b) requires only a "reasonable inference" of scienter.  *In re Cabletron Sys., Inc.*, 311
F.3d 11, 28 (1st Cir. 2002) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)).

applies the choice-of-law rules of the forum).

The Supreme Judicial Court embraces "a functional choice-of-law approach," the application of which is guided by the Restatement (Second) of Conflict of Laws (1971). *See, e.g.*, *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 668 (Mass. 1985). Section 148(2) of the Restatement governs when plaintiff's reliance on a fraudulent statement "took place in whole or in part in a state other than where the false representations were made." Restatement (Second) of Conflict of Laws § 148(2). *See also Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 70 (1st Cir. 1984). Section 148(2) provides that in this situation, four kinds of contacts will help to determine the state with the "most significant relationship to the occurrence and the parties": where the plaintiff relied on the representations; place where the plaintiff received the representations; where the defendant made the representations; and the parties' respective domiciles, residences, nationalities, places of incorporation, and places of business. *Id.*

Section 148 overwhelmingly favors application of Massachusetts law, as Massachusetts was the place where the Bank acted in reliance upon the defendant's representations and received the representations. *Id.* at §§ 148(2)(a), (b). The commentary to section 148 makes clear that the place where plaintiff acted in *reliance* is *more important* than the place where the defendant made the misrepresentation. *Id.* at cmt. (g).[11] In fact, plaintiff's principal place of business is a "contact[] of substantial significance when the loss is pecuniary in its nature." *Id.* at cmt. (i). Thus, "[t]he domicile, residence and place of business of the plaintiff *are more important than are similar contacts on the part of the defendant*." *Id.* (emphasis added). Moreover, comment

---

[11] *Contra* CR Mem. at 8 (claiming that under section 148(2), the place where defendant made the misrepresentations is "particularly significant"). According to Comment (g), the place where plaintiff received the representation "constitutes approximately as important a contact as does the place where the defendant made" it, but these similarly weighted factors are "not so important . . . as is the place where the plaintiff acted in reliance on the defendant's representation." Restatement (Second) § 148 at cmt. (g).

(j) advises that "[i]f any two . . . contacts, apart from the defendant's . . . place of business, are located wholly within a single state, this will usually be the state of the applicable law." *Id.* cmt. (j). Because Massachusetts is the place where the Bank "acted in reliance" *and* "received the representations," the court should apply Massachusetts law.

Massachusetts courts, applying section 148 in analogous circumstances, have reached this same conclusion. For example, in evaluating fraudulent misrepresentation claims brought by a class whose members were dispersed across several states, a court in this District concluded that because three of the significant contacts—namely "the place of action in reliance, the place where misrepresentations were received, and the place of plaintiff's domicile"—lay in the "home state of each consumer," the law of each consumer's state governed. *In re Pharm. Indus. Average Wholesale Price Litigation*, 230 F.R.D 61, 82-83 (D. Mass. 2005); *Telford v. Iron World Mfg., LLC*, 680 F. Supp. 2d 337 (D. Mass. 2010).

Although Defendants rely on *Cold Spring Harbor Laboratory v. Ropes & Gray LLP*, 840 F. Supp. 2d 473 (D. Mass. 2012), CR Mem. 9, choice of law was effectively conceded, and not litigated or disputed by the parties. 840 F. Supp. 2d at 477 n.6. Similarly unhelpful is *Bank of America, N.A. v. Deloitte & Touche, LLP*, 21 Mass. L. Rptr. 677, 2006 WL 3725566 (Mass. Super. Ct. 2006). Although the plaintiff was a Boston-based bank, it was "acting as agent for a syndicate of lenders, none of whom [was] . . . based in Massachusetts." *Id.* at *4. Thus, unlike here, the injuries were suffered by parties not based in Massachusetts. *Id.*

The application of Massachusetts law is also consistent with the principles identified by section 6 of the Second Restatement. *See* CR Mem. 8. While Defendants, invoking section 6, assert that New York purports to have a "strong" interest in the application of its laws, the Supreme Judicial Court has, in another case involving the financial industry, "rejected the

Empire State's imperial reach." *Bushkin*, 393 Mass. at 630. In *Bushkin*, the court declined to

apply New York's statute of frauds, despite New York's assertion of an overriding governmental

interest in the application of that law to members of the financial community. *Id.* The Court

likewise rejected the notion that New York law would promote predictability because

"[u]niformity and interstate order could be advanced only if all States accepted New York's

extrajurisdictional reach, but other jurisdictions have not done so." *Id*. at 635.

**B.      The Bank Has Sufficiently Alleged that the Rating Agencies Committed Fraud.**

A defendant has committed fraud under Massachusetts law if it "(1) made a false

representation of material fact," "(2) with knowledge of its falsity, (3) for the purpose of

inducing the plaintiff to act on this representation, (4) which the plaintiff justifiably relied on as

being true, to her detriment." *Greenleaf Arms Realty Trust I, LLC v. New Boston Fund, Inc*., 962

N.E.2d 221, 227 (Mass. App. Ct. 2012).[12]  The Complaint satisfies each element.[13]

**1.      The credit ratings were actionable misrepresentations.**

Rule 9(b) requires a plaintiff to "identify the fraudulent statement . . , the person making

the statement, and when the statement was made." *Supra* § III (quoting *Crisp Human Capital*,

613 F. Supp. 2d at 140). Thus, for *each* Certificate, the Bank has identified (1) the Rating

Agencies that issued ratings; (2) the rating issued by each Rating Agency; and (3) the date on

which the rating was communicated to the Bank. Compl. ¶ 982. The Bank further pleaded that

these ratings were communicated to the Bank through preliminary term sheets, prospectus

supplements, free writing prospectuses, and Bloomberg messages. *Id.* ¶ 983.

---

[12] Although New York imposes an additional loss causation requirement, *see infra* § IV.B.5, the remaining elements of New York law are identical. *See, e.g.*, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.* ("*Abu Dhabi I*"), 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009).

[13] The Bank has adequately alleged materiality. *E.g.* Compl. ¶ 891. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011) (even under Rule 9(b), a plaintiff need only plead facts that "'raise a reasonable expectation that discovery will reveal evidence" satisfying the materiality requirement" (citation omitted)).

Although Defendants cite the general proposition that "statements of opinion cannot give rise to a deceit action," CR Mem. 12, they neglect to recognize several well-established exceptions to this rule.[14]  Specifically, an opinion is actionable if: (1) "it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it," *McEneaney v. Chestnut Hill Realty Corp.*, 650 N.E.2d 93, 96 (Mass. App. Ct. 1995);[15]  (2) "where the speaker possesses superior knowledge concerning the subject matter to which the misrepresentations relate," *Stolzoff v. Waste Sys. Int'l, Inc.*, 792 N.E.2d 1031, 1041 (Mass. App. Ct. 2003);[16] or (3) if the opinion "does not represent the actual belief of the person expressing the opinion." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011).[17]  These same exceptions apply under New York common law.[18]  Although any single exception renders an opinion actionable, here the ratings issued by the Rating Agencies satisfy all three exceptions.

### a.  The ratings falsely implied they were based in fact.

---

[14] This is despite their own authority recognizing such exceptions. *See Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001); *Hinchey v. NYNEX Corp.*, 979 F. Supp. 40, 44 (D. Mass. 1997); *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 49 (Mass. 2009).

[15] *See also Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 14-15 (1st Cir. 2004).

[16] *See also Lawson v. Affirmative Equities Co.*, 341 F. Supp. 2d 51, 65 (D. Mass. 2004) ("A statement of opinion may also be actionable where the maker's knowledge of the subject matter is so superior that a reasonable recipient would understand the opinion as an assertion of fact."); *Gopen v. Am. Supply Co., Inc.*, 407 N.E.2d 1255, 1257 (Mass. App. Ct. 1980) (forecast actionable "where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate" (quoting Williston, Contracts § 1496, at 373-374 (3d ed. 1970))).

[17] *See also Starr v. Fordham*, 648 N.E.2d 1261, 1267 (Mass. 1995) ("Statements of present intention as to future conduct may be the basis for a fraud action, if the statements misrepresent the actual intention of the speaker . . . ." (citations and internal quotation marks omitted)); *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1030 n.24 (Mass. 2004) (opinions are actionable if they are "inconsistent with facts known at the time they are made").

[18] *See SNCB Corporate Fin. Ltd. v. Schuster*, 877 F. Supp. 820, 826 (S.D.N.Y.1994) ("[A] statement of opinion is not fraudulent under New York law unless it is not honestly held at the time it was made."); *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552-53 (N.Y. 1986) ("When . . . the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a "mixed opinion" and is actionable.")

Credit ratings "may reasonably be understood" by investors "as implying that there are facts to justify" the ratings, not to mention that "there are no facts . . . incompatible with" the ratings. *McEneaney*, 650 N.E.2d at 96. Credit ratings of PLMBS "address the likelihood of the receipt of all payments on the mortgage loans by the related Certificate holders." Compl. ¶ 737; *accord* CR Mem. 12. The ratings assigned to the Certificates were not merely opinions that it *might* be *possible* that the certificate holders would receive all payments. Rather, the Certificates were assigned triple-A ratings—the highest possible rating assigned by the Rating Agencies. *Id.* According to their own definitions, such a rating represents an "[e]xtremely strong capacity to meet financial commitments." *Id.* Such a strong assessment unquestionably implies that there are facts to support the rating—at the very least that there is some *material* basis to support awarding the *highest possible rating* as opposed to some lower, less certain assessment of risk.

The factual underpinnings of these ratings were not just implied. Credit ratings of PLMBS were purportedly based on factual data, including: (1) the underwriting standards of the mortgage originators; (2) the characteristics of the underlying loans, including the appraised value of the mortgaged property; and (3) the concentration of loans along a number of variables, including the extent to which borrowers had indications of low credit quality. Compl. ¶ 213.

This was false. In truth, the ratings were based on false information, including the fiction that underwriting and appraisal standards were applied to the origination of the mortgages underlying the Certificates. *See* J. Opp. at 23-36. Because the ratings did not take into consideration the true characteristics of the mortgage loans, they did not address the true likelihood of the receipt of distributions on those loans. *E.g.* Compl. ¶¶ 740-44, 895.

In addition, the ratings were based on stale data and models that ignored dramatic changes in the mortgage industry—including lending to riskier borrowers and the dramatic rise

in housing prices—and thus were useless in evaluating the likelihood of default of the actual mortgages underlying the PLMBS. *Id.* ¶¶ 777-788. Finally, because the Rating Agencies routinely bowed to pressure to inflate their ratings, *id.* ¶¶ 745-769, and manipulated their own committee voting process, *id.* ¶¶ 770-773, the ultimate ratings had very little to do with the actual facts regarding the assets underlying the PLMBS. Thus, even if the credit ratings were opinions, they were actionable misrepresentations because they were not based in fact. *See, e.g.*, *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 639 (S.D. Ohio 2008) ("[A]llegations that the [credit] ratings were not factually well-grounded are sufficient under Rule 12(b)(6)" where the plaintiff "allege[d] that had Moody's considered the aspects of National Century's operations that were not in compliance with the Master Indenture, it could not have legitimately assigned the NPF XII notes the high ratings it did.").

*Nomura* did not hold otherwise. CR Mem. 12. Although *Nomura* stated that credit ratings are "opinions," it also clearly stated that an opinion is actionable if it "lacks any basis." 632 F.3d at 775.[19] Additionally, the Sixth Circuit's opinion in *Compuware Corp. v. Moody's Investors Services, Inc.*, 499 F.3d 520, 529 (6th Cir. 2007), CR Mem. 13, is inapposite as it did not evaluate Massachusetts—or New York—common law and did not evaluate whether an opinion was actionable in fraud or negligent misrepresentation. 499 F.3d at 529. Importantly, the court did not hold that credit ratings were not *based* on facts, but rather held that the rating itself did not *communicate* any defamatory fact about the rated company. *Id.*[20] Conversely, a rating is actionable because it "may reasonably be understood" by investors "as implying that there are facts to justify" it, when in fact there are no such facts. *McEneaney*, 650 N.E.2d at 96.

---

[19] *In re Lehman Bros. Mortgage-Backed Securities Litigation* did not hold that ratings are inactionable because they are not based in fact, but rather held that rating agencies were not "underwriters." 650 F.3d 167, 183 (2d Cir. 2011).

[20] Defendants' reliance on *Jefferson County School District No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848, 855-56 (10th Cir. 1999), fails for this same reason. *Id.*

### b.      The Rating Agencies possessed superior knowledge.

The ratings are also actionable because the Rating Agencies "possesse[d] superior knowledge concerning the subject matter to which the misrepresentations relate." *Stolzoff*, 792 N.E.2d at 1041. The Rating Agencies were "Nationally Recognized Statistical Rating Organizations" ("NRSROs"), designated by the SEC to signify that "the rating organization is recognized in the United States as an issuer of credible and reliable ratings." Compl. ¶ 802. The NRSRO status has "regulatory significance," "as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO ratings." *In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003). Indeed, by policy and regulatory guidance, the Bank could purchase only triple-A rated PLMBS. *E.g.* Compl. ¶ 738.

This position of trust was critical in the context of PLMBS because, unlike the Rating Agencies, the Bank could not confirm for itself the claimed quality of the mortgages underlying the Certificates. The Senate Subcommittee noted: "[t]he more complex and opaque the structured finance instruments became, the more reliant investors were on high credit ratings for the instruments to be marketable." *Id.* ¶ 803. The Rating Agencies acknowledged that investors were forced to rely on their ratings in light of their superior knowledge. For example, Jerome Fons, Moody's former Managing Director of Credit Policy, wrote in 2008 that because "details of the underlying asset pool . . . are not publicly available for external scrutiny . . . [t]he role of rating agencies . . .[was] particularly important to the structured finance process." *Id.* ¶ 805. Similarly, as Moody's CEO Raymond McDaniel testified in 2005: "Ratings facilitate [the broad marketability of bonds] . . . because many [large U.S. investors] have prudential investment guidelines that rely in part upon ratings as a measure of desired portfolio quality." *Id.* ¶ 804.

At the time the Bank purchased the Certificates, it did not have access to the loan files for the mortgages underlying the Certificates, *Id.* ¶¶ 209-10, nor did it have any reason to doubt that

the mortgages were originated in compliance with underwriting and appraisal standards.  *See* J. Opp. at 76-78.  Conversely, the Rating Agencies not only had access to critical information in loan files, Compl. ¶¶ 212-13—analysis of which would have provided them with information about underwriting and appraisal abuses, *see* J. Opp. at 23-36—but they also *knew* that the mortgage originators had abandoned their underwriting guidelines.  *See infra* at IV.B.2.b.

Accordingly, because the Rating Agencies possessed superior knowledge regarding the creditworthiness of the Certificates, their "opinions" regarding that creditworthiness were actionable misrepresentations.  *See Gopen*, 407 N.E.2d at 1257 (projection of future net worth of a company was actionable misrepresentation because the defendant had "superior knowledge," including access to the company's "internal finances"); *Stolzoff*, 792 N.E.2d at 1043 (defendants possessed "superior knowledge" sufficient to render actionable their projections of revenue to be earned from landfill mining projects).  *See generally Abu Dhabi I*, 651 F. Supp. 2d at 181 (ratings were based on "non-public information that even sophisticated investors cannot obtain").

