# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF BOSTON,<br><br>                Plaintiff,<br><br>        vs.<br><br>ALLY FINANCIAL, INC. F/K/A GMAC LLC, et al.,<br><br>                Defendants. | Civil Action No. 1:11-cv-10952-GAO<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANT WELLS FARGO'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

# I. INTRODUCTION

Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss ("Opp.") relies on a skewed understanding of federal pleading standards, under which blunderbuss allegations about an entire industry suffice to state a claim against a particular defendant, and allegations concerning a particular security or mortgage loan at one point in time are sufficient to support claims involving a different security supported by different mortgage loans originated during an entirely different time period. The law, however, requires Plaintiff to allege "enough facts to state a claim to relief that is plausible on its face" concerning *the Wells Fargo Defendants* and Plaintiff's investment in the WFMBS 2006-AR12 1A1 Certificate. *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff has not done so.

A. **Plaintiff Does Not Plausibly Allege That Wells Fargo Abandoned The Underwriting Guidelines Described In Its Offering Documents**

Plaintiff acknowledges, as it must, that the Offering Documents for WFMBS 2006-AR12 1A1 contained extensive disclosures which described multiple ways in which Wells Fargo relaxed its underwriting practices for the mortgage loans underlying the Certificate. (Opp. 26.) These disclosures included, for example, a detailed description of Wells Fargo's program "to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize [their] underwriting discretion." (Off. Docs. at 36-37; *see generally* W.F. Mem. 2-3.)[1] Plaintiff may now take issue with these policies or wish that it had paid more attention to them, but it cannot dispute that they were fully disclosed to potential investors.

Instead, Plaintiff employs a more extreme tactic, calculated to survive a motion to dismiss in the face of these forthright disclosures: it posits that Wells Fargo "abandoned" its stated underwriting guidelines *entirely*. (*E.g.*, Opp. 1.)[2] By employing this theory, Plaintiff has assumed a heavy pleading burden. It must allege "enough facts" to permit a "plausible" inference that Wells Fargo's underwriting guidelines were a dead letter—not an inference of sporadic or episodic

---

[1] Defined terms have the same meaning as in Wells Fargo's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint ("W.F. Mem.").

[2] For example, Plaintiff contends that Wells Fargo's disclosures regarding relaxed underwriting standards for current customers are "largely irrelevant," because they applied to "only 10.23%" of the loan pool (Opp. 26 n.25)—suggesting that Wells Fargo could only avoid liability if it had disclosed that underwriting standards were relaxed for the *entire* loan pool.

departures from the stated underwriting guidelines, but an inference that the guidelines were abandoned across the board. *Iqbal*, 556 U.S. at 697. Plaintiff failed to carry this burden.

To show that Wells Fargo "abandoned" its underwriting guidelines, Plaintiff relies primarily on allegations about the percentage of loans in the WFMBS 2006-AR12 trust that were at least 90 days delinquent, in default, or in foreclosure. (AC ¶ 848.) That rate was alleged to be just 17.22 percent—the second lowest of 111 loan pools described by Plaintiff—during a period when home prices dropped by 33 percent nationwide, and even more precipitously in California, where most of the WFMBS 2006-AR12 loans were made.[3] *See* W.F. Mem. 2-6. "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Common sense does not permit the inference that a relatively modest default rate, in the midst of the greatest housing crisis in seven decades, establishes *wholesale abandonment* of underwriting guidelines.

Nonetheless, Plaintiff contends that "numerous courts[] have found this data supports an inference that underwriting was abandoned," and urges the Court to do likewise here. (Opp. 35 (collecting cases).) But that argument is facile, because the other cases Plaintiff cites dealt with different disclosures and dramatically different default rates. In *Federal Housing Finance Agency v. JPMorgan Chase & Co.*, --- F. Supp. 2d ---, 2012 WL 5395646, at *7 (S.D.N.Y. 2012) (cited in Opp. 35), for example, the plaintiff had alleged that "as many as 60% of the loans in the Supporting Loan Groups—intended to be among the safest of the loans in a given securitization—are in default, have been foreclosed upon, or are delinquent." Similarly, in *N.J. Carpenters v. RBS*, 720 F. Supp. 2d 254, 270 (S.D.N.Y. 2010) the plaintiffs had alleged delinquency and default rates of 42.35 percent as of May 2009. *See* No. 08-cv-5093, Dkt. No. 54, ¶ 70. These cases do not hold that *any* allegation that some percentage of the mortgages in a trust have defaulted—be it 17.22 percent, or 10 percent, or 5 percent—establishes wholesale abandonment of underwriting guidelines for *all* of the mortgages in that trust, as Plaintiff suggests.

