# EXHIBIT B

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
DEXIA SA/NV; Dexia Holdings, Inc.; FSA Asset
Management LLC; Dexia Credit Local SA,
Plaintiffs,
v.
BEAR, STEARNS & CO., INC.; The Bear Stearns
Companies, Inc.; Bear Stearns Asset Backed Secur-
ities I LLC; EMC Mortgage LLC (f/k/a EMC Mort-
gage Corporation); Structured Asset Mortgage In-
vestments II Inc.; J.P. Morgan Acceptance Corpora-
tion I; J.P. Morgan Mortgage Acquisition Corpora-
tion; J.P. Morgan Securities LLC (f/k/a JPMorgan
Securities INC.); Wamu Asset Acceptance Corp.;
Wamu Capital Corp.; Wamu Mortgage Securities;
JPMorgan Chase & Co.; and JPMorgan Chase
Bank, N.A., Defendants.

No. 12 Civ. 4761(JSR).
Feb. 27, 2013.

*MEMORANDUM*
JED S. RAKOFF, District Judge.

**\*1** This action arises from the purchase by
plaintiff FSA Asset Management LLC ("FSAM")
of over $1.6 billion in certificates issued in 51 res-
idential mortgage-backed securities ("RMBS") of-
ferings in 2006 and 2007. Am. Cmplt. ¶¶ 2, 13. Ac-
cording to the allegations in the Amended Com-
plaint, FSAM assigned and transferred the RMBS
certificates, including all "right, title and interest"
in the RMBS assets, to plaintiffs Dexia SA/NV,
Dexia Holdings, Inc., and Dexia Credit Local SA
(collectively with FSAM, "Dexia"), pursuant to
inter-company agreements. *Id.* ¶ 18.

Defendants are thirteen entities now owned by
defendant JPMorgan Chase & Co. *See id.* ¶ 10. De-
fendants served as the sponsors, depositors, and/or
underwriters for the 51 RMBS offerings at issue in
this case, or are currently successors to or in control

of such entities. Defendant JP Morgan Securities
LLC, a wholly-owned subsidiary of defendant JP-
Morgan Chase & Co., served as the underwriter for
nineteen of the securitizations at issue. *Id.* ¶¶ 25,
27. Plaintiffs allege that JPMorgan Chase & Co.
directed the activities of JP Morgan Securities and
three additional JPMorgan Chase & Co. subsidiar-
ies—JPMorgan Chase Bank, N.A., J.P. Morgan
Mortgage Acquisition Corp. (sponsor of thirteen se-
curitizations) and J.P. Morgan Acceptance Corp. I
(depositor for thirteen securitizations)—all of
which are also named as defendants. *Id.* ¶¶ 26–29,
315.[FN1]

Defendant Bear, Stearns & Co., the lead under-
writer for nineteen of the securitizations at issue
and at the time of the transactions a wholly-owned
subsidiary of The Bear Stearns Companies, merged
with J.P. Morgan Securities in March 2008. *Id.* ¶
19. Plaintiffs allege that defendant The Bear Ste-
arns Companies directed the activities of Bear, Ste-
arns & Co. and three other wholly-owned subsidiar-
ies—EMC Mortgage LLC (sponsor of nine securit-
izations), Bear Stearns Asset Backed Securities I
LLC (depositor for seven securitizations), and
Structured Asset Mortgage Investments II
(depositor for four securitizations)—all of which
are also named as defendants. *Id.* ¶¶ 19–22, 306.
[FN2] In March 2008, The Bear Stearns Companies
merged with JPMorgan Chase & Co., making its
subsidiaries into subsidiaries of JPMorgan Chase &
Co. *Id.* ¶¶ 19–23.

