UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF BOSTON,<br><br>Plaintiff,<br><br>v.<br><br>ALLY FINANCIAL, INC., *et al.*,<br><br>Defendants. | Civil Action No 11-cv-10952-GAO |

**WELLS FARGO'S RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

Defendants Wells Fargo & Company, Wells Fargo Asset Securities Corporation, and Wells Fargo Bank, N.A. (collectively, "Wells Fargo") file this response to Plaintiff's Notice of Supplemental Authority in Opposition to Defendants' Motions to Dismiss the Amended Complaint (Dkt. No. 259) ("Notice"). Plaintiff's Notice discusses two recent decisions from outside the First Circuit denying motions to dismiss in mortgage-backed securities ("MBS") cases: *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, Inc.*, 709 F.3d 109 (2d Cir. 2013) ("*Carpenters*") and *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, ___ F. Supp. 2d ___, 2013 WL 856499 (S.D.N.Y. Feb. 27, 2013) ("*Dexia*").

*Carpenters* and *Dexia* underscore the deficiencies in Plaintiff's allegations against Wells Fargo in at least two respects. First, they affirm the well-settled rule that a plaintiff must make adequate factual allegations specific to the securities on which it is suing, which Plaintiff has failed to do with respect to the lone Wells Fargo security at issue here, WFMBS 2006-

1

AR12 1A1.  Second, the detailed allegations that survived motions to dismiss in *Carpenters* and *Dexia* illustrate the inadequacy of the allegations made by Plaintiff against Wells Fargo.

    1.  As an initial matter, neither *Carpenters* nor *Dexia* changes Plaintiff's obligation to plead facts specific to each security in this lawsuit in order to allege an actionable misrepresentation or omission.  Regardless of whether a plaintiff must "plead facts regarding the specific *mortgages* underlying the certificates it purchased" (Notice at 3 (emphasis added)), it is beyond dispute that a plaintiff must allege facts regarding the specific *securities* it purchased.  Both *Carpenters* and *Dexia* expressly required factual allegations showing not just that defendants there engaged in faulty and undisclosed underwriting practices, but also that such practices adversely affected the securities in question.  *Carpenters* required "a 'fairly specific' account of how [] relevant underwriters had systematically disregarded the guidelines disclosed in a security's registration statement," as well as specific factual allegations "[t]o connect [the plaintiff's] description of [the defendant's] conduct with the . . . Trust" that issued the particular securities at issue in that case.  709 F.3d at 122-23.  *Dexia* applied a similar framework, denying defendants' motion to dismiss only after finding that the plaintiffs had alleged sufficient facts regarding defendants' mortgage origination and securitization practices to allow a "reasonable fact-finder [to] infer that those practices *affected the securitizations at issue in th[at] case*." 2013 WL 856499, at *4 (emphasis added).  These cases affirm the well-settled requirement for both defendant- and security-specific allegations—a pleading requirement that cannot be satisfied by blunderbuss allegations against an entire industry, or vague allegations against a particular defendant that are unconnected to the particular securities at issue.

    2.  Nothing in *Carpenters* or *Dexia* suggests that the scant factual allegations Plaintiff asserts against Wells Fargo with respect to the WFMBS 2006-AR12 trust are sufficient to state a

claim. To the contrary, the allegations in those cases underscore why Plaintiff has failed to state a claim against Wells Fargo.

Plaintiff contends, for example, that *Carpenters* is authority that "high mortgage default rates" support an "inference that mortgage underwriters disregarded their guidelines." Notice at 4. But the Second Circuit found that inference available only because the plaintiffs had alleged an "exceedingly high rate[] of early payment default," and default rates as of June 30, 2011 of more than 68 percent, along with other allegations of flawed underwriting. 709 F.3d at 118, 122-24. Here, by contrast, Plaintiff made *no* allegations against Wells Fargo regarding early payment defaults. And it alleged a default rate as of March 31, 2011 for WFMBS 2006-AR12 of just *17.22 percent* (Amended Complaint for Rescission and Damages ¶ 848 (Dkt. No. 180) ("AC"))—just a quarter of the default rate alleged in *Carpenters* and far less than one would expect in light of the financial crisis and housing bust. Similarly, the "high rates of default" alleged in *Dexia* ranged between 42 percent and 46 percent, two-and-a-half times the rate alleged here for WFMBS 2006-AR12. 2013 WL 856499, at *3. Accordingly, Plaintiff's allegation of a comparatively low mortgage default rate for WFMBS 2006-AR12, nearly five years after the security was issued and in the midst of the greatest economic dislocation since the Great Depression, does not support an inference of flawed underwriting practices.