### c.    The Rating Agencies did not believe their ratings of the Certificates.

The credit ratings are also actionable because they did "not represent the actual belief[s]" of the Rating Agencies.  *Nomura*, 632 F.3d at 775.  Specifically, the Rating Agencies "knew that the triple-A ratings assigned to the PLMBS did not accurately portray their credit risk, as they knew they were the result of flawed models, abandoned underwriting guidelines, and the Rating Agencies' obsession with market share."  Compl. ¶ 739.  *See, e.g.*, *Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan Sec. LLC*, No. 09-016892, 2010 WL 7928643, at *11 (Pa. Com. Pl. Nov. 29, 2010) ("[A]llegations that the rating agencies did not genuinely believe the ratings . . . will support a fraudulent misrepresentation claim."); *Abu Dhabi I*, 651 F. Supp. 2d at 176 (credit ratings "were not mere opinions but rather actionable misrepresentations" because "the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned . . . were accurate

16

and had a basis in fact").  As explained below, the Bank has sufficiently pleaded facts in support of these allegations.  *See infra* § IV.B.2.

Defendants argue the Bank must not only allege that the Rating Agencies did not believe their ratings but *also* that the opinion was "objectively false," *i.e.*, that "there existed provable facts that conflicted with or contradicted the opinion."  CR Mem. 13-14, 19.  The Bank *has* pleaded objective falsity, as it has pleaded ample, *provable* facts that contradicted the triple-A ratings, including, *inter alia*, that the originators of the mortgages underlying *each* Certificate did not follow their own stated underwriting guidelines.  J. Opp. at 23-36. *See also supra* § IV.B.1.a. Moreover, Defendants' legal argument about objective falsity is mistaken.  Notwithstanding *In re Credit Suisse First Boston Corp.*, No. 02-12056, 2005 WL 852455, at *5 (D. Mass. Mar. 31, 2005) (finding that objective falsity" was required to state a claim under Section 10(b) of the Exchange Act),[21] the First Circuit has now clarified that an opinion is actionable even if it is *only* subjectively false.  *Nomura*, 632 F.3d at 775 ("An opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis *or* knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement.") (emphasis added).  Nonetheless,

 **2.**     **The Bank has pleaded sufficient facts demonstrating that the Rating Agencies knew their ratings were false.**

"In cases premised on misstatements of opinion," where "the falsity element . . . entails an inquiry into whether the statement was subjectively false," the "subjective aspect of the falsity requirement and the scienter requirement essentially merge."  *In re Credit Suisse*, 431 F.3d at 48. Scienter and knowledge do not need to be pleaded with particularity, but rather need only satisfy Rule 8.  *See supra* § III.  Here, the Bank pleaded facts supporting a "plausible" inference that the

---

[21] On appeal the First Circuit declined to opine as to whether objective falsity was required. *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 47 (1st Cir. 2005).

Rating Agencies did not believe their ratings. *Id.*

The mental state of a corporate defendant can be alleged with respect to the corporation's management or agents. *See, e.g.*, *Cabletron*, 311 F.3d at 40 ("The scienter alleged against the company's agents is enough to plead scienter for the company."); *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 36 (D. Mass. 2009) (scienter may be "ascertained through the mental state of [corporate] management"). Here, the Bank has pleaded detailed facts supporting plausible inferences that the Rating Agencies' management and agents knew that: (1) their ratings were based on mortgage underwriting guidelines that had been abandoned, *supra* at 2-3; (2) the accuracy of their ratings was undermined by ratings shopping and pervasive conflicts of interest, *supra* at 3-4; (3) senior managers within the Rating Agencies exerted pressure on ratings analysts to issue ratings they did not believe, *supra* at 4-5; and (4) their ratings were based on inaccurate, outdated data and models that management refused to update—despite the availability of better data and models—because they knew it would threaten market share. *Supra* at 5-6. These systemic defects distorted the ratings of each Certificate. As a result, the Rating Agencies knew their ratings of the Certificates were false.

The Bank's allegations are far more detailed than those considered in *Nomura*. Plaintiffs in *Nomura* alleged only that the rating agencies "should have been using better methods and data," that the "rating agencies produced high ratings aimed at keeping business," and that "some inside the company thought that ratings were skewed." 632 F.3d at 775. The Bank has not relied only on inaccurate ratings data and models, but has alleged detailed facts regarding knowing distortion of ratings to maintain market share, including coercion of ratings analysts and manipulation of rating committees. Moreover, to the extent that Bank does rely on ratings models and data, the Bank has not only alleged that the Rating Agencies *should* have used better

methods and data, but rather that they both *knew* their data and models were flawed *at the time* of the ratings and *refused* to update the models because it would cause them to lose market share. *Supra* at 5-6.  Given these detailed allegations, Defendants' assertion that the Bank alleges only economic motive rings hollow.  CR Mem. 19.[22]  As one court explained:

> [W]here . . . the Rating Agencies . . . knew that the ratings process was flawed, knew that the portfolio was not a safe, stable investment, and knew that the Rating Agencies could not issue an objective rating because of the effect it would have on their compensation, it may be plausibly inferred . . . the Rating Agencies knew they were disseminating false and misleading ratings.

*Abu Dhabi I*, 651 F. Supp. 2d at 178-79.

Notably, despite the *Nomura* plaintiffs' sparse pleadings, the First Circuit stated that "[t]he line is admittedly a fine one" and dismissed plaintiffs' claim only because "the complaint stops short of alleging expressly that the leadership of S&P or Moody's believed that their companies' ratings were false or were unsupported by models that generally captured the quality of the securities being rated." 632 F.3d at 775.  This is precisely what the Bank alleged here.

Indeed, the Complaint includes explicit acknowledgements from the management of the Rating Agencies that they knew their ratings did not actually portray the credit risk of rated investments.  For example, William J. Harrington, a former Senior Vice President in Moody's derivative products group, told the SEC that "[t]he ongoing, unresolved conflict of interest plays out in the formation of Moody's opinions. These public opinions of Moody's are often at odds with its private opinions."  Compl. ¶ 747.  Harrington noted that "[t]his conflict of interest permeates all levels of employment, from entry-level analyst to the Chairman and Chief Executive Officer."  *Id*.  Richard Michalek, a former Moody's vice president and senior credit officer, testified that "[t]he threat of losing business to a competitor, even if not realized,

---

[22]Unlike in *Abu Dhabi Commercial Bank v. Credit Suisse*, No. 115417/2010 (N.Y. Sup. Ct. Aug. 4, 2011), and *Merrill Lynch*, 273 F. Supp. 2d at 373, the Bank has not merely pleaded the *existence* of motive, but has pleaded *actions* taken in *furtherance* of that motive.

absolutely tilted the balance away from an independent arbiter of risk towards a captive facilitator of risk transfer." *Id.*. ¶ 756. Frank L. Raiter, the former head of S&P's Residential Mortgage Rating Group testified that "in the residential ratings group[,] . . . between 1995 and 2005[,] . . . [r]ating production was achieved at the expense of . . . criteria quality." Compl. ¶ 775. S&P's director of RMBS research stated in a 2005 email that S&P "massage[d] the sub-prime and Alt-A numbers to preserve market share." *Id.* ¶ 784. In light of the Bank's detailed allegations regarding manipulation of the rating process, these admissions strongly support a plausible inference that management and agents of the Rating Agencies knew their ratings were false when issued. *See Nomura*, 632 F.3d at 775; *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) (scienter sufficiently alleged based on specific statements indicating that top officials knew that Moody's independence, ratings, and methodology was compromised).

A plaintiff can also plead knowing falsity by alleging a "divergence between internal reports and external statements on the same subject." *Greebel*, 194 F.3d at 196; *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994) (plaintiffs sufficiently pleaded scienter by "present[ing] a contrast between what company officials were hearing internally . . . and what the company was telling the public at the same time"). Here, the Bank pleaded that the management and agents of the Rating Agencies heard reports that originators systemically abandoned underwriting guidelines, Compl. ¶¶ 740-43; that ratings shopping undermined the accuracy and credibility of their ratings, *id.* ¶¶ 753-57; that rating committees were manipulated in pursuit of market share objectives, *id.* ¶¶ 771-72; and that their rating models were insufficient to assess credit risk in light of the higher risks associated with subprime and Alt-A loans. *Id.* ¶ 784. Despite these alarming internal reports, the Rating Agencies issued triple-A ratings.

**a.      The Bank does not need to plead facts unique to each Certificate.**

Defendants incorrectly assert that the Bank must plead facts unique to each of the 111 Certificates at issue in the Complaint.  CR Mem. 16-17.  *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Services, LLC* ("*Ohio Police & Fire I*"), 813 F. Supp. 2d 871, 884 (S.D. Ohio 2011), did not hold that a plaintiff *must* plead "issuance-specific" allegations, but rather held that pleading such "issuance-specific" facts was but one of several ways that a plaintiff could sufficiently plead subjective falsity.  *Id*.  The court also recognized a plaintiff could "allege that the Rating Agencies knew of specific deficiencies common to the collateral pools underlying all of the securities purchased by the Ohio Funds."  *Id.*  This is precisely what the Bank has done.

The Bank pleaded facts supporting plausible inferences that the Rating Agencies knew of systemic deficiencies in their rating process and knew these deficiencies meant their ratings did not assess credit risk.  These systemic defects distorted the rating of each Certificate.  Although these facts are not unique to any Certificate, they are "specific" facts that support plausible inferences that the Rating Agencies did not believe their rating of each particular Certificate.

This rationale finds support in *Nomura*.  First, *Nomura* explicitly adopted this rationale with respect to the plaintiff's underwriting claims.  *See* J. Opp. at 14-16 (citing 632 F.3d at 773).  Second, in assessing the plaintiffs' allegations regarding credit ratings, the court did not fault plaintiffs for failing to plead facts unique to each security.  Indeed, notwithstanding this lack of security-specific facts, the court found that the line distinguishing plaintiffs' allegations from sufficient allegations was "fine," and indicated that plaintiffs allegations would have been sufficient had they alleged, as the Bank does here, that management of the rating agencies did not believe their ratings.  *Nomura*, 632 F.3d at 775.  Nothing in *Nomura* could be read as

requiring facts unique to each security.[23]  Indeed, to require a plaintiff to plead facts unique to

each certificate would be inconsistent with the First Circuit's mandate that, even in cases

evaluated under Rule 9(b), "we cannot hold plaintiffs to a standard that would effectively require

them, pre-discovery, to plead evidence." *Mississippi Pub. Emps.*, 523 F.3d at 90.

Defendants cite two district court opinions that required issuance-specific pleading, CR

Mem. 16-17,[24] but each was based on the PLSRA's requirement that plaintiffs "state with

particularity facts sufficient to raise a 'strong' inference of scienter."  *In re Credit Suisse*, 2005

WL 852455, at *3; *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 372 (S.D.N.Y. 2003).

Because the PSLRA does not apply here and because knowledge under Rule 9(b) may be

pleaded generally, *supra* § III, the issuance-specific requirement of these cases is inapplicable.

The Sixth Circuit's recent affirmation of the district court's holding in *Ohio Police &*

*Fire I* does not alter this analysis.  *See Ohio Police & Fire Pension Fund v. Standard & Poor's*

*Fin. Services LLC* ("*Ohio Police & Fire II*"), No. 11-4203, 2012 WL 5990337 (6th Cir. Dec. 3,

2012).  Like the district court, the Sixth Circuit did not require plaintiffs to plead facts unique to

each security.  The court distinguished cases cited by plaintiff by stating that they "all involve

complaints that pled specific facts suggesting that the Agencies believed a particular opinion

they provided was improper."  *Id.* at *11.  However, as explained above, a plaintiff can support

an inference that defendants did not believe a "particular opinion" without pleading facts unique

to the investment being rated; for example, by pleading detailed facts regarding knowledge of

deficiencies common to multiple opinions.  Indeed, the cases cited by the Sixth Circuit as having

pleaded "specific facts" regarding "particular opinion[s]" relied on similar allegations of

---

[23] Defendants cannot distinguish the *Nomura* analysis on the basis that Rule 9(b) applies.
  Scienter allegations need only satisfy the pleading requirements of Rule 8, *see supra* § III—the
  same pleading requirements applied by the court in *Nomura*.  *See* 632 F.3d at 771.

[24] Defendants' cite *Rice v. Charles Schwab*, No. 10-00398, 2010 WL 5156654, at *3 (C.D. Cal.
  Oct. 22, 2010), but *Rice* did not consider whether issuance-specific pleading was required. *Id.*

knowledge of systemic flaws in the rating process.  *See, e.g.*, *Abu Dhabi I*, 651 F. Supp. 2d at

178 ("[F]ormer employees of the Rating Agencies . . . stated publicly that the Rating Agencies . .

. knew at the time the Cheyne SIV's ratings were issued that the process used to derive ratings

generally was deeply flawed and unreliable."); *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785

F. Supp. 2d 799, 824-25 (N.D. Cal. 2011) (agencies failed to follow proper methodology).

As the Sixth Circuit explained, the flaw in the plaintiff's pleading was not a failure to

plead facts unique to each investment, but rather the failure to plead anything beyond "[g]eneral

criticism of business practices."  *Ohio Police & Fire II*, 2012 WL 5990337, at *11.  Although the

court did not accept the inference that "the Agencies did not believe . . . their ratings with respect

to any MBS [plaintiff] purchased over a three-year period," the court did not hold that such an

inference was *per se* unreasonable.  *Id.*  Rather, the court held that to support such an inference, a

plaintiff must plead more than mere "general criticism" of Rating Agency "business practices."

*Id.*  Here the bank has pleaded far more: it has pleaded specific facts supporting a plausible

inference that the Rating Agencies' knew of—and refused to correct—specific, systemic defects

in the ratings process that Defendants knew distorted their ratings of PLMBS, including each of

the 111 Certificates.  As a result, the Sixth Circuit's opinion in *Ohio Police & Fire II* does not

support Defendants' motion to dismiss.   Neither this decision, nor any of the others relied on by

Defendants, stands for the proposition urged by Defendants here—that they are immune from

liability for their knowingly flawed ratings because only they possess the *Certificate-specific*

*proof* of their misdeeds.

> **b.**      **The Bank has adequately pleaded that the Rating Agencies knew that
> mortgage originators abandoned underwriting guidelines.**

Defendants next challenge the Bank's allegations that they knew mortgage originators

abandoned underwriting guidelines.  CR Mem. 17-18.[25]  Defendants' portrayal of these claims as

resting merely on a "congressional report" and "internal emails discussing a single originator" is

misleading.  *Id.* at 17.  First, this "congressional report" was based on extensive investigation

performed by the bipartisan Senate Subcommittee and concluded that the Rating Agencies

"knew of increased credit risk due to mortgage fraud, lax underwriting standards, and

unsustainable housing price appreciation, but failed adequately to incorporate those factors into

their credit rating models."  Compl. ¶ 741.  Given that the Certificates were backed by loans

originated by nearly every major mortgage originator in the country, Defendants cannot credibly

assert that this report does "not support any argument that the Rating Agencies somehow 'knew'

that the originators actually at issue in this case 'had abandoned' their underwriting guidelines."

CR Mem. 17.  Second, Defendants ignore internal emails in which directors at S&P expressed

awareness as early as August of 2006 that "there has been rampant appraisal and underwriting

fraud *in the industry* for quite some time."  Compl. ¶ 743 (emphasis added).

Defendants also improperly argue that the Bank must plead that the Rating Agencies

knew that the "loans pooled in the trusts were not as represented."  CR Mem. 17.  Such a

Certificate-specific pleading standard is not required.  *See* J. Opp. at 14-16; *supra* § IV.B.2.a.