---

[3] These judicially noticeable data are not "self-serving statistics" (Opp. 36); rather, they are necessarily part of the "context" in which *Iqbal* requires Plaintiff's allegations of default rates to be considered. Plaintiff itself acknowledges that a decline in property value creates "an incentive to stop making mortgage payments . . . ." (AC ¶ 854.) An inference that a relatively low default rate was caused by the abandonment of underwriting guidelines is therefore less plausible if the default rate was accompanied by a dramatic decline in housing prices. *See* W.F. Mem. 4-5.

Plaintiff's allegations derived from purported "confidential witnesses" are similarly insufficient. They largely contain statements recycled from other complaints, in other contexts, that by their own terms cannot possibly relate to any of the loans underlying the WFMBS 2006-AR12 1A1 Certificate. *See* W.F. Mem. 5-6. Although Plaintiff dismisses this "critique" as "erroneous" (Opp. 31 n.31), the irrelevance of the allegations is evident from the face of the Amended Complaint itself. For example, "CS-21's" statements about origination practices "in late 2006 or early 2007" might plausibly be relevant in other contexts, but they cannot state a claim here, where all of the mortgage loans at issue were originated before July 2006. (Off. Docs. at A-2.)[4]

**B.     Plaintiff Does Not Allege Misrepresentations Concerning Appraisals Or LTVs**

Plaintiff's automated valuation model ("AVM") allegations do not state a claim for misrepresentation regarding appraisals or loan-to-value ("LTV") ratios, because Plaintiffs do not allege that the AVM's estimates of property values were different from those stated in the Offering Documents in any significant respect. AVMs "state[] a single dollar appraisal figure, along with a plus or minus percentage margin of error." *Fiserv Solutions, Inc. v. XL Specialty Ins. Co.*, 94 A.D.3d 456, 463 (N.Y. App. Div. 2012). For example, an AVM might state an appraisal figure of $200,000 with a margin of error of plus-or-minus 15%.[5] *Id.* Taken together, these figures would convey a statistical estimate, made to a stated degree of confidence, that the actual value of a home fell within a bandwidth of $170,000 to $230,000. Differences within that bandwidth are not statistically significant. In the Amended Complaint, however, Plaintiff tells only half of the story: it makes allegations based on appraisal figures generated by its AVM, but conceals the margin of error. (AC ¶ 885; *see* W.F. Mem. 7.) Without any allegation about the margin of error, it is impossible for the Court to draw from these allegations the inference that the Offering Documents were inaccurate. If the undisclosed margin of error exceeds the overstatement of LTV ratios

---

[4] There is nothing "circular" about Wells Fargo's argument that the statements of "CS-20" in Paragraph 494 could not have any connection to WFMBS 2006-AR12 1A1. *See* W.F. Mem. 6. CS-20 described perceived deficiencies in loans with FICO scores "as low as 550 to 560." (AC ¶ 494.) This could not possibly describe loans underlying the Wells Fargo loans at issue here, which *all* had higher FICO scores. (Off. Docs. at A-2.) Nowhere has Plaintiff alleged that the FICO scores for loans underlying WFMBS 2006-AR12 1A1 were misstated.

[5] Notably, Plaintiff does not dispute that the margin of error of plus-or-minus 15 percent represented in a white paper published by CoreLogic is typical for this type of model. *See* W.F. Mem. 7 & n.17; *see also* Wells Decl. Ex. D.

alleged in the Amended Complaint, then Plaintiff's allegations actually *confirm* the accuracy of the Offering Documents.  Nor can Plaintiff rehabilitate the Amended Complaint by focusing on its AVM allegations for various subcategories of loans underlying the WFMBS 2006-AR12 1A1 Certificate (Opp. 45-46)—subcategories for which it *also* failed to allege a margin of error.

Plaintiff's responses are unavailing.  It cites *Capital Ventures Int'l v. UBS Sec. LLC*, 2012 WL 4469101, at *9 (D. Mass. Sept. 28, 2012), for the proposition that the "specific objections" raised by the Defendants in that case regarding the AVM methodology there were "premature." But the *Capital Ventures* court was responding to an entirely different argument: the defendants there faulted the plaintiff for "not alleg[ing] that its AVM considered the same factors or followed the same standards that appraisers followed," not for failing to allege a margin of error.  No. 11-cv-11937, Dkt. No. 14 at 20.  Moreover, Plaintiff misses the point when it cites authority for the proposition that "statistical significance is a question of fact."  (Opp. 45 (quoting *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 635-36 (S.D.N.Y. 2008)).  It is Plaintiff's obligation to plead "enough facts to state a claim," *Iqbal*, 556 U.S. at 697; that courts have treated statistical significance as a question of fact does not excuse Plaintiff from *alleging* any facts that would permit an inference of significance.  *Cf. Avon Pension Fund v. GlaxoSmithKline PLC*, 343 Fed. Appx. 671, 672-73 (2nd Cir. 2009) (affirming dismissal of fraud claims for defendant's failure to disclose test results because plaintiff failed to plead that such results were statistically significant).