Finally, WaMu Capital Corp., at the time of the
securitizations a wholly-owned subsidiary of Wash-
ington Mutual Bank and now a subsidiary of JP-
Morgan Chase Bank, served as the underwriter for
the remaining thirteen securitizations at issue in this
case. *Id.* ¶ 31. Washington Mutual Bank also owned
WaMu Asset Acceptance Corp. (depositor for six
securitizations) and WaMu Mortgage Securities
Corp. (sponsor of four securitizations), both of
which are named as defendants and both of which
are now also wholly-owned subsidiaries of JPMor-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

gan Chase Bank. *Id.* ¶¶ 32–33.[FN3]

Dexia filed an Amended Complaint in this action in the Supreme Court of the State of New York, New York County, on May 18, 2012, asserting state law claims of fraud, fraudulent inducement, aiding and abetting fraud, and negligent misrepresentation under New York common law against the various defendants, as well as successor liability against defendants JPMorgan Chase & Co. and JPMorgan Securities as successors-in-interest to Bear Stearns. *Id.* ¶¶ 304–88. Defendants removed this case to federal court on June 18, 2012, and the Court denied plaintiffs' motion to remand the case back to state court on September 11, 2012. *See* Order, ECF No. 24 (Sept. 11, 2012); Memorandum, ECF No. 51 (Feb. 21, 2013). On July 27, 2012, defendants filed a motion to dismiss the Amended Complaint for failure to state a claim and failure to plead with particularity. By a "bottom line" Order dated September 27, 2012, the Court denied defendants' motion to dismiss. *See* Order, ECF No. 27 (Sept. 27, 2012). This Memorandum explains the reasons for that ruling.

**\*2** To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff's pleading must "allege a plausible set of facts sufficient to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This standard demands that a plaintiff set forth factual allegations that, if accepted as true, are sufficient to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Beyond the well-pleaded allegations in the Amended Complaint, the Court may also consider those documents "incorporated in [the Amended Complaint] by reference" and "matters of which judicial notice may be taken." *SEC v. Apuzzo,* 689 F.3d 204, 207 (2d Cir.2012) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002)).

Taken in the light most favorable to plaintiffs as the non-moving party, the Amended Complaint alleges that defendants, in the various offering documents[FN4] used to sell the 51 securitizations at issue, made fraudulent misrepresentations regarding the riskiness of the securitizations and the underlying loans, on which FSAM relied to its detriment in deciding to invest in the securitizations. *Id* . ¶¶ 7–8. The offering documents made the following representations alleged to be false: (1) that the mortgage loans underlying the RMBS were originated pursuant to the underwriting standards listed in the offering documents and were carefully selected because they met those standards, *id.* ¶¶ 238–56; (2) that the mortgage pools reflected specified borrower credit scores, occupancy rates, lack of early payment defaults, and other metrics, *id.* ¶¶ 257–71; (3) that the underlying loans were secured by properties that had been independently appraised in accordance with established industry standards and that the mortgages met stated loan-to-value ratios, *id.* ¶¶ 272–78; and (4) that the RMBS certificates' AAA ratings were based on credit ratings agencies' independent evaluation of the RMBS, *id.* ¶¶ 279–84.

Because distributions to RMBS certificate-holders are made from the mortgage payments flowing into the issuing trust, "the value of [an] RMBS depends on the quality of the mortgages in the designated pools, including the borrowers' ability to timely make their mortgage payments and the value of the collateral supporting the mortgages." *Id.* ¶ 35. Here, however, as described in greater detail in the discussion of defendants' arguments for dismissal below, the Amended Complaint alleges that defendants knew that these representations were not true and in fact engaged in deliberate actions that undermined the quality of the loans being securitized. In particular, the Amended Complaint alleges that "Defendants were well aware of ... improper origination and securitization practices," but continued to engage in such practices in order to "reap [ ] enormous profits" by securitizing large volumes of low-quality loans unbeknownst to certificate-holders. *Id.* ¶ 290.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

**\*3** In support of its allegations, the Amended Complaint references various public reports, testimony before governmental bodies, and statements by confidential witnesses that highlight the defendants' systematic disregard of underwriting standards, failure to conduct proper due diligence, and pressure on the credit ratings agencies to provide inflated ratings for their RMBS offerings. *See id.* ¶¶ 57–58 (quoting statements made by Matt Van Leeuwen, former analyst at EMC Mortgage, to *The Atlantic* regarding Bear Stearns' policy of immediate securitization of mortgages before any payments were made); *id.* ¶ 91 (detailing statements of eight confidential witnesses who reported that WaMu incentivized the approval of effectively all loan applications); *id.* ¶ 128 (noting that Jamie Dimon, JPMorgan's CEO, testified before the Financial Crisis Inquiry Commission that, JPMorgan had loosened its underwriting standards).