Plaintiff also offers *Carpenters* as authority that "statements by confidential witnesses . . . support a reasonable inference that underwriting guidelines had been disregarded" (Notice at 3), but ignores the stark differences between the specific statements alleged in *Carpenters* and those alleged here with respect to WFMBS 2006-AR12. In *Carpenters*, which involved securities backed by loans from a single originator, the plaintiff alleged "statements from no fewer than *eight*" different confidential witnesses, along with their respective titles, office locations and

3

precise periods of employment. 709 F.3d at 118 (emphasis added). Moreover, the plaintiff alleged that "seven of the eight employees" had worked for the defendants "during the six months preceding May 1, 2007, when over ninety percent of the mortgages in the Series 2007-2 Trust had been originated." *Id.* These detailed allegations allowed the court to conclude that the confidential witnesses "would have participated in different aspects of [the loan] origination process during part or all of the relevant time period" and therefore, probably "ha[d] the alleged knowledge of [relevant] underwriting practices." *Id.* at 124. Here, by contrast, Plaintiff has alleged statements from just *two* Wells Fargo employees, which are recycled from complaints previously filed by Plaintiff's counsel in other cases involving different securities.[1] *See* AC ¶ 487. None of Plaintiff's allegations supports the probability that either witness has relevant knowledge of how the loans for WFMBS 2006-AR12 were originated. In fact, the statements of one witness pertain exclusively to a period *after* the issuance of WFMBS 2006-AR12. *See* AC ¶ 496; *see generally* Wells Fargo's Mem. of Law in Supp. of Mot. to Dismiss at 5-6 (Dkt. No. 215). And unlike the confidential witness statements in *Carpenters*, which allegedly "contradicted the 2007-2 Prospectus's description of [the relevant] underwriting standards," 709 F.3d at 118, the limited witness statements alleged by Plaintiff here pertain largely to loan metrics and efforts to increase loan volume, and in no way contradict the disclosures in Wells Fargo's offering documents. *See, e.g.*, AC ¶¶ 486, 488, 490.

---

[1] *Compare* AC ¶¶ 487-98, *with* First Amended Complaint for Rescission and Damages ¶¶ 266-77, *Federal Home Loan Bank of Chicago v. Banc of America Securities LLC*, No. LC091499 (Cal. Sup. Ct. Los Angeles County, Sept. 15, 2011); Corrected Amended Complaint for Rescission and Damages ¶¶ 312-22, *Federal Home Loan Bank of Chicago v. Banc of America Funding Corp., et al.*, No. 10 CH 45033 (Ill. Cir. Ct. Apr. 8, 2011); Amended Complaint for Rescission and Damages at ¶¶ 339-40, 342-43, 346-53, *Federal Home Loan Bank of Indianapolis v. Banc of America Mortg. Securities, Inc., et al.*, No. 49D05 1010 PL 045071 (Ind. Sup. Ct. Jul. 14, 2011).

Plaintiff also falls short when it attempts to argue that *Carpenters* and *Dexia* establish that Wells Fargo's disclosures were inadequate. *See* Notice at 4-6. The disclosures at issue in those cases were different from the disclosures made by Wells Fargo in connection with WFMBS 2006-AR12. Unlike the disclosures described in *Carpenters* and *Dexia*, *see* 709 F.3d at 125, Wells Fargo's disclosures contained a unique section dedicated exclusively to "Underwriter Discretion." This section explained to potential investors like Plaintiff not only that Wells Fargo loan officers were permitted to make exceptions, but that Wells Fargo had initiated a program designed to encourage the more aggressive making of exceptions beginning in the second quarter of 2005, and that the program could result in higher delinquencies, foreclosures, and losses, *despite* the consideration of compensating factors:

> During the second calendar quarter of 2005, Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies. This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines. There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses, among mortgage loans underwritten in accordance with the updated philosophy, as compared to mortgage loans underwritten prior to the commencement of the initiative.