Even more contrived is the assertion that the Bank conceded that the Rating Agencies

could not have known of defective loans underlying the Certificates.  CR Mem. 17.  Although

the Complaint stated that "only" the Securities Defendants[26] were "in a position to have access to

the loan files, Compl. ¶ 210, the Complaint also stated—a mere *three* paragraphs later—that the

Securities Defendants "provided [each] credit rating agency with information about the credit

---

[25] Even if these allegations are not *ipso facto* sufficient, they support the inference of knowing falsity.  *Supra* § II (citing *Gagne*, 565 F.3d at 45 (court must consider "complaint as a whole")).

[26] This memorandum refers to the Depositor/Issuer, Sponsor, Underwriter, and Corporate Seller Defendants as the "Securities Defendants."

quality and characteristics of the loans" underlying each Certificate.  *Id.* ¶ 212.  The Complaint

further stated that the Rating Agencies evaluated "[t]he mortgagor's ability to pay."  *Id.* ¶ 213.

Defendants' reference to *Capital Ventures International v. UBS Securities LLC*, No. 11-

11937, 2012 WL 4469101, at *12 (D. Mass. Sept. 28, 2012), is a red herring.  CR Mem. 18.

Defendants argue that the Bank's allegations, like those in *Capital Ventures*, fail to adequately

allege scienter.  In *Capital Ventures*, plaintiffs conclusorily alleged—that the "rating agencies

issued ratings 'based on the loan profiles fed to the agencies, which included false and

misleading data regarding, among other things, the property's occupancy status and value, and

regarding the underwriting processes applied to that loan.'" 2012 WL 4469101, at *12.  While

these allegations say nothing about the knowledge of the Rating Agencies, this is not what the

Bank is alleging here.  Rather, the Bank has alleged that the Rating Agencies knew there was

widespread abandonment of underwriting guidelines, knew that their ratings were based on the

premise that underwriting guidelines were actually followed, and refused to alter their ratings

methodology to account for this inconsistency.  Compl. ¶¶ 740-44.

### c.      The Federal Rules do not require redundant pleading.

Defendants' critique of "generalized complaints about the 'Rating Agency Defendants'

collectively," CR Mem. 14-15, is both factually misleading and legally erroneous.  First, as

detailed above, the Bank does not rely on "generalized complaints," but rather pleads detailed

facts regarding the practices of the specific Rating Agencies.  Second, neither Rule 9(b) nor Rule

8(a) requires redundancy. [27]  A plaintiff is not required to repeat—for each defendant—factual

allegations that apply equally to each Defendant.  As one court recently explained:

---

[27] The Bank *has* detailed each Rating Agency's role.  CR Mem. 15.  Specifically, as noted above,
the Bank identified (1) the Rating Agency that issued each rating; (2) the rating issued by each
Rating Agency; and (3) the date on which the rating was communicated to the Bank.  Compl.
¶ 982.  Defendants' reference to pleading with particularity is also inappropriate because the
Bank is not required to plead knowledge or scienter with particularity.  *See supra* § III.

> Although plaintiffs do have "an obligation to 'make clear exactly who is alleged to have done what to whom,' " plaintiffs are not required to copy and paste their allegations for each rating agency. It is sufficient to define the three Rating Agencies collectively as the "Rating Agencies"—as plaintiffs did—and then use that collective term in all allegations that apply equally to those three defendants.

*King Cnty., Wash. v. IKB Deutsche Industriebank AG* ("*IKB II*"), 863 F. Supp. 2d 288, 316

(S.D.N.Y. 2012).  Similarly, it would defy logic to prohibit reliance on a government

investigation addressing the behaviors of specific defendants simply because the investigation

found that *each* of the defendants engaged in the *same* conduct.[28]

> ### d.   The Bank has not pleaded fraud by hindsight.

The Complaint has not simply recited "acknowledgments from S&P and Moody's

executives conceding, in hindsight, that the[ir] models and data . . . were deficient."  CR Mem.

15 (quoting *Nomura*, 632 F.3d at 775-76); *see also* CR Mem. 16 (citing *In re Lehman Bros. Sec.*

*& ERISA Litig.*, 684 F. Supp. 2d 485, 495 (S.D.N.Y. 2010) (same)).[29]  Rather, when the

Complaint addresses models and data, the Bank also pleads facts prior to or contemporaneous

with the issuance of the ratings demonstrating that the Rating Agencies knew their data and

models were outdated and inaccurate and that management refused to adopt available, updated

---

[28] No case cited by Defendants holds otherwise.  CR Mem. 15.  In *Loan v. Federal Deposit Insurance Corp.*, plaintiffs' allegations were insufficient because "the individual defendants are being sued based on their status as directors and former officers of the bank rather than for any actual role they may have played in producing or circulating the Subscription Offering Circular."  717 F. Supp. 964, 968 (D. Mass. 1989).  Similarly, in *Greebel*, 182 F.R.D. at 374, "Plaintiffs d[id] not allege that any individual Defendant[] . . . made or endorsed any of the challenged statements."  *Id.*  Finally, the allegations in *In re Stratus Computer, Inc. Securities Litigation*, No. 89-2075, 1992 WL 73555, at *7 (D. Mass. Mar. 27, 1992), were insufficient because they made "no reference to any particular act of any individual defendant."  *Id.*  Because the Bank alleged that *each* Rating Agency issued specific fraudulent ratings on specific dates with respect to specific Certificates, these cases are inapposite.

[29] Unlike in *Ohio Police & Fire I*, the Bank has not merely "recite[d] congressional . . . testimony and news articles . . . concerning the in-hindsight failure of the Rating Agencies to accurately analyze the credit risks associated with subprime mortgages."  CR Mem. 15-16.

data and models because they knew it would threaten market share. *See supra* at 5-6.[30]

The doctrine of "fraud by hindsight" does not preclude the Bank from supplementing its detailed, contemporaneous factual allegation with allegations concerning the dramatic and sudden downgrade of the Certificates from the *highest* rating possible to "junk" status. Compl. ¶¶ 789-95. The relevant consideration is not simply that the ratings of the Certificates turned out to be wrong, CR Mem. 18, but rather the extreme degree to which they were wrong. *E.g.*, *id.* ¶ 789-90 (although the historical default rate on triple-A rated investments was only 0.08%, *all* of the triple-A rated Certificates have been downgraded to "junk"). Both the SEC and various courts have noted that this dramatic—and widespread—downgrade of triple-A rated mortgage-backed securities "raised questions about . . . the integrity of the ratings process." *Id.* ¶ 791. *See, e.g.*, *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, --- F. Supp. 2d ---, No. 11-6188, 2012 WL 5395646, at *9 (S.D.N.Y. Nov. 5, 2012) ("The Agency's reliance on [credit-rating downgrades] is not. . . an effort to argue 'fraud by hindsight;' rather . . . these market events are telltale signs of defects that were present in the securitizations all along, albeit unbeknownst to the purchasing public.").[31] Moreover, the extreme drop in rating within a relatively short period of time supports a plausible inference that the ratings were unsupported by factual data, and that the Rating Agencies knew this and did not believe their ratings when issued. *See generally Greebel*, 194 F.3d at 196 (in support of scienter, plaintiff may plead the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information").

The Bank does not contend that massive downgrades are *ipso facto* sufficient to support an inference of scienter. Rather, these facts bolster the Bank's detailed factual allegations

---

[30] *Abu Dhabi Commercial Bank v. Credit Suisse*, No. 115417/2010, *slip op.* at 7 (N.Y. Sup. Ct. Aug. 4, 2011), CR Mem. 16, is inapposite, as plaintiffs did not allege that defendants knew their models were unreliable or that they refused to change because of self interest. *Slip op.* at 7

[31] *See generally Nomura*, 632 F.3d at 773 (a "sharp drop in the credit ratings" supported inference of underwriting abandonment in conjunction with other specific factual allegations).

regarding defendants' knowledge of falsity.  The First Circuit has made clear that the doctrine of

"fraud by hindsight" does not preclude reliance on later disclosed facts in such instances.

*Mississippi Pub. Emps.*, 523 F.3d at 90.  Indeed, the court explained that, "at the pleadings stage,

'a bad outcome truly is relevant to the likelihood of fraud.'" *Id.* (citation omitted).

Although Defendants cite *Tsereteli*, CR Mem. 18, that court did not assess whether a

plaintiff could supplement its pleadings with evidence of subsequent downgrades, but rather held

that plaintiffs' reliance on the subsequent downgrades could not make up for the fact that none of

the *other* facts alleged supported an inference that defendants knew the ratings were false.  692

F. Supp. 2d at 395.  *In re Merrill Lynch Auction Rate Securities Litigation*, No. 09-2030, 2011

WL 536437, at *12 (S.D.N.Y. Feb. 9, 2011), CR Mem. 18, is inapposite, as plaintiffs did not cite

subsequent downgrades as *evidence* that ratings were disbelieved, but rather asserted a *claim* that

the ratings *should have been downgraded* after issuance.  2011 WL 536437, at *12.

### e.   The Bank has sufficiently pleaded these claims with respect to Fitch.

Fitch argues that the Complaint is defective because it is identified by name only eight

times.  Fitch Mem. 1.  Although there are numerous allegations against the "Rating Agency

Defendants"—a defined phrase that encompasses Moody's, S&P, and Fitch—Fitch disregards all

of these allegations as "generalized statements" that lack "particularity."  *Id.* at 2.  As noted

above, this exact argument was rejected by the Southern District of New York in denying Fitch's

motion to dismiss.  *See supra* § IV.B.2.c (citing *IKB II*, 863 F. Supp. 2d at 316 ("It is sufficient

to define the three rating agency defendants collectively as the 'Rating Agencies' . . . and then

use that collective term in all allegations that apply equally to those three defendants.")).

The Bank has made particularized allegations regarding Fitch's misleading ratings and

has pleaded facts supporting a plausible inference that Fitch knew its ratings were false when

made.  The Bank identified 12 Certificates originally rated AAA by Fitch.  Compl. ¶ 899.  Each

Certificate was later downgraded to junk.  *Id.*  Fitch was engaged in a competitive "race to the bottom" that resulted in misleading ratings driven by obsession with market share.  *Id.* ¶ 750. Based on its in-depth investigation, including interviewing Fitch employees and reviewing internal documents to which the Bank does not have access, the Senate Subcommittee concluded that from 2004 to 2007, the Rating Agencies, including Fitch, "knew of increased credit risks due to mortgage fraud, lax underwriting standards, and unsustainable housing price appreciation, but failed adequately to incorporate those factors into their credit rating models."  *Id.* ¶ 741 (quoting S. Subcomm., Anatomy of a Financial Collapse at 245-46).  This failure was intentional and the result of a competitive race to the bottom between the Rating Agencies:  "[t]he rating agencies weakened their standards as each competed to provide the most favorable rating to win business and greater market share. The result was a race to the bottom." *Id.* ¶ 750 (quoting S. Subcomm., Anatomy of a Financial Collapse at 243).  The Financial Crisis Inquiry Commission concluded that "the rating agencies [including Fitch] placed market share and profit considerations above the quality and integrity of their ratings."  *Id.* ¶ 768 (citing FCIC Report at 212).

These government findings are supported by internal documents referenced in the Complaint:  Moody's actively monitored the deals that it lost to Fitch and firing managers that lost deals, *Id.* ¶¶ 763-64, and investment bankers threatened the ratings agencies with the loss of business to their competitors if they attempted to strengthen their rating models.  *Id.* ¶ 749.  The fact that these documents are not from Fitch—Fitch is vigorously opposing providing any discovery—does not make them any less credible or probative of the Bank's allegations.  There is significantly more information in the public domain regarding Moody's and S&P's rating practices, but Fitch, S&P and Moody's are all competitors, and Fitch's rating behavior with respect to the 12 Certificates it rated was identical to that of Moody's and S&P's.  All of the

Rating Agencies originally provided the highest possible ratings to the Bank's Certificates, only to have those ratings collapse to junk in the space of a few years. *Id.* ¶ 899. While Fitch purports to be "stunned" by the Bank's claims (notwithstanding widespread condemnation of the conduct of all three Rating Agencies), Fitch Mem. 4, what truly would be stunning would be for *only* Moody's and S&P to have dramatically disregarded their rating standards, and yet for all three Rating Agencies to nevertheless arrive at the *same AAA ratings* that all of them were subsequently forced to downgrade to junk.

Fitch argues that the Bank has failed to allege "specific facts supporting an inference of fraudulent intent" because it has not identified exactly who at Fitch knew the ratings and models were inaccurate, what specific facts they knew, when they knew these facts, and why the facts give rise to a fraud claim. *Id*. at 5. However, this degree of detailed pleading regarding scienter is not required—and in any event is information possessed only by Fitch. Rule 9(b) does not require a plaintiff to allege "specific facts" regarding knowledge or intent, but rather plead only a "reasonable inference" of scienter. *See supra* § III. Given (1) the competitive environment in which Fitch operated; (2) the pressure to match the inflated ratings of its competitors; (3) the fact that it did match these ratings; and (4) that government investigations have explicitly concluded Fitch knew of underwriting abandonment, it is reasonable to infer that Fitch knew its ratings were inflated.

Fitch's reliance on *Genesee County* and *First Community Bank* is also misplaced. Fitch Mem. 6. In *Genesee County*, the District Court determined that apart from references to government investigations, the only allegation against Fitch—which consisted of a statement from Fitch's CEO that Fitch did not do its due diligence—lead to the conclusion that Fitch's credit ratings were "honestly held when formed but simply turned out later to be inaccurate" or

that "Fitch could have formed better opinions." *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1203-04 (D.N.M. 2011).  This conclusion was disagreed with by another District Court, which found that the plaintiff had adequately pled that Fitch did not genuinely and reasonably believe the ratings it issued, and that the ratings were without a basis in fact.  *IKB II*, 863 F. Supp. 2d at 316.   Furthermore, the Bank's claim against Fitch is not based on adequate or inadequate due diligence, but rather that Fitch, along with Moody's and S&P, all participated in a race to bottom whereby they sacrificed rating accuracy for market share.  This race necessarily required the participation of all three rating agencies. Compl. ¶ 745-776.  *First Community Bank* is equally inapposite.  There, a Tennessee trial court held that the plaintiff failed to sufficiently allege "conspiracy jurisdiction" against Fitch, as well as the existence of the duty necessary to support a Tennessee negligent misrepresentation or constructive fraud claim.  *First Cmty. Bank v. First Tenn. Bank, N.A.*, No. 3-475-11, Tr. 10, 18. Neither of these elements is applicable here—the plaintiff has alleged direct personal jurisdiction over Fitch, and that Fitch intentionally provided inaccurate ratings.

### 3. The Rating Agencies provided their ratings for the purpose of inducing the Bank and other investors to purchase the Certificates.

Liability for fraud in Massachusetts is not contingent on showing "intent to deceive."  CR Mem. 20.  Rather, a party who knowingly makes a materially false statement has committed fraud if the statement was made "for the purpose of inducing the plaintiff to act on this representation."  *Greenleaf Arms*, 962 N.E.2d at 227.  It is not required for the Rating Agencies to have intended the Bank, specifically, to act on their ratings, as "[o]ne who makes a fraudulent misrepresentation is subject to liability to the persons *or class of persons* whom he intends *or has reason to expect* to act or to refrain from action in reliance upon the misrepresentation." *Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1067 (Mass. App. Ct. 2003) (emphasis

added) (quoting Restatement (Second) of Torts § 531 (1977)).