Finally, Plaintiff recycles yet more confidential witness statements that do not support a plausible inference that the appraisers for loans underlying WFMBS 2006-AR12 1A1 consistently disbelieved their own valuations.  Plaintiff relies on statements by two witnesses about events that took place years *after* the last loan originations for WFMBS 2006-AR12 1A1, arguing that "practices after this period are . . . indicative of practices before it." (Opp. 42.)  But this view of pleading standards would render them a nullity, permitting suits to survive the pleading stage even when the allegations have no temporal connection to the conduct at issue.  Nor does the statement by "CS-20" that "outside brokers, loan officers, and appraisers . . . all made money off of the [appraisal] transaction" and "[c]onsequently" had "a 'let's make a deal mentality,'" support Plaintiffs' claims.  (Opp. 41 (quoting AC ¶ 498).)  It is no revelation that people in the real estate

business hope to make money, and that many of them have an interest in completing a transaction; that hardly supports an inference that the appraisers breached their professional responsibilities and delivered appraisal opinions they did not genuinely believe.

### C. Plaintiff Does Not Allege Misrepresentations Concerning Predatory Lending

Wells Fargo cannot be liable for misrepresentations regarding predatory lending because Plaintiff itself defines "predatory lending" as practices designed to steer borrowers "into subprime loans," but WFMBS 2006 AR12 1A1 contains only prime loans. *See* W.F. Mem. 8-9 (quoting AC ¶ 506). In response, Plaintiff improperly seeks to revise and augment the allegations in the Amended Complaint. It now defines "predatory lending" to extend to prime loans, on the theory that it includes any "lending to a borrower without a reasonable expectation that the borrower will be able to repay." (Opp. 51 (citing AC ¶¶ 252-59).) None of the allegations Plaintiff cites for this new definition actually say that predatory lending can include "prime loans," however, and many say quite the opposite.[6]

### D. Plaintiff Does Not Allege Misrepresentations By Wells Fargo Concerning Third-Party Due Diligence

Although Plaintiff avers broadly that "the Securities Defendants conducted a certain amount of due diligence on the loans" (AC ¶ 10), it never specifically alleges that *Wells Fargo* engaged in due-diligence of third-party loans with respect to WFMBS 2006 AR12-1A1, much less that Wells Fargo misrepresented what that due diligence was. What is more, Wells Fargo clearly disclosed that "post-purchase reviews" of loans from third-party correspondents would only be conducted "in the case of bulk purchase acquisitions" (Off. Docs. at 32), and Plaintiff does not allege that any such acquisitions took place for WFMBS 2006 AR12-1A1. *See* W.F. Mem. 9. Plaintiff cannot state a claim for misrepresentation against Wells Fargo concerning an entire category of conduct (due diligence of loans) if it has never alleged that Wells Fargo actually engaged in that conduct.

Respectfully submitted,

Dated: March 4, 2013

---

[6] *See, e.g.*, AC ¶ 252 ("predatory loans are characterized by excessively high interest rates or fees, and abusive or unnecessary provisions"); *id.* ¶ 253 ("high cost loans"); *id.* ¶ 257 ("Subprime ARM loans"); *id.* ¶ 259 ("mortgage loans with predatory terms").

By: */s/ John K. Wells, Esq.*

| | |
|---|---|
| David L. Ward (BBO #565813) | |
| John K. Wells (BBO #671345) | George M. Garvey (*pro hac vice*) |
| MICHAELS, WARD & RABINOVITZ, LLP | Christian K. Wrede (*pro hac vice*) |
| One Beacon Street, 2nd Floor | MUNGER, TOLLES & OLSON LLP |
| Boston, Massachusetts 02108 | 355 South Grand Ave., 35th Floor |
| Tel: (617) 350-4040 | Los Angeles, California 90071-1560 |
| Fax: (617) 350-4050 | Telephone: (213) 683-9100 |
| dlw@michaelsward.com | Facsimile: (213) 683-5153 |
| jkw@michaelsward.com | george.garvey@mto.com |
| | christian.wrede@mto.com |

*Attorneys for Wells Fargo Asset Securities Corporation;*
*Wells Fargo Bank, N.A.; and Wells Fargo & Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants on the Notice of Electronic Filing (NEF).

*/s/ John K. Wells, Esq.*
John K. Wells, Esq. (BBO #671345)