According to the allegations in the Amended Complaint, defendants' failure to meet the standards claimed in the offering documents has led to high rates of default on the underlying loans. *See* Am. Cmplt. ¶ 80 (reporting that, on average, over 46% of the mortgage loans underlying the Bear Stearns certificates were at least sixty days delinquent as of March 2012); *id.* ¶ 117 (reporting that, on average, almost 49% of the mortgage loans underlying the WaMu certificates were at least sixty days delinquent as of March 2012); *id.* ¶ 140 (reporting that, on average, almost 42% of the mortgage loans underlying the JPMorgan certificates were at least sixty days delinquent as of March 2012). Dexia further alleges that because the RMBS were "much riskier than represented at the time of issuance," "the true value of the RMBS was much less than the amount Plaintiffs paid at the time of purchase," and virtually all of the RMBS whose certificates were at issue have been downgraded from "high grade" investment grade securities to "junk." *Id.* ¶ 302.

The Court turns first to Dexia's claims of fraud and fraudulent inducement. Under New York law, a plaintiff claiming fraud must allege "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP,* 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d 976, 979 (2009). A plaintiff must plead the same elements in order to make out a claim for fraudulent inducement prior to contract. *Centro Empresarial Cempresa S.A. v. America Movil S.A.B. de C.V.,* 17 N.Y.3d 269, 276, 929 N.Y.S.2d 3, 952 N.E.2d 995, 1000 (2011) (stating that a plaintiff pleading fraudulent inducement must "establish the basic elements of fraud"). Here, Dexia alleges that defendants, in order to induce FSAM to purchase the RMBS certificates, made misrepresentations in the various documents provided by defendants both prior to and at the time of purchase such as "registration statements, prospectuses, prospectus supplements, and marketing materials, including free writing prospectuses, term sheets and draft prospectuses." Am. Cmplt. ¶ 6.

**\*4** For each of these claims, plaintiffs also must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which applies to any claim that "sounds in fraud." *Rombach v. Chang,* 355 F.3d 164, 167, 170–71 (2d Cir.2004). [FN5] Rule 9(b) instructs that "a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To satisfy this standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007). "[R]eference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of the representation where, as here, defendants are ... affiliates participating in the offer of securities." *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990).

Defendants first claim that Dexia has failed to allege a connection between their alleged failures to

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

comply with prescribed standards for underwriting and securitizing mortgage loans and the specific securitizations and loans here at issue sufficient to suggest that any statements to the contrary in the offering documents were false. Thus, claim defendants, Dexia's allegations of fraudulent misrepresentations are too general to satisfy the specificity requirement of Rule 9(b).

However, the Amended Complaint's allegations, as well as the documents incorporated therein, present a picture of defendants' unsound mortgage origination and securitization practices so pervasive that a reasonable fact-finder could infer that those practices affected the securitizations at issue in this case. *See Allstate Ins. Co. v. Countrywide Fin. Corp.,* 824 F.Supp.2d 1164, 1185 n. 23 (C.D.Cal.2011) ("[R]epresentations relating to Countrywide's underwriting practices are sufficiently pleaded as applying to Countrywide's entire operation and therefore to the specific Offerings purchased by Allstate."). Moreover, the Amended Complaint alleges that these practices materially increased the risk of poor performance of both the underlying loans and the securitizations themselves. Am Cmplt. ¶¶ 246–47. Under these circumstances, the Amended Complaint's allegations are sufficiently specific to satisfy Rule 9(b).

Defendants next urge that Dexia's fraud claims should be dismissed for failure to adequately allege any material untrue statement or omission in the various offering documents. Defendants identify a number of disclosures in the offering documents that they claim adequately informed certificate purchasers, like FSAM, of the risks that form the basis of the Amended Complaint, making the offering documents not materially misleading. The Court addresses each category of alleged misrepresentations in turn, keeping in mind that the "central issue" in determining whether material misrepresentations have been sufficiently pleaded "is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have

mis[led] a reasonable investor about the nature of the [securities]." *Olkey v. Hyperion 1999 Term Trust,* 98 F.3d 2, 5 (2d Cir.1996) (alteration in the original).