Decl. of John Wells in Supp. of Wells Fargo's Mot. to Dismiss, Ex. A, at 36-37 (Dkt. No. 216-1).[2] Thus, when *Carpenters* found that "'saying that exceptions occur' does not reveal . . . a

---

[2] Similarly, disclosures regarding Wells Fargo's loan origination practices warned investors that in some instances, Wells Fargo approved borrowers without current credit reports, new FICO scores, verifications of current employment, income or assets, or current appraisals. Decl. of John Wells in Supp. of Wells Fargo's Mot. to Dismiss, Ex. A, at 36 (Dkt. No. 216-1). Moreover, (footnote continued)

wholesale abandonment of underwriting standards," 709 F.3d at 125 (citation omitted), and *Dexia* found that a "reasonable fact-finder could conclude" that the defendants' disclosures suggested only "a low level of occasionally non-compliant loans in the loan pools," 2013 WL 856499, at *5, those findings were based on *different* disclosures. They do not support Plaintiff's arguments concerning the robust disclosures made by Wells Fargo in connection with WFMBS 2006-AR12.

At bottom, Plaintiff's arguments based on *Carpenters* and *Dexia* suffer from the same flaw apparent in its opposition to Defendants' motions to dismiss. Plaintiff asks the Court to read these cases as establishing that *any* allegation concerning default rates, or *any* alleged statement by a confidential witnesses, is sufficient to state a claim for "abandonment" of underwriting guidelines, and that *no* disclosures were adequate to warn against the risks inherent in MBS investments in the mid-2000s. But that simplistic view cannot be squared with the *Carpenters* and *Dexia* decisions, or with the requirements of Rule 12(b)(6). Facts matter. *Carpenters* and *Dexia* denied motions to dismiss in light of allegations of default rates ranging from 42 to 68 percent, detailed statements from numerous confidential witnesses who were alleged to have knowledge about the relevant securities, and disclosure language that was particular to the securities in those cases. They cannot save Plaintiff's claims against Wells Fargo here, which are supported by an allegation of a *low* default rate of 17.22 percent for the loans underlying WFMBS 2006-AR12 and "confidential witness" statements from just two

---

Wells Fargo expressly warned investors that borrowers had the option to select the "no documentation" method of underwriting themselves in exchange for a higher interest rate, and that it expected the resulting loans to have "higher rates of delinquency and default" than loans selected for "no documentation" underwriting on the basis of an automated risk assessment. *Id.* at S-41.

former employees with no connection to WFMBS 2006-AR12, and which founder in the face of Wells Fargo's unique and robust disclosures regarding "more aggressive[]" underwriting.

For the foregoing reasons, and the reasons set forth in the Defendants' previous briefing, Wells Fargo respectfully requests that its motion to dismiss Plaintiff's claims be granted.

Respectfully submitted,

Dated:  April 18, 2013

*/s/ John K. Wells, Esq.*
David L. Ward (BBO #565813)
John K. Wells (BBO #671345)
MICHAELS, WARD & RABINOVITZ, LLP
One Beacon Street, 2nd Floor
Boston, Massachusetts 02108
Tel: (617) 350-4040
Fax: (617) 350-4050
dlw@michaelsward.com
jkw@michaelsward.com

George M. Garvey (*pro hac vice*)
Michael J. Mongan (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave., 35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 683-5153
george.garvey@mto.com
michael.mongan@mto.com

*Attorneys for Wells Fargo Asset Securities Corporation;*
*Wells Fargo Bank, N.A.; and Wells Fargo & Company*

Dated:  April 18, 2013

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants on the Notice of Electronic Filing (NEF).

*/s/ John K. Wells, Esq.*
John K. Wells, Esq. (BBO #671345)
MICHAELS, WARD & RABINOVITZ, LLP
One Beacon Street, 2nd  Floor
Boston, MA 02108
Tel: (617) 350-4040
Fax: (617) 350-4050