The Bank has pleaded ample facts supporting a plausible inference[32] that the Rating Agencies rated the Certificates with intent to induce investors, including the Bank, to purchase the Certificates. *See* Compl. ¶¶ 991-92. As explained above, the Rating Agencies' decisions to rate the Certificates triple-A were motivated primarily by profit and an obsession with market share. *See supra* §IV.B.2. The Rating Agencies knew that if they did not rate the Certificates triple-A they would not get paid, as: (1) they were not hired to rate the Certificates unless they provided preliminary triple-A ratings; and (2) they were not compensated until *after* each PLMBS transaction closed—with triple-A ratings. Compl. ¶ 748. At the same time, the Rating Agencies were aware that investors relied on their credit ratings, particularly with respect to PLMBS and other asset-backed securities. *See supra* § IV.B.1.b. Specifically, the Rating Agencies knew that if they rated the Certificates triple-A, it would induce a limited number of institutional investors, including the Bank, to purchase the Certificates.[33] Thus, in choosing to falsely rate the Certificates triple-A, the Rating Agencies intentionally pursued a course of conduct knowing it would induce investors, including the Bank, to purchase the Certificates. *See generally Abu Dhabi I*, 651 F. Supp. 2d at 179 (plaintiffs pleaded a plausible inference of scienter based on similar allegations, including that: (1) the rating agencies "knew that if they refused to assign the [investment] the high rating . . . , 'Morgan Stanley would have taken its business elsewhere'"; and (2) "the Rating Agencies were paid only if they provided the desired ratings and only in the even that the transaction closed with those ratings.").[34]

---

[32] Allegations of intent need only be pleaded generally. *See supra* § III (citing Fed. R. Civ. P. 9(b)).

[33] *See, e.g.*, Compl. ¶ 804 (Moody's CEO Raymond McDaniel testified that "[r]atings facilitate [the broad marketability of bonds] . . . because many [large U.S. investors] have prudential investment guidelines that rely in part upon ratings as a measure of desired portfolio quality.").

[34] Defendants cannot argue that their primary motivation was financial or that the Bank's

Defendants largely ignore these allegations and instead cite cases holding that plaintiffs cannot plead scienter "by hindsight." CR Mem. 20-21. Those cases are irrelevant, as the factual allegations enumerated above refer to the intent of the Rating Agencies *at the time* they issued the ratings. Although Defendants cite the opinion of a New York trial court in *Abu Dhabi Commercial Bank v. Credit Suisse*, No. 115417/2010 (N.Y. Sup. Ct. Aug. 4, 2011), CR Mem. 21, that court did not even consider whether plaintiff had adequately alleged intent. Slip op. at 7.[35] Defendants' citation to a hearing transcript from a state trial court in Tennessee in which the court applied *Tennessee* common law is puzzling. CR Mem. 21. The court did not evaluate plaintiffs' allegations of intent or provide any meaningful analysis of plaintiff's claims, and instead simply asserted that it found "the complaint devoid of the necessary allegations to make a case for fraud." *First Cmty Bank v. First Tenn. Bank, N.A.*, No. 3-475-116, hearing tr. at 17-18 (Tenn. Cir. Ct. May 25, 2012).

Defendants also cite dicta from the Second Circuit in which the court stated that "[g]eneral allegations that the defendants acted in their economic self-interest are not enough." CR Mem. 21. Here, however, the Bank's allegations are neither "general" nor as simple as Defendants suggest. The Bank's claim is not simply that the Rating Agencies were "motivated by profits"—though clearly they were. Rather, the Bank has alleged that the Rating Agencies' profit motivation could only be satisfied if they issued artificially inflated ratings that they knew

---

purchase of the Certificates was collateral damage, as Massachusetts courts have made clear that a party is liable even if it only "had reason to expect" that a class of persons would act in reliance on the knowing false representation. *Reisman*, 787 N.E.2d at 1067. *Accord Cheng v. Sunoco, Inc. (R & M)*, No. 09-40041, 2010 WL 5437235 (D. Mass. Dec. 22, 2010) ("[A] party . . . need only demonstrate that it was among those who could have reasonably been expected to rely on the misrepresentations."); *Int'l Totalizing Sys., Inc. v. PepsiCo, Inc.*, 560 N.E.2d 749, 754 n.12 (Mass. App. Ct. 1990) ("[A] result is intended if the actor . . . acts believing that there is a substantial certainty that the result will follow." (citing Restatement (Second) of Torts § 531 cmt. c)).

[35] Rather, the court held that plaintiffs in *Abu Dhabi* failed to plead a false statement, as plaintiffs failed to allege that S&P did not believe its ratings. Slip op. at 7.

would induce investors to purchase the Certificates despite undisclosed risks.[36]

### 4.     The Bank's reliance on the credit ratings was justifiable.

The reasonableness of reliance is an inherently factual question that is inappropriate for resolution on a motion to dismiss.  *See* J. Opp. 76-78 (citing *First Marblehead Corp. v. House*, 473 F.3d 1, 11 (1st Cir. 2006)).  This is true even where Rule 9(b) applies.  *See, Rodi*, 389 F.3d at 16 ("[R]easonableness of . . . reliance ordinarily constitutes a question of fact for the jury.").

Defendants first argue that the Bank did "not plead any factual support" for the reasonableness of its reliance.  CR Mem. 22.  In addition to being startling (the Rating Agencies don't believe it is reasonable for investors to rely on their ratings?), it is also false.  The Bank did not "blind[ly]" rely on the credit ratings.  CR Mem. 22.  By policy and regulatory guidance, the Bank could purchase PLMBS only if they received triple-A-ratings from the Rating Agencies. *E.g.* Compl. ¶ 738.  The Rating Agencies were bestowed by the federal government with NRSRO status, which conveyed that each was "an issuer of credible and reliable ratings."  *Id*. ¶ 802.  The Rating Agencies were in positions of superior knowledge regarding the credit quality of the Certificates because, unlike the Bank, the Rating Agencies had access to critical information from the issuers of the Certificates and the loan files regarding underwriting and credit quality of the mortgages.  *See supra* § IV.B.1.b.  Thus, as the Senate Subcommittee explained, "[t]he more complex and opaque the structured finance instruments became, the more reliant investors were on high credit ratings for the instruments to be marketable." *Id.* ¶ 803. Indeed, the Rating Agencies themselves acknowledged the extent to which investors were forced to rely on their ratings.  *Supra* § IV.B.1.b.

These allegations are more than sufficient.  Given these facts, numerous courts have held

---

[36]An unreported New York trial court opinion on plaintiff's failure to tie profit motive to a motive to issue false ratings adds little to this discussion.  *Technical Support Servs., Inc. v. Int'l Bus. Machines Corp.*, 856 N.Y.S.2d 26 (Table), 2007 WL 4500382, at *30 (Sup. Ct. 2007).

that even sophisticated investors are justified in relying on the ratings of the Rating Agencies. *See, e.g.*, *Abu Dhabi I*, 651 F. Supp. 2d at 181 ("[T]he market at large, including sophisticated investors, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status and . . . the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain."); *Anschutz*, 785 F. Supp. 2d at 827 (reasonableness of reliance sufficiently alleged, as "the Agencies had access to non-public information regarding the structure of the securities that was not available to [investors]").

Thus, Defendants' second argument, relying on the Bank's purported sophistication, CR Mem. 22-23, also fails because it is contrary to fact and logic.  As Defendants tell it, the source of this sophistication is the Bank's participation in the mortgage markets, in particular its purchase of prime "whole loans" from its member banks.  Defendants provide no basis for the Court to conclude that the Bank's experience purchasing *prime* loans gave it any insight into the underwriting abuses that plagued the *Alt-A* and *subprime* loans underlying the Certificates.  Nor can Defendants establish that the Bank's experience funding and purchasing mortgages provided it with any knowledge regarding the systemic manipulation of credit ratings by the Rating Agencies.  While the Bank certainly participated in the mortgage markets, nothing about its experience gave it reason to believe that the Ratings Agencies issued knowingly false ratings such that its reliance on the ratings would be *per se* unreasonable.

Moreover, Defendants ask this Court to conclude, *as a matter of law*, that the Bank simultaneously was so sophisticated that it knew of these risks and yet so irrational that, notwithstanding this knowledge, it chose to purchase the Certificates anyway.  At the very least, Defendants cannot maintain that *every* reasonable jury would agree.  *See Rodi v. S. New England School of Law*, 532 F.3d 11, 15 (1st Cir. 2008)  (determination of reasonableness of reliance

permissible on a motion for summary judgment only "if no reasonable jury could find the party's reliance reasonable").  Notably, Defendants do not even attempt to explain why the Bank, a conservative investor with a public mission, would buy securities that it *knew to be unsound*.

Defendants' effort to rely on the Securities Defendants' disclosures in the Offering Documents fails because these disclosures did not disclose, *e.g.,* the abandonment of underwriting guidelines, nor warn the Bank of any of the reasons why the Rating Agencies did not believe their credit ratings.  *See* J. Opp. at 49-50.  Defendants' reliance on *Quinn v. McGraw-Hill Companies, Inc.*, 168 F.3d 331, 336 (7th Cir. 1999), is misplaced.   The basis for the plaintiff's lawsuit in *Quinn*  was that S&P severely downgraded its ratings, a possibility that was expressly disclosed to the plaintiff.  *Id.* at 333.  The Bank is not suing simply because its Certificates were downgraded, rather the crux of the Bank's claims against the Rating Agencies is that they knowingly issued false ratings out of a desire to improve or maintain their market share.  This risk was certainly not disclosed to the Bank or any other investor.  Moreover, the *Quinn* plaintiff received a letter expressly warning him that "*substantial risks* were involved in an investment in the Bonds." *Id.* (emphasis added).  In contrast, the Offering Documents did not disclose to the Bank that there were "substantial risks" in investing in the Certificates, let alone that there were substantial risks that origination standards would be disregarded and ratings intentionally inflated.  A disclosure that a rating may be lowered "[*i]]f* the performance of the . . . certificates is substantially worse than assumed by the rating agencies," CR Mem. 23 (emphasis added), did not disclose that the Rating Agencies did not believe their assumptions about the performance of the Certificates when the ratings were issued.

Finally, even if the Bank's "sophistication" could have had any bearing on its knowledge of the risks or reliability of the ratings (and it did not), investor sophistication is only one of at

least *eight* different factors relevant to the reasonableness of reliance.  *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir. 1987).  "[N]o single factor is determinative" and the fact finder must "balance[e] . . . all relevant considerations."  *Id*  Given this, Defendants cannot argue that the Bank's purported sophistication was so significant that, as a matter of law, it overpowered each of the seven other relevant factors.[37]

### 5. Although not required, the Bank has sufficiently pleaded loss causation.

Defendants argue that the Bank must plead "loss causation," *i.e.* "a 'causal connection' between the credit ratings . . . and the alleged decline in the market value of the Certificates."  CR Mem. 24-25.  This is not required to state—or prove—a claim under Massachusetts common law.  *See, e.g.*, *Reisman*, 787 N.E.2d 1068.  Rather, "where reliance on a fraudulent misstatement is a substantial factor in the *decision to purchase* and/or retain stock, the maker of a false representation is liable for a subsequent loss in the value of stock suffered in reliance on the false representation."  *Id.* (emphasis added) (citing *David v. Belmont*, 197 N.E. 83, 85 (Mass. 1935) ("[T]he risk of a fall, from whatever cause, is presumed to have been contemplated by the defendant when he falsely and fraudulently induced the plaintiff to retain his stock.")).[38]

Defendants' argument is based entirely on New York law, CR Mem. 24-25, which is not applicable here.  *See supra* § IV.A.  Regardless, the "loss causation" requirement under New York law is not nearly as stringent as Defendants assert.  Under New York law, "[l]oss causation is causation in the traditional 'proximate cause' sense."  *Glidepath Holding B.V. v. Spherion*

---

[37] Even if New York law applied, the "affirmative duty" imposed on "sophisticated investors," CR Mem. 22, requires only that investors "make use of the means of verification . . . available to it."  *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195 (N.Y. App. Div. 2012).  Because the Bank did not have access to the loan files, it did not have any means to verify the accuracy of the ratings.  As noted in *Anschutz*: "the Rating Agencies fail to explain how . . . [plaintiff] could have discovered the then-non public information . . . that the Rating Agencies made actionable misrepresentations."  785 F. Supp. 2d at 827 n.26.

[38] "That other factors—in the case of stocks or bonds, general economic . . . conditions—might also have contributed to the loss does not preclude recovery."  *Reisman*, 787 N.E.2d at 1070.

*Corp.*, 590 F. Supp. 2d 435, 457 (S.D.N.Y. 2007).  As the Second Circuit explained:

> [A] misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.

*Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005).

This is precisely what the Bank alleged.[39]  The Bank has suffered hundreds of millions of dollars in other than temporary impairment ("OTTI") on the Certificates.  Compl. ¶ 18.  The Bank was forced to take OTTI because of the current and anticipated future poor performance of the underlying mortgages—*i.e.* if borrowers do not pay their mortgages, the trusts cannot pay certificate holders.  *Id.*  The mortgages experienced widespread defaults and delinquencies because they were originated in violation of underwriting and appraisal standards—*i.e.* they were originated without regard for the ability of borrowers to repay.  *Id.* ¶¶ 260-263.

These risks were at the center of the "zone of risk" concealed by the triple-A credit ratings.  The ratings "address[ed] the likelihood of the *receipt of all payments on the mortgage loans* by the related Certificate holders."  *Id.* ¶ 737 (emphasis added).  The ratings purported to take into account the ability of the borrowers to repay as well as compliance with the applicable underwriting and appraisal standards.  *Id.* ¶¶ 212-213.

Contrary to Defendants' assertion, CR Mem. 25, New York law does not "impose[] on plaintiffs the heavy burden of pleading 'facts sufficient to exclude other non-fraud explanations.'" *King Cnty., Wash. v. IKB Deutsche Industriebank AG ("IKB I")*, 708 F. Supp. 2d 334, 342 (S.D.N.Y. 2010).  *Accord Gayle v. City of New York*, 703 N.E.2d 758, 759 (N.Y. 1998) ("Plaintiffs need not positively exclude every other possible cause of the accident.").  Defendants cite only *Laub v. Faessel*, which did not hold that a plaintiff must *exclude* all *non-fraud*

---

[39] *Laub v. Faessel,* 297 A.D.2d 28, 32 (N.Y. App. Div. 2002), is inapposite, as "plaintiff [did] not allege . . . that defendants made any misrepresentations about . . . any specific stock."  *Id.*

explanations but rather faulted plaintiffs for failing to *plead* the *fraudulent* explanation.  745

N.Y.S.2d 534, 537 (N.Y. App. Div. 2002).  As one court explained:

> To hold that plaintiffs failed to plead loss causation solely because the credit crisis occurred contemporaneously with Rhinebridge's collapse would place too much weight on one single factor and would permit S & P and Moody's to blame the asset-backed securities industry when their alleged conduct plausibly caused at least some proportion of plaintiffs' losses.

*IKB I*, 708 F. Supp. 2d at 343.  In any event, Defendants' assertion that the "unforeseeable and

unprecedented market-wide financial crisis" was an intervening cause of the Bank's losses, CR

Mem. 25, inappropriately presumes that Defendants could not foresee the crisis and ignores that

the alleged cause of the Bank's losses—undisclosed abandonment of mortgage underwriting

concealed by artificially inflated credit ratings—is widely considered to be among the leading

causes of the financial crisis.[40]  Defendants provide no reason for the court to conclude, *as a

matter of law*, that the financial crisis was *intervening*—much less a *cause* of any losses—as

opposed to just yet another *result* of the same malfeasance alleged in the Complaint.