**\*5** First, the Amended Complaint alleges that, contrary to the representations in the offering documents that the loans underlying the securitizations generally were originated in accordance with specified underwriting guidelines and that the defendants engaged in due diligence to ensure quality control, the offerings "routinely included mortgages, and sold RMBS based on mortgages, that deviated from the stated loan origination and underwriting standards." Cmplt. ¶ 245; *see also id.* ¶¶ 238–44. Moreover, the Amended Complaint alleges that the Bear Stearns and JPMorgan defendants "waived in" approximately fifty percent of the loans that third-party due diligence vendor Clayton Holdings deemed to be defectively underwritten, and the WaMu defendants "knowingly securitized fraudulent mortgages and off-loaded exceptionally poor loans from its balance sheet into securitizations after determining that those mortgages were of exceptionally poor quality and likely to default." Am. Cmplt. ¶¶ 1, 255.

In response, Defendants argue that three provisions in the offering documents disclosed that the mortgages within the loan pools might not meet the underwriting guidelines: (1) that some mortgages were underwritten pursuant to guidelines less stringent than traditional underwriting standards and thus carried a heightened risk of loss, *see, e.g.,* BALTA 2006–4 at S–34;[FN6] (2) that "[f]rom time to time, exceptions to a lender's underwriting policies may be made," *e.g.,* JPALT 2006–A2 at S–30; and (3) that originators were obligated to "repurchase or substitute" loans that were found not to comply with the representations made in those documents, suggesting that there might be some nonconforming loans in the pool, *see, e.g.,* BALTA 2006–4 at S–143. However, a reasonable fact-finder could conclude that these disclosures suggested to a reasonable investor not the systematic deviation

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

from established underwriting standards alleged by plaintiffs, but rather a low level of occasionally non-compliant loans in the loan pools that could be subject to repurchase. *See In re Bear Stearns Mortg. Pass–Through Certificates Litig.,* 851 F.Supp.2d 746, 775 (S.D.N.Y.2012) (finding that while the repurchase clause "could be read as an acknowledgment of occasional underwriting violations, it cannot be read as an acknowledgment of the pandemic of violations that Plaintiffs allege"). Thus, these disclaimers are insufficient to render not misleading the assertion in the offering documents that underwriting guidelines were "generally" followed. *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.,* 714 F.Supp.2d 475, 483 (S.D.N.Y.2010).

Second, Dexia alleges that the defendants falsely represented the risk of borrower default by presenting misleading borrower credit scores and overstating the percentage of mortgages that were secured by owner-occupied residences. Am. Cmplt. ¶¶ 261, 267. According to the Amended Complaint, the Bear Stearns defendants expressly instructed its due diligence vendor not to verify occupancy status or credit scores and to "just make up data like FICO scores," while the JPMorgan defendants purposefully steered borrowers to high-risk mortgages (making the reported credit scores less predictive) and the WaMu defendants granted loans without establishing credit scores if borrowers provided alternative trade lines (skewing the credit scores actually reported). *Id.* Furthermore, Dexia alleges that Bear Stearns misrepresented the risk of borrower default by stating in the offering documents that no "mortgages supporting the RMBS were in default at the time of the securitization," while failing to disclose that it had adopted a policy of securitizing mortgages before the expiration of the early payment-default period, during which time a borrower's failure to make his payments is treated as an indication of mortgage fraud or borrower inability to repay. *Id.* ¶¶ 55, 269–71.

**\*6** As to credit scores and occupancy, while the offering documents disclosed that borrower credit quality and occupancy may not be verified and that there is "no assurance that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans," *e.g.,* JPALT 2006–A2 at A–6, S–34, these are not the risks that materialized—that the information was misrepresented entirely—and so do not adequately disclose the risks to purchasers of the certificates. *See In re Novagold Res. Inc. Sec. Litig.,* 629 F.Supp.2d 272, 291 (S.D.N.Y.2009) ("[T]he cautionary language must 'warn [ ] of the specific contingency that lies at the heart of the alleged misrepresentation.' " (quoting *P. Stolz Family Partnership L.P. v. Daum,* 355 F.3d 92, 97 (2–d Cir.2004)) (alteration in original).