To require the Bank to plead more at this stage would be inconsistent with the rule that,

even where Rule 9(b) is applicable, allegations regarding "loss causation" need only satisfy Rule

8(a).  *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  Because the Bank has

pleaded a plausible inference that "some or all of the risk is concealed by the defendant's

misrepresentation or omission, . . . loss causation [has been] sufficiently pled."  *Nathel v. Siegal*,

592 F. Supp. 2d 452, 467-68 (S.D.N.Y. 2008) (loss causation adequately pleaded where "[t]he

high risk of loss of Plaintiffs' investment was actively concealed by these misrepresentations").

---

[40] Although Defendant's cite *Lentell*, CR Mem. 25, there the court merely stated that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud *decreases*."  396 F.3d at 173 (emphasis added).  As the Southern District of New York subsequently stated in upholding similar claims of loss causation, "*Lentell* does not say that the existence of a market-wide phenomenon necessarily *eliminates* a plausible causal connection between plaintiffs' losses and defendants' alleged fraud."  *IKB I*, 708 F. Supp. 2d at 343.

The result sought by Defendants is, at the end of the day, perverse.  They helped precipitate the financial collapse with their knowingly inflated ratings, but the ensuing collapse purportedly is an "intervening" event that immunizes them from liability.  The law does not support this result.

**C.      The Bank has Stated a Claim of Negligent Misrepresentation.**

The Bank has alleged negligent misrepresentation claims against Moody's and S&P with respect to four private placement PLMBS.  Compl. ¶¶ 1008-21.  A defendant is liable for negligent misrepresentation if, "in the course of [its] business, profession or employment, or in any other transaction in which [it had] a pecuniary interest, [it] suppli[ed] false information for the guidance of others in their business transactions without exercising reasonable care or competence in obtaining or communicating the information, . . . and [if those others] suffered pecuniary loss caused by their justifiable reliance upon  the information." *Cumis*, 918 N.E.2d at 47-48 (quotation marks and citations omitted).  Defendants do not contest that the ratings were provided in the course of their business.  For the reasons stated above, the Bank has pleaded that (1) the information was false; (2) that defendants failed to exercise reasonable care;[41] (3) that the Bank's reliance was justifiable; and (4) that the Bank suffered pecuniary loss caused by its reliance on the ratings.  Defendants' remaining arguments are that the information was not provided for the Bank and that these negligent misrepresentation claims are preempted by federal statutory and constitutional law.  These arguments are without merit.

---

[41] Defendant's assertion that "a claim predicated on negligence . . . does not provide the requisite state of mind to render an opinion actionable," CR Mem. 30, is legally erroneous.  First, it ignores that subjective falsity is but one of three *distinct* bases upon which an opinion can be actionable; an opinion is also actionable if it falsely implied it was based in fact or if defendants possessed superior knowledge or access to information.  *See supra* § IV.B.1.  Second, that a party can be negligent even if it did not know its statements were false does not compel a corollary conclusion that it is not negligent in communicating statements it knows are false.  Notably, the Southern District of New York recently rejected this very argument.  *IKB II*, 863 F. Supp. 2d at 305-06.  *See also LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1092–95 (S.D.N.Y. 1996) (negligent misrepresentation based on a false credit rating); *Eaves v. Designs for Finance, Inc.*, 785 F. Supp. 2d 229, 256 (S.D.N.Y. 2011) (same).

1.      **S&P and Moody's owed the Bank a duty of care.**

S&P and Moody's argue that, under the economic loss doctrine, Massachusetts law requires "the defendant[s] had actual knowledge of the plaintiff's identity."  CR Mem. 28.  This is false.  *See* J. Opp. at 81-84.  Rather, the Supreme Judicial Court adopted Section 552 of the Restatement (Second) of Torts, which provides that liability extends to "loss suffered by . . . the person *or one of a limited group of persons* for whose benefit and guidance he intends to supply the information or *knows that recipient intends to supply it*."  *Nycal Corp. v. KPMG Peat Marwick LLP.*, 688 N.E.2d 1368, 1371 (Mass. 1998) (quoting  Restatement (Second) of Torts § 552 (1977)) (emphasis added).  Here, S&P and Moody's provided their ratings to a "recipient," the Securities Defendants with whom they contracted.  *E.g.* Compl. ¶ 1017.  The Bank, in turn, was "one of a limited group of persons for whose benefit and guidance . . . [the Rating Agencies] kn[ew] the recipient [Securities Defendants] intend[ed] to supply" the ratings.  *Id*. ¶¶ 4, 7, 208, 739, 1011, 1013.[42]  Indeed, Moody's and S&P explicitly acknowledged that investors relied heavily on their credit ratings.  *Supra* § IV.B.1.b.  Accordingly, S&P and Moody's owed the Bank a duty of care.[43]  *See, e.g.*, *Anschutz*, 785 F. Supp. 2d at 826 ("This is not a case where the Ratings Agencies 'merely knew' of the possibility of their ratings being repeated to third parties.").[44]

---

[42] Moody's and S&P evaluated *inter alia* the ability of the mortgagors to make payments. Compl. ¶ 213, and their ratings "address the likelihood of the receipt of all payments on the mortgage loans by the related Certificate holders."  *Id.* ¶ 737.  This information is relevant primarily—if not exclusively—to the *investors* deciding whether to purchase the Certificates.

[43] Contrary to Defendants' assertion, CR Mem. 28, *Reisman* did not—and could not—hold otherwise.  787 N.E.2d at 1067.  Indeed, *Reisman* paraphrased *Nycal* as extending the tort of negligent misrepresentation to "a limited group of persons," *id.*, and explicitly recognized that "the Supreme Judicial Court . . . adopt[ed] . . . § 552 of the Restatement." *Id.* at 1075.

[44] *See generally Stone/Cong. v. Town of Andover*, No. 95-4510, 1997 WL 11737, at *3 (Mass. Dist. Ct. Jan. 3, 1997) ("Although [Defendant] did not know the specific identity of the party to be so affected, in the ususal chronology of drafting, bidding and contracting, an architect does reasonably foresee that a general contractor will base its bid upon the architect's plans.");

This group of investors was sufficiently "limited" for the purposes of the Restatement. The Bank was one of a limited group of institutional investors that could afford $50 million PLMBS. J. Opp. at 81-84. This alone is sufficient. *Id.* Nonetheless, the Bank has pleaded negligent misrepresentation claims only with respect to private-placement deals, Compl. ¶ 1009, which could be sold only to "Qualified Institutional Buyers" ("QIB"). A QIB is one of a narrow subset of institutional investors, including banks, insurance companies, and investment companies, that own or invest in at least $100 million in securities. 17 C.F.R. § 230.144A(a)[45]. Because this group of QIB's was "distinct from the much larger class who might reasonably be expected sooner or later to have access to" the credit ratings, *Nycal*, 688 N.E.2d at 1372 (quoting Restatement (Second) of Torts § 552, comment h, at 132-33), Moody's and S&P owed a duty of care to these QIBs, including the Bank. *See, e.g.*, *Anschutz*, 785 F. Supp. 2d at 826 ("[A]lthough the class of QIBs ["Qualified Institutional Buyers"] might number in the thousands, it is still a circumscribed and identifiable group that the Ratings Defendants not only knew would have access to the ratings but who necessarily rely on the ratings in order to purchase investment grade securities.").[46] Although *Ohio Police & Fire I* reached a contrary conclusion, CR Mem. 29, it did so based on a unique requirement of Ohio law.[47]

---

*Gavett v. Roto-Rooter Services, Co.*, No. 01-10385, 2001 WL 1688896, at *2 (D. Mass. Nov. 27, 2001) ("In the "usual chronology" of sewer inspection, the inspection company knows that its services are providing information to a group of . . . potential purchasers of the property.").

[45] *E.g.*, CCMFC 2007-1A Private Placement Memorandum at iv. *See also* SEC Rule 144A, 17 C.F.R. § 230.144A(d)  ("securities are offered or sold only to a qualified institutional buyer").

[46] *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09-2030, 2011 WL 536437, at *12 n.6 (S.D.N.Y. Feb. 9, 2011), CR Mem. 29, is unpersuasive. While the court stated in dicta that there was no duty under California law because the universe of QIBs "is far from 'narrow and circumscribed,'" 2011 WL 536437, at *12 n.6, the court did not apply the legal standard beyond merely quoting the words "narrow and circumscribed," nor did it provide any factual basis to conclude that the universe of QIBs was not "narrow and circumscribed." *Id.*

[47] Under Ohio law, "'a special relationship' must exist to create a duty." *Ohio Police & Fire I*, 813 F. Supp. 2d at 880. However, Massachusetts does not require a "special relationship." *See* *NPS, LLC v. Ambac Assurance Corp.*, 706 F. Supp. 2d 162, 179 (D. Mass. 2010).

Defendants also criticize the Bank for failing to allege "that S&P or Moody's had relevant contacts with FHLB." CR Mem. 29. However, the Supreme Judicial Court explicitly rejected any such requirement. *Nycal*, 688 N.E.2d at 1370-71 (rejecting requirement that there must be "some conduct on the part of the [defendant] creating a link to [the plaintiff.]"). Similarly, Defendants' closing assertion—that it is not sufficient that "Moody's and S&P intended to supply their ratings to investors *like* FHLB," CR Mem. 29 (emphasis in original)—is also expressly contradicted by *Nycal*. Indeed, under *Nycal*, that is *all* that is required.

Finally, even if New York law applies, Defendants misinterpret the nature of the "special relationship" required between a defendant and plaintiff. CR Mem. 26-28. First, although a plaintiff must be a "known party," CR Mem. 27, "[b]ecause [the Bank was a] member[] of a select group of qualified investors, [it was a] known part[y] towards whom the Rating Agencies targeted their alleged misrepresentations." *IKB II*, 863 F. Supp. 2d at 308 (New York case law "should not be read to require that the defendant know the identity of each particular plaintiff; rather, plaintiffs are a 'known party' if they are members of a 'settled and particularized class,' as opposed to an 'indeterminate class.'" (quoting *White v. Guarente*, 372 N.E.2d 315, 320 (N.Y. 1977); *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931))). Second, although there must be "conduct by the defendants linking them" to the class of plaintiffs, CR Mem. 27, this test is satisfied because "not only have plaintiffs alleged that the Rating Agencies were aware their ratings would be given to a select group of qualified investors, but plaintiffs also alleged that the Rating Agencies issued their ratings with the end and aim of inducing that limited group of investors to invest." *IKB II*, 863 F. Supp. 2d at 309. *See supra* § IV.B.3.

## 2. The Bank's negligent misrepresentation claims are not preempted.

The Bank's claims are not preempted by the Credit Rating Agency Reform Act of 2006 (the "CRARA"), CR Mem. 31-33, because the CRARA does not apply retroactively and because

neither the text nor the purpose of the CRARA supports preemption.

Although the CRARA was passed in 2006, the Rating Agencies did not become subject to its provisions until September 24, 2007, when they registered as NRSROs under CRARA's new registration requirements.[48]  However, the ratings of the four private placement Certificates—the only Certificates for which the Bank has stated negligent misrepresentation claims—were communicated to the Bank on or before September 21, 2007.  Compl. ¶ 1009.

The CRARA is not retroactive.  There is a "deeply rooted" presumption in our law against retroactivity.  *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994).  "Congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  The CRARA contains no retroactivity provision, and "[t]here is certainly no expression of Congressional intent in CRARA that its provisions be applied retroactively."  *Illinois v. McGraw-Hill Co.*, No. 12-02535, 2012 WL 5440768, at *7 (Ill. Cir. Ct. Nov. 7, 2012).  The SEC clearly stated that the CRARA did not apply to the Rating Agencies until September 24, 2007:

> These firms [S&P, Fitch, and Moody's] registered with the Commission as national recognized statistical rating organizations in September 2007. . . . These firms were not subject to the Credit Rating Agency Reform Act of 2006 or Commission regulations for credit rating agencies until September 2007.

S.E.C., Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies, July 8, 2008, *available at* http://www.sec.gov/news/studies/2008/craexamination070808.pdf; *see also Illinois v. McGraw-Hill*, 2012 WL 5440768, at *7 ("The SEC has acknowledged that S&P was not subject to the CRARA until it registered as an NRSRO in September 2007."). Defendants provide no reason to apply the CRARA retroactively, and

---

[48]*See* Press Release 2007-199, S.E.C., *Seven Credit Rating Agencies Register with SEC as [NRSROs]* (Sept. 24, 2007).  Although the Rating Agencies previously had NRSRO status, the CRARA created a detailed scheme to govern the activities of NRSROs, including a process by which a rating agency must register to obtain (or retain) NRSRO status.  15 U.S.C. § 78o–7(a).

none exists.

Defendants' preemption argument falters substantively as well.  Any preemption analysis must begin from two principles.  First, the "starting presumption" is that "Congress does not intend to supplant state law." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995).  This is particularly true when Congress has legislated "in a field which the States have traditionally occupied[.]" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.*  Preemption should be found *only* where it represents the "clear and manifest intent of Congress." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

The Rating Agencies rely, primarily, on two clauses of the CRARA.  CR. Mem. 31. First, Defendants cite 15 U.S.C. § 78o(c)(1), which vests in the SEC "exclusive authority to enforce" the CRARA "with respect to any [NRSRO], if such [NRSRO] issues credit ratings in material contravention of [applicable] procedures . . . , including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest."  This provision does not support Defendants' argument because the Bank's claims do not relate to a failure to comply with applicable procedures.  Moreover, the CRARA explicitly preserved the authority of state and other federal agencies to, *inter alia*, "investigat[e] and bring[] an enforcement action with respect to fraud or deceit against any [NRSRO]."  15 U.S.C. § 78o–7(o)(2) ).  *Connecticut v. Moody's Corp.*, No. X04HHDCV10, 2012 WL 2149408, at *5 (Conn. Super. Ct. May 10, 2012) (Section 78o-7(o) ) "makes clear that Congress did not intend to shield rating agencies from liability from state deceptive practices regulation.").[49]  Where "Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both

_____

[49] Additionally, 15 U.S.C. § 78o–7(i)(2) preserves "the operation of any of the antitrust laws" as well as portions of the FTC Act, 15 U.S.C. § 45, which declares unfair methods of competition unlawful and authorizes the FTC to take enforcement actions to prevent such conduct.

concepts and to tolerate whatever tension there is," the case for preemption is "particularly

weak."  *Wyeth v. Levine*, 555 U.S. 555, 575 (2009) (citation omitted).

Second, Defendants rely on 15 U.S.C. § 78o(c)(2) , which provides that "neither the

[SEC] nor any State . . . may regulate the substance of credit ratings or the procedures and

methodologies by which any ['NRSRO'] determines credit ratings."  *Id.*  Although § 78o(c)(2)

restricts the authority of states to "regulate," the term "regulate"—and its variants—has been

interpreted narrowly.  Statutory provisions prohibiting "regulations" have been interpreted to

preempt only *positive* enactments.  *See, e.g.*, *Sprietsma v. Mercury Marine*, 537 U.S. 51, 63

(2002) (clause in the Federal Boat Safety Act preempting state or local "law or regulation" was

"most naturally read as not encompassing common-law claims.").

Next, although Congressional intent is the "ultimate touchstone in every pre-emption

case," *Medtronic*, 518 U.S. at 485 (internal quotation marks omitted), Defendants fail to cite any

legislative history supporting preemption.  And there is none.  As one court recently concluded:

> There is nothing in either the text of the statute or the legislative history to
> establish that Congress intended to preempt a common law negligent
> misrepresentation claim based in part or in whole on allegations that credit
> agencies failed to follow their own practices.