As to the early payment default period disclosure, defendants note that the *WaMu* defendants' offering documents explicitly warned that "The First Payment Date on Some Mortgage Loans Has Not Yet Occurred Meaning that those Borrowers Could Not be Delinquent on the Referenced Monthly Payment." LBMLT 2006–3 at S–17. However, this does not address Dexia's allegation that the *Bear Stearns* defendants failed to disclose their policy of securitizing loans before the early payment-default period expired, and in fact suggests that such a disclosure prudently should have been made.

Third and finally, the Amended Complaint includes allegations that defendants knowingly included in the offering statements inflated valuations of the property collateralizing the mortgages in the loan pools from supposedly independent appraisers as well as inaccurate ratings on the securitizations from the credit rating agencies. *See* Am. Cmplt. ¶¶ 273–77, 281, 284. In particular, Dexia alleges that the WaMu defendants had a policy of blacklisting appraisers who refused to inflate collateral values, thereby undermining their independence; that appraisers increased the stated appraisal value 80% of the time that WaMu requested reconsideration; and that the Bear Stearns defendants did not disclose that it instructed its due diligence vendor not to re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

view appraisals. *Id.* ¶ 277. As to the credit rating agencies, Dexia alleges that the ratings on the RMBS at issue were materially false and misleading because defendants did not disclose to the ratings agencies that they deliberately undermined the due diligence processes and because defendants pressured the ratings agencies to provide them with AAA ratings, undermining the agencies' claimed independence. Cmplt. ¶¶ 281, 284.

Defendants argue that these allegations are belied by the fact that the offering documents expressly disclosed that the valuation of the underlying properties could fluctuate over time, *see, e.g.,* BALTA 2006–4 at S–42 ("No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans."); that media, governmental, and analyst reports warned of the risks of such fluctuations; and that the appraisers' and credit rating agencies' valuations constituted merely the opinions of those individuals.

**\*7** If only the appraisal amounts and the credit ratings were at issue, defendants would be correct that such allegations represent the subjective opinions of the appraisers and ratings agencies, which are actionable only where "the speaker did not truly believe the statements at the time it was made public." *In re Bear Stearns,* 851 F.Supp.2d at 770. But even in such a case, "[p]laintiffs can state a claim by pleading that the Rating Agencies or Defendants did not believe that the ratings accurately reflected the quality of the securities." *Id.* at 771; *see also Allstate,* 824 F.Supp.2d at 1185 ("If Countrywide did not subjectively believe the opinions that it included in the Offering Documents, then it may have misrepresented the fact of its subjective belief."). Here, Dexia has sufficiently alleged "facts which call into question the factual bases" for the appraisal and rating evaluations, *Allstate,* 824 F.Supp.2d at 1187, as evidenced Dexia's allegations that defendants improperly pressured both appraisers and the rating agencies into increasing their evaluations, and that the defendants routinely waived in large

numbers of defective loans. *See* Am. Cmplt. ¶¶ 71–76, 93–102, 132, 217–32, 277. Thus, the Court concludes that the allegations in the Amended Complaint support an inference that defendants did not truly believe the value of the property appraisals or the securitizations' credit ratings included in the offering materials, and therefore the appraisal and credit rating determinations are actionable.

Even beyond the subjective opinions, however, Dexia alleges that defendants falsely represented that loans with high loan-to-value ratios were restricted to particularly creditworthy borrowers and that the appraisals were conducted pursuant to the Uniform Standards of Appraisal Practice. *See id.* ¶¶ 167, 275. These allegations concern statements of fact and are thus actionable on their own for their objective falsity. *See In re Bear Stearns,* 851 F.Supp.2d at 769 (finding this distinction).

Moving away from the issue of whether the offering documents contained material misrepresentations, defendants next argue that the Amended Complaint fails to adequately allege defendants' knowledge of the falsity of the alleged misrepresentations in each of the offerings. In order to plead such knowledge, Dexia must allege sufficient facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns,* 493 F.3d at 99.