*Anschutz*, 785 F. Supp. 2d at 830.  In fact, preemption would be inconsistent with the stated

purpose of the CRARA: "[t]o improve ratings quality for the protection of investors and in the

public interest."  Pub. L. No. 109–291, 120 Stat. 1327, 1327 (2006) (preamble).  "Given [the]

express purpose to protect investors . . . , it would be incongruous, to say the least, to conclude

that Congress also intended to strip investors . . . of longstanding remedies for misconduct by

rating agencies." *Illinois v. McGraw-Hill*, 2012 WL 5440768, at *8.[50]

---

[50] Defendants' passing reference to principles of conflict preemption, CR Mem. 33 n.19, falls
flat.  The Rating Agencies have failed to articulate any argument as to why they could not
comply with the requirements of both state and federal law.  *Gade v. Nat'l Solid Waste Mgmt.*

Finally, Defendants assertion that courts have found "similar" claims preempted, CR Mem. 32-33, is erroneous.  *Genesse County* held only that "some" of plaintiffs theories—those regarding "faulty practices and procedures"—were preempted by CRARA and explicitly held that plaintiffs' ultimate claim— "that S & P did not believe their ratings"—was *not* preempted. 825 F. Supp. 2d at 1256.  Similarly, although Defendants cite the transcript of a Tennessee state trial court, the court provided no analysis and indeed actually stated that it "*cannot* read that act in any way to conclude . . . that act is designed by Congress to preempt such litigation."  *First Community*, hearing tr. at 21 (emphasis added).  And in any event, the vast majority of cases have rejected this very same preemption argument in similar litigation.  *See, e.g. Nat'l Century*, 580 F. Supp. 2d at 651; *Anschutz*, 785 F. Supp. 2d at 830; *Illinois v. McGraw-Hill*, 2012 WL 5440768; *Connecticut v. Moody's Corp.*, 2012 WL 2149408, at *8.

**3.    The First Amendment does not bar the Bank's negligent misrepresentation claims.**

S&P and Moody's next argue that their credit ratings of the four private placement Certificates are opinions protected by the First Amendment and that, as such, they can give rise to liability only if the Bank can establish they were made with "actual malice" rather than mere negligence.  CR Mem. 33-37.  This argument is erroneous.

As an initial matter, there is no *per se* First Amendment privilege for "opinion." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (no "separate constitutional privilege for 'opinion[s]'").  Instead, an opinion that is "sufficiently factual to be susceptible of being proved true or false" is actionable. *Id.* at 19-21.  As set forth above, the credit ratings at issue are indeed the sort of "opinions" which have been deemed actionable.  *See supra* § IV.B.1.

---

*Ass'n*, 505 U.S. 88, 98 (1992).  Nor can an intent to occupy the entire field be inferred where, as here, Congress expressly preserved state authority to bring enforcement actions based upon fraud and deceit.  *See Altria Grp., Inc. v. Good*, 555 U.S 70, 75 (2008).

Nor does the Bank need to satisfy the "actual malice" standard established in *New York Times v. Sullivan*, 376 U.S. 254 (1964).  The Constitution requires proof that a false statement was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false"—only if the statement regards both a public ficture and a matter of public concern.  *N.Y. Times*, 376 U.S. at 280; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974).  However, this constitutional protection does not apply to statements that do not involve public figures or matters of public concern.  *See*. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-61 (1985).  As the Supreme Court explained:

> We have long recognized that not all speech is of equal First Amendment importance.  It is speech on "'matters of public concern'" that is "at the heart of the First Amendment's protection." . . .  In contrast, speech on matters of purely private concern is of less First Amendment concern.

*Id.* at 759.  *Accord Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011).[51]  When a false statement involves neither public figures nor matters of public concern, it is constitutional to impose liability for negligence.  *See Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 108 (1st Cir. 2000).[52]

Because the ratings of the four private placement Certificates pertained to investments available only to a small group of institutional investors, they concerned neither matters of public concern *nor* public figures.  Courts have consistently held that credit ratings of investments

---

[51] Notably, all of the other cases cited by Defendants as applying the "actual malice" standard involved defamation claims brought by *public figures*. *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) ("whether a public figure may recover damages . . . caused by the publication of an ad parody offensive to him"); *St. Amant v. Thompson*, 390 U.S. 727, 728 (1968) ("public official's defamation action"); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 492 (1984) ("petitioner did not contest the conclusion that it was a public figure, or the applicability of the *New York Times* standard"); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001) ("CSI concedes that it is a public figure").

[52] Although it is unclear what, if any, mental state is required in a case not involving public figures or matters of public concern, it can be no more than negligence, as negligence is sufficient in cases involving private parties and matters of *public* concern. *See Veilleux*, 206 F.3d at108 ("private individuals must prove . . . at least to negligence on the part of a media defendant, at least as to matters of public concern" (citing *Gertz*, 418 U.S. at 347)).

targeted only to a limited number of institutional investors do not address matters of public concern.  *See, e.g.*, *Abu Dhabi I*, 651 F. Supp. 2d at 176 (explaining that "where a rating agency has disseminated [its] ratings to a select group of investors rather than to the public at large, the rating agency is not afforded the same [First Amendment] protection" and holding that the ratings were not entitled to First Amendment protection because they "were provided . . . in connection with a private placement to a select group of investors"); *Anschutz*, 785 F. Supp. 2d at 831-32 ("Plaintiff's allegations, that the ratings at issue here were . . . only distributed to the select group of QIBs, satisfies the Court—at this juncture—that the First Amendment does not require TAC to meet the "actual malice" standard for its misrepresentation claims."); *In re Nat'l Century*, 580 F. Supp. 2d at 640 (refusing to apply the First Amendment where Moody's ratings had been "targeted to a select class of institutional investors with the resources to invest tens of millions of dollars").  Similarly, courts have held that where, as here, the rated investments are issued by limited-purpose trusts—as opposed to publicly held corporations—the ratings do not address "public figures" for the purposes of the First Amendment.  *See, e.g.*, *Genesee Cty.*, 825 F. Supp. 2d 1082; *Anschutz*, 785 F. Supp. 2d at 828-29 (the actual malice standard does not apply because there "has been no showing here that the Trusts . . . are 'public figures.'").

Although Defendants note that some courts have held that credit ratings "are matters of public concern," CR Mem. 34, these courts did so only where the credit ratings pertained to securities issued by public corporations or other investments available to the public at large.[53] Here, however, the private-placement ratings pertain to investments issued by limited purpose

---

[53] *See, e.g.*, *Compuware Corp.*, 499 F.3d at 525–29 (addressing published ratings reports regarding a publicly-held corporation); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 511 F. Supp. 2d 742, 819 (S.D. Tex. 2005)  ("[N]ationally published credit agency ratings reports regarding Enron, a top Fortune 500 company, . . . are matters of public concern."); *Jefferson Cnty.*, 175 F.3d at 850 (addressing ratings of school district bonds published in Moody's "Rating News," an electronically distributed information service sent to subscribers and news services).

trusts and were directed only to a limited group of qualified investors.  Accordingly, these ratings

are subject to a claim for negligent misrepresentation; proof of actual malice is not required.

**D .**     **The Bank Has Stated a Claim Under Chapter 93A .**

Under chapter 93A a plaintiff must plead that (1) a defendant engaged in "an unfair

method of competition or an unfair or deceptive act"; (2) that caused plaintiff's "loss of money

or property"; (3) while both plaintiff and defendant were engaged "in any trade or commerce."

M.G.L. c. 93A, § 11.  Section 11 also provides an affirmative defense for a defendant who can

prove that the unfair or deceptive act did not occur "primarily and substantially" in

Massachusetts. *Id.*  Defendants challenge this claim by misstating the pleading burden, ignoring

controlling case law, and overlooking the Complaint's allegations.

As an initial matter, Defendants' argue that because their ratings are opinions, they are

not actionable under chapter 93A.  CR Mem. 43.  However, as the Bank has explained at length,

*see supra* § IV.B.1, the ratings are actionable, both because they imply the existence of facts that

were not true, *see, e.g.*, *Stolzoff*, 792 N.E.2d at 1041, 1045, and because the Rating Agencies did

not believe their ratings.  *See, e.g.*, *Sherburn v. Meade*, 21 N.E.2d 946, 949-50 (Mass. 1939).

**1.**     **Defendants fail to establish their affirmative defense as a matter of law.**

The Rating Agencies' contention that their unfair or deceptive acts did not occur

"primarily and substantially" in Massachusetts is an affirmative defense that is *Defendants*'

burden to prove.  *Amcel Corp. v. Int'l Executive Sales, Inc.*, 170 F.3d 32, 35 (1st Cir. 1999).

Affirmative defenses may be raised by a motion to dismiss, but only if "the facts establishing the

defense [are] clear on the face of the plaintiff's pleadings."  *Trans-Spec Truck Serv., Inc. v.*

*Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (quotation marks and citation omitted).  Thus,

Defendant cannot prevail by pointing to what the Bank has *not* pleaded.  CR Mem. 38-39.

Instead, the question is whether the Complaint affirmatively establishes that the unfair and

deceptive acts did *not* occur "primarily and substantially" in Massachusetts.  It does not.

The Complaint, rather, is consistent with the claim's "center of gravity" lying in Massachusetts.  *Kuwaiti Danish Computer Co. v. Digital Equip. Co.*, 781 N.E.2d 787, 799 (Mass. 2003).  The Complaint alleges that the Bank, located in Boston, "received and acted upon" the Rating Agencies' deceptions in Massachusetts.  Compl. ¶ 1004; *see also id.* ¶¶ 2, 22, 28.  It also alleges that the Bank suffered all its losses in Massachusetts.  *Id.* ¶ 1004.  *See RGJ Assocs., Inc. v. Stainsafe, Inc.*, 338 F. Supp. 2d 215, 234 (D. Mass. 2004) (noting that not just the source of the wrongful conduct, but also "where the misconduct was received and where it was 'acted upon,'" are relevant to the center-of-gravity analysis (citation omitted)).

Defendants, however, believe the Complaint must be dismissed because it has not alleged that the deceptive communications were formulated in and sent from Massachusetts.  CR Mem. 38-39.  But it is entirely possible for deceptive acts to have occurred "primarily and substantially" in Massachusetts even though the source of the deception came from outside it. For example, where a physician recruitment firm in New York drafted deceptive statements in New York and sent them into Massachusetts, and the plaintiff hospital ingested, relied on, and suffered losses from the deceptive statements in Massachusetts, the First Circuit held that the acts happened primarily and substantially in Massachusetts.  *See Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1262, 1265-66 (1st Cir. 1990) ("The victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its venomous sting.  The site of the victim's ingestion is therefore critical to a determination of whether the deceptive or unfair acts were committed primarily and substantially in the Commonwealth.").  *Clinton*, which is still good law, *see Uncle Henry's Inc v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005), shows that Defendants cannot carry their burden

as a matter of law.  The two contrary cases Defendants cite were decided after discovery and

trial—after defendants submitted evidence to support their affirmative defense.  CR Mem. 39

(citing *Renwood Winery, Inc. v. Landmark Label, Inc.*, No. 04-1402, 2005 WL 2757537 (Mass.

Ct. App. Oct. 25, 2005); *Stoneridge Control Devices, Inc. v. Teleflex, Inc.*, No. 021554, 2004

WL 389105 (Mass. Super. Ct. Feb. 17, 2004)).[54]  Nor can Defendants rely on *Fishman*

*Transducers v. Paul*, decided after "extensive discovery."  684 F.3d 187, 190 (1st Cir. 2012).[55]

## 2.    The Bank and the Rating Agencies shared a commercial relationship.

While a chapter 93A plaintiff must show that the parties had "some 'commercial

relationship,'" *Spencer v. Doyle*, 733 N.E.2d 1082, 1087 (Mass. Ct. App. 2000) (citation

omitted), this requirement is not a demanding one.  Privity is not required, and a plaintiff must

simply allege that the relationship was "more than trivial." *Reisman*, 787 N.E.2d at 1078.

The relationship between the Bank and the Rating Agencies far surpassed the trivial.

First, the regulations governing the Bank required it to purchase only triple-A-rated securities.

Compl. ¶¶ 8, 211.  The transactions at issue in this case would not have happened had it not been

for the Rating Agencies' actions.  Their role in the deals was essential.  Second, the Rating

Agencies took an active role in the deals, "working cooperatively with investment bankers" to

---

[54]Likewise, in *In re National Century Financial Enterprises, Inc.*, 846 F. Supp. 2d 828, 891 (S.D.
Ohio 2012), the court adjudicated a motion for summary judgment after discovery. Defendants
cite two other nonprecedential decisions, one not even from Massachusetts.  *BT Triple Crown*
*Merger Co. v. Citigroup Global Markets Inc.*, No. 600899/08, 2008 WL 1970900, at *7 (N.Y.
Sup. Ct. 2008); *Ezenia! Inc. v. Datacraft Mex., S.A.*, Nos. 033390, 86763, 2004 WL 3091658,
at *2-3 (Mass. Super. Ct. 2004)).  But in neither *Ezenia!* nor *BT Triple Crown* did the courts
mention any allegation that the harm from the deceptive acts was confined to Massachusetts.

[55]In *Fishman*, a home shopping network engaged in false advertising across the country.  The
plaintiff suffered lost profits due to trademark infringement, and given the network's wide
reach, its losses necessarily stretched across the country rather than being located only in
Massachusetts.  684 F.3d at 190.  Here, by contrast, the only relevant harm is to the Bank's
balance sheet, which is entirely in Massachusetts.  Defendants argue that the credit ratings were
widely disseminated, but fail to provide any information about other investors who purchased
the same Certificates as the Bank.  At any rate, this has nothing to do with whether the
deceptive acts were "ingested" in Massachusetts.  *Clinton*, 907 F.2d at 1265-66.

ensure that the securities were awarded triple-A ratings. *Id.* ¶ 764; *see also, e.g.*, *id.* ¶¶ 750, 752-53, 755, 762, 769, 1001. Thus, *Imprimis Investors, LLC v. KPMG Peat Marwick LLP*, on which the Rating Agencies rely, is not on point: there, the auditor "played no active role," and the investors did not "rel[y] upon" the auditor's report. 868 N.E.2d 143, 153 (Mass. Ct. App. 2007). This case is closer to *Reisman*, where the court upheld a chapter 93A claim, noting the active role the auditor played in the transaction. *Reisman*, 787 N.E.2d at 1078.

### 3.     A chapter 93A claim is independent of common-law claims.

The Rating Agencies argue that if the Bank's common-law claims fail, so must its chapter 93A claim. Several district courts have agreed with this proposition, *see Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 590 F. Supp. 2d 196, 212 (D. Mass. 2008), but the proposition cannot be squared with the consistent holding of the Supreme Judicial Court that a claim under chapter 93A is "not dependent on traditional tort or contract law concepts." *Kattar v. Demoulas*, 739 N.E.2d 246, 257 (quoting *Heller v. Silverbranch Constr. Corp.*, 382 N.E.2d 1065, 1070 (Mass. 1978)). To state a chapter 93A claim, "it is *neither necessary* nor sufficient that a particular act or practice violate common or statutory law." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 184 (1st Cir. 2009) (emphasis added, quotation marks and citation omitted). A chapter 93A claim, then, is independent of common-law claims.