In the Amended Complaint, Dexia makes a number of allegations that support its claim that defendants knew that the misrepresentations were false. First, Dexia alleges that defendants knew that they needed to obtain high credit ratings to sell the certificates, and acted on this motive by providing false information to the credit rating agencies regarding the underlying loans, by exerting improper pressure on the agencies to give high credit ratings, and by distributing the false results through the offering materials. Cmplt. ¶¶ 215–37. Such allegations suggest an improper motive beyond a general business motive for profits, as the defendants' al-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

leged improper conduct suggests that they "had a motive to maintain the appearance that the ... assets were safe and highly rated." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,* 651 F.Supp.2d 155, 180 (S.D.N.Y.2009). The Amended Complaint also pleads facts suggesting defendants knew that the certificates were backed by loans originated in violation of the stated underwriting guidelines, including loans that the defendants themselves "waived in" despite their nonconformity, and that the appraisals were not conducted according to industry standards, even if the defendants themselves were not the originators of the loans. Am. Cmplt. 1155–76, 82–139, 215–32, 279–84. "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts ...." *S.E .C. v. Mudd,* 11 Civ. 9202, 2012 WL 3306961, at *11 (S.D.N.Y. Aug.10, 2012). Finally, the Court finds that the confidential witness statements incorporated into the Amended Complaint, combined with the documentary sources, support a strong inference that the defendants knew that the mortgages included within the loan pools were not of the quality represented in the offering documents. *See Freudenberg v. E\*Trade Fin. Corp.,* 712 F.Supp.2d 171, 197 (S.D.N.Y.2010) ("The fact that this case involves corroboration from multiple sources also supports an inference of a scienter."). Thus, the Court finds that Dexia has sufficiently pleaded defendants' knowledge of the falsity of the statements in the offering documents.

**\*8** Next, defendants argue that plaintiffs, as highly sophisticated financial institutions with significant experience in the mortgage industry, cannot allege that they were justified in relying on the representations in the offering documents, as is required to sustain a claim of fraud under New York law.[FN7] According to defendants, FSAM had access to information about the investments, including explicit warnings in the offering documents to conduct its own research, widespread media and governmental reports about the risks of mortgage pools, and its own mortgage-related activities, mak-

ing its reliance on the offering documents unreasonable. By contrast, Dexia argues that, despite defendants' claims to the contrary, it was unable to uncover defendants' fraud based on its own investment and credit analyses, and, but for defendants' fraudulent misrepresentations, it would not have purchased the RMBS. Am. Cmplt. ¶¶ 287–88.

In determining whether a plaintiff's reliance on defendants' representations was justified, "New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions." *Global Minerals & Metals Corp. v. Holme,* 35 A.D.3d 93, 100, 824 N.Y.S.2d 210 (N.Y.App.Div.2006). If that due diligence should have put the investor "on notice of the existence of material facts which have not been documented and [it] nevertheless proceeds with a transaction without securing the available documentation," that investor "may truly be said to have willingly assumed the business risk that the facts may not be as represented." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 195 (2d Cir.2003) (quoting *Rodas v. Manitares,* 159 A.D.2d 341, 343, 552 N.Y.S.2d 618 (N.Y.App.Div.1990)). However, even a sophisticated party may rely on the representations of another where the facts misrepresented were "peculiarly within the Defendants' knowledge." *Allied Irish Banks, P.L.C. v. Bank of Am ., N.A.,* No. 03 Civ. 3748, 2006 WL 278138 (S.D.N.Y. Feb. 2, 2006) (quotation marks omitted). Here, Dexia adequately alleges that, given the information regarding the individual loans that defendants possessed and that plaintiffs could not have obtained, no outside information could have led it to discover defendants' fraudulent practices. Am. Cmplt. ¶ 44. Thus, the Court finds that plaintiffs have adequately alleged that their reliance on defendants' representations in the offering documents was justifiable and "not so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility." *Abu Dhabi,* 651 F.Supp.2d at 172.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

Defendants next argue that Dexia has failed to allege any specific facts showing that its losses were caused by defendants' alleged fraudulent conduct, rather than by the global financial crisis. To prove loss causation, Dexia must plead facts that indicate that the information concealed by the defendants' misrepresentations was "the reason the transaction turned out to be a losing one." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994). Furthermore, when a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors," a plaintiff must allege specific facts "which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 174 (2d Cir.2005) (quoting *First Nationwide Bank,* 27 F.3d at 772).