Independent of any common-law claim, it was deceptive and unfair for the Rating Agencies to give triple-A ratings to securities based on assumptions it knew to be false, Compl. ¶¶ 740-44, 777-88, influenced by financial conflicts of interest, *id.* ¶¶ 745-47, and subject to constant pressure by investment banks, *id.* ¶¶ 748-53, all while being aware that the quality of their ratings was drastically impaired, *id.* ¶¶ 754-59. Motivated by nothing more than the perceived need to expand market share, *id.* ¶¶ 760-69, the Rating Agencies issued ratings they knew would be relied upon by investors like the Bank, *see supra* § IV.B.3, and helped to cause

the worst financial crisis since the Great Depression, *see* S. Subcomm. on Investigations, *Wall Street and Financial Crisis: Anatomy of a Financial Collapse* (2011).  The "nature," "purpose," and "effect" of the Rating Agencies' actions easily qualify as unfair or deceptive.  *Mass. Employers Ins. Exch. v. Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995).

## V.    THIS COURT HAS PERSONAL JURISDICTION OVER EACH RATING AGENCY

This Court has general jurisdiction over Defendants Fitch, Moody's, and S&P because each has continuous and systematic business contacts with Massachusetts and derives significant revenue from its business in the Commonwealth. Each Rating Agency does not dispute critical facts supporting personal jurisdiction—such as, *inter alia*, that it derives and has derived millions of dollars in revenue from its Massachusetts business since at least 2006, that it has employees and physical offices in Massachusetts, that it is licensed to do business in Massachusetts, and/or that it has, over the past five or more years, rated literally *thousands* of Massachusetts bond issues, securities, corporations, and other Massachusetts-based entities. These facts demonstrate that each Rating Agency maintains and has long maintained a continuous and systematic course of business in Massachusetts. This Court's exercise of personal jurisdiction over each of the Rating Agencies comports with due process, and the Rating Agencies' Motions to Dismiss the Amended Complaint for Lack of Personal Jurisdiction should be denied.[56]  In the alternative, to the extent the Court determines the Bank has not yet been able to make a *prima facie* showing with respect to any Rating Agency, such Defendant's motion should be stayed and the Bank should be permitted to pursue jurisdictional discovery to aid the Court in determining whether the exercise of personal jurisdiction is appropriate.

---

[56] In the alternative, if the proffered facts are not yet sufficient, the Plaintiff seeks leave to conduct further jurisdictional discovery. As set out below, the Plaintiff has been proactive and diligent in serving jurisdictional discovery, but Fitch has refused to provide any discovery while Moody's and S&P have refused to produce the bulk of the requested discovery.

**A.      This Court Has General Personal Jurisdiction Over Each Rating Agency.**

      **1.      Legal standard.**

On a motion to dismiss for personal jurisdiction, the plaintiff has the burden of showing

that the court has personal jurisdiction over the defendants. *See, e.g., Hannon v. Beard*, 524 F.3d

275, 279 (1st Cir. 2008). Federal courts generally apply a *prima facie* standard, requiring the

plaintiff to proffer evidence that, if credited, supports findings of all facts essential to personal

jurisdiction. *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). A court is required

to take a plaintiff's proffered evidence as true and construe the plaintiff's evidence and factual

assertions "in the light 'most congenial to the plaintiff's jurisdictional claim.'" *Daynard v. Ness,

Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002) (quoting

*Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998)).

A district court may exercise authority over a defendant by virtue of either general or

specific personal jurisdiction. *Daynard,* 290 F.3d at 51. "In determining whether a non-resident

defendant is subject to its jurisdiction, a federal court … 'is the functional equivalent of a state

court sitting in the forum state.'" *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995) (quoting

*Ticketmaster-New York, Inc. v. Alioto,* 26 F.3d 201, 204 (1st Cir. 1994)). Here, personal

jurisdiction is appropriate if the defendants fall within the Massachusetts Long-Arm statute,

M.G.L. c. 223A, § 3.

The Bank alleges that each Defendant is subject to this Court's personal jurisdiction

because the Defendants are subject to general jurisdiction in this state. Compl. ¶ 23. While the

Rating Agencies challenge both specific and general jurisdiction (*see generally* Moody's Mem.

205, 213), the Bank's opposition is based on the assertion of general jurisdiction over the Rating

Agencies, and the Bank is not pressing an argument regarding specific jurisdiction.

General jurisdiction exists when the defendant has engaged in "continuous and

systematic activity" in the forum, even if the activity is unrelated to the suit. *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir. 1992). "In evaluating whether the exercise of personal jurisdiction is warranted, courts concentrate on the quality and quantity of contacts between the . . . defendant and the forum." *U.S. v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 619 (1st Cir. 2001) (citing *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999)). The Massachusetts Long-Arm statute provides for jurisdiction over defendants "causing tortious injury in this commonwealth *by an act or omission outside this commonwealth* if he regularly does or solicits business, or engages in any other persistent course of conduct, or *derives substantial revenue from goods used or consumed or services rendered*, in this commonwealth." M.G.L. c. 223A, § 3(d)  (emphasis added).

The plaintiff must also show that the exercise of personal jurisdiction comports with the Fourteenth Amendment's Due Process Clause. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2850 (2011). To do so, the plaintiff must show that the exercise of jurisdiction would be reasonable with reference to five factors: (1) the burden on the defendant; (2) the forum state's interest; (3) the plaintiff's interest; (4) the judicial system's interest in efficiency; and (5) the common interest in substantive social policies.  *See, e.g., Harrelson v. Seung Heun Lee*, 798 F. Supp. 2d 310, 314-15 (D. Mass. 2011).

> **2.** *Goodyear* **does not modify** *International Shoe's* **general jurisdiction test with respect to the Bank's theory of jurisdiction.**

The Rating Agencies misinterpret the Supreme Court's decision in *Goodyear* to argue for a novel and heightened general jurisdiction standard. *See* Moodys' Mem. 3, Fitch Mem., and S&P Mem. 4. According to the Rating Agencies, general jurisdiction is now "an exceptional exercise of plenary authority that is permitted only rarely and under limited circumstances." S&P Mem. 5. This purported standard would effectively limit general jurisdiction over large

corporations to one or two places—the place of incorporation and the principal place of business. *Id*. This is incorrect. Defendants' argument is premised on the notion that *Goodyear* constitutes a dramatic revision to the standard articulated in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) , but there is nothing in the decision to suggest that the Court meant to rewrite the well-established "continuous and systematic" standard under *International Shoe*. In fact, the *Goodyear* Court repeated the longstanding test articulated in *International Shoe* that a state may assert general jurisdiction over corporations whose "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 131 S. Ct. at 2851 (citing *International Shoe*, 326 U.S. at 317). The Rating Agencies fixate on the phrase "essentially at home" in arguing that general jurisdiction is effectively limited to an entity's corporate headquarters. *See* Moody's Mem. 3 (forum must "effectively function as the corporation's base"). This cannot be correct—the very concept of general jurisdiction over *foreign* corporations based on "continuous and systematic" contacts, *Goodyear*, 131 S. Ct. at 2851, necessarily indicates that a corporate entity can be sued in places other than its corporate headquarters and place of incorporation. Moreover, if the Supreme Court intended to radically revise the standard of *International Shoe*, it would not have referred to that decision as the "canonical opinion" in the area of personal jurisdiction. 131 S. Ct. at 2853.

S&P even goes so far as to suggest that *Goodyear* constitutes a sea change in jurisprudence, whereby the  Supreme Court "rejected the lower courts' 'sprawling view' of general jurisdiction," thereby summarily wiping clean the slate of existing authority on general jurisdiction. S&P Mem. 4. In truth, *Goodyear* rejected *one* lower court's "sprawling view," *Goodyear*, 131 S. Ct. at 2856, finding that the North Carolina Court of Appeals had erroneously conflated the specific jurisdiction "stream of commerce" theory with a general jurisdiction

standard. *Goodyear*, 131 S. Ct. at 2855 (internal citation omitted). This does not mean, and the *Goodyear* court did not hold, that general jurisdiction is "an exceptional exercise of plenary authority that is permitted only rarely and under limited circumstances." *Cf.* S&P Mem. 5.

Nonetheless, the *Goodyear* court's finding that the defendants were subject to North Carolina's jurisdiction emphasizes the differences between the jurisdictional facts there and in the instant case, and demonstrates why *Goodyear*'s rejection of general jurisdiction does not apply here. *Goodyear* concerned the deaths of two North Carolina boys in a bus accident in France. Alleging that defective tires caused the accident, the parents sued the foreign tire manufacturers in a North Carolina court. None of these defendants had *any* contacts with North Carolina: they were based in Luxembourg, Turkey, and France, sold tires only in Europe and Asia, and never visited or solicited sales in North Carolina. In finding general jurisdiction, the North Carolina court erroneously relied on a "stream-of-commerce" theory based on the fact that a few tires had, unrelated to the accident in France, reached North Carolina through the stream of commerce. The *Goodyear* opinion clarified that the stream of commerce theory applies only to specific jurisdiction, and held that the lower court had improperly merged the specific and general jurisdiction analyses. The Bank is not relying on a stream-of-commerce analysis to justify general jurisdiction in this case. Rather, the Bank relies on the Rating Agencies' continuous and systematic contacts with Massachusetts to support general jurisdiction. The analysis that *Goodyear* rejected is simply inapposite to the current action. Accordingly, the general jurisdiction standard of *International Shoe* is fully applicable—and satisfied—here.

   **3.    Each Rating Agency has continuous and systematic contacts with Massachusetts, and satisfies the long-arm statute.**

The weight of authority, including *Goodyear*, shows that the Rating Agencies' contacts with Massachusetts are sufficiently continuous and systematic to subject them to general

jurisdiction. The long-arm statute provides that a court may exercise personal jurisdiction over a nonresident "causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." M.G.L. c. 223A, § 3(d). This section "is to be construed 'extremely broadly,'" and is disjunctive: "only one of its prongs need be satisfied to find statutory authorization for personal jurisdiction." *Fiske v. Sandvik Mining*, 540 F. Supp. 2d 250, 255 (D. Mass. 2008) (quoting *Noonan v. Winston Co.*, 135 F.3d 85, 92-93 (1st Cir. 1998)); *see also Rosenthal v. MPC Computers, LLC*, 493 F. Supp. 2d 182, 194-95 (D. Mass. 2007).

"It is well settled under Massachusetts law that 'substantial revenue' is not an absolute amount nor an absolute percentage of total sale." *Keds Corp. v. Renee Int'l. Trading Corp.*, 888 F.2d 215, 219 (1st Cir. 1989). Rather, the law requires only "literal satisfaction of the statutory requirement." *Id*. The case law makes clear that thousands of dollars constitutes "substantial revenue" for purposes of the Massachusetts Long-Arm Statute. *See Keds Corp.*, 888 F.2d at 219 (noting that sales of $15,000 in 1989 and $5,000 in 1970 each "easily" met the substantial revenue requirement); *American Home Assurance Co. v. Sport Maska, Inc.*, 808 F. Supp. 67, 74 (D. Mass. 1992)(finding that "hundreds of thousands of dollars" derived from sales in Massachusetts met the standard although it amounted to less than 2% of the defendant's total sales); *see also Chase-Walton Elastomers Inc. v. Bennett*, No. 02-1304, 2002 WL 31235508 (Mass. Super. Ct. Oct. 1, 2002) (unpublished) ($1 million dollars in sales in 1999-2001 "may hardly be considered insubstantial" and satisfied the long-arm statute); *Snyder v. ADS Aviation Maint.*, No. 9700968, 2000 WL 145110 (Mass. Super. Ct. Jan. 10, 2000) (yearly revenues of several thousand dollars were substantial under long-arm statute). Thus, the Rating Agencies'

Massachusetts revenue, amounting to *millions* of dollars annually for each corporation, clearly satisfies the substantial revenue requirement of the Massachusetts Long-Arm statute.

Additionally, while registration as a foreign corporation to do business in Massachusetts and naming a registered agent for service of process, standing alone, do not immediately confer general personal jurisdiction, these activities "add some modest weight to the jurisdictional analysis." *Fiske*, 540 F. Supp. 2d at 256 (citing *Sandstrom v. ChemLawn Corp.*, 904 F.2d 83, 89 (1st Cir. 1990)). S&P concedes that both entities named in this suit are licensed to do business in Massachusetts. Affidavit of Janet Sacks ("Sacks Aff.") ¶¶ 7-8. Moody's represents that it is no longer registered to do business in Massachusetts, but appears to have been so registered at the time of the conduct at issue. Affidavit of William Tice ("Tice Aff.") ¶ 2.

The Rating Agencies' reliance on the *Harlow* case is unavailing. *Harlow* concerns the application of Maine's long-arm statute to a medical malpractice suit against a Massachusetts hospital. The general jurisdiction analysis in *Harlow* turns on the fact that treating patients from Maine at a hospital in Massachusetts quite clearly does not constitute "continuous and systematic activity" in Maine. *Harlow v. Children's Hosp.*, 432 F.3d 50, 66 (1st Cir. 2005).

In their dismissal papers, each Rating Agency concedes that it derives substantial revenue from its business in Massachusetts. This fact and the others detailed below show a persistent course of conduct and of services rendered in Massachusetts, and satisfy general jurisdiction.

### a.     Moody's

Moody's states that Moody's Investment Services, Inc. averaged $23 million per year for the years for 2006-2011 in revenue derived from Massachusetts customers. Affidavit of William May ("May Aff.") ¶ 2. Moody's has also leased office space in Boston since at least "late 2004 or early 2005," and has up to four employees in Massachusetts. Affidavit of Geordie Thompson ("Thompson Aff.") ¶¶ 2-5. Moody's pays considerable income, excise, and payroll taxes in

Massachusetts. Tice Aff. ¶ 2. In addition, Moody's broadly markets its subscription-based ratings products and its services in rating securities, bonds, and corporate entities to Massachusetts residents. The Bank is one of thousands of such Massachusetts subscribers and rated entities. *See* Declaration of Amy Williams-Derry ("Derry Decl.") ¶¶ 19-20, Exs. 11-12 (listing Massachusetts subscribers to Moody's products with contract start dates in 2005, 2006, and 2007). Since 2004, the Bank alone has paid Moody's over $400,000 for its subscription services. Declaration of Frank Nitkiewicz ("Nitkiewicz Decl.") ¶¶ 3-5. Moody's annually rates the Bank's creditworthiness, just as it rates numerous other Massachusetts entities. This process entails detailed review of Bank records and visits to the Bank's headquarters in Boston. *Id*. ¶¶ 6-8. Since 2004, the Bank has paid Moody's an additional $400,000 for these ratings. *Id*. ¶ 9.

The Bank's investigation and the limited documents Moody's has produced show that it issued, for example, over 12,000 ratings of municipal bonds issued by the Commonwealth, its agencies, and Massachusetts cities and towns between 2007 and 2012. Derry Decl. ¶¶ 15-17, Exs. 7-9. Moody's has also invoiced thousands of Massachusetts private entities for subscription and rating services rendered between 2005 and 2012. *Id.* ¶¶ 18-20, Exs. 10-12.

     **b.**    **S&P**

S&P concedes that The McGraw-Hill Companies, Inc. derived $184 million in revenue from Massachusetts sales in 2011 alone. Sacks Aff. ¶ 9. S&P Financial Services, LLC also derived over $118 million in revenue from sales in Massachusetts in 2011 alone, *id*. ¶ 10, for a collective total of over $302 million. Both S&P entities are registered as foreign corporations doing business in Massachusetts and concede that they pay considerable taxes in Massachusetts. *Id*. ¶¶ 7-8; Derry Decl. ¶ 25, Ex. 17. The S&P defendants together had over 200 employees in Massachusetts every year from 2004-2012, and admit they leased three business properties in Massachusetts in 2011 and 2012. Sacks Aff. ¶¶ 11-12; Derry Decl. ¶ 21, Ex. 13. At least one

such lease dates back to 2004. Derry Decl. ¶¶ 26-27, Exs. 18-19.