**\*9** However, the Court finds that Dexia has sufficiently alleged that defendants' misrepresentations hid facts that caused the ultimate economic harm the plaintiffs suffered. Dexia alleges that the securities performed poorly because of defaults on the underlying loans, against which the application of underwriting standards is intended to protect. *See, e.g.,* Am. Cmplt. ¶ 36. Moreover, as another Court in this district has found, *Lentell* does not place upon plaintiffs "the heavy burden of pleading facts sufficient to exclude other non-fraud explanations." *King Cnty., Wash. v. IKB Deutsche Industriebank AG,* 708 F.Supp.2d 334, 342 (S.D.N.Y.2010). Thus, because Dexia plausibly alleges that defendants' conduct caused its losses on the securitizations, the Court finds that Dexia has satisfied its burden of adequately pleading loss causation.

Finally, defendants argue that Dexia cannot establish damages because it cannot claim to have failed to receive all payments on the securities to which it is entitled as a certificate holder. However, New York follows "the well-established common law rule that fraud damages represent the difference between the purchase price of the asset and its true value, plus interest, generally measured as of the date of sale." *Allstate,* 824 F.Supp.2d at 1188. Here, Dexia has pleaded that the defendants misrepresented the value of the underlying collateral supporting the securitizations at issue. As the court in *Allstate* found, if this claim is proved true "the RMBS may have been worth less than [Dexia] paid for them at the time of sale." *Id.* Indeed, as this Court has previously held, a measure of damages that considers only whether a plaintiff has received the payments due on a certificate "constitutes too cramped a reading of damages." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.,* 277 F.R.D. 97, 108 (S.D.N.Y.2011) (internal quotation marks omitted). Thus, the Court finds that plaintiffs have adequately pleaded that they have suffered damages arising from defendants' alleged fraud.

The Court turns next to Dexia's claims for aiding and abetting fraud. To allege aiding and abetting fraud under New York law, plaintiffs must allege (1) the existence of an underlying fraud, (2) actual knowledge of the fraud, and (3) substantial assistance in the commission of the fraud. *See VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP,* 348 F.Supp.2d 255, 269 (S.D.N.Y.2004). Since the Court has determined that Dexia has adequately pleaded fraud and fraudulent inducement, the Court disregards defendants' arguments in favor of dismissing this claim to the extent they are based on a failure to plead an underlying fraud.[FN8] Furthermore, the Court rejects defendants' argument that Dexia conclusorily alleged merely that The Bear Stearns Companies and JPMorgan Chase & Co., the parent companies of the other defendants, "directed the activities of" their subsidiaries and received profits, and otherwise failed to plead any facts suggesting actual knowledge or participation in the alleged fraud. Throughout the Amended Complaint, Dexia alleges that high-level executives of the defendant entities knew and participated in creating policies that incentivized high-risk lending and reduced controls in order to increase profits by creating greater numbers of RMBS regardless of quality. *See* Am. Cmplt. ¶¶ 55–79, 125, 133,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

143–53, 198–99. Such allegations are sufficient to satisfy the knowledge and participation requirements of aiding and abetting fraud.

**\*10** The Court turns finally to Dexia's claim of negligent misrepresentation. In order to allege negligent misrepresentation, plaintiff must demonstrate that it had a "special relationship" wi defendants that would give rise to a duty to provide accurate information. *See J.A.O. Acquisition Corp. v. Stavitsky,* 8 N.Y.3d 144, 148, 831 N.Y.S.2d 364, 863 N.E.2d 585 (2007). A special relationship requires that defendants either "(1) possesse[d] unique or specialized expertise or (2) occupie[d] a special position of confidence and trust with the injured party." *EED Holdings v. Palmer Johnson Acquisition Corp.,* 387 F.Supp.2d 265, 281 (S.D.N.Y.2004). A plaintiff can sufficiently plead such a "special relationship" by showing that there was "a relationship between the parties that extended beyond the typical arm's length business transaction: defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 103 (2d Cir.2001).