S&P markets its subscription products, rating services, and LEVELS software to Massachusetts residents. The Bank is one of many such subscribers, rated entities, and software licensees. Since 2004, the Bank has paid S&P over $400,000 for its subscription services, and nearly a million dollars in licensing fees for the LEVELS software. Nitkiewicz Decl. ¶¶ 14, 19-20. S&P also annually rates the Bank's creditworthiness, which requires detailed review of Bank records and visits to the Bank's headquarters in Boston. *Id.* ¶¶ 15-16. Since 2004, the Bank has paid S&P over $490,000 for these ratings. *Id.* ¶ 17.

The Bank's investigation shows that S&P issued, for example, over 12,000 ratings of municipal bonds issued by the Commonwealth, its agencies, and Massachusetts cities and towns between 2007 and 2012. Derry Decl. ¶ 15, Ex. 7. S&P's documents show that it issued 9105 ratings to Massachusetts entities between 2005 and 2011. *Id.* ¶¶ 22-23, Exs. 14-15. S&P's documents also show thousands of separate invoices to Massachusetts entities between 2005 and early December 2012. Derry Decl. ¶ 24, Ex. 16.

####      c.      Fitch

Fitch concedes that it derived nearly $40 million from "activities in Massachusetts" between 2006 and 2012. Declaration of Heather Merrigan ("Merrigan Decl.") ¶ 7. Fitch, like the other Rating Agencies, widely markets its subscription products and rating services to Massachusetts residents. The Bank is one of hundreds or thousands of Massachusetts subscribers, and since 2004, the Bank has paid Fitch over $180,000 for its subscription products. Nitkiewicz Decl. ¶¶ 23-25. Fitch offered to rate the Bank in 2010, and the Bank participated in the ratings process—entailing visits of Fitch employees to the Bank's Boston offices, as well as detailed review of Bank records—before it ultimately declined to purchase Fitch's rating. *Id.* ¶¶ 26-29. Fitch has, however, rated numerous other Massachusetts entities, and presumably has

solicited the business of many more. For example, the Bank's investigation shows that Fitch issued over 2,500 ratings of municipal bonds issued by the Commonwealth, its agencies, and Massachusetts cities and towns between 2007 and 2012. Derry Decl. ¶ 15, Ex. 7.

### d.     These systematic contacts establish general jurisdiction.

The Rating Agencies clearly satisfy the Massachusetts under the state's Long-Arm statute: each of the Rating Agencies "regularly does or solicits business," "engages in…[a] persistent course of conduct," and/or "derives substantial revenue from goods used…or services rendered, in this commonwealth." M.G.L. c. 223A, § 3(d).  The millions of dollars in revenue collected and the thousands of ratings provided to Massachusetts businesses by each Rating Agency, together with the marketing, solicitation, business travel, communications, meetings, and other Massachusetts-centered activities that necessarily support and accompany this business satisfies the requirement of contacts that are so "continuous and systematic as to render [the defendant] essentially at home in the State forum." *Goodyear*, 131 S. Ct. at 2851.

### 4.     This Court's exercise of jurisdiction is reasonable and comports with due process.

Once the defendants have been shown to have "continuous and systematic" contacts with Massachusetts and the Massachusetts long-arm statute is satisfied, the Court must analyze whether its exercise of personal jurisdiction is reasonable and comports with due process; "[i]n general, this means that [the defendant] must fairly be said to have participated in the economic life of Massachusetts." *Rosenthal*, 493 F. Supp. 2d at 196. This analysis focuses on five factors:

> (1) the defendant's "burden" of appearing; (2) "the forum state's interest in adjudicating the dispute;" (3) the "plaintiff's interest in obtaining convenient and effective relief;" (4) the judicial system's "interest in obtaining the most efficient resolution of controversies;" and (5) the common interests of all sovereigns in promoting "substantive social policies."

*Harrelson*, 798 F. Supp. 2d at 317.

### a.      Burden

To prevail on this factor, the Rating Agencies would have to show that "exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." *Saturn Mgmt. LLC v. GEM-Atreus Advisors, LLC*, 754 F. Supp. 2d 272, 281 (D. Mass. 2010) (citing *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 718 (1st Cir. 1996)). No such unusual burden applies here: each Rating Agency's burden in appearing in this forum is *de minimis*, particularly in light of the frequency and apparent ease with which their employees travel to Massachusetts in the course of their ordinary business. *See, e.g.,* Nitkiewicz Decl. ¶¶ 8, 11, 16, 22, 27-28, 30. Moreover, each Rating Agency is ably represented by both local and national counsel in this action, and has asserted no burden argument.

### b.      Massachusetts' Interest

Massachusetts has a powerful interest in protecting its residents from fraudulent, misleading and deceptive conduct. "A State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). This factor is significant where, as here, the Plaintiff has a significant public policy mission to support housing finance to and affordable housing programs for Massachusetts residents through its members.

### c.      Plaintiff's Interest

The Bank also clearly has a legitimate interest in litigating against its tortfeasors in a Massachusetts court. The Bank's witnesses and documents are located at its offices in Boston, and the Bank suffered its injury in Massachusetts. The Bank's interest in obtaining effective relief is therefore "well served by the exercise of jurisdiction in Massachusetts." *See, e.g., Saturn Mgmt.*, 754 F. Supp. 2d at 281. Additionally, the plaintiff's choice of forum is to be accorded "a degree of deference in respect to the issue of its own convenience." *Ticketmaster-New York*, 26

F.3d at 211. Forcing the Bank to litigate its claims on the same transactions in more than one forum, (i.e. if the securities claims proceed here and the Bank is forced to litigate against the Rating Agencies in a separate forum) would be duplicative and highly inconvenient of both party and judicial resources. *See, e.g., Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994).

### d.      The Judicial System's Interest

This Court's exercise of jurisdiction serves "the judicial system's interest in obtaining the most efficacious resolution of the controversy," and, like the previous factor, "counsels against furcation of the dispute among several different jurisdictions." *Pritzker*, 42 F.3d at 64. There are numerous defendants in this action, and separating the Bank's claims against the Rating Agencies "would both contravene the goal of judicial economy and conjure up the chimera of inconsistent outcomes." *Id*. Moreover, even if dismissed as defendants in this action, the Rating Agencies will be necessary third parties for discovery on the Bank's claims against the securities defendants. It is most efficient and supports judicial economy to consolidate this litigation, relating to a common set of transactions, in one forum.

### e.      Substantive Social Policies

As with the second factor, Massachusetts has an undeniable interest in redressing harms inflicted on its citizens by out-of-state defendants, as well as in providing a convenient forum in which they may seek relief. *See Harrelson*, 798 F. Supp. 2d at 318. Moreover, there is no public policy disfavoring the exercise of jurisdiction here: the Bank has not engaged in forum-shopping, but "merely filed suit in the state in which they maintain their principal office." *See Saturn Mgmt*., 754 F. Supp. 2d at 281. The Rating Agencies suggest that they are subject only to the jurisdiction of the New York or Delaware courts, but the nature of their business—they are Nationally Recognized Statistical Rating Organizations registered with the SEC, and the "single most important criterion to granting NRSRO status" is that the agencies are recognized

*throughout the United States* as issuers of "credible and reliable ratings by the predominant users of securities ratings"—necessarily exposes them to liability elsewhere. *Anschutz Corp. v. Merrill Lynch & Co.*, 785 F. Supp. 2d 799, 809 (N.D. Cal. 2011). Indeed:

> [W]hile the Rating Agencies operate out of New York, the information they publish is intended to reach and reaches throughout the United States. The Agencies cannot have a reasonable expectation that potential liability for their conduct will be determined solely under the law of New York.

*Id*. at 822.

Thus, each factor weighs in favor of finding that this Court's exercise of personal jurisdiction over each of the Rating Agencies is reasonable and does not violate due process.

**B.      Alternatively, the Court Should Allow the Bank to Conduct Jurisdictional Discovery.**

If the Court finds that the facts the Bank has cited above are not sufficient to make a *prima facie* showing of personal jurisdiction over any one of the Rating Agencies, the Bank respectfully requests that it be allowed to pursue jurisdictional discovery from that defendant. Such a request "merits solicitous attention." *Swiss Am. Bank*, 274 F.3d at 625. "[A] diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.,* 116 F.3d 962, 964 (1st Cir. 1997); *see also Group of Former Emps. of Sprague Caribe v. Am. Annuity Grp., Inc.*, 388 F. Supp. 2d 3, 5 (D.P.R. 2005); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 307 F. Supp. 2d 145, 157 (D. Maine 2004). At the very least, the Bank's showing makes a "colorable claim," and if the facts proffered so far are insufficient to make a *prima facie* showing, the Bank should be permitted jurisdictional discovery. *See, e.g., New England Coll. v. Drew Univ.*, No. 08-424, 2009 WL 395753, at *4 (D.N.H. Feb. 17, 2009).

The Bank has also been "diligent in preserving [its] rights to be entitled to jurisdictional

discovery," including presenting facts to the court which show "why jurisdiction would be found if discovery were permitted." *Swiss Am. Bank*, 274 F.3d at 626; *see also Sunview*, 116 F.3d at 964; *Barrett v. Lombardi*, 239 F.3d 23, 26 (1st Cir. 2001). The Bank has already served jurisdictional discovery on each of the Rating Agencies and met and conferred with each in order to develop jurisdictional facts. Derry Decl. ¶¶ 2, 9-11, 13. The Bank's request for leave to conduct jurisdictional discovery is therefore timely. *See, e.g., D'Jamoos v. Atlas Aircraft Ctr., Inc.*, No. 08-108, 2008 WL 5083798, at *2 (D.N.H. 2008). Moody's and S&P have produced a limited selection of documents in response to a few of the Bank's requests—each taking the position that it would only produce documents supporting the statements in its affidavits—while Fitch has flatly refused to produce any discovery, even relating to the factual assertions in the declaration supporting its motion to dismiss. Derry Decl. ¶¶ 10-14, Exs. 5-6.

To the extent not already established, there are at least three bases why further jurisdictional discovery here will demonstrate adequate contacts with Massachusetts to support general jurisdiction over the three Rating Agencies. First, the Bank's direct knowledge of the Rating Agencies' business in Massachusetts illustrates the types of contacts that jurisdictional discovery will substantiate. These contacts include licensing agreements and the payment of fees for the use of proprietary software at designated Massachusetts businesses and institutions, the purchase and use of ratings products by Massachusetts entities, attendance by Massachusetts residents at seminars and conferences sponsored by the Rating Agencies in Massachusetts, and the enormous number of Massachusetts public and private entities and debt issuances that are continually and systematically rated by the Rating Agencies. Nitkiewicz Decl. ¶¶ 2-30; Derry Decl. ¶¶ 15-20, 22-24. Second, the discovery requests the Bank has already served on the Rating Agencies illustrate the scope of the discovery the Bank seeks and why it will illuminate grounds

for personal jurisdiction. Derry Decl. ¶¶ 3-8.  Third, the Rating Agencies' responses to these discovery requests—and, in particular, their *objections* based on burden, suggesting a significant volume of responsive documents—support the pursuit of further jurisdictional discovery.  *See id*.

As set forth above and in the Nitkiewicz Declaration, the Bank is aware of several categories of business relationships that each of the Rating Agencies systematically solicits and continuously maintains with Massachusetts residents. The Bank knows of these relationships because the Rating Agencies have solicited or maintained them with the Bank. The Bank has every reason to think that each of the Rating Agencies solicits and maintains similar relationships with numerous Massachusetts residents, and the evidence submitted herewith demonstrates the pervasive, ongoing nature of the Rating Agencies' business dealings in Massachusetts.  *See, e.g*., Derry Dec. Exs. 7, 8-12, 13-17.  These continuous and systematic contacts would support this Court's exercise of personal jurisdiction over each of the Rating Agencies.

As the requests for production and interrogatories the Bank has already served illustrate, the Bank seeks jurisdictional discovery from each Rating Agency relating to their solicitation of, marketing to, and engagement by Massachusetts entities; the nature of and revenue attributable to the resulting business relationships; business travel by Rating Agency employees to Massachusetts; ratings activities by the Rating Agencies' Massachusetts-based employees, and the number of such employees; licensing and subscription agreements with Massachusetts entities; Massachusetts taxes and assessments paid; registration to conduct business in Massachusetts; Massachusetts property owned or leased; bank accounts held in Massachusetts; business relationships with and billing to the Bank; relationships with Massachusetts colleges and universities such as recruiting, consulting, and conferences; and seminars and conferences sponsored or attended. Derry Decl. ¶¶ 3-8, Exs. 1-6. If the Court grants it leave to conduct

jurisdictional discovery, the Bank believes that it will develop evidence that each Rating Agency maintains systematic and continuous contacts of many or all of these types in Massachusetts, and that these contacts will readily support this Court's exercise of personal jurisdiction.

Moody's' and S&P's responses and objections to the Bank's discovery requests illustrate the types of facts that further jurisdictional discovery would develop. As described above, the few documents that Moody's and S&P have produced illustrate the continuous and systematic— as well as lucrative—nature of their business activities in Massachusetts. Moreover, both Moody's and S&P object to most of the Bank's discovery requests regarding the quantity and continuous nature of their business contacts with Massachusetts residents, apparently on the grounds that these contacts are *so numerous that listing them or producing documents relating to them would be unduly burdensome*. Derry Decl. at ¶¶ 3-6, Exs. 1-4. Indeed, these objections approach an admission that these contacts are in fact continuous and systematic, and therefore support the exercise of general jurisdiction in Massachusetts.

In summary, the Bank believes it has made a *prima facie* showing supporting personal jurisdiction over each of the Rating Agencies. However, if the Court finds that the facts so far presented are insufficient to show personal jurisdiction over any one of the Rating Agencies, the Bank's showing thus far at least constitutes a "colorable claim" of jurisdiction, and the Bank seeks leave of the Court to pursue additional jurisdictional discovery. The Bank has been diligent in pursuing its claim of jurisdiction and discovery related thereto, and has presented the specific types of jurisdictional facts that it believes discovery will reveal.

## VI.   CONCLUSION

For the foregoing reasons, the Bank respectfully requests that the Rating Agencies' Motions to Dismiss be denied in their entirety.

Dated: January 16, 2013                           Respectfully submitted,

Lynn Lincoln Sarko
_____

Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Derek W. Loeser
dloeser@kellerrohrback.com
Amy Williams-Derry
awilliams-derry@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900, Fax (206) 623-3384

Thomas G. Shapiro, BBO No. 454680
tshapiro@shulaw.com
Adam M. Stewart, BBO No. 661090
astewart@shulaw.com
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA  02109
(617) 439-3939,  Fax:  (617) 439-0134

KELLER ROHRBACK P.L.C.
Gary A. Gotto
ggotto@kellerrohrback.com
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012
(602) 248-0088, Fax (602) 248-2822

**Attorneys for Plaintiff Federal Home
Loan Bank of Boston**

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and

paper copies will be sent via U.S. first class mail to those indicated as non-registered participants

on January 16, 2013.


/s/ Lynn Lincoln Sarko
Lynn Lincoln Sarko