To the extent that defendants argue that no plaintiff other than FSAM can allege the existence of a relationship to support a negligent misrepresentation claim because only FSAM had any direct contact with defendants, this argument is a red herring. As noted above, the Amended Complaint alleges that FSAM assigned its rights in this action to the other three plaintiffs, which allows them to stand in FSAM's shoes for the purposes of their negligent misrepresentation claim.[FN9] *See Feinberg v. Katz,* No. 99 Civ. 0045, 2005 WL 2990633, at \*6 (S.D.N.Y. Nov. 7, 2005). Beyond the assignment issue, the question of the nature of the relationship between defendants and FSAM raises a question of fact that is better reserved for determination after discovery into this relationship. *See King County, Wash. v. IKB Deutsche Industriebank AG,*

863 F.Supp.2d 288, 306 (S.D.N.Y.2012) ("Under New York law, '[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact.'" (quoting *Kimmell v. Schaefer,* 89 N.Y.2d 257, 264, 652 N.Y.S.2d 715, 675 N.E.2d 450, 454 (1996))). Accordingly, the Court denies defendants' motion to dismiss Dexia's claim for negligent representation.

For the foregoing reasons, the Court, in its Order of September 27, 2012, denied the defendants' motion to dismiss the Amended Complaint.

For the foregoing reasons, the Court, in its Order of September 27, 2012, denied the defendants' motion to dismiss the Amended Complaint.

FN1. JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities, J.P. Morgan Mortgage Acquisition Corp., and J.P. Morgan Acceptance Corp. I are collectively referred to as the "JPMorgan defendants."

FN2. Bear, Stearns & Co., EMC Mortgage, Bear Stearns Asset Backed Securities I, and Structured Asset Mortgage Investments II are collectively referred to as the "Bear Stearns defendants."

FN3. WaMu Capital Corp., WaMu Asset Acceptance Corp., and WaMu Mortgage Securities Corp. I are collectively referred to as the "WaMu defendants."

FN4. These documents include "registration statements, prospectuses, prospectus supplements, and marketing materials, including free writing prospectuses, term sheets and draft prospectuses." Am. Cmplt. ¶ 6.

FN5. Rule 9(b) also applies to Dexia's aiding and abetting fraud claims, described below. *See Lerner v. Fleet Bank, N.A.,* 459

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)
**(Cite as: 2013 WL 856499 (S.D.N.Y.))**

F.3d 273, 292–93 (2d Cir.2006).

FN6. Defendants' memorandum supporting their motion to dismiss includes a lengthy appendix that lists comparable provisions for the different offerings at issue. *See* Memo. of Law in Supp. of Def.'s Mot. to Dismiss Am. Cmplt., App'x A, ECF No. 18–1 (filed July 27, 2012). For brevity's sake, the Court cites only a single representative provision for each issue.

FN7. To the extent defendants argue that no plaintiff except FSAM can establish reliance because there is no allegation that these other plaintiffs read and relied upon the offering documents, the Court rejects this argument because, as described below, the other plaintiffs derive their claims from FSAM's assignment of its rights, and therefore stand in FSAM's shoes in judging the transaction. *See Feinberg v. Katz,* No. 99 Civ. 0045, 2005 WL 2990633, at *6 (S.D.N.Y. Nov. 7, 2005).

FN8. As defendants' motion to dismiss the Amended Complaint's successor liability claim against JPMorgan & Co. is based solely on a failure to allege primary liability, that argument is rejected as well.

FN9. Defendants also challenge the standing of Dexia SA/NV, Dexia Holdings, Inc., and Dexia Credit Local SA, arguing that FSAM's assignment of its interest in the certificates did not include its rights or claims concerning the transaction in which FSAM acquired the certificates. The Amended Complaint alleges that FSAM assigned "all 'right, title and interest' in the RMBS assets (including all rights and remedies sought in this action)." Am. Cmplt. ¶ 18. The Court accepts as true this factual representation for the purposes of this motion to dismiss and denies defendants' motion, although the Court may dis-

miss either FSAM or the other three plaintiffs for lack of standing upon greater factual development of the nature of the assignment.

S.D.N.Y.,2013.
Dexia SA/NV v. Bear, Stearns & Co., Inc.
--- F.Supp.2d ----, 2013 WL 856499 (S